# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **HYUNDAI STEEL COMPANY,**<br><br>    **Plaintiff,**<br>  **v.**<br><br>**UNITED STATES,**<br><br>    **Defendant,**<br><br>  **and**<br><br>**NUCOR CORPORATION,**<br><br>    **Defendant-Intervenor.** | **Before: Hon. M. Miller Baker, Judge**<br><br>**Court No. 21-00304** |

## NUCOR CORPORATION'S SUPPLEMENTAL MATERIAL IN RESPONSE TO THE COURT'S ORDER

Pursuant to the Court's Order on February 22, 2023, Nucor Corporation ("Nucor") hereby submits the *Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2018: Certain Cold-Rolled Steel Flat Products from the Republic of* Korea. This document was cited for the first time in the briefing in this appeal in Nucor's Response Brief. Def.-Intervenor Nucor Corporation's Resp. Br. (Sept. 29, 2022), ECF No. 41; Order (Feb. 22, 2023), ECF No. 50.

Ct. No. 21-00304

Should you have any questions concerning this submission, please do not hesitate to contact the undersigned.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Maureen E. Thorson, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Dated:  February 28, 2023

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

C-580-882
Administrative Review
POR: 01/01/2018 - 12/31/2018
**Public Document**
E&C/OVI: TRW/MYS

January 15, 2021

**MEMORANDUM TO:**     Jeffrey I. Kessler
                       Assistant Secretary
                         for Enforcement and Compliance

**FROM**:              James Maeder
                       Deputy Assistant Secretary
                         for Antidumping and Countervailing Duty Operations

**SUBJECT:**           Decision Memorandum for the Preliminary Results of the
                       Countervailing Duty Administrative Review; 2018: Certain Cold-
                       Rolled Steel Flat Products from the Republic of Korea

## I.     SUMMARY

The Department of Commerce (Commerce) is conducting an administrative review of the countervailing duty (CVD) order on certain cold-rolled steel flat products (cold-rolled steel) from the Republic of Korea (Korea) for the period of review (POR) January 1, 2018 through December 31, 2018. We are conducting this review in accordance with section 751 of the Tariff Act of 1930, as amended (the Act). This review covers 41 producers and/or exporters of subject merchandise. Commerce selected Hyundai Steel Co., Ltd., also referred as Hyundai Steel Company (Hyundai Steel) and Dongbu Steel Co. Ltd. (Dongbu Steel) as mandatory respondents.[1] We preliminarily determine that Hyundai Steel and Dongbu received countervailable subsidies that are above *de minimis*.

## II.    BACKGROUND

On September 20, 2016, Commerce published the *Order* in the *Federal Register*.[2] On September 3, 2019, Commerce published a notice of opportunity to request an administrative

---

[1] As explained below, Dongbu Steel responded on behalf of itself and its cross-owned producer and input supplier Dongbu Incheon Steel Co., Ltd. (Dongbu Incheon). Dongbu Steel and Dongbu Incheon are hereafter referred to collectively as "Dongbu." Hyundai Steel responded on behalf of itself, Hyundai HYSCO, and SPP Yulchon Energy. Hyundai Steel, Hyundai HYSCO, and SPP Yulchon Energy are hereafter referred to collectively as "Hyundai."
[2] *See Certain Cold-Rolled Steel Flat Products from Brazil, India, and the Republic of Korea: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order (the Republic of Korea) and Countervailing Duty Orders (Brazil and India)*, 81 FR 64436 (September 20, 2016) (*Order*).



review of the *Order*.[3]  On September 30, 2019, the petitioners in the underlying CVD investigation[4] requested a review of 41 alleged producers and/or exporters of subject merchandise.[5]  Between September 23 and 30, 2019, Hyundai Steel, Dongbu, and POSCO, foreign producers or exporters of subject merchandise, each requested a review of the *Order*.[6]

On November 12, 2019, Commerce initiated an administrative review of the *Order* for the period January 1, 2018 through December 31, 2018, separately naming 42 alleged producers and/or exporters of subject merchandise.[7]  In the "Respondent Selection" section of the *Initiation Notice*, Commerce stated that, if necessary, it intended to select respondents based on U.S. Customs and Border Protection (CBP) data for entries of certain cold-rolled steel from Korea made during the POR.[8]  Accordingly, on November 26, 2019, Commerce released CBP data to all interested parties, and requested comments regarding the data and respondent selection.[9]  On December 3, 2019, we received comments from the petitioners, Hyundai Steel and POSCO regarding the CBP Data Release Memorandum.[10]  On December 9, 2019, in response to interested party comments, we released revised CBP data and requested further comments on the

---

[3] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 84 FR 45949 (September 3, 2019).

[4] The petitioners in the underlying CVD investigation include:  AK Steel Corporation, ArcelorMittal USA LLC, Nucor Corporation, Steel Dynamics, Inc., and United States Steel Corporation (U.S. Steel) (collectively, the petitioners).

[5] *See* Petitioners' Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Request for Administrative Review," dated September 30, 2019 (Petitioners' Review Request).

[6] *See* POSCO's Letter, "Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Request for Administrative Review," dated September 23, 2019 (POSCO's Review Request); Hyundai Steel's Letter, "Certain Cold-Rolled Steel Flat {*sic.*} from the Republic of Korea, Case No. C-580-882:  Request for Countervailing Duty Administrative Review," dated September 27, 2019 (Hyundai Steel's Review Request); Dongbu's Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Request for Administrative Review," dated September 30, 2019 (Dongbu's Review Request).

[7] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 61011, 61016 (November 12, 2019) (*Initiation Notice*).  Petitioner's Review Request, Hyundai Steel's Review Request, and Dongbu Steel's Review Request cover the same producers/exporters.  The petitioners requested a review of "Hyundai Steel Co., Ltd.," while Hyundai Steel requested a review of "Hyundai Steel Company."  Therefore, we initiated a review of both "Hyundai Steel Co. Ltd." and "Hyundai Steel Company" (*see Initiation Notice*, 84 FR at 61016).  However, Hyundai Steel later responded on behalf of "Hyundai Steel Co. Ltd.," but identified itself as both "Hyundai Steel Company" and "Hyundai Steel Co. Ltd."  *See, e.g.*, Hyundai Steel's Letters, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case no. C-580-882:  Response to Affiliates Company Sections of Initial Questionnaire," dated January 22, 2020 (Hyundai Steel Affiliation QR) and "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Hyundai Steel's Initial Questionnaire Response," dated February 24, 2020 (Hyundai Steel IQR) at Exhibit 38.  This accounts for the difference between the number of companies included in Petitioners' Review Request (41) and the number of companies included in the *Initiation Notice* (42).  Accordingly, this review covers 41 producers and/or exporters.

[8] *See Initiation Notice*, 84 FR at 61011.

[9] *See* Memorandum, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea; 2018:  Release of U.S. Customs and Border Protection Import Data," dated November 26, 2019 (CBP Data Release Memorandum).

[10] *See* Petitioners' Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Comments on CBP Data," dated December 3, 2019; Hyundai Steel's Letter, "Cold-Rolled Steel from the Republic of Korea, Case No. C-580-882:  Comments on CBP Data and Respondent Selection," dated December 3, 2019; POSCO's Letter, "Cold-Rolled Steel from the Republic of Korea, Case No. C-580-882:  POSCO's Comments on CBP Data and Respondent Selection," dated December 3, 2019.

revised CBP data.[11]  On December 16, 2019, we received comments from the petitioners regarding respondent selection.[12]

On December 12, 2019, Metal One notified Commerce that they did not import any cold-rolled steel from Vietnam that was manufactured using hot-rolled steel flat products substrate originating in Korea and, thus, their imports were not within the scope of the anti-circumvention inquiry, and thus Metal One's entries of cold-rolled steel imported from Vietnam during the POR should be liquidated without regard to the cold-rolled steel antidumping duty (AD)/CVD orders from Korea.[13]

On January 2, 2020, Commerce selected Hyundai Steel and Dongbu Steel as the mandatory respondents in the administrative review,[14] and on January 8, 2020, issued the initial questionnaire to the Government of Korea (GOK).[15]  Both Dongbu Steel and Hyundai Steel submitted their affiliation questionnaire responses on January 22, 2020.[16]  On February 24, 2020, Hyundai Steel submitted its response to Section III of Commerce's Initial Questionnaire on behalf of itself, Hyundai HYSCO, and SPP Yulchon.[17]  On February 28, 2020, Dongbu Steel submitted its response to Section III of Commerce's Initial Questionnaire, behalf of itself and Dongbu Incheon, Dongbu's wholly-owned subsidiary and cross-owned producer of subject merchandise.[18]  On March 2, 2020, the GOK submitted its response to Commerce's Initial Questionnaire.[19]  Between May 5, 2020 and December 16, 2020, Commerce issued supplemental questionnaires to Hyundai Steel and Dongbu, and received timely responses.[20]  On March 30,

---

[11] See Memorandum, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea; 2018:  Release of the Revised U.S. Customs and Border Protection Import Data," dated November 26, 2019 (CBP Data Release Memorandum).

[12] See Petitioner's Letter, "Cold-Rolled Steel Flat Products from the Republic of Korea:  Petitioner's Comments on Respondent Selection," dated December 16, 2019.

[13] See Metal One's Letter, "Certain Cold-Rolled Steel Flat Products – Metal One's Notice of No Circumventing Shipment during the Period of Review," dated December 12, 2019.

[14] See Memorandum, "Countervailing Duty Administrative Review of Certain Cold- Rolled Steel Flat Products from the Republic of Korea:  Selection of Respondents for Individual Examination," dated January 2, 2020 (Respondent Selection Memorandum).

[15] See Commerce's Letter, "Administrative Review of the Countervailing Duty Order on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Initial Questionnaire," dated January 8, 2020 (Commerce's Initial Questionnaire).

[16] See Hyundai Steel Affiliation QR and Dongbu's Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Response to Affiliated Companies Section of Initial Questionnaire," dated January 22, 2020 (Dongbu Affiliation QR).

[17] See Hyundai Steel's Letters, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Hyundai Steel's Initial Questionnaire Response," dated February 24, 2020 (Hyundai Steel IQR); "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Hyundai HYSCO's Initial Questionnaire Response," dated February 24, 2020 (Hyundai HYSCO IQR); "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  SPP Yulchon Energy's Initial Questionnaire Response," dated February 24, 2020 (SPP Yulchon IQR).

[18] See Dongbu's Letter "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Dongbu's Initial Questionnaire Response," dated February 28, 2020 (Dongbu IQR).

[19] See the GOK's Letter "Administrative Review on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Response," dated March 2, 2020 (GOK IQR).

[20] See Commerce's Letters, "Countervailing Duty Administrative Review of Certain Cold-Rolled Steel Flat Products:  First Supplemental Questionnaire for Hyundai Steel Co., Ltd.," dated  May 5, 2020 (Hyundai Steel First

2020, Nucor filed deficiency comments on Dongbu's initial questionnaire responses, which included specific allegations of uncreditworthines and unequityworthiness related to Dongbu's debt restructuring.[21]

On May 7, 2020, Commerce issued the first supplemental questionnaire to GOK.[22]  The GOK provided certain portions of its response by the applicable deadline; however, because the GOK did not provide the remainder of its response in a timely manner,[23]  Commerce rejected the GOK's untimely submissions.[24]  On December 10 and 16, 2020, Commerce issued the second supplemental questionnaire and the new subsidy allegation (NSA) questionnaire, respectively, to the GOK and received timely responses.[25]

Supplemental Questionnaire); "Countervailing Duty Administrative Review of Certain Cold-Rolled Steel Flat Products:  Second Supplemental Questionnaire for Hyundai Steel Co., Ltd.," dated December 8, 2020 (Hyundai Steel Second Supplemental  Questionnaire); "Countervailing Duty Administrative Review of Certain Cold-Rolled Steel Flat Products:  First Supplemental Questionnaire for Dongbu Steel Co., Ltd.," dated July 1, 2020; Commerce's Letter "Countervailing Duty Administrative Review of Certain Cold-Rolled Steel Flat Products:  First {*sic.*}Supplemental Questionnaire for Dongbu Steel Co., Ltd.," dated July 7, 2020 (Dongbu Second Supplemental Questionnaire); Commerce's Letter, "Administrative Review of the Countervailing Duty Order on Certain Cold-Rolled Steel Flat Products from the Republic of Korea; 2018:  Supplemental Questionnaire," dated December 10, 2020 (Dongbu Third Supplemental Questionnaire); *see also* Hyundai Steel's Letters, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Hyundai Steel's First Supplemental Questionnaire Response," dated May 26, 2020 (Hyundai Steel's May 26, 2020 SQR); "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Hyundai Steel's Second Supplemental Questionnaire Response," dated December 16, 2020 (Hyundai Steel's December 16, 2020 SQR); Dongbu's Letters, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Dongbu's First Supplemental Questionnaire Response," dated July 22, 2020 (Dongbu's July 22, 2020 SQR); "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Dongbu's First Supplemental Questionnaire Response – Loans and Credits Section," dated July 27, 2020 (Dongbu's July 27, 2020 Loans and Credits SQR); Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Dongbu's Second Supplemental Questionnaire Response," dated July 27, 2020 (Dongbu's July 27, 2020 SQR); and "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Dongbu's Third Supplemental Questionnaire Response," December 15, 2020 (Dongbu's December 15, 2020 SQR).
[21] *See* Nucor's Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Comments on Dongbu's Initial Questionnaire Response," dated March 30, 2020 (Petitioners' Dongbu IQR Comments).
[22] *See* Commerce's Letter, "Administrative Review of the Countervailing Duty Order on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  First Supplemental Questionnaire," dated May 7, 2020 (GOK First Supplemental Questionnaire).
[23] *See* GOK's Letter, "Countervailing Duty Administrative Review on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  First Supplemental Questionnaire Additional Response," dated June 5, 2020 (GOK's June 5, 2020 SQR).
[24] *See* Commerce's Letter, "Administrative Review of Countervailing Duty Order of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Rejection of Questionnaire Response," July 6, 2020 (July 6, 2020 Response Rejection Letter); *see also* Memorandum, "Reject Submissions," dated July 6, 2020 (July 6, 2020 Response Rejection Memo).
[25] *See* Commerce's Letters, "Administrative Review of the Countervailing Duty Order on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Second Supplemental Questionnaire," dated December 10, 2020 (GOK Second Supplemental Questionnaire); "Countervailing Duty Administrative Review of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  New Subsidy Allegation Questionnaire," dated December 16, 2020 (GOK NSA Questionnaire); *see also* GOK's Letters, "Countervailing Duty Administrative Review on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Second Supplemental Questionnaire Response," dated December 16, 2020 (GOK's December 16, 2020 SQR); "Countervailing Duty Administrative Review on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Submission of Translation," dated December 28,

On March 23, 2020, the petitioners submitted a timely NSA that Korean cold-rolled steel producers benefitted from subsidized electricity during the POR.[26]  On April 2, 2020, the GOK, Hyundai Steel, and Dongbu each submitted comments regarding the petitioners' NSA.[27]  On April 17, 2020, the petitioners filed rebuttal comments.[28]  On December 15, 2020, U.S. Steel submitted pre-preliminary comments regarding the NSA related to electricity.[29]  On December 15, 2020, Commerce released its decision memorandum regarding initiation of an investigation into the alleged program, the Provision of Electricity for Less Than Adequate Remuneration (LTAR).[30]  We intend to examine this program further after the preliminary results.  On December 22, 2020, the petitioners made pre-preliminary comments, which included an allegation that Dongbu was unequityworthy.[31]  We intend to examine the Debt to Equity Conversion program, including the allegation that Dongbu was unequityworthy at the time of the debt-to-equity conversions, after the preliminary results.

On August 1, 2020 and August 6, 2020, the GOK provided comments containing certain new factual information (NFI) to correct or rebut information contained in Dongbu's July 22, 2020 SQR, Dongbu's July 27, 2020 Loans and Credits SQR, and Dongbu's July 27, 2020 SQR.[32]  However, the GOK included in its response unsolicited NFI which we had previously rejected when it was untimely filed as part of the GOK's first supplemental questionnaire response, which we had previously rejected.  Accordingly, on September 16, 2020, we rejected the GOK's NFI submissions and asked the GOK to resubmit the submissions with the previously rejected

2020; "Countervailing Duty Administrative Review on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Submission of Translation," dated December 31, 2020; and "Countervailing Duty Administrative Review on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Response to the New Subsidy Allegation," dated December 31, 2020.

[26] See Petitioners' Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Petitioners' New Subsidy Allegation," dated March 23, 2020 (NSA Submission).

[27] See Hyundai Steel's Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Hyundai Steel's Response to Petitioners' New Subsidy Allegation," dated April 2, 2020 (Hyundai Steel NSA Comments); see also Dongbu's Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-882:  Dongbu's Response to Petitioners' New Subsidy Allegation," dated April 2, 2020 (Dongbu NSA Comments); and GOK's Letter, "Countervailing Duty Administrative Review on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Response to Petitioners' New Subsidy Allegation," dated April 2, 2020 (GOK NSA Comments).

[28] See Petitioners' Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Reply to Respondents Response to New Subsidy Allegation," dated April 17, 2020 (Petitioners NSA Rebuttal Comments).

[29] See Petitioners' Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  U.S. Steel's Pre-Preliminary Comments Concerning Petitioners' Electricity New Subsidy Allegations," dated December 15, 2020.

[30] See Memorandum, "New Subsidy Allegation," dated December 15, 2020.

[31] See Petitioners' Letter, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Pre-Preliminary Comments re Dongbu," dated December 23, 2020 (Petitioners' Pre-Preliminary Results Comments).

[32] The GOK's July 22, 2020, and July 27, 2020, comments, as originally filed, were rejected from the record.

factual information removed.[33]  On September 18, 2020, the GOK provided modified NFI comments in accordance with our instructions.[34]

On April 24, 2020, Commerce tolled all deadlines in administrative reviews by 50 days.[35]  On July 21, 2020, Commerce tolled all deadlines in administrative reviews by an additional 60 days.[36]  On July 6 and December 15, 2020, Commerce extended the deadline for the preliminary results of this review.[37]  The revised deadline for the preliminary results is now January 15, 2021.[38]

## III.    PERIOD OF REVIEW

The period of review (POR) is January 1, 2018 through December 31, 2018.

## IV.    SCOPE OF THE *ORDER*

The products covered by this order are certain cold-rolled (cold-reduced), flat-rolled steel products, whether or not annealed, painted, varnished, or coated with plastics or other non-metallic substances.  The products covered do not include those that are clad, plated, or coated with metal.  The products covered include coils that have a width or other lateral measurement ("width") of 12.7 mm or greater, regardless of form of coil (*e.g.*, in successively superimposed layers, spirally oscillating, *etc.*).  The products covered also include products not in coils (*e.g.*, in straight lengths) of a thickness less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness.  The products covered also include products not in coils (*e.g.*, in straight lengths) of a thickness of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness.  The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).  For purposes of the width and thickness requirements referenced above:

---

[33] *See* Commerce's Letter, "Administrative Review of Countervailing Duty Order of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Rejection of Untimely Factual Information," dated September 16, 2020; *see also* Memorandum, "Rejection of Submissions in Accordance with 351.104(a)(2)(ii)(A)," dated September 16, 2020.

[34] *See* GOK's Letter, "Countervailing Duty Administrative Review (2018) on Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Resubmission of Factual Information in relation to the Dongbu's First Supplemental Questionnaire Responses," dated September 18, 2020. (GOK's September 18, 2020 NFI Comments).

[35] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID-19," dated April 24, 2020.

[36] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews," dated July 21, 2020.

[37] *See* Memorandum, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Extension of Deadline for Preliminary Results of Countervailing Duty Administrative Review; 1/1/2018 – 12/31/2018," dated July 6, 2020; *see also* Memorandum, "Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Extension of Deadline for Preliminary Results of Countervailing Duty Administrative Review; 1/1/2018 – 12/31/2018," dated December 15, 2020.

[38] *Id.*

(1) where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

(2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which:  (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by weight; and (3) none of the elements listed below exceeds the quantity, by weight, respectively indicated:

- 2.50 percent of manganese, or
- 3.30 percent of silicon, or
- 1.50 percent of copper, or
- 1.50 percent of aluminum, or
- 1.25 percent of chromium, or
- 0.30 percent of cobalt, or
- 0.40 percent of lead, or
- 2.00 percent of nickel, or
- 0.30 percent of tungsten (also called wolfram), or
- 0.80 percent of molybdenum, or
- 0.10 percent of niobium (also called columbium), or
- 0.30 percent of vanadium, or
- 0.30 percent of zirconium

Unless specifically excluded, products are included in this scope regardless of levels of boron and titanium.

For example, specifically included in this scope are vacuum degassed, fully stabilized (commonly referred to as interstitial-free (IF)) steels, high strength low alloy (HSLA) steels, motor lamination steels, Advanced High Strength Steels (AHSS), and Ultra High Strength Steels (UHSS).  IF steels are recognized as low carbon steels with micro-alloying levels of elements such as titanium and/or niobium added to stabilize carbon and nitrogen elements.  HSLA steels are recognized as steels with micro-alloying levels of elements such as chromium, copper, niobium, titanium, vanadium, and molybdenum.  Motor lamination steels contain micro-alloying levels of elements such as silicon and aluminum.  AHSS and UHSS are considered high tensile strength and high elongation steels, although AHSS and UHSS are covered whether or not they are high tensile strength or high elongation steels.

Subject merchandise includes cold-rolled steel that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the review if performed in the country of manufacture of the cold-rolled steel.

All products that meet the written physical description, and in which the chemistry quantities do not exceed any one of the noted element levels listed above, are within the scope of this order unless specifically excluded.  The following products are outside of and/or specifically excluded from the scope of this order:

- Ball bearing steels;[39]
- Tool steels;[40]
- Silico-manganese steel;[41]
- Grain-oriented electrical steels (GOES) as defined in the final determination of the U.S. Department of Commerce in *Grain-Oriented Electrical Steel from Germany, Japan, and Poland*.[42]
- Non-Oriented Electrical Steels (NOES), as defined in the antidumping orders issued by the U.S. Department of Commerce in *Non-Oriented Electrical Steel from the People's Republic of China, Germany, Japan, the Republic of Korea, Sweden, and Taiwan*.[43]

The products subject to this order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers:  7209.15.0000, 7209.16.0030, 7209.16.0060,

---

[39] Ball bearing steels are defined as steels which contain, in addition to iron, each of the following elements by weight in the amount specified:  (i) not less than 0.95 nor more than 1.13 percent of carbon; (ii) not less than 0.22 nor more than 0.48 percent of manganese; (iii) none, or not more than 0.03 percent of sulfur; (iv) none, or not more than 0.03 percent of phosphorus; (v) not less than 0.18 nor more than 0.37 percent of silicon; (vi) not less than 1.25 nor more than 1.65 percent of chromium; (vii) none, or not more than 0.28 percent of nickel; (viii) none, or not more than 0.38 percent of copper; and (ix) none, or not more than 0.09 percent of molybdenum.

[40] Tool steels are defined as steels which contain the following combinations of elements in the quantity by weight respectively indicated:  (i) more than 1.2 percent carbon and more than 10.5 percent chromium; or (ii) not less than 0.3 percent carbon and 1.25 percent or more but less than 10.5 percent chromium; or (iii) not less than 0.85 percent carbon and 1 percent to 1.8 percent, inclusive, manganese; or (iv) 0.9 percent to 1.2 percent, inclusive, chromium and 0.9 percent to 1.4 percent, inclusive, molybdenum; or (v) not less than 0.5 percent carbon and not less than 3.5 percent molybdenum; or (vi) not less than 0.5 percent carbon and not less than 5.5 percent tungsten.

[41] Silico-manganese steel is defined as steels containing by weight:  (i) not more than 0.7 percent of carbon; (ii) 0.5 percent or more but not more than 1.9 percent of manganese, and (iii) 0.6 percent or more but not more than 2.3 percent of silicon.

[42] *See Grain-Oriented Electrical Steel from Germany, Japan, and Poland:  Final Determinations of Sales at Less Than Fair Value and Certain Final Affirmative Determination of Critical Circumstances*, 79 FR 42501, 42503 (July 22, 2014).  This determination defines grain-oriented electrical steel as "a flat-rolled alloy steel product containing by weight at least 0.6 percent but not more than 6 percent of silicon, not more than 0.08 percent of carbon, not more than 1.0 percent of aluminum, and no other element in an amount that would give the steel the characteristics of another alloy steel, in coils or in straight lengths."

[43] *See Non-Oriented Electrical Steel from the People's Republic of China, Germany, Japan, the Republic of Korea, Sweden, and Taiwan:  Antidumping Duty Orders*, 79 FR 71741, 71741-42 (December 3, 2014).  The orders define NOES as "cold-rolled, flat-rolled, alloy steel products, whether or not in coils, regardless of width, having an actual thickness of 0.20 mm or more, in which the core loss is substantially equal in any direction of magnetization in the plane of the material.  The term 'substantially equal' means that the cross grain direction of core loss is no more than 1.5 times the straight grain direction (*i.e.*, the rolling direction) of core loss.  NOES has a magnetic permeability that does not exceed 1.65 Tesla when tested at a field of 800 A/m (equivalent to 10 Oersteds) along (*i.e.*, parallel to) the rolling direction of the sheet (*i.e.*, B800 value).  NOES contains by weight more than 1.00 percent of silicon but less than 3.5 percent of silicon, not more than 0.08 percent of carbon, and not more than 1.5 percent of aluminum.  NOES has a surface oxide coating, to which an insulation coating may be applied."

7209.16.0070, 7209.16.0091, 7209.17.0030, 7209.17.0060, 7209.17.0070, 7209.17.0091, 7209.18.1530, 7209.18.1560, 7209.18.2510, 7209.18.2520, 7209.18.2580, 7209.18.6020, 7209.18.6090, 7209.25.0000, 7209.26.0000, 7209.27.0000, 7209.28.0000, 7209.90.0000, 7210.70.3000, 7211.23.1500, 7211.23.2000, 7211.23.3000, 7211.23.4500, 7211.23.6030, 7211.23.6060, 7211.23.6090, 7211.29.2030, 7211.29.2090, 7211.29.4500, 7211.29.6030, 7211.29.6080, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7225.50.6000, 7225.50.8080, 7225.99.0090, 7226.92.5000, 7226.92.7050, and 7226.92.8050.

The products subject to the order may also enter under the following HTSUS numbers: 7210.90.9000, 7212.50.0000, 7215.10.0010, 7215.10.0080, 7215.50.0016, 7215.50.0018, 7215.50.0020, 7215.50.0061, 7215.50.0063, 7215.50.0065, 7215.50.0090, 7215.90.5000, 7217.10.1000, 7217.10.2000, 7217.10.3000, 7217.10.7000, 7217.90.1000, 7217.90.5030, 7217.90.5060, 7217.90.5090, 7225.19.0000, 7226.19.1000, 7226.19.9000, 7226.99.0180, 7228.50.5015, 7228.50.5040, 7228.50.5070, 7228.60.8000, and 7229.90.1000.

The HTSUS subheadings above are provided for convenience and customs purposes only.  The written description of the scope of the order is dispositive.

## V.   RATE FOR NON-EXAMINED COMPANIES

The statute and Commerce's regulations do not address the methodology for the establishment of a rate to be applied to respondents not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(e)(2) of the Act. Generally, Commerce looks to section 705(c)(5) of the Act, which provides instructions for calculating the all-others rate in an investigation, for guidance when calculating the rate for respondents which we did not individually examine in an administrative review.  Section 705(c)(5)(A) of the Act articulates a preference that we are not to calculate an all-others rate using rates which are zero, *de minimis*, or based entirely on facts available.  Accordingly, Commerce's usual practice in determining the rate for non-examined respondents has been to weight average the countervailable subsidy rates for the selected companies, excluding rates that are zero, *de minimis*, or based entirely on facts available.[44]  Section 705(c)(5)(A)(ii) of the Act also provides that, where all rates are zero, *de minimis*, or based entirely on facts available, we may use "any reasonable method" for assigning the all-others rate, including averaging the estimated weighted-average countervailable subsidy rates determined for the exporters and producers individually examined.

As indicated in the accompanying *Federal Register* notice of the preliminary results, dated concurrently with this Preliminary Decision Memorandum, we preliminarily determine that Hyundai Steel and Dongbu received countervailable subsidies that are above *de minimis*. Therefore, we are applying to the non-selected companies the weighted average of the countervailable subsidy rates calculated for Hyundai Steel and Dongbu using publicly ranged sales data submitted by the respondents.[45]

---

[44] *See, e.g.*, *Certain Pasta from Italy:  Final Results of the 13ᵗʰ (2008) Countervailing Duty Administrative Review*, 75 FR 37386, 37387 (June 29, 2010) (*Pasta from Italy*).
[45] *See* Memorandum, "Preliminary Results Calculations of Subsidy Rate for Non-Selected Companies Under Review," dated concurrently with this memorandum.

## VI.    SUBSIDIES VALUATION INFORMATION

### A.    Allocation Period

For non-recurring subsidies, we applied the "0.5 percent test," as described in 19 CFR 351.524(b)(2).  Under this test, we divide the amount of subsidies approved under a given program in a particular year by the relevant sales value (*e.g.*, total sales or export sales) for the same year.  If the amount of the subsidies is less than 0.5 percent of the relevant sales value, then the benefits are allocated to the year of receipt rather than across the average useful life (AUL).  In the instant review, we are relying on a 15-year AUL.[46]

### B.    Attribution of Subsidies

Commerce's regulations at 19 CFR 351.525(b)(6)(i) state that Commerce will normally attribute a subsidy to the products produced by the corporation that received the subsidy.  However, 19 CFR 351.525(b)(6)(ii)-(v) provides that Commerce will attribute subsidies received by certain other companies to the combined sales of those companies when:  (1) two or more corporations with cross-ownership produce the subject merchandise; (2) a firm that received a subsidy is a holding or parent company of the subject company; (3) there is cross-ownership between an input supplier and a downstream producer and production of the input is primarily dedicated to the production of the downstream product; or (4) a corporation producing non-subject merchandise received a subsidy and transferred the subsidy to a corporation with cross-ownership with the subject company.

According to 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  This regulation states that this standard will normally be met where there is a majority voting interest between two corporations or through common ownership of two (or more) corporations.  The Court of International Trade (CIT) upheld Commerce's authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[47]

Dongbu Steel reported that Dongbu Incheon is Dongbu Steel's wholly-owned subsidiary, a cross-owned producer of subject merchandise, and Dongbu Steel's supplier of hot-rolled coil that Dongbu Steel used in the production of cold-rolled steel.[48]  In addition, Dongbu Steel reported that during the POR and AUL periods, none of Dongbu Steel's or Dongbu Incheon's other cross-owned affiliates produced subject merchandise, supplied inputs to Dongbu Steel or Dongbu Incheon for the production of the downstream product, or transferred subsidies to Dongbu Steel or Dongbu Incheon.[49]  Furthermore, Dongbu Steel has no holding company parents or other

---

[46] *See* U.S. Internal Revenue Service Publication 946 (2008), "How to Depreciate Property," at Table B-2:  Table of Class Lives and Recovery Periods.
[47] *See Fabrique de Fer de Charleroi v. United States*, 166 F. Supp. 2d 593, 600-604 (CIT 2001).
[48] *See* Dongbu Affiliation QR at 1 and 6-8.
[49] *Id.* at 6-8.

parent companies.[50]  Finally, no other companies produced subject merchandise which Dongbu Steel or Dongbu Incheon exported and no other companies exported subject merchandise which Dongbu Steel or Dongbu Incheon produced.[51]  Accordingly, Dongbu Steel responded to the initial questionnaire on behalf of itself and Dongbu Incheon.[52]  Based on the information provided by Dongbu and pursuant to 19 CFR 351.525(b)(6)(ii), we have attributed subsidies received by Dongbu Steel and/or Dongbu Incheon to the combined sales of both companies, net of intercompany sales between the two companies.

Hyundai Steel reported that it is a publicly traded company engaged in the production and sale of steel products, including cold-rolled steel.[53]  Hyundai Steel reported that it is not a subsidiary of any other company and it has no parent or holding company.[54]  Hyundai Steel provided a full response on behalf of itself, and for companies acquired prior to the POR, Hyundai HYSCO and SPP Yulchon.[55]  Both Hyundai HYSCO and SPP Yulchon ceased operations prior to the POR.[56]  In its response for these two companies, Hyundai Steel reported that neither company received subsidies during the AUL period that would be attributable to Hyundai Steel during the POR.[57]  Consistent with prior proceedings,[58] and pursuant to 19 CFR 351.525(b)(6)(i), we have attributed subsidies received by Hyundai Steel to the sales of Hyundai Steel for these preliminary results.

## C.    Benchmarks and Discount Rates

### Short-Term U.S. Dollar-Denominated Loans

Hyundai Steel and Dongbu reported receiving short-term import financing from the Korea Export-Import Bank (KEXIM) during the POR.[59]  Hyundai provided information about short-term loans from commercial banks for consideration as comparable commercial loans for purposes of identifying an interest rate benchmark.  Consistent with 19 CFR 351.505(a)(2), we

---

[50] *Id.* at 6.

[51] *Id.* at 3.

[52] *See* Dongbu IQR at 1; *see also* Dongbu Affiliation QR at 1 and 6-7.

[53] *See* Hyundai Steel Affiliation QR at 3-4

[54] *Id.* at 4.

[55] *See* Hyundai Steel Affiliation QR at 1-2 and 22-23; Hyundai Steel IQR; Hyundai HYSCO IQR; SPP Yulchon IQR.

[56] *See* Hyundai HYSCO IQR at 1; SPP Yulchon IQR at 6-7.

[57] *See* Hyundai HYSCO IQR at 4 and Exhibits HYSCO-12 and HYSCO-13; SPP Yulchon IQR at Exhibits SPP-13 and SPP-14; Hyundai Steel's May 26, 2020 SQR at Exhibit HYSCO-21.

[58] *See Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, 2016*, 83 FR 51446 (October 11, 2018) (*CRS First Admin Review Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at "Attribution of Subsidies" (unchanged in *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2016*, 84 FR 24087 (May 24, 2019) (*CRS First Admin Review Final Results*)) (collectively, *CRS First Admin Review*), and accompanying Issues and Decision Memorandum (IDM) at "Attribution of Subsidies"; *see also Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2017*, 84 FR 60377 (November 8, 2019) (*CRS Second Admin Review Preliminary Results*), and accompanying PDM at "Attribution of Subsidies" (unchanged in *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 38361 (June 26, 2020) (*CRS Second Admin Review Final Results*) (collectively, *CRS Second Admin Review*), and accompanying IDM at "Attribution of Subsidies").

[59] *See* Dongbu IQR at 16-17; *see also* Hyundai Steel IQR at 15.

preliminarily determine that some of those loans constitute comparable commercial loans, and it is appropriate to use these loans to calculate a weighted-average benchmark interest rate.[60] Regarding Dongbu, because commercial company-specific Korean won (KRW) rates were not available, for Dongbu's KEXIM import financing program, we used the short-term Korean lending rates, published in the International Monetary Fund's (IMF) International Financial Statistics, consistent with past practice in other Korean CVD proceedings.[61]

In addition, Dongbu received loans under the Korea Development Bank (KDB) short-term discounted loan program and the debt restructuring program during the POR.[62]  Dongbu provided information about short-term loans from commercial banks for consideration as comparable commercial loans for purposes of identifying a short-term loan interest rate benchmark.  Consistent with 19 CFR 351.505(a)(2), we preliminarily determine that some of those loans constitute comparable commercial loans and it is appropriate to use these loans to calculate a weighted-average short-term loan benchmark interest rate.[63]

**Long-Term U.S. Dollar and Korean Won-Denominated Loans**

During the POR, Dongbu had outstanding countervailable long-term Korean won-denominated loans from government-controlled banks.[64]  As benchmarks for countervailable, won-denominated long-term loans and as discount rates, we used, where available, the company-specific interest rates on the company's comparable commercial, won-denominated loans.  If such loans were not available, we used, where available, the company-specific corporate bond rate on the company's public and private bonds, as we have determined that the GOK did not control the Korean domestic bond market after 1991.[65]  This is the approach Commerce has taken in several prior Korean CVD proceedings.[66]  Specifically, in those cases, we determined that, absent company-specific, commercial long-term loan interest rates, the won-denominated corporate bond rate is the best indicator of the commercial long-term borrowing rates for won-

---

[60] *See* Memorandum, "Calculations for the Preliminary Results:  Hyundai Steel," dated concurrently with this memorandum (Hyundai Steel's Preliminary Calculation Memorandum); *see also* Memorandum, "Calculation for the Preliminary Results:  Dongbu Steel Co., Ltd./Dongbu Incheon Steel Co., Ltd.," dated concurrently with this memorandum (Dongbu's Preliminary Calculation Memorandum).

[61] *See, e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:  Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 81 FR 63168 (September 14, 2016), and accompanying PDM at 15, unchanged in *Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 FR 16341 (April 4, 2017) (*CTL Final Determination*), and accompanying IDM at 9.

[62] *See* Dongbu's February 10, 2020 Initial QR at 14-18.

[63] *See* Dongbu's Preliminary Calculation Memorandum.

[64] *See* Dongbu IQR at Exhibit A-2.

[65] *See, e.g.*, *Final Negative Countervailing Duty Determination:  Stainless Steel Plate in Coils from the Republic of Korea*, 64 FR 15530, 15531 (March 31, 1999) (*SS Plate from Korea*), and Memorandum "Analysis Memorandum on the Korean Domestic Bond Market," dated March 9, 1999.

[66] *See, e.g.*, *SS Plate from Korea*, and "Analysis Memorandum on the Korean Domestic Bond Market" (March 9, 1999); *see also Final Affirmative Countervailing Duty Determination:  Structural Steel Beams from the Republic of Korea*, 65 FR 41051 (July 3, 2000), and accompanying IDM at "Benchmark Interest Rates and Discount Rates"; *Final Affirmative Countervailing Duty Determination:  Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 FR 37122 (June 23, 2003), and accompanying IDM at "Discount Rates and Benchmark for Loans."

denominated loans in Korea, because it is widely accepted as the market rate in Korea.[67]  Where company-specific rates were not available, we used the national average of the yields on three-year, won-denominated corporate bonds, as reported by the Bank of Korea (BOK).  This approach is consistent with 19 CFR 351.505(a)(3)(ii) and prior Korean CVD proceedings.[68]  In accordance with 19 CFR 351.505(a)(2)(i), our benchmarks take into consideration the structure of the government-provided loans.  Pursuant to 19 CFR 351.505(a)(2)(iii), we used benchmark rates issued in the same year that the government loans were issued.  Dongbu also had restructured long-term loans and other debt under the debt restructuring program.  In addition, because we preliminarily determine that Dongbu was uncreditworthy at the time of the restructuring of these long-term loans (*see* below), in accordance with 19 CFR 351.505(a)(3)(iii), we added a risk premium to the benchmark rate used to measure countervailable subsidy benefits associated with Dongbu's outstanding restructured long-term debts/loans during the POR.

Hyundai Steel reported that certain research and development (R&D) grants under the Industrial Technology Innovation Promotion Act (ITIPA) are related to pending projects.[69]  Because the funds received by Hyundai Steel will need to be repaid and the repayment obligation is contingent upon Hyundai Steel taking some future action or achieving some goal in fulfillment of the loan's requirements, we normally treat this provision of funds as contingent liability interest-free loans pursuant to 19 CFR 350.505(d)(1).  Further, because the repayment of the loans will occur at a point in time more than one year after the receipt of the contingent liability loan, we treat this as a long-term interest-free loan for purposes of measuring the benefit.  Hyundai Steel provided a commercial long-term benchmark loan only for a certain year when grants under the ITIPA were approved.[70]  Because Hyundai Steel did not provide loan information to be used for benchmark purposes for all years in which grants under the ITIPA were approved, we relied on data from the IMF's *International Financial Statistics* for the years in which the grants were approved, in absence of comparable commercial long-term benchmark loans from Hyundai Steel.[71]

## D.    Creditworthiness

According to 19 CFR 351.505(a)(4)(i), Commerce will generally consider a firm to be uncreditworthy if, "based on information available at the time of the government-provided loan, the firm could not have obtained long-term loans from conventional commercial sources."  Pursuant to 19 CFR 351.505(a)(4)(i)(A)-(D), Commerce normally examines:  (1) the receipt by the firm of comparable commercial long-term loans; (2) present and past indicators of the firm's financial health, as reflected in various financial indicators calculated from the firm's financial statements and accounts; (3) recent past and present indicators of the firm's ability to meet its costs and fixed financial obligations with its cash flow; and (4) evidence of the firm's future financial position, such as market studies, country and industry economic forecasts, and project and loan appraisals prepared prior to the agreement between the lender and the firm on the terms

---

[67] *See Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations:  Certain Steel Products from Korea*, 58 FR at 37328, 37345-37346 (July 9, 1993).
[68] *See, e.g.*, *CORE First Admin Review* IDM at "Benchmark for Long Term Loans"; *see also CORE Second Admin Review* IDM at "Benchmark Interest Rates."
[69] *See* Hyundai Steel's May 26, 2020 SQR at 12 and Exhibit C-20.
[70] *See* Hyundai Steel IQR at Exhibit A-2.
[71] *See* Hyundai Steel's Preliminary Calculation Memorandum.

of the loan.[72] When there is evidence that the company received long-term commercial loans, unaccompanied by a government guarantee, during or prior to the period at issue, then Commerce will normally find the company is not uncreditworthy, in accordance with 19 CFR 351.505(a)(4)(ii). When a company has been found to be uncreditworthy, Commerce calculates a benchmark pursuant to the formula found in 19 CFR 351.505(a)(3)(iii), including an added risk premium in the benchmark interest rate(s). Participation in the Dongbu debt restructuring program allowed Dongbu to restructure certain existing loans, corporate bonds, and L/C Usance loans, and to convert certain of Dongbu's debt into equity.[73]

***Initiation of Creditworthiness Investigation***

Under 19 CFR 351.505(a)(6)(i), Commerce will normally initiate an investigation of creditworthiness if: (1) the petitioner makes a specific allegation of uncreditworthiness; and (2) the allegation is supported by information establishing a reasonable basis to believe or suspect that the respondent firm is uncreditworthy.

As explained above, on March 30, 2020, petitioner Nucor submitted comments on Dongbu's IQR, including specific allegations of uncreditworthiness and unequityworthiness. Additionally, on December 23, 2020, Nucor submitted their Petitioners' Pre-Preliminary Results Comments regarding Dongbu's creditworthiness and equityworthiness.[74] These comments alleged that Dongbu is uncreditworthy and specifically that Commerce "should thus continue to find that Dongbu was not creditworthy during the period including 2014 (the year the debt restructuring began), 2015, 2016, 2017, and 2018 (the POR)." Nucor's cited information contained Dongbu's responses for the alleged period, the details of which are largely proprietary, as well as the public versions of Dongbu's responses in Commerce's prior decisions in corrosion-resistant steel products (CORE) from Korea, which Dongbu placed on the record of this review, in which we repeatedly found Dongbu to be uncreditworthy with respect to its debt restructuring.[75] We find that the allegation constitutes a sufficient basis to initiate an uncreditworthiness investigation.

---

[72] *See* 19 CFR 351.505(a)(4)(i)(A)-(D).

[73] *See* section "Dongbu's Debt Restructuring," below.

[74] *See* Petitioners' Pre-Preliminary Results Comments.

[75] *See Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Affirmative Determination*, 80 FR 68842 (*CORE Preliminary Determination*), and accompanying IDM at 12-15 (unchanged in *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35310 (*CORE Final Determination*), and accompanying IDM); *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, Rescission of Review, in Part, and Intent To Rescind, in Part; 2015–16*, 83 FR 39671 (August 10, 2018) (*CORE First Review Preliminary Results*), and accompanying PDM at 12-15 (unchanged in *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015-2016*, 84 FR 11749 (March 28, 2019) (*CORE First Review Final Results*), and accompanying IDM); *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, in Part; 2017*, 84 FR 48107 (September 12, 2019) (*CORE Second Review Preliminary Results*), and accompanying PDM at 12-15 (unchanged in *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 15112 (March 17, 2020) (*CORE Second Review Final Results*), and accompanying IDM); *Certain Corrosion-Resistant Steel Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 FR 74692 (November 23, 2020) (*CORE Third Review Preliminary Results*), and accompanying PDM at 11.

Accordingly, we have initiated an uncreditworthiness investigation covering the years 2014 through 2018.[76]  For more information on our creditworthiness initiation, including relevant business proprietary information, *see* Dongbu's Preliminary Results Analysis Memorandum.

***Preliminary Finding Regarding Creditworthiness***

In the investigation and administrative reviews regarding CORE from Korea, we investigated Dongbu's debt restructuring program and found this program to be countervailable.[77]  We also found Dongbu to be uncreditworthy in all three previously completed segments of the CORE proceeding and in the preliminary results of the concurrent third review of CORE from Korea (*i.e.* from 2014 through the end of each of the previous POI or PORs).[78]  Accordingly, we calculated benchmark interest rates in the previous and concurrent CORE from Korea segments pursuant to the formula found in 19 CFR 351.505(a)(3)(iii).  Nucor referenced Commerce's findings in the preliminary results of the concurrent third administrative review of CORE from Korea (covering the 2018 POR) that Dongbu was uncreditworthy.  As Nucor notes, there Commerce stated:

> Dongbu did not obtain any long-term loans from conventional commercial sources in 2018; Dongbu's financial indicators, its past and present ability to meet its costs and fixed financial obligations with its cash flow, and Dongbu's future financial position, have not changed since the period covered from the original investigation and the prior administrative reviews. Dongbu's current ratio and quick ratio have not improved and continue to be below Commerce's benchmark during the POR. Dongbu's debt-to-equity ratio continues to be high and there is no evidence that Dongbu's future financial position is likely to grow stronger.[79]

The same information exists on the record of this review, including Dongbu's financial statements for the years 2013 through 2018, and extensive information related to Dongbu's 2014-2018 financial difficulties and debt restructuring.  Therefore, we preliminarily find Dongbu to have been uncreditworthy from 2014 through the end of the POR (2018), pursuant to 19 CFR 351.505(a)(6).  The record, including Dongbu's 2013 through 2018 financial statements and record information regarding Dongbu's debt restructuring, demonstrates that Dongbu remains uncreditworthy from 2014 through 2018.  Dongbu did not obtain any long-term loans from conventional commercial sources in the years 2014 through 2018.  Furthermore, Dongbu's financial indicators and its past and present ability to meet its costs and fixed financial obligations with its cash flow indicate uncreditworthiness.  Dongbu's future financial position

---

[76] Petitioners' Dongbu IQR Comments at 5-6.

[77] *Id.*

[78] *See CORE Preliminary Determination* IDM at 10 (unchanged in *CORE Final Determination* IDM); *CORE First Review Preliminary Results* PDM at 12 (unchanged in *CORE First Review Final Results* IDM); *CORE Second Review Preliminary Results* PDM at 11 (unchanged in *CORE Second Review Final Results* IDM); *Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2018*, 85 FR 74692 (November 23, 2020) (*CORE Third Review Preliminary Results*), and accompanying PDM at 11.

[79] *See CORE Third Review Preliminary Results* PDM at 11.

has not improved significantly since 2014, and record information indicates that at the time that Dongbu's debt was restructured, available information did not indicate that Dongbu's financial position was likely to improve significantly in the future.[80]  Therefore, pursuant to 19 CFR 351.505(a)(4), we find that Dongbu was uncreditworthy during the years 2014 (when Dongbu's debt restructuring began), 2015, 2016, 2017, and 2018 (the POR).  Furthermore, we find that loans that were made by private banks to Dongbu under Dongbu's debt restructuring (as discussed in greater detail below) cannot constitute "comparable commercial loans" under 19 CFR 351.505(a)(2) due to the substantial government influence and the fact that they were part of a government program.[81]  Therefore, we find that these loans are unsuitable for benchmark purposes.  Accordingly, for these preliminary results of review, we have used an interest rate benchmark that includes an added risk premium to calculate benefits under Dongbu's debt restructuring and other GOK loan programs in accordance with 19 CFR 351.505(a)(3)(iii).

## F.    Denominators

When selecting an appropriate denominator for use in calculating the *ad valorem* subsidy rate, Commerce considers the basis for the respondent's receipt of benefits under each program.  As discussed in further detail below, where the program has been found to be countervailable as a domestic subsidy, we have used total sales as the denominator for our rate calculations for Hyundai Steel and Dongbu.  For Dongbu, because the short-term discounted loans for export receivables have been found to be countervailable as an export subsidy, we have used the recipient's export sales as the denominator.  In the section below, we describe the denominators we used to calculate the countervailable subsidy rates for each of the various subsidy programs.

## VII.  USE OF FACTS OTHERWISE AVAILABLE

Sections 776(a)(1) and (2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" (FA) if necessary information is not on the record or an interested party or any other person:  (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.  Furthermore, Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available (adverse facts available or AFA) when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is "information derived from the petition that gave rise to the

---

[80] For further information regarding Dongbu's borrowings, past and current financial position, ability to meet interest expenses with cash flows, and past and present indicators of Dongbu's future financial position, some of the specific details of which are business proprietary, *see* Dongbu's Preliminary Calculation Memorandum and Dongbu IQR, Exhibit 6A, Exhibit 6B, Exhibit A2, Exhibit A5, Exhibit A6, and Exhibit G-2.
[81] *See* section "Dongbu Debt Restructuring," below.

investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise."[82]  It is Commerce's practice to consider information to be corroborated if it has probative value.[83]  In analyzing whether information has probative value, it is Commerce's practice to examine the reliability and relevance of the information to be used.[84]  However, the SAA emphasizes that Commerce need not prove that the selected facts available are the best alternative information.[85]

Finally, under the new section 776(d) of the Act, Commerce may use any countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, use a CVD rate for a subsidy program from a proceeding that the administering authority considers reasonable to use, including the highest of such rates.

For purposes of these preliminary results, we are applying FA, including the use of an adverse inference in applying the facts otherwise available, in the circumstances outlined below.

*The GOK's June 5, 2020 SQR*

As explained above, the GOK failed to provide timely responses to several questions in the GOK First Supplemental Questionnaire, including:[86]

- Information regarding changes to the Restriction of Special Location Taxation Act (RSLTA) – Local Tax Exemptions on Land Outside Metropolitan Areas – Article 78 Program which was found to be countervailable in a previous segment of this proceeding;[87]
- Information regarding *de facto* specificity for the Restriction of Special Taxation Act (RSTA) Article 25(2):  Tax Deductions for Investments in Energy Economizing Facilities, which was found to be countervailable in a previous segment of this proceeding;[88]
- Information regarding *de facto* specificity for RSTA Article 25(3):  Tax Credit for Investment in Environmental and Safety Facilities, which was found to be countervailable in a previous segment of this proceeding;[89] and

---

[82] *See, e.g.*, SAA at 870.

[83] *See* SAA at 870.

[84] *See, e.g.*, SAA at 869.

[85] *See* SAA at 869-870.

[86] *See* GOK First Supplemental Questionnaire; the GOK's June 5, 2020 SQR; *see also* July 6, 2020 Response Rejection Letter and July 6, 2020 Response Rejection Memo.

[87] *See* GOK First Supplemental Questionnaire at 4; *see also CRS First Review Preliminary Results* PDM at 16-18 (unchanged in *CRS First Review Final Results* IDM).

[88] *See* GOK First Supplemental Questionnaire at 9; *see also Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Negative Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 80 FR 79567 (December 22, 2015) (*CRS Preliminary Determination*), and accompanying PDM at 17-18 (unchanged in *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 49943 (July 29, 2016) (*CRS Final Determination*)) (collectively, *CRS Investigation*), and accompanying IDM at 19).

[89] *See* GOK First Supplemental Questionnaire at 9; *see also CRS Preliminary Determination* PDM at 18-19 (unchanged in *CRS Final Determination* IDM at 19).

- Information regarding changes to the Modal Shift Program, which was found to be countervailable in a previous segment of this proceeding.[90]

With respect to each of these programs, we find that the GOK failed to provide information within the deadlines established within the meaning of section 776(a)(2)(B) of the Act, and significantly impeded this proceeding within the meaning of section 776(a)(2)(C) of the Act. As a result, necessary information is not available on the record within the meaning of section 776(a) of the Act. Accordingly, the application of FA is necessary with respect to these programs. Furthermore, we find that the GOK failed to cooperate by not acting to the best of its ability to comply with our request for information within the meaning of Section 776(b) of the Act.

Regarding the RSLTA Article 78 and Modal Shift programs, each of which was found to be countervailable in previous segments of this proceeding, the GOK did not provide information regarding whether changes may have been made to the programs. Therefore, for the reasons mentioned above, we preliminarily determine as AFA that there were no changes to these programs, and thus each of the programs continues to provide a financial contribution and a benefit, and is specific within the meaning of the Act. With regard to RSTA 25(2) and 25(3) programs, we rejected the GOK's late submission containing program usage information related to these programs, necessary for a *de facto* specificity analysis, and thus as AFA we preliminarily find that these programs continue to be *de facto* specific. For further details, *see infra* at the "Programs Preliminarily Determined to be Countervailable" section.

## VIII.  ANALYSIS OF PROGRAMS

### A.     Programs Preliminarily Determined to be Countervailable

### 1.     Dongbu's Debt Restructuring

As explained above, Commerce has previously reviewed Dongbu's debt restructuring in the CVD proceeding regarding CORE form Korea.[91] Dongbu reported that the Dongbu Steel Creditor Banks Committee (Creditor Bank Committee), and later the Dongbu Steel Creditor Financial Institutions Committee (Creditor Financial Institutions Committee), administered Dongbu's Debt restructuring. Among the creditor banks included in these two committees, the Corporate Bond Stabilization Fund (CBSF), Korea Credit Guarantee Fund (KODIT), KDB, KEXIM, and Woori Bank, were majority owned by government-owned or government-controlled entities.[92] Among Dongbu's other creditors, Nonghyup Bank, Shihan Bank, Hana

---

[90] *See* GOK First Supplemental Questionnaire at 6; *see also CRS Final Determination* IDM at 36-37.
[91] *See CORE Preliminary Determination* IDM at 13-14 (unchanged in *CORE Final Determination* IDM); *CORE First Review Preliminary Results* PDM at 13-16 (unchanged in *CORE First Review Final Results* IDM); *CORE Second Review Preliminary Results* PDM (unchanged in *CORE Second Review Final Results* IDM).
[92] *See* Dongbu IQR, Exhibit G-2 at 28; *see also CORE Preliminary Determination* IDM at 13-14 (unchanged in *CORE Final Determination* IDM). The Creditor Bank Committee was established as part of Dongbu's involvement in the Corporate Voluntary Restructuring Program under the authority of the CBCA. *See* Dongbu IQR, Exhibit G-2 at 1 and 8-9. Between July 7, 2014 and February 2015, the Creditor Bank Committee consisted of KDB, KEXIM, KoFC, Nonghyup Bank, Shihan Bank, Hana Bank, Woori Bank, Korea Exchange Bank, and Industrial Bank of

Bank, and K-Saving Bank were majority privately owned.[93]  The KDB was the primary creditor of Dongbu.[94]

In June 2014, Dongbu applied for the Corporate Voluntary Restructuring Program under the Creditor Banks' Committee Agreement (CBCA).[95]  Dongbu's creditors held a series of meetings during 2014 to determine how to restructure Dongbu's debt.  Dongbu reported that, on July 7, 2014, Dongbu's creditors held the first Creditor Bank Committee meeting.[96]  This meeting resulted in the establishment of the Creditor Bank Committee, including KDB, KoFC, KEXIM, Nonghyup Bank, Shihan Bank, Hana Bank, Woori Bank, Korea Exchange Bank (KEB), and IBK; these firms' participation in Dongbu's debt restructuring; an agreement to suspend the exercise of the creditors' rights; the appointment of PriceWaterhouseCoopers (PWC) as the consulting firm to prepare a business normalization plan; the exclusion of asset-backed commercial paper from the restructuring plan; and the refinancing of corporate bonds.[97]  At the second meeting held on July 21, 2014, the Creditor Bank Committee approved certain emergency operating loans for Dongbu.[98]  However, because PWC determined that Dongbu's value as a going concern under a scenario in which Dongbu shut down its hot-rolled steel business exceeded the company's liquidation value, the Creditor Bank Committee held a third Meeting on September 30, 2015, and approved a restructuring plan.[99]  On October 22, 2014, Dongbu entered into an agreement for compliance of business normalization plan with the KDB and the Creditor Bank Committee.[100]  On October 19, 2015, Dongbu entered into a corporate workout program under the Corporate Restructuring Promotion Act (CRPA).[101]  Also on October 19, 2015, the Creditor Financial Institutions Committee, was formed and held its first meeting.[102]  At this meeting, the Dongbu Steel Creditor Financial Institutions' Committee (DSCFIC) incorporated certain decisions of the Creditor Bank Committee and approved a debt restructuring plan.[103]  Further meetings and other developments occurred between October 2015 and December 2018, including further debt-to equity conversions and interest rate reductions on outstanding debt.[104]  However, in general, the debt restructuring plan provided for the following: the restructuring of certain existing loans, corporate bonds, and L/C Usance loans; the issuance of certain new loans; and, the conversion of some of Dongbu's debt into equity.[105]

---

Korea (IBK).  *See* Dongbu IQR, Exhibit G-2 at 9.  However, KoFC was merged into KDB on January 2015.  *See* Dongbu IQR, Exhibit G-2 at 23.  The DSCFIC is a committee subsequently established in October 2015 as part of Dongbu's participation in the Corporate Workout Program under the authority of the CRPA.  *See* Dongbu IQR, Exhibit G-2 at 1-2, 8, and 13.  As of October 19, 2015, the DSCFIC consisted of KDB, KEXIM, Nonghyup Bank, Shihan Bank, Hana Bank, Woori Bank, KODIT, CBSF, and K-Saving Bank.  *See* Dongbu IQR, Exhibit G-2 at 13-14.

[93] *See* Dongbu IQR, Exhibit G-2 at 28.

[94] *Id.* at 33.

[95] *Id.* at 8.

[96] *Id.* at 9.

[97] *Id.*

[98] *Id.*

[99] *Id.* at 9.

[100] *Id.* at 11.

[101] *Id.* at 13-14.

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.* at 10-18.  As stated above, we intend to examine the conversion of some of Dongbu's debt into equity in a post-preliminary determination.

### i. Restructured Loans

*Financial Contribution*

Section 771(5)(B) of the Act defines an "authority" as a government of a country or any public entity within the territory of the country. As explained above, CBSF, KODIT, KDB, KEXIM, and Woori Bank were all majority owned by government-owned or government-controlled entities. As also explained above, Commerce has previously found IBK, KDB, KEXIM, KoFC, and Woori Bank to be majority government-owned and to be authorities within the meaning of section 771(5)(B) of the Act, including in 2014, the year in which Dongbu applied for restructuring.[106] Commerce has also previously found that IBK, KDB, KEXIM are policy banks.[107] As Commerce noted in *NOES Final Determination*, policy banks are created by a government in order to implement government industrial policies through the provision of financing to industries and enterprises; thus a policy bank, by its very nature, is an authority under section 771(5)(B) of the Act.[108] Commerce also noted in *CORE Preliminary Determination* that Woori Bank's 2014 Form 20-F filing with the SEC states that "…So long as the Korean government remains our controlling shareholder, it will have the ability to cause us to take actions or pursue policy objectives that may conflict with the interests of our other shareholders. For example, in order to further its public policy goals, the Korean government could request that we participate with respect to a takeover of a troubled financial institution or encourage us to provide financial support to particular entities or sectors."[109] Commerce also noted in *CORE Preliminary Determination* that "…the Korean government has full control over IBK's management, policies and operations pursuant to the IBK Act."[110] Therefore, consistent with Commerce's determinations in earlier segments of this proceeding and with our prior findings in the CORE from Korea proceeding, we preliminarily determine that each of the GOK-owned or GOK-controlled banks and other financial institutions (*i.e.*, CBSF, KODIT, KDB, KoFC, KEXIM, Woori Bank, and the IBK) are authorities under section 771(5)(B) of the Act.[111] We also preliminarily determine that these authorities provided a financial contribution to Dongbu as defined under section 771(5)(D)(i) of the Act.

*Specificity*

With respect to specificity, the GOK stated that Dongbu was one of a very limited number of companies that underwent debt restructuring by creditors' councils during the period 2014 (the year in which Dongbu entered the debt restructuring) through 2018 (the POR).[112] Because the

---

[106] *See CORE Preliminary Determination* PDM at 13-14 (unchanged in *CORE Final Determination*) and *CRS Preliminary Determination* PDM at 27, (unchanged in *CRS Final Determination*). KDB and KoFC also merged in 2014. *See* Dongbu IQR at Exhibit G-2 at 27.

[107] *See, e.g.*, *CRS Preliminary Determination* PDM at 27 (unchanged in *CRS Final Determination*).

[108] *See Non-Oriented Electrical Steel from the Republic of Korea: Final Negative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 79 FR 61605 (October 14, 2014) (*NOES Final Determination*), and accompanying IDM at Comment 7.

[109] *See CORE Preliminary Determination* PDM at 14 (unchanged in *CORE Final Determination*).

[110] *Id.*

[111] *See, e.g.*, *CORE Preliminary Determination* PDM at 13-14 (unchanged in *CORE Final Determination*); and *CRS Preliminary Determination* PDM at 27 (unchanged in *CRS Final Determination*).

[112] *See* GOK IQR at 162.

actual recipients of financing pursuant to restructurings by creditors' councils are limited in number, this subsidy is specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.

*Benefit*

Under section 771(5)(E)(ii) of the Act, there is a benefit with respect to the provision of a loan if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market.  Consistent with the investigation and prior administrative reviews of CORE from Korea, we have calculated the benefit from these restructured loans from GOK-owned and GOK-controlled banks by comparing the interest actually paid on the loans during the POR to what the company would have paid on a comparable loan during the POI or POR.  While there were some private commercial banks involved in the debt restructuring of Dongbu, Dongbu's debt restructuring was controlled by the Creditor Bank Committee and Creditor Financial Institutions Committee which, in turn, were controlled by GOK policy banks, such as the KDB.  Furthermore, consistent with our findings regarding Dongbu's restructured loans in *CORE from Korea Final Determination* [113] and *Refrigerators from Korea Final Determination*,[114] we preliminarily determine that the loans from private creditors that were members of the Creditor Bank Committee cannot be construed to be "comparable commercial loans" and, thus, cannot be used as a commercial benchmark under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(2), because the Creditor Bank Committee is controlled by GOK-controlled policy, special purpose banks.

To determine the benefit conferred to Dongbu from the loans resulting from the loan restructuring during the POR, in accordance with 19 CFR 351.505(c)(2), we compared the interest actually paid on the loans during the POR to the benchmark interest rates, including a risk premium, as described in the "Benchmarks and Discount Rates" section above, during the POR.  On this basis, we determined a countervailable subsidy rate of 6.85 percent *ad valorem* in 2018 for Dongbu.[115]

## 2.    KDB Short-Term Discounted Loans for Export Receivables

Dongbu received certain documents-against-acceptance (D/A) export financing from the KDB for its export of subject merchandise to the United States.[116]  Commerce previously determined that this program was a countervailable export program in *Cold-Rolled Steel from Korea Final Determination*.[117]  The GOK reported that there were no changes to this program during the

---

[113] *See CORE from Korea Preliminary Determination* PDM (unchanged in *CORE from Korea Final Determination* IDM); *CORE from, Korea First Review Preliminary Results* PDM (unchanged in *CORE from Korea First Review Final Results* IDM); *CORE from Korea Second Review Preliminary Results* PDM (unchanged in *CORE from Korea Second Review Final Results* IDM).

[114] *See also Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 77 FR 17410 (March 16, 2012) (*Refrigerators from Korea Final Determination*), and accompanying IDM at 111-14.

[115] *See* Dongbu's Preliminary Calculation Memorandum.

[116] *See* Dongbu IQR at 17-18, Exhibit A-5, and Exhibit A-6.

[117] *See Cold-Rolled Steel from Korea Preliminary Determination* and the accompanying PDM at 14-15 (unchanged in *Cold-Rolled Steel from Korea Final Determination*).

POR.[118]  Therefore, we preliminarily determine that because KDB is an authority under section 771(5)(B) of the Act, this program results in a financial contribution in the form of a direct transfer of funds through loans under section 771(5)(D)(i) of the Act.  We also preliminarily find that this program is specific under section 771(5A)(A) and (B) of the Act, because the loans were contingent on export performance.  Our finding is consistent with prior Korea CVD proceedings.[119]

To calculate the benefit under this program, we used the benchmarks described in the "Benchmarks and Discount Rates" section above, as well as the methodology described in 19 CFR 351.505(c) to calculate the interest that Dongbu would have paid on a comparable commercial loan during the POR and divided that benefit by the appropriate sales.  On this basis, we preliminarily determine that Dongbu received a countervailable subsidy rate of 0.01 percent *ad valorem* under this program.[120]  Hyundai Steel reported that it did not use this program.[121]

### 3.    RSLTA - Local Tax Exemptions on Land Outside Metropolitan Areas – Article 78

Hyundai Steel reported receiving tax exemptions under Article 78 of the RSLTA.[122]  The GOK administers the tax exemption program under Article 78 of the RSLTA to provide incentives for companies to relocate from populated areas in the Seoul metropolitan region to industrial sites in underdeveloped areas of the country.[123]  Under Article 78 of the RSLTA, any entity acquiring real estate in a designated industrial complex for the purpose of constructing new or renovating existing buildings shall be exempted from the acquisition tax.[124]  In addition, the entity located in these designated industrial complexes shall have the property tax reduced by 50 percent for five years from the date the tax liability becomes effective.[125]  The tax exemption is increased to 100 percent of the relevant land, buildings, or facilities that are located in an industrial complex outside of the Seoul metropolitan area.[126]  The program is administered by the county tax officials where the industrial complex is located.[127]  Because we rejected the GOK's late submission, the record does not contain necessary information regarding whether there have been any changes to this program since it was examined in a prior segment of this proceeding.[128]  Because the GOK did not act to the best of its ability to provide the necessary information, as AFA, we preliminarily determine that there were no changes to this program during the POR.

Based on the above information, we preliminarily determine that the tax reductions constitute a financial contribution in the form of revenue forgone, as described under section 771(5)(D)(ii) of

---

[118] *See* GOK Initial QR at 11.
[119] *See Cold-Rolled Steel from Korea Preliminary Determination* and the accompanying PDM at 14-15 (unchanged in *Cold-Rolled Steel from Korea Final Determination* and *CRS Second Admin Review Preliminary Results* and the accompanying PDM at 28 (unchanged in *CRS Second Admin Review Preliminary Results*).
[120] *See* Dongbu Preliminary Calculation Memorandum.
[121] *See* Hyundai Steel IQR at 15 and SPP Yulchon IQR at 14.
[122] *See* Hyundai Steel IQR at 19-20 and Exhibit B-11; Hyundai Steel's May 26, 2020 SQR at Exhibit B-24.
[123] *See CRS Second Admin Review Preliminary Results* PDM at 15 (unchanged in *CRS Second Admin Review Final Results*).
[124] *Id*.
[125] *Id*.
[126] *Id*.
[127] *Id*.
[128] *See* GOK First Supplemental Questionnaire at 4.

the Act, and confer a benefit pursuant to section 771(5)(E) of the Act and 19 CFR 351.509(a). We further preliminarily determine that the tax exemptions provided under this program are specific under section 771(5A)(D)(iv) of the Act because the subsidies are limited to enterprises located within designated geographical regions.  Our findings regarding specificity are consistent with prior Korean CVD proceedings.[129]

The tax exemptions provided under this program are recurring benefits, because the taxes are due annually.  Thus, the benefit is expensed in the year in which it is received.[130]  To calculate the benefit, we subtracted the amount of taxes paid by the firms from the amounts that would have been paid absent the program.  To calculate the countervailable subsidy rate, we divided the total benefit by the company's total sales.  On this basis, we preliminarily determine the countervailable subsidy rate under the Article 78 program for Hyundai Steel is 0.02 percent *ad valorem* for 2018.[131]  Dongbu reported that it did not use this program during the POR.[132]

### 4.    RSTA Article 25(2):  Tax Deductions for Investments in Energy Economizing Facilities

Hyundai Steel reported receiving tax deductions under RSTA Article 25(2).[133]  The purpose of this program is to facilitate the enhancement of energy efficiency in business sectors through a credit towards taxes payable.[134]  Commerce previously determined that this program was countervailable.[135]  The GOK reported that there were no changes to this program during the POR.[136]

We preliminarily determine that this program results in a financial contribution from the GOK to recipients in the form of revenue forgone, as described in section 771(5)(D)(ii) of the Act.  The benefit conferred on the recipient is the difference between the amount of taxes it paid and the amount of taxes that it would have paid in the absence of this program, in accordance with section 771(5)(E) of the Act and as described in 19 CFR 351.509(a), effectively, the amount of the tax credit claimed.  Regarding specificity, based on record evidence, we preliminarily

---

[129] *See, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; and Rescission of Review, in Part; Calendar Year 2017*, 84 FR 15182 (April 15, 2019) (*CTL Plate from Korea 2017 Preliminary Results*), and accompanying PDM at 8-9 (unchanged in *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; Calendar Year 2017*, 84 FR 42893 (August 19, 2019) (*CTL Plate from Korea 2017 Final Results*), and accompanying IDM at 4); *see also Large Diameter Welded Pipe from the Republic of Korea: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 83 FR 30693 (June 29, 2018) (*LDWP from Korea Prelim*), and accompanying PDM at 21-22 (unchanged in *Large Diameter Welded Pipe from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 84 FR 6369 (February 27, 2019) (*LDWP from Korea Final*), and accompanying IDM at 14-15).
[130] *See* 19 CFR 351.524(a) and (c).
[131] *See* Hyundai Steel's Preliminary Calculation Memorandum.
[132] *See* Dongbu IQR at 22-23.
[133] *See* Hyundai Steel IQR at 18.
[134] *See CRS Second Admin Review Preliminary Results* PDM at 16 (unchanged in *CRS Second Admin Review Final Results*); *see also* GOK IQR at 45.
[135] *See CRS Preliminary Determination* PDM at 17-18 (unchanged in *CRS Final Determination* IDM at 19) (collectively, *CRS Investigation*).
[136] *See* GOK IQR at 42.

determine there is no basis to find that the recipients are limited, by law, to certain enterprises or industries under section 771(5A)(D)(i) of the Act.  Therefore, we examined whether the program is specific as a matter of fact under section 771(5A)(D)(iii) of the Act.  In a prior segment of this proceeding, we relied on information contained in the GOK's Statistical Yearbook of National Tax for finding *de facto* specificity.[137]  As described above, the record does not contain the GOK's Statistical Yearbook of National Tax covering the POR, due to the rejection of the GOK's late submission in response to the GOK First Supplemental Questionnaire.[138]  Thus, as AFA, we preliminarily determine that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act, because the actual number of recipients is limited.[139]

To calculate the countervailable subsidy rate, we divided the amount of the tax savings received by Hyundai Steel by its total sales during the POR.  On this basis, we preliminarily determine that Hyundai Steel received a countervailable subsidy rate of 0.05 percent *ad valorem* under this program. [140]  Dongbu reported it did not use this program during the POR.[141]

## 5.    RSTA Article 25(3):  Tax Credit for Investment in Environmental and Safety Facilities

Hyundai Steel and Dongbu Incheon both reported receiving tax deductions under RSTA Article 25(3).[142]  Dongbu Steel reported it did not use this program during the POR.[143]  Introduced in 2007, RSTA Article 25(3) aims to motivate investments in facilities that are constructed for the purpose of preserving the environment.[144]  Any entity making an investment in facilities under this program may apply for ten percent tax deduction.[145]  Commerce has previously determined that this program was countervailable.[146]  The GOK reported that there were no changes to this program during the POR with regard to our previous countervailability finding.[147]

In prior segments of this proceeding, we relied on information contained in the GOK's Statistical Yearbook of National Tax for finding *de facto* specificity.[148]  As described above, the record does not contain the GOK's Statistical Yearbook of National Tax covering the POR, due to the rejection of the GOK's late submission in response to the GOK First Supplemental Questionnaire. Thus, as AFA, we preliminarily determine that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act, because the actual number of

---

[137] *See, e.g.*, *CRS Second Admin Review Preliminary Results* PDM at 17 (unchanged in *CRS Second Admin Review Final Results* IDM at 9).

[138] *See* section "Use of Facts Otherwise Available," above; *see also* GOK First Supplemental Questionnaire at 9.

[139] *See* GOK First Supplemental Questionnaire at 9.

[140] *See* Hyundai Steel's Preliminary Calculation Memorandum.

[141] *See* Dongbu IQR at 21.

[142] *See* Hyundai Steel IQR at 18 and Dongbu IQR at 21.

[143] *See* Dongbu IQR at 21.

[144] *See* *CRS Second Admin Review Preliminary Results* PDM at 17 (unchanged in *CRS Second Admin Review Final Results*).

[145] *Id*.

[146] *See* *CRS Preliminary Determination* PDM at 18-19 (unchanged in *CRS Final Determination* IDM at 19).

[147] *See* GOK IQR at 49 and 53.  The GOK stated that there were no changes during the POR except that the tax credit rate in the applicable law changed.

[148] *See* *CRS Preliminary Determination* PDM at 18-19 (unchanged in *CRS Final Determination* IDM at 19).

recipients is limited.[149]  We note that in prior segments of this proceeding, we found that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act because the actual number of recipients is limited, and the GOK has reported there were no changes to this program during the POR that affects the program's countervailability.[150]  We preliminarily determine that this program results in a financial contribution from the GOK to recipients in the form of revenue forgone, as described in section 771(5)(D)(ii) of the Act, and confers a benefit pursuant to section 771(5)(E) of the Act and 19 CFR 351.509(a).[151]

To calculate the countervailable subsidy, we divided the amount of the tax savings received by Hyundai Steel by its total sales during the POR.  On this basis, we preliminarily determine that Hyundai Steel received a countervailable subsidy rate of 0.09 percent *ad valorem* under this program and we preliminarily determine the countervailable subsidy rate that Dongbu received under this program to be less than 0.005 percent *ad valorem* for 2018 (*de minimis*).[152]

6.      **RSTA Article 26:  Tax Deduction for GOK Facilities Investment Support**

Hyundai Steel reported receiving tax deductions under RSTA Article 26.[153]  Under Article 26 of the RSTA, the GOK provides tax incentives to companies that make investments in their respective fields of businesses.  Under RSTA Article 26, taxpayers are permitted to apply for a credit towards taxes payable for the qualifying investment.[154]  The following categories of companies qualify for the tax incentives provided under the program:  (1) a small- or medium-sized enterprise, (2) a "transitioning" company, or (3) "any other company."[155]  The GOK noted that there were no changes made to this program during the POR.[156]  The relevant law authorizing the credit, RSTA Article 26, limits this program to enterprises or industries within a designated geographical region within the jurisdiction of the authority providing the subsidy, specifically to areas outside the Seoul Metropolitan Area.[157]

We preliminarily determine that the tax credits under RSTA Article 26 constitute a financial contribution in the form of revenue forgone, as described under section 771(5)(D)(ii) of the Act and confer a benefit pursuant to section 771(5)(E) of the Act and 19 CFR 351.509(a).  We further preliminarily determine that the tax credits provided under this program are specific under section 771(5A)(D)(iv) of the Act, because benefits are limited to enterprises located

---

[149] *See* section "Use of Facts Otherwise Available," above; *see also* GOK First Supplemental Questionnaire at 9.

[150] *See CRS Preliminary Determination* PDM at 18-19 (unchanged in *CRS Final Determination* IDM at 19); *see also* GOK IQR at 49 and 53.  The GOK stated that there were no changes during the POR except that the tax credit rate in the applicable law changed.

[151] *See CRS Preliminary Determination* PDM at 18-19 (unchanged in *CRS Final Determination* IDM at 19).

[152] *See* Hyundai Steel's Preliminary Calculation Memorandum and Dongbu's Preliminary Calculation Memorandum.

[153] *See* Hyundai Steel IQR at 19.

[154] *See CRS Second Admin Review Preliminary Results* PDM at 18 (unchanged in *CRS Second Admin Review Final Results*); *see also* GOK IQR at 59.

[155] *Id.*

[156] *See* GOK IQR at 56.

[157] *See CRS Second Admin Review Preliminary Results* PDM at 18 (unchanged in *CRS Second Admin Review Final Results*).

within designated geographical regions.  Our findings in this regard are consistent with prior Korean CVD proceedings.[158]

To calculate the benefit for Hyundai Steel, we subtracted the amount of taxes paid by the firm from the amount that would have been paid absent the program.  To calculate the countervailable subsidy rate, we divided the total benefit by the total sales of the company.  On this basis, we preliminarily determine the countervailable subsidy rate under this program during the POR to be 0.27 percent *ad valorem* for Hyundai Steel.[159]  Dongbu reported it did not use this program during the POR.[160]

7.    **Electricity Discounts under Trading of Demand Response Resources (DRR) Program**

Hyundai Steel and Dongbu reported receiving grants under this program during the POR.  The legal basis for this program is Article 31(5) of the Electricity Business Law (EBL) and Chapter 12 of the Rules on Operation of Electricity Utility Market (ROEUM).[161]  Chapter 12 of the ROEUM governs the program's operations, the purpose of which is to smooth imbalances between the supply and demand of power provision by creating a competitive marketplace to determine the price of demand response resources.[162]  The program is divided into two sub-programs, Demand Response Peak Curtailment and Demand Response Program for Payment Savings.[163]  The former program is designed to curtail load during peak electricity demand periods, and the latter is intended to minimize power generation costs through price competition.[164]  The Korean Power Exchange (KPX) operates both programs.[165]  KPX is majority-owned by the Korea Electric Power Corporation (KEPCO), which is, in turn, majority-owned by the GOK.[166]  Commerce previously determined that this program was countervailable.[167]

The GOK noted that there were no changes made to this program during the POR.[168]  Thus, consistent with our findings in prior segments of this proceeding, we preliminarily determine that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act because the actual recipients of the subsidy are limited in number.[169]  Also, consistent with our

---

[158] *See CTL Plate from Korea 2017 Preliminary Results* PDM at 11-12 (unchanged in *CTL Plate from Korea 2017 Final Results* IDM at 11); *see also LDWP from Korea Preliminary Determination* PDM at 20-21 (unchanged in *LDWP from Korea Final Determination* IDM at 14).

[159] *See* Hyundai Steel's Preliminary Calculation Memorandum.

[160] *See* Dongbu IQR at 21-22.

[161] *See CRS Second Admin Review Preliminary Results* PDM at 24 (unchanged in *CRS Second Admin Review Final Results*).

[162] *Id.*

[163] *Id.*; *see also* Hyundai Steel's May 26, 2020 SQR at 6.

[164] *See CRS Second Admin Review Preliminary Results* PDM at 24 (unchanged in *CRS Second Admin Review Final Results*).

[165] *Id.*

[166] *Id.*

[167] *See CRS Second Admin Review* IDM at 10.

[168] *See* GOK IQR at 113.

[169] *See CRS First Admin Review Preliminary Results* PDM at 24-25 (unchanged in *CRS First Admin Review Final Results* IDM at 10); *see also CTL Plate from Korea 2017 Final Results*.

prior finding, we preliminarily find KEPCO to be an "authority" within the meaning of section 771(5)(B) of the Act.[170]  Therefore, we determine that payments provided under this program provide a financial contribution in the form of a direct transfer of funds from KPX to companies participating in this program, under section 771(5)(D)(i) of the Act, and a benefit exists in the amount of the grant provided to Hyundai Steel and Dongbu, in accordance with 19 CFR 351.504(a).  Our findings in this regard are consistent with prior CVD proceedings involving Korea.[171]

Because there is no information on the record indicating that subsidies under the DRR program were tied to export sales, we used the total sales of Hyundai Steel as a denominator to determine the countervailable subsidy rate under this program during the POR.  On this basis, we preliminarily determine the countervailable subsidy rate that Hyundai Steel received under this program to be 0.05 percent *ad valorem* for 2018 and we preliminarily determine the countervailable subsidy rate that Dongbu received under this program to be 0.02 percent *ad valorem* for 2018.[172]

## 8.    Modal Shift Program

Hyundai Steel reported that it used this program and received grants during the POR.[173]  The GOK established this grant program in 2010 in order to decrease greenhouse gas emissions in the transportation and logistics sector.[174]  Specifically, through this program, the GOK aims to increase the transport volume by railroad and vessels, in order to decrease the transport volume by heavy freight motorized vehicles.[175]  Under this program, the GOK Ministry of Land, Infrastructure, and Transport provides grants to administering agencies for truck-to-rail "modal shift" entities, and the GOK Ministry of Oceans and Fisheries provides grants to administering agencies for truck-to-marine freight "modal shift" entities.[176]  This program is established and operated under Article 21 of the Sustainable Transportation Logistics Development Act, Article 24 of its Enforcement Decree, and Article 9 of the Regulations on Modal Shift Agreement (MSA).[177]  Commerce has previously found this program to be countervailable.[178]

Because we rejected the GOK's late submission, the record does not contain necessary information regarding whether there have been any changes to this program since it was examined in a prior segment of this proceeding.[179]  Because the GOK did not act to the best of its ability to provide the necessary information, as AFA, we preliminarily determine that there were no changes to this program during the POR.  Thus, consistent with our findings in prior segments

---

[170] *See CRS Second Admin Review Preliminary Results* PDM at 24 (unchanged in *CRS Second Admin Review Final Results*).

[171] *Id*.

[172] *See* Dongbu's Preliminary Calculation Memorandum.

[173] *See* Hyundai Steel IQR at 30.

[174] *See CRS Second Admin Review Preliminary Results* PDM at 25 (unchanged in *CRS Second Admin Review Final Results*).

[175] *Id*.

[176] *Id*.

[177] *Id*.

[178] *See CRS First Admin Review Preliminary Results* PDM at 26-27 (unchanged in *CRS First Admin Review Final Results* IDM at 10).

[179] *See* GOK First Supplemental Questionnaire at 6.

of this proceeding, we preliminarily determine that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(I) of the Act because the actual recipients of the subsidy are limited in number.[180]  Our findings are consistent with prior CVD proceedings involving Korea.[181]

Also, consistent with our prior findings, we preliminarily determine that a financial contribution exists in the form of a direct transfer of funds from the GOK under section 771(5)(D)(i) of the Act, and a benefit exists in the amount of the grant received by Hyundai Steel during the POR.[182]

To calculate the countervailable subsidy rate for the POR, we divided the amount of assistance Hyundai Steel received by Hyundai Steel's total sales.  Accordingly, we preliminarily determine the countervailable subsidy rate that Hyundai Steel received under this program is 0.01 percent *ad valorem*.  Dongbu reported that it did not receive benefits under, this program.[183]

## 9.     Reduction for Sewerage Fees

In the initial questionnaire responses, Hyundai Steel and Dongbu Incheon reported that they used this program.[184]  This program provides a reduction in the water bill if a company can demonstrate that the amount of sewage that was discharged into the public sewerage system was less than the amount of clean water that it had consumed from the public water supply system.[185]

Under this program, the GOK bills companies and households for public sewerage system usage on the basis of the amount of clean water that users have consumed from the public water supply.[186]  However, if a user can show that the amount of sewage water that it discharged into the public sewerage system is less than the amount of clean water that it has consumed from the public water supply system, authorities will calculate the public sewerage system usage fee on the basis of the proven amount of the sewage water discharged into the sewerage system.[187]  A user can also install a "gray water system," which processes unclean water for recycling purposes without discharging it into the public sewerage system.[188]  If a gray water system is installed, the amount of the waste water that a user discharges into public sewerage system is considered to be less than the amount of clean water consumed from the public water supply

---

[180] *See CRS First Admin Review Preliminary Results* PDM at 26-27 (unchanged in *CRS First Admin Review Final Results* IDM at 10).
[181] *See Non-Oriented Electrical Steel from the Republic of Korea:  Final Negative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 79 FR 61605 (October 14, 2014), and accompanying IDM at 26-27; *Welded Line Pipe from the Republic of Korea:  Final Negative Countervailing Duty Determination*, 80 FR 61365 (October 13, 2015), and accompanying IDM at 36 ("The SAA notes:  "the Administration intends to apply the specificity test in light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy."); SAA, H.R. Doc. No. 103-316 (1994) at 929.
[182] *Id.*
[183] *See* Dongbu IQR at 30.
[184] *See* Hyundai Steel IQR at 60 and Exhibit I-37; *see also* Dongbu IQR at 46-47.
[185] *See* GOK IQR at 193-194.
[186] *Id.* at 193.
[187] *Id.*
[188] *Id.*

system, [189] because recycling the gray water, results in the unclean water being used at least twice before being discharged into the public water system.[190]

The legal basis for the program is Article 65(1) of the Sewerage Act and Article 36(2) of the Enforcement Decree of the Sewerage Act.[191]  Article 14 and Article 21 of the Incheon Metropolitan City Ordinance on Sewage System Usage, and Article 9 of the Enforcement Decree of the same Ordinance, stipulate the method by which the service fee for the usage of the public sewerage system is calculated.[192]  To qualify for this program, companies or households must submit an application to their local government authority.[193]  Although the program was introduced through the amendment of the Presidential Decree of the Sewerage Act by the Ministry of Environment, which is a central level of the Korean government, the authority to execute the program is delegated to regional level governments, which in this case was the Incheon Metropolitan City Government.[194]  Further, the Incheon Metropolitan City Government delegated its authority to local level governments, which in this case were the Incheon Dong-gu and Seo-su local governments.[195]  Companies submit applications and relevant documents (*e.g.*, reports) in order to request that local level governments calculate the public sewerage system usage fee on the basis of the sewage water actually or deemed to have been discharged into the sewerage system and not on the basis of the amount of clean water consumed from the public water supply system.[196]  Then, the local waterworks authorities, which in this case was the Incheon Waterwork Authority, issue the bills and collects the public sewerage system usage fees based on the amount of waste water discharged into the sewerage system.[197]

The local governments maintain the application forms and notification letters, which report that a "gray water" system" has been installed or any objective report showing the amount of water discharged into the public sewerage system is less than the amount of clean water consumed from the public water supply system.[198]  They also maintain approval notifications which were sent to applicants.[199]  The Incheon Waterwork Authority keeps a record of the billing and collection of the public sewerage system usage fees.[200]

We preliminarily determine that the reduction in sewerage fees under this program results in a financial contribution from the GOK to recipients in the form of revenue forgone, as described in section 771(5)(D)(ii) of the Act.  Record information does not indicate that the reduction in sewerage fees under this program is limited by law to certain enterprises or industries under section 771(5A)(D)(i) of the Act.[201]  Thus, we examined whether the program is *de facto* specific under section 771(5A)(D)(iii) of the Act.  Based on the total amount of revenue forgone by the

---

[189] *Id.*
[190] *Id.*
[191] *Id.* at 196.
[192] *Id.* at 201.
[193] *Id.* at 200.
[194] *Id.* at 194.
[195] *Id.* at 194-195.
[196] *Id.* at 195-196 and 200-201.
[197] *Id.* at 195.
[198] *Id*. at 196 and 200-201.
[199] *Id*. at 196.
[200] *Id.*
[201] *Id.* at 202-203.

GOK during the POR, and the amount of the benefits received by Hyundai Steel, we preliminarily determine that this program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(II) of the Act because Hyundai Steel is a predominant user of this program.[202]

The benefit conferred on the recipient under this program is the difference between the amount of water fees paid by each respondent and the amount of water fees that it would have paid in the absence of this program, in accordance with section 771(5)(E) of the Act.  In effect, the benefit equals the amount of the water fees waived if the company had paid the water usage bill in full. We treated the total amount of fees waived during the POR to Hyundai Steel and Dongbu as the benefit attributable to each company.

To calculate the net countervailable subsidy rate for the POR, we divided the total benefit amount by each respondent's total sales during the POR.  On this basis, we preliminarily determine a countervailable subsidy rate of 0.01 percent *ad valorem* for Hyundai Steel and we preliminarily determine the countervailable subsidy rate that Dongbu received under this program to be 0.01 percent *ad valorem* for 2018.[203]

## 10.     Provision of Port Usage Rights at the Port of Incheon[204]

The GOK reported that this program is part of a public-private partnership wherein the GOK entered into an arrangement to construct a wharf at the North Port of Incheon (Incheon Wharf), attracting investment from the private sector instead of using its own budget.[205]  The public-private partnership is a typically long-term cooperative arrangement between two or more public and private partners nature that work together to complete a project and/or to provide services to the population.[206]  The Incheon Wharf project is administered by the Ministry of Oceans and Fisheries, under the Private Participation in Social Infrastructure Act introduced in 1994, and the Basic Plan for the Public-Private Partnership Projects, which is a Ministerial Decree adopted by the Ministry of Economy and Finance.[207]  The details of the agreement on the Incheon Wharf project are contained in the North Incheon Wharf Private Investment Project Implementation Agreement (the Agreement) and maintained by the Ministry of Oceans and Fisheries.[208]  The

---

[202] *Id*. at 205.

[203] *See* Hyundai Steel's Preliminary Calculation Memorandum and Dongbu's Preliminary Calculation Memorandum; *see also CTL Plate from Korea 2018 Prelim*.

[204] The GOK reported the program name as the "Port Usage Rights at the Port of Incheon" instead of the name "Reimbursements on Construction Costs for Facilities at Inchon Harbor."  *See* GOK's December 16, 2020 SQR at Appendix 2.  Although we listed this program as "Reimbursements on Construction Costs for Facilities at Inchon Harbor" which Hyundai Steel has received since the *CRS Investigation* (*see CRS Final Determination* IDM at 38), during the course of the *CRS Second Review*, we initiated on this program as a newly alleged program titled "Provision of Port Usage Rights at the Port of Incheon."  *See* Memorandum, "New Subsidy Allegations," dated August 15, 2019 at 4.  In the *CRS Second Review Final Results*, we determined that this "Provision of Port Usage Rights at the Port of Incheon" program did not confer a measurable benefit.  *See CRS Second Review Final Results* IDM at 11.  Thus, for this preliminarily results, we find that "Provision of Port Usage Rights at the Port of Incheon" and "Reimbursements on Construction Costs for Facilities at Inchon Harbor" are the same program, and, from the ongoing review, we will analyze the program as "Provision of Port Usage Rights at the Port of Incheon" instead of "Reimbursements on Construction Costs for Facilities at Inchon Harbor."

[205] *See* GOK's December 16, 2020 SQR at 1-2.

[206] *Id*. at footnote 1.

[207] *Id*. at Appendix 2.

[208] *Id*. at 2 and Appendix 2.

construction of the Incheon Wharf started in 2003 and ended in 2006.[209]  The GOK bestowed the right to use the Incheon Wharf to the private partner (*i.e.*, Hyundai Steel) for a specified period of time without paying port usage fees, as well as the right to collect certain usage fees from third-party users.[210]  Article 2 paragraph 54 of the Agreement states the types of fees that can be collected under the Harbor Act and the Harbor Transport Business Act.[211]

Hyundai Steel reported it entered into an agreement with the Ministry of Oceans and Fisheries regarding the construction of the wharf at North Incheon Harbor in August 2001 and entered into a revised agreement in April 2009.[212]  Hyundai Steel financed the construction of the Incheon Wharf and, pursuant to Korean law, ownership of the port facility reverted to the GOK in 2007.[213]  Hyundai Steel received funding from the GOK between 2004 and 2007 for some of the construction costs.[214]  The remaining construction costs are being amortized by Hyundai Steel over a specified period.[215]  Hyundai Steel was granted the right to operate and use the port for its own operations freely for transporting its purchased goods, as well as the right to collect fees from third-party users, for a specified time period.[216]  Thus, Hyundai Steel reported it collected berth occupancy charges (or berthing income) from shipping companies and reported these amounts for each of the years from 2007 through 2018.[217]

Further, in response to a supplemental questionnaire, Hyundai Steel reported that in connection with its own usage of the port, it had a service contract with an unaffiliated private terminal operating company.[218]  Hyundai Steel states that harbor facility usage fees can be levied as harbor facility lease fees for terminal operating companies, as prescribed in Article 2(6) of the Harbor Transport Business Act.[219]  While Hyundai Steel paid the terminal operating company for its services,[220] Hyundai Steel was entitled to harbor facility usage fees from the terminal operating company.[221]  The specific harbor facility usage fees relating to the terminal operating company during the POR that Hyundai Steel reported amounts for are:  (1) apron usage fees; (2) land usage fees; and (3) open storage yard fees.[222]

We preliminarily determine that the program provides a financial contribution because the fees that the GOK gave Hyundai Steel the right to collect, which would otherwise have been collected by the GOK absent the agreement between the parties, represent revenue forgone by the GOK within the meaning of section 771(5)(D)(ii) of the Act.  The berthing income and the harbor facility usage fees are revenue forgone by the GOK because Hyundai Steel did not pay the GOK the fees it collected.  Further, we preliminarily find the program to be specific under section

---

[209] *Id*. at 2, Footnote 3.
[210] *Id*. at 5.
[211] *Id*. at 3.
[212] *See* Hyundai Steel IQR at 40.
[213] *Id*.
[214] *Id*.
[215] *Id*.
[216] *Id*.  *See also* Hyundai Steel's May 26, 2020 SQR at 24.
[217] *See* Hyundai Steel IQR. at 41 and Exhibit G-3.
[218] *See* Hyundai Steel's December 16, 2020 SQR at 7.
[219] *Id*. at 9.
[220] *Id*. at 7.
[221] *Id*. at 8-9.
[222] *Id*. at 9-12.

771(5A)(D)(iii)(I) of the Act because the actual recipients are limited in number.[223]  A benefit exists under section 771(5)(E) of the Act in the amount of the fees exempted reported by Hyundai Steel.  Consistent with prior proceedings, we have treated this program as a recurring grant program.[224]  To calculate the benefit we summed up the berthing income and the harbor facility usage fees that Hyundai Steel received during the POR, and divided this amount by Hyundai Steel's total sales.  On this basis, we preliminarily determine a countervailable subsidy rate of 0.01 percent *ad valorem* for Hyundai Steel under this program.[225]

**B.      Programs Preliminarily Determined to be Not Used or Not to Confer a Measurable Benefit**

**Hyundai Steel**

1. Suncheon Harbor Port Usage Fee Exemptions
2. Port Usage Fee Exemption Programs
3. Other Port Usage Fee Exemption Programs
4. KEXIM Import Financing
5. KEXIM Short-Term Export Credits
6. KEXIM Export Factoring
7. KEXIM Export Loan Guarantees
8. KEXIM Trade Bill Rediscounting Program
9. KEXIM Overseas Investment Credit Program
10. KDB Short-Term Discounted Loans for Export Receivables
11. Industrial Base Fund Loans
12. K-SURE Export Credit Guarantee
13. K-SURE Short-Term Export Credit Insurance
14. Long-Terms Loans from KORES and KNOC
15. Clean Coal Subsidies
16. GOK Subsidies for "Green Technology R&D" and its Commercialization
17. Support for SME "Green Partnerships"
18. RSTA Article 8-3
19. RSTA Article 9, formerly TERCL Article 8
20. RSTA Article 10(1)(1)
21. RSTA Article 10(1)(2)
22. RSTA Article 10(1)(3)

---

[223] *See* GOK's December 16, 2020 SQR at 2; *see also* Hyundai Steel Preliminary Calculation Memorandum.
[224] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review*, 2017, 85 FR 64122 (October 9, 2020), and accompanying IDM at Comment 6; *see also, e.g.*, *Notice of Final Results of Countervailing Duty Administrative Review:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 72 FR 38565 (July 13, 2007), and accompanying IDM at 6-7 and Comment 1; *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review*; 2011, 78 FR 55241 (September 10, 2013), and accompanying PDM at 11 (unchanged in *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review*; 2011, 79 FR 5378 (January 31, 2014)); *Notice of Final Affirmative Countervailing Duty Determination:  Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea*, 67 FR 62102 (October 3, 2002), and accompanying IDM at 20 and Comment 11.
[225] *See* Hyundai Steel Preliminary Calculation Memorandum.

23.    RSTA Article 10-2
24.    RSTA Article 11
25.    RSTA Article 22
26.    RSTA Article 24
27.    RSTA Article 25
28.    RSTA Article 29(4)
29.    RSTA Article 30
30.    RSTA Article 120
31.    RSTA Article 104(5)
32.    RSTA Article 104(14)
33.    RSTA Article 104(15)
34.    RSTA Article 104(8)(1)
35.    RSTA 94
36.    RSLTA Articles, including 19, 31, 46, 47-2, 84, 109 and 112
37.    LTA 109, 112, 137, 145, and 146
38.    Asset Revaluation Under Article 56(2) of the TERCL
39.    Tax Reductions and Exemptions in Free Economic Zones
40.    Exemptions and Reductions of Lease Fees in Free Economic Zones
41.    Grants and Financial Support in Free Economic Zones
42.    Sharing of Working Opportunities/Employment Creating Incentives
43.    R&D Grants under ITIPA
44.    Power Generation Price Difference Payments (PGPDP)
45.    Daewoo International Corporation's (DWI's) Debt Workout
46.    GOK Infrastructure Investment at Incheon North Harbor
47.    Machinery & Equipment (KANIST R&D) Project
48.    Grant for Purchase of Electrical Vehicle
49.    Power Business Law Subsidies
50.    Provision of Liquefied Natural Gas (LNG) for LTAR
51.    Dongbu Debt Restructuring
52.    Special Accounts for Energy and Resources (SAER) Loans
53.    Energy Savings Programs:
            Electricity Savings for Designated Period Program
            Electricity Savings through the Bidding Process Program
            Electricity Savings upon an Emergency Reduction Program
            Electricity Savings through General Management Program
            Utilization of Capability of the Private Sector
            In Accordance with Prior Announcement
            Intelligent Electricity Savings
            Support for Instruments with High Energy Efficiencies
            Management of the Electricity Load Factor Program
54.    Energy Savings Program[226]
55.    The GOK's Purchases of Electricity for MTAR
56.    Incentives for Compounding and Prescription Cost Reduction
57.    Subsidies for Employment Security during Period of Childbirth and Childcare
58.    Incentives for Usage of Yeongil Harbor in Pohang City

---

[226] *See CRS Final Determination* IDM at footnote 119.

59.  VAT Exemptions on Imported Goods
60.  Import duty Exemptions
61.  Incentives for Usage of Gwangyang Port
62.  Incentives for Natural Gas Facilities
63.  Subsidies for Construction and Operation of Workplace Nursery
64.  Subsidies for Hyundai Steel Red Angels Women's Football Club
65.  Co-existence Project for Large- Medium- Small Enterprises as Energy Companies
66.  One Company for One Street Clean Management Agreement
67.  Support for Smoking Cessation Treatment
68.  Seoul Guarantee Insurance
69.  Subsidies for Pohang Art Festival
70.  Fast-Track Restructuring Program
71.  Grants from the Korea Agency for Infrastructure Technology Advancement
72.  Discount of Expenses for Wastewater Reclamation and Reusing System
73.  Discount on Expenses for Water Usage
74.  Grants for LED Efficiency Improvement
75.  Purchase of Land from Government Entities
76.  Other Transactions with Government Entities
77.  Discount of Electricity Fee for Energy Storage System
78.  VAT Tax Deductions Due to Bad Debt
79.  Other Transactions with Government Entities
80.  Various Government Grants Contained in Financial Statements
81.  Supporting on Projects under Center for Creative Economy and Innovation
        Job Experience Program for Job-Seekers
        Idea Competition for Venture Business
        Operating Expense for Projects to Support SMEs
        Project for Supporting SME's Startups
82.  Provision of Medical Services
83.  Compensation for Moving Cost
84.  Vocational Skills Development
85.  Vocational Skills Development for Non-POSCO Employees
        Corporate University
        Work and Learn Program
        Consortium Project
        Support for Job-Seekers
        Operating Council for Cooperation with SMEs
86.  Other Assistance in the AUL Period
87.  Support for Inducement of Tourists
88.  Assistance for Medical Business Research
89.  Assistance for Small Entrepreneurs in the Cosmetic Industry
90.  Reimbursement of Operating Expenses for the Consultative Counsel of Consigned Enterprises
91.  Subsidy Program for Extension of Employment of Elderly Persons
92.  Subsidy Program of Promoting Employment of the Disabled
93.  Project on Construction of Innovative IT Network
94.  Subsidy for Installation of High-Efficient Induction Motor

95.    Subsidy for Registration in Green House Gas Emission Reduction Project
96.    Grants for Employment of Youth Interns
97.    Grants for Participation in Green Energy EXPO

**Dongbu**

1.    Port Usage Fee Exemption Programs
2.    Other Port Usage Fee Exemption Programs
3.    KEXIM Import Financing
4.    KEXIM Short-Term Export Credits
5.    KEXIM Export Factoring
6.    KEXIM Export Loan Guarantees
7.    KEXIM Trade Bill Rediscounting Program
8.    KEXIM Overseas Investment Credit Program
9.    Industrial Base Fund Loans
10.    K-SURE Export Credit Guarantees
11.    K-SURE Short-Term Export Credit Insurance
12.    Long-Terms Loans from KORES and KNOC
13.    Clean Coal Subsidies
14.    GOK Subsidies for "Green Technology R&D" and its Commercialization
15.    Support for SME "Green Partnerships"
16.    RSTA Article 8-3
17.    RSTA Article 9, formerly TERCL Article 8
18.    RSTA Article 10(1)(1)
19.    RSTA Article 10(1)(2)
20.    RSTA Article 10(1)(3)
21.    RSTA Article 10-2
22.    RSTA Article 11
23.    RSTA Article 22
24.    RSTA Article 24
25.    RSTA Article 25
26.    RSTA Article 25(2)
27.    RSTA Article 25(3)
28.    RSTA Article 29(4)
29.    RSTA Article 30
30.    RSTA Article 120
31.    RSTA Article 104(5)
32.    RSTA Article 104(14)
33.    RSTA Article 104(15)
34.    RSLTA Articles, including 19, 31, 46, 47-2, 84, 109 and 112
35.    LTA 109, 112, 137, 145, and 146
36.    Asset Revaluation Under Article 56(2) of the TERCL
37.    Tax Reductions and Exemptions in Free Economic Zones
38.    Exemptions and Reductions of Lease Fees in Free Economic Zones
39.    Grants and Financial Support in Free Economic Zones
40.    Sharing of Working Opportunities/Employment Creating Incentives

41.    R&D Grants under ITIPA
42.    Power Generation Price Difference Payments (PGPDP)
43.    Machinery & Equipment (KANIST R&D) Project
44.    Grant for Purchase of Electrical Vehicle
45.    Power Business Law Subsidies
46.    Provision of Liquefied Natural Gas (LNG) for LTAR
47.    Special Accounts for Energy and Resources (SAER) Loans
48.    Energy Savings Programs:
            Electricity Savings for Designated Period Program
            Electricity Savings through the Bidding Process Program
            Electricity Savings through General Management Program
            Utilization of Capability of the Private Sector
            In Accordance with Prior Announcement
            Intelligent Electricity Savings
            Management of the Electricity Load Factor Program
49.    Energy Savings Program[227]
50.    The GOK's Purchases of Electricity for MTAR
51.    Incentives for Compounding and Prescription Cost Reduction
52.    Subsidies for Employment Security during Period of Childbirth and Childcare
53.    Incentives for Usage of Yeongil Harbor in Pohang City
54.    VAT Exemptions on Imported Goods
55.    Import duty Exemptions
56.    Incentives for Usage of Gwangyang Port
57.    Incentives for Natural Gas Facilities
58.    Subsidies for Construction and Operation of Workplace Nursery
59.    Co-existence Project for Large- Medium- Small Enterprises as Energy Companies
60.    One Company for One Street Clean Management Agreement
61.    Support for Smoking Cessation Treatment
62.    Seoul Guarantee Insurance
63.    Subsidies for Pohang Art Festival
64.    Fast-Track Restructuring Program
65.    Grants from the Korea Agency for Infrastructure Technology Advancement
66.    Discount of Expenses for Wastewater Reclamation and Reusing System
67.    Discount on Expenses for Water Usage
68.    Other Transactions with Government Entities
69.    Discount of Electricity Fee for Energy Storage System
70.    VAT Tax Deductions Due to Bad Debt
71.    Other Transactions with Government Entities
72.    Supporting on Projects under Center for Creative Economy and Innovation
            Job Experience Program for Job-Seekers
            Idea Competition for Venture Business
            Operating Expense for Projects to Support SMEs
            Project for Supporting SME's Startups
73. Provision of Medical Services
74. Compensation for Moving Cost

---

[227] *See CRS Final Determination* IDM at footnote 119.

75. Other Assistance in the AUL Period
76. Development of Advanced River Road Disaster Prevention Design Adjacent to Water Impact Area for the Control of Debris Flow and Sediment
77. Refund on Employer's Support Trainning Education Expense
78. Employment Promotion of Disabled
79. Employment Promotion of the Elderly
80. Development of PROTECT Explosion Proof Panel with 20mm Thickness
81. Development of Direct Reduction Iron Manufacturing and Process Technology Using Domestic Resources
82. Dangjin Dongbu Steel's Housing Playground Replacement Support
83. Dangjin Dongbu Steel's Housing Playground Safety Inspection Support
84. Industrial Natural Gas Support Program
85. Development of Integrated Design Engineering Technology for Retractable Large Spatial Structures
86. Rewards for Outstanding Recycling Performance
87. Development of Advanced River Road Disaster Prevention Design Adjacent to Water Impact Area for the Control of Debris Flow and Sediment
88. Employment Stability Promotion for Employees During Period of Childbirth and Childcare
89. Industrial Natural Gas Support Program
90. Development of integrated design engineering technology for retractable large spatial structures

## IX.    RECOMMENDATION

Based on our analysis, we recommend adopting the above positions.  If this recommendation is accepted, we will publish the preliminary results of this review in the *Federal Register*.

☒                                   ☐
_____          _____
Agree                              Disagree

1/15/2021

X  _____

Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

37