## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, Plaintiff, v. UNITED STATES, Defendant, and NUCOR CORPORATION, Defendant-Intervenor. | Court No. 21-00304 |

### PLAINTIFF HYUNDAI STEEL COMPANY'S
### RESPONSE TO COURT REQUEST

Plaintiff Hyundai Steel Company hereby respectfully responds to the Court's February 22, 2023 order.  *See* Order, Hyundai Steel Company v. United States, No. 21-00304 (Ct. Int'l Trade Feb. 22, 2023), ECF No. 50.  In its order, the Court requested that Plaintiff shall file copies of decision memoranda issued by the U.S. Department of Commerce that Plaintiff cited in its briefs submitted in this matter.  *Id.*

Pursuant to the Court's request, Plaintiff includes herein copies of the decision memoranda that it cited in its brief and reply brief in

support of its motion for judgment on the agency record. *See* Plaintiff Hyundai Steel Company's Brief in Support of its Motion for Judgment on the Agency Record, Hyundai Steel Company v. United States, No. 21-00304 (July 18, 2022), ECF No. 34; *see also* Plaintiff's Reply Brief in Support of its Motion for Judgment on the Agency Record, Hyundai Steel Company v. United States, No. 21-00304 (October 27, 2022), ECF No. 43. For the reasons explained in Plaintiff's briefing, the determinations by the U.S. Department of Commerce in the attached cases support the conclusion that no countervailable benefit was conferred on Hyundai Steel.

Please contact the undersigned should you have any questions regarding this matter.

Respectfully submitted,

/s/ Brady W. Mills
Brady W. Mills
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 408-5153

*Counsel to Plaintiff Hyundai Steel Company*

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: HONORABLE M. MILLER BAKER

*Hyundai Steel Company, v. United States*
Court No. 21-00304
Plaintiff's Response to Court Request
Exhibit List

| Attachment No. | Attachment Title |
| --- | --- |
| Attachment 1 | Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils From the Republic of Korea, 64 Fed. Reg. 30,636 (Dep't Commerce June 8, 1999). |
| Attachment 2 | Notice of Final Affirmative Countervailing Duty Determination: Certain Cold-Rolled Carbon Steel Flat Products From the Republic of Korea, 67 Fed. Reg. 62,102 (Dep't Commerce Oct. 3, 2002). |
| Attachment 3 | Notice of Final Results of Countervailing Duty Administrative Review: Certain Cut-to-Length Carbon- Quality Steel Plate from the Republic of Korea, 72 Fed. Reg. 38,565 (Dep't Commerce July 13, 2007). |
| Attachment 4 | Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2011, 78 Fed. Reg. 55,241 (Dep't Commerce Sept. 10, 2013). |
| Attachment 5 | Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2011, 79 Fed. Reg. 5,378 (Dep't Commerce Jan. 31, 2014). |
| Attachment 6 | Supercalendered Paper From Canada: Preliminary Affirmative Countervailing Duty Determination, 80 Fed. Reg. 45,951 (Dep't Commerce Aug. 3, 2015). |
| Attachment 7 | Supercalendered Paper From Canada: Final Affirmative Countervailing Duty Determination, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015). |

| Attachment 8 | Certain Quartz Surface Products From the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination, 84 Fed. Reg. 54,841 (Dep't Commerce Oct. 11, 2019). |
| --- | --- |
| Attachment 9 | Certain Quartz Surface Products From the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part, 85 Fed. Reg. 25,400 (Dep't Commerce May 1, 2020). |
| Attachment 10 | Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2017, 85 Fed. Reg. 64,122 (Dep't Commerce Oct. 9, 2020). |

Attachment 1

Final Affirmative Countervailing Duty Determination:
Stainless Steel Sheet and Strip in Coils From the
Republic of Korea, 64 Fed. Reg. 30,636 (Dep't
Commerce June 8, 1999).

parties with its responses to the Department's questionnaires in a timely fashion. However, the Department believes that Arinox, a *pro se* company, was operating in good faith and to the best of its ability in attempting to respond to the Department's requests for information. Although Arinox's responses to our questionnaires and other information were not served immediately upon the petitioners, it submitted this information in a timely fashion, was sufficiently complete so as to provide a reliable basis for our determination, was capable of being used without undue difficulty, and we provided it to the petitioners shortly before the preliminary determination. We conducted the verification of Arinox approximately three weeks later and verified the accuracy of Arinox's submissions. This three-week period provided the petitioners with a reasonable amount of time to make substantive comments regarding any potential subsidies to Arinox prior to verification. For these reasons and consistent with sections 782(c)(2) and (e) of the Act, the Department has continued to calculate a separate *ad valorem* subsidy rate for Arinox in this final determination.

**Verification**

In accordance with section 782(i) of the Act, we verified the information used in making our final determination. We followed standard verification procedures, including meeting with government and company officials, and examining relevant accounting records and original source documents. Our verification results are detailed in the public versions of the verification reports, which are on file in the Central Records Unit.

**Suspension of Liquidation**

In accordance with section 705(c)(1)(B)(i) of the Act, we have calculated an individual rate for each company investigated. We determine that the total estimated net countervailable subsidy rate is 12.22 percent *ad valorem* for AST and 1.03 percent *ad valorem* for Arinox. The All Others rate is 12.09 percent, which is the weighted average of the rates for both companies.

In accordance with our *Preliminary Determination,* we instructed the U.S. Customs Service to suspend liquidation of all entries of stainless steel sheet and strip in coils from Italy, which were entered or withdrawn from warehouse, for consumption on or after November 17, 1998, the date of the publication of our *Preliminary Determination* in the **Federal Register.** In accordance with

section 703(d) of the Act, we instructed the U.S. Customs Service to discontinue the suspension of liquidation for merchandise entered on or after January 2, 1999, but to continue the suspension of liquidation of entries made between November 17, 1998, and January 1, 1999. We will reinstate suspension of liquidation under section 706(a) of the Act if the ITC issues a final affirmative injury determination and will require a cash deposit of estimated countervailing duties for such entries of merchandise in the amounts indicated above. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or canceled.

**ITC Notification**

In accordance with section 705(d) of the Act, we will notify the ITC of our determination. In addition, we are making available to the ITC all non-privileged and non-proprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order, without the written consent of the Assistant Secretary for Import Administration.

If the ITC determines that material injury, or threat of material injury, does not exist, these proceedings will be terminated and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or canceled. If, however, the ITC determines that such injury does exist, we will issue a countervailing duty order.

**Return or Destruction of Proprietary Information**

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to Administrative Protective Order (APO) of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Failure to comply is a violation of the APO.

This determination is published pursuant to sections 705(d) and 777(i) of the Act.

Dated: May 19, 1999.

**Richard W. Moreland,**

*Acting Assistant Secretary for Import Administration.*

[FR Doc. 99–13683 Filed 6–7–99; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–580–835]**

**Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils From the Republic of Korea**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce

**EFFECTIVE DATE:** June 8, 1999.

**FOR FURTHER INFORMATION CONTACT:** Eva Temkin or Richard Herring, Office of CVD/AD Enforcement VI, Import Administration, U.S. Department of Commerce, Room 4012, 14th Street and Constitution Avenue, N.W., Washington, D.C. 20230; telephone (202) 482–2786.

**Final Determination**

The Department of Commerce (the Department) determines that countervailable subsidies are being provided to certain producers and exporters of stainless steel sheet and strip in coils from the Republic of Korea. For information on the estimated countervailing duty rates, please see the "Suspension of Liquidation" section of this notice.

**Petitioners**

The petition in this investigation was filed by Allegheny Ludlum Corporation, Armco, Inc., J&L Specialty Steel, Inc., Washington Steel Division of Bethlehem Steel Corporation, United Steelworkers of America, AFL–CIO/CLC, Butler Armco Independent Union, and Zanesville Armco Independent Organization, Inc. (collectively referred to hereinafter as the petitioners).

**Case History**

Since the publication of our preliminary determination in this investigation on November 17, 1998 (*Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination: Stainless Steel Sheet and Strip in Coils from the Republic of Korea,* 63 FR 63884 (Preliminary Determination)), the following events have occurred:

**Federal Register** / Vol. 64, No. 109 / Tuesday, June 8, 1999 / Notices

We conducted verification of the countervailing duty questionnaire responses from February 2 through February 12, 1999. In addition, portions of the questionnaire responses were verified from December 3 through December 18, 1998, during our verification of the countervailing duty investigation of Stainless Steel Plate in Coils from Korea. Because the final determination of this countervailing duty investigation was aligned with the final antidumping duty determination (see 63 FR at 63885), and the final antidumping duty determination was postponed (see 64 FR 137), the Department on January 13, 1999, extended the final determination of this countervailing duty investigation until no later than May 19, 1999 (see 64 FR 2195). On January 27, February 2, 10, and 12, April 12 and 13, 1999, the Department released its verification reports to all interested parties.

The Department issued decision memoranda on the issue of direction of credit by the Government of Korea (GOK) and the operations of the Korean domestic bond market on March 4 and March 9, 1999, respectively, during the countervailing duty investigation of Stainless Steel Plate in Coils from the Republic of Korea. See Final Negative Countervailing Duty Determination: Stainless Steel Plate in Coils from the Republic of Korea, 64 FR 15530, 15533 (March 31, 1999) (Stainless Steel Plate from Korea). These memoranda were placed on the record in this investigation on March 31, 1999. Petitioners and respondents filed case briefs on April 21, 1999, and rebuttal briefs were filed on April 28, 1999.

## The Applicable Statute and Regulations

Unless otherwise indicated, all citations to the statute are references to the provisions of the Tariff Act of 1930, as amended by the Uruguay Round Agreements Act (URAA) effective January 1, 1995 (the Act). In addition, unless otherwise indicated, all citations to the Department's regulations are to the current regulations as codified at 19 CFR Part 351 (April 1998).

## Scope of Investigation

We have made minor corrections to the scope language excluding certain stainless steel foil for automotive catalytic converters and certain specialty stainless steel products in response to comments by interested parties.

For purposes of this investigation, the products covered are certain stainless steel sheet and strip in coils. Stainless steel is an alloy steel containing, by weight, 1.2 percent or less of carbon and 10.5 percent or more of chromium, with or without other elements. The subject sheet and strip is a flat-rolled product in coils that is greater than 9.5 mm in width and less than 4.75 mm in thickness, and that is annealed or otherwise heat treated and pickled or otherwise descaled. The subject sheet and strip may also be further processed (e.g., cold-rolled, polished, aluminized, coated, etc.) provided that it maintains the specific dimensions of sheet and strip following such processing.

The merchandise subject to this investigation is classified in the Harmonized Tariff Schedule of the United States (HTS) at subheadings: 7219.13.00.30, 7219.13.00.50, 7219.13.00.70, 7219.13.00.80, 7219.14.00.30, 7219.14.00.65, 7219.14.00.90, 7219.32.00.05, 7219.32.00.20, 7219.32.00.25, 7219.32.00.35, 7219.32.00.36, 7219.32.00.38, 7219.32.00.42, 7219.32.00.44, 7219.33.00.05, 7219.33.00.20, 7219.33.00.25, 7219.33.00.35, 7219.33.00.36, 7219.33.00.38, 7219.33.00.42, 7219.33.00.44, 7219.34.00.05, 7219.34.00.20, 7219.34.00.25, 7219.34.00.30, 7219.34.00.35, 7219.35.00.05, 7219.35.00.15, 7219.35.00.30, 7219.35.00.35, 7219.90.00.10, 7219.90.00.20, 7219.90.00.25, 7219.90.00.60, 7219.90.00.80, 7220.12.10.00, 7220.12.50.00, 7220.20.10.10, 7220.20.10.15, 7220.20.10.60, 7220.20.10.80, 7220.20.60.05, 7220.20.60.10, 7220.20.60.15, 7220.20.60.60, 7220.20.60.80, 7220.20.70.05, 7220.20.70.10, 7220.20.70.15, 7220.20.70.60, 7220.20.70.80, 7220.20.80.00, 7220.20.90.30, 7220.20.90.60, 7220.90.00.10, 7220.90.00.15, 7220.90.00.60, and 7220.90.00.80. Although the HTS subheadings are provided for convenience and Customs purposes, the Department's written description of the merchandise under investigation is dispositive.

Excluded from the scope of this investigation are the following: (1) Sheet and strip that is not annealed or otherwise heat treated and pickled or otherwise descaled, (2) sheet and strip that is cut to length, (3) plate (i.e., flat-rolled stainless steel products of a thickness of 4.75 mm or more), (4) flat wire (i.e., cold-rolled sections, with a prepared edge, rectangular in shape, of a width of not more than 9.5 mm), and (5) razor blade steel. Razor blade steel is a flat-rolled product of stainless steel, not further worked than cold-rolled (cold-reduced), in coils, of a width of not more than 23 mm and a thickness of 0.266 mm or less, containing, by weight, 12.5 to 14.5 percent chromium, and certified at the time of entry to be used in the manufacture of razor blades. See Chapter 72 of the HTS, "Additional U.S. Note" 1(d).

In response to comments by interested parties, the Department has determined that certain specialty stainless steel products are also excluded from the scope of this investigation. These excluded products are described below.

Flapper valve steel is defined as stainless steel strip in coils containing, by weight, between 0.37 and 0.43 percent carbon, between 1.15 and 1.35 percent molybdenum, and between 0.20 and 0.80 percent manganese. This steel also contains, by weight, phosphorus of 0.025 percent or less, silicon of between 0.20 and 0.50 percent, and sulfur of 0.020 percent or less. The product is manufactured by means of vacuum arc remelting, with inclusion controls for sulphide of no more than 0.04 percent and for oxide of no more than 0.05 percent. Flapper valve steel has a tensile strength of between 210 and 300 ksi, yield strength of between 170 and 270 ksi, plus or minus 8 ksi, and a hardness (Hv) of between 460 and 590. Flapper valve steel is most commonly used to produce specialty flapper valves in compressors.

Also excluded is a product referred to as suspension foil, a specialty steel product used in the manufacture of suspension assemblies for computer disk drives. Suspension foil is described as 302/304 grade or 202 grade stainless steel of a thickness between 14 and 127 microns, with a thickness tolerance of plus-or-minus 2.01 microns, and surface glossiness of 200 to 700 percent Gs. Suspension foil must be supplied in coil widths of not more than 407 mm, and with a mass of 225 kg or less. Roll marks may only be visible on one side, with no scratches of measurable depth. The material must exhibit residual stresses of 2 mm maximum deflection, and flatness of 1.6 mm over 685 mm length.

Certain stainless steel foil for automotive catalytic converters is also excluded from the scope of this investigation. This stainless steel strip in coils is a specialty foil with a thickness of between 20 and 110 microns used to produce a metallic substrate with a honeycomb structure for use in automotive catalytic converters. The steel contains, by weight, carbon of no more than 0.030 percent, silicon of no more than 1.0 percent, manganese of no more than 1.0 percent, chromium of between 19 and 22 percent, aluminum of no less than 5.0 percent, phosphorus of no more than 0.045 percent, sulfur of no more than 0.03 percent, lanthanum of less than

0.002 or greater than 0.05 percent, and total rare earth elements of more than 0.06 percent, with the balance iron.

Permanent magnet iron-chromium-cobalt alloy stainless strip is also excluded from the scope of this investigation. This ductile stainless steel strip contains, by weight, 26 to 30 percent chromium, and 7 to 10 percent cobalt, with the remainder of iron, in widths 228.6 mm or less, and a thickness between 0.127 and 1.270 mm. It exhibits magnetic remanence between 9,000 and 12,000 gauss, and a coercivity of between 50 and 300 oersteds. This product is most commonly used in electronic sensors and is currently available under proprietary trade names such as "Arnokrome III." [1]

Certain electrical resistance alloy steel is also excluded from the scope of this investigation. This product is defined as a non-magnetic stainless steel manufactured to American Society of Testing and Materials ("ASTM") specification B344 and containing, by weight, 36 percent nickel, 18 percent chromium, and 46 percent iron, and is most notable for its resistance to high temperature corrosion. It has a melting point of 1390 degrees Celsius and displays a creep rupture limit of 4 kilograms per square millimeter at 1000 degrees Celsius. This steel is most commonly used in the production of heating ribbons for circuit breakers and industrial furnaces, and in rheostats for railway locomotives. The product is currently available under proprietary trade names such as "Gilphy 36." [2]

Certain martensitic precipitation-hardenable stainless steel is also excluded from the scope of this investigation. This high-strength, ductile stainless steel product is designated under the Unified Numbering System ("UNS") as S45500-grade steel, and contains, by weight, 11 to 13 percent chromium, and 7 to 10 percent nickel. Carbon, manganese, silicon and molybdenum each comprise, by weight, 0.05 percent or less, with phosphorus and sulfur each comprising, by weight, 0.03 percent or less. This steel has copper, niobium, and titanium added to achieve aging, and will exhibit yield strengths as high as 1700 Mpa and ultimate tensile strengths as high as 1750 Mpa after aging, with elongation percentages of 3 percent or less in 50 mm. It is generally provided in thicknesses between 0.635 and 0.787 mm, and in widths of 25.4 mm. This product is most commonly used in the manufacture of television tubes and is

currently available under proprietary trade names such as "Durphynox 17." [3]

Finally, three specialty stainless steels typically used in certain industrial blades and surgical and medical instruments are also excluded from the scope of this investigation. These include stainless steel strip in coils used in the production of textile cutting tools (e.g., carpet knives).[4] This steel is similar to AISI grade 420 but containing, by weight, 0.5 to 0.7 percent of molybdenum. The steel also contains, by weight, carbon of between 1.0 and 1.1 percent, sulfur of 0.020 percent or less, and includes between 0.20 and 0.30 percent copper and between 0.20 and 0.50 percent cobalt. This steel is sold under proprietary names such as "GIN4 Mo." The second excluded stainless steel strip in coils is similar to AISI 420–J2 and contains, by weight, carbon of between 0.62 and 0.70 percent, silicon of between 0.20 and 0.50 percent, manganese of between 0.45 and 0.80 percent, phosphorus of no more than 0.025 percent and sulfur of no more than 0.020 percent. This steel has a carbide density on average of 100 carbide particles per 100 square microns. An example of this product is "GIN5" steel. The third specialty steel has a chemical composition similar to AISI 420 F, with carbon of between 0.37 and 0.43 percent, molybdenum of between 1.15 and 1.35 percent, but lower manganese of between 0.20 and 0.80 percent, phosphorus of no more than 0.025 percent, silicon of between 0.20 and 0.50 percent, and sulfur of no more than 0.020 percent. This product is supplied with a hardness of more than Hv 500 guaranteed after customer processing, and is supplied as, for example, "GIN6".[5]

## Injury Test

Because the Republic of Korea (Korea) is a "Subsidies Agreement Country" within the meaning of section 701(b) of the Act, the International Trade Commission (ITC) is required to determine whether imports of the subject merchandise from Korea materially injure, or threaten material injury to, a U.S. industry. On August 9, 1998, the ITC announced its preliminary finding that there is a reasonable indication that an industry in the United States is being materially injured, or threatened with material injury, by reason of imports from Korea of the subject merchandise (see *Certain*

*Stainless Steel Sheet and Strip from France, Germany, Italy, Japan, the Republic of Korea, Mexico, Taiwan and the United Kingdom*, 63 FR 41864 (August 9, 1998)).

## Period of Investigation

The period of investigation for which we are measuring subsidies (the POI) is calendar year 1997.

## Use of Facts Available

As discussed in our preliminary determination, both Sammi Steel Co., Ltd. (Sammi) and Taihan Electric Wire Co., Ltd. (Taihan), two producers of subject merchandise, failed to respond to the Department's questionnaire. *See Preliminary Determination.* Since the preliminary determination in this investigation we have not been presented with new information on this issue. Therefore, we have continued to find that Sammi and Taihan each have failed to cooperate to the best of their abilities, and, in accordance with 776(b) of the Act, have continued to apply an adverse facts available (AFA) rate to these two companies. This rate was based on the petition, as well as our findings in the *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea*, 58 FR 37338 (July 9, 1993) (*Steel Products from Korea*), and additional findings in this proceeding.

In *Steel Products from Korea*, we determined a country-wide *ad valorem* subsidy rate of 4.64 percent based on many of the same programs alleged in this case. Therefore, we are using the highest published *ad valorem* rate of 4.64 percent that was calculated in *Steel Products from Korea* as representative of the benefits from the industry-wide subsidies alleged in this petition, and received by the other respondents in this investigation. In addition, we are also applying a facts available rate to Sammi and Taihan for a subsidy program newly examined in this investigation, POSCO's two-tiered pricing structure to domestic customers. We found this program to be countervailable, and calculated company-specific program rates for Dai Yang and Inchon; as discussed below, we used Inchon's calculated rate for this program as adverse facts available for Sammi and Taihan. (A detailed discussion of this program can be found in the "Programs Determined to be Countervailable" section of this notice.)

Therefore, in Taihan's case, we used the 4.64 rate from *Steel Products from Korea* because the subsidy programs alleged in this investigation, with the exception of the one new allegation, are

---

[1] "Arnokrome III" is a trademark of the Arnold Engineering Company.

[2] "Gilphy 36" is a trademark of Imphy, S.A.

[3] "Durphynox 17" is a trademark of Imphy, S.A.

[4] This list of uses is illustrative and provided for descriptive purposes only.

[5] "GIN4 Mo," "GIN5" and "GIN6" are the proprietary grades of Hitachi Metals America, Ltd.

**Federal Register**/Vol. 64, No. 109/Tuesday, June 8, 1999/Notices **30639**

virtually identical to the programs for which the 4.64 rate in *Steel Products from Korea* was calculated. In addition, in accordance with section 776(b)(4) of the Act, for the two-tiered pricing program, we are applying the highest calculated company-specific rate for this program to Taihan as adverse facts available, 2.36 percent *ad valorem*, the company-specific program rate for Inchon. We added this 2.36 percent rate to the 4.64 percent rate (representing the program rates of the other subsidy allegations) to arrive at a total *ad valorem* rate of 7.00 percent as adverse facts available for Taihan.

In Sammi's case, in addition to applying the 4.64 rate from *Steel Products from Korea* for most of the programs covered in this investigation and the 2.36 rate for POSCO's two-tiered pricing structure, we calculated a rate for one other program that was not previously investigated: POSCO's purchase of Sammi Specialty Steel. This program is addressed below in the "Programs Determined to be Countervailable" section of this notice. We used information provided in the petition, in the verification reports of POSCO and the Government of Korea, in POSCO's questionnaire responses, and additional information placed on the record of this investigation, for the calculation of the program rate for POSCO's purchase of Sammi Specialty Steel. We then added the rate calculated for this program and the rate representing the subsidy conferred by POSCO's two-tiered pricing structure to the other programs' rate of 4.64 percent *ad valorem* calculated in *Steel Products from Korea*, which is representative of the benefits from the other industry-wide subsidies alleged in the petition and received by the other respondents. We thus arrived at a total *ad valorem* rate of 59.30 percent as adverse facts available for Sammi.

Petitioners also alleged that Sammi benefitted from two other company-specific subsidies: (1) A "national subsidy" and (2) 1992 emergency loans. With respect to the alleged "national subsidy," we have not deviated from the methodology established in the *Preliminary Determination*. We continue to treat this "national subsidy" as a grant bestowed upon Sammi, and employ the Department's grant methodology. *See* the *General Issues Appendix*, which is appended to the *Final Affirmative Countervailing Duty Determination: Certain Steel Products from Austria*, 58 FR 37225, 37227 (July 9, 1993) (*GIA*). Because the total amount of the national subsidy is less than 0.50 percent of Sammi's 1993 sales, the subsidy was expensed in the year of

receipt. Thus, there is no benefit under this program during the POI.

The petitioners also alleged that in 1992 the GOK directed a package of 132 billion won in "emergency loans" to Sammi in order to save the company from bankruptcy. In our preliminary determination we calculated a separate subsidy rate for this allegation. However, we have reconsidered this facts available calculation in this final determination. In *Steel Products from Korea*, we investigated the allegation that the GOK directs banks in Korea to provide loans to the steel industry. This program was determined to be countervailable, and a calculated subsidy rate for this program is included as part of the facts available rate applied in this determination. Because we have already accounted for the subsidy provided by the GOK's direction of credit in our facts available rate taken from *Steel Products from Korea*, we have not calculated an additional subsidy rate for this allegation.

The Statement of Administrative Action accompanying the URAA clarifies that information from the petition and prior segments of the proceeding is "secondary information." *See* Statement of Administrative Action, accompanying H.R. 5110 (H.R. Doc. No. 103–316) (1994) (SAA), at 870. If the Department relies on secondary information as facts available, section 776(c) of the Act provides that the Department shall, to the extent practicable, corroborate such information using independent sources reasonably at its disposal. The SAA further provides that to corroborate secondary information means simply that the Department will satisfy itself that the secondary information to be used has probative value. However, where corroboration is not practicable, the Department may use uncorroborated information.

With respect to the programs for which we did not receive information from uncooperative respondents, the information was corroborated either through the exhibits attached to the petition or by reviewing determinations in other proceedings in which we found virtually identical programs in the same country to be countervailable. Specifically, with respect to Taihan, the programs alleged in the current investigation were virtually identical to those found to be countervailable in *Steel Products from Korea*. We were unable to corroborate the rate we used for Taihan, because the petition did not contain countervailing duty rate information for these programs. Therefore, it was not practicable to corroborate such a rate. However, we

note that the SAA at 870 specifically states that where "corroboration may not be practicable in a given circumstance," the Department may nevertheless apply an adverse inference. Further, in Sammi's case (in addition to the programs from *Steel Products from Korea* discussed above), we corroborated the newly-alleged programs with the information provided in the petition, *i.e.*, Sammi's financial statements for years 1993 through 1996, and numerous public press articles. Specifically, Sammi's financial statements show a line item entitled "national subsidy." The financial statements further indicate that Sammi's debt burden was very high and that the company was not making interest payments that reflected the significant debt load. This demonstrates that the GOK may have entrusted or directed government and/or commercial banks to provide the type of emergency loan package to Sammi in 1992 that was alleged in the petition. Moreover, news articles indicate that the GOK was trying to rescue Sammi, and that this effort included both the emergency loans in 1992 and POSCO's purchase of Sammi Specialty Steel.

Additionally, the Department initiated an investigation with respect to a fourth new allegation, "Financial Assistance in Conjunction with the 1997 Sammi Steel Company Bankruptcy." The petitioners alleged that the GOK mitigated the effects of Sammi's bankruptcy with the use of countervailable subsidies. According to petitioners, when Sammi filed for receivership in March 1997, the GOK: (1) Provided grants and other rescue aid which were directed through a consortium of Sammi's rivals, and (2) rescheduled Sammi's debt through a combination of loan forgiveness and reduced interest rate loans.

We requested information concerning this program from the GOK and Sammi. While Sammi chose not to cooperate in this investigation, the GOK responded to the Department's questionnaires, stating that there was no consortium and that no grants were provided to Sammi. The GOK further stressed that Sammi's debt was addressed in the context of normal bankruptcy proceedings. In our preliminary determination we calculated no benefit from this program, but we stated we would continue to seek information that would enable us to make a facts available determination about this program in our final determination. Therefore, during our verification of POSCO, we examined various accounts of POSCO to determine whether POSCO provided any assistance to Sammi

similar to that alleged by petitioners. We did not find a provision of assistance to Sammi or write-off of Sammi's debt by POSCO. In addition, during our verification of the Government of Korea, we examined Sammi's Bankruptcy Reorganization Plan, which included Sammi's 1997 balance sheet and income statement. Our examination of these documents revealed no government assistance to Sammi in the form of grants or write-off of debt. Therefore, we have not calculated a subsidy rate for this allegation. However, because Sammi did not respond to our request for information, we will continue to examine this allegation in any subsequent administrative review.

**Subsidies Valuation Information**

*Benchmarks for Long-term Loans and Discount Rates:* During the POI, the respondent companies had both won-denominated and foreign currency-denominated long-term loans outstanding which had been received from government-owned banks, Korean commercial banks, overseas banks, and foreign banks with branches in Korea. A number of these loans were received prior to 1992. In the 1993 investigation of *Steel Products from Korea,* the Department determined that, through 1991, the GOK influenced the practices of lending institutions in Korea and controlled access to overseas foreign currency loans. *See Certain Steel Products from Korea,* 58 FR at 37338, and the "Direction of Credit" section below. In that investigation, we determined that the best indicator of a market rate for long-term loans in Korea was the three-year corporate bond rate on the secondary market. Therefore, in the final determination of this investigation, we used the three-year corporate bond rate on the secondary market as our benchmark to calculate the benefits which the respondent companies received from direct foreign currency loans and domestic foreign currency loans obtained prior to 1991, and still outstanding during the POI. These rates were reported by the GOK in its September 10, 1998, questionnaire response (public version on file in the Department's Central Records Unit, Room B–099).

For years in which the companies under investigation have been deemed uncreditworthy, we calculated the discount rates according to the methodology described in the *GIA.* Specifically, due to the necessary use of adverse facts available with regard to Sammi, we used the highest commercial bank loan interest rates available, and added a risk premium equal to 12 percent of the commercial lending rate,

in accordance with the methodology outlined in the *GIA.*

In this investigation, the Department also examined whether the GOK continued to control and/or influence the practices of lending institutions in Korea between 1992 and 1997. Based on our findings, discussed below in the "Direction of Credit" section of this notice, we are using the following benchmarks to calculate the companies' benefit from long-term loans obtained in the years 1992 through 1997: (1) For countervailable, foreign-currency denominated loans, we are using, where available, company-specific, weighted-average U.S. dollar-denominated interest rates on the companies' loans from foreign bank branches in Korea; and (2) for countervailable won-denominated loans, where available, we are using company-specific three-year corporate bond rates. Where unavailable, we continue to use a national average three-year corporate bond rate on the secondary market, consistent with our preliminary determination. We are also using three-year company-specific corporate bond rates, where applicable, as discount rates to determine the benefit from non-recurring subsidies received between 1992 and 1997.

We continue to find that the Korean domestic bond market was not controlled by the GOK during the period 1992 through 1997, and that domestic bonds serve as an appropriate benchmark interest rate. See *Analysis Memorandum on the Korean Domestic Bond Market,* dated March 9, 1999 (public document on file in the Department's Central Records Unit, Room B–099 (CRU)). On February 5, 1999, POSCO, Inchon, and Dai Yang submitted information in response to the Department's request for the companies' average interest rate on corporate bonds for each year 1992 through 1997. *See* POSCO's February 5, 1999 questionnaire response, Inchon's February 5, 1999 questionnaire response, and Dai Yang's February 5, 1999 questionnaire response (public versions on file in the CRU). Dai Yang had no corporate bonds (other than a previously reported convertible bond) issued during the period 1992–1997; therefore, we continue to use the national-average three-year corporate bond rate as a benchmark for this company. Additionally, Inchon had not issued any bonds prior to 1997; thus, we continue to use the national-average three-year corporate bond rates as a benchmark for Inchon between 1992 and 1996. Because POSCO was unable to retrieve data on the bond issuance fees the company paid in the years 1992

through 1996, we have added to the average interest rate for each of those years the bond issuance fees that POSCO paid in 1997.

Dai Yang did not have U.S. dollar loans from foreign bank branches in Korea. Therefore, we had to rely on a dollar loan benchmark that is not company-specific, but provides a reasonable representation of industry practice, to determine whether a benefit was provided to Dai Yang from dollar loans received from government banks and Korean domestic banks. Our first alternative was to use a national-average benchmark, but we were unable to identify a national-average dollar benchmark from foreign bank branches in Korea. Therefore, we used the interest rates on dollar loans from foreign bank branches in Korea received by another respondent in this investigation, Inchon, as a benchmark for Dai Yang's dollar loans from government banks and Korean domestic banks. For a further discussion on our selection of a dollar-loan benchmark for Dai Yang, see Comment 9.

*Benchmarks for Short-Term Financing:* For those programs which require the application of a short-term interest rate benchmark, we used as our benchmark company-specific weighted-average interest rates for commercial won-denominated loans for the POI. Each respondent provided to the Department its respective company-specific, short-term commercial interest rate.

*Allocation Period:* In the *Preliminary Determination,* we allocated nonrecurring subsidies received by POSCO and Sammi over 15 years. (No other company received nonrecurring subsidies.) We invited interested parties to comment on this allocation period. We received no objections from the interested parties on the use of a 15 year allocation period. Therefore, for the reasons specified in the *Preliminary Determination* and in the *Final Negative Countervailing Duty Determination: Stainless Steel Plate in Coils From the Republic of Korea,* 64 FR 15530, 15531 (March 31, 1999), we continue to determine that the appropriate allocation period is 15 years for this investigation.

*Treatment of Subsidies Received by Trading Companies:* We required responses from the trading companies because the subject merchandise may be subsidized by means of subsidies provided to both the producer and the exporter of the subject merchandise. Subsidies conferred on the production and exportation of subject merchandise benefit the subject merchandise even if the merchandise is exported to the

United States by an unaffiliated trading company rather than by the producer itself. Therefore, the Department calculates countervailable subsidy rates on the subject merchandise by cumulating subsidies provided to the producer with those provided to the exporter. During the POI, POSCO and Inchon exported subject merchandise to the United States through trading companies. We required that the trading companies provide responses to the Department with respect to the export subsidies under investigation.

We continue to find that one of the trading companies, POSTEEL, is affiliated with POSCO within the meaning of section 771(33)(E) of the Act because POSCO owned 95.3 percent of POSTEEL's shares as of December 31, 1997. The other trading companies are not affiliated with POSCO. Additionally, according to its response, Inchon is affiliated with one of the trading companies, Hyundai. This reported affiliation is based upon cross-shareholdings and common board members within the Hyundai group. The trading company, Hyundai, responded to the Department's questionnaire concerning subsidies that it had received during the POI. In the current proceeding, the status of affiliation does not affect the inclusion of subsidies provided to trading companies in the respondents' calculated subsidy rates. Therefore, we are not making a determination of affiliation of Inchon and Hyundai within the meaning of section 771(33) of the Act.

Under section 351.107 of the Department's regulations, when the subject merchandise is exported to the United States by a company that is not the producer of the merchandise, the Department may establish a "combination" rate for each combination of an exporter and supplying producer. However, as noted in the "Explanation of the Final Rules" (the Preamble), there may be situations in which it is not appropriate or practicable to establish combination rates when the subject merchandise is exported by a trading company. In such situations, the Department will make exceptions to its combination rate approach on a case-by-case basis. *See Antidumping Duties; Countervailing Duties; Final rule*, 62 FR 27296, 27303 (May 19, 1997).

In the *Preliminary Determination* of this investigation, we determined that it was not appropriate to establish combination rates. This determination was based on two main facts: first, the majority of the subsidies conferred upon the subject merchandise were received

by the producers; second, the difference in the levels of subsidies conferred upon individual trading companies with regard to the subject merchandise is insignificant. Combination rates would serve no practicable purpose because the calculated subsidy rate for a producer and a combination of any of the trading companies would effectively be the same rate. As no new information has been presented since the *Preliminary Determination* which would cause us to reconsider this methodology, we are not calculating combination rates in the final determination of this investigation.

Instead, we have continued to calculate rates for the producers of subject merchandise that include the subsidies received by the trading companies. To reflect those subsidies that are received by the exporters of the subject merchandise in the calculated *ad valorem* subsidy rate, we used the following methodology: for each of the seven trading companies, we calculated the benefit attributable to the subject merchandise. We then factored that amount into the calculated subsidy rate for the relevant producer. In each case, we determined the benefit received by the trading companies for each export subsidy, and weighted the average of the benefit amounts by the relative share of each trading company's value of exports of the subject merchandise to the United States. These calculated *ad valorem* subsidies were then added to the subsidies calculated for the producers of subject merchandise. Thus, for each of the programs below, the listed *ad valorem* subsidy rate includes countervailable subsidies received by both the producing and trading companies.

**Creditworthiness**

As discussed in the *Preliminary Determination*, we initiated an investigation of Inchon's creditworthiness from 1991 through 1997, and of Sammi's creditworthiness from 1990 to 1997, to the extent that nonrecurring grants, long-term loans, or loan guarantees were provided in those years. In the *Preliminary Determination*, we found Inchon to be creditworthy, but we found Sammi to be uncreditworthy for the years 1990 through 1997. We received no comments from the interested parties relating to our analysis of Inchon's and Sammi's creditworthiness. Thus, for the reasons specified in the *Preliminary Determination*, we determine that Inchon is creditworthy and that Sammi is uncreditworthy for the years 1990 through 1997. *See Preliminary Determination*, 63 FR at 63888.

*I. Programs Determined To Be Countervailable*

A. Direction of Credit

In the 1993 investigation of *Steel Products from Korea*, the Department determined (1) that the GOK influenced the practices of lending institutions in Korea; (2) that the GOK regulated long-term loans provided to the steel industry on a selective basis; and (3) that the selective provision of these regulated loans resulted in a countervailable benefit. Accordingly, all long-term loans received by the producers/exporters of the subject merchandise were treated as countervailable. The determination in that investigation covered all long-term loans bestowed through 1991. *See* 58 FR at 37339.

In this investigation, petitioners allege that the GOK continued to control the practices of lending institutions in Korea through the POI, and that the steel sector received a disproportionate share of low-cost, long-term credit, resulting in the conferral of countervailable benefits on the producers/exporters of the subject merchandise. Petitioners assert, therefore, that the Department should countervail all long-term loans received by the producers/exporters of the subject merchandise that were still outstanding during the POI.

1. *The GOK's Credit Policies Through 1991*

As noted above, we previously found significant GOK control over the practices of lending institutions in Korea through 1991, the period investigated in *Steel Products From Korea*. This finding of control was determined to be sufficient to constitute a government program and government action. *See* 58 FR at 37342. We also determined that (1) the Korean steel sector, as a result of the GOK's credit policies and control over the Korean financial sector, received a disproportionate share of regulated long-term loans, so that the program was, in fact, specific, and (2) the interest rates on those loans were inconsistent with commercial considerations. *Id.* at 37343. Thus, we countervailed all long-term loans received by the steel sector from all lending sources.

In this investigation, we provided the GOK with the opportunity to present new factual information concerning the government's credit policies prior to 1992, which we would consider along with our finding in the prior investigation. The GOK has not provided new factual information that would lead us to change our

determination in *Steel Products from Korea.* Therefore, we determine that the provision of long-term loans in Korea through 1991 results in a financial contribution within the meaning of section 771(5)(D)(i) of the Act. This finding is in conformance with the SAA, which states that "section 771(5)(B)(iii) encompasses indirect subsidy practices like those which Commerce has countervailed in the past, and that these types of indirect subsidies will continue to be countervailable." SAA at 925. In accordance with section 771(5)(E)(ii) of the Act, a benefit has been conferred to the recipient to the extent that the regulated loans are provided at interest rates less than the benchmark rates described under the "Subsidies Valuation" section, above.

We also determine that all regulated long-term loans provided to the producers/exporters of the subject merchandise through 1991 were provided to a specific enterprise or industry, or group thereof, within the meaning of section 771(5A)(D)(iii)(III) of the Act. This finding is consistent with our determination in *Steel Products from Korea. See* 58 FR at 37342.

POSCO, Inchon and Dai Yang all received long-term loans prior to 1992 that remained outstanding during the POI. These included loans with both fixed and variable interest rates for all three responding companies. To determine the benefits from the regulated loans with fixed interest rates, we applied the Department's standard long-term loan methodology and calculated the grant equivalent for the loans. For the variable-rate loans, we compared the amount of interest paid during the POI on the regulated loans to the amount of interest that would have been paid at the benchmark rate. We then summed the benefit amounts from all of the loans attributable to the POI and divided the total benefit by each company's total sales. On this basis, we determine the countervailable subsidy rates to be 0.17 percent *ad valorem* for POSCO, 0.06 percent *ad valorem* for Inchon, and 0.04 percent *ad valorem* for Dai Yang.

2. *The GOK's Credit Policies From 1992 Through 1997.*

The Department's preliminary analysis of the GOK's credit policies from 1992 through 1997 is contained in the March 4, 1999, *Memorandum Re: Analysis Concerning Post 1991 Direction of Credit,* on file in the CRU (Credit Memo). As detailed in the Credit Memo, the Department preliminarily determined that the GOK continued to control directly and indirectly the lending practices of most sources of credit in Korea through the POI. The

Department also preliminarily determined that GOK-regulated credit from domestic commercial banks and government-controlled banks such as the Korea Development Bank (KDB) was specific to the steel industry. This credit conferred a benefit on the producer/exporters of the subject merchandise in accordance with section 771(5)(E)(ii) of the Act, because the interest rates on the countervailable loans were less than the interest rates on comparable commercial loans. *See* Credit Memo at 15–17. Finally, we preliminarily found that access to government-regulated foreign sources of credit in Korea did not confer a benefit to the recipient, as defined by section 771(5)(E)(ii) of the Act, and, as such, credit received by respondents from these sources was found not countervailable. This determination was based on the fact that credit from Korean branches of foreign banks were not subject to the government's control and direction. Thus, respondents' loans from these banks served as an appropriate benchmark to establish whether access to regulated foreign sources of funds conferred a benefit on the respondents. On the basis of that comparison, we found that there was no benefit. *See id.* at 18. The comments we received from the parties have not led us to change the basic findings detailed in the Credit Memo.

In the preliminary determination we examined, as a separate program, loans provided under the Energy Savings Fund, and found that these loans were countervailable. *See Preliminary Determination,* 63 FR at 63890. However, on the basis of our findings detailed in the Credit Memo, we now determine that these loans are countervailable as directed credit, rather than as a separate program. These loans are policy loans provided by banks that are subject to the same GOK influence that is described in the Credit Memo. Accordingly, they are countervailable as directed credit, and we have included these loans in our benefit calculations. Thus, on the basis of our finding in the credit memo, and the modifications to the calculations discussed in the comments section, below, for the GOK's post-1991 credit policies, we determine the countervailable subsidy rates to be less than 0.005 percent *ad valorem* for POSCO, less than 0.005 percent *ad valorem* for Inchon, and 0.08 percent *ad valorem* for Dai Yang.

B. Purchase of Sammi Specialty Steel Division by POSCO

In February 1997, POSCO purchased the specialty steel bar and pipe division of Sammi for 719.4 billion won. This division became POSCO's Changwon

facility. Petitioners alleged that POSCO was directed by the government to purchase the Sammi Specialty Steel Division as a matter of national interest as opposed to one of economic merit. Petitioners alleged that the GOK used its ownership in POSCO as a vehicle for the subsidization of Sammi. Thus, petitioners allege that POSCO's purchase of the Sammi Specialty Steel Division provided a countervailable benefit to Sammi.

As noted in the "Use of Facts Available" section of this notice, Sammi did not respond to the Department's questionnaires. POSCO has provided certain documents relevant to this purchase, but Sammi's lack of response to our questionnaires means that significant portions of information required by the Department to analyze this program have not been provided. Thus, in making this determination, we have relied, in part, on both information provided by POSCO and information provided in the petition with respect to this allegation. In accordance with section 776(b) of the Act, the Department may use an inference that is adverse to the interest of a party when selecting from facts otherwise available when the party has failed to cooperate with a request for information. As discussed in the "Use of Facts Available" section, we determined that Sammi has failed to cooperate by not answering the Department's questionnaire.

Based on the information on the record, we determine that the actions of POSCO should be considered as an action of the GOK because POSCO is a government-controlled company. During the POI, the GOK was the largest shareholder of POSCO. The shareholdings of the GOK are approximately ten times larger than the next largest shareholder. Indeed, the next two largest shareholders of POSCO are domestic banks, the credit of which has been determined to be directed by the GOK (*see* the "Direction of Credit" section of this notice). In order to further maintain its control over POSCO, the GOK has enacted a law, as well as placed into the Articles of Incorporation of POSCO, a requirement that no individual shareholder except the GOK can exercise voting rights in excess of three percent of the company's common stock. According to POSCO, the GOK intends to maintain the individual ownership limit of three percent until the end of 2001.

In addition, the Chairman of POSCO is appointed by the GOK. The Chairman of POSCO during the POI was the former Deputy Prime Minister and the Minister of the GOK's Economic

**Federal Register**/Vol. 64, No. 109/Tuesday, June 8, 1999/Notices

Planning Board, and was appointed as POSCO's chairman by the Korean president. Half of POSCO's outside directors are appointed by the GOK and the Korean Development Bank (three by the GOK and one by the government-owned KDB.) During the POI, the appointed directors of POSCO included a Minister of Finance, the Vice Minister of the Ministry of Commerce and Industry, the Minister of the Ministry of Science and Technology, and a Member of the Bank of Korea's Monetary Board. POSCO is also one of three companies designated a ''Public Company'' by the GOK. One of the other ''Public Companies'' is the state-run utility company, KEPCO.

Over the course of this investigation, we have reviewed numerous documents that relate to this purchase, including the valuation studies and the purchase contract between POSCO and Sammi. The purchase price of 719.4 billion won agreed upon by POSCO and Sammi included money both for the assets that POSCO was purchasing and for the repayment of debt associated with these assets. Ostensibly, Sammi used the proceeds from the sale to pay debts owed by its other divisions.

Because no information was provided by Sammi with respect to this program, as facts available the determination of the countervailability of this program was based upon information gathered from POSCO, the GOK, information provided in the petition, and from public documents regarding POSCO's purchase of Sammi which have been placed on the record of this investigation. This information indicates that POSCO purchased the speciality steel division of Sammi Steel as the result of government pressure. The current Chairman of POSCO has confirmed that the POSCO purchase of Sammi's speciality steel division was the result of outside political pressure. The Chairman characterized POSCO's decision in 1997 to purchase the production facilities from Sammi in an attempt by the government to prevent Sammi's bankruptcy as ''a mistake.'' At the time of the Sammi purchase, the Chairman of POSCO had been appointed by the former president. In addition, at the time of the purchase, a POSCO director stated that the decision to purchase Sammi's speciality steel division ''transcends economic merit.'' Internal proprietary documents of POSCO (which are on the record in this investigation) echo this statement. At the time of the purchase, the company was operating at less than 60 percent of its capacity. In addition, Sammi had shown a profit only once since 1991 and lacked strong future prospects. *See*

*Memorandum to the File Re: Source Documents on Government Control of POSCO, Sammi Purchase by POSCO, and POSCO Pricing* (Source Document Memo).

Internal government auditors also examined POSCO's purchase of the Sammi speciality steel division. A report issued by the Board of Audit and Inspection (BAI) criticized POSCO's purchase of the Sammi plant. The BAI found fault with POSCO's investment decision resulting from poor feasibility studies. The BAI noted that, according to POSCO's own internal business plan, the internal rate of return (IRR) of new investments should be over 10 percent. However, the BAI noted that POSCO did not even examine Sammi's IRR when it decided to purchase the Sammi plant. The BAI concluded that Sammi's IRR is much lower than the minimum required by POSCO's own internal regulations for new investments. The BAI also stated that, in estimating the future profits and losses of an investment, POSCO's own internal regulations state that it should assume an investment's prices would remain constant for 15 years. However, as the BAI noted with respect to the Sammi purchase, POSCO assumed that prices would increase two percent a year. Thus, profit from the purchase was overestimated. POSCO's deviation from its own internal regulations on estimating future profit and loss resulted in calculations that anticipated profits from the Sammi investment within four years of the purchase date. If POSCO had followed its own internal regulations, it would have expected to incur losses on its purchase of Sammi for an additional 14 years.

In addition to noting that POSCO failed to follow its own internal regulations in its purchase of Sammi's speciality steel division, the BAI found other fundamental problems with the purchase of Sammi's Changwon facility. The BAI stated that at the time of the purchase of the Changwon plant, there was both oversupply and overproduction in the speciality steel industry. The BAI noted that, while supply at the time of the purchase was 240 million tons, the demand for speciality steel was only 110 million tons. Therefore, the BAI concluded that there was no reason for POSCO's ''hasty'' undertaking of Sammi's ''old equipment.'' The BAI also stated that because POSCO contracted to purchase the Sammi facility without clarifying the state of the equipment and labor force, the Changwon Tax Office and Labor Committee may require POSCO to pay an additional 80 billion won for both Sammi employees' retirement, and unforeseen tax consequences and

administrative litigation. The BAI report also stated that POSCO paid Sammi 21.4 billion won for steel-making techniques that were already either developed by POSCO or widely used in the steel industry.

The information on the record demonstrates that POSCO is a government-controlled entity; that POSCO's decision to purchase the Sammi speciality steel division was the result of government pressure; that Sammi was in poor financial straits; that POSCO failed to follow its own internal regulations regarding new investments when making the investment decision to purchase Sammi; and that, overall, the purchase of Sammi did not make good economic sense. For these reasons, the Department determines that POSCO's purchase of the Sammi speciality steel division provided a countervailable benefit and a financial contribution to Sammi under section 771(5)(D) of the Act. In accordance with section 771(5A)(D)(i) of the Act, we also find that this program is specific to Sammi.

During verification of POSCO's questionnaire response, POSCO officials stated that Sammi was also trying to sell its specialty steel division to other companies. However, as Sammi has refused to cooperate in this investigation, we have no information as to whether any potential investor expressed an interest in purchasing Sammi's speciality steel division for any price. As adverse facts available, we are assuming that were it not for POSCO's purchase, Sammi's Changwon facility would not have been sold to a commercial investor due to the poor financial condition of the company and the overcapacity in the stainless steel market at the time of the POSCO purchase. In addition, according to POSCO's own internal guidelines regarding new investments, POSCO should not have purchased Sammi's Changwon facility. Further information on the record also demonstrates that the decision to purchase the stainless steel facility from Sammi was based upon political and government influence in order to provide funds to Sammi to forestall its eventual bankruptcy. The information on the record indicates that, absent the GOK's control of POSCO and its influence on POSCO's decision to purchase the Changwon facility, Sammi would not have been able to sell its stainless steel division; therefore, we consider the full amount of the purchase price paid to Sammi by POSCO to constitute a countervailable benefit.

To calculate the benefit to Sammi from this purchase, we treated the amount of the purchase price, 719.4 billion won, as a non-recurring grant

and allocated it over the average useful life of assets in the industry. For a discussion of the AUL, see the "Subsidies Valuation" section of this notice. Based on this methodology, we calculated a countervailable subsidy of 52.30 percent *ad valorem* for Sammi for this program during the POI.

## C. GOK Pre-1992 Infrastructure Investments at Kwangyang Bay

In *Steel Products from Korea,* the Department investigated the GOK's infrastructure investments at Kwangyang Bay over the period 1983–1991. We determined that the GOK's provision of infrastructure at Kwangyang Bay was countervailable because we found POSCO to be the predominant user of the GOK's investments. The Department has consistently held that a countervailable subsidy exists when benefits under a program are provided, or are required to be provided, in law or in fact, to a specific enterprise or industry or group of enterprises or industries. *See Steel Products from Korea,* 58 FR at 37346.

No new factual information or evidence of changed circumstances has been provided to the Department with respect to the GOK's infrastructure investments at Kwangyang Bay over the period 1983–1991. Therefore, to determine the benefit from the GOK's investments to POSCO during the POI, we relied on the calculations performed in the 1993 investigation of *Steel Products from Korea,* which were placed on the record of this investigation by POSCO. In measuring the benefit from this program in the 1993 investigation, the Department treated the GOK's costs of constructing the infrastructure at Kwangyang Bay as untied, non-recurring grants in each year in which the costs were incurred.

To calculate the benefit conferred during the POI, we applied the Department's standard grant methodology and allocated the GOK's infrastructure investments over a 15-year period. *See* the allocation period discussion under the "Subsidies Valuation Information" section, above. We used as our discount rate the three-year corporate bond rate on the secondary market, the same rate used in *Steel Products from Korea.* We then summed the benefits received by POSCO during 1997, from each of the GOK's yearly investments over the period 1983–1991. We then divided the total benefit attributable to the POI by POSCO's total sales for 1997. On this basis, we determine a net countervailable subsidy of 0.29 percent *ad valorem* for the POI.

## D. Export Industry Facility Loans

In *Steel Products from Korea,* 58 FR at 37328, the Department determined that export industry facility loans (EIFLs) are contingent upon export, and are therefore export subsidies to the extent that they are provided at preferential rates. In this investigation, we provided the GOK with the opportunity to present new factual information concerning these EIFLs, which we would consider along with our finding in the prior investigation. The GOK has not provided new factual information that would lead us to change our determination in *Steel Products from Korea.* Therefore, we continue to find that EIFLs are provided on the basis of export performance and are export subsidies under section 771(5A)(B) of the Act. We also determine that the provision of loans under this program results in a financial contribution within the meaning of section 771(5)(D)(i) of the Act. In accordance with section 771(5)(E)(ii) of the Act, a benefit has been conferred on the recipient to the extent that the EIFLs are provided at interest rates less than the benchmark rates described under the "Subsidies Valuation" section, above. We note that this program is also countervailable due to the GOK's direction of credit; however, we have separated this program from direction of credit because it is an export subsidy, and therefore requires a different benefit calculation.

Dai Yang was the only respondent with outstanding loans under this program during the POI. To calculate the benefit conferred by this program, we compared the actual interest paid on the loan with the amount of interest that would have been paid at the applicable dollar-denominated long term benchmark interest rate as discussed in the "Subsidies Valuation" section, above. When the interest that would have been paid at the benchmark rate exceeds the interest that was paid at the program interest rate, the difference between those amounts is the benefit. We divided the benefits derived from the loans by total export sales. On this basis, we determine that Dai Yang received from this program during the POI a countervailable subsidy of 0.08 percent *ad valorem.*

## E. Short-Term Export Financing

The Department determined that the GOK's short-term export financing program was countervailable in *Steel Products from Korea* (see 58 FR at 37350). During the POI, POSCO and Dai Yang were the only producers or

exporters of the subject merchandise that used export financing.

In accordance with section 771(5A)(B) of the Act, this program constitutes an export subsidy because receipt of the financing is contingent upon export performance. A financial contribution is provided under this program within the meaning of section 771(5)(D)(i) of the Act in the form of a loan. To determine whether this export financing program confers a countervailable benefit to POSCO and Dai Yang, we compared the interest rate POSCO and Dai Yang paid on the export financing received under this program during the POI with the interest rate each company would have paid on a comparable short-term commercial loan. See discussion above in the "Subsidies Valuation Information" section with respect to short-term loan benchmark interest rates.

Because loans under this program are discounted (*i.e.,* interest is paid up-front at the time the loans are received), the effective rate paid by POSCO and Dai Yang on their export financing is a discounted rate. Therefore, it was necessary to derive a discounted benchmark interest rate from POSCO's and Dai Yang's company-specific weighted-average interest rate for short-term won-denominated commercial loans. We compared this discounted benchmark interest rate to the interest rates charged on the export financing and found that the program interest rates were lower than the benchmark rate. In accordance with section 771(5)(E)(ii) of the Act, we determine that this program confers a countervailable benefit because the interest rates charged on the loans were less than what POSCO and Dai Yang would have had to pay on a comparable short-term commercial loan.

To calculate the benefit conferred by this program, we compared the actual interest paid on the loans with the amount of interest that would have been paid at the applicable discounted benchmark interest rate. When the interest that would have been paid at the benchmark rate exceeded the interest that was paid at the program interest rate, the difference between those amounts is the benefit. Because POSCO and Dai Yang were unable to segregate their export financing applicable only to subject merchandise exported to the United States, we divided the benefit derived from the loans by total exports. On this basis, we determine a net countervailable subsidy of less than 0.005 percent *ad valorem* for POSCO, and 0.04 percent *ad valorem* for Dai Yang.

F. Reserve for Export Loss—Article 16 of the TERCL

Under Article 16 of the Tax Exemption and Reduction Control Act (TERCL), a domestic person engaged in a foreign-currency earning business can establish a reserve amounting to the lesser of one percent of foreign exchange earnings or 50 percent of net income for the respective tax year. Losses accruing from the cancellation of an export contract, or from the execution of a disadvantageous export contract, may be offset by returning an equivalent amount from the reserve fund to the income account. Any amount that is not used to offset a loss must be returned to the income account and taxed over a three-year period, after a one-year grace period. All of the money in the reserve is eventually reported as income and subject to corporate tax either when it is used to offset export losses or when the grace period expires and the funds are returned to taxable income. The deferral of taxes owed amounts to an interest-free loan in the amount of the company's tax savings. This program is only available to exporters. During the POI, Dai Yang, Inchon, Samsun, Samsung, Sunkyong, and Daewoo used this program. Although POSCO did not use this program during the POI, its exports of the subject merchandise were shipped through trading companies which did use this program during the POI (Samsun, Samsung, Sunkyong, and Daewoo). Neither Inchon nor Dai Yang shipped through any trading companies that received benefits from this program, although both Inchon and Dai Yang received benefits as exporters.

We determine that the Reserve for Export Loss program constitutes an export subsidy under section 771(5A)(B) of the Act because the use of the program is contingent upon export performance. We also determine that this program provides a financial contribution within the meaning of section 771(5)(D)(i) of the Act in the form of a loan.

To determine the benefits conferred by this program, we calculated the tax savings by multiplying the balance amounts of the reserves as of December 31, 1996, by the corporate tax rate for 1996. We treated the tax savings on these funds as short-term interest-free loans. Accordingly, to determine the benefits, the amounts of tax savings were multiplied by the companies' weighted-average interest rates for short-term won-denominated commercial loans for the POI, described in the "Subsidies Valuation Information" section, above. Using the methodology for calculating subsidies received by

trading companies, which also is detailed in the "Subsidies Valuation Information" section of this notice, we determine a countervailable subsidy of less than 0.005 percent *ad valorem* attributable to POSCO, a subsidy of 0.15 percent *ad valorem* for Inchon, and a countervailable subsidy of 0.01 percent *ad valorem* attributable to Dai Yang.

G. Reserve for Overseas Market Development—Article 17 of the TERCL

Article 17 of the TERCL operates in a manner similar to Article 16, discussed above. This provision allows a domestic person engaged in a foreign trade business to establish a reserve fund equal to one percent of its foreign exchange earnings from its export business for the respective tax year. Expenses incurred in developing overseas markets may be offset by returning from the reserve, to the income account, an amount equivalent to the expense. Any part of the fund that is not placed in the income account for the purpose of offsetting overseas market development expenses must be returned to the income account over a three-year period, after a one-year grace period. As is the case with the Reserve for Export Loss, the balance of this reserve fund is not subject to corporate income tax during the grace period. However, all of the money in the reserve is eventually reported as income and subject to corporate tax either when it offsets export losses or when the grace period expires. The deferral of taxes owed amounts to an interest-free loan equal to the company's tax savings. This program is only available to exporters. The following exporters of the subject merchandise received benefits under this program during the POI: Dai Yang, Hyosung, Hyundai, POSTEEL, Samsun, Samsung, and Sunkyong, and Daewoo. Although Inchon and POSCO did not use this program during the POI, these companies' exports of the subject merchandise were shipped through trading companies which did use this program during the POI: Inchon shipped through Hyundai, and POSCO shipped through Hyosung, POSTEEL, Samsun, Samsung, and Sunkyong, and Daewoo. Dai Yang did not ship through trading companies during the POI.

We determine that the Reserve for Overseas Market Development program constitutes an export subsidy under section 771(5A)(B) of the Act because the use of the program is contingent upon export performance. We also determine that this program provides a financial contribution within the meaning of section 771(5)(D)(i) of the Act in the form of a loan.

To determine the benefits conferred by this program during the POI, we employed the same methodology used for determining the benefit from the Reserve for Export Loss program. We used as our benchmark interest rate, each company's respective weighted-average interest rate for short-term won-denominated commercial loans for the POI, described in the "Subsidies Valuation Information" section above. Using the methodology for calculating subsidies received by trading companies, which also is detailed in the "Subsidies Valuation Information" section of this notice, we calculate a countervailable subsidy of 0.01 percent *ad valorem* for this program during the POI for POSCO, 0.01 percent *ad valorem* for Inchon, and 0.01 percent *ad valorem* for Dai Yang.

H. Investment Tax Credits

Under the TERCL, companies in Korea are allowed to claim investment tax credits for various kinds of investments. If the tax credits cannot all be used at the time they are claimed, the company is authorized to carry them forward for use in later tax years. During the POI, the respondents used various investment tax credits received under the TERCL to reduce their net tax liability. In *Steel Products from Korea,* we found that investment tax credits were not countervailable (*see* 58 FR at 37351); however, changes in the statute effective in 1995 have caused us to revisit the countervailability of the investment tax credits.

POSCO claimed or used the following tax credits in its fiscal year 1996 income tax return which was filed during the POI: (1) Tax credits for investments in facilities for research and experimental use and investments in facilities for vocational training or assets for business to commercialize new technology under Article 10; (2) tax credits for vocational training under Article 18; (3) tax credits for investment in productivity improvement facilities under Article 25; (4) tax credits for investment in specific facilities under Article 26; (5) tax credits for temporary investment under Article 27; and (6) tax credits for specific investments under Article 71 of TERCL. Inchon claimed or used: (1) Tax credits for investments in technology and human resources under Article 9; and (2) tax credits for investment in productivity improvement facilities under Article 25. Dai Yang also claimed or used tax credits under Articles 9 and 25.

For these specific tax credits, a company normally calculates its authorized tax credit based upon three or five percent of its investment, *i.e.,* the

company receives either a three or five percent tax credit. However, if a company makes the investment in domestically-produced facilities under these Articles, it receives a 10 percent tax credit. Under section 771(5A)(C) of the Act, which became effective on January 1, 1995, a program that is contingent upon the use of domestic goods over imported goods is specific, within the meaning of the Act. Because Korean companies receive a higher tax credit for investments made in domestically-produced facilities, we determine that investment tax credits received under Articles 10, 18, 25, 26, 27, and 71 constitute import substitution subsidies under section 771(5A)(C) of the Act. In addition, because the GOK foregoes collecting tax revenue otherwise due under this program, we also determine that a financial contribution is provided under section 771(5)(D)(ii) of the Act. Therefore, we determine this program to be countervailable.

To calculate the benefit from this tax credit program, we examined the amount of tax credit the companies deducted from their taxes payable for the 1996 fiscal year. In its fiscal year 1996 income tax return filed during the POI, POSCO deducted from its taxes payable credits earned in the years 1992 through 1995, which were carried forward and used in the POI in addition to POSCO's 1996 deduction. We first determined the amount of the tax credits claimed which were based upon the investment in domestically-produced facilities. We then calculated the additional amount of tax credits received by the company because it earned tax credits of 10 percent on investments in domestically-produced facilities rather than the regular three or five percent tax credit. Next, we calculated the amount of the tax savings earned through the use of these tax credits during the POI and divided that amount by POSCO's total sales for the POI. Neither Inchon nor Dai Yang carried forward any tax credits from previous years. Therefore, to calculate their rates we calculated the additional amount of the tax savings earned on investments in domestically-produced facilities and divided that amount by each company's total sales for the POI. On this basis, we determine a countervailable subsidy of 0.18 percent *ad valorem* to POSCO, 0.06 percent *ad valorem* to Inchon, and 0.41 percent *ad valorem* to Dai Yang from this program during the POI.

## I. Electricity Discounts Under the Requested Load Adjustment Program

Petitioners alleged that the respondents are receiving countervailable benefits in the form of utility rate discounts. The GOK reported that during the POI the government-owned electricity provider, KEPCO, provided the respondents with three types of discounts under its tariff schedule. These three discounts were based on the following rate adjustment programs in KEPCO's tariff schedule: (1) Power Factor Adjustment; (2) Summer Vacation and Repair Adjustment; and (3) Requested Load Adjustment. *See* the discussion below in ''Programs Determined To Be Not Countervailable'' with respect to the Power Factor Adjustment and Summer Vacation and Repair Adjustment discount programs.

The GOK introduced the Requested Load Adjustment (RLA) discount in 1990, to address emergencies in KEPCO's ability to supply electricity. Under this program, customers with a contract demand of 5,000 KW or more, who can curtail their maximum demand by 20 percent or suppress their maximum demand by 3,000 KW or more, are eligible to enter into a RLA contract with KEPCO. Customers who choose to participate in this program must reduce their load upon KEPCO's request, or pay a surcharge to KEPCO. During the POI, both POSCO and Inchon participated in this program.

The RLA discount is provided based upon a contract of two months, normally July and August when the demand for electricity is greatest. Under this program, a basic discount of 440 won per KW is granted between July 1 and August 31, regardless of whether KEPCO makes a request for a customer to reduce its load. During the POI, KEPCO granted 44 companies RLA discounts even though KEPCO did not request these companies to reduce their respective loads. The GOK reported that because KEPCO increased its capacity to supply electricity in 1997, it reduced the number of companies with which it maintained RLA contracts in 1997. In 1996, KEPCO had entered into RLA contracts with 232 companies.

At the preliminary determination, we found that discounts provided under the RLA were distributed to a limited number of customers, *i.e.*, a total of 44 customers during the POI. Therefore, we determined that the RLA program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act. We also stated in the preliminary determination that, given the information the GOK provided on the record regarding KEPCO's increased capacity to supply

electricity and the resulting decrease in KEPCO's need to enter into a large number of RLA contracts during the POI, we would further investigate the *de facto* specificity of this discount program at verification. We stated that it was the GOK's responsibility to demonstrate to the Department on what basis KEPCO chose the 44 customers with which it entered into RLA contracts during the POI.

Based on the information which we obtained at verification, we analyzed whether this electricity discount program is specific in fact (*de facto* specificity), within the meaning of section 771(5A)(D)(iii) of the Act. We find that the GOK failed to demonstrate to the Department a systematic procedure through which KEPCO selects those customers with which it enters into RLA contracts. The GOK simply stated that KEPCO enters into contracts with those companies which volunteer for the discount program. If KEPCO does not reach its targeted adjustment capacity with those companies which volunteered for the program, then KEPCO will solicit the participation of large companies. We note that KEPCO was unable to provide to the Department the percentage of 1997 RLA recipients which volunteered for the program and the percentage of those recipients which were persuaded to cooperate in the program. Therefore, we continue to find that the discounts provided under the RLA were distributed to a limited number of users. Given the data with respect to the small number of companies which received RLA electricity discounts during the POI, we determine that the RLA program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act. The benefit provided under this program is a discount on a company's monthly electricity charge. A financial contribution is provided to POSCO and Inchon under this program within the meaning of section 771(5)(D)(ii) of the Act in the form of revenue foregone by the government.

Because the electricity discounts are not ''exceptional'' benefits and are received automatically on a regular and predictable basis without further government approval, we determine that these discounts provide a recurring benefit to POSCO and Inchon. Therefore, we have expensed the benefit from this program in the year of receipt. *See GIA*, 58 FR at 37226. To measure the benefit from this program, we summed the electricity discounts which POSCO and Inchon received from KEPCO under the RLA program during the POI. We then divided that amount by POSCO's and Inchon's total sales value for 1997.

**Federal Register**/Vol. 64, No. 109/Tuesday, June 8, 1999/Notices

On this basis, we determine a net countervailable subsidy of less than 0.005 percent *ad valorem* for both POSCO and Inchon.

## J. Loans From the National Agricultural Cooperation Federation

According to Dai Yang's September 10, 1998, questionnaire response, the company received a loan administered by the National Agricultural Cooperation Federation (NACF). The loan was given at an interest rate which is below the benchmark interest rate described in the "Subsidies Valuation" section of the notice. Moreover, under the terms of this loan, the regional government (that of Ansan City) paid a portion of the interest. Although this Ansan City-administered program is only available to small- and medium-sized enterprises, the loan approval criteria indicates that export performance is also an important criterion for approval. Applications for these loans are evaluated on a point system. The applicant receives 10 out of a possible 100 "points" if it is a promising small and medium size business. However, the applicant can also receive 10 points if its exports comprise over twenty percent of its total sales. In addition, an applicant can garner 10 points if it is involved in overseas market development. Therefore, two of the criteria of loan approval are based upon export performance.

Under section 771(5A)(B) of the Act, an export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as one of two or more conditions. Dai Yang did meet the criteria of having over twenty percent of sales in export markets, and so may have qualified based on these export criteria. Further, pursuant to section 351.514 of the Department's regulations (63 FR at 65381), Dai Yang did not demonstrate that it was approved to receive these benefits solely under non-export criteria. Thus, after examination of this program, we determine that Dai Yang's receipt of this loan to be a *de facto* export subsidy pursuant to section 771(5A)(B) of the Act. In addition, by paying a portion of the interest on the loan, the actions of the Ansan City government confer a benefit in accordance with section 771(5)(E)(ii) of the Act. Therefore, we determine this program to be countervailable.

In the *Preliminary Determination*, we treated this loan as a short-term loan because it is rolled over annually with a revised interest rate. However, record evidence indicates that all of the interest rates for the life of the loan were set at the time the loan was approved. Thus,

we believe that it is more reasonable to measure the benefit from this loan using the Department's long-term fixed rate loan methodology. We used as our benchmark the rate described in the "Subsidies Valuation" section of the notice, above. We divided the benefit calculated in the POI by Dai Yang's total exports during 1997. On this basis, we determine the countervailable subsidy attributable to Dai Yang during the POI to be 0.04 percent *ad valorem*.

## K. POSCO's Two-Tiered Pricing Structure to Domestic Customers

In our supplemental questionnaire, we requested information from POSCO and the other respondents regarding an allegation that the GOK mandates POSCO to subsidize local manufacturers by selling them steel at 30 percent below the international market price. In response to this allegation, POSCO stated that no such program exists. However, in its response, POSCO provided information regarding its pricing structure in the domestic and export markets.

We verified that POSCO maintains three different pricing systems which serve different markets: domestic prices in Korean won for products that will be consumed in Korea; direct export prices in U.S. dollars or Japanese yen; and, local export prices in U.S. dollars. POSCO's local export prices are provided to those domestic customers that purchase steel for further processing into products that are exported. During the POI, POSCO sold hot-rolled stainless steel coil, which is the main input in the subject merchandise, to Dai Yang and Inchon, which used the coil to produce subject merchandise sold both as exports and in the domestic market. POSCO is the only Korean producer of hot-rolled stainless steel coil.

As noted earlier, POSCO is a government-controlled company. (*See* the discussion relating to government control of POSCO in the program "Purchase of Sammi Speciality Steel Division by POSCO".) POSCO sets different prices for the identical product for domestic purchases based upon the purchasers' anticipated export performance. Therefore, when POSCO sells hot-rolled stainless steel coil to Dai Yang and Inchon to be used to manufacture subject merchandise which is exported, POSCO charges a lower price than the price charged on the identical hot-rolled stainless steel coil sold to the companies for manufacturing subject merchandise to be sold in the domestic market. Because POSCO charges a lower price based upon export performance, this pricing policy

constitutes an export subsidy under section 771(5A)(B) of the Act. Because exporters are charged a lower price, this program also provides a financial contribution to the exporters under section 771(5)(D).

The benefit from this type of export subsidy is based upon the difference in the price charged to exporters and the price charged for domestic consumption. The only exception is for pricing programs which fall under Item (d) of the Illustrative List of Export Subsidies, which is provided for in Annex I of the Agreement on Subsidies and Countervailing Measures.[6] Item (d) allows governments to maintain a program which provides different prices based upon export or domestic consumption if certain strict criteria are met by the government. However, POSCO's dual pricing policy does not fit within the parameters of the Item (d) exception. Therefore, the benefit from this program is based upon the difference between the prices charged by POSCO for export and the prices charged by POSCO for domestic consumption.

To determine the value of the benefit under this program, we compared the monthly weighted-average price charged by POSCO to Dai Yang and Inchon for domestic production to the monthly weighted-average price charged by POSCO to respondents for export production, by grade of hot-rolled coil. We then divided the amount of the price savings by the value of exports of the subject merchandise during the POI. On this basis, we determine that Dai Yang received a countervailable subsidy of 0.87 percent *ad valorem* from this program, and that Inchon received a countervailable subsidy of 2.36 percent *ad valorem* from this program during the POI.

## II. Programs Determined To Be Not Countervailable

### A. Electricity Discounts Under the Power Factor Adjustment and Summer Vacation and Repair Adjustment Programs

KEPCO provided three types of discounts under its tariff schedule during the POI. These three discounts were based on the following rate

---

[6] A subsidy arises under Item (d) from the provision by governments or their agencies either directly or indirectly through government-mandated schemes, of imported or domestic products or services for use in the production of export goods, on terms or conditions more favourable than for provision of like or directly competitive products or services for use in the production of goods for domestic consumption, if (in the case of products) such terms or conditions are more favorable than those commercially available on world markets to their exporters.

adjustment programs in KEPCO's tariff schedule: (1) Power Factor Adjustment; (2) Summer Vacation and Repair Adjustment; and (3) Requested Load Adjustment. *See* the separate discussion above in regard to the countervailability of the ''Requested Load Adjustment'' program.

With respect to the Power Factor Adjustment (PFA) program, the GOK reported that the goal of the PFA is to improve the energy efficiency of KEPCO's customers which, in turn, provides savings to KEPCO in supplying electricity to its entire customer base. Customers who achieve a higher efficiency than the performance standard (*i.e.*, 90 percent) receive a discount on their base demand charge.

We verified that the PFA is not a special program, but a normal factor used in the calculation of a customer's electricity charge which was introduced in 1989. The PFA is available to all general, educational, industrial, agricultural, midnight power, and temporary customers who meet the eligibility criteria. The eligibility criteria are that a customer must: (1) Have a contract demand of 6 KW or more; (2) have a power factor that exceeds the 90 percent standard power factor; and (3) have proper facilities to measure its power factor. If these criteria are met, a customer automatically receives a PFA discount on its monthly electricity invoice. During the POI, over 600,000 customers were recipients of PFA discounts.

With the aim of curtailing KEPCO's summer load by encouraging customer vacations or the repair of their facilities during the summer months, the GOK introduced the Summer Vacation and Repair Adjustment program (VRA) in 1985. Under this program, a discount of 550 won per KW is given to customers, if they curtail their maximum demand by more than 50 percent, or 3,000 KW, through a load adjustment or maintenance shutdown of their production facilities during the summer months.

The VRA discount program is available to all industrial and commercial customers with a contract demand of 500 KW or more. The VRA is one of several programs that KEPCO operates as part of its broad long-term strategy of demand-side management which includes curtailing peak demand. We verified that over eight hundred customers, from a wide and diverse range of industries, received VRA discounts during the POI.

We analyzed whether these electricity discount programs are specific in law (*de jure* specificity), or in fact (*de facto* specificity), within the meaning of

section 771(5A)(D)(i) and (iii) of the Act. First, we examined the eligibility criteria contained in the law. The Regulation on Electricity Supply and KEPCO's Rate Regulations for Electric Service identify companies within a broad range of industries as eligible to participate in the electricity discount programs. With respect to the PFA, all general, educational, industrial, agricultural, midnight power, and temporary customers who have the necessary contract demand are eligible to participate in the discount program. The VRA discount program is available to a wide variety of companies across all industries, provided that they have the required contract demand and can reduce their maximum demand by a certain percentage. Therefore, based on our analysis of the law, we determine that the PFA and VRA electricity programs are not *de jure* specific under section 771(5A)(D)(i) of the Act.

We also examined evidence regarding the usage of the discount electricity programs and found no predominant use by the steel industry. The information on the record demonstrates that discounts under the PFA and VRA are distributed to a large number of firms in a wide variety of industries. Therefore, after analyzing the data with respect to the large number of companies and diverse number of industries which received electricity discounts under these programs during the POI, we determine that the PFA and VRA programs are not *de facto* specific under section 771(5A)(D)(iii) of the Act. Accordingly, we determine that the PFA and VRA discount programs are not countervailable.

**B. GOK Infrastructure Investments at Kwangyang Bay Post-1991**

The GOK has made the following infrastructure investments at Kwangyang Bay since 1991: Construction of a road from Kwangyang to Jinwol, construction of a container terminal, and construction of the Jooam Dam. The GOK stated that pursuant to Article 29 of the Industrial Sites and Development Act, it is the national and local governments' responsibility to provide basic infrastructure facilities throughout the country, and the nature of the infrastructure depends on the specific needs of each area and/or the types of industries located in a particular area. The GOK provides services to companies through the use of the infrastructure facilities and charges fees for the services based on published tariff rates applicable to all users.

With respect to the GOK's post-1991 infrastructure investments at Kwangyang Bay, the GOK argues that

the construction of the infrastructure was not for the benefit of POSCO. The GOK reported that the purpose of developing the Jooam Dam was to meet the rising demand for water by area businesses and households. The supply capacity of the Sueochon Dam, which was constructed prior to 1991, cannot meet the area's water needs and, therefore, a second dam in the Kwangyang Bay area was built. The GOK further reported that the Jooam Dam does not benefit POSCO because POSCO receives all of its water supply from the Sueochon Dam. At verification, we obtained information which demonstrates that the Jooam Dam's water pipe line connects neither to the Sueochon Dam nor to POSCO's steel mill at Kwangyang Bay. Accordingly, POSCO cannot source any of its water supply from the Jooam Dam and, therefore, the company is not benefiting from the GOK's construction of the Jooam Dam.

The GOK also constructed a container terminal at Kwangyang Bay to relieve congestion at the Pusan Port and to encourage the further commercial development of the region. The GOK stated that, given the nature of the merchandise imported, produced, and exported by POSCO at Kwangyang Bay, this container terminal cannot be used by POSCO's operations. According to the responses of the GOK and POSCO and the information obtained at verification, neither steel inputs nor steel products can be shipped through the container terminal at Kwangyang Bay. Given the nature of steel inputs (*e.g.*, bulk products like scrap) and finished steel products (*e.g.*, bundled bars and plate), products such as these would or could not be loaded or unloaded from a ship through a container terminal and, therefore, the facility is not used by steel producers.

The road from Kwangyang to Jinwol was constructed in 1993. The GOK stated that this is a general service, public access road available for, and used by, all residents and businesses in the area of Kwangyang Bay. According to the GOK, the reason for building the public highway was not to serve POSCO, but to provide general infrastructure to the area as part of the GOK's continuing development of the country and to relieve a transportation bottleneck. At verification, we obtained information on the road and learned that, in fact, it is utilized by both industries in the area to transport goods and by residents living in the Kwangyang Bay area.

Based on the information obtained at verification regarding the GOK's infrastructure investments at

**Federal Register** / Vol. 64, No. 109 / Tuesday, June 8, 1999 / Notices

Kwangyang Bay since 1991, we determine that the GOK's investments in the Jooam Dam, the container terminal, and the public highway were not made for the benefit of POSCO. Therefore, we find that these investments are not providing countervailable benefits to POSCO.

C. Port Facility Fees

In the 1993 investigation of *Steel Products from Korea*, the Department found that POSCO, which built port berths at Kwangyang Bay but, by law, was required to deed them to the GOK, was exempt from paying fees for use of the berths. POSCO was the only company entitled to use the berths at the port facility free of charge. The Department determined that because this privilege was limited to POSCO, and because the privilege relieved POSCO of costs it would otherwise have had to pay, POSCO's free use of the berths at Kwangyang Bay constituted a countervailable subsidy. The Department stated that each exemption from payment of the fees, or ''reimbursement'' to POSCO, creates a countervailable benefit because the GOK is relieving POSCO of an expense which the company would have otherwise incurred. *See Steel Products from Korea*, 58 FR at 37347–348.

With respect to the instant investigation, since 1991, POSCO, at its own expense, has built new port facilities at Kwangyang Bay. Because title to port facilities must be deeded to the GOK in accordance with the Harbor Act, POSCO transferred ownership of the facilities to the GOK. In return, POSCO received the right to use the port facilities free of charge, and the ability to charge other users a usage fee until the company recovers all of its investment costs. At the preliminary determination, we determined that because POSCO is exempt from paying port facility fees, which it otherwise would have to pay, and the government is foregoing revenue that is otherwise due, POSCO's free usage of the port facilities provided a financial contribution to the company within the meaning of section 771(5)(D)(ii) of the Act. We also found that the exemption from paying port facility charges is specific under section 771(5A)(D)(iii) of the Act, because POSCO was the only company exempt from paying these port facility fees during the POI. During verification, we discovered that Inchon also participated in this program.

Since our preliminary determination, we have gathered further information with respect to the Harbor Act and the number and types of companies which have built infrastructure which, as

required by law, were subsequently transferred to the government. At verification, we learned that, because the government does not have sufficient funds to construct all of the infrastructure a company may need to operate its business, the GOK allows a company to construct, at its own expense, such infrastructure. However, the Harbor Act prohibits a private company from owning certain types of infrastructure, such as ports. Therefore, the company, upon completion of the project, must deed ownership of the infrastructure to the government pursuant to Article 17–1 of the Harbor Act. Because a company must transfer to the government its infrastructure investment, the GOK, under Articles 17–3 and 17–4 of the Harbor Act, grants the company free usage of the facility and the right to collect fees from other users of the facility until the company recovers its investment cost. Once a company has recovered its cost of constructing the infrastructure, the company must pay the same usage fees as other users of the infrastructure facility.

We verified that under the Harbor Act, any company within any industrial sector is eligible to construct infrastructure necessary for the operation of its business provided that it receives approval by the Administrator of the Maritime and Port Authority to build the facility. We learned that if the ownership of the infrastructure, which the company built, must transfer to the government, then the company, by law, has the right to free usage of that facility and the ability to collect fees from other users of the facility. The right of free usage and the ability to collect user fees are granted to every company which has to deed facilities to the GOK. The free usage and collection of user fees continues only until the company which built the facility recaptures its cost of constructing the facility.

Further, at verification we learned that in permitting a company to build infrastructure subject to the Harbor Act requirements, the GOK has in place a procedure for approving a company's investment costs and for monitoring the company's free usage and collection of user fees. Because the GOK allows a company, for a period of time, to use for free the infrastructure it built, the GOK, through the respective port authority, reviews each infrastructure project to assess the cost. The port authority then approves a certain monetary amount for the infrastructure through a settlement process with the company. A company can only receive free usage of a facility

up to the monetary amount approved by the port authority.

At verification, we obtained documentation which indicates that since 1991, a diverse grouping of private sector companies across a broad range of industrial sectors have made a number of investments in infrastructure facilities at various ports in Korea, including at Kwangyang Bay. In each case, the company which built the infrastructure was required to transfer it to the GOK, and received free usage of the infrastructure and the ability to collect user fees from other companies until they recover their respective investment costs. POSCO and Inchon were not the only companies entitled to use a particular port facility infrastructure, which it built, free of charge.

As a result of the information obtained at verification, we have revisited our preliminary determination that POSCO's exemption from paying port facility charges is specific under section 771(5A)(D)(iii) of the Act. As discussed above, we verified that since 1991, a diverse grouping of private sector companies representing a wide cross-section of the economy have made a large number of investments in infrastructure facilities at various ports in Korea, including numerous investments at Kwangyang Bay. Those companies which built infrastructure that was transferred to the GOK, as required by the Harbor Act, received free usage of the infrastructure and the ability to collect user fees from other companies which use the facilities, until they recover their respective investment costs. POSCO and Inchon are only two of a large number of companies from a diverse range of industries to use this program. Accordingly, we determine that this program is not specific under section 771(5A)(D)(iii) of the Act. Therefore, we find that this program is not countervailable.

*III. Programs Determined To Be Not Used*

Based on the information provided in the responses and the results of verification, we determine that the companies under investigation either did not apply for or receive benefits under the following programs during the POI:

A. Tax Incentives for Highly-Advanced Technology Businesses under the Foreign Investment and Foreign Capital Inducement Act

B. Reserve for Investment under Article 43–5 of TERCL

C. Export Insurance Rates Provided by the Korean Export Insurance Corporation

D. Special Depreciation of Assets on Foreign Exchange Earnings

E. Excessive Duty Drawback

Petitioners alleged that under the Korean Customs Act, Korean producers/exporters may have received an excessive abatement, exemption, or refund of import duties payable on raw materials used in the production of exported goods. The Department has found that the drawback on imported raw materials is countervailable when the raw materials are not consumed in the production of the exported item and, therefore, the amount of duty drawback is excessive. In *Steel Products from Korea,* we determined that certain Korean steel producers/exporters received excessive duty drawback because they received duty drawback at a rate that exceeded the rate at which imported inputs were actually used. *See Steel Products from Korea,* 58 FR at 37349.

At verification, we learned that the refund of duties only applies to imported raw materials that are physically incorporated into the finished merchandise. Items used to produce a product, but which do not become physically incorporated into the final product, do not qualify for duty drawback. We confirmed that the National Technology Institute (NTI) maintains a materials list for each product, and only materials that are physically incorporated into the final product are eligible for duty drawback.

We verified that the NTI routinely conducts surveys of producers of exported products to obtain their raw material input usage rate for manufacturing one unit of output. With this information, the NTI compiles a standard usage rate table for imported raw material inputs which is used to calculate a producer/exporter's duty drawback eligibility. In determining an input usage rate for a raw material, the NTI factors recoverable scrap into the calculation. In addition, the loss rate for each imported input is reflected in the input usage rate. At verification, the GOK confirmed that the factoring of reusable scrap into usage rates is done routinely for all products under Korea's duty drawback regime.

We also confirmed during our verification that there is no difference in the rate of import duty paid and the rate of drawback received. The rate of import duty is based on the imported materials and the rate of drawback depends on the exported merchandise and the usage rate of the imported materials. The companies pay import duties based on the rate applicable to and the price of the imported raw material. The companies then receive duty drawback based on the amount of that material consumed in the production of the finished product according to the standard input usage rate. Accordingly, the rate at which the respondents receive duty drawback is the amount of import duty paid on the amount of input consumed in producing the finished exported product.

Based on the information on the record, we determine that the respondents have not received duty drawback on imported raw materials that were not physically incorporated in the production of exported merchandise. As in *Steel Products from Korea,* we also determine that the respondents appropriately factured recovered scrap into its calculated usage rates and that the duty drawback rate applicable to the respondents takes into account recoverable scrap. *See Steel Products from Korea,* 58 FR at 37349. Therefore, we determine that the respondents have not received excessive duty drawback.

### IV. Programs Determined To Be Terminated

Based on information provided by the GOK, we determine that the following program does not exist:

*Unlimited Deduction of Overseas Entertainment Expenses*

In *Steel Products from Korea,* 58 FR at 37348–49, the Department determined that this program conferred benefits which constituted countervailable subsidies because the entertainment expense deductions were unlimited only for export business activities. In the present investigation, the GOK reported that Article 18–2(5) of the Corporate Tax Law, which provided that Korean exporters could deduct overseas entertainment expenses without any limits, was repealed by the revisions to the law dated December 29, 1995. According to the GOK, beginning with the 1996 fiscal year, a company's domestic and overseas entertainment expenses are deducted within the same aggregate sum limits as set by the GOK. As a result of the revision to the law, overseas entertainment expenses are now treated in the same fashion as domestic expenses in calculating a company's income tax. Therefore, we determine that this program is no longer in existence.

*Interested Party Comments*

*Comment 1: The GOK's Pre-1992 Credit Policies: New Factual Information Concerning Foreign Currency-Denominated Loans*

Respondents assert that the Department ignored new factual information on the record of this proceeding concerning domestic foreign currency loans. Specifically, respondents submitted information indicating that from 1986 through 1988, interest rates on domestic foreign currency loans were only subject to an interest rate ceiling, and that after 1988, banks and other financial institutions were free to set the interest rates on these loans subject only to the ceiling established by the Interest Limitation Act. Respondents claim that the Department ignored this information and incorrectly assumed that the reimposition of interest rate ceilings on Korean won loans after a failed attempt at liberalization in 1988 also applied to domestic foreign currency loans.

Respondents further state that the Department found at verification that the interest rate liberalization program applied solely to lending rates in Korean won. Therefore, for all domestic foreign currency loans received prior to 1992, there is no basis for the Department's determination that interest rates on these loans were regulated and that these loans provided countervailable subsidies.

According to petitioners, the Department's finding that pre-1992 direct foreign loans provided a countervailable subsidy was correct and supported by the evidence on the record. Petitioners contend that the issue at hand is the GOK's control over access to the foreign loans, not control of the interest rate. Petitioners further state that respondents have provided no new evidence to disprove this finding and nothing in the new law is contrary to either the Department's 1993 determination, or the determination in *Stainless Steel Plate from Korea.*

*Department's Position:* The alleged ''new'' information cited by respondents in their brief concerning interest rates on domestic foreign currency loans was considered by the Department in *Steel Products From Korea,* and again in *Stainless Steel Plate from Korea.* The discussion addressing the GOK's strict control of interest rates specifically states that ''[i]nterest rate ceilings on domestic foreign currency loans were

**Federal Register**/Vol. 64, No. 109/Tuesday, June 8, 1999/Notices

also maintained until 1988.'' *See Steel Products From Korea,* 58 FR at 37341. Thus, the Department considered the fact that the *de jure* controls over domestic foreign currency loans were removed after 1988 in reaching its conclusion that these loans continued to be subject to indirect GOK influence. Respondents' contention that ''window guidance'' (*i.e.,* the GOK's indirect control over interest rates) applied only to domestic won loans is also without merit.

The Department examined this question and reached the opposite conclusion in *Steel Products From Korea.* The Department reiterated this conclusion in *Stainless Steel Plate from Korea,* where it also noted that independent bankers had stated that ''interest rates were once again regulated until the early 1990s, through a system of ''window guidance.'''' Under this system commercial banks were effectively directed by the government not to raise interest rates above a certain level. While this statement is contained within the discussion of the failed 1988 liberalization plan, the bankers did not distinguish between domestic and foreign rates of lending by domestic commercial banks. Finally, in calling for the prohibition of ''window guidance'' over financial institutions'' loan rates, the Presidential Commission did not refer only to won-denominated rates. As noted above, the Department's findings in *Steel Products From Korea* took into account respondents' ''new'' information. This finding has since been upheld by the Court in *British Steel plc* v. *United States,* 941 F. Supp 119 (CIT 1996) (British Steel II), and by the Department in its final determination of *Stainless Steel Plate from Korea.* For these reasons our finding concerning the countervailability of pre-1992 foreign currency denominated loans from domestic sources remains unchanged in this final determination.

*Comment 2: Post-1991 GOK Credit Policies: Whether POSCO Received Long-Term Loans From Korean Banks At Favorable Interest Rates*

Respondents contend that, according to the Department's own calculations in *Stainless Steel Plate from Korea,* POSCO did not receive a benefit from favorable interest rates from regulated and directed sources of credit during the 1992–1997 period, and hence there is no countervailable subsidy in this time period. Respondents propose that the ''minuscule benefits'' found are merely a result of rounding errors caused by the use of weighted-average benchmarks during a period of fluctuating interest rates. Alternatively, the insignificant

benefit found in the *Stainless Steel Plate from Korea* determination may have resulted from variations in the LIBOR base rate on all of these loans. Respondents do not argue with the Department's use of three-year corporate bonds as representative of the long-term market rate for won loans in Korea.

Petitioners rebuttal argument is twofold. As an initial matter, the calculations from *Stainless Steel Plate from Korea* that are cited by respondents contain an error. When this error is corrected, it becomes apparent that there was a benefit to POSCO from its long-term won-denominated loans. Secondly, even if this benefit is minimal, it falls within the rubric of the GOK's direction of credit, and was therefore properly countervailed.

*Department's Position:* As detailed in the Credit Memo, we have determined that access to government-regulated foreign sources of credit did not confer a benefit to POSCO, as defined by section 771(5)(E)(ii) of the Act, and, as such, credit received by respondents from these sources was found not countervailable. Petitioners' argument that this decision was based on a calculation error is based on an incorrect characterization of these loans as fixed rate loans. Because these loans have variable interest rates, our methodology is to calculate the benefit at the time the interest on the loan is paid. For these reasons, we find that there was no benefit from direct foreign loans received by POSCO in 1997.

*Comment 3: The GOK's Pre-1992 Credit Policies: Whether Direct Foreign Loans Constitute a Financial Contribution Within the Meaning of the Act*

According to respondents, the only government regulation of direct foreign loans consisted of an interest rate ceiling. Respondents state that the GOK could not, under its regulations, direct or induce foreign lenders to provide loans to POSCO; nor could it regulate (and reduce) the interest rates these lenders would charge on such loans. Rather, these loans were negotiated directly between foreign banks and POSCO without the GOK's direct or indirect involvement. As such, respondents' state that the Department's preliminary finding that direct foreign loans are countervailable is in conflict with the ''financial contribution'' standard of section 771(5)(D)(i) of the Act. Respondents assert that direct foreign loans from foreign banks do not constitute countervailable subsidies because there is no government financial contribution. Respondents further claim that the Department did not explain in its preliminary

determination how loans from foreign sources could constitute a financial contribution by the GOK.

Moreover, respondents state that these loans do not meet the ''entrusts or directs'' standard of the Act, because (1) they can not be characterized as a contribution that ''would normally be vested in the government,'' and (2) the requirement that the practice of lending by the foreign entity ''does not differ in substance from practices normally followed by the government'' is not met in this instance. Furthermore, because access to direct foreign loans was restricted by the GOK on the basis of a borrowers' ability to access the market without a government or bank guarantee, POSCO would have been able to receive direct foreign loans at the interest rates obtained on its own and without government involvement.

Respondents also address the Department's assertion in the new countervailing duty regulations (and the Statement of Administrative Action) that its indirect subsidy standard remains unchanged under the ''financial contribution'' standard of the Post-Uruguay Round law, specifically referring to the indirect subsidy practices countervailed in *Steel Products from Korea.*[7] Respondents state that to simply subsume direct foreign loans from foreign entities within the broad claim of an unchanged indirect subsidy standard (and the endorsement in the SAA of *Steel Products from Korea*) is ''overly simplistic and legally in error.''

Petitioners dispute respondents' assertion that the GOK's control over access to direct foreign loans does not constitute a financial contribution, within the meaning of the Act. Petitioners state that this question has been addressed by the SAA, which specifically references the Department's indirect subsidy findings in *Steel Products From Korea* to illustrate that the indirect subsidy standard includes the GOK's control over access to direct foreign loans. Petitioners contend that to accept respondents' argument would be to repudiate the interpretation of the statute in the SAA. Petitioners note, moreover, that the Department preliminarily found in the Credit Memo that the GOK's control over the Korean financial system continued through the POI and included the control of access to direct foreign loans.

*Department's Position:* As petitioners correctly note, respondents' arguments concerning this issue have been fully

---

[7] *Countervailing Duties; Final Rule,* 63 FR 65348, 65349 (November 25, 1998) (*CVD Final Rule*); SAA at 926.

addressed by the Congress through its approval of the SAA and the *CVD Final Rule*.[8] In *Steel Products From Korea*, the finding of government control was determined to be sufficient to constitute a government program and government action, as defined by the Act. Moreover, in the preliminary determination, we did not revisit that prior determination, and also found that the subsidy identified meets the standard for a subsidy as defined by the post-URAA Act. *Preliminary Determination*, 63 FR at 63890.

While respondents contend that subsuming GOK-controlled access to direct foreign loans from foreign entities within the SAA's claim of an unchanged indirect subsidy standard is "overly simplistic and legally in error," the clear and unambiguous language of the SAA is that Congress intended the specific types of indirect subsidies found to be countervailable in *Steel Products From Korea* to continue to be covered by the Act, as amended by the URAA. The Department's final countervailing duty regulations are equally clear on this issue: the preamble confirms that the standard for finding indirect subsidies countervailable under the URAA-amended law "is no narrower than the prior U.S. standard for finding an indirect subsidy as described in *Steel Products from Korea.*" *See CVD Final Rule*, 63 FR at 65349. For these reasons, we have not changed our preliminary determination concerning the countervailability of pre-1992 direct foreign loans.

*Comment 4: The GOK's Pre-1992 Credit Policies: Benchmark Applied to Determine the Benefit From Foreign Currency-Denominated Loans*

Respondents challenge the Department's use of a won-denominated benchmark to calculate the countervailable benefit from POSCO's outstanding pre-1992 long-term foreign currency-denominated loans. According to respondents, the Department's long established methodology is to compare countervailable loans with a benchmark in the same currency. Respondents cite the *Final Affirmative Countervailing Duty Determination: Certain Apparel from Thailand*, 50 FR 9818, 9824 (1985), which states that, the "benchmark must be applicable to loans denominated in the same currency as the loans under consideration." Respondents also note that this standard was articulated in the *Final Affirmative Countervailing Duty*

*Determination: Cold-rolled Carbon Steel Flat-rolled Products from Argentina*, 49 FR 18006 (April 26, 1984) (*Cold-Rolled Steel From Argentina*). In that case, the Department stated:

[f]or loans denominated in a currency other than the currency of the country concerned in an investigation, the benchmark is selected from interest rates applicable to loans denominated in the same currency as the loan under consideration (where possible, interest rates on loans in that currency in the country where the loan was obtained; otherwise, loans in that currency in other countries, as best evidence). The subsidy for each year is calculated in the foreign currency and converted at an exchange rate applicable for each year. *Id.* at 18019.

Respondents contend that this policy was reiterated in the Department's new regulations, the preamble to which refers to the currency of the loans as one of "the three most important characteristics" in determining the benchmark. *CVD Final Rule*, 63 FR at 65363. Thus, respondents assert that the Department (1) did not consider any other commercially-viable alternatives (such as those rates "in other countries"); (2) ignored any reference to its long-standing policy of comparing loans in the same currency; and (3) provided no explanation for abandoning that policy. Accordingly, respondents state that the Department must revise its calculation of the benefit from foreign currency-denominated loans, using a benchmark that is in conformance with its policy and regulations.

Petitioners dispute respondents' benchmark argument, stating that the Department clearly rejected this argument in *Stainless Steel Plate from Korea*. While petitioners do not dispute that it is the Department's preference to use a benchmark in the same currency, the Department made clear in the final determination of *Stainless Steel Plate from Korea* that such a comparison was not appropriate when it reaffirmed its determination from *Steel Products from Korea*.

*Department's Position:* Respondents' arguments concerning the Department's methodology for measuring benefits from countervailable foreign currency-denominated long-term loans are partially correct. As stated in the *Stainless Steel Plate from Korea* determination, it is true that in most instances we measure the benefit from countervailable foreign currency loans by comparing such loans with a benchmark denominated in the same currency, provided the borrower would otherwise have had access to such foreign currency loans. However, in the context of the Korean financial system prior to 1992, this methodology is not

appropriate. 64 FR at 15540. Specifically, in *Steel Products From Korea*, the Department found that all sources of foreign currency-denominated credit were subject to the government's control and direction, and were countervailable. Therefore, these sources of foreign currency credit, including overseas markets, could not serve as an appropriate benchmark, and the Department had to determine the rate that companies would have had to pay absent government control. That rate was the corporate bond yield on the secondary market. *See Steel Products From Korea*, 58 FR at 37346; and *Stainless Steel Plate from Korea*, 64 FR at 15540.

Respondents assert that the Department did not consider any other commercially viable alternatives. Respondents ignore, however, the fact that the corporate bond yield on the secondary market was the only alternative, unregulated, and commercially viable source of financing in Korea. Accordingly, this was the only viable benchmark with which to measure the benefit from government-regulated sources of credit. None of respondents' arguments in this investigation have led us to change our determination in *Steel Products From Korea*, which was reiterated in *Stainless Steel Plate from Korea*. Therefore, our finding concerning POSCO's pre-1992 foreign currency-denominated long-term loans remains unchanged in this final determination.

*Comment 5: The GOK's Pre-1992 Credit Policies: Whether Direct Foreign Loans Are Not Countervailable Pursuant to the Transnational Subsidies Rule*

Respondents assert that pursuant to the so-called "transnational subsidies rule," funds provided from sources outside a country under investigation are not countervailable. Specifically, respondents state that section 701(a)(1) of the Act applies only to subsidies provided by the government of the country in question or an institution located in, or controlled by, that country. In support of this contention, respondents cite *North Star Steel* v. *United States*, 824 F. Supp. 1074 (CIT 1993) (*North Star*), in which the Court upheld the Department's determination that an Inter-American Development Bank loan guaranteed by the Government of Argentina on behalf of the recipient was not subject to the countervailing duty law. In particular, the CIT stated that "[t]his determination is consistent with the purpose of the countervailing duty law, which is 'intended to offset the unfair competitive advantage that foreign

---

[8] Although the *CVD Final Rule* is not controlling in this investigation, it does represent a statement of the Department's practice and interpretations of the Act, as amended by the URAA.

Federal Register / Vol. 64, No. 109 / Tuesday, June 8, 1999 / Notices

producers would otherwise enjoy from * * * subsidies paid by their government.'" *North Star*, 824 F. Supp. at 1079 (quoting *Zenith Radio Corp.* v. *United States*, 437 U.S. 443, 456 (1978)). Respondents also cite a case in which the Department refused to initiate an investigation of private, foreign co-financing of a World Bank project, stating that "[f]or the same reasons [applicable to funds from the World Bank], a loan granted by a group of Japanese banks and insurance companies [in the Philippines] * * * would not be countervailable." *See Initiation of Countervailing Duty Investigation: Certain Textiles and Textile Products from the Philippines*, 49 FR 34381 (August 30, 1984).

Petitioners assert that the Department's determination does not contravene the transnational subsidy rule because the subsidy in this case is based on controlled access to credit, and not on a differential in interest rates. The fact that the payment of the funds comes from a private source outside of Korea is irrelevant. According to petitioners, the case law cited by respondents does not involve situations in which a foreign government conferred countervailable subsidies by controlling access to third country financial sources. In addition, petitioners note that these cases predate the changes in the statute that expressly recognize indirect subsidies provided through private actors.

*Department's Position:* Respondents' assertion concerning the transnational subsidies rule is incorrect. Respondents made this same argument in *Steel Products From Korea* (*see* 58 FR at 37344) and in *Stainless Steel Plate from Korea* (*see* 64 FR at 15539). In upholding the Department's determination in *Steel Products From Korea*, the Court did not find in any way that the Department's determination with respect to direct foreign loans was in conflict with the transnational subsidies rule, as argued by respondents in that prior investigation. The cases cited by respondents are also not relevant to the facts of this investigation because those cases deal with funds from foreign governments or international lending or development institutions. This investigation, however, concerns the Korean government's control over access to funds from overseas private sources of credit.

More specifically, however, the Department rejected respondents' argument both in *Steel Products From Korea* and in *Stainless Steel Plate from Korea* because the benefit alleged was not the actual funding of direct foreign loans, but rather the "preferential access to loans that are not generally available to Korean borrowers." *Steel Products From Korea*, 58 FR at 37344; *Stainless Steel Plate from Korea*, 64 FR at 15539. The GOK was found to control this access and because the steel industry received a disproportionate share of these low-cost funds, this preferential access was found to confer a countervailable benefit on the steel industry. Nothing argued by respondents in this investigation would lead us to change these prior determinations concerning direct foreign loans. Therefore, our preliminary determination remains unchanged.

*Comment 6: Post-1991 GOK Credit Policies: Whether Foreign Currency Loans from Domestic Branches of Foreign Banks are Countervailable*

Petitioners argue that, contrary to its decision in *Stainless Steel Plate from Korea*, the Department should find countervailable access to foreign currency loans extended by foreign bank branches located in Korea. Petitioners contend that the same conditions which led the Department to find the existence of direction of credit for domestic bank sources are present in the case of foreign currency loans extended by foreign bank branches in Korea. Moreover, there is no affirmative evidence to justify overturning the 1993 determination of GOK control over domestic branches of foreign banks. Petitioners assert that the Department mistakenly relied on a lack of any substantive discussion in the record concerning the influence of the GOK on foreign banks as affirmative evidence that no such controls exist. According to petitioners, there is little, if any, meaningful discussion about the direct or indirect influence of GOK regulations and policies on the operation of foreign banks in Korea in the record, including the verification reports. Thus, petitioners argue that the Department does not have a basis for its determination in *Stainless Steel Plate from Korea* that foreign currency loans from branches of foreign banks in Korea are not countervailable.

Petitioners argue that pursuant to the Court of International Trade's (CIT) recent ruling in *AI Tech Specialty Steel Corp.* v. *United States*, the Department may not infer the truth of certain facts from lack of any contradictory evidence on the record, and so may not conclude that, absent evidence to the contrary, the GOK did not exert improper controls or influence over foreign commercial banks.[9] Rather, petitioners argue that the Department is required to support or authenticate with record evidence (*i.e.*, verify) any factual assertion on which it relies. Slip Op. 98–136 at 9 (CIT 1998). Petitioners state that, in this case, the Department has violated that principle by failing to gather and verify the necessary facts in support of the conclusion reached.

Moreover, petitioners assert that what little record evidence is available demonstrates that GOK control over foreign banks in Korea is equivalent to that over Korean domestic banks. The petitioners argue that, according to record evidence, foreign commercial banks and domestic banks are on an "equal footing," and must therefore be subject to the same controls. In particular, petitioners cite to the General Bank Act, the Bank of Korea Act, and the Foreign Exchange Management Law, noting that foreign banks are also subject to the provisions of these laws. Petitioners also refer to the Department's finding that the BOK and MOFE have equal authority to control and monitor all banks, and acted a manner such that, "[t]o a significant extent, these institutions [BOK and MOFE] continued to intervene directly and indirectly in the lending activities of commercial banks." Directed Credit Memo at 6.

Petitioners assert that because the Department found that foreign banks were controlled indirectly by the GOK in *Steel Products from Korea*, and because the Department did not find any practical changes in the GOK's indirect role on lending rates and appointment of bank officials between 1991 and 1997, there is no evidence to support the conclusion that these controls ceased to exist for foreign banks. Specifically, petitioners argue that the GOK maintained indirect control over foreign banks in two ways: (1) By influencing lending rates; and (2) by influencing the appointment of bank officials. With regard to lending rates, petitioners argue that (as indicated in the *Presidential Report*) foreign commercial banks must be subject to the same "window guidance" as domestic commercial banks to prevent interest rates from increasing. *See Presidential Report* at 29. According to petitioners, risk-averse, profit-motivated foreign commercial banks would only charge such low interest rates in the Korean

---

[9] Slip Op. 98–136 at 9, 1998 WL 661461 (Ct. Int'l Trade Sept. 24, 1998)("After having failed to uncover evidence to corroborate Isibar's statement on the industry standard, Commerce should then have either concluded that the claim was unverifiable or continued the investigative process until corroborating evidence was obtained").

market if GOK policies restricted either the interest rates or borrowers' access to credit from those banks. Moreover, petitioners maintain instead that there is not sufficient evidence to determine that foreign banks were without GOK influence in the selection of bank officials at Korean branches.

In rebuttal, respondents argue that the petitioners' cite to *AI Tech* is not pertinent. The reasoning of *AI Tech* does not logically extend to this case because there is no evidence to support a conclusion of direction and control over Korean branches of foreign banks. Respondents advance that the record evidence, including meetings with commercial bankers, incontrovertibly indicates that there is no Korean government control of these banks. Rather, petitioners resort to using generalities and speculation about the operation of the Korean banking system and its provisions, which pertain neither to direction of credit to the steel industry, nor to the Department's *de facto* finding of direction of credit. Respondents also reject petitioners argument because petitioners do not present any evidence of the means by which the GOK controlled or directed the lending practices of these foreign bank branches, in contrast to the Department's findings regarding the domestic banking system. Rather, foreign banks' most important source of funds is their head offices; this provides them with both greater autonomy from the Korean banking system and a lower cost of funds than that available to Korean commercial banks. Respondents note that petitioners' focus on government controls on the inflow of foreign funds is misplaced, as the GOK is primarily concerned with the domestic money supply, while the inflow of foreign currency is linked to the use of these funds.

Finally, respondents point out that the GOK does not, and does not need to, influence these banks to lend to POSCO. Respondents reiterate that POSCO is one of the best companies in Korea, and, given POSCO's strong credit rating and reputation, most commercial banks would like to lend to the company.

*Department's Position:* First, we note that petitioners make the statement that because the Department found government control over domestic branches of foreign banks in our 1993 decision in *Steel Products from Korea* that it is incumbent on the Department to rely on affirmative evidence that this control has been repealed. Petitioners argue that the record evidence in this investigation provides no affirmative evidence of any such repeal. Petitioners are incorrect. First, we must make the

basic point that the specific GOK control of domestic branches of foreign banks during the period 1992 through 1997, which is at issue here, was not examined in *Steel Products from Korea.* As such, there is no "affirmative evidence" to "repeal." In addition, in *Steel Products from Korea,* our determination of GOK control was based on the entirety of the financial system in Korea as existed pre-1992. In this current investigation, we determined that the more appropriate basis of examination of direction of credit after 1991 is an analysis of GOK control with respect to each aspect of the different types of commercial banks in Korea, including domestic banks and foreign bank branches.

More importantly, with respect to petitioners' argument on this issue, as a matter of law, the countervailability of the GOK's control over domestic branches of foreign banks during the period 1992 through 1997, which was not examined in *Steel Products from Korea,* can only be based upon the information on the record in this current investigation. As detailed above and explained in the Credit Memo, the information on the record in this investigation demonstrates that while the GOK controls domestic commercial banks it does not control branches of foreign banks in Korea.

Petitioners' contention that record evidence establishes that the Korean branches of foreign banks were subject to the same GOK controls and direction that applied to domestic commercial banks is not supported by the record. The record evidence cited by petitioners does not amount to GOK control and direction of these institutions' operations and lending practices.

The 1996 and 1998 OECD reports do not support petitioners' arguments. While the 1996 OECD report discusses funding levels by foreign banks in Korea, nowhere does that report state that these banks were subject to the GOK's control or direction. Moreover, the 1998 OECD Report, in discussing the weakness of the Korean banking system, and in attributing responsibility for that weakness partly to the government's direct and indirect intervention in the operations of commercial banks, mentions only domestic commercial banks, not foreign banks. In fact, the report discusses the inability of domestic commercial banks, after their privatization, to "develop the autonomy [from the government] needed in a market economy."

Contrary to their arguments, petitioners' reliance on the reports issued by the Presidential Commission

for Financial Reform, quoted by the Department in the Credit Memo, is equally misplaced. The section of the Presidential Report titled "Deregulation of Access to Foreign Capital Markets," cited by petitioners, refers to regulations governing access to foreign capital markets, not regulations governing foreign currency-denominated loans from domestic branches of foreign banks in Korea.[10] Regulations governing access to foreign capital markets are quite separate from those governing domestic branches of foreign banks in Korea. To the extent that the Presidential Commission addressed domestic foreign currency loans, it addressed the lifting of restrictions on the usage of these funds, which is limited mostly to the importation of machinery from abroad. This has nothing to do with any GOK controls over the operations of domestic branches of foreign banks.

Petitioners also support their argument with the contention that foreign banks are subject to some of the same regulatory provisions contained in the General Bank Act that govern domestic commercial banks. However, the Department's analysis in the Credit Memo did not rely on these regulatory provisions but on the record evidence that the GOK continued to influence the lending practices of these domestic commercial banks indirectly, in part because these banks did not develop autonomy from the government. As we explained in the Credit Memo, the weakness of domestic banks vis-a-vis the government was in part an outgrowth of the government's historical role in allocating credit in accordance with policy objectives. Also, the corporate governance structure of Korea's commercial banks (weak ownership structure, lack of autonomy in appointing banking officials) contributed to their weakness vis-a-vis the government. The fact that the GOK's indirect involvement in commercial banking operations continued into the 1990s exacerbated this problem. *See* Credit Memo at 8–9. Foreign banks in Korea, however, were not subject to this same influence. Their sources of funds were their head offices and, as respondents correctly illustrate, appointment of their senior officials was not subject to influence by the GOK. Moreover, there is no evidence that the GOK played a role in the distribution of these funds by the Korean branches. Petitioners proffer no evidence that foreign banks in Korea were

---

[10] *Financial Reform in Korea: The First Report (Presidential Report I)* at 22 (April 1997), Exhibit MOFE–9 of the MOFE Verification Report, on file in the CRU.

''inescapably influenced by the controls on every other sector of the banking industry.'' Rather, they speculate that these banks would be no less influenced than their Korean counterparts by the lead of the Korean Development Bank and the Bank of Korea to extend credit to certain government-favored projects. This is not a conclusion reached by any of the commercial bankers at verification, and petitioners do not point to any evidence that would support this contention. We also note that petitioners' view of the GOK's motivation to control foreign sources of money to keep interest rates from falling is not consistent with one of the alleged methods of control, *i.e.*, limits on interest rates through ''window guidance.''

The fact that foreign banks in Korea did not account for a significant amount of total lending in Korea is not sufficient evidence to lead us to conclude that POSCO would not have been able to raise sufficient funds from this source. Rather, the record shows that loans from foreign banks in Korea were a significant source of POSCO's borrowing, and credit from these banks was not controlled by the GOK.

Petitioners have correctly argued that the Department is required to support or authenticate with record evidence factual assertions relied upon in our final determinations. Indeed, section 782(i) of the Act requires the Department to verify the information used in making a final determination. In this investigation, petitioners alleged that the GOK controlled the allocation of credit in Korea during the years 1992 through 1997. Therefore, once a credible allegation was made, the responsibility of the Department was to solicit and develop factual information to determine whether the GOK was directing credit during those years. In this investigation, the Department properly examined individually the various sources of long-term credit in Korea. This examination included, among other sources, loans from foreign banks with branches in Korea.

Because of the complexity of this issue, a government's control and its allocation of credit within its borders, the Department conducted four days of meetings with commercial and investment banks and with economic and financial research institutes in Korea. During this intensive four-day period with experts in the operation of the commercial credit market in Korea, we focused on all aspects of the alleged GOK control of banks in Korea, including its alleged control of foreign banks. In these meetings we sought information on the aspects and

measures used by the government in its control of credit and financial institutions in Korea. Information provided to us by these banking and financial experts on the measures used by the GOK to control banks and allocate credit in the Korean financial market was summarized in our Bankers Report.

Based in large part on the information which was gathered during these meetings, we determined that the actions of the GOK in the Korean financial system support the conclusion that the GOK controls credit through both government-owned banks, such as the Korean Development Bank, and Korean domestic banks; however, no similar control was found for foreign banks operating in Korea. As noted in the facts detailed above, and in the Credit Memo, our determination that the GOK does not control the lending decisions and allocation of credit of foreign banks operating in Korea is supported by the information on the record in this investigation.

*Comment 7: Post-1991 GOK Credit Policies: Whether POSCO's Access to Foreign Securities Markets Results in Countervailable Benefits*

According to petitioners, extensive record evidence, in particular the Department's findings at verification, shows that access to foreign sources of funds, including foreign securities, was strictly controlled by the GOK through the POI. Petitioners assert that, as recognized by POSCO, the MOFE restricted access to foreign securities markets with the purpose of maintaining low levels of cost of funds for certain companies. Petitioners state that interest rates on foreign credit markets were five to seven percentage points lower than those on domestic foreign currency loans, and petitioners charge that the GOK's goal of preventing inflationary effects necessitated the maintenance of this interest rate differential. In addition, petitioners claim that the GOK's control over access to foreign funds constitutes a financial contribution within the meaning of the Act, in particular, the ''entrusts or directs'' standard of section 771(5)(B)(iii) of the Act.

Respondents note that in the recent *Stainless Steel Plate from Korea* final determination, the Department determined that POSCO's alleged ''preferential access'' to regulated foreign sources of funds did not confer a benefit. They state that the record evidence in this case also supports a finding that access to foreign securities did not confer a benefit to POSCO. Respondents also dispute petitioners'

claim that access to foreign securities constitutes a financial contribution within the meaning of the Act, stating that petitioners' interpretation of the ''entrust or directs'' standard is unreasonable. Respondents state that this standard cannot encompass private actions by independent foreign parties that are consistent with market-oriented behavior at market-determined interest rates.

*Department's Position:* In the Credit Memo, we stated that there are three elements required to find a potential subsidy countervailable: (1) A financial contribution is made by a government or public body; (2) a benefit is conferred on the recipient; and (3) the subsidy is specific. If one of these three elements is not met, the subsidy is not countervailable. In accordance with section 771(5)(E)(ii) of the Act, we examined whether a benefit has been conferred on the recipient, POSCO, from foreign securities issued in overseas markets. We also preliminarily determined that POSCO's access to government-regulated foreign sources of credit did not confer a benefit to the recipient, as defined by section 771(5)(E)(ii) of the Act, and, as such, is not countervailable. *See* Credit Memo at 18. As discussed in *Comment 5*, above, we continue to find that branches of foreign banks are not subject to the GOK's control and direction. Therefore, we continue to find that access to government-regulated foreign sources of credit did not confer a benefit, because the rates obtained on foreign securities, even though access to them was limited, were not less than those on foreign currency loans available to respondent companies in Korea. As such, there is no need to address the additional comments raised by petitioners and respondents above.

*Comment 8: Whether Lending From Domestic Branches of Foreign Commercial Banks Is an Appropriate Benchmark for Long-term Financing*

Petitioners dispute the Department's decision in *Stainless Steel Plate from Korea* that because the GOK did not control or direct credit provided by the domestic branches of foreign commercial banks, the interest rate on certain such loans is an appropriate benchmark for determining the benefit from (1) foreign currency loans from Korean commercial banks extended post-1991 and (2) foreign securities offerings. Petitioners argue that since record evidence establishes the GOK's control of credit from domestic branches of foreign commercial banks, the Department must use an alternative benchmark from an uncontrolled

domestic source. Petitioners assert that the Department should instead continue to apply the methodology established in *Steel Products from Korea (1993),* and use the domestic corporate bond rate.

Respondents claim that there is substantial evidence on the record to support the Department's finding that the GOK neither controls nor directs the operations of foreign commercial banks. Therefore, loans from these banks are appropriate as benchmark commercial loans.

*Department's Position:* We have determined that the GOK does not control credit from domestic branches of foreign banks. *See Comments 5 and 6,* above. Because these uncontrolled foreign banks provided foreign currency loans, interest rates on these loans are the appropriate benchmarks to use in calculating the benefit from foreign currency loans provided to the respondents from government-owned banks and government-controlled domestic banks. For the reasons discussed in *Comment 6,* we disagree with petitioners' arguments that funding from domestic branches of foreign banks cannot serve as an appropriate benchmark to measure any potential benefit from regulated foreign currency-denominated sources of credit, *e.g.,* foreign securities from abroad.

*Comment 9: Dai Yang's Long-Term Interest Rate Benchmark for Dollar-Denominated Loans*

Respondents argue that, absent loans by Korean branches of foreign banks, the Department should use the average interest rates charged on domestic foreign currency loans from Korean branches of foreign banks to POSCO and Inchon as a benchmark for calculating the benefit from Dai Yang's domestic foreign currency loans. Respondents note that the use of this industry-specific data would be in line with the Department's policy of using industry-specific benchmarks when company-specific benchmarks were not available. Alternatively, respondents assert that the Department may use data solely from Inchon if the Department determines that to be more appropriate.

Petitioners reject the use of an ''industry-specific'' benchmark, as proposed by Dai Yang. While respondents cite to the Department's *1989 Proposed Regulations* in support of this practice, there is no such standard established in the *1997 Proposed Regulations,* which indicates that the Department will use a national average rate absent company-specific benchmark information. Moreover, petitioners suggest the impracticality of this suggestion, as the stated purpose of

a benchmark rate is to reflect the ''amount the firm would pay on a comparable commercial loan(s) that *the firm could actually obtain on the market.''* 19 C.F.R. 351.505(a)(1) (emphasis added). Given the varied financial status of firms, there is no reason to believe that one firm's rates are an acceptable surrogate for another firm. Therefore, the Department should use the national average interest rate benchmark to determine the benefit on all long-term financing, loans and bonds.

*Department's Position:* While petitioners are correct that is the Department's practice to use a national average interest rate benchmark when company-specific rates are unavailable, we were unable to locate a national average rate for domestic branches of foreign banks, or any other appropriate surrogate national average rate in this case. Additionally, it is the Department's long-standing practice to compare countervailable foreign currency-denominated loans to a benchmark in the same currency, as discussed in *Comment 7* above, making the use of the won-denominated interest rate benchmark, as suggested by petitioners, inappropriate in this circumstance. *See e.g., CVD Final Rule,* 63 FR at 65363; *see also, Certain Apparel from Thailand,* 50 FR at 9824 (''benchmark must be applicable to loans denominated in the same currency as the loans under consideration),'' and *Cold-Rolled Steel From Argentina,* 49 FR at 18019 (''the benchmark is selected from interest rates applicable to loans denominated in the same currency as the loan under consideration'').

In the past, where the Department has found that a company-specific factor is a reasonable representation of industry practice, we have used such information as the most appropriate surrogate. *See Final Affirmative Countervailing Duty Determination: Certain Stainless Steel Wire Rod from Italy,* 63 FR 40474, 40477 (July 29, 1998). As stated in the Department's *CVD Final Rule,* 63 FR at 65408, section 351.505(a)(2)(i), ''* * * the Secretary normally will place primary emphasis on similarities in the structure of the loans (*e.g.,* fixed interest rate v. variable interest rate), the maturity of the loans (*e.g.,* short-term v. long-term), and the currency in which the loans are denominated.'' Based on the similarities in the circumstances and structure of Inchon's and Dai Yang's lending practices, we find that the rate calculated from Inchon's loans by Korean branches of foreign banks is the most appropriate benchmark.

*Comment 10: Inchon's Long-Term Loan Benchmark*

Respondents propose that, consistent with the recent *Stainless Steel Plate from Korea* final determination and its regulations, the Department should use the interest rates on Inchon's long-term foreign currency loans from Korean branches of foreign banks to calculate a company-specific weighted-average U.S. dollar-denominated benchmark rate for Inchon. If the Department finds that Inchon's domestic foreign currency loans and direct foreign loans constitute directed credit, it should then use this calculated company-specific benchmark for calculating the benefits conferred upon Inchon.

In rebuttal, petitioners contend that the methodology used to calculate POSCO's company-specific weighted average dollar denominated benchmark interest rate, which Inchon proposes to continue using in this investigation, deviates substantially from the Department's established policy. It is the Department's practice to use a benchmark that is based on the year in which a long-term loan obligation was assumed. However, the methodology used by the Department understated the benefit to producers of subject merchandise by failing to countervail certain loans.

*Department's Position:* Consistent with the Department's long-term policy, and with the methodology established in the final determination of *Stainless Steel Plate from Korea,* it is appropriate to calculate a company-specific weighted-average U.S. dollar-denominated benchmark based on loans extended by Korean branches of foreign banks to calculate the benefit to Inchon from domestic foreign currency loans and direct foreign loans.

Petitioners argue that this is inconsistent with the Department's practice of using a benchmark based on the year in which a loan was received. While petitioners are correct that this is the Department's standard practice, in this case, annual information was not available. Moreover, it is also the Department's standard practice to compare government-regulated credit to a benchmark denominated in the same currency, if such a benchmark is available, as discussed in *Comment 7,* above. This is in accordance with Department policy and past practice. *See e.g., CVD Final Rule,* 63 FR at 65363; *see also, Certain Apparel from Thailand,* 50 FR at 9824 (quoting, ''benchmark must be applicable to loans denominated in the same currency as the loans under consideration),'' and *Cold-Rolled Steel From Argentina,* 49

FR at 18019 (quoting, ''the benchmark is selected from interest rates applicable to loans denominated in the same currency as the loan under consideration''). Therefore, we believe that the benchmark calculation methodology determined in *Stainless Steel Plate from Korea* is the most reasonable surrogate.

*Comment 11: Post-1991 GOK Credit Policies: Whether POSCO Received Disproportionate Benefits From GOK-Regulated Long-Term Loans*

Respondents argue the Department erred when it determined that all producers of the subject merchandise received a disproportionate share of long-term loans, in spite of POSCO's demonstration, according to the Department's own GDP test, that it did not. Respondents indicate that it is within the Department's authority to address, on a company-specific basis, those companies that may have received a disproportionate share of long-term loans; however, it is not within the Department's authority to generalize the impact of benefits received by specific companies onto an entire industry, thereby finding disproportionality against a company whose loan shares were demonstrably not disproportionate.

Respondents state that the appropriate legal standard is whether a domestic subsidy ''is a specific subsidy, in law or in fact, to an enterprise or industry * * *.'' (quoting section 771(5A)(D) of the Act). Because POSCO is ''an enterprise'' as defined by the statue, and constitutes ''the industry'' for which the Department must make a determination concerning the existence of a domestic subsidy from the purported directed credit, the Department must find that the subsidy is not specific to POSCO.

According to petitioners, respondents' contention that the Department must examine whether disproportionate benefits have been provided to POSCO is a misinterpretation of the law. In particular, petitioners state that the statute dictates that the Department will find *de facto* specificity when either an enterprise or an industry receives disproportionate benefits. The record, petitioners note, shows that the Korean iron and steel industry received a disproportionate amount of a subsidy.

*Department's Position:* We disagree with respondents' arguments. The fact that POSCO borrowed very little from those sources of credit that were found to be *de facto* specific to the steel industry during the relevant period is irrelevant. The clear language of the statute is that a subsidy is specific when ''an enterprise *or* an industry receives a disproportionately large amount of the

subsidy.'' Section 771(5A)(D)(iii)(III) of the Act (emphasis added). Thus, when a subsidy is specific to an industry, even if it is not specific to an enterprise that is part of that industry, the Department will find that subsidy to be countervailable, even if the actual subsidy to the enterprise is very small.

While respondents may characterize this approach as ''collective guilt,'' the Department has in numerous cases found countervailable relatively small subsidies to a respondent firm on the basis of disproportionate use by the industry to which the respondent belongs. *See, e.g., Final Affirmative Countervailing Duty Determination: Certain Steel Products from Brazil,* 58 FR 37295, 37299 (July 9, 1993) (*Certain Steel from Brazil*). Indeed, this is not an unusual fact pattern for *de facto* specificity findings under, for example, large research and development programs. As such it is not surprising that under respondents' suggested approach, the Department would rarely find a subsidy to be de facto specific, because subsidies under a program are frequently not received on a disproportionate basis by a single enterprise. Finally, we agree with petitioners that respondents' attempt to link certain methodologies that are conducted on a company-specific basis to the specificity analysis is also without merit. The quantification of the benefit is simply not germane to the Department's analysis concerning specificity.

*Comment 12: Countervailability of POSCO's Two-Tiered Pricing System*

Respondents argue that POSCO's pricing decisions are not influenced by the GOK, and that the pricing structure in question is consistent with commercial considerations and is widely used by companies in numerous industries in Korea. Respondents They state that two-tiered pricing has evolved as a natural response to market competition: because the competing imports are eligible for duty drawback, companies in Korea must set local export prices to compete with duty-exclusive import prices. Otherwise, respondents claim, POSCO would lose business to competing importers. Further, respondents argue that the Department's methodology used in the preliminary determination was based upon the flawed assumption that there are no major differences between different hot-rolled stainless coils, and that the Department failed to consider quality and terms-of-sale differences in its price comparisons as required under section 771(5)(E)(iv) of the Act, which

sets forth the standards for determining the adequacy of remuneration.

Petitioners agree with the Department's preliminary determination that POSCO supplied exporters of subject merchandise with preferentially priced hot-rolled stainless steel coil, and that this practice constitutes a countervailable export subsidy. Petitioners state that the Department should continue to use import prices for hot-rolled stainless steel coil as the benchmark for calculating the benefit conferred by this program, consistent with the Department's practice of using the world market price as a benchmark. As an alternative, petitioners propose the use of a weighted-average of the home market prices and import prices as the benchmark price.

Petitioners rebut respondents' argument that POSCO's pricing system is consistent with commercial considerations, and disagree with respondents' claim that this pricing schemeystem is necessary in order for POSCO to compete with foreign competitors. Petitioners maintain that the attribution of commercial benefits to a subsidy program such as this one is irrelevant, as commercial considerations—such as the loss of business—do not mitigate the countervailability of such subsidies. Moreover, the language of the statute states that the adequacy of remuneration will be measured ''in relation to prevailing market conditions * * * for goods purchased in the country which is subject to the investigation.'' Therefore, POSCO's competition with imported material is also immaterial.

*Department's Position:* Because POSCO, a government-owned entity, charged lower prices to respondent companies for inputs that were used to produce subject merchandise for export, this program constitutes an export subsidy in accordance with section 771(5A)(B) of the Act. We disagree with respondents' claim that there was no GOK control or intervention in POSCO's pricing decisions. As discussed in the ''Programs Determined to be Countervailable'' section of this notice, we have determined that the actions of POSCO are the actions of the GOK because POSCO is a government-controlled company. Respondents also indicate that POSCO has no incentive to sell to its competitors at subsidized prices. However, as discussed above, POSCO is a government-controlled company, and record evidence indicate that the GOK does influence POSCO's pricing decisions. *See* Source Document Memo.

The parties have put forth numerous arguments explaining how the benefit

from this program should be determined under the guidelines of the adequacy of remuneration standard established in section 771(5)(E)(iv) of the Act. However, the adequacy of remuneration standard is not relevant to the program at issue. The program at issue is one in which POSCO charges different prices to Korean steel manufacturers based upon export performance. This type of dual pricing program is specifically addressed in the Illustrative List of Export Subsidies (the Illustrative List) which is provided as Annex I of the Agreement on Subsidies and Countervailing Measures. Because this type of program is specifically addressed under Item (d) of the Illustrative List, the criteria to be used to determine whether POSCO's dual pricing policy is a countervailable subsidy is the criteria set forth under Item (d), not the criteria used to determine the adequacy of remuneration as argued by the parties. Indeed, the adequacy of remuneration standard used for the provision of goods and services and the criteria used to determine the subsidy based upon price preferences for inputs used in the production of goods for exports are set forth in separate regulations. *See* section 351.511 and section 351.516 of the *CVD Final Rules.*

Additionally, respondents discussed various other market conditions, *e.g.*, quality, as factors which cause differences between POSCO's prices and those of POSCO's foreign competitors. However, as discussed in the ''Programs Determined to be Countervailable'' section of this notice, we have altered our methodology from the preliminary determination. Therefore, the products and pricing practices of only one supplier, POSCO, is considered in the Department's comparison. The Department is comparing POSCO's ''domestic'' prices to POSCO's ''local export'' prices. While factors such as quality may potentially create a price differential between different producers, these variables do not play a role in the different prices at which POSCO sells the same subject merchandise to its customers. Therefore, these arguments are not applicable.

Respondents argued that if the Department mistakenly countervailed POSCO's two-tiered pricing policy, numerous adjustments should be made to the import prices which served as the benchmark in the preliminary determination. Petitioners also put forth numerous arguments with regard to these benchmark prices. However, as discussed in the ''Programs Determined to be Countervailable'' section of this notice, we have stated the reasons for

basing our comparison on prices charged by POSCO to respondents when producing for domestic sale and the prices charged by POSCO to respondents when producing for export. Therefore, the parties' arguments with regard to the use of import prices as a benchmark are not applicable.

The parties argue about the date that should be considered the ''date of sale'' by the Department. As indicated by both petitioners and respondents, this is not a dumping investigation, and the important question is when the prices being compared were set. Therefore, we based the comparison on the months in which the prices were set, which is the month in which the order was placed. Therefore, we believe that the most reasonable comparison is a monthly one, established by the order dates of the respondent firms.

Finally, respondents argue that this pricing system is not unique to POSCO, but is used by numerous companies in a variety of industries as a market response to Korea's system of duty drawback. First we note POSCO's own statements indicate that POSCO sets local export prices at levels that are below the duty-exclusive price. *See* POSCO's October 21, 1998 questionnaire response at 2. Under the countervailing duty law, a government pricing program which provides a lower price to exporters based upon export performance is a countervailable subsidy under section 771(5A)(B) of the Act. The statute and Item (d) of the Illustrative List provide the standard to be used by the Department to determine whether a countervailable subsidy has been provided by a pricing program of the type under examination in this investigation. Once the pricing program is determined to be an export subsidy under the statute, no further analysis on the countervailability of this program is required.

*Comment 13: The GOK's Pre-1992 Investments Constitute Non-Countervailable ''General Infrastructure''*

Respondents state that in the preliminary determination, the Department relied exclusively upon its decision in *Steel Products from Korea* to find that the GOK's investments at Kwangyang Bay during the period 1983–1991, provided countervailable subsidies to POSCO. Respondents note that the final determination of *Steel Products from Korea,* however, was made under the Pre-Uruguay Round law and on a different factual record. Therefore, in order to carry out its statutory mandate, the Department must apply the Post-Uruguay Round law to

the facts presented in this instant investigation, and revisit its preliminary determination. Under section 771(5)(B) of the Act, there is now a requirement that a financial contribution must be provided by the government in order for a countervailable subsidy to exist. Respondents further argue that under section 771(5)(D)(iii) of the Act, the term ''financial contribution'' does not include the provision of general infrastructure.

Respondents state that, although the Department's administrative determinations, and the statute itself, are silent as to the definition of ''general infrastructure'' under the new law, the Department's new CVD regulations are instructive. Respondents note that section 351.511(d) of the new regulations defines ''general infrastructure'' as ''infrastructure that is created for the broad societal welfare of a country, region, state, or municipality.'' *See CVD Final Rules.* They argue that under the Post-Uruguay Round law and the basic standard for general infrastructure articulated in section 351.511(d) of the new regulations, the GOK's pre-1992 infrastructure investments at Kwangyang Bay constitute non-countervailable ''general infrastructure.''

Petitioners note that the Department in the past has found that the Kwangyang Bay investments do not constitute general infrastructure, and urge the Department to continue this practice. *See Stainless Steel Plate from Korea,* 64 FR at 15547, and *Steel Products from Korea,* 58 FR at 37346–47.

*Department's Position:* Respondents are correct when they assert that general infrastructure is not considered to be a financial contribution under 771(5)(D)(iii) of the Act. However, they are incorrect when they state that the infrastructure development at Kwangyang Bay constitutes general infrastructure. As respondents have acknowledged, the statute is silent as to the definition of ''general infrastructure;'' however, they note that the Department's new CVD regulations are instructive. *See CVD Final Rules,* 63 FR at 65412. While the new CVD regulations are not applicable to this case because this investigation was initiated before the effective date of these regulations, we are referring to them, in part, for guidance as to what constitutes ''general infrastructure.''

The new CVD regulations define general infrastructure as ''infrastructure that is created for the broad societal welfare of a country, region, state or municipality.'' Thus, any infrastructure that does not satisfy this public welfare

concept is not general infrastructure and is potentially countervailable. Therefore, the type of infrastructure *per se* is not dispositive of whether the government provision constitutes "general infrastructure." Rather, the key issue is whether the infrastructure is developed for the benefit of the society as a whole. For example, interstate highways, schools, health care facilities, sewage systems, or police protection would constitute general infrastructure if we found that they were provided for the good of the public and were available to all citizens and members of the public. Infrastructure, such as industrial parks and ports, special purpose roads, and railroad spur lines that do not benefit society as a whole, does not constitute general infrastructure within the meaning of the new CVD regulations, and is countervailable if the infrastructure is provided to a specific enterprise or industry and confers a benefit.

The infrastructure provided at Kwangyang Bay was not provided for the good of the general public; instead, it was built to support POSCO; therefore, it does not constitute "general infrastructure." It is clear from the record that the infrastructure provided for POSCO's benefit at Kwangyang Bay is *de facto* specific, and that POSCO is the dominant user. *See Steel Products From Korea,* 53 FR at 37346–47. Therefore, the infrastructure at Kwangyang Bay is countervailable. Indeed, the "Explanation of the Final Rules" (the Preamble) to the new CVD regulations, which respondents assert are instructive on this issue, specifically cites to the infrastructure provided at Kwangyang Bay in *Steel Product From Korea* as an example of industrial parks, roads, rail lines, and ports that do not constitute "general infrastructure," and which are countervailable when provided to a specific enterprise or industry. *See CVD Final Rules,* 63 FR at 65378–79.

*Comment 14: GOK's Pre-1992 Investments Are Not Countervailable Because They Are "Tied" to Kwangyang Bay*

Respondents state that, in the preamble to the new regulations, the Department has adopted the practice of attributing subsidies that can be "tied" to particular products to those products. *See CVD Final Rules,* 63 FR at 65400. With respect to the instant investigation, respondents argue that the alleged subsidies are "tied" to the products that are produced at POSCO's Kwangyang Bay facility. Since the subject merchandise is not produced at the Kwangyang Bay facility, the subject

merchandise does not benefit in any way from the allegedly subsidized general infrastructure at Kwangyang Bay. Respondents contend that it would run counter to the Department's practice, and common sense, to attribute countervailable benefits to products that cannot benefit from the alleged subsidies. They also note that under the Department's past practice, where a subsidy is "tied" only to non-subject merchandise, that subsidy is not attributed to the merchandise under investigation. *See Final Results of Countervailing Duty Administrative Review: Certain Iron-Metal Castings from India,* 62 FR 32297, 32302 (June 13, 1997).

Respondents argue that the Department was faced with a similar factual situation as the instant case in the *Final Affirmative Countervailing Duty Determination: Iron Ore Pellets from Brazil,* 51 FR 21961, 21966 (June 17, 1986) (*Iron Ore Pellets from Brazil*). In that case, petitioners argued that infrastructure and regional tax benefits provided to the Carajas mine project should be attributed to the respondent even though respondent did not produce (or intend to produce) subject merchandise at the Carajas mine project. The Department rejected petitioners' argument finding that the infrastructure and tax benefits were, by definition, only for the Carajas mine project. Because the respondent did not produce subject merchandise at the Carajas mine project, the Department did not consider this program countervailable with respect to subject merchandise.

Respondents contend that, rather than directly addressing the fact that the alleged subsidies are tied to Kwangyang Bay, the Department has instead mis-cited to its earlier finding in *Steel Products from Korea.* They note that in the preliminary determination of the instant investigation the Department claims that the alleged subsidy in *Steel Products from Korea* was treated as "untied." However, respondents state that nowhere in *Steel Products from Korea* does it state that the alleged subsidy was being treated as "untied." In fact, respondents state that the issue of whether the subsidies were tied or untied never arose in that investigation because the subject merchandise was produced at both of POSCO's steel facilities and, therefore, it was unnecessary for the Department to characterize the alleged subsidy as either "tied" or "untied." They argue that in mischaracterizing its finding in *Steel Products from Korea,* the Department is attempting to bootstrap that finding into the instant investigation.

In their rebuttal brief, petitioners reject the respondents' argument that the Department is attempting to bootstrap its finding in *Steel Products from Korea* into the instant investigation. In *Steel Products from Korea,* petitioners state that the Department, by dividing the benefit attributable to the POI by POSCO's total sales, clearly treated the grants as untied benefits. *See Steel Products from Korea,* 58 FR at 37347. The Department clearly reiterated this position in *Stainless Steel Plate from Korea,* 64 FR 15549. Therefore, petitioners argue, the Department should continue to find Kwangyang Bay infrastructure investments "untied" in the final determination.

*Department's Position:* First, we note that the attribution, or "tying," of a subsidy to a particular product or market is a long-standing policy of the Department, not one recently adopted in the new CVD regulations. Also, it has been the practice of the Department to attribute the benefit conferred from an "untied" domestic subsidy to the recipient's total sales. (This is how the subsidy rate was calculated for the Kwangyang Bay subsidy in *Steel Products from Korea.*) By contrast, if the subsidy was, for example, tied to export performance, then the Department would only attribute the benefit of the subsidy to the recipient's export sales.

Respondents' argument that the infrastructure subsidy provided to POSCO is tied to only certain of POSCO's production is flawed. Part of respondents' argument rests upon the premise that a regional subsidy can be tied to only the subsidy recipient's production in that region. If this allocation methodology were adopted and the Department tied regional subsidies to production in a particular region, the Department would essentially be forced to calculate factory-specific subsidy rates. In addition, if such a methodology were applied, then foreign companies could easily escape collection of countervailing duties by selling the production of a subsidized region domestically, while exporting from a facility in an unsubsidized region. This allocation methodology has been clearly rejected by the Department. *See, e.g., Final Negative Countervailing Duty Determination: Fresh Atlantic Salmon from Chile,* 63 FR 31437, 31445–46 (June 9, 1998) (stating, "[T]he Department does not tie the benefits of federally provided regional programs to the product produced in the specified regions.") Indeed, the Department has explicitly rejected this argument in the new CVD regulations cited by

respondents in support of their argument on this issue. *See CVD Final Rules,* 63 FR at 65404. The infrastructure development at Kwangyang Bay provided a benefit to POSCO and, as discussed further below, the benefit from the subsidy is untied and is attributed to POSCO's total sales.

Respondents' argument is also flawed because respondents have misinterpreted the attribution methodology. Attribution of the benefit of a subsidy is based upon the information available at the time of bestowal. The concept of "tying" a subsidy at the time of bestowal can be traced back to *Certain Steel Products from Belgium. See Final Affirmative Countervailing Duty Determination: Certain Steel Products from Belgium,* 47 FR 39304, 39317 (September 7, 1982). At the time of bestowal of the subsidy conferred by the Kwangyang Bay infrastructure, the benefit of the subsidy was to POSCO, not to a specific product line. Thus, the benefit cannot be tied to any specific product, but instead, is an untied benefit provided by the GOK to POSCO. Once it is determined that an untied subsidy has been provided to a firm, the Department will attribute that untied subsidy to the firm's total sales, even if the products produced by the firm differ substantially from the time when the subsidy was provided. The Department will not examine whether product lines have been expanded or terminated since the time of the subsidy's bestowal.

Finally, we note that respondents' reliance on *Iron Ore Pellets from Brazil* is misplaced. First, in both *Iron Ore Pellets from Brazil* and in the Kwangyang Bay subsidy at issue in this investigation, the determination of attribution of a subsidy was made at the time of bestowal, which is consistent with Department policy. Thus, in both cases, the Department applied the same standard in determining whether a subsidy was tied or untied. Second, the subsidy alleged in *Iron Ore Pellets from Brazil* was alleged to have been provided to an input into the subject merchandise, an issue distinct from the issue in the instant investigation. We further note that the treatment of input subsidies at issue in *Iron Ore Pellets from Brazil* has changed since 1986. *See e.g.,* section 351.525(b)(6)(iv) of the *CVD Final Rules* and *Final Results of Countervailing Duty Administrative Review: Industrial Phosphoric Acid from Israel,* 63 FR 13626 (March 20, 1998). Thus, if the identical subsidy issue cited in *Iron Ore Pellets from Brazil* were before the Department today, it is uncertain whether the same

decision would be made in 1999 as was made in 1986.

*Comment 15: The Department Erred in Treating the Alleged Benefit to POSCO as a Grant*

Respondents note that, in the preliminary determination, the Department determined that the GOK's costs of constructing the infrastructure at Kwangyang Bay constituted grants to POSCO. In treating these costs as grants to POSCO, respondents argue, the Department has ignored the fact that the GOK owns these facilities and charges POSCO the normal user fees for the services provided. They assert that it is erroneous as a matter of law and contrary to Department precedent to countervail as grants infrastructure that the respondent does not own and where normal user fees are paid to use the infrastructure services. (*Citing,* sections 771(5)(D)(i) and (E)(iv) of the Act, and the *Final Affirmative Countervailing Duty Determination: Industrial Phosphoric Acid from Israel,* 52 FR 25447, 25451 (July 7, 1987) (*IPA from Israel; Final Determination*).)

Respondents contend that rather than treating the infrastructure investments as grants, the Department should have analyzed the issue as one of whether the infrastructure services were provided "for less than adequate remuneration," citing section 771(5)(E)(iv) of the Act. They note that adequacy of remuneration is the new statutory provision for determining whether the government's provision of a good or service constitutes a countervailable subsidy. According to section 771(5)(E) of the Act, the adequacy of remuneration with respect to a government's provision of a good or service shall be determined in relation to prevailing market conditions (*i.e.,* price, quality, availability, marketability, transportation, and other conditions of purchase or sale) for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.

Respondents state that the Department addressed a similar issue in *IPA from Israel; Final Determination.* At issue in that case were certain rail lines built (and owned) by the Israeli government for "the almost exclusive use of a few chemical companies. *See IPA from Israel; Final Determination,* 52 FR 25447. The Department recognized that any benefit to be derived from the infrastructure was related to the use of that infrastructure, and since the respondent in question paid for such use, the question was whether the payments for such use were

higher or lower than those paid by other users for similar services. The Department determined that the rates paid were not preferential and, therefore, that no benefit or subsidy existed.

Respondents also state that in *Certain Steel Products from Brazil,* the Department applied a similar analysis. In that case, the Department determined that "The fees charged * * * reflected standard fees applied to all users of port facilities, thus, they are non-specific." *Certain Steel Products from Brazil* at 37300. *See also, Final Affirmative Countervailing Duty Determination: Carbon Steel Wire Rod from Trinidad and Tobago,* 49 FR 480, 486 (Jan. 4, 1984) (*Carbon Steel Wire Rod from Trinidad and Tobago*).

Respondents argue, in the alternative, that if the Department continues to treat these benefits as "grants," then these grants must be pro-rated based upon the actual benefit to POSCO. They note that the GOK provided information on the use of these facilities and, where possible, POSCO's portion of the total usage during the POI. Since POSCO is not the only company that benefits from the infrastructure investments at Kwangyang Bay, the Department cannot simply attribute the entire benefit from the GOK's infrastructure investments to POSCO. The benefit found must be allocated proportionate to POSCO's use of these facilities at Kwangyang Bay during the POI.

In their rebuttal brief, petitioners state that respondents are blurring the distinction between the original provision of specific infrastructure investments and the adequacy of remuneration of fees charged for the future use of the infrastructure. In addition, petitioners argue that the investment grants should not be "pro-rated" based on POSCO's use of the facilities, because POSCO is the dominant beneficiary. Petitioners note that in *Steel Products from Korea,* the Department determined that Kwangyang Bay was specifically designed for POSCO. *See Steel Products from Korea,* 58 FR at 37347. Petitioners point out that the Department specifically clarified this point in the recent final determination of *Stainless Steel Plate from Korea. See Stainless Steel Plate from Korea,* 64 FR at 15,550.

*Department's Position:* The Kwangyang Bay infrastructure subsidy under investigation in *Steel Products from Korea, Stainless Steel Plate from Korea,* and this investigation is not the fee charged by the government for use of rail and port facilities, as was the issue in the cases cited by respondents. Indeed, we found an alleged program

**Federal Register**/Vol. 64, No. 109/Tuesday, June 8, 1999/Notices

providing "preferential" port charges to the Korean steel industry not to exist in *Steel Products from Korea*. Therefore, the cases cited by respondents are not relevant to the treatment of the Kwangyang Bay subsidy.

The benefit under this subsidy program to POSCO was the creation of Kwangyang Bay to support POSCO's construction of its second integrated steel mill. The building of this infrastructure to support POSCO's expansion, which was planned years before POSCO commenced production at Kwangyang Bay, was the benefit countervailed in *Steel Products from Korea* and in this investigation. Thus, the benefit conferred by this subsidy program to POSCO, and the benefit that must be measured, is the construction of these facilities, rather than the fees charged to POSCO for their use. Therefore, it is reasonable to measure the benefit from this program by treating the costs of constructing the Kwangyang Bay facilities for POSCO as nonrecurring grants.

In addition, we also disagree with respondents' argument that we should pro-rate this subsidy between POSCO and to other companies currently located at Kwangyang Bay. Again, respondents have misinterpreted the nature of the benefit. The infrastructure at Kwangyang Bay was built to support POSCO's expansion and its creation of its second integrated steel mill. Therefore, the program is a subsidy provided to POSCO, and the benefit from the program is properly attributed to POSCO.

*Comment 16: The Department Should Exclude Dai Yang's "Merchandise" Sales From its Reported Sales Denominator*

Petitioners argue that the Department should exclude the amount of "merchandise sales," or goods resold, from Dai Yang's sales denominator in its final analysis. Petitioners reason that these sales, which were discovered at verification, are sales of goods not produced by Dai Yang, and so should not be included in Dai Yang's sales figures.

Respondents argue that it is hypocritical for petitioners to argue, on one hand, that the "untied" subsidies which POSCO allegedly received from the pre-1992 infrastructure investments at Kwangyang Bay should be attributed to the production of subject merchandise, while on the other hand Dai Yang's "merchandise" sales should be left out of the calculation because they are "untied."

*Department's Position:* According to the *GIA*, it is the Department's aim to

"capture every part of the sales transaction that could benefit from subsidies" in the total sales denominator. *GIA*, 58 FR at 37237. Moreover, it is the Department's long-standing position that production subsidies are tied to a company's domestic production. Following the approach outlined in *Certain Steel from France* (1993), we have applied the Department's "tied" analysis to this situation. *See*, GIA, 58 FR at 37236. The presumption that the subsidies at issue are tied to domestic production has not in any way been rebutted by respondents, and respondents have not attempted to show that Dai Yang's "merchandise" sales should appropriately be included in the sales denominator. We therefore determine that the appropriate sales denominator is the total of Dai Yang's domestically produced merchandise, and we have excluded Dai Yang's "merchandise" sales, as these are not sales of goods produced by the company.

Respondents argue that it is inconsistent to exclude "untied" sales while concurrently countervailing a subsidy which is "untied" to the production of subject merchandise. However, this position is not inconsistent. Subsidies received for infrastructure, for example, indirectly benefit production. Thus, it is reasonable to countervail such a subsidy. However, to include in the sales denominator sales of merchandise that were not produced by the particular respondent would be unreasonable, as this merchandise is clearly not part of the production process.

*Comment 17: Countervailability of Long-Term Loans Where Dai Yang Did Not Have Interest Payments Due During the POI*

Respondents state that it is the Department's methodology to calculate the benefit from long-term variable rate loans at the time the interest on the loan would be paid; hence no benefit exists on a loan if no interest was due during the POI. Respondents argue that the Department's methodology for measuring the benefit from fixed rate loans requires the same result. Therefore, respondents conclude that there is no benefit from either fixed or variable rate long-term loans if no interest payments were due on those loans in 1997.

*Department's Position:* We agree with respondents that it has been the Department's long-standing policy to calculate the benefit of a long-term fixed-rate loan assigned to a particular year by calculating the difference in interest payments for that year, *i.e.*, the

difference between the interest paid by the firm in that year on the government provided loan and the interest the firm would have paid on a comparable commercial loan. *See* section 771(5)(E)(ii) of the Act. Because our methodology is to calculate the benefit at the time the interest on the loan would be paid on the comparison loan, and because no interest payment would be made during the POI, we find that there is no benefit to Dai Yang from these loans.

*Comment 18: The Loan That Dai Yang Received From the National Agricultural Cooperation Foundation Was Not Specific and Is Thus Not Countervailable*

Respondents argue that the Department erred in its preliminary finding that the loan that Dai Yang received from the National Agricultural Cooperation Foundation was countervailable as an export subsidy because Dai Yang had provided the wrong evaluation criteria in its questionnaire response. Respondents assert that the record evidence, in particularly the evidence gathered at verification, indicates that this loan program was generally available to small and medium size enterprises (SMEs), and that companies were not evaluated for these loans based on export performance. Respondents conclude that this loan is not an export subsidy, is non-specific, and, hence is not countervailable.

Petitioners argue that this loan should be countervailed as an export subsidy, or alternatively as a GOK policy loan. According to petitioners, the fact that this loan program was available only to SMEs is not pertinent. The evidence on the record supports the conclusion that export performance is a factor in the availability of NACF loans; that the loans are advertised as "small and medium size company loan" does not negate the fact that export status is a criteria for eligibility.

Respondents disagree with the assertion that Dai Yang's loan from the NACF is countervailable as a GOK-directed policy loan. It is Ansan City, and not the GOK, which funds and administers this loan program. Respondents assert that since the GOK was not involved, this program lies outside the rubric of GOK direction of credit. Rather, respondents reiterate that the correct standard is whether the program was specific within Ansan City which, as discussed above, it was not.

*Department's Position:* We disagree with respondents' assertion that the criteria for approval of lending under this program is not contingent upon

export performance. While new information was presented at verification which indicated that this program is available only to small- and medium-sized enterprises, the loan approval criteria indicates that export performance is also an important criterion for approval. According to the loan approval criteria, export performance and overseas market development are two of the factors considered in the approval process. As the Department has found this program to be a countervailable export subsidy, petitioners argument that it should be countervailed as direction of credit is moot.

*Comment 19: The Department Should Not Include the Subsidy From Dai Yang's Export Industry Facility Loan in the Cash Deposit Rate*

Respondents argue that the Export Industry Facility Loan that Dai Yang had outstanding during the POI should not be countervailable because: (1) As verified, the program was terminated in 1994; and (2) Dai Yang's outstanding balance was paid off in early 1998. Hence, there can be no future benefit to Dai Yang. Respondents argue that according to the Department's regulations, such a program-wide change may be taken into account in establishing the estimated countervailing duty cash deposit rate.

In their rebuttal brief, petitioners indicate that, as outlined in the Department's new regulations, the Department's policy is to make such an adjustment if the applicable events occurred during the POI, but before the preliminary determination. In this case, the program-wide change occurred prior to the POI, and thus is inapplicable to the current investigation. Furthermore, since the benefits did not cease until after the POI, the Department should not adjust the cash deposit rate.

*Department's Position:* Petitioners are correct in their contention that the Department should not adjust the cash deposit rate. Pursuant to section 355.50(d)(1) of the Department's *1989 Proposed Regulations,* and codified in section 351.526 of the *CVD Final Rule* the Secretary will not adjust the cash deposit rate where a program is terminated and, ''the Secretary determines that residual benefits may continue to be bestowed under the terminated program.'' *See CVD Final Rule,* 63 FR at 65417. *See also, e.g., Live Swine From Canada; Final Results of Countervailing Duty Administrative Review,* 63 FR 2204. As reported by the GOK and verified by the Department, the Export Industry Facility Loan program was terminated in 1994.

However, Dai Yang continued to receive countervailable benefits from this program throughout the POI.

*Comment 20: The Department's Use of the Aggregate Rate Found in Steel Products From Korea for Determining a Subsidy Benefit to Sammi*

Respondents argue that the country-wide *ad valorem* rate from *Steel Products from Korea* which was used as facts available should be modified to reflect the fact that three of the programs found countervailable in *Steel Products from Korea* were applicable only to POSCO: government equity infusions, infrastructure at Kwangyang Bay, and the exemption from dockyard fees. Petitioners maintain that the Department should exclude these benefits because (1) the petition did not allege these subsidies were provided to Sammi; and (2) the Department recently determined that POSCO's exemption from port fees was not a countervailable subsidy.

Petitioners rebut the suggestion that the facts available rate applied to Sammi be adjusted to account for POSCO-specific programs. Because the Department applied the rate from *Steel Products from Korea* as adverse facts available, the components of this rate are immaterial. None of the components of this rate are specific to Sammi; the Department chose to use this rate as an adequate surrogate for company-specific information. In support of this opinion, petitioners cite *Krupp Stahl A.G.* v. *United States,* 822 F. Supp. 789, 792 (CIT 1993) (*Krupp Stahl*), quoting *Asociacion Colombiana de Exportadores de Flores* v. *United States,* 704 F. Supp. 1114,1126 (CIT 1989), *aff'd,* 901 F.2d 1089 (Fed. Cir. 1990), which said that the appropriate facts available information ''is not necessarily accurate information, it is information which becomes usable because a respondent has failed to provide accurate information.''

Because Sammi did not cooperate in this investigation, there is no evidence that they did not receive benefits from the ''POSCO-specific'' programs, nor can the Department know what subsidies may have been uncovered had Sammi cooperated in the investigation. The Department may, therefore, make the adverse assumption that unreported subsidies may exist. The Department has broad discretion to define facts available, as stated in *Krupp Stahl* and in *Allied-Signal Aerospace Co.* v. *United States,* 996 F.2d 1185,1191 (Fed. Cir. 1993), and should use the discretion to maintain the aggregate facts available rate for Sammi.

*Department's Position:* Pursuant to section 776(b) of the Act, the Department chose to use the aggregate rate found in *Steel Products from Korea* as an adverse facts available representation of countervailable benefits conferred to Sammi by the GOK. Because this rate was based on many of the same programs alleged in this case, we consider it to be an appropriate basis for a facts available countervailing duty rate calculation.

We disagree with respondents' argument that because some of the program rates incorporated in the aggregate rate were specific to POSCO, the Department should exclude these POSCO-specific benefits. As indicated by petitioners, because Sammi chose not to participate in this investigation, the Department has no basis for concluding that Sammi has not benefitted, at a minimum, from the level of subsidies found applicable to the Korean steel industry in *Steel Products from Korea.* According to section 351.308(c) of the Department's regulations, the Department may use the rates found in a previous countervailing duty investigation in an adverse facts available situation. Therefore, we have relied upon the final determination of *Steel Products from Korea* as an appropriate source for adverse facts available.

*Comment 21: POSCO's Purchase of Sammi's Changwon Facility*

Respondents argue that the because the preliminary determination was based on a misplaced decimal in the translated version of the purchase contract, the amount of the final payment to Sammi for this facility was vastly overstated. In reality, respondents claim, the amount POSCO paid was based on the lower of the two independent third-party valuation reports. POSCO did not pay more for this facility than this study concluded that it was worth, and there was no countervailable subsidy to Sammi.

In rebuttal, petitioners point to record evidence which indicates that this sale was an attempt by the GOK to prevent Sammi's bankruptcy. Moreover, petitioners argue that the KDB's release of Sammi's collateral which enabled this purchase amounts to a grant, and hence, a financial contribution. Because this contribution was exclusive to Sammi, this subsidy meets the Department's definition of specificity. Therefore, the full purchase price paid by POSCO is countervailable as a grant.

*Department's Position:* While respondents are correct in their statement that the ad valorem rate determined by the Department in its

Federal Register / Vol. 64, No. 109 / Tuesday, June 8, 1999 / Notices

preliminary determination was based on a misplaced decimal in POSCO's submission, we disagree with their contention that POSCO's purchase of Sammi's Changwon does not confer a countervailable benefit. Additional evidence acquired since the preliminary determination, however, indicates that POSCO made this purchase at the request of the GOK, and, in doing so, deviated substantially from its own internal regulations on purchasing. Therefore, we determine that POSCO's purchase of this facility provided a countervailable subsidy to Sammi. For a more detailed discussion of this program, please *see* the "Programs Determined To Be Countervailable" of this notice.

*Comment 22: Government Financial Assistance as a Result of Sammi's Bankruptcy*

Respondents argue that, as verified by the Department, when Sammi declared bankruptcy its debts were restructured and payment schedules were established for each creditor, including the KDB. There is no evidence that Sammi received government assistance in the form of grants or debt write-offs in conjunction with its bankruptcy. Instead, the Department found at verification that the KDB ceased lending to Sammi after 1996, and that once Sammi declared bankruptcy, the KDB notified Sammi that it was closing its accounts. Respondents argue Sammi's bankruptcy was consistent with normal bankruptcy procedures; therefore, the Department should conclude in its final determination that there was no GOK financial assistance provided to Sammi in conjunction with its bankruptcy and, hence, no countervailable subsidy.

Petitioners argue that, as shown by record evidence, the GOK forced POSCO to purchase Sammi's Changwon facility to either prevent or ameliorate the effects of bankruptcy on Sammi. Absent this rescue plan, and the massive equity infusion caused by the Changwon purchase, Sammi would have entered into bankruptcy earlier and have been liquidated. Alternatively, Sammi would have defaulted on loans and had its collateral seized. Petitioners propose that the Department should countervail the full value of the loan extensions to Sammi on its KDB loans.

*Department's Position:* Petitioners argue that POSCO's purchase of Sammi's Changwon facility, and the KDB's corresponding release of collateral, constitutes emergency assistance in conjunction with Sammi's bankruptcy. While the Department agrees that the Changwon facility was purchased by POSCO at the behest of

the GOK, we disagree that the KDB's release of collateral constituted bankruptcy assistance. As verified by the Department, the KDB released the collateral in question as a result of POSCO's agreement to purchase the assets held. The bulk of POSCO's payment for the Changwon facility went to pay off Sammi's outstanding loans with respect to this facility.

While Sammi chose not to cooperate in this investigation, the GOK indicated that there was no consortium, there were no grants, and that Sammi's debt was addressed in the context of normal bankruptcy proceedings. During our verification, we examined the other respondents' accounts and financial records and did not find any provision of assistance to Sammi; nor did we find evidence of such assistance during our verification of the Government of Korea. Because our investigation revealed no government assistance to Sammi in the form of grants or write-off of debt, we have not calculated a subsidy rate for this allegation. However, because Sammi did not respond to our request for information, we will continue to examine this allegation in any subsequent administrative review. For more information regarding this program, please see the "Use of Facts Available" section of this notice.

*Comment 23: Calculation of the Benefit From Sammi's 1992 "Emergency Loans"*

Respondents argue that the Department made numerous mistakes in its calculation of the countervailable benefit from the "emergency loans" in the preliminary determination. The Department's premise that the entire amount of 132 billion won remained outstanding during the POI, and that these were interest-free loans, is flawed. Further, Sammi's 1997 balance sheet indicates that there must have been little, if any, of these "emergency loan" funds outstanding during the POI, and that Sammi would have been unable to make payments on any loans from March to December 1997, since Sammi was under court receivership at this time. Respondents also argue that according to Sammi's 1996 balance sheet, Sammi had less than 132 billion won in outstanding long-term loans at the end of 1996, before the POI began.

Petitioners claim that the Department should reject this suggestion and reaffirm the methodology used in the preliminary determination, because there is not enough information on the record to justify any other course of action. The Department has no way of knowing whether the loans in question were forgiven between 1992 and 1996, which would account for the 1997

balance sheet statement. Petitioners again cite *Krupp Stahl* (*See Comment 22*) to support the idea that whether Sammi was actually subject to a subsidy of the full amount of the loans is irrelevant because of Sammi's refusal to cooperate. Because Sammi chose not to participate in this investigation, and therefore the record contains insufficient and unverified evidence, the full amount of the emergency loans should be countervailed.

*Department's Position:* As discussed in the "Programs Determined to be Countervailable" section of this notice, we determined that the aggregate rate from *Steel Products from Korea* which we have applied to Sammi as adverse facts available, includes a calculated subsidy rate for the GOK's direction of credit. Because the aggregate rate from *Steel Products from Korea* includes a calculated subsidy rate for the GOK's direction of credit to the Korean steel industry, we have not calculated an additional subsidy rate for this allegation that the GOK directed banks in Korea to provide loans to Sammi in 1992. Indeed, in the petition, this allegation of the provision of the 1992 loans to Sammi is included as part of petitioners' allegation of directed credit, and references our determination is Steel Products from Korea. Therefore, parties' comments with respect to the quantification of the benefit from the "emergency loan" package are not germane.

**Verification**

In accordance with section 782(i) of the Act, we verified the information used in making our final determination. We followed standard verification procedures, including meeting with the government and company officials, and examining relevant accounting records and original source documents. Our verification results are outlined in detail in the public versions of the verification reports, which are on file in the CRU of the Department of Commerce (Room B–099).

**Suspension of Liquidation**

In accordance with section 705(c)(1)(B)(i) of the Act, we have calculated an individual subsidy rate for each of the companies under investigation. We determine that the total estimated net countervailable subsidy rates are as follows:

| Producer/exporter | Net subsidy rate (percent) |
| --- | --- |
| POSCO | 0.65 |
| Inchon | 2.64 |
| Dai Yang | 1.58 |

| Producer/exporter | Net subsidy rate (percent) |
|---|---|
| Sammi | 59.30 |
| Taihan | 7.00 |
| All Others Rate | 1.68 |

We determine that the total estimated net countervailable subsidy rates for POSCO is 0.65 percent *ad valorem*, which is *de minimis*. Therefore, we determine that no countervailable subsidies are being provided to POSCO for its production or exportation of stainless steel sheet and strip in coils. In accordance with section 705(c)(5)(A)(i) of the Act, we have calculate the all-others rate by averaging the weighted average countervailable subsidy rates determined for the producers individually investigated. On this basis, we determine that the all-others rate is 1.68 percent *ad valorem*.

In accordance with our preliminary affirmative determination, we instructed the U.S. Customs Service to suspend liquidation of all entries of stainless steel sheet and strip in coils from the Republic of Korea which were entered, or withdrawn from warehouse, for consumption on or after November 17, 1998, the date of the publication of our preliminary determination in the **Federal Register**. Since the estimated net countervailing duty rates for POSCO and Dai Yang were *de minimis*, these companies were excluded from this suspension of liquidation. In accordance with section 703(d) of the Act, we instructed the U.S. Customs Service to discontinue the suspension of liquidation for merchandise entered on or after March 17, 1999, but to continue the suspension of liquidation of entries made between November 17, 1998, and March 16, 1999.

We will reinstate suspension of liquidation under section 706(a) of the Act if the ITC issues a final affirmative injury determination, and will require a cash deposit of estimated countervailing duties for such entries of merchandise in the amounts indicated above. Because the estimated net countervailing duty rate for POSCO is *de minimis*, this company will be excluded from the suspension of liquidation.

**ITC Notification**

In accordance with section 705(d) of the Act, we will notify the ITC of our determination. In addition, we are making available to the ITC all non-privileged and non-proprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary

information in our files provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order, without the written consent of the Assistant Secretary for Import Administration.

If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or canceled. If, however, the ITC determines that such injury does exist, we will issue a countervailing duty order.

**Destruction of Proprietary Information**

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to Administrative Protective Order (APO) of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Failure to comply is a violation of the APO.

This determination is published pursuant to sections 705(d) and 777(i) of the Act.

Dated: May 19, 1999.

**Richard W. Moreland,**
*Acting Assistant Secretary for Import Administration.*
[FR Doc. 99–13769 Filed 6–7–99; 8:45 am]
**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–580–834]**

**Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils From the Republic of Korea**

**AGENCY:** Import Administration, International Trade Administration, Department of Commerce.

**EFFECTIVE DATE:** June 8, 1999.

**FOR FURTHER INFORMATION CONTACT:** Maria Dybczak (POSCO), Brandon Farlander (Inchon) or Rick Johnson, Import Administration, International Trade Administration, U.S. Department of Commerce, 14th Street and Constitution Avenue, N.W., Washington, D.C. 20230; telephone: (202) 482–5811, (202) 482–1082 or (202) 482–3818, respectively.

**The Applicable Statute**

Unless otherwise indicated, all citations to the Tariff Act of 1930, as

amended (''the Act''), are references to the provisions effective January 1, 1995, the effective date of the amendments made to the Act by the Uruguay Round Agreements Act (''URAA''). In addition, unless otherwise indicated, all citations to the Department of Commerce (''Department'') regulations are to the regulations at 19 CFR Part 351 (1998).

**Final Determination**

We determine that stainless steel sheet and strip in coils (''SSSS'') from the Republic of Korea are being sold in the United States at less than fair value (''LTFV''), as provided in section 735 of the Act. The estimated margins are shown in the ''Continuation of Suspension of Liquidation'' section of this notice.

**Case History**

Since the preliminary determination, issued on December 17, 1998, (*Notice of Preliminary Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils (''SSSS'') from the Republic of Korea* (''*Preliminary Determination*''), 64 FR 137 (January 4, 1999)), the following events have occurred:

On December 17, 1998, the Department postponed the final determination to 135 days after publication of the preliminary determination (*see Notice of Preliminary Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils (''SSSS'') from the Republic of Korea* (''*Preliminary Determination*''), 64 FR 137 (January 4, 1999)). On December 28, 1998, respondent Pohang Iron & Steel Co., Ltd., (''POSCO'') alleged ''significant ministerial errors'' made in the Department's margin calculation for the preliminary determination. After reviewing POSCO's allegations, the Department agreed that it had inadvertently used daily rates instead of a weighted-average exchange rate, that sales made to unaffiliated companies were erroneously excluded from the calculation of normal value, and that deductions for inland freight from plant to warehouse and warehousing expenses were inadvertently excluded from the calculation of normal value. Because these errors taken together constitute a significant ministerial error, as defined in 19 CFR 351.224(g), we amended our preliminary determination. On January 26, 1999 the Department published its amended preliminary determination (*see Notice of Amended Preliminary Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils from Korea* (64 FR 3928)), amending

Attachment 2

Notice of Final Affirmative Countervailing Duty
Determination: Certain Cold-Rolled Carbon Steel Flat
Products From the Republic of Korea, 67 Fed. Reg.
62,102 (Dep't Commerce Oct. 3, 2002).

C-580-849
Investigation
Public Document
DAS II/Office VI:  DB, TT

September 23, 2002

MEMORANDUM TO:      Faryar Shirzad
                         Assistant Secretary
                          for Import Administration

FROM:                Bernard T. Carreau
                         Deputy Assistant Secretary
                          for AD/CVD Enforcement II

SUBJECT:          Issues and Decision Memorandum:  <u>Final Affirmative</u>
                         <u>Countervailing Duty Determination:  Certain Cold-Rolled Carbon</u>
                         <u>Steel Flat Products from the Republic of Korea</u>

<u>Summary</u>

We have analyzed the comments and rebuttal comments of interested parties in the final determination of the above-mentioned countervailing duty (CVD) investigation covering the period of investigation (POI), calendar year 2000.  As a result of our analysis, we have made certain modifications to our <u>Notice of Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination:  Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea</u>, 67 FR 9685, at 9686 (March 4, 2002) (<u>Preliminary Determination</u>).  Below are the "Methodology and Background Information" and "Analysis of Programs" sections of this memorandum that describe the decisions made in this CVD investigation with respect to Dongbu Steel Co., Ltd. (Dongbu), Hyundai Hysco (HYSCO), Pohang Iron & Steel Co., Ltd.[1] (POSCO), and Union Steel Manufacturing Co., Ltd. (Union), the producers/exporters of subject merchandise covered by this segment of the proceeding.  Also below is the "Analysis of Comments" section in which we discuss the issues raised by interested parties.  We recommend that you approve the positions we have developed below in this memorandum.

---

   [1]  Pohang Coated Steel Co., Ltd. (POCOS), a wholly-owned subsidiary of POSCO which also produces and exports subject merchandise, submitted a questionnaire response.  Because POCOS is a wholly-owned subsidiary of POSCO, we have included the benefits received by POCOS in our calculation of POSCO's rate and have used POSCO's consolidated sales as our denominator.  Reference to POSCO throughout this notice will also include POCOS.

-2-

Methodology and Background Information

I.    The Net Subsidy Rate Attributable to Union Steel Manufacturing Co., Ltd. (Union)

       Sections 776(a)(2)(A) and 776(a)(2)(B) of the Act require the use of facts available
when an interested party withholds information that has been requested by the Department of
Commerce (the Department) or when an interested party fails to provide the information
requested in a timely manner and in the form required.  As described in the Preliminary
Determination, we found that Union failed to respond to the Department's questionnaire.
Consequently, we used facts otherwise available.  Because Union failed to provide any requested
information, the Department did not consider the application of sections 782(d) and (e) of the
Act.

       Section 776(b) of the Act provides that in selecting from among the facts available, the
Department may use an inference that is adverse to the interests of a party if it determines that a
party has failed to cooperate to the best of its ability.  In this investigation, the Department
requested that all producers/exporters in Korea that shipped subject merchandise to the United
States during the POI submit the information requested in our initial questionnaire.  However,
Union, a producer/exporter that shipped subject merchandise to the United States during the POI,
did not participate in the investigation.

       The Department finds that by not providing the necessary information specifically
requested by the Department and by failing to participate in any respect in this investigation,
Union has failed to cooperate to the best of its ability.  Therefore, in selecting facts available, the
Department determines that an adverse inference is warranted.

       Section 776(b) of the Act states that, when employing an adverse inference, the
Department may rely upon information derived from (1) the petition; (2) a final determination in
a countervailing duty or antidumping investigation; (3) any previous administrative review, new
shipper review, expedited antidumping review, section 753 review; or (4) any other information
placed on the record.  See also 19 CFR 351.308(c).  As adverse facts available in the Preliminary
Determination, for Union's net subsidy rate, we used a subsidy rate from Final Affirmative
Countervailing Duty Determination:  Stainless Steel Sheet and Strip in Coils from the Republic
of Korea, 64 FR 30636 at 30639 (June 8, 1999), (Sheet and Strip). This rate was used as adverse
facts available for a company in that final determination pursuant to 19 CFR 351.308(c)(ii).  This
rate represented a composite of programs used in Korea, based on the adverse inference of a
company's use of such program.  While no comments were raised, we have modified our
preliminary determination.

       The Statement of Administrative Action accompanying the URAA states that information
from the petition and prior segments of the proceeding, as well as other sources, are "secondary
information."  See Statement of Administrative Action, accompany H.R. 5110 (H.R. Doc. No.
193-316) (1994) (SAA), at 870.  If the Department relies on secondary information as facts
available, section 776(c) of the Act provides that the Department shall, to the extent practicable,
corroborate such information using independent sources reasonably at its disposal. The SAA
further provides that to corroborate secondary information means that the Department will satisfy
itself that the secondary information to be used has probative value.

-3-

We did not receive any information from Union in this investigation. Therefore, for each program examined and found to be providing countervailable benefits, unless the record information made it clear that Union could not have received benefits from the program, we made the adverse inference that Union benefitted from the program.  In each case, our finding was that the program provided countervailable benefits to the steel industry and in no case did we determine that the program was tied to the production of subject merchandise.  Then, in order to establish the countervailing duty rate for each of these programs, we examined the company-specific, program-specific rates established in this investigation and in the most recent segment of these proceedings: Certain Steel Products, Plate in Coils, Sheet and Strip, CTL Plate and Structural Beams.  See Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea, 58 FR 37338, 37339 (July 9, 1993) (Certain Steel Products), Final Negative Countervailing Duty Determination: Stainless Steel Plate in Coils from the Republic of Korea, 64 FR 15530 (March 31, 1999) (Plate in Coils), Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 64 FR 73276 (December 29, 1999), and Final Affirmative Countervailing Duty Determination: Structural Steel Beams from the Republic of Korea, 65 FR 41051 (July 3, 2000) (Structural Beams).  We considered these additional proceedings because, as noted above, each of the considered programs was available to the steel industry and none of the programs were tied to the production of a particular steel product.  As adverse facts available, we selected the highest company-specific, program-specific rate available from these sources.  Based on this approach, we have established a total ad valorem rate of 3.43 percent as adverse facts available for Union.

II.      Subsidies Valuation Information

A.      Allocation Period

Under section 351.524(d)(2) of the CVD Regulations, we will presume the allocation period for non-recurring subsidies to be the average useful life (AUL) of renewable physical assets for the industry concerned, as listed in the Internal Revenue Service's (IRS) 1977 Class Life Asset Depreciation Range System, as updated by the Department of Treasury.  The presumption will apply unless a party claims and establishes that these tables do not reasonably reflect the AUL of the renewable physical assets for the company or industry under investigation, and the party can establish that the difference between the company-specific or country-wide AUL for the industry under investigation is significant.

In this investigation, no party to the proceeding has claimed that the AUL listed in the IRS tables does not reasonably reflect the AUL of the renewable physical assets for the firm or industry under investigation. Therefore, in accordance with section 351.524(d)(2) of the CVD Regulations, in the Preliminary Determination, we used an allocation period of 15 years, which is the average useful life corresponding to the steel industry, as indicated by the IRS depreciation tables.  See  67 FR at 9686.  No party contested the Department's use of a 15-year AUL in the Preliminary Determination.  Therefore, in accordance with section 351.524(d)(2) of the CVD regulations, we have allocated all non-recurring subsidies over 15 years.

-4-

B.     <u>Benchmarks for Loans and Discount Rate</u>

*Benchmarks for Short-term Financing:*

In the <u>Preliminary Determination</u>, for those programs requiring the application of a short-term won-denominated interest rate benchmark, in accordance with section 351.505(a)(2)(iv) of the CVD regulations, we used as our benchmark a company-specific weighted-average interest rate for commercial won-denominated loans outstanding during the POI.  <u>See</u> 67 FR at 9687.

*Benchmarks for Long-Terms Loans and Discount Rates:*

During the POI, respondent companies had both won-denominated and foreign currency-denominated long-term loans outstanding which had been received from government-owned banks, Korean commercial banks, overseas banks, and foreign banks with branches in Korea. Some loans were received prior to 1992.  In the 1993 investigation of <u>Certain Steel Products</u>, and in <u>Structural Beams</u>, the Department determined that, through 1991, the Government of Korea (GOK) influenced the practices of lending institutions in Korea and controlled access to overseas foreign currency loans.  In both investigations, we determined that the best indicator of a market rate for long-term loans in Korea was the three-year corporate bond rate on the secondary market. In the <u>Preliminary Determination</u>, we used the three-year corporate bond rate as our benchmark to calculate the benefits which the respondent companies received from direct foreign currency loans and domestic foreign currency loans obtained prior to 1992, and still outstanding during the POI.  As we received no comments on this issue we will continue to follow our methodology used in <u>Preliminary Determination</u>.

In the <u>Plate in Coils</u>, <u>Sheet and Strip</u>, and in the Benchmark Interest Rates and Discount Rates section of the Issues and Decision Memorandum that accompanied <u>Structural Beams</u>, we examined the GOK's direction of credit policies for the period 1992 through 1998.  Based on information gathered during the course of those investigations, the Department also determined that the GOK controlled directly or indirectly the lending practices of most sources of credit in Korea between 1992 and 1998.  In the current investigation, based upon these earlier findings and updated information, we determine that the GOK still exercised substantial control over lending institutions in Korea during the POI.

In the previous investigations the Department determined that the GOK controlled access to foreign securities and direct foreign loans.  Therefore, the Department found that foreign securities and foreign loans from outside of Korea were directed by the GOK and countervailed. <u>See</u> <u>Plate in Coils</u>, 64 Fr 15533.  During the course of the instant investigation the Department collected additional information on the law and functioning of foreign securities and direct foreign loans.  The Department finds in this final determination that foreign securities and direct foreign loans given after April 1999 are not countervailable and thus now represent an appropriate benchmark.  For further discussion of the Department's finding, see the Direction of Credit section below.

Based on our findings on this issue in prior investigations, as well as in the instant investigation, discussed below in the "Direction of Credit" section of this notice, we are using the following benchmarks to calculate respondents' long-term loans obtained since 1992, and which are still outstanding during the POI:

-5-

(1) For countervailable, foreign-currency denominated long-term loans, we used, where available, the company-specific weighted-average foreign-denominated interest rates on the companies' loans from foreign bank branches in Korea, foreign securities and direct foreign loans received after April 1999.  If such a benchmark was not available, then, as facts available, we had to rely on the lending rates as reported by the IMF's International Financial Statistics Yearbook.

(2) For countervailable won-denominated long-term loans, where available, we used the company-specific corporate bond rate on the companies' won denominated public and private bonds.  We note that this benchmark is based on the decision in Plate in Coils, 64 FR 15530, 15531, in which we determined that the GOK did not control the Korean domestic bond market after 1991, and that domestic bonds may serve as an appropriate benchmark interest rate.  Where unavailable, we used the national average of the yields on three-year won-denominated corporate bonds as reported by the Bank of Korea (BOK).  We note that the use of the three-year corporate bond rate from the BOK follows the approach taken in Plate in Coils, 64 FR 15530, 15532, in which we determined that, absent company-specific interest rate information, the won-denominated corporate bond rate is the best indicator of a market rate for won-denominated long-term loans in Korea.

We are also using, where available, the company-specific won-denominated corporate bond rate as the discount rate to determine the benefit from non-recurring subsidies received between 1992 and 2000.  Where unavailable, we are using the national average of the three-year Korean won corporate bond rate.

C.    Treatment of Subsidies Received by Trading Companies

We required responses from trading companies with respect to the export subsidies under investigation because the subject merchandise may be subsidized by means of subsidies provided to both the producer and the exporter of the subject merchandise.  All subsidies conferred on the production and exportation of subject merchandise benefit the subject merchandise even if it is exported to the United States by an unaffiliated trading company rather than by the producer itself.  Therefore, the Department calculates countervailing duty rates on the subject merchandise by cumulating subsidies provided to the producer with those provided to the exporter.  See 19 CFR 351.525.

During the POI, Dongbu exported the subject merchandise to the United States through one trading company, Dongbu Corporation (Dongbu Corp).  POSCO exported subject merchandise through two trading companies, Daewoo International Corporation (Daewoo) and POSCO Steel Service & Sales Co., Ltd. (Posteel).  Dongbu Corp, Daewoo, and Posteel responded to the Department's questionnaires with respect to the export subsidies under investigation.

Under 19 CFR 351.107, when subject merchandise is exported to the United States by a company that is not the producer of the merchandise, the Department may establish a "combination" rate for each combination of an exporter and supplying producer.  However, as noted in the "Explanation of the Final Rules" (the Preamble), there may be situations in which it is not appropriate or practicable to establish combination rates when the subject merchandise is exported by a trading company.  In such situations, the Department will make exceptions to its

-6-

combination rate approach on a case-by-case basis.  See Antidumping Duties; Countervailing Duties; Final Rule, 62 FR 27296, 27303 (May 19, 1997).

In the Preliminary Determination, we determined that it is not appropriate to establish combination rates.  This determination is based on two main facts.  First, the majority of subsidies conferred upon the subject merchandise were received by the producers.  Second, the difference in the levels of subsidies conferred upon individual trading companies with regard to subject merchandise is insignificant.  Thus, combination rates would serve no practical purpose because the calculated subsidy rate for any of the  producers and a combination of any of the trading companies would effectively be the same rate.  Instead, we continue to calculate rates for the producers of subject merchandise that include the subsidies received by the trading companies.  To reflect those subsidies that are received by the exporters of the subject merchandise in the calculated ad valorem subsidy rate, we used the following methodology:  for each of the trading companies, we calculated the benefit attributable to the subject merchandise. In each case, we determined the benefit received by the trading companies for each of the export subsidies.  Next we weighted the average of the benefit amounts by the relative share of each trading company's value of exports of the subject merchandise to the United States to the relative share of direct exports of the producer of subject merchandise to the United States.  These calculated ad valorem subsidies were then added to the subsidies calculated for the producers of subject merchandise.  Thus, for each of the programs below, the listed ad valorem subsidy rate includes countervailable subsidies received by both the producing and trading companies.

Analysis of Programs

I.      Programs Conferring Subsidies

        A.      GOK Directed Credit

We determined in Plate in Coils that the provision of long-term loans via the GOK's direction of credit policies was specific to the Korean steel industry through 1991 within the meaning of section 771(5A)(D)(iii) of the Act, and resulted in a financial contribution, within the meaning of sections 771(5)(E)(ii) and 771(5)(D)(i) of the Act, respectively.

In Plate in Coils, the Department also determined that the GOK continued to control directly and indirectly the lending practices of most sources of credit in Korea through 1997.  In CTL Plate, the Department continued to find that the GOK's regulated credit from domestic commercial banks and government-controlled banks such as the Korea Development Bank (KDB) was specific to the steel industry.  In the final determination of CTL Plate, the Department determined that the GOK continued to control, directly and indirectly, the lending practices of sources of credit in Korea in 1998.  See CTL Plate, 64 FR at 73180.  Further, the Department determined in that investigation that these regulated loans conferred a benefit on the producers of the subject merchandise to the extent that the interest rates on these loans were less than the interest rates on comparable commercial loans within the meaning of section 771(5)(E)(ii) of the Act.  In  1999 Sheet and Strip, we determined that the GOK continued to control credit through 1999.  See Final Results and Partial Rescission of Countervailing Duty Administrative Review: Stainless Steel Sheet and Strip in Coils From the Republic of Korea, 67

-7-

FR 1964 (January 15, 2002) (1999 Sheet and Strip).  We provided the GOK with the opportunity to present new factual information concerning the government's credit policies in 2000, the POI, which we would consider along with our finding in the prior investigations.  Respondents did not provide any new information on the GOK lending policies for domestic banks.  Therefore, based upon the determinations in these cited cases, we continue to find lending from domestic banks and from government-owned banks such as the KDB to be countervailable.

  With respect to foreign sources of credit, in Plate in Coils and Sheet and Strip, we determined that access to foreign currency loans from Korean branches of foreign banks (i.e., branches of U.S. and foreign-owned banks operating in Korea) did not confer a benefit to the recipient as defined by section 771(5)(E)(ii) of the Act, and, as such, credit received by the respondent from these sources was found not countervailable.  This determination was based upon the fact that credit from Korean branches of foreign banks was not subject to the government's control and direction.  Thus, in Plate in Coils and Sheet and Strip, we determined that respondent's loans from these banks could serve as an appropriate benchmark to establish whether access to regulated foreign sources of credit conferred a benefit on respondents.  As such, lending from this source is not countervailable, and, where available, loans from Korean branches of foreign banks continue to serve as an appropriate benchmark to establish whether access to regulated foreign currency loans from domestic banks confers a benefit upon respondents.

  We collected certain information during this investigation regarding access to direct foreign loans and foreign securities.  We verified that with respect to access to direct foreign loans (i.e., loans from offshore banks) and the issuance of offshore foreign securities by Korean companies, the GOK has replaced the Foreign Exchange Management Act (FEMA), with the Foreign Exchange Transaction Act (FETA).  Under FEMA, companies seeking direct foreign loans or foreign securities were required to get approval from the GOK.  Under this scheme we found that the GOK controlled access to these type of lending activities.  However, in April 1999, when FETA came into effect, the positive approval system was replaced with a negative system.  Under FETA, a company must notify the Ministry of Finance and Economy (MOFE) of any foreign exchange transaction but it does not require approval.  We verified that companies no longer need approval from the GOK to access foreign loans or to issue foreign securities.  We therefore find that any foreign security and direct foreign loans received after April 1999 are not countervailable and, where available, will serve as an appropriate benchmark.

  Dongbu, HYSCO, and POSCO received long-term fixed and variable rate loans from GOK owned/controlled institutions that were outstanding during the POI.  In order to determine whether these GOK-directed loans conferred a benefit, we compared the interest rates on the directed loans to the benchmark interest rates detailed in the "Subsidies Valuation Information" section of this notice.

  For variable-rate loans, the repayment schedules of these loans did not remain constant during the lives of the respective loans.  Therefore, we have calculated the benefit from these loans using the Department's variable rate methodology.

  In the Preliminary Determination at 9688, we calculated a benefit for countervailable fixed-rate loans using the "grant equivalent" methodology as described in section 351.505(c)(3) of the CVD Regulations.  Regarding the calculation of the benefit on countervailable, fixed-rate loans, in past cases the Department has employed the "grant equivalent" methodology, as

-8-

described in section 351.505(c)(3) of the CVD Regulations, when the government-provided loan and the comparison loan have dissimilar grace periods or maturities, or where the repayment schedules have different shapes (e.g., declining balance versus annuity style). See, e.g., Sheet and Strip, CTL Plate, and H-Beams.

In this final determination, the Department is revising its application of the grant equivalent methodology discussed in 351.505(c)(3) of the CVD Regulations. We note that section 351.505(c)(2) of the CVD Regulations states that the Department "will normally calculate the subsidy amount to be assigned to a particular year by calculating the difference in interest payments for that year, (i.e., the difference between the interest paid by the firm in that year on the government-provided loan and the interest the firm would have paid on the comparison loan)." We also note that, in reference to paragraph (c)(2), the Preamble of the Department's CVD Regulations states that in situations where the benefit from a long-term, fixed rate loan stems solely from a concessionary interest rate, it is not necessary to engage in the grant equivalent methodology. See 63 FR at 65369. Thus, the CVD Regulations and the Preamble direct the Department to default to a simple comparison of interest payments made during the POR when calculating the benefit from a long-term, fixed rate loan.

The Preamble goes on to describe those situations in which the Department shall deviate from the "simple, default methodology," and instead employ the grant equivalent methodology. The Preamble states that, "[b]ecause a firm may derive a benefit from special repayment terms, in addition to any benefit derived from a concessional interest rate," the Department will calculate the benefit using the "grant equivalent" methodology. See 63 FR at 65369.

There is no information on the record that indicates that the companies derived a benefit from any special repayment terms (i.e., abnormally long grace periods or maturities, etc.) on its long-term, fixed-rate loans. Therefore, in accordance with section 351.505(c)(2) of the CVD Regulations, we are calculating the benefit that Dongbu, HYSCO, and POSCO received on their long-term, fixed-rate loans by comparing the amount of interest paid on the loan during the POI to the amount of interest that would have been paid during the POI on a comparable, commercial loan.

Therefore, to calculate a benefit we used the above mentioned methodology, and summed the benefit amounts from all countervailable loans. We then divided the total benefit by the respective company's total f.o.b. sales value during the POI. On this basis, we determine the net countervailable subsidy to be 0.10 percent ad valorem for Dongbu, 0.25 percent ad valorem for HYSCO, and 0.05 percent ad valorem for POSCO.

B.     GOK Infrastructure Investment at Kwangyang Bay Through 1991

In Certain Steel Products, the Department investigated the GOK's infrastructure investments at Kwangyang Bay over the period 1983-1991. We determined that the GOK's provision of infrastructure at Kwangyang Bay was countervailable because we found POSCO to be the predominant user of the GOK's investments. The Department has consistently held that a countervailable subsidy exists when benefits under a program are provided, or are required to be provided, in law or in fact, to a specific enterprise or industry or group of enterprises or industries. See Certain Steel Products, 58 FR at 37346.

-9-

In the Preliminary Determination, we found that the GOK's infrastructure investments at Kwangyang Bay over the period 1983-1991 were countervailable. No new factual information or evidence of changed circumstances has been provided to the Department with respect to the GOK's infrastructure investments at Kwangyang Bay over the period 1983-1991. Therefore, we continue to determine that POSCO benefits from the GOK's investments during the POI. To calculate the benefit from these grants, we relied on the calculations performed in the 1993 investigation of Certain Steel Products, which were placed on the record of this investigation by POSCO.

To calculate the benefit conferred during the POI, we applied the Department's standard grant methodology and allocated the GOK's infrastructure investments over a 15-year allocation time period. See the allocation period discussion under the "Subsidies Valuation Information" section, above. Using the 15 year allocation period, POSCO continues to receive benefits under this program from GOK investments made during the years 1986 through 1991. To calculate the benefit from these grants, we used as our discount rate the three-year corporate bond rate on the secondary market as used in Certain Steel Products. We then summed the benefits received by POSCO during the POI from each of the GOK's yearly investments over the period 1986-1991. We then divided the total benefit attributable to the POI by POSCO's total f.o.b. sales for the POI. Accordingly, the net subsidy under the GOK's infrastructure investments at Kwangyang Bay over the period 1986-1991 is 0.15 percent ad valorem for POSCO for the POI.

C.    Research and Development (R&D)

The GOK, through the Ministry of Commerce, Industry, and Energy (MOCIE), Ministry of Science and Technology (MOST), the Ministry of Environment (MOE), and the Ministry of Construction and Transportation (MOCAT), provides R&D grants to support numerous projects undertaken by the steel industry.

These grants are designed to foster the development of efficient technology for industrial development. A company may participate in this program in several ways: (1) a company may perform its own R&D project, (2) it may participate through the Korea New Iron and Steel Technology Research Association (KNISTRA), which is an association of steel companies established for the development of new iron and steel technology, and/or (3) a company may participate in another company's R&D project and share R&D costs, along with funds received from the GOK. To be eligible to participate in this program, the applicant must meet the qualifications set forth in the basic plan and must perform R&D as set forth under the Notice of Industrial Basic Technology Development. Upon completion of the R&D project, the participating company must repay 50 percent of the R&D grant (30 percent in the case of Small and Medium Enterprises (SMEs) established within 7 years) to the GOK, in equal payments over a five-year period. If the R&D project is not successful, the company must repay the full amount. In CTL Plate, we determined that this program was countervailable. See CTL Plate, 64 FR 73185. No new factual information or evidence of changed circumstances has been provided to the Department with respect to this program. Therefore, we continue to determine that this program is countervailable.

To determine the benefit from the grants received through KNISTRA, we first calculated the percent of each company's contribution to KNISTRA and applied that percentage to the

-10-

GOK's contribution for each R&D project.  We then summed the grants received by each company through KNISTRA and divided the amount by each company's respective total f.o.b. sales.  To determine the benefit from the grants provided directly to the companies, we divided the amount of the grant by each company's respective total f.o.b. sales.  Based upon this methodology, we determine that POSCO received a countervailable subsidy of 0.08 percent ad valorem and that Dongbu received a countervailable subsidy of less than 0.005 percent ad valorem.  HYSCO did not use this program.

       D.      <u>Provision of Land at Asan Bay</u>

      In the instant investigation and in <u>CTL Plate</u>, petitioners alleged that the GOK provided land at Asan Bay to the steel industry for less than adequate remuneration.  The GOK's overall development plan is published every 10 years and describes the nationwide land development goals and plans for the balanced development of the country.  Under these plans, the Ministry of Construction and Transportation (MOCAT) prepares and updates its Asan Bay Area Broad Development Plan.  The Korea Land Development Corporation (Koland) is a government investment corporation that is responsible for purchasing, developing, and selling land in the industrial sites.

      The Asan Bay area was designated as an Industrial Site Development Area in December 1979.  The Asan Bay area consists of five development sites, (1) Kodai, (2) Wanjung, (3) Woojung, (4) Poseung, and (5) Bukok.  Although Wanjung and Woojung are within the Asan National Industrial Estate, those properties are not owned by Koland.  In <u>CTL Plate</u>, we found that steel companies received price discounts on purchases of land at Asan Bay, and found this program countervailable.  <u>See CTL Plate</u>, 64 FR 73184.

      We verified that the GOK, in setting the price per square meter for land at the Kodai industrial estate, removed the ten percent profit component form the price.  Therefore, we determine that the exemption from the profit provides a benefit to Dongbu.  We then calculated this ten percent price discount by the number of square meters purchased by Dongbu.  In addition to this price discount, the GOK provided an adjustment to Dongbu's final payment to account for "interest earned" by the company for pre-payments.  Companies purchasing land at Asan Bay must make payments on the purchase and development of the land before the final settlement.  The GOK provided a financial contribution to Dongbu under section 771(5)(D)(i) of the Act when it refunded the interest earned on the advanced payments.  This interest earned refund is specific to Dongbu under section 771(5A)(D)(iii)(I) of the Act, as being limited to Dongbu.  Therefore, we find that this additional credit on the final payment made by the GOK to Dongbu also provides a countervailable benefit to the company.  The land price discount and the interest earned refund are non-recurring subsidies.

      Under section 351.524(b)(2) of the CVD Regulations, non-recurring benefits which are less than 0.5 percent of the company's relevant sales are expensed in the year of receipt.  We performed the 0.5 percent test, and we find that the land price discount and the interest earned refund exceeded 0.5 percent of the sales for the respective year; therefore, to calculate the benefit conferred during the POI on the land price discount and the interest earned refund, we applied the Department's standard grant methodology and allocated the benefit provided by this program over a 15-year allocation time period.  <u>See</u> the allocation period discussion under the "Subsidies

-11-

Valuation Information" section, above.  We then divided the total benefit attributable to the POI by Dongbu's total f.o.b. sales for the POI.  On this basis, we determine a net countervailable subsidy of 0.47 percent ad valorem for the POI.

For further information, see Comment 7: Provision of Land at Asan Bay in the "Analysis of Comments" section, below.

E.    POSCO's Exemption of Bond Requirement from Port Use at Asan Bay

As noted above, the GOK has developed industrial estates at Asan Bay.  In CTL Plate, we determined that the GOK built port berths #1, #2, #3, and #4 in the Poseung area.  In September 1997, POSCO signed a three-year lease agreement with the Inchon Port Authority (IPA) for the exclusive use of port berth #1, which the GOK constructed.  The GOK also entered into a lease agreement in 1997 for the exclusive use of port berths #2, #3, and #4, with a consortium of six companies.  The consortium of companies was required to purchase bonds, which the GOK would repay without interest after the lease expired in 10 years.  However, POSCO was not required to purchase a bond for the exclusive use of port berth #1.

In CTL Plate, we found this program countervailable.  See CTL Plate, 64 FR 73183-73184.  We determined that the waiver of the bond purchase was only provided to POSCO, and was therefore specific under section 771(5A)(D) of the Act.  In addition, we determined that the GOK's waiver of the bond purchase requirement for the exclusive use of port berth #1 by POSCO conferred a financial contribution under section 771(5)(D)(ii) of the Act, because the GOK foregoes collecting revenue that it normally would collect.  We also determined that because the GOK had to repay the bonds at the end of the lease term, the bond purchase waiver is equivalent to an interest free loan for three years, the duration of the lease.  During verification we were informed that POSCO made an annual renewal of its lease.  See June 17, 2002, Memorandum to Melissa G. Skinner, Director: Verification Report for Pohang Iron & Steel Co., Ltd. (POSCO), Pohang Coated Steel Co., Ltd. (POCOS), and POSCO Steel Service & Sales Co., Ltd. (POSTEEL) in the Countervailing Duty Investigation of Certain Cold-Rolled Carbon Steel Flat Products from Korea at page 6, (POSCO's Verification Report).  No new factual information or evidence of changed circumstances has been provided to the Department with respect to this program.  Therefore, we continue to find this program countervailable.

To determine the benefit from this program, we treated the amount of the bond waived as a long-term interest-free loan.  We then applied the methodology provided for in section 351.505(c)(4) of the CVD Regulations for a long-term fixed rate loan, and compared the amount of interest that should have been paid during the POI on the interest free loan to the amount of interest that would have been paid based upon the interest rate on a comparable won-denominated benchmark loan.  We then divided the benefit by the company's total f.o.b. sales.  On this basis, we determine the net countervailable subsidy to be less than 0.005 percent ad valorem for POSCO.

F.    Investment Tax Credits

Under Korean tax laws, companies in Korea are allowed to claim investment tax credits for various kinds of investments.  If the investment tax credits cannot all be used at the time they

-12-

are claimed, then the company is authorized to carry them forward for use in subsequent years. Until December 28, 1998, these investment tax credits were provided under the Tax Reduction and Exemption Control Act (TERCL).  On that date TERCL was replaced by the Restriction of Special Taxation Act (RSTA).  Pursuant to this change in the law, investment tax credits received after December 28, 1998, were provided under the authority of RSTA.

During the POI, Dongbu earned or used the following tax credits for: (1) Investments in Equipment to Develop Technology and Manpower (RSTA Article 11, previously TERCL Article 10); (2) Investments in Productivity Increasing Facilities (RSTA Article 24, previously TERCL Article 25); (3) Investments in Specific Facilities (RSTA Article 25, previously TERCL Article 26); and (4) Equipment Investment to Promote Worker's Welfare (RSTA Article 94, previously TERCL Article 88).

POSCO used the following tax credits during the POI:  (1) Investments in Productivity Increasing Facilities (RSTA 24); and (2) Investments in Specific Facilities (RSTA 25).  In addition, POSCO earned a tax credit under Investments in Equipment to Develop Technology and Manpower (RSTA 11), but did not receive a countervailable benefit during the POI from this tax credit.

HYSCO had outstanding investment tax credits during the POI.  However, due to the net tax loss for the income tax return filed during the POI, the company could not use and did not claim any investment tax credits during the POI.

If a company invested in foreign-produced facilities (i.e., facilities produced in a foreign country), the company received a tax credit equal to either three or five percent of its investment.  However, if a company invested in domestically-produced facilities (i.e., facilities produced in Korea), it received a 10 percent tax credit.  Under the tax credit for Equipment Investment to Promote Worker's Welfare, a tax credit could only be claimed if a company used domestic machines and materials.  Under section 771(5A)(C) of the Act, a program that is contingent upon the use of domestic goods over imported goods is specific, within the meaning of the Act.  We determined that these investment tax credits constituted import substitution subsidies under section 771(5A)(C) of the Act in CTL Plate, because Korean companies received a higher tax credit for investments made in domestically-produced facilities.  In addition, because the GOK forwent the collection of tax revenue otherwise due under this program, we determined that a financial contribution is provided under section 771(5)(D)(ii) of the Act.  The benefit provided by this program was a reduction in taxes payable.  Therefore, we determined that this program was countervailable in CTL Plate.  See CTL Plate at 73182.

We verified that changes have been made in the manner in which these investment tax credits are determined.  Pursuant to amendments made to TERCL which occurred on April 10, 1998, the distinction between investments in domestic and imported goods was eliminated for the tax credits for Investments in Equipment to Develop Technology and Manpower (RSTA 11), Investments in Productivity Increasing Facilities (RSTA 24), and Investments in Specific Facilities (RSTA 25).  We verified that, prior to April 10, 1998, the tax credit for these investments was ten percent for domestic-made facilities and three percent for foreign-made facilities.  However, for investments made after April 10, 1998, there is no difference between domestic-made and foreign-made facilities.  The current tax credit is five percent for all of these investments.

-13-

Because the distinction between investments in domestic and foreign-made goods was eliminated for investments made after April 10, 1998, we determine the tax credits received pursuant to these investment programs for investments made after April 10, 1998 to be no longer countervailable.  However, companies can still carry forward and use the tax credits for investments earned under the countervailable aspects of the TERCL program before the April 10, 1998 amendment to the tax law.  In addition, the tax credits for Equipment Investment to Promote Workers' Welfare (RSTA 94) are still only available for companies using domestic machines and materials. Therefore, we continue to find the use of investment tax credits earned on Equipment Investment to Promote Workers' Welfare countervailable.  We also continue to find countervailable the use of investment tax credits earned on investments made before April 10, 1998, under the other three investment tax programs.

We verified that the tax credits earned by Dongbu for Investments in Equipment to Develop Technology and Manpower (RSTA 11), Investments in Productivity Increasing Facilities (RSTA 24), and Investments in Specific Facilities (RSTA 25) were not based on a tax credit differential between purchasing domestic facilities and imported facilities.  In addition, we verified that the tax credit earned during the POI for Equipment Investment to Promote Workers' Welfare (RSTA 84) was not used to reduce taxes payable during the POI because the entire tax credit was carried forward to future years.  Therefore, we determine that Dongbu did not benefit from this program during the POI.

POSCO did use investment tax credits under this program that originated from tax credits earned based upon the differential between purchasing domestic facilities and imported facilities. To calculate the benefit from these investment tax credits, we examined the amount of tax credits POSCO deducted from its taxes payable for the 1999 fiscal year income tax return, which was filed during the POI.  We first determined the amount of the tax credits claimed which were based upon investments in domestically-produced facilities.  We then calculated the additional amount of tax credits received by the company because it earned tax credits of 10 percent on such investments instead of a three or five percent tax credit.  Next, we calculated the amount of the tax savings earned through the use of these tax credits during the POI and divided that amount by POSCO's total f.o.b. sales during the POI.  On this basis, we determine a net countervailable subsidy of 0.35 percent ad valorem for POSCO.

G.    Reserve for Export Loss – Article 16 of the TERCL

Under Article 16 of the TERCL, a domestic person engaged in a foreign-currency earning business can establish a reserve amounting to the lesser of one percent of foreign exchange earnings or 50 percent of net income for the respective tax year.  Losses accruing from the cancellation of an export contract, or from the execution of a disadvantageous export contract, may be offset by returning an equivalent amount from the reserve fund to the income account. Any amount that is not used to offset a loss must be returned to the income account and taxed over a three-year period, after a one-year grace period.  All of the money in the reserve is eventually reported as income and subject to corporate tax either when it is used to offset export losses or when the grace period expires and the funds are returned to taxable income.  The

-14-

deferral of taxes owed amounts to an interest-free loan in the amount of the company's tax savings. This program is only available to exporters. We verified that this program was terminated on April 10, 1998, and no new funds could be placed in this reserve after January 1, 1999. However, Dongbu still had an outstanding balance in this reserve during the POI. Dongbu Corp., a trading company used by Dongbu also had an outstanding balance in this reserve during the POI. HYSCO returned the remaining balance of this reserve fund to income during the POI.

In Sheet and Strip, 64 FR 30636, 30645, we determined that this program constituted an export subsidy under section 771(5A)(B) of the Act because the use of the program is contingent upon export performance. We also determined that this program provided a financial contribution within the meaning of section 771(5)(D) of the Act. No new information or evidence of changed circumstances has been presented to cause us to revisit this determination. Thus, we determine that this program constitutes a countervailable export subsidy.

Under our traditional methodology used to calculate a benefit from this tax reserve, the Department considered that this program provided only a deferral of tax liability. That is, this program allowed a company to shift its tax payment on the funds in the reserve from year 1 to years 4, 5, and 6. For example, in Year X a company places funds into a reserve account and these funds are, therefore, not taxed in Year X. However, four years later when one-third of the funds in the tax reserve are returned to taxable income, then income taxes are paid on these funds in Year X plus four. Therefore, because the company received a deferral of income taxes on those funds, we considered the tax savings on these funds for those four years to benefit the company in the form of an interest-free loan. That is, the company had money it otherwise would not have had absent this program. The amount of the interest-free loan was based upon the tax savings on the balance in the tax reserve. We also determined that if a company had a tax loss during the POI, then there was no benefit from this tax reserve because the company had no tax liability during the POI. We did not calculate a benefit on the portion of the tax reserve which was returned to taxable income during the POI.

In the Preliminary Determination, we indicated that we were reviewing this methodolgy to determine whether we were accurately calculating the benefit conferred by these tax reserves. Based upon our review, we have determined that we need to revise our benefit calculations. In the past, we did not calculate a benefit from the reserve balances in years in which a company was in tax loss and did not incur tax payments. Upon further review, we determine that the time in which the deferral of tax liability took place was in the year in which funds from the company's income were placed into the tax reserve. Therefore, regardless of whether the company is in a tax loss during the POI, the balance in the tax reserve is still providing the company with an interest-free loan. This methodology treats the tax reserves as a deferral of tax liability and therefore, the benefit lies in the amount of the reserve deferred. A company receives a benefit when it defers a certain amount of taxable income; however, the benefit ceases once the company returns the reserve to taxable income and pays taxes on this amount.

In addition, we also recognize that a company is benefitting when it returns funds from the reserve back into income during those years in which the company is at a tax loss. If the company is in a tax loss situation and does not pay any taxes on income in the year in which the funds are refunded to the income account, the funds that were placed into the tax reserve are never taxed. Under this scenario, the company, instead of being provided with a deferral of tax liability on these reserve funds, has also been provided with a complete exemption of tax liability

-15-

on this income.  When a company is in a tax loss position and returns its reserves and does not have to pay taxes, this confers a benefit in the form of a tax forgiveness.  Furthermore, a financial contribution is provided as the GOK does not collect revenue that was otherwise due.

As noted above, Dongbu and Dongbu Corp had outstanding balances in this reserve during the POI.  To determine the benefit conferred by this program, we calculated the tax savings by multiplying the balance amount of the reserve as of December 31, 1999, as filed during the POI, by the corporate tax rate for 1999.  We treated the tax savings on these funds as a short-term interest-free loan.  See 19 CFR 351.509.  Accordingly, to determine the benefit, we multiplied the amount of tax savings for Dongbu and Dongbu Corp by their respective weighted-average interest rate for short-term won-denominated commercial loans for the POI, as described in the "Subsidies Valuation Information" section, above.  In addition, using the methodology for calculating subsidies received by trading companies, which is also detailed in the "Subsidies Valuation" section of this notice, we calculated a benefit for Dongbu Corp attributed to Dongbu.

As noted above, HYSCO returned the remaining balance of this reserve fund to income during the POI.  However, the company was in a tax loss and did not pay taxes during this year.  Therefore, HYSCO received a complete tax exemption under this program.  To calculate the benefit, we treated the reversed amount returned to income as a tax forgiveness.  We first determined the reserve amount returned to income, next we calculated the tax savings on that amount.  We then divided the benefit by the respective total export sales.

On this basis, we calculated a countervailable subsidy of 0.07 percent ad valorem for Dongbu and 0.03 percent ad valorem for HYSCO.

H.    Reserve for Overseas Market Development Under TERCL Article 17

Article 17 of the TERCL allows a domestic person engaged in a foreign trade business to establish a reserve fund equal to one percent of its foreign exchange earnings from its export business for the respective tax year.  Expenses incurred in developing overseas markets may be offset by returning, from the reserve to the income account, an amount equivalent to the expense.  Any part of the fund that is not placed in the income account for the purpose of offsetting overseas market development expenses must be returned to the income account over a three-year period, after a one-year grace period.  As is the case with the Reserve for Export Loss, the balance of this reserve fund is not subject to corporate income tax during the grace period.  However, all of the money in the reserve is eventually reported as income and subject to corporate income tax either when it offsets export losses or when the grace period expires.  The deferral of taxes owed amounts to an interest-free loan equal to the company's tax savings.  This program is only available to exporters.  This program was terminated on April 10, 1998, and no new funds could be placed in this reserve after January 1, 1999.  However, Dongbu still had an outstanding balance in this reserve during the POI.  Dongbu Corp., a trading company used by Dongbu and Posteel, a trading company used by POSCO, also had outstanding balances in this reserve during the POI.

In Sheet and Strip, 64 FR 30636, 30645, we determined that this program constituted an export subsidy under section 771(5A)(B) of the Act because the use of the program is contingent upon export performance.  We also determine that this program provided a financial contribution within the meaning of section 771(5)(D)(i) of the Act in the form of a loan.  No new information

-16-

or evidence of changed circumstances has been presented to cause us to revisit this determination. Thus, we determine that this program constitutes a countervailable export subsidy.

To determine the benefit conferred by this program during the POI, we employed the same methodology used for determining the benefit from the Reserve for Export Loss program under Article 16 of the TERCL. We used as our benchmark interest rate each company's respective weighted-average interest rate for short-term won-denominated commercial loans for the POI, as described in the "Subsidies Valuation Section" above. We then divided the benefit by the respective total export sales. In addition, using the methodology for calculating subsidies received by trading companies, which is also detailed in the "Subsidies Valuation" section of this notice, we calculated a benefit attributable to each respective producer. On this basis, we calculated a countervailable subsidy of 0.04 percent ad valorem for Dongbu and a countervailable subsidy of 0.02 percent ad valorem POSCO.

I.      Asset Revaluation Under Article 56(2) of the TERCL

Under Article 56(2) of the TERCL, the GOK permitted companies that made an initial public offering between January 1, 1987, and December 31, 1990, to revalue their assets at a rate higher than the 25 percent required of most other companies under the Asset Revaluation Act. In CTL Plate, we found this program countervailable. See 64 FR 73176, 73183. No new information, evidence of changed circumstances, or comments from interested parties were presented in this **investigation to warrant any reconsideration of the countervailability of this program**.

The benefit from this program is the difference that the revaluation of depreciable assets has on a company's tax liability each year. To calculate the benefit under this program, we used the additional depreciation in the tax return filed during the POI, which resulted from the company's asset revaluation, and multiplied that amount by the tax rate applicable to that tax return. We then divided the resulting benefit for each company by their respective total sales. On this basis, we determine a net countervailable subsidy of 0.04 percent ad valorem for POSCO. HYSCO received no benefit from this program because it had a net tax loss. Dongbu did not use this program.

J.      Tax Reserve for Balanced Development under RSTA Article 58 (TERCL Article 41)

TERCL Article 41 allowed a company that planned to relocate its facility from a large city to a local area to establish a reserve equal to 15 percent of the facility's value. The balance in the reserve was not subject to corporate income tax in that year but all monies in the reserve must eventually be returned to the income account and are then subject to tax at the expiration of the grace period. The reserve amount equivalent to the amount incurred from the relocation of its facilities from the large city to a local area will be included in taxable income after a two-year grace period and over a three-year period. If the reserve amount is not used for the payment of relocation, this unused amount is included in the company's taxable income, after the two-year grace period. This program was replaced by Article 58 of RSTA. Subsequent to the

-17-

establishment of Article 58 of RSTA, the program was terminated and the last date that this reserve could be established was August 31, 1999.  Dongbu was the only company which established a reserve under this program before the program's August 31, 1999 termination. Dongbu still had an outstanding balance under this reserve during the POI.

In the <u>Preliminary Determination</u>, we determined that this program is specific within the meaning of section 771(5A)(D)(iv) of the Act, because the program is limited to enterprises or industries located within a designated geographical region.  Because the deferral of taxes owed provided under this program amounts to an interest-free loan equal to the company's tax savings, we also determined that this program provided a financial contribution within the meaning of section 771(5)(D)(i) of the Act as revenue foregone that the GOK would have otherwise collected.  We also find that under section 771(5)(E)(ii) of the Act, Dongbu received a benefit in the form of a loan.

To determine the benefit conferred by this program to Dongbu, we employed the same methodology described in the Reserve for Export Loss Program, above.  We calculated the tax savings by multiplying the balance amount of the reserve as of December 31, 1999, by the corporate tax rate for 1999.  We treated the tax savings on these funds as a short-term interest-free loan.  <u>See</u> section 351.509 of the CVD Regulations.  Accordingly, to determine the benefit, we multiplied the amount of tax savings by Dongbu's weighted-average interest rate for short-term won-denominated commercial loans for the POI, as described in the "Subsidies Valuation Information" section, above.  We then divided the benefit by the company's total f.o.b. sales.  On this basis, we calculated a countervailable subsidy of 0.02 <u>ad</u> <u>valorem</u> for Dongbu.

In the <u>Preliminary Determination</u> we invited interested parties to comment on this issue. Specifically, we invited interested parties to comment on whether the methodology the Department has traditionally applied to these types of Korean tax programs accurately quantifies the benefit conferred by these tax reserves.  For further information, <u>see</u> Comment 5: Tax Programs of the "Analysis of Comments" section of this Decision Memorandum.

K.      <u>Short-term Export Financing</u>

In <u>Certain Steel Products</u>, the Department determined that the GOK's short-term export financing program was countervailable.   <u>See</u> 58 FR at 37350.  **Respondents have not provided any new information to warrant reconsideration of this determination.  Therefore, we continue to find this program countervailable**.  During the POI, both HYSCO and POSCO used export financing.

To determine whether this export financing program confers a countervailable benefit, we compared the interest rate HYSCO and POSCO paid on the export financing received under this program during the POI with the interest rate they would have paid on a comparable short-term commercial loan.  <u>See</u> discussion above in the "Subsidies Valuation Information" section with respect to short-term loan benchmark interest rates.

To calculate the benefit conferred by this program, we compared the actual interest paid on the loans with the amount of interest that would have been paid at the applicable benchmark interest rate.  We then divided the benefit derived from all of HYSCO's and POSCO's  export loans by the value of the companies' total export sales.  On this basis, we determine a net

-18-

countervailable subsidy of 0.07 percent ad valorem for HYSCO and less than 0.005 percent ad valorem for POSCO.

      L.      Local Tax Exemption on land outside of Metropolitan area

        At verification the Department found that HYSCO and POSCO were exempt from paying registration and acquisition taxes for their industrial land located outside of a metropolitan area. Dongbu received these exemptions on the purchase of land at Asan Bay, however, these exemptions were received prior to the POI.  Under Korean tax law, companies are exempt from the registration and acquisition taxes on industrial land outside of a metropolitan area.

        The Department finds that these exemptions are regionally specific under section 771(5A)(D)(iv) of the Act, as being limited to an enterprise or industry located within a designated geographical region.  See e.g. Final Affirmative Countervailing Duty Determinations: Low Enriched Uranium from Germany, the Netherlands, and the United Kingdom, 66 FR 65903 (December 21, 2001).  A financial contribution is provided, as the GOK foregoes revenue that it would otherwise collect.  A benefit is conferred in the form of a tax exemption.

        To calculate the benefit, we took the amount of each companies' tax exemption and divided that tax savings by the companies' respective total f.o.b. sales.  Using this methodology, we calculated a net countervailable subsidy rate of 0.01 percent ad valorem for HYSCO and 0.04 percent ad valorem for POSCO.

      M.      Electricity Discounts under the Requested Load Adjustment Program

        The GOK introduced an electricity discount under the Requested Load Adjustment (RLA) program in 1990, to address emergencies in the Korea Electric Power Company (KEPCO's) ability to supply electricity.  Under this program, customers with a contract demand of 5,000 kW or more, who can curtail their maximum demand by 20 percent or suppress their maximum demand by 3,000 kW or more, are eligible to enter into a RLA contract with KEPCO. Customers who choose to participate in this program must reduce their load upon KEPCO's request, or pay a surcharge to KEPCO.

        Customers can apply for this program between May 1 and May 15 of each year.  If KEPCO finds the application in order, KEPCO and the customer enter into a contract with respect to the RLA discount.  The RLA discount is provided based upon a contract for two months, normally July and August.  Under this program, a basic discount of 440 won per kW is granted between July 1 and August 31, regardless of whether KEPCO makes a request for a customer to reduce its load.  During the POI, KEPCO granted POSCO electricity discounts under this program.

        In Sheet and Strip, the Department found this program specific under section 771(5A)(D)(iii)(I) of the Act because the discounts were distributed to a limited number of customers.  Respondents have not provided any new information to warrant reconsideration of this determination.  Therefore, we continue to find this program countervailable.

        Because the electricity discounts provide recurring benefits, we have expensed the benefit from this program in the year of receipt. To measure the benefit from this program, we summed the electricity discounts which POSCO received from KEPCO under the RLA program during

-19-

the POI. We then divided that amount by POSCO's total f.o.b. sales value for the POI. On this basis, we determine a net countervailable subsidy of less than 0.005 percent <u>ad valorem</u> for POSCO.

### N.    <u>POSCO's Provision of Steel Inputs at Less than Adequate Remuneration</u>

POSCO is the only Korean producer of hot-rolled stainless steel coil (HRC), which is the main input into the subject merchandise. During the POI, POSCO sold HRC to Dongbu to produce subject merchandise. We verified that HYSCO did not purchase HRC from POSCO to produce subject merchandise. In <u>CTL Plate</u>, the Department determined that the GOK, through its ownership and control of POSCO, set prices of steel inputs used by the Korean steel industry at prices at less than adequate remuneration, and also found this program countervailable. <u>See</u> 64 FR at 73184.

Under section 351.511(a)(2) of the CVD Regulations, the adequacy of remuneration is to be determined by comparing the government price to a market determined price based on actual transactions in the country in question. Such prices could include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions. During the POI, Dongbu imported HRC; therefore, we are using Dongbu's actual imported prices of HRC as our basis of comparison to the price at which POSCO sold HRC to Dongbu. Based upon this comparison, we determined that POSCO sold HRC to Dongbu at less than adequate remuneration. As a result, a benefit is conferred to Dongbu under section 771(5)(E)(iv); therefore, we continue to find this program countervailable. Because HYSCO did not purchase HRC from POSCO to produce subject merchandise, we determine that HYSCO did not receive a benefit under this program.

In the <u>Preliminary Determination</u>, the Department stated that during verification we would closely examine whether or not the GOK continues either directly or indirectly to control POSCO's pricing policy in the Korean domestic market. We received numerous comments from both the petitioners and respondents on this issue. The results of verification and our analysis of the comments submitted by respondents and petitioners have not led the Department to change its decision in the <u>Preliminary Determination</u> that this program is countervailable for this POI. The comments on this issue have been addressed in the comments section of this notice. <u>See</u> Comments 1 and 2, below.

To determine the value of the benefit under this program, we compared the monthly delivered weighted-average price charged by POSCO to Dongbu for HRCs to the monthly delivered, duty-inclusive weighted-average price Dongbu paid for imported HRCs. We made due allowances for the different specifications of HRCs, thus allowing the Department to compare a single product. In addition, we made an adjustment to the imported price for duty drawback. Under duty drawback a company receives a portion of the duty paid for importing when it reexports merchandise manufactured using that import. We verified that Dongbu received drawback of a portion of the duties it paid on imported HRC. Therefore, we adjusted the monthly weight-averaged import price to account for that portion of import duties which were drawn back. Next, we multiplied this price difference by the quantity of HRC that Dongbu purchased from POSCO during the POI. We then divided the amount of the price savings by the

-20-

f.o.b. sales value of subject merchandise.  On this basis, we determine that Dongbu received a countervailable subsidy of 0.37 percent <u>ad</u> <u>valorem</u> from this program during the POI.

      O.     <u>Dongbu's Excessive Exemptions under the Harbor Act</u>

      Under the Harbor Act, companies are allowed to construct infrastructure facilities at Korean ports; however, these facilities must be deeded back to the government.  Because the ownership of these facilities reverts to the government, the government compensates private parties for the construction of these infrastructure facilities.  Because a company must transfer to the government its infrastructure investment, under the Harbor Act, the GOK under grants the company free usage of the facility and the right to collect fees from other users of the facility for a limited period of time.  Once a company has recovered its cost of constructing the infrastructure, the company must pay the same usage fees as other users of the infrastructure.  In <u>Sheet and Strip</u>, we determined that this program was not countervailable because it was not specific under section 771(5A)(D)(iii) of the Act.

      During verification of the instant investigation, the Department found that Dongbu received free use of harbor facilities at Asan Bay based upon both its construction of a port facility as well as a road that the company built from its plant to its port.  We verified that Dongbu received an exemption of harbor fees for a period of almost 70 years under this program.  Furthermore, Koland official have stated that any roads built by companies at Asan Bay are built at the company's expense.  Moreover, given the length of the exemption period provided to Dongbu, the company received more than just a limited exemption on its harbor fee.  It also received compensation which lasted longer than the useful life of the constructed assets.  However, under this program, Dongbu is being reimbursed for the roads which it constructed and received additional exemptions of fees by the GOK under the Harbor Act.  As only Dongbu has received a 70 year exemption period, we find that this excessive exemption period is specific to Dongbu under section 771(5A)(D)(iii)(I) of the Act.  Moreover, we find that the GOK is foregoing revenue that it would otherwise collect by allowing Dongbu to be exempt from port charges for up to 70 years.

      During verification we were able to determine the average yearly amount of harbor fees exemptions provided to Dongbu as a result of this program.  To calculate the benefit we took the average yearly amount of exemptions and divided that amount by Dongbu's total f.o.b. sales for the POI.  Using this methodology, we calculated a countervailable net subsidy rate of 0.03 percent <u>ad</u> <u>valorem</u> for Dongbu under this program.

      P.     <u>Exemption of VAT on Imports of Anthracite Coal</u>

      The Department investigated an allegation that the GOK provided anthracite coal to the steel industry for less than adequate remuneration.  At verification the Department determined that POSCO did not purchase any anthracite coal from the GOK.  However, we did verify that imports of anthracite coal were exempt from paying VAT, and that POSCO imported anthracite coal during the POI.  (<u>See</u> POSCO's Verification Report page 4).  We also verified that VAT is paid on imports of non-anthracite coal.

-21-

Based on information on the record, the GOK allows for only a few items to be exempt from VAT, a substantial majority of items must pay VAT when being imported. We determine that this program is specific under section 771(5A)(D)(i) of the Act, as the items allowed to be imported without paying VAT are limited. We also find that a financial contribution is provided under section 771(5)(D)(ii) of the Act, as the GOK is not collecting revenue otherwise due. POSCO imported anthracite coal during the POI, therefore, it received a benefit in the amount of the VAT that it would have otherwise paid if not for the exemption. Therefore, we find this program countervailable, and find a net countervailable subsidy rate of 0.03 percent ad valorem for POSCO.

II.      Programs Determined To Be Not Countervailable

     A.      GOK Infrastructure Investments at Kwangyang Bay Post-1991

Petitioners alleged that the GOK made infrastructure investments during the POI for POSCO at Kwangyang Bay. In Plate in Coils, we determined that the GOK's investments at Kwangyang Bay since 1991, in the Jooam Dam, the container terminal, and the public highway were not specific. See 64 FR 15536. We verified that the only new GOK expenditures made at Kwangyang Bay were for the container terminal. We determined in Plate in Coils that the GOK's investments in the container terminal did not provide a benefit to POSCO because POSCO does not use the container terminal. No new factual information or evidence of changed circumstances has been provided to the Department with respect to this program. Therefore, we continue to determine that this program is not countervailable.

     B.      R&D Aid for Anthracite Coal Technology

This program refers to the project "Technology for Sintered Anthracite Coal" in the August 1996 report prepared by the Korea Iron and Steel Association (KOSA). This project was solely financed by POSCO from the company's own funds. Because the GOK did not provide any funds for this project, we determine that this program is not countervailable.

     C.      Asan Bay Infrastructure Subsidies

Petitioners alleged that the GOK provided infrastructure subsidies related to roads, piers, distribution facilities, and industrial water supplies to steel companies located at Asan Bay. Based upon the information on the record of this investigation and in the CTL Plate remand redetermination, we determine that no benefit was provided under this program. Therefore, we find this program not countervailable.

The roads located in and around the Asan Bay area can be divided into three different categories. The first category is roads that are located within the industrial estates which were built by Koland, the government agency which developed and sells the land at the Asan Bay industrial estates. The construction costs incurred by Koland for these roads are included as part of the land purchase price charged to companies purchasing land in the industrial estates. The second category is roads that are built on an individual company's site within the industrial estate

-22-

which are built and paid for by the companies themselves.  The third category of roads is the main roads and highways that are located around the Asan Bay area and which are used by the general public.  Generally, the construction of toll free roads is handled by the Ministry of Construction and Transportation (MOCAT) and are built using funds from the GOK budget.  These roads are part of the country's general road and highway system.  The costs for construction and operation of toll roads are paid from the GOK budget and by the Korea Road Corporation (KRC).  The construction costs of the KRC are recovered through the collection of tolls from users.  The major highway that serves the Asan Bay area is the West Coast Highway, which is part of the National Highway system.

With respect to the allegation that companies located in Asan Bay industrial estates benefit from the GOK's provision of roads, we determine that:  (1) the roads build by the GOK within the industrial estate do not provide a benefit because the cost of road construction is included in the purchase price of the land; (2) the additional roads within the industrial estate on individual company sites do not provide a benefit because these roads are build and paid for by the company; and (3) the West Coast Highway and other national roads within the Asan Bay area are part of the country's national road system and thus constitute general infrastructure, and therefore do not provide a countervailable benefit.

With respect to the allegation of industrial water facilities, sewage facilities, and electric power facilities, the GOK states in its response that the companies located in the Asan Bay industrial estates pay for these services.  The fees charged to these companies for these services are based on the general published tariff rates for each of these services.  In addition, the connections from the main water pipe to the user are constructed and paid for by the user; individual lines from the main electricity transformers to each companies' individual facility are constructed and paid for by the company; and sewage facilities located within an individual company's facility as well as the connection to the main sewage facility are constructed and paid for by the individual company.  Because companies within the industrial estate pay for the construction of these facilities and pay the published tariff rates for industrial services, we determine that no benefit is provided by the GOK by the provision of these goods and services.  There are no distribution depots at Asan Bay.

We note that with respect to this program, the Department was required to conduct verification of the provision of infrastructure at Asan Bay in a recent remand of <u>CTL Plate</u>.  The Departments's remand redetermination of <u>CTL Plate</u> is in litigation, and thus, serves as no legal precedent in this instant investigation.  However, factual information gathered in the course of the <u>CTL Plate</u> remand may be placed on the record of this investigation and considered in this determination.  Therefore, we have placed the public verification reports for both the GOK and POSCO from the <u>CTL Plate</u> remand on the record of this current investigation.  <u>See</u> "Remand Verification Report for the Government of Korea (GOK) in the Court of International Trade (CIT) Remand of the Countervailing Duty Investigation of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea" and "Remand Verification Report for Pohang Iron and Steel Co., Ltd. (POSCO) in the Court of International Trade (CIT) Remand of the Countervailing Duty Investigation of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea."  Both of these public verification reports are dated November 26, 2001, and have been placed in the public file in the CRU.  The information in the verification reports substantiates the information provided in the responses.

-23-

The petitioners also alleged that the companies located in the Asan Bay industrial estates benefit from the provision of port facilities.  The port facilities at Asan Bay are not part of the industrial estates.  The port facilities located at Asan Bay are owned and administered by the Inchon Port Authority (IPA), a division of the Ministry of Maritime and Fisheries (MOMAF).  Furthermore, with respect to the provision of port facilities, we have previously found this program not countervailable in Sheet and Strip.  No new factual information or evidence of changed circumstances has been provided to the Department with respect to this program.  Therefore, we continue to determine the provision of port facilities to be not countervailable.

        D.     Reserve for Energy-Saving Equipment (RSTA Article 30)

Under TERCL article 29, all domestic companies are able to establish a reserve for investment in energy-saving facilities amounting to 15 percent of the total investment value of the facility.  The balance in the reserve is not subject to corporate income tax in the year it is invested or the following two years; afterwards, it is returned to income and is subject to taxation.  This article was replaced with RSTA article 30 on December 28, 1998.

Information on the record demonstrates that this program is not limited to any industry and is therefore not specific, as required under section 771(5A) of the Act.  We received no comments on this program and, as it is not specific, we find that this program is not countervailable.

III.    Programs Determined To Be Not Used

        A.     Anthracite Coal for Less than Adequate Remuneration

Petitioners alleged that the GOK provides anthracite coal to steel producers at suppressed prices.  Petitioners claim that these suppressed prices are part of a GOK price stabilization program where steel producers are receiving anthracite coal at less than adequate remuneration.  This program is designed to support and maintain the domestic coal industry in Korea by managing anthracite and briquette prices and is administered by MOCIE and the Coal Industry Promotion Board (CIPB).  The GOK fixes the highest selling price of anthracite and briquette and then provides funds to the mining companies and briquette manufacturing companies for the difference between their costs of production and sales prices through the coal industry stabilization fund.  Thus, the GOK controls prices of anthracite coal mined in Korea.

POSCO was the only respondent to use anthracite coal.  However, during the POI, POSCO used only imported anthracite coal and thus did not use this program.  Based on the fact that POSCO had no purchases of domestic anthracite coal, we determine that POSCO did not use this program during the POI.

        B.     Grants to Dongbu

We verified that these grants which were contained in Dongbu's 1996 Financial Statement related to R&D projects that Dongbu participated in between 1991 and 1995.  These grants equaled less than 0.5 percent of Dongbu's sales in 1996.  Thus, under section

-24-

351.524(b)(2) of the CVD Regulations, these grants are expensed in the year of receipt. Therefore, because no benefit was conferred to Dongbu from these grants during the POI, we determine that this program was not used.

C.     Technical Development Fund (RSTA Article 9, formerly TERCL Article 8)

On December 28, 1998, the TERCL was replaced by RSTA; pursuant to this change in law, TERCL Article 8 is now identified as RSTA Article 9.  Apart from the name change, the operation of RSTA Article 9 is the same as the previous TERCL Article 8 and its Enforcement Decree.

This program allows a company operating in manufacturing or mining, or in a business prescribed by the Presidential Decree, to appropriate reserve funds to cover the expenses needed for development or innovation of technology.  These reserve funds are included in the company's losses and reduce the amount of taxes paid by the company.  Under this program, capital goods and capital intensive companies can establish a reserve of five percent, while companies in all other industries are only allowed to establish a three percent reserve.

In CTL Plate, we determined that this program is countervailable because the capital goods industry is allowed to claim a larger tax reserve under this program than all other manufacturers. We also determined in CTL Plate that this program provides a financial contribution within the meaning of section 771(5)(D)(i) of the Act in the form of a loan.  The benefit provided by this program is the differential two percent tax savings enjoyed by the companies in the capital goods industry, which includes steel manufacturers.  See CTL Plate at 73181. While we continue to find this program countervailable, Dongbu only contributed funds to this reserve at the three percent rate; therefore, we find that the company did not benefit from this program.  Thus, the countervailable aspect of this program was not used.

D.     Export Insurance

IV.     Total Ad Valorem Rate

The net subsidy rates for producers/exporters of subject merchandise are as follows:

| Producer/Exporter | Net Subsidy Rate |
|---|---|
| Dongbu Steel Co., Ltd. (Dongbu) | 1.09 percent ad valorem |
| Hyundai Hysco (HYSCO) | 0.36 percent ad valorem |
| Pohang Iron & Steel Co., Ltd. (POSCO) | 0.76 percent ad valorem |
| Union Steel Manufacturing Co., Ltd. (Union) | 3.43 percent ad valorem |
| All Others Rate | 1.09 percent ad valorem |

-25-

## V.    Analysis of Comments

**Comment 1:**  *GOK Control of POSCO*

Petitioners contend that, for reasons outlined below, the Department should continue to countervail the benefit to Dongbu from POSCO's provision of steel inputs at less than adequate remuneration.  Specifically, petitioners argue that, despite POSCO's September 2000 privatization, the GOK continued to control POSCO during the POI through holding shares in POSCO, holding superior voting rights, and exercising control over leadership of the corporation.  Petitioners maintain that the GOK continues to hold shares in POSCO through the government-owned Industrial Bank of Korea (IBK), as well as other government-owned entities.  Petitioners argue that the IBK owned 4.12 percent of POSCO as of December 31, 2000.  Moreover, petitioners contend that the Korea Development Bank (KDB) held 10 percent of the shares in POSCO until October 6, 2000.  Additionally, petitioners argue that the National Pension Corporation (NPC), a government-owned entity, held more than one percent of POSCO's shares throughout the POI.

Furthermore, petitioners argue that the GOK continued to hold superior voting rights during the POI.  Petitioners dispute respondents' assertion that all of POSCO's shares are common shares and thus no shareholder has superior voting rights.  Petitioners maintain that any restrictions on the acquisition of shares were in place during the POI, and, therefore, POSCO's statement is irrelevant that amendments to its bylaws during the course of privatization lifted restrictions on the acquisition of shares.  Petitioners also assert that general voting rights were still limited by law until September 26, 2000, the majority of the POI, and the effect was not lifted until March 2001 when POSCO could modify its Articles of Incorporation to implement the change.  Further, petitioners argue that the GOK's recognition of POSCO as a "public company" continued after privatization, as evidenced by the fact that POSCO was subject to the supervision of the Korean Board of Audit and Inspection (KBAI), a governmental agency that regulates other governmental bodies, throughout 2000.

Additionally, petitioners assert that the GOK continued to exercise control over POSCO's leadership during the POI.  As evidence, petitioners point to the fact that at least two former government officials served on POSCO's board of directors (BOD) until spring 2000, and at least four of POSCO's eight outside directors during the POI had direct government or government-related service.  Petitioners also point to the Department's verification report of POSCO, which they claim provides further evidence that under procedures in place until March 2000, five of POSCO's eight outside directors were recommended to the board by the top five largest shareholders, with the KDB and the IBK each selecting one director.  Petitioners state that the verification report confirmed that two of the eight outside directors are still ex-appointees of government banks.  Petitioners maintain that at least four of POSCO's outside directors have had former government experience, and, during the POI, half of POSCO's outside directors had government ties.  In addition, petitioners assert that the appointment of POSCO's current top management is a direct result of the GOK's continued control of the company.

Respondents rebut petitioners' argument that POSCO is controlled by the GOK.  Respondents state that the limited evidence provided by petitioners is not sufficient to find a direct subsidy, which requires a demonstration that POSCO is a public entity.  Respondents

-26-

argue that under the Statement of Administrative Action ("SAA"), a direct subsidy can only be provided by the government itself or a public entity or public body.  Respondents maintain that the fact that the IBK, the KDB, and the NPC held a small percentage of POSCO's shares during the POI does not prove that POSCO was a government-controlled company.  Namely, respondents argue that the Department verified that the IBK has no incentive to use its ownership interest to direct or influence POSCO to sell HRC at artificially low prices since the IBK would suffer from any decision that negatively affected POSCO and its share price. Regarding the KDB's ownership interest in POSCO, respondents maintain that these shares were originally to be sold by the end of 1999 as part of POSCO's privatization, but due to poor equity market conditions in Korea, this target date was not met until September 29, 2000.  While the KDB was still holding shares of POSCO during the POI, respondents assert that the KDB was a passive investor waiting for a financially beneficial time to sell its shares of POSCO.  Respondents further argue that the NPC is administered by the Ministry of Health and Welfare, who uses a committee to make investment decisions for the Pension Fund, and there is no evidence that the GOK controls this committee or directs it to make decisions.

Moreover, respondents argue that the Department verified that POSCO's designation as a "public company" and the restrictions on voting rights were both removed during the POI.  Respondents maintain that any restrictions on an individual shareholder's voting rights or ownership in POSCO were removed as of September 26, 2000, and the fact that POSCO's Articles of Incorporation were not amended until the next general meeting of shareholders is irrelevant as a matter of law.  The removal of legal restriction, not the formality of amending POSCO's Articles of Incorporation, is what matters, argue respondents.  In addition, respondents assert that even if the KBAI did "regulate" POSCO during part of the POI by virtue of its ability to audit POSCO, petitioners have pointed to no specific evidence that demonstrates that POSCO was subject to such supervision after the removal of POSCO designation as a public company.

Respondents further rebut petitioners' arguments that the GOK continued to exercise control over the leadership of POSCO during the POI.  Respondents state that the GOK has no direct involvement in appointing POSCO's leadership and that only two outside members of POSCO's BOD were appointed by GOK-owned entities.  Respondents state that during the POI none of POSCO's standing directors were former government officials or employees.  Regarding outside directors, respondents assert that only two of the eight are former government officials or employees, not four, as petitioners state.  Additionally, respondents argue that these officials' government service ended 33 years and 9 years ago.  Regarding the other two outside directors that petitioners allude to, respondents argue that they were not government employees or officials but were instead unpaid outside consultants on various government commissions and committees.  Respondents maintain that petitioners have offered no evidence that all of POSCO's shareholders are controlled by the GOK and that they voted in accordance with GOK policy.

Petitioners maintain that even if POSCO were fully privatized, the GOK continues to entrust or direct the company to provide a financial contribution.  Petitioners cite to the

-27-

Department's recently completed administrative review of <u>1999 Sheet and Strip</u>,[2] in which the Department found that there was insufficient evidence on the record to conclude that the GOK has not directed POSCO to make a financial contribution. Petitioners further argue that although the GOK states that its dual pricing policy was terminated in 1999, record evidence demonstrates that the scheme to provide preferentially-priced inputs to exporters remains in place through the use of preferential credit terms. Petitioners assert that, as the Department found in <u>1999 Sheet and Strip</u>, the distinction between the dual pricing system and the favorable credit system which replaced it has no bearing on whether the GOK, through POSCO, sold inputs for less than adequate remuneration. Petitioners maintain that in the spring of 1999, before POSCO's privatization, the dual pricing system was terminated and immediately replaced with the use of letters of credit that provided favorable financing terms. Therefore, petitioners conclude, the GOK, through its ownership and control of POSCO, set prices of steel inputs for sale to Korean steel producers at less than adequate remuneration.

Respondents rebut petitioners' assertions that the GOK has entrusted or directed POSCO. First, respondents argue that petitioners can point to no specific evidence that supports its claim that GOK exercised any control over POSCO nor any evidence of a causal nexus between the program and the benefit. Furthermore, respondents argue that petitioners' reference to <u>Sheet and Strip</u> fails to provide persuasive evidence, as that decision was based on evidence from a previous period of review, POSCO was not a respondent in that review, and no verification was conducted. Furthermore, respondents argue that even assuming *arguendo* that POSCO were providing discounts to its competition using a favorable credit system, this alone does not constitute an indirect subsidy or any subsidy. Without any evidence that the GOK entrusted or directed POSCO to sell HRC at artificially low prices, petitioners' indirect subsidy claim fails, according to respondents.

Respondents argue that the Department can no longer rely upon the GOK's minor ownership of POSCO as support for its determination that the GOK controlled and set POSCO's prices of HRC at less than adequate remuneration. Respondents maintain that the GOK's ownership of POSCO was greatly reduced during the POI, and the GOK is no longer the single largest shareholder. Respondents assert that by the end of the POI, the IBK's ownership of POSCO was reduced to 4.12 percent. All of these shares are common shares with normal voting rights which are held by the IBK. Respondents point out that the single largest block of POSCO's shares consist of American Depository Receipts (ADRs), which trade on the New York Stock Exchange. Additionally, respondents quote to the Department's verification report with private parties, reiterating that the Department learned at verification that the IBK most likely is not influencing POSCO's pricing policy because it lacks any incentive to direct POSCO's pricing policy of HRC or other products and it wants POSCO to be profitable. Furthermore, respondents affirm that the KDB, previously POSCO's largest shareholder and the basis for finding GOK ownership and control, held no shares at the end of 2000.

---

[2] See <u>Stainless Steel Sheet and Strip in Coils from the Republic of Korea:  Amended Final Results of Countervailing Duty Administrative Review</u>, 67 FR 8229 (February 22, 2002) (<u>1999 Sheet and Strip</u>) and the accompanying <u>Issues and Decision Memorandum:  Final Results of Countervailing Duty Administrative Review:  Stainless Steel Sheet and Strip in Coils from the Republic of Korea</u> (January 8, 2002).

-28-

Petitioners rebut respondents' claim, arguing that it is undisputed that GOK-controlled entities held a substantial stake in POSCO throughout the POI. Petitioners maintain that regardless of whether GOK-owned banks had reduced their holdings or the GOK was the single largest shareholder, a reduced or second-largest stake can still afford effective control, as the Department found in 1999 Sheet and Strip. Moreover, petitioners argue that ADRs do not constitute a single stake, as they are held by numerous investors. Petitioners assert that the question is not who else owns a stake in POSCO, but what the GOK owns and what other means it has to influence POSCO's behavior. Petitioners point to a report by Merrill Lynch that was placed on the record and that reveals the potential for government influence over POSCO's affairs. Furthermore, petitioners rebut respondents' argument that the GOK has no incentive to exert influence over POSCO through the IBK because it wants POSCO to be profitable, stating that the desire for POSCO to be profitable has never been an impediment to the GOK using POSCO to bestow subsidies.

Respondents assert that POSCO's designation as a "public company" has been mischaracterized by petitioners and the Department. Respondents cite to AK Steel v United States, 192 F. 3d 1367 (CAFC 1999), arguing that the Court of Appeals for the Federal Circuit noted that the fact that a company is designated as a public company does not in itself provide the GOK with control over the business decisions of the company. Respondents maintain that on September 26, 2000, the Minister of the MOFE removed POSCO's designation as a "public company" and simultaneously revoked the restriction that no individual shareholder other than the GOK could exercise voting rights in excess of three percent of the company's common shares. Respondents conclude that any restrictions placed on an individual shareholder's voting rights or ownership in POSCO were removed as of POSCO's privatization, and, therefore, the Department can no longer rely upon these restrictions as support for its finding that the GOK controlled POSCO and used this control to set POSCO's prices for HRC at less than adequate remuneration.

Petitioners rebut respondents' argument, stating that although the official designation was lifted in 2000, the legal consequences associated with it, including statutory restrictions on voting rights for POSCO's shareholders and GOK involvement in POSCO's decision making, continued through the POI. Petitioners maintain that stock voting restrictions existed for all or most of the POI. Moreover, petitioners argue that respondents have the burden to demonstrate that the lifting of the public company designation rendered stock voting restrictions null and void and they have not done so. Petitioners maintain that the verified evidence illustrates that voting restrictions remained in place during the POI. Additionally, petitioners argue that respondents' citation to AK Steel is misplaced. Petitioners argue that the court said nothing about the connection between public company and government control. Moreover, they maintain that by the same reasoning made by respondents, the removal of the public company designation did not reduce or eliminate government control.

Respondents assert that the Department can no longer rely on the obsolete fact that POSCO's chairman and BOD were appointed by the GOK. Specifically, respondents state that beginning in March 1999, POSCO revised its Articles of Incorporation to establish new procedures for selecting members of its BOD and to assure the independence and transparency of the selection process. These new procedures included reducing its standing directors from nine to seven and outside directors from ten to eight. In addition, at the General Meeting of

-29-

Shareholders on March 17, 2000, two outside directors who were former government employees resigned. Respondents maintain that the composition of the BOD during the POI is a result of these new procedures. Respondents assert that none of POSCO's standing directors are either current or former government employees. Moreover, only two of the eight directors have any prior government affiliation. Additionally, respondents point out that since the POI, no directors have been appointed by the GOK or the KDB. Respondents further state that the Department confirmed at verification that apart from one outside director who did some consulting work with MOFE and one who formerly worked with MOCIE, none of the other BOD members had any government affiliation listed on their resumes. In sum, respondents argue that POSCO's BOD was independent and free of GOK influence during the POI.

Petitioners rebut respondents' claim that the GOK did not influence POSCO's leadership during the POI. Petitioners argue that respondents have provided no evidence that would alter the Department's finding in <u>CTL Plate</u> and <u>Sheet and Strip</u> that the President of Korea selected the chairman of POSCO. Petitioners state that the Presidentially-selected chairman served throughout the POI and continues to hold his post. Petitioners argue that the new procedures by which future leaders of POSCO are to be appointed by resolution of the BOD has no bearing on what occurred during the POI. Additionally, petitioners assert that these new selection procedures have not freed POSCO or its BOD from the GOK's control.

Respondents argue that POSCO's pricing is not influenced by the GOK. In fact, respondents contend that the Department has pointed to no evidence on the record that the GOK actually exercised control to force POSCO to sell HRC to Dongbu for less than adequate remuneration. On the contrary, respondents argue that the record indicates that POSCO's hot-rolled pricing decisions are made based on ordinary commercial considerations. As evidence, respondents point to POSCO's new single pricing system, which replaced the two-tiered pricing system, whereby POSCO establishes its domestic prices based on its own judgement of market conditions, including import competition. POSCO revises its HRC prices quarterly, based upon market conditions, through quantity discounts, market discounts, import competition prices, and payment terms. In addition, respondents point to the fact, verified by the Department, that POSCO is being investigated by the Korean Fair Trade Commission (KFTC) for refusing to increase supplies of HRC to HYSCO, as further evidence that POSCO's pricing is not influenced by the GOK. Finally, respondents assert that the Department's meetings with private parties in Korea further support a finding that POSCO is a private company that sets its prices based on ordinary commercial considerations.

Petitioners rebut these arguments, stating that to the extent that POSCO remains in effect a government seller of inputs, the only remaining question is whether the price charged is equal to or greater than the applicable benchmark price. They assert that to the extent that the Department relies on an 'entrusts or directs' analysis, the burden rests on respondents to prove that the difference between the price charged and the adequate remuneration price is exclusively due to factors other than government influence. That POSCO takes other factors, such as market conditions, into account in its pricing decisions does not demonstrate an absence of GOK intervention, argue petitioners. Additionally, petitioners argue that the Department's discussions with private parties cannot be considered as verified information. Furthermore, petitioners argue that the KFTC investigation does not support respondents' claim that the GOK asserts no control over POSCO. Petitioners assert that the product at issue in the KFTC investigation is a

-30-

specialized type of HRC that would not be exported in large quantities.  Petitioners contend that the GOK influencing POSCO directly in the current situation while taking a more indirect approach (i.e., a KFTC investigation) to deal with an internal problem (i.e., POSCO's sales of HRC to HYSCO) is consistent with the GOK's past efforts to benefit POSCO's exporting customers.

Finally, respondents assert that even if the Department finds a subsidy from Dongbu's purchase of HRC inputs from POSCO, it should conclude that the subsidy ended with the completion of POSCO's privatization in October 2000.  Without the means to influence POSCO, either through selected representatives on POSCO's BOD or through the exercise of voting rights as shareholder, the GOK cannot direct POSCO to provide inputs to its customers for less than adequate remuneration, argue respondents.  Therefore, respondents maintain, the Department must find that any subsidy ended by October 2000 and must calculate Dongbu's cash deposit rate on any future entries by deducting the subsidy found with respect to this program during the POI.

The Department's Position

In Sheet and Strip, the Department first determined that the actions of POSCO should be considered the actions of the GOK because it was a government-controlled company during 1997.  See 64 FR 30642.  We reaffirmed this decision in CTL Plate for 1998 and 1999 Sheet and Strip for 1999.  As such, we found that POSCO's sales of inputs to Korean steel producers constituted a subsidy because these sales were made for less than adequate remuneration.  In Sheet and Strip, the Department based its decision on six main factors:  (1) GOK as largest shareholder, (2) law restricting voting rights for public companies, (3) restriction in POSCO's Articles of Incorporation of voting rights for individual shareholders, (4) POSCO's designation as a public company, (5) appointment of POSCO's Chairman by the President of Korea, and (6) half of POSCO's outside directors were appointed by the GOK and KDB.

In the instant investigation, record evidence demonstrates that many of the factors cited above have changed in whole or in part.  First, in 1997, the GOK owned 33 percent of POSCO's shares and was the largest shareholder; by 1999, and through the beginning of 2000, the GOK reduced its shares to 15 percent.  It further reduced its shares to 4.12 percent by October 2000, and by March 2001, it held 3.02 percent of POSCO's shares.  By March 2001, shortly after the POI, the GOK was no longer the largest shareholder; however, it remained the largest shareholder during the POI.

Second, on September 26, 2000, the GOK removed POSCO's "public company" designation and thus terminated the provision of the law which restricted the voting rights for any individual shareholder to exceed 3 percent of POSCO's common shares.  While the GOK eliminated the law which restricted POSCO's voting rights, POSCO did not remove the clause mirroring this restriction from its Articles of Incorporation until March 2001, at the annual shareholder's meeting, held outside of the POI.  The Department notes that in the POI addressed in Sheet and Strip, the President of Korea appointed POSCO's Chairman, and that he remained the chairman throughout the present POI. He was subsequently appointed by the shareholders as a whole, rather than the GOK, at the shareholders meeting in March 2001. As for the last factor that the Department earlier relied upon as evidence of the GOK's control of POSCO, half of the outside directors being appointed by the GOK, in the current POI the number of outside directors

-31-

was reduced from four to two. Also, the voting process was revised so that large government-controlled shareholders could no longer automatically appoint a director.

While we recognize that both the GOK and POSCO have made substantial changes to the ownership, voting rights and board membership, the Department is not convinced that during the POI, POSCO acted on its own volition and was not government-controlled. While the GOK reduced its shares from 15 percent to 4 percent during the POI, it was still the largest shareholder and the primary reduction in shareholding came only in October 2000 near the end of the POI. In addition, throughout the POI and until March 2001, POSCO's Articles of Incorporation included the individual shareholders' voting rights restriction set forth by the GOK. Also, the Chairman presiding over POSCO throughout the POI was appointed by the GOK. Therefore, we disagree with respondents' argument that during the POI, POSCO acted entirely without GOK direction.

Respondents also argued that there is no evidence that the GOK is directing POSCO to sell inputs of HRC to other steel companies for less than adequate remuneration. They argue that, not only do petitioners not make a convincing argument, there is no evidence on the record supporting the finding of GOK-control or even a causal nexus for an indirect subsidy. Respondents argue that POSCO's pricing decisions are based on "ordinary" commercial considerations, including market conditions such as import competition. They cite to the June 26, 2002, Memorandum to Melissa G. Skinner, Director: Meeting with Private Parties regarding the Countervailing Duty Investigation of Certain Cold-Rolled Carbon Steel Flat Products from Korea and Second Administrative Review of Stainless Steel Sheet and Strip from Korea (Private Meetings Verification Report), where an analyst stated that, "POSCO used to provide HRC at a low price, now they do not." The analyst further stated that POSCO's prices are now related to the international market price. Respondents also cite to an antitrust case between POSCO and the GOK. The GOK investigated POSCO under the antitrust law for not selling high-quality HRC to HYSCO, a competitor of POSCO, for downstream cold-rolled products. In the antitrust case, the GOK argued that POSCO is abusing its dominant position in the market by not selling to HYSCO. The Korean Fair Trade Commission (KFTC) recently ruled in favor of the GOK, and imposed fines. POSCO has signaled its intent to appeal. Respondents argue that if the GOK controlled POSCO, then POSCO would have sold to HYSCO and the GOK would not have to sue under its antitrust law to get POSCO to sell to HYSCO. We disagree with respondents' argument that by POSCO taking into account market conditions, such as import competition, in its pricing decision, it demonstrates that the GOK does not direct or control POSCO. While POSCO may take into consideration certain market conditions, petitioners argue that respondents must prove that the difference between the price charged and the adequate remuneration price is exclusively due to factors other than government influence. We agree with petitioners that POSCO's taking into account market considerations does not, by itself, demonstrate an absence of GOK control. We also disagree with respondents' claim that POSCO's antitrust case positively affirms POSCO's privatization. We find that this argument is not a definitive factor demonstrating that the GOK does not control or direct POSCO. For instance, one could equally conclude that POSCO has taken a benign approach to its monopolistic position in the HRC market, unless it meets competition with a downstream competitor, where it takes advantage of its monopolistic position and refuses to sell to the competitor. Likewise, there may be legal or other reasons why the KFTC, as one arm of the government, would need to respond to a complaint regarding price or market dominance behavior, and these are not evidence of a lack of

-32-

control otherwise of POSCO.  The argument that if the GOK was controlling POSCO it would not take up an antitrust case is not a persuasive indication that POSCO is not being controlled by the GOK.

    We recognize that substantial changes have occurred since our <u>1999 Sheet and Strip</u> determination, including notable developments in the period following the POI.  However, the record of the period subject to this investigation, 2000, shows continued GOK control over POSCO for the entire period.  This is particularly the case given that the GOK retained a substantial shareholding until late in the POI and that some other aspects of government control were not revised until after the POI.  It is on the basis of these facts that we must make our determination.  Accordingly, we find that POSCO continued to be controlled by the GOK during the entire POI.

**Comment 2:** *POSCO's Provision of Hot-rolled Coil at Less than Adequate Remuneration*

    In addition to constituting a financial contribution, petitioners argue that the provision of HRC at less than adequate remuneration confers a benefit that is specific.  Petitioners assert that this program constitutes an automatically specific export subsidy under 19 U.S.C. 1677(5A)(B) because cold-rolled producers pay POSCO less for HRC inputs if the finished product is exported.  Specifically, petitioners maintain that the evidence demonstrates that purchasers who export a finished good incorporating POSCO's HRC pay less than purchasers whose finished product is sold domestically.  Therefore, petitioners argue this constitutes an export subsidy and urge the Department to allocate the benefit solely to exports, as it did in <u>CTL Plate</u>.  Furthermore, petitioners advocate that, when comparing the subsidized prices to the benchmark prices, the Department ensure that the terms of delivery used in the benchmark match the subsidized prices.  Petitioners maintain that when imports are used as the benchmark, as in the instant case, the Department's methodology is to use the subject company's actual cost of imports for comparison purposes.  Thus, petitioners argue, the benchmark includes all delivery charges and import duties.  Petitioners maintain that although section 771(5)(E)(iv) of the Act dictates the use of delivered prices as the basis of comparison, the Department failed to follow this requirement of parallelism in its <u>Preliminary Determination</u> because it compared f.o.b. prices of imports with delivered prices for purchases from POSCO.

    Respondents rebut petitioners' statements, arguing that should the Department continue to find this program countervailable, the correct denominator for measuring the benefit is sales of all products made with HRC.  Respondents state that petitioners have provided no evidence that would support the finding that this program constitutes an export subsidy.  Moreover, respondents point out that in <u>CTL Plate</u>, POSCO was still employing a two-tiered domestic pricing scheme and the Department found an export subsidy with respect to local export prices and compared purchases from POSCO at the local export price to prices of imports.

    Respondents maintain that in the <u>Preliminary Determination</u>, the Department changed its analysis to reflect POSCO's elimination of its two-tiered pricing policy and treated this program as a domestic subsidy, comparing all purchases of HRC from POSCO to imports of HRC.  Therefore, argue respondents, the appropriate denominator is all sales of products made from HRC, not exports of subject merchandise.  In addition, respondents argue that petitioners do not explain how the fact that POSCO has different payment terms for domestic and local export

-33-

purchases results in a benefit or an export subsidy.  According to respondents, a closer look at the alleged discount that exporters receive in the form of favorable payment terms fails to reveal how purchasers at the local export price have the more favorable payment terms.

Respondents also rebut petitioners' contention that the Department failed to use comparable prices when determining if Dongbu's purchases of HRC from POSCO were for less than adequate remuneration.  Respondents state that all freight charges incurred in shipping the imported merchandise to Dongbu are included in the total price, and, therefore, the Department's calculations in the Preliminary Determination did follow the requirement of parallelism and compared Dongbu's delivered prices for imports with Dongbu's delivered prices from POSCO.

Respondents argue that, should the Department continue to determine that POSCO is selling HRC for prices at less than adequate remuneration, it must adjust the import prices used as a benchmark for calculating the benefit to Dongbu to account for the impact of Dongbu's receipt of duty drawback.  Respondents state that the Department verified that Dongbu received a duty drawback for duties paid on imports of HRC during the POI, and since the Department treated Dongbu's input purchases from POSCO as a domestic subsidy, it must make an adjustment to the monthly average unit prices it calculated for imports to take into account the fact that Dongbu receives duty drawback on a majority of the import duties it pays.  Respondents maintain that comparing a duty-inclusive import price to POSCO's domestic price would ignore commercial reality and would have the effect of improperly inflating the amount of the subsidy.  Therefore, respondents urge the Department to apply the metric ton duty drawback actually received by Dongbu during the POI and deduct it from the previously-calculated monthly benchmarks to determine the amount of price differential between Dongbu's purchases from POSCO and its import purchases.

In addition, respondents purport that the appropriate sales denominator is all products sold by Dongbu that are produced using HRC since the Department measured the benefit to Dongbu bases on all of its purchases of HRC from POSCO.

Petitioners rebut this argument by respondents, asserting that the Department should tie the benefit to all exports of cold-rolled steel.  Petitioners maintain that in the Preliminary Determination, the Department stated that it intended to continue to find this program tied to subject merchandise; however, it did not do so.  Petitioners argue that record evidence supports tying the benefit to exports, as was done in CTL Plate.  Petitioners argue that there is no basis for allocating the subsidy to products other than cold-rolled steel.  They assert that the Department cannot assume that Dongbu internally transferred the subsidized cold-rolled products at below market value, thereby passing a portion of the benefit to other downstream flat-rolled products.  Therefore, petitioners assert that the denominator must be restricted to coll-rolled products if it is not restricted to exports.

The Department's Position

Petitioners are correct in their characterization of CTL Plate, where the Department attributed the benefit found over export sales of subject merchandise.  However, in a subsequent case, 1999 Sheet and Strip, the Department found that POSCO removed its two-tier pricing policy and therefore, the Department compared all purchases from POSCO, not just local export purchases.  Therefore, the Department determined that it was more appropriate to compare all

-34-

purchases of HRC from POSCO to all import purchases of HRC. These purchases were not tied to either subject merchandise or export of subject merchandise, but rather, to all products produced using HRC. We find that the proper denominator for this program is Dongbu's total f.o.b. sales of merchandise using HRC.

In calculating the benefit that Dongbu received from purchasing HRC from POSCO at less than adequate remuneration, section 351.511(a)(iv) of the CVD Regulations directs the Department to compare delivered prices. Petitioners claim that the Department did not do this in the preliminary determination. The Department agrees with respondents that the import prices used to compare purchases of HRC from POSCO included freight charges. Therefore, the Department will continue to calculate the benefit of this program by comparing delivered purchases from POSCO by import purchases inclusive of freight.

Respondents claim that the Department erred in the calculation of this program's subsidy rate for the Preliminary Determination, by not making an adjustment for the duty drawn back for items exported which included the imported HRC. Respondents state that the import prices include duties paid, which duties the company subsequently receives back when it exports.

We agree with respondents. Adjusting for the drawback of import duties is consistent with section 771(5)(E)(iv) of the Act which states that the adequacy of remuneration will be determined in relation to prevailing market conditions which include price, quality, availability, marketability, transportation, and other conditions of purchase of sale. The availability and use of duty drawback in Korea is a condition of sale in Korea. Imports into Korea which are subsequently exported are entitled to duty drawback. We verified that a large portion of the import duties which are paid by Dongbu are drawn back by Dongbu. In calculating a benefit, the goal is to derive net prices paid by Dongbu for both its purchases from POSCO and its import purchases in order to make an appropriate comparison, we therefore find it necessary to apply this adjustment to the import price to account for that portion of the import duties which are refunded (or drawn back).

**Comment 3:  *Exemption of VAT***

Petitioners state that the Department is required to countervail subsidies discovered in the course of an investigation, and they maintain that transactions of goods under a local letter of credit that were discovered during verification to be exempt from VAT regulations constitute such a new subsidy.

Respondents rebut the contention made by petitioners that transactions of goods under a local letter of credit that are exempt from VAT regulations constitute a new subsidy. Respondents state that since it is well established that the exemption of the VAT on exports is not a subsidy, the exemption of the VAT on exported products manufactured using HRC is not a subsidy.

Department's Position:

-35-

Goods in Korea which are sold under a local export letter of credit are exempt from VAT because these goods are destined for export.  It is a well established tenet of the countervailing duty law that VAT or sales tax exemptions on exported goods are not countervailable subsidies.

**Comment 4:** *Direction of Credit*

Petitioners argue that the Department should continue to countervail loans provided to Dongbu, HYSCO, and POSCO, because such loans are inconsistent with commercial considerations.  Specifically, petitioners urge the Department to continue to countervail the benefits derived from loans respondents received from domestic, privately-owned Korean banks and GOK-owned banks because such loans are extended on government direction of low-cost credit.

Additionally, petitioners argue that the Department should continue to countervail the benefits arising from direct foreign loans and the issuance of offshore securities by Korean companies.  Petitioners maintain that the GOK has failed to demonstrate that it no longer controls access to the loan market and, instead, the record illustrates that the GOK continued to control access to foreign sources of credit during the POI.  Petitioners claim that the Foreign Exchange Transaction Act (FETA) does little to liberalize access to foreign loans and the in-advance reporting system provision of the law differs little from the prior approval system that it replaced.  Prior approval is still required for certain categories of transactions (e.g., short-term loans with a maturity of less than one year, depending on the credit rating of the borrower), according to petitioners, and even under the in-advance reporting system, the GOK continues to control access to foreign credit sources.  Petitioners argue that the GOK admits that a notification and registration process for all direct foreign currency loans and foreign securities continues to exist.  Moreover, petitioners declare that the Department's verification report of the GOK confirms that all long-term transactions greater than US $30 million must be registered prior to the contract taking force and the withdrawal of funds.  Petitioners claim that although respondents have characterized the in-advance reporting system as a formality, the new system appears no different from the in-advance reporting system found countervailable in CTL Plate. See 64 FR 73176.  In addition, petitioners conclude that the fact that the steel industry's borrowings from commercial banks may have declined is not evidence, as respondents assert, that the GOK is no longer allocating credit.

Respondents rebut this position, arguing that the Department verified that unless the FETA specifically lists the activity as one requiring approval, it is allowed without any GOK approval.  Respondents further maintain that since the FETA went into effect in April 1999, there were no direct foreign loans or foreign securities issued that required GOK approval.  Moreover, respondents argue that petitioners' reference to certain transactions that still require GOK approval is purely theoretical, ignoring the fact that, in practice, no foreign loans or foreign securities required approval during the POI.  Respondents further refute petitioners' statements regarding the notification and registration process, arguing that the GOK went on to state that registration of direct loans or foreign securities does not limit access to such funds.  Respondents assert that the only limitation on any company who wishes to obtain direct foreign loans and foreign securities is the company's own business strength and creditworthiness.

-36-

Petitioners, in their rebuttal briefs, point to the fact that respondents do not contest the Department's decision to countervail the loans from GOK-owned banks and private Korean banks as evidence that respondents implicitly accept the underlying findings of directed credit. Petitioners argue that the facts leading to earlier findings of GOK control have not changed, and respondents have not demonstrated that the GOK no longer controls access to the foreign loan market.  Petitioners note that in the Preliminary Determination, the Department stated that the new legislation, while it shows that the GOK is making strides, was not sufficient to warrant a reconsideration of the direction of credit determination at that time.  Petitioners maintain that respondents have not provided evidence sufficient to overcome the Department's prior findings.

Department's Position:

In the Preliminary Determination, we stated that at verification we would closely examine access to direct foreign loans (i.e., loans from offshore banks) and the issuance of offshore foreign securities by Korean companies with respect to the 2000 period.  At verification, we reviewed the FETA and learned that when the FETA became effective in April 1999, the main change governing foreign exchange transactions was the adoption of a negative system, whereby companies can access foreign sources of funds unless certain limited restrictions apply.  Under the old positive approval system, a company could not obtain direct foreign loans or issue foreign securities without obtaining GOK approval (see June 26, 2002, Memorandum to Melissa G. Skinner, Director: Verification Report for the Government of Korea (GOK) and the Korea New Iron & Steel Technology Research Association (KNISTRA) in the Countervailing Duty Investigation of Certain Cold-Rolled Carbon Steel Flat Products from Korea at page 1 (GOK Verification Report at 1).  Moreover, all long-term transactions under $30 million can be handled directly with a foreign exchange bank, while long-term transactions greater than $30 million must be registered with, although not approved by, MOFE (Id.).

We disagree with petitioners' contention that the GOK continues to control access to foreign sources of credit.  We do find that the new system under the FETA differs significantly from the approval system found countervailable in prior cases, including CTL Plate.  In CTL Plate, we found that under the old law, access to direct foreign loans still required the approval of the MOFE (see 64 FR 73176 at 73179).  Evidence collected at verification of the instant investigation reveals that this type of system is no longer in place.  Regarding petitioners' comments about the notification and registration process, we do not find this system evidence of government control; rather, it is common practice for any Central Bank to be notified of large foreign currency transactions.  More importantly, we verified the fact that the approval system has been terminated.  With the change in the law, companies now merely notify the government that they are issuing offshore foreign securities or borrowing funds from offshore banks.  We also verified that these notifications are automatically registered by the government without government approval.  Therefore, due to the change in legislation, we determine that access to direct foreign loans (i.e., loans from offshore banks) and the issuance of offshore foreign securities by Korean companies is no longer controlled or directed by the GOK and no longer countervailable.

Although, we learned that some short-term (i.e., less than one year) transactions still require prior approval from MOFE, petitioners' comments on the approval of short-term loans is

-37-

not germane to this issue. This is because the program in question is the government's direction of long-term credit. MOFE officials stated that they still require approval on these short-term loans because it was these types of short-term loans used by Korean companies to finance capital investment which helped to trigger the 1997 financial crisis.

**Comment 5:** *Tax Programs*

Petitioners argue that the Department should continue to countervail the benefits received by respondents under investment tax credits, RSTA Articles 24 and 25. Petitioners state that the benefit is the reduction in taxes payable and should be calculated based on the entire tax credit claimed for the POI. Furthermore, petitioners maintain that the calculation should fully reflect POSCO's revised data submitted on April 4, 2002. In addition, petitioners assert that the Department failed to countervail the entire amount of tax credits claimed under RSTA Articles 11 (Investments in Equipment to Develop Technology and Manpower) and 24 (Investments in Productivity Increasing Facilities) for POSCO and Dongbu, and 25 (Investments in Specific Facilities) for POSCO after the removal of the import substitution eligibility criterion in April 1998. Petitioners argue that the removal of the import substitution eligibility criterion does not necessarily eliminate the specificity of the subsidy under RSTA Article 25, and demonstrating that the legal eligibility for the tax reserve article has changed is not adequate to show non-specificity. Additionally, petitioners state that respondents have provided no evidence of the actual distribution of benefits for any of the tax articles. Therefore, petitioners maintain, given respondents' refusal to provide this data, the Department must resort to facts otherwise available and continue to find these benefits specific.

Respondents counter that the Department verified that for RSTA Articles 11, 24, 25, and 26, the GOK had eliminated the differential tax treatment between foreign and domestic goods effective April 10, 1998, thereby eliminating prohibited subsidies and making the programs consistent with WTO requirements. Respondents assert that the amount of the countervailable subsidy found by the Department was only for those additional tax credits that were earned as a result of the differential between the rates of tax credit on domestic and foreign goods (i.e., the import substitution element), not the entire tax credit. Respondents point out that the basis for the Department's finding that only the amount of tax credit earned as a result of the import substitution element of these programs was countervailable was that the tax credit programs were otherwise non-specific. Respondents indicate that the Department determined in CTL Plate that these benefits were non-specific, and note that petitioners have provided no new evidence in this investigation to suggest that tax credits earned by companies under these RSTA articles can result in a specific benefit when the tax credits did not result from the differential in tax credit rates between domestic and foreign goods.

Furthermore, petitioners assert that the Department must countervail respondents' use of tax reserves. Petitioners state that while TERCL Articles 16 (Reserve for Export Loss) and 17 (Reserve for Overseas Market Development) have been repealed as of April 1998, companies may still carry forward benefits under these articles. Thus, petitioners maintain that the Department must continue to countervail these articles. Moreover, with respect to RSTA Article 9 (Technical Development Reserve Fund), petitioners argue that the Department erred by not countervailing Dongbu's benefits in the Preliminary Determination. Petitioners state that the

-38-

Department assumed that Dongbu had not used this program because the company contributed during the POI to its reserve account only at a three percent rate rather than at the higher five percent rate available to firms in the capital goods sector.  Petitioners argue that this was a mistake because while Dongbu's tax documents show that its 1999 additions to this reserve account may have been based on the three percent rate, Dongbu's tax documents and other information on the record do not support this conclusion.  In addition, petitioners assert that the benefits from using this reserve at the three percent rate would still be countervailable unless verified by the Department to be <u>de facto</u> non-specific.  Petitioners assert that because the Department asked the GOK to provide data, by industry and region, on companies who have benefitted from each RSTA article and the GOK stated that such data is not compiled in a database, the Department must apply the facts available.  The facts available, according to petitioners, are that the benefits to Dongbu are specific, as previously found in <u>CTL Plate</u>.

Respondents rebut this position, arguing that Dongbu made no additions to its Technical Development Reserve Fund under RSTA Article 9 during the POI; it only reversed back to income the scheduled portions of prior year contributions to this reserve.  Respondents are clear that in filing its tax return, Dongbu identified that it contributed to the reserve at the 3 percent rate, leaving no room for petitioners' claim that in prior years Dongbu may have contributed at a higher rate because the form itself addressed only contributions made in those prior years and unambiguously stated the applicable tax rate.  Additionally, respondents assert that, as the Department found in <u>CTL Plate</u>, petitioners have provided no additional evidence or information that would alter the finding that this program is non-specific.

Petitioners further argue that HYSCO, which claims it did not benefit from the tax reserve articles during the POI because it was in a tax loss situation in 1999, effectively received a complete tax exemption resulting from its emptying of reserve accounts in the net loss year.  Petitioners contend that in tax year 1999, because it was facing a net loss financial position, HYSCO returned its entire remaining balance, accumulated during the years prior to 1999, from the reserve accounts to an income account.  Instead of triggering an income tax liability, however, HYSCO paid no tax on the amounts reverted because the company's overall net loss in 1999 was greater than the amount reverted to the income accounts.  Therefore, petitioners conclude, HYSCO was able not only to defer tax payments but to avoid taxation altogether on income that was earned in profitable years.  Petitioners state that when measuring benefits associated with tax reserve programs, the Department has traditionally relied on the methodology it used in <u>Cooking Ware</u>,[3] in which the Department treated the benefits arising from the use of tax reserves as interest-free short-term loans because they provide a deferral of direct taxes.  Petitioners state that since 19 CFR §351.509 does not provide specific guidelines relating to a tax benefit that arises in a tax loss year, the Department must countervail the difference between the actual taxes paid and the taxes paid under normal circumstances.  Under normal circumstances (<u>i.e.</u>, absent the tax program), argue petitioners, HYSCO would have paid taxes on the income regardless of when it was reverted and would have paid its 1999 year-end outstanding corporate taxes associated with the reserve programs in 2000.  In the case of HYSCO, petitioners assert, where a tax exemption is conferred, the Department should countervail the entire amount of tax

---

[3]  <u>See</u> <u>Final Affirmative Countervailing Duty Determination:  Certain Stainless Steel Cooking Ware from the Republic of Korea</u>, 51 FR 42867 (November 26, 1986) (<u>Cooking Ware</u>).

-39-

liability that is returned to an income account during the POI.  Thus, this would effectively amount to treating the amount of the deferred and then exempted tax as loan forgiveness, argue petitioners.

Respondents counter that there was no revenue forgone by the government with respect to HYSCO's use of RSTA Article 9 and TERCL Article 16 tax reserves during the POI because, regardless of its use of the programs, HYSCO had no income tax liability in fiscal year 1999.  Respondents assert that HYSCO did nothing more than what was required under the law concerning these programs when it reverted the remaining tax reserves to income in fiscal year 1999.  Moreover, respondents explain that HYSCO will not be able to avoid taxation altogether on income earned in profitable years, as petitioners allege.  Instead, respondents declare, by including as income in fiscal year 1999 the amounts of the reserves reverted to income, HYSCO reduced its net tax loss for fiscal year 1999 and thus reduced the amount of tax loss carried forward for future years.  Therefore, at a future date, HYSCO's tax liability will be higher as a result of the lowering of its tax loss for fiscal year 1999.  Regarding HYSCO's use of RSTA Article 9, respondents refute petitioners' claim that there is a countervailable subsidy to HYSCO, arguing that there is no evidence on the record to indicate that HYSCO accrued its reserve at the 5 percent rate, and even if it did, the only benefit would be from that portion of the reserve that was accrued above the 3 percent rate.

Department's Position:

The Department agrees with petitioners that for the final calculations the Department will use revised data, either submitted after the original questionnaire response or collected during verification.  The Department disagrees with petitioners' allegation that it did not properly calculate Dongbu and POSCO's benefits received under RSTA Articles 11, 24, and 25.  We disagree with petitioners' argument that the removal of the import substitution criterion in April 1998 does not eliminate the specificity of these credits.  In fact, the Department finds that the change of law eliminating the import substitution criterion makes this program no longer specific.  The Department continues to find that any credits received prior to April 1998 and at a rate that differentiates between domestically-produced facilities and foreign facilities is still countervailable.  Therefore, for the final determination the Department will countervail the difference between tax credits received under the import substitution scheme.

We agree with petitioners that under tax reserves articles 16 and 17, any outstanding balance is specific under section 771(5A)(A) of the Act.  We disagree with their assertion that we erred in the <u>Preliminary Determination</u> by not countervailing RSTA article 9 for Dongbu.  In <u>CTL Plate</u>, we determined that RSTA 9, former TERCL article 8, was specific as the capital goods industry was able to claim a higher rate than other industries.  <u>See</u> 64 FR 73192.  However, record evidence demonstrates that Dongbu did not claim the reserve at the capital goods industry rate, therefore, the Department continues to find that Dongbu did not use this program.

The Department disagrees with respondents' assertion that HYSCO did not receive a benefit under RSTA article 9 and TERCL article 16.  We invited parties to comment on the methodology applied to calculate a benefit for tax reserves.  The tax reserves allow a company to defer certain amounts of tax liabilities until a future date.  The Department continues to find that

-40-

this methodology is appropriate.  However, when a company is at a tax loss and is able to return to taxable income part of the reserve amount, and does not pay taxes on it, that company is receiving a tax exemption.  Therefore, as noted earlier, we found that HYSCO received a countervailable subsidy by being exempt from paying taxes on the amount that it reversed to taxable income for the tax year covered during the POI.

**Comment 6:** *Research and Development (R&D) Subsidies*

Petitioners explain that in <u>CTL Plate</u>, the Department countervailed R&D subsidies provided through KNISTRA.  Petitioners assert that the Department should continue to countervail these subsidies, as it did in the <u>Preliminary Determination</u>, and must ensure that its final calculation includes all KNISTRA-related projects discovered during the instant investigation.

In addition, petitioners urge the Department to apply facts available to countervail the benefits respondents received from other R&D subsidies beyond those countervailed in <u>CTL Plate</u>.  Petitioners state that, to the extent that respondents benefitted from R&D programs beyond those <u>CTL Plate</u>, the Department is fully justified in finding these benefits specific based on facts available, since the GOK did not provide the requested data.  For example, petitioners state that although the evidence demonstrates that POSCO participated in an array of government-sponsored R&D projects, underwritten by various government agencies including MOCIE, MOST, MOE, and MOCAT, the GOK failed to disclose these programs and POSCO provided partial information.  Petitioners argue that many of the programs are steel specific and must be countervailed at the final.

Respondents rebut petitioners' suggestion that the Department countervail unreported R&D subsidies on a facts available basis.  Respondents assert that the R&D projects discussed at verification were listed in respondents' questionnaire responses.  Regarding the Coal-based Smelting Reduction Technology Development Project, also known as FINEX, respondents maintain that the Department examined this program at verification and found that there were no government contributions to this project during the POI.  In addition, respondents maintain that the Department verified each company's R&D projects and accounts, as well as the government agencies that provided the benefits, and found no discrepancies in their responses.  Respondents further argue that the Department fully verified all of POSCO's government-supported R&D projects and found no unreported benefits or discrepancies in POSCO's responses.  Regarding this program that petitioners argue POSCO did not report, respondents argue that it was reported in <u>CTL Plate</u> and the reason no benefit was reported during the POI was that the GOK's contributions ended before the POI.  Furthermore, respondents assert that the Department examined R&D assistance to POSCO from years prior to the POI to determine whether any grants should be allocated over time (including FINEX) and found that due to their small size, these grants should be expensed in the year of receipt.

<u>Department's Position</u>:

At verification, we examined all R&D assistance POSCO received, specifically from MOCIE, MOST, MOE, and MOCAT and the FINEX project (<u>see</u> POSCO Verification Report at

-41-

3-4).  We verified that all support received from those agencies was reported by respondents (see GOK Verification Report at 8-9).  We found no discrepancies.  We also verified that grants provided in support of the FINEX project were all received before the POI and would have been expensed in the year of receipt (see POSCO Verification Report at 4).  Therefore, we determine that we have countervailed all outstanding R&D assistance received by POSCO as well as the other respondents.

**Comment 7:**  *The GOK's Provision of Infrastructure at Kwangyang Bay*

Petitioners state that, in Certain Steel Products, the Department found that the GOK provided countervailable infrastructure subsidies at Kwangyang Bay that benefitted POSCO. Petitioners assert that since respondents have not provided any new evidence or information, these subsidies should continue to be countervailed using the previously calculated benefit stream.  Additionally, petitioners argue the GOK continued to provide countervailable infrastructure subsidies at Kwangyang Bay from 1991 to the present, including in 1997 the construction of a new port that involved a government financial contribution in the form of a direct transfer of funds.  Petitioners point out that in Certain Steel Products and CTL Plate, the Department treated the GOK infrastructure expenditures at Kwangyang Bay as non-recurring grants to POSCO and applied its standard grant methodology.  Petitioners maintain that the Department should continue to apply the same methodology in the instant investigation and countervail the GOK's construction outlays for Phase 2 (1995-2003) at Kwangyang Bay. Petitioners maintain that the benefit associated with the infrastructure is specific because it is limited to, or at least disproportionally enjoyed by, the steel sector.  Petitioners state that this is evident because the steel industry is one of only a few industries with operations at Kwangyang Bay and the Department has previously determined that the steel industry is the enterprise around which the rest of Kwangyang Bay was built.

Respondents agree with petitioners observation that the GOK has made substantial investments at Kwangyang Bay; however, they disagree with petitioners' claim that POSCO uses or benefits from the container port.  Respondents note that while POSCO is located in the general area, there is a physical separation between the new container port and the port facilities used by POSCO.  They point to a map that was collected at verification to demonstrate that there is a physical separation between the port facilities found countervailable and the new container port facilities.  (See GOK Verification Exhibit 6).  Respondents argue that there is no basis for the Department to conclude that POSCO received any benefit from the GOK's container project at Kwangyang Bay.  Therefore, the Department should not follow petitioners' recommendation of finding the GOK's investments as being directed towards POSCO.

Department's Position:

The Department finds that no new information has been presented during this investigation to warrant a change in the previous determination that POSCO received a benefit from the GOK's infrastructure subsidies at Kwangyang Bay until 1991.  Therefore, the Department continues to find this program countervailable.  However, the Department disagrees with petitioners' allegation that POSCO received a benefit from the GOK's construction of

-42-

container ports at Kwangyang Bay.  In Plate in Coils, we verified and determined that neither steel inputs nor steel products are shipped through the container terminal at Kwangyang Bay. We found that the GOK's expenditures at the container terminal did not provide a benefit to POSCO.  See Plate in Coils at 15536.  Based on the Plate in Coils finding and no new information on the record, we determine that the GOK's additional expenditures for the container terminal provided during the POI do not confer a benefit to POSCO.

**Comment 8:**    *The GOK's Provision of Infrastructure at Asan Bay*

Petitioners assert that the Department must countervail infrastructure subsidies at Asan Bay.  These subsidies, according to petitioners, include outlays at Asan Bay for the development of roads, berths, and estate development, and GOK commitments to expand the seaport at Asan Bay prior to 1995 and to support infrastructure projects related to the Tangjin ironworks, including money for roads, industrial water facilities, distribution depots, and electric power stations.  Petitioners assert that the infrastructure assistance at Asan Bay confers a benefit on producers of cold-rolled steel, specifically Dongbu.  Petitioners argue that the Department erred in its Preliminary Determination when it stated that the cost of road construction is included in the purchase price of the land.  Petitioners argue that the infrastructure subsidies at issue are wholly distinct from the provision of land at less than adequate remuneration.  Petitioners claim that the Department cannot collapse these subsidies or treat the purchase price for land as an offset to an infrastructure subsidy.   Finally, petitioners assert that the benefits conferred are specific, as evidenced by the fact that steel companies dominate the Kodai region in Asan Bay. Moreover, petitioners state that the record demonstrates that only a limited number of companies and industries were invited to operate at Asan Bay, and, therefore, the benefits from this subsidy are specific.

Respondents counter that there were no infrastructure subsidies provided to Dongbu. They note that the Department investigated these expenditures in the CTL Plate remand determination and found that the roads built in Asan Bay were part of the country's general highway and road system, and were found to be general infrastructure, thus not countervailable.

Respondents also address the GOK's expenditures with respect to Asan Bay's estate development.  The actual costs of the industrial sites were recovered through the sale of land to various companies.  Respondents point out that Dongbu did not use any port berths constructed by the GOK; rather, Dongbu constructed its own port berth which was subsequently reverted back to the GOK.  Dongbu paid the appropriate tariff rate for water, electricity, and sewage. They note that the facilities providing water to Dongbu also provide water to a substantial area, and that the sewage disposal facilities were located in the Poseung industrial site, which is across from Dongbu's site in the Kodai industrial site.  Respondents support the Department's finding in the Preliminary Determination that the GOK did not provide countervailable infrastructure benefits at Asan Bay.  See, 64 FR 9694-95.

Department's Position:

The Department affirms its Preliminary Determination, where it found that the GOK did not provide a financial contribution as the cost of roads are included in the price of the land.  The

-43-

Department also verified that Dongbu built and paid for any additional roads within its industrial site, and therefore the GOK did not provide a financial contribution.  Consistent with our CTL Plate remand redetermination, we continue to find that the construction of the water, sewage and electricity facilities were not specific to Dongbu or the steel industry.  Therefore, we find that Dongbu did not receive countervailable subsidies from the GOK's provision of infrastructure at Asan Bay.  We also verified that Dongbu paid the appropriate tariff rate for the water, electricity, and sewerage services used at Asan Bay.

**Comment 9:**  *Provision of Land at Asan Bay:  Land Price and Benchmark*

Petitioners argue that in its Preliminary Determination, the Department correctly countervailed Dongbu's land purchases at Asan Bay.  Petitioners point to the fact that the Department verified that Dongbu contracted with Koland to purchase land at the Kodai Industrial Estate at Asan Bay and assert that this sale of land constitutes a financial contribution under the statute.  Moreover, petitioners maintain that, as the Department preliminarily found, the transfer occurred at a price below market value and therefore conferred a benefit.  Petitioners affirm the Department's calculation of the benefit associated with these land discounts and state that the Department should continue to apply its standard grant methodology at the final.  Petitioners also declare that the Department correctly found that the benefits are limited to Dongbu and are therefore specific.  Additionally, petitioners maintain that the Department correctly countervailed the adjustments to Dongbu's final purchase price to reflect interest earned by the company's pre-payments for the land.  Alternatively, petitioners suggest that the Department could consider the interest rebate, the sum the GOK paid to Dongbu for payments Dongbu had previously made to the GOK, a distinct financial contribution in the form of a direct transfer of funds.

Respondents assert that petitioners ignore information provided by the GOK, Dongbu and the Department's verification findings with respect to the issues of:  the contract price reduction and the interest rebate by the GOK at the closing of the land deal.  Respondents disagree with petitioners' contention that the price originally advertised and announced by Koland represents "fair market value."  Respondents state that the original-published prices for the industrial land sites at Asan Bay were proposed prices for the land, estimates which were to be revised based on the actual development costs as determined at the time of settlement.  Respondents assert that a more appropriate way of characterizing the initial price announcement is as a "cost-plus" price (i.e., the final actual costs plus 10 percent profit).  By the time of settlement, Koland's profit component had been explicitly eliminated from the final price.  Respondents concede that Koland's removal of the 10 percent profit component constitutes a subsidy.

Respondents state that the Department improperly calculated and vastly overstated Dongbu's benefit from its purchase of land at Asan Bay.  For one, respondents maintain that the land price discount was not in fact a discount; instead, it was simply an adjustment to the final purchase price reflecting the lower actual development costs incurred.  Respondents state that the Department verified that the final calculated price per square meter for land at the Kodai industrial site included various direct costs and indirect expenses, including capitalized expenses, which reflect the cost of capital (i.e., interest) on the GOK's expenditures up to December 31, 1998, the settlement date.  The Department also verified the revisions in Dongbu's land purchase contracts as a result of the changes in land development costs and the cost changes that occurred

-44-

between the time of Dongbu's revised contracts and the settlement date, respondents state. Respondents maintain that the capitalized expenses were not actual expenses incurred in the development of the Kodai site but instead reflect the time value of Koland's development costs incurred during the period of development so that the final settlement price reflected the present value of Koland's expenditures as of the settlement date. Therefore, respondents argue, the original published price was only a proposed price that both parties understood was subject to change based on the GOK's actual development costs. The GOK's actual development costs were lower than the original proposed price, and, explain respondents, it is for this reason the price paid by Dongbu was lower than the original published price. Respondents assert that in using the original proposed selling price as the benchmark and treating any amount that Dongbu paid below this benchmark as a discount, the Department ignored the commercial reality of the transaction and overstated Dongbu's benefit. Respondents urge the Department to use the actual verified development costs as the benchmark.

Petitioners rebut respondents' argument that the published land price is not an appropriate benchmark. They provide three points on why this argument is without merit: (1) it is not supported by fact; (2) it requires a cost-to-government standard; and (3) it provided no evidence that the published price was just a starting price. First, petitioners maintain that respondents' argument is not supported by the facts on the record. They point to the record which states that Koland established its published price at Asan Bay by asking an appraisal association to select three appraisal companies to appraise the cost and the value of the land. Then Koland went through a three step-process to sell the land. It acquired the land, announced the sale of the land, and then negotiated a contract with the company. Petitioners contend that the GOK deliberately established the list price of land sites at Asan Bay, and that the list price was much more than a mere "offer price." Second, petitioners take issue with respondents' cost-to-government standard. Petitioners state that while the cost may have been low to the GOK, that does not mean that the benefit to Dongbu was also limited. Petitioners assert that as a matter of law, the benchmark used cannot be based on the GOK's cost; rather, the Department must apply a market benchmark. Petitioners also note that respondents have not offered an alternative benchmark. Petitioners maintain that this published price comports with the benefit-to-recipient mandate reflected in the statue. See section 771(5)(E) of the Act. Lastly, petitioners contend that if the published land price was not a valid benchmark, then respondent had the opportunity to supply evidence that this was the case. For instance, respondents could have demonstrated that other land sale contracts at Asan Bay were merely starting points, and that Dongbu, relative to other land buyers, received no special treatment. Petitioners also point to the Department's finding in CTL Plate where it used as the benchmark Koland's published land price for Asan Bay.

Petitioners discuss the Department's hierarchy of benchmarks for the provision of less than adequate remuneration under section 351.511 of the CVD Regulations, noting that no private sellers exist for use as an established market benchmark. As there is no private benchmark, the Department is directed under section 351.511(a)(2)(iii) to determine whether the government generally applied "market principles" in setting prices for the good or service in question. Petitioners contend that the land price in question includes non-commercial factors like the GOK's waiver of profits and periodic lowering of the agreed contract price. Petitioners support the Department's Preliminary Determination, where it used Koland's advertised land price as the benchmark.

-45-

Petitioners further argue that respondents' reliance on the contracts as evidence that the price of the land was readjusted to reflect the GOK's actual cost does not fulfill the statutory and regulatory requirements. Petitioners assert that the advertised list price is the proper benchmark and that the GOK's costs are legally irrelevant. Petitioners also argue that the Department should ignore respondents' claim that Dongbu's benefit was limited to the amount of profit waived by the GOK.

In the Preliminary Determination, the Department calculated a benefit for two separate subsidies, the land price discount and the interest-earned refund. Respondents argue that an examination of the verified record reveals that the interest-earned refund did not provide Dongbu with a specific subsidy. Respondents maintain that the Department improperly treated the interest-earned refund as a specific subsidy to Dongbu, ignoring the fact that this interest-earned refund was an integral part of the whole pricing formula for determining the final settlement price of land at Asan Bay. Respondents profess that this refund for interest earned on prepayments was specifically provided for in the contract and did not result in a lowering of the price Dongbu paid for the land; instead, it was an adjustment made to account for the time value of money that Dongbu had prepaid so that the amount Dongbu paid the GOK at settlement reflected the present value of Dongbu's payments as of the settlement date. Respondents assert that the amounts of interest earned on Dongbu's advance payments were treated as part of its total payments and were applied to the total price for each site to determine the net amount due from Dongbu at the final settlement. Furthermore, respondents state that this adjustment was provided to both parties, as the GOK also received a similar credit by including its capitalized expenses as part of the purchase price. For these reasons, argue respondents, the credit for interest earned on advance payments did not provide a specific benefit to Dongbu and should not be treated as a countervailable subsidy.

As noted above in petitioners' case briefs, they contend that the Department should continue to find that the adjustments made to Dongbu's final purchase price are countervailable for the final determination. Petitioners argue the interest rebates further deepen the countervailable benefit to Dongbu from the purchase of land. Petitioners also argue that the Department could find that the interest rebates are a distinct financial contribution in the form of a direct transfer of funds. Moreover, petitioners cite to the CTL Plate remand redetermination, where the Court of International Trade (CIT) directed the Department to reconsider its original finding where the interest rebates were found not to be countervailable. See 64 at 73184. In the CTL Plate remand redetermination, the Department found that the interest rebate provided a countervailable benefit to the company, and that the GOK provided a financial contribution as revenue foregone, and that it was specific to a limited amount of users. Petitioners counter respondents' assertion that the interest rebate was paid pursuant to provisions in the land sale contract, with the argument that a contract cannot insulate a subsidy from being countervailed.

Department's Position:

The Department in the Preliminary Determination determined that Dongbu purchased land at Asan Bay for less than adequate remuneration. We affirm that decision in this final determination, however, based upon the results of verification we have modified the benchmark price used to quantify a portion of the benefit conferred under this program.

-46-

In our <u>Preliminary Determination</u>, we used Koland's published price as our benchmark and compared that price to the actual price paid by Dongbu.  During verification we found that the published price in the original sales announcement was only an estimated price and that the sales contracts for land specify that the land price is subject to change.  <u>See</u> GOK Verification Report at page 9 and 10.  We verified that the published price of land in the original sales announcement included the costs of the land and the costs of land development expenses.  <u>Id</u>.  We also verified that there were several revisions of the sales price between Koland and Dongbu.  Some of the revisions were due to the fact that a portion of the land development, which was included in the original published price, was deducted from the sales price because Dongbu decided to contract out this portion of the land development to a private company rather than pay Koland to perform this land development.  <u>See</u> Dongbu Verification Report at page 5.  However, Koland still provided some of the land development expenses which were included in the published price.  These land development activities included constructing roads and laying pipes and water lines.  The estimated costs of these land development expenses were included in the published price.  However, our review of Koland's budget records during verification demonstrated that the final costs of the land development incurred by Koland were lower than the estimated land development costs included in the original published land price.  Therefore, there were revisions to the published price to account for these lower, actual land development costs.  <u>See</u> GOK Verification Report at 9 and 10.  For purposes of this final determination, we are not using the published price as our benchmark because we verified that the published price was estimated.  We are instead basing our benchmark price on the final revised price charged to Dongbu for the land.  However, adjustments are required in order to calculate our benchmark.

Under section 771(5)(E)(iv) of the Act, the determination of the adequacy of remuneration is determined based upon prevailing market conditions.  To determine whether a subsidy was provided when Koland sold land at the industrial site at Asan Bay, the first preference under the CVD Regulations for a benchmark would be the price of land in that area as set by a private party.  In this case, the only industrial land for sale is by the government.  Although there were no private sellers of industrial land at Asan Bay, Dongbu contracted with a private party for land development.  During verification, we determined that the price charged to Dongbu for land development was based upon the private land developer's costs plus ten percent to account for profit.  We verified that although Koland included its full costs in its final price charged to Dongbu, Koland did not include any profit in its price.  Because the prevailing market conditions include a profit factor of ten percent, we have calculated a ten percent profit factor and added that profit factor to the final land price charged to Dongbu in order to calculate our benchmark.

We disagree with petitioners' argument that the use of this benchmark constitutes a cost-to-government analysis.  Under section 771(5)(E) of the Act, the Department will determine that "a benefit shall normally be treated as conferred where there is a benefit to the recipient."  In this case, the Department is not concerned with the cost that the GOK incurred, but rather, it is concerned with the amount of the benefit that Dongbu received from purchasing land at Asan Bay.  We verified that prevailing market conditions for the price of land at Asan Bay includes both costs and profit.  We verified that the government accurately determined the costs for land and land development in its final price charged to Dongbu for land at the industrial estate at Asan Bay but that the government did not include profit in that price. Therefore, we included a profit

-47-

component in our benchmark price. This benchmark does calculate the benefit based upon the benefit to the recipient because Dongbu, if it had purchased the land from a private party, would have paid a price based on the costs of the land (and land development) plus a profit of 10 percent. Our benchmark price includes both the costs of the land plus 10 percent profit. The fact that the costs are derived from the actual expenses incurred by the government does not mean that we have constructed a price based on a cost-to-government analysis rather than using a market-based standard. That statement would only be true if we based our benchmark price solely on the government's costs without making an adjustment for profit. We also note that the cost of the land to Koland was not determined by the government but was set by independent appraisal companies. See GOK Verification Report at 9.

The Department also affirms its Preliminary Determination finding that the "interest earned" on advanced payments is countervailable. We find that Dongbu received a benefit by being reimbursed for payments made prior to the final settlement; moreover, we find that a financial contribution was provided by the GOK as revenue foregone. During verification, we determined that Dongbu was able to commence construction on the site before final payment was made and that construction had begun after the first payment. Therefore, Dongbu had full use of the land at the time the first payment was made, not when the final payment was made. It is standard commercial practice that payments for land may be paid over time. However, it is not standard commercial practice that at the time of the final payment, the purchaser of land is credited and reimbursed for earlier payments made before that last payment. Dongbu contracted a private party to undertake certain land development on its land at Asan Bay. Like the payment schedule set forth in the land purchase contract between Koland and Dongbu, the private party required payments over time for its land development activities. Thus, payments were required while the private party was undertaking land development activities for Dongbu, not when the land development was completed. However, the private party did not make an "interest earned" deduction on the final settlement to account for Dongbu's payments made before the final payment of the contract was made. Therefore, an adjustment for earlier payments at the time of final settlement is inconsistent with prevailing market conditions, and thus this adjustment made by the government to Dongbu's final settlement payment is countervailable.

**Comment 10:** *Provision of Land at Asan Bay: Fees Waived*

Petitioners argue that waivers of any fees associated with the land purchase at Asan Bay amount to a financial contribution in the form of revenue forgone and must be countervailed as a grant, as they were in CTL Plate. Petitioners state that the benefit is the full amount of the contractual payment not made.

Respondents note that petitioners were correct in their analysis that the management fees associated with Dongbu's land contract were revised with each land contract revision. However, respondents point out that this issue has not been properly reviewed by the Department, either through supplemental questionnaires, the Preliminary Determination, or during verification. Therefore, they maintain that it is difficult to respond to petitioners' late allegation. Respondents deduce from the various contracts that: (1) the management fee is separate from the purchase price of the land; (2) for Kodai site 1-2, 1-2-1, the management fee was reduced with each contract, when Dongbu Corp. took over land development from Koland; and (3) the last contracts

-48-

signed in June 1997, were based on revised cost estimates as of April 30, 1997, which contained additional revisions to the management fees.  Respondents note that during verification the Department focused on Koland's calculation of the final land price and Dongbu's payments and not on when the management fees were due.  They further stress that nowhere on the record is there any indication of when or whether Dongbu paid any management fees in relation to the two Kodai sites.  Respondents dispute petitioners' assumptions that:  (1) Koland had no independent right to reduce or eliminate the management fees even though circumstances had changed substantially from the time of the first contract to the conclusion of the settlement; (2) the management fees were a necessary part of the total price and that a reduction or elimination constitutes a financial contribution in terms of revenue foregone; and (3) the lack of record evidence demonstrating that management fees were paid, when not being investigated, indicates that no payment were made.  Also, respondents note that the publication price that the Department used as the benchmark in the <u>Preliminary Determination</u> does not make any mention of management fees.  Respondents further state that it is not apparent that there is a legal obligation for Koland to collect such a fee.  Moreover, respondents claim that petitioners have proffered no reason for the Department to conclude that Koland was required to collect a management fee; therefore, there is no basis for the Department to determine that Dongbu received a countervailable benefit.

<u>Department's Position:</u>

As noted above, the determination of the adequacy of remuneration is determined upon prevailing market conditions.  To determine whether a subsidy was provided when Koland sold land at the industrial site at Asan Bay, the first preference for a benchmark would be the price of land in that area as set by a private party.  In this case, the only industrial land for sale is by the government.  Although there were no private sellers of industrial land at Asan Bay, Dongbu contracted with a private party for land development.  During verification, we determined that the price charged to Dongbu for land development was based upon the private land developers costs plus ten percent to account for profit.  There is no information on the record indicating that the private land developer charged Dongbu any other fees, such as management fees.  Because the private party did not charge Dongbu a management fee for development of the land at Asan Bay, we have no basis for finding that the lack of charge or collection of a similar fee for the purchase of that land at Asan Bay constitutes a subsidy.

## Comment 11:  *Exemption of Port Fees under the Harbor Act*

Petitioners maintain that the non-commercial nature of this program is demonstrated by the lengthy fee waivers negotiated under the Harbor Act.  Due to the fact that only companies constructing facilities under the Harbor Act are eligible for this scheme, petitioners state the benefit is specific.

Regarding petitioners' claim that a new subsidy exists with respect to the exemption of port fees as compensation for construction costs to companies that build port berths and revert them to the GOK when the compensation cost includes a profit to the developer, respondents contend that petitioners' claim is illogical.  Respondents disagree with petitioners' dual positions

-49-

that Dongbu received a subsidy because Koland did not include in its purchase price a profit with respect to the costs in incurred for the land that Dongbu purchased, where a commercial developer would, and that as a commercial developer (of the port berth), Dongbu should not receive a 10 percent profit in the total development costs of the reverted port for which it is being compensated.  Respondents argue that petitioners cannot have it both ways; either Dongbu received a subsidy when Koland did not act in accordance with commercial reality by not including a 10 percent profit or Dongbu received a subsidy because the GOK allows Dongbu, commercial developer, to earn a 10 percent profit as compensation for constructing a port. Respondents concede that the absence of the profit element in the land price provides a subsidy, and, therefore, advance that the Department should find that the profit element in the compensation equation is not countervailable.

Respondents also rebut petitioners' argument that the waivers are unusually lengthy. Respondents restate that Dongbu, not the GOK, incurred the costs for building the port facilities, and even with the reversion of the port to the GOK, the GOK owns additional infrastructure for which it did not incur costs to build.  The GOK does not build the infrastructure; instead, those companies (Dongbu) that need the infrastructure build it, incur all costs, and receive exemptions for fees that would normally be due to the GOK.   Respondents also remark that the idea of compensation is only a relative term.  For example, they note that while Dongbu paid VAT on the costs incurred in constructing the port berth, VAT is not included in the calculation of the amount of compensation due to Dongbu.  They also state that the compensation amount is calculated in nominal terms, and, therefore, the amount of fees exempted anytime in the possible 70 years that Dongbu may receive exemptions will offset Dongbu's costs at their face value.  The calculation does not take into account the time value of Dongbu's costs incurred years earlier. Respondents maintain that a realistic assessment is not that Dongbu received a subsidy, but rather, that Dongbu will never fully be compensated for the costs it incurred in constructing the port facilities that it reverted to the GOK.

Department's Position:

In Certain Steel Products, the Department found that POSCO was exempt from paying fees for the use of the port berths, after building it and reverting it to the GOK.  As POSCO was the only company entitled to use the berths at the port facility free of charge, the Department found that this program was limited in number and was therefore specific.  See 58 FR 37347-48. In Sheet and Strip the Department revised this determination, and found that the Harbor Act was not specific under section 771(5A)(D)(iii) of the Act, as it was not limited in number; rather, it was open to a large range of industries.  It is the Department's practice not to revisit prior determinations unless new information has been presented.  However, the information on the record for this case warrants revisiting this issue with respect to the excessive exemption period provided to Dongbu.

As established in Sheet and Strip, it is normal for a company that builds a port berth and reverts it to the GOK, not to pay usage fees and to collect fees until the company has been fully compensated for its construction costs.  The Department finds that in this case, Dongbu actually will be exempt from paying usage fees for up to 70 years.  The actual useful life and depreciation period of these assets is much less than 70 years.  Thus, we find that Dongbu is receiving a

-50-

benefit from the GOK by not having to pay usage fees for the use of the port berth for such an extended time period.  Therefore, we find that the GOK is providing a financial contribution in the form of revenue foregone and that it is specific to Dongbu.   As noted earlier, the benefit is the full amount of the yearly exemption provided to Dongbu under this program.

We also note that respondents' statement with respect to the treatment of profit under this program and under the provision of land at Asan Bay is incorrect; just because profit is included as part of the price benchmark in the Asan Bay program does not mean that a profit component should be included in the compensation being provided to the respondent.  The determination of the benefit for the provision of land at Asan Bay is based upon the adequacy of remuneration which is determined on prevailing market conditions.  Therefore, as agreed by all parties, land transactions from private parties include an element of profit.  Because the government did not include profit in the price of industrial land sold to Dongbu, then Dongbu received a benefit based on the amount of profit which would have been paid by Dongbu if it had purchased the land from a private party.

With respect to the compensation determined by the GOK under the Harbor Act, the calculation of the benefit is still determined based upon the benefit to the recipient.  Set aside the fact that the full amount of exemption provided to Dongbu is countervailable because of the excessive exemption period it received under this program.  Assume that the only difference between Dongbu and all the other uses of this program is that the GOK rebates to Dongbu not only the costs the company incurred but also a ten percent profit which is not provided to any other recipient.  Respondents would argue that the profit component would not be countervailable because the market dictates that profit should be included in a market price.  However, that logic does not follow in this situation.  This is because the original purpose of the program is to compensate Dongbu for its construction costs of infrastructure at Asan Bay.  In constructing these facilities, Dongbu did not pay profit to itself.  Therefore profit is not an expenditure which was incurred by Dongbu.  Its reimbursement is limited to its actual expenditures incurred by the company; profit not being one of these.  If the government included a ten percent profit factor, then the government is over-compensating or over-rebating Dongbu, which provides Dongbu with a countervailable benefit.

**Comment 12:** *POSCO's donation to POSTECH*

Petitioners state that POSCO received another countervailable tax subsidy, which the Department must countervail in the final determination.  This subsidy, which petitioners state that the Department discovered at verification, is a tax benefit in the form of a tax deduction for a donation that POSCO made to POSTECH, a university affiliated with the company.  Petitioners state that although the benefits associated with charitable contributions are not generally considered countervailable, the self-dealing nature of this transaction demonstrates that it is countervailable.  Petitioners maintain that in exchange for its donation, POSCO received a stock buy-back and an interest in future royalty payments.  Petitioners argue that this benefit is specific because the record holds no evidence of similar companies receiving tax benefits for their stock buy-backs or royalty purchases.  Petitioners state that the Department should apply POSCO's nominal tax rate to the donation in order to calculate the benefit of POSCO's tax savings.

-51-

Respondents disagree with petitioners contention that POSCO's donation to POSTECH was extraordinary self-dealing and is therefore countervailable.  Respondents discuss the facts of this issue.  First, respondents argue that POSCO made a donation of cash to POSTECH. POSTECH used part of this donation to purchase POSCO stock.  Both parties (POSCO and POSTECH) agreed that as a result of the donation, POSCO would receive certain rights to royalties if POSTECH invested salable items as a result of the donation.  Second, respondents point to POSCO's Board of Directors Meeting where the approval of the donation makes it clear that POSCO considered the donation as both a contribution to the development of the national economy and the research capabilities of a leading university, as well as an investment that could have future payoffs.  Respondents disagree with petitioners' allegation that this action provided a subsidy.  Respondents argue that as the donation was cash, there was no condition applied that POSTECH must purchase POSCO's stock, and, therefore, there was no stock buyback subsidy. Moreover, respondents note that it makes good financial sense that POSTECH would invest part of the large sum it received in one of the most attractive and low-risk stocks in Korea to form part of its endowment.  Respondents also dispute petitioners' assumption that any royalty payments to POSCO would not be taxable.  As royalties are income and taxable like any other form of income, there is no basis for such a conclusion.  Therefore, respondents urge the Department to dismiss petitioners' subsidy allegation and find this not countervailable.

Department's Position:

The Department disagrees with petitioners that this program provides a countervailable subsidy.  There is no evidence on the record to show that charitable donations are specific under the Act.  Charitable donations are a standard deduction available to all persons in Korea. Therefore, we find that this program does not provide a countervailable subsidy.   In addition, regardless of whether POSCO made this donation to POSTECH, used these funds to conduct its own research and development, or used these funds for other capital investments, each of these activities produce expenditures which are equally used to offset taxable income.

-52-

V.    <u>Recommendation</u>:

      Based on our analysis of the comments received, we recommend adopting all of the above positions.  If these recommendations are accepted, we will publish the final results of the determination in the <u>Federal</u> <u>Register</u>.


_____                         _____
Agree                                            Disagree



_____
Faryar Shirzad
Assistant Secretary
  for Import Administration


_____
              Date

Attachment 3

Notice of Final Results of Countervailing Duty Administrative Review: Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, 72 Fed. Reg. 38,565 (Dep't Commerce July 13, 2007).

C-580-837
POR: 01/01/05 - 12/31/05
Public Document
IA/Office 3: JL

DATE:                         July 5, 2007

MEMORANDUM TO:                David M. Spooner
                              Assistant Secretary
                                for Import Administration

FROM:                         Stephen J. Claeys
                              Deputy Assistant Secretary
                                for Import Administration

SUBJECT:                      Issues and Decision Memorandum:  Final Results of
                              Countervailing Duty Administrative Review: Certain Cut-to-
                              Length Carbon-Quality Steel Plate from the Republic of Korea
                              (Final Results)
                              Period of Review (POR):  01/01/2005–12/31/2005

---

## Summary

We have analyzed the case brief comments submitted by Dongkuk Steel Mill Co., Ltd. (DSM) in
the administrative review of the countervailing duty (CVD) order on certain cut-to-length carbon
quality steel plate from the Republic of Korea for the period January 1, 2005, through December
31, 2005.[1]  Below is the "Analysis of Comments" section, which contains the Department of
Commerce's (Department) response to the issues raised in the respondent's brief.  We
recommend that you approve the position described in this memorandum.

Below is a complete list of the issues in this review for which we received comments from
respondent.

Comment:       GOK Infrastructure Investment at Inchon North Harbor

I.       SUBSIDIES VALUATION INFORMATION

---

[1]Neither petitioners (Mittal Steel USA Inc.) nor the Government of Korea (GOK) submitted
either a case or rebuttal brief.

A.    <u>Average Useful Life</u>

Under 19 CFR 351.524(d)(2), we will presume the allocation period for non-recurring subsidies to be the average useful life (AUL) of renewable physical assets for the industry concerned as listed in the Internal Revenue Service's (IRS) 1997 Class Life Asset Depreciation Range System, as updated by the Department of the Treasury. The presumption will apply unless a party claims and establishes that the IRS tables do not reasonably reflect the company-specific AUL or the country-wide AUL for the industry under examination and that the difference between the company-specific and/or country-wide AUL and the AUL from the IRS table is significant. According to the IRS tables, the AUL of the steel industry is 15 years. No interested party challenged the 15-year AUL derived from the IRS tables. Thus, in this review, we have allocated, where applicable, all of the non-recurring subsidies provided to the producers/exporters of subject merchandise over a 15-year AUL.

B.    <u>Benchmarks for Long-Term Loans Issued through 2005</u>

During the POR, DSM had outstanding long-term won-denominated and foreign-currency denominated loans from government-owned banks and Korean commercial banks. Based on our findings on this issue in prior investigations and administrative reviews, we are using the following benchmarks to calculate the subsidies attributable to respondent's countervailable long-term loans obtained in the years 1991 through 2005:

(1) For countervailable, foreign-currency denominated loans, pursuant to 19 CFR 351.505(a)(2)(ii), and consistent with our past practice to date, our preference is to use the company-specific, weighted-average foreign currency-denominated interest rates on the company's loans from foreign bank branches in Korea, foreign securities, and direct foreign loans received after 1991. <u>See</u>, <u>e.g.</u>, <u>Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils from the Republic of Korea</u>, 64 FR 30636, 30640 (June 8, 1999) (<u>Sheet and Strip Investigation</u>); <u>see</u> <u>also</u> <u>Final Negative Countervailing Duty Determination:  Stainless Steel Plate in Coils from the Republic of Korea</u>, 64 FR 15530, 15531 (March 31, 1999) (<u>Plate in Coils Investigation</u>). Where no such benchmark instruments are available, and consistent with 19 CFR 351.505(a)(3)(ii) as well as our methodology in a prior administrative review, we rely on the lending rates as reported by the IMF's <u>International Financial Statistics Yearbook</u>. <u>See</u> <u>Final Results and Partial Rescission of Countervailing Duty Administrative Review:  Stainless Steel Sheet and Strip in Coils from the Republic of Korea</u>, 69 FR 2113 (January 14, 2004), and the accompanying Issues and Decision Memorandum at Section II. B "Subsidies Valuation Information."

(2) For countervailable, won-denominated, long-term loans, our practice is to use the company-specific corporate bond rate on the company's public and private bonds. This benchmark is consistent with our decision in <u>Plate in Coils Investigation</u>, 64 FR at 15531, in which we determined that the GOK did not direct or control the Korean domestic bond market after 1991, and that the interest rate on domestic bonds may serve as an appropriate benchmark interest rate. Where unavailable, we used the national average of the yields on three-year

2

corporate bonds, as reported by the Bank of Korea (BOK).  For example, we note that the use of the three-year corporate bond rate from the BOK follows the approach taken in the <u>Plate in Coils Investigation</u>, in which we determined that, absent company-specific interest rate information, the corporate bond rate is the best indicator of a market rate for won-denominated long-term loans in Korea.  <u>See</u> <u>Plate in Coils Investigation</u>, 64 FR at 15531.  <u>See also</u> 19 CFR 505(a)(3)(ii).

In accordance with 19 CFR 351.505(a)(2), our benchmarks take into consideration the structure of the government-provided loans.  For fixed-rate loans, pursuant to 19 CFR 351.505(a)(2)(iii), we used benchmark rates issued in the same year that the government loans were issued.  For variable-rate loans outstanding during the POR, pursuant to 19 CFR 351.505(a)(5)(i), our preference is to use the interest rates of variable-rate lending instruments issued during the year in which the government loans were issued.  Where such benchmark instruments are unavailable, we use weighted-average interest rates of all variable rate loans issued during the POR as our benchmark, as such rates better reflect a variable interest rate that would be in effect during the POR.  This approach is in accordance with the Department's practice in similar cases.  <u>See</u>, <u>e.g.</u>, <u>Final Results and Partial Rescission of Countervailing Duty Administrative Review:  Stainless Steel Sheet and Strip From the Republic of Korea</u>, 68 FR 13267 (March 19, 2003), and accompanying Issues and Decision Memorandum at Comment 8; <u>see</u> <u>also</u> 19 CFR 351.505(a)(5)(ii).

## II.   ANALYSIS OF PROGRAMS

A.   <u>Programs Preliminarily Determined To Confer Subsidies</u>

1.   <u>The GOK's Direction of Credit</u>

In the most recently completed administrative review of this CVD order, the Department reaffirmed earlier determinations that the GOK controlled and directed lending through year 2001.  In addition, the Department noted that neither DSM nor the GOK provided any new information that would warrant a change in the Department's determination.  Finding that the GOK did not act to the best of its ability, the Department employed an adverse inference and determined that the GOK continued it direction-of-credit policies from 2002 through 2004.  <u>See</u>, <u>e.g.</u>, <u>Preliminary Results of Countervailing Duty Administrative Review:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea</u>, 71 FR 11397, 11399 (March 7, 2006) (<u>2004 CTL Plate Preliminary Results</u>) (unchanged in final results <u>Notice of Final Results of Countervailing Duty Administrative Review:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea</u>, 71 FR 38861 (July 10, 2006) (<u>2004 CTL Plate Final Results</u>)).

During the POR, DSM had outstanding loans that were received prior to the 2002 period.  As in the prior administrative review, in this review, we asked the GOK for information pertaining to the GOK's direction-of-credit policies for the period from 2002 through 2005.  The GOK did not provide any new or additional information that would warrant a departure from these prior findings, stating instead that:

3

"... the Government of Korea continues to believe that the evidence demonstrates that
there has been no direction of credit to the Korean steel industry.  Nevertheless, the
Department has consistently found that long-term loans received by Korean steel
producers were the result of the Korean Government's direction, despite the
Government's repeated submission of evidence to the contrary. . . Consequently, in this
review, the Government will not contest the Department's findings on direction of long-
term loans."

 See September 12, 2006, GOK submission at page 9.  Because the GOK withheld the requested
information on its lending policies, the Department does not have the necessary information on
the record to determine whether the GOK has continued its direction-of-credit policies through
2005; therefore, the Department must base its determination on facts otherwise available.  See
section 776(a)(2)(A) of the Act.

Section 776(b) of the Act further provides that the Department may use an adverse
inference in applying the facts otherwise available when a party has failed to cooperate by not
acting to the best of its ability to comply with a request for information.  Section 776(b) of the
Act also authorizes the Department to use as adverse facts available (AFA) information derived
from the petition, the final determination, a previous administrative review, or other information
placed on the record.  For the reasons discussed below, we determine that, in accordance with
sections 776(a)(2) and 776(b) of the Act, the use of AFA is appropriate for the final results for
the determination of direction of credit for loans received from 2002 through 2005.

In this case, the GOK refused to supply requested information that was in its possession,
even though the GOK had provided similar information in prior proceedings.  See, e.g., Final
Affirmative Countervailing Duty Determination:  Certain Cut-to-Length Carbon-Quality Steel
Plate from the Republic of Korea, 64 FR 73176, 73178 (December 29, 1999) (CTL Plate
Investigation).  Therefore, consistent with section 776(a)(2)(A) of the Act, we find that the GOK
did not act to the best of its ability and, therefore, are employing an adverse inference in
selecting from among the facts otherwise available.  As AFA, we find that the GOK's direction-
of-credit policies continued through 2005.  As noted above, the GOK's direction-of-credit
policies provide a financial contribution, confer a benefit, and are specific, pursuant to sections
771(5)(D)(i), 771(5)(E)(ii), and 771(5A)(D)(iii) of the Act, respectively.  Therefore, we find that
lending from domestic banks and government-owned banks through 2005 are countervailable.
Thus, any loans received through 2005 from domestic banks and government-owned banks that
were outstanding during the POR are countervailable, to the extent that the interest amount paid
on the loan is less than what would have been paid on a comparable commercial loan.  The
Department's decision to rely on adverse inferences when lacking a response from the GOK
regarding the direction-of-credit issue is in accordance with its practice.  See, e.g., 2004 CTL
Plate Preliminary Results (unchanged in final results 2004 CTL Plate Final Results).

4

DSM received long-term fixed- and variable-rate loans from GOK-owned or -controlled institutions that were outstanding during the POR and had both won- and foreign currency-denominated loans outstanding during the POR.  In accordance with 19 CFR 351.505(c)(2) and (4), we calculated the benefit for each fixed- and variable-rate loan received from GOK-owned or -controlled banks to be the difference between the actual amount of interest paid on the directed loan during the POR and the amount of interest that would have been paid during the POR at the benchmark interest rate.  We conducted our benefit calculations using the benchmark interest rates described in the "Subsidies Valuation Information" section above.  For foreign currency-denominated loans, we converted the benefits into Korean won using exchange rates obtained from the BOK.

To calculate the total benefit for all directed credit, we added the benefit received from foreign currency loans in Korean won to the benefit received from won-denominated loans.  To calculate the net subsidy rate, we divided DSM's total benefits by its respective total F.O.B. sales values during the POR, as this program is not tied to exports or a particular product.  On this basis, we determine the net subsidy rate under the direction-of-credit program to be 0.01 percent ad valorem for DSM.

    2.    Asset Revaluation under Tax Programs under the Tax Reduction and Exemption Control Act (TERCL) Article 56(2)

Under Article 56(2) of the TERCL, the GOK permitted companies that made an initial public offering between January 1, 1987, and December 31, 1990, to revalue their assets at a rate higher than the 25 percent required of most other companies under the Asset Revaluation Act.  The Department has previously found this program to be countervailable.  For example, in the CTL Plate Investigation, the Department determined that this program was de facto specific under section 771(5A)(D)(iii) of the Act because the actual recipients of the subsidy were limited in number and the basic metal industry was a dominant user of this program.  We also determined that a financial contribution was provided in the form of tax revenue foregone pursuant to section 771(5)(D)(ii) of the Act.  See CTL Plate Investigation, 64 FR at 73182-83.  The Department further determined that a benefit was conferred, within the meaning of section 771(5)(E) of the Act, on those companies that were able to revalue their assets under TERCL Article 56(2) because the revaluation resulted in participants paying fewer taxes than they would otherwise pay absent the program.  Id.  No new information, evidence of changed circumstances, or comments from interested parties were presented in this review to warrant any reconsideration of the countervailable status of this program.

The benefit from this program is the difference that the revaluation of depreciable assets has on a company's tax liability each year.  Evidence on the record indicates that DSM revalued its assets under Article 56(2) of the TERCL in 1988.  However, DSM reports that in 1998 it revalued its assets yet again.  DSM states the revaluation in 1998 was not pursuant to TERCL Article 56(2) and, according to the GOK, was consistent with Korean Generally Accepted Accounting Principles (GAAP).  DSM claims that the asset revaluations that were adopted in 1988 under Article 56(2) of TERCL were superseded when it revalued its assets in 1998.  Hence,

the 1988 asset revaluation would only affect the calculation of depreciation costs for tax years prior to 1998. However, there were certain assets that were not revalued in 1998. For those assets which were not revalued in 1998, we identified the total amount of the change in depreciation expense attributable to the 1988 asset revaluation for 2004 (the tax return submitted during the POR). We then multiplied this amount by the tax rate for 2004 to determine the benefit under this program. This is the same approach the Department used in the previous review. See 2004 CTL Plate Preliminary Results (unchanged in final results 2004 CTL Plate Final Results). As this program is not tied to exports, we used the benefit amount as the numerator and DSM's total sales as the denominator. Using this methodology, we determine the countervailable subsidy from this program to be less than 0.005 percent ad valorem, which, according to the Department's practice, is considered not measurable and is not included in the calculation of the CVD rate. See, e.g., the "Other Programs" section of the Issues and Decision Memorandum that accompanied the Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada, 70 FR 73448 (December 12, 2005).

> 3.   GOK Infrastructure Investment at Inchon North Harbor

Under the Act on Participation of Private Investment in Infrastructure (the Harbor Act), signed in 2000, the GOK contracts with private companies to construct infrastructure facilities at Inchon North Harbor. The program is designed to encourage private investment in new infrastructure facilities at Inchon North Harbor. The government compensates private parties for a portion of the construction costs of these facilities. In addition, the company is given the right to operate the facility for a certain period of time.

Under the Harbor Act, DSM participated in an agreement with the Ministry of Maritime Affairs and Fisheries (MOMAF), under which DSM is constructing one of 17 piers at Inchon North Harbor. According to information submitted by the GOK, the government will retain title to the pier. However, upon completion of the project, DSM will receive free use of harbor facilities at Inchon Port and the right to collect fees from other users of the facility for a period of 50 years. At the end of the 50-year period, operating rights revert to the GOK. Further, under the Harbor Act, the GOK compensates DSM for 30 percent of the construction costs of the facility. DSM reported receiving payments during the POR from the GOK as reimbursements for construction costs it incurred from the fourth quarter of 2003 through the third quarter of 2004. As this is the first time DSM has reported receiving benefits to the Department, the Department has not previously examined this program.[2]

DSM and the GOK claim that the reimbursements DSM received under the program are not countervailable, "Because this program represents a government purchase of construction services, it does not constitute a "financial contribution" under the terms of the countervailing

---

[2]The GOK indicated in its September 12, 2006, response that benefits received by DSM in 2003 were inadvertently not reported during the last POR, due to an oversight.

6

duty statute." <u>See</u> GOK's September 12, 2006, questionnaire response at 4; <u>see also</u> DSM's September 12, 2006, questionnaire response at 38.

The record evidence indicates that the actual recipients of the grant, whether considered on an enterprise or industry basis are limited in number.  The GOK reported that only a few companies representing limited industries received the grant.  <u>See</u> DSM's September 12, 2006, questionnaire response at Appendix G-6-C.  Therefore, we determine that the program is <u>de facto</u> specific within the meaning of section 771(5A)(D)(iii)(I) of the Act.  For purposes of these final results, we disagree with the claims of the GOK and DSM that the GOK's payments to DSM constitute compensation for services provided in connection with the construction of the GOK's pier.  As we did in the preliminary results, we find that the 50-year duration of DSM's lease of the pier facility is so long that it effectively renders DSM the owner of the facility.  As such, we find that the GOK's payments to DSM constitute grants that aid the construction of a facility which, due to the lengthy duration of the lease, is effectively owned and operated by DSM.  On this basis, we determine that the reimbursements DSM received under the program constitute a direct financial contribution, in the form of grants, and confer a benefit within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act, respectively.

To calculate the benefit under this program, we first summed the amount of payments DSM received each year under the program.  We determined that the reimbursements, DSM received under the program constitute a direct financial contribution, in the form of grants.  Therefore, in accordance with 19 CFR 351.524(c), we are treating the grants DSM received under the program as non-recurring.  Pursuant to 19 CFR 351.524(b)(2), the Department allocates non-recurring benefits provided under a particular subsidy program to the year in which the benefits are received if the total amount approved under the subsidy program is less that 0.5 percent of the relevant sales of the firm in question, during the year in which the subsidy was approved.  The GOK provided the total approved amount with  the date of approval.

We received a comment on this issue.  <u>See</u> Comment: GOK Infrastructure Investment at Inchon North Harbor, below.  After consideration of the comment received, we continue to find this program to be countervailable.  However, based on the comment received, we have modified our characterization of calculation of  the benefit from this program.  In the preliminary results we found that the grants received by DSM under this program are tied to the production and sales of the subject merchandise.  For the purpose of these final results we determine that the benefit DSM received from this program is not tied solely to the production and sale of subject merchandise.  Rather, as a domestic subsidy, any benefit should be attributed to DSM's total sales.  Therefore, for the final results, the Department performed the 0.5 percent test by dividing the GOK contribution at the time of receipt by DSM's total sales at the time of receipt.  On  this basis, we determine DSM's net subsidy rate under this program to be 0.09 percent <u>ad valorem.</u>

4.    Research and Development under Korea Research Association of New Iron and Steelmaking Technology (KANIST) (formerly KNISTRA)

Under the program, companies make contributions to KANIST, which also receives contributions from the GOK.  KANIST then contracts with universities and other research institutions.  Upon completion of the projects, KANIST shares the results of the research with the companies that participated in the projects.

The Department examined this program in the underlying investigation.  In that segment of the proceeding, the Department determined that the GOK, through the Ministry of Commerce, Industry and Energy (MOCIE), provided research and development grants to support numerous projects designed to foster the development of efficient technology for industrial development.  See CTL Plate Investigation, 64 FR at 73185.  We found this program to be specific as the grants were provided directly to respondents and their affiliates that are steel-related, and that the grants provided a financial contribution.  Id.; see also sections 771(5A)(D)(ii) and 771(5)(D)(i) of the Act.  Moreover, pursuant to section 771(5)(E) of the Act, the Department determined that the benefit was the amount of the GOK's contribution allocated to the percentage of the company's contribution and was conferred at the time of receipt.  No new information, evidence of changed circumstances, or comments from interested parties were presented in this review to warrant any reconsideration of the countervailable status of this program.

DSM reported that it participated in research and development projects coordinated by KANIST.  In these projects, DSM and other Korean companies made contributions to KANIST, which also received contributions from the GOK.  Specifically, DSM reported that it participated in four projects.  The first project deals with the "Elimination of Accumulated Impurities and Metal Structural Non-detrimental Technology Development."  DSM and the GOK made contributions to this project from 2002 through 2006.  The remaining three projects are dedicated to the development of structural steel.  See Exhibit D-6-A, Volume II, of DSM's September 12, 2006, questionnaire response; see also Exhibit G-B-4 of the GOK's September 12, 2006, questionnaire response.  Based on the information in DSM's response, we determine that the projects aimed at structural steel development are tied to non-subject merchandise.  We also determine that the remaining research and development project is relevant to the early stages of the production process and, therefore, attributable to DSM's total steel sales.

In keeping with the Department's practice, we calculated the benefits related to the project on the "Elimination of Accumulated Impurities and Metal Structural Non-detrimental Technology Development" by allocating the GOK's payments based on DSM's contributions to the project.  See 2004 CTL Plate Preliminary Results, 71 FR at 11400 (unchanged in final results 2004 CTL Plate Final Results).  Pursuant to 19 CFR 351.524(b)(2), the Department allocates non-recurring benefits provided under a particular subsidy program to the year in which the benefits are received if the total amount approved under the subsidy program is less that 0.5 percent of the relevant sales of the firm in question, during the year in which the subsidy was approved.  However, neither the GOK nor DSM provided the total approved amounts nor the dates of approval.  Therefore, we performed our analysis under 19 CFR 351.524(b)(2) by dividing DSM's portion of the GOK contribution at the time of receipt by DSM's total steel sales

8

at the time of receipt.  This is consistent with our approach in the previous administrative review as well.  Using this approach, the calculated percentages in each year were less than 0.5 percent.  Therefore, we determine that all of the GOK's contributions were expensed in the year of receipt.  To calculate the net subsidy rate under the program, we divided the contributions made by the GOK during the POR that were allocated to DSM by DSM's total steel sales during the POR.  On this basis, we calculated a net subsidy rate for DSM to be less than 0.005 percent <u>ad valorem</u>, which, according to the Department's practice, is considered not measurable and is not included in the calculation of the CVD rate.  <u>See</u> <u>2004 CTL Plate Preliminary Results</u> and <u>2004 CTL Plate Final Results.</u>

B.      <u>Programs Found to Be Not Used</u>

        We examined the following programs and determine that DSM did not apply for or receive benefits under these programs during the POR:

1.      <u>Special Cases of Tax for Balanced Development Among Areas (TERCL Articles 41, 42, 43, 44, and 45)</u> (Reserve for Investment Program)
2.      <u>Electricity Discounts (VRA, VCA, ELR and DLI Programs)</u>
3.      <u>Price Discount for DSM Land Purchase at Asan Bay</u>
4.      <u>Local Tax Exemption on Land Outside of Metropolitan Area</u>
5.      <u>Exemption of VAT on Anthracite Coal</u>

C.      <u>Program Found to Be Not Countervailable</u>

1.      <u>Special Tax Credit for Boosting Employment</u>

        Under Articles 30-34 of the RSTA, the GOK created "The Special Tax Credit for Boosting Employment" in July 2004.  The program expired in December 31, 2005.  It was designed to boost employment, and tax credits were allowed for any Korean company that met the requirements of employing more full-time workers in 2004 and 2005 than it employed the previous year.  It provided for a credit of one million won for each full-time worker employed in 2004 or 2005 in excess of the number of full-time workers employed the previous year.  DSM reported receiving credits towards taxes payable under this program for its 2004 tax return, the tax return submitted during the POR.

        Information supplied by DSM and the GOK indicates that this tax program is available to nearly all companies in Korea except for a small category of specialized businesses the GOK deems "harmful to juveniles, affecting public morales, certain private teaching institutes, and certain real estate businesses."  <u>See</u> page 25, Exhibit I of DSM's September 12, 2006, questionnaire response.  Based on information supplied by DSM and the GOK, we determine that this program is not specific within the meaning of section 771(5A)(D) of the Act.  Therefore, the Department determines that this program is not countervailable.

III.    **TOTAL** **_AD VALOREM_** **RATE**

The total net countervailable subsidy rate for DSM in this review is 0.10 percent <u>ad valorem</u> for 2005, which is <u>de minimis</u>.

## IV.   ANALYSIS OF COMMENTS RECEIVED

Comment:     *GOK's Pier Construction at Inchon North Harbor*

Respondent argues that the Department incorrectly found in its <u>Preliminary Results</u> that the GOK's infrastructure investment at Inchon North Harbor confers a countervailable benefit. <u>See</u> <u>Notice of Preliminary Results of Countervailing Duty Administrative Review:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea</u>, 72 FR 10163 (March 7, 2007) (<u>Preliminary Results</u>).

First, DSM claims that the program represents government purchase of construction services; therefore, it does not fall under the statutory definition of  "financial contribution" under the terms of the countervailing duty statute.  <u>See</u> Section 771(5)(D) of the Act.

Second, DSM argues that the Department's preliminary finding that the 50-year duration of DSM's lease on the pier effectively gives DSM ownership of the pier is flawed.  DSM claims that assets retain residual value even after the depreciation period has fully run.  DSM argues that there is no reason to believe that the AUL principle was accurately applied by the Department because the AUL identified in the IRS tables does not necessarily establish "the actual working life" of a pier similar to the one under construction by DSM.  Morever, DSM claims that there is no evidence that the IRS examined the construction of the pier or the conditions under which it would be operated.  DSM argues that an "average" is just that, and does not preclude the use of a much longer useful life.

Third, DSM takes issue with the Department's preliminary finding that the pier will be used in the production or sale of subject merchandise.  According to the information submitted by DSM, DSM does not produce subject merchandise at its Inchon production facility.  Therefore, DSM argues there is no reason to believe that DSM will use the pier to unload materials for use in its Pohang production facility where DSM produces subject merchandise.

In conclusion, DSM argues that the evidence does not support the Department's preliminary finding that the GOK's infrastructure investment at Inchon North Harbor should be found countervailable.  For the reasons stated above, DSM argues that the Department should reverse its preliminary finding.

Petitioners did not comment on this issue.

<u>Department's Position</u>

First, we disagree with DSM's claims that the GOK's payments to DSM constitute compensation for services provided for the construction of the pier at Inchon North Harbor because record evidence demonstrates that DSM was not merely hired by the GOK to perform constructions services at this site. Rather, the record shows that DSM reached an agreement with the GOK to construct a pier which, because of the terms of the lease agreement, is effectively owned and operated by DSM for its own use, and that the GOK contributed a substantial portion of the constructions costs to DSM for this pier. Therefore, we continue to find that the GOK's payments to DSM constitute grants that aid the construction of a pier facility. On this basis, we determine that the reimbursements DSM received under the program constitute a direct financial contribution in the form of grants, which confer a benefit to DSM within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act, respectively.

Second, we also disagree with DSM's claim that the Department's reliance on the AUL for land improvements, including docks and wharves, which is 50 years, is flawed. DSM has not provided any evidence to supports its claim that the AUL cited by the Department in the <u>Preliminary Results</u> is not representative in this instance. The Preamble to the countervailing duty regulations specifically notes that, in the Department's experience, ". . .for most industries and most types of industries, the IRS tables have provided an *accurate and fair approximation* of the AUL of assets in the industry in question." <u>See</u> Preamble, Rules and Regulations, 19 CFR 351, Countervailing Duties Part III. 63 FR 65348, 65396, November 25, 1998. Moreover, we note that what is at issue is not the precise AUL of this specific pier, but whether DSM's 50-year lease of the pier, with terms that provide for the ability to charge unregulated user fees, is so long a period that it effectively renders ownership of the pier to DSM. In this respect, the average AUL for wharves and docks from the IRS tables is a useful point of reference that we have used to support our conclusion that the lease period constitutes a period of time so great that it effectively renders ownership of the pier to DSM.

Third, we agree with DSM that the benefit is not tied solely to the production and sale of subject merchandise. Therefore, for these final results, we have attributed the POR benefit over total DSM sales in accordance with 19 CFR 351.525(b)(3). However, we disagree with DSM's argument that the Pier Construction at Inchon North Harbor Project is not countervailable because the steel scrap imports at the Inchon facility are too distant to be used by the facility that produces subject merchandise. First, we note that the record indicates that DSM uses scrap inputs to produce steel. <u>See</u> DSM's September 12, 2006, questionnaire response at 9. <u>See also</u> DSM's November 28, 2006, questionnaire response at Appendix SD 9. Second, DSM's argument on this point is based on the manner in which the company intends to use the steel scrap imports once the construction of the pier is completed, specifically upon assumption that scrap will only be used at the Inchon production facility. As explained in the Preamble to our regulations in analyzing whether a benefit exists, "We are concerned with what goes into a company, such as enhanced revenues and reduced cost inputs in the broad sense. . . not with what the company does with the subsidy." <u>See</u> Preamble 63 FR at 65361.

<u>Recommendation</u>

Based on our analysis of the comments received, we recommend adopting the above positions. If these recommendations are accepted, we will publish the final results of review and the final net subsidy rate for DSM in the <u>Federal</u> <u>Register</u>.

_____

Agree                                    Disagree

_____

David. M. Spooner
Assistant Secretary
  for Import Administration

_____

Date

8

12

Attachment 4

**Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2011, 78 Fed. Reg. 55,241 (Dep't Commerce Sept. 10, 2013).**

Barcode:3153046-02 C-580-818 **UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

C-580-818
AR: 1/1/2011 - 12/31/2011
**Public Document**
IA AD/CVD O8: AMM

September 3, 2013

| | |
|---|---|
| **MEMORANDUM TO:** | Paul Piquado<br>Assistant Secretary<br>for Import Administration |
| **FROM:** | Gary Taverman<br>Senior Advisor<br>for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Decision Memorandum for Preliminary Results of 2011<br>Countervailing Duty Administrative Review:  Corrosion-Resistant<br>Carbon Steel Flat Products from the Republic of Korea |

## SUMMARY

In response to requests from interested parties, the Department of Commerce ("Department") is conducting an administrative review of the countervailing duty ("CVD") order on corrosion-resistant carbon steel flat products ("CORE") from the Republic of Korea ("Korea") for the period of review ("POR") January 1, 2011, through December 31, 2011.  The Department preliminarily finds that Pohang Iron & Steel Co. Ltd. ("POSCO"), Dongbu Steel Co., Ltd. ("Dongbu"), and Hyundai HYSCO Ltd. ("HYSCO"), received *de minimis* net subsidy rates, as provided in section 703 of the Tariff Act of 1930, as amended ("the Act"), and in accordance with 19 CFR 351.221(b)(4)(i).[1]

If these preliminary results are adopted in our final results of review, we will instruct U.S. Customs and Border Protection ("CBP") to liquidate without regard to CVDs on all appropriate entries of subject merchandise during the POR.  Interested parties are invited to comment on these preliminary results.  We intend to issue final results no later than 120 days from the date of publication of this notice, pursuant to section 751(a)(3)(A) of the Act.

## BACKGROUND

On August 17, 1993, the Department published in the *Federal Register* the CVD order on CORE from Korea.[2]  On August 1, 2012, the Department published a notice of opportunity to request an administrative review of this CVD order.[3]

---

[1] *See also* 19 CFR 351.106(c)(1).

[2] *See Countervailing Duty Orders and Amendments of Final Affirmative Countervailing Duty Determinations: Certain Steel Products from Korea*, 58 FR 43752 (August 17, 1993).

[3] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 77 FR 45580 (August 1, 2012).



On August 31, 2012, we received timely requests for review of the CVD order from United States Steel Corporation ("Petitioner") and HYSCO. On September 26, 2012, the Department published a notice of initiation of the administrative review of the CVD order on CORE from Korea covering the period January 1, 2011, through December 31, 2011.[4] On October 1, 2012, the Department issued the initial questionnaire to Dongbu, HYSCO, POSCO, and the Government of Korea ("GOK"). On November 28, 2012, November 30, 2012, December 3, 2012, and December 4, 2012, the Department received questionnaire responses from Dongbu, HYSCO, POSCO, and the GOK, respectively. On December 3, 2012, the Department received a separate questionnaire response from Daewoo International Corporation ("Daewoo").

On April 23, 2013, May 24, 2013, and June 28, 2013 the Department issued supplemental questionnaires to HYSCO. On May 21, 2013, May 30, 2013, and July 12, 2013, the Department received supplemental questionnaire responses from HYSCO. On June 28, 2013, the Department issued supplemental questionnaires to POSCO and Daewoo. On July 26, 2013, and August 2, 2013, respectively, the Department received supplemental questionnaire responses from POSCO and Daewoo.

On April 15, 2013, the Department issued a memorandum extending the preliminary results of the instant administrative review to September 3, 2013.[5]

In accordance with 19 CFR 351.213(b), this review covers only those producers or exporters for which a review was specifically requested. The companies subject to this review are Dongbu, HYSCO, and POSCO.

**Scope of the Order**

Products covered by this order are certain corrosion-resistant carbon steel flat products from Korea. These products include flat-rolled carbon steel products, of rectangular shape, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished or coated with plastics or other nonmetallic substances in addition to the metallic coating, in coils (whether or not in successively superimposed layers) and of a width of 0.5 inch or greater, or in straight lengths which, if of a thickness less than 4.75 millimeters, are of a width of 0.5 inch or greater and which measures at least 10 times the thickness or if of a thickness of 4.75 millimeters or more are of a width which exceeds 150 millimeters and measures at least twice the thickness. The merchandise subject to this order is currently classifiable in the Harmonized Tariff Schedule of the United States ("HTSUS") at subheadings: 7210.30.0000, 7210.31.0000, 7210.39.0000, 7210.41.0000, 7210.49.0030, 7210.49.0090, 7210.49.0091, 7210.49.0095, 7210.60.0000, 7210.61.0000, 7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.1000, 7210.90.6000, 7210.90.9000, 7212.20.0000, 7212.21.0000, 7212.29.0000, 7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000,

---

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 77 FR 59168 (September 26, 2012).
[5] *See* Memorandum to Gary Taverman, through Melissa G. Skinner, entitled "Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Extension of Deadline for Preliminary Results of Countervailing Duty Administrative Review," dated April 15, 2013.

7212.50.0000, 7212.60.0000, 7215.90.1000, 7215.9030, 7215.90.5000, 7217.12.1000, 7217.13.1000, 7217.19.1000, 7217.19.5000, 7217.20.1500, 7217.22.5000, 7217.23.5000, 7217.29.1000, 7217.29.5000, 7217.30.15.0000, 7217.32.5000, 7217.33.5000, 7217.39.1000, 7217.39.5000, 7217.90.1000 and 7217.90.5000.  Although the HTSUS subheadings are provided for convenience and customs purposes, the Department's written description of the merchandise is dispositive.

**Attribution of Subsidies**

The Department's regulations at 19 CFR 351.525(b)(6)(i) state that the Department will normally attribute a subsidy to the products produced by the corporation that received the subsidy.  However, 19 CFR 351.525(b)(6)(ii)-(v) provides that the Department will attribute subsidies received by certain other companies to the combined sales of those companies when: (1) two or more corporations with cross-ownership produce the subject merchandise; (2) a firm that received a subsidy is a holding or parent company of the subject company; (3) there is cross-ownership between an input supplier and a downstream producer and production of the input is primarily dedicated to the production of the downstream product; or (4) a corporation producing non-subject merchandise received a subsidy and transferred the subsidy to a corporation with cross-ownership with the subject company.

According to 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  This regulation states that this standard will normally be met where there is a majority voting interest between two corporations or through common ownership of two (or more) corporations.  The Court of International Trade ("CIT") has upheld the Department's authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[6]

Pursuant to 19 CFR 351.525(b)(6)(ii), we have attributed subsidies received by Dongbu, POSCO and HYSCO to the firms' respective sales.  In addition, POSCO reported that a portion of its sales of subject merchandise to the United States during the POR were exported through Daewoo, a trading company of which POSCO has majority ownership.  Therefore, because Daewoo is a trading company that ships subject merchandise produced by POSCO, pursuant to 19 CFR 351.525(c), we have cumulated benefits received by Daewoo with those received by POSCO.

**Subsidies Valuation Information**

      A.      Benchmarks for Short-Term Financing

For those programs requiring the application of a won-denominated, short-term interest rate benchmark, in accordance with 19 CFR 351.505(a)(2)(iv), we used as our benchmark the company-specific weighted-average interest rate for commercial won-denominated loans

---

[6] *See Fabrique de Fer de Charleroi v. United States*, 166 F. Supp. 2d 593, 600-604 (CIT 2001) (*Fabrique*).

outstanding during the POR.  This approach is in accordance with 19 CFR 351.505(a)(3)(i) and the Department's practice.[7]

        B.      Benchmarks for Long-Term Loans and Discount Rates

During the POR, POSCO had outstanding countervailable long-term won-denominated loans from government-owned banks and Korean commercial banks.

As benchmarks for countervailable, won-denominated long-term loans and as discount rates, we used, where available, the company-specific interest rates on the company's comparable commercial, won-denominated loans.  If such loans were not available, we used, where available, the company-specific corporate bond rate on the company's public and private bonds, as we have determined that the GOK did not control the Korean domestic bond market after 1991.[8]  The use of a corporate bond rate as a long-term benchmark interest rate and a discount rate is consistent with the approach the Department has taken in several prior Korean CVD proceedings.[9]  Specifically, in those cases, we determined that, absent company-specific, commercial long-term loan interest rates, the won-denominated corporate bond rate is the best indicator of the commercial long-term borrowing rates for won-denominated loans in Korea because it is widely accepted as the market rate in Korea.[10]  Where company-specific rates were not available, we used the national average of the yields on three -year, won-denominated corporate bonds, as reported by the Bank of Korea ("BOK").  This approach is consistent with 19 CFR 351.505(a)(3)(ii) and our practice.[11]

In accordance with 19 CFR 351.505(a)(2)(i), our benchmarks take into consideration the structure of the government-provided loans.  For countervailable fixed-rate loans, pursuant to 19 CFR 351.505(a)(2)(iii), we used benchmark rates issued in the same year that the government loans were issued.

**Average Useful Life**

Pursuant to 19 CFR 351.524(d)(2), we will presume the allocation period for non-recurring subsidies to be the average useful life ("AUL") of renewable physical assets for the industry concerned as listed in the Internal Revenue Service's ("IRS") 1997 Class Life Asset

---

[7] See, e.g., Corrosion–Resistant Carbon Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review, 74 FR 2512 (January 15, 2009) ("Final Results of CORE from Korea 2006"), and accompanying Issues and Decision Memorandum ("IDM") at "Benchmarks for Short-Term Financing."

[8] See, e.g., Final Negative Countervailing Duty Determination:  Stainless Steel Plate in Coils from the Republic of Korea, 64 FR 15530, 15531 (March 31, 1999) and "Analysis Memorandum on the Korean Domestic Bond Market" (March 9, 1999).

[9] Id.; see also Final Affirmative Countervailing Duty Determination:  Structural Steel Beams from the Republic of Korea, 65 FR 41051 (July 3, 2000), and accompanying IDM at "Benchmark Interest Rates and Discount Rates;" and Final Affirmative Countervailing Duty Determination:  Dynamic Random Access Memory Semiconductors from the Republic of Korea, 68 FR 37122 (June 23, 2003), and accompanying IDM at "Discount Rates and Benchmark for Loans."

[10] See Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations:  Certain Steel Products from Korea, 58 FR at 37328, 37345-37346 (July 9, 1993).

[11] See, e.g., Final Results of CORE from Korea 2006, and accompanying IDM at "Benchmark for Long Term Loans."

4

Depreciation Range System, as updated by the Department of the Treasury.  The presumption will apply unless a party claims and establishes that the IRS tables do not reasonably reflect the company-specific AUL or the country-wide AUL for the industry under examination and that the difference between the company-specific and/or country-wide AUL and the AUL from the IRS tables is significant.  According to the IRS tables, the AUL of the steel industry is 15 years.  No interested party challenged the 15-year AUL derived from the IRS tables.  Thus, in this review, we have allocated, where applicable, all of the non-recurring subsidies provided to the producers/exporters of subject merchandise over a 15-year AUL.

## I.      Programs Determined To Be Countervailable

### A.      Promotion of Specialized Enterprises for Parts and Materials

Under the Act on Special Measures for the Promotion of Specialized Enterprises for Parts and Materials ("Promotion of Specialized Enterprises Act"), the GOK shares the costs of research and development ("R&D") projects with companies or research institutions.  The goal of the program is to support technology development for core parts and materials necessary for technological innovation and improvement in competitiveness.[12]  The program is administered by the Ministry of Knowledge Economy ("MKE") and Korea Evaluation Institute of Industrial Technology ("KEIT").[13]

In accordance with Articles 3 and 4 of the Promotion of Specialized Enterprises Act, MKE prepares a base plan and a yearly execution plan for the development of the parts and materials industry.[14]  Under the execution plan, MKE announces to the public a detailed business plan for the development of parts and materials technology.[15]  This business plan includes support areas, qualifications, and the application process.[16]  According to the GOK, any person or company can participate in the program by preparing an R&D business plan that conforms with the requirements set forth in the MKE business plan.[17]  The completed application must then be submitted to KEIT, which evaluates the application and selects the projects eligible for government support.[18]  After the selected application is finally approved by MKE, MKE and the participating companies enter into an R&D agreement and then MKE provides the grant.[19]

R&D project costs are shared by the GOK and companies or research institutions as follows:  1) When the group of companies involved in the research is made up of a ratio above two-thirds small to medium-sized companies, the GOK provides a grant up to three-fourths of the project cost; 2) When the group of companies involved in the research is made up of a ratio below two-thirds small to medium-sized companies, the GOK provides a grant up to one-half of the project cost.[20]

---

[12] *See* GOK's December 4, 2012, questionnaire response ("GOK's Initial QR") at Exhibit P-1.
[13] *Id.*
[14] *See* GOK's Initial QR at Exhibit P-1.
[15] *Id.* at 2.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.* at 3.
[20] *See* GOK's Initial QR, Exhibit P-1.

Upon completion of the project, if the GOK evaluates the project as "successful," the participating companies must repay 40 percent of the R&D grant to the GOK over five years.[21] However, if the project is evaluated by the GOK as "not successful," the company does not have to repay any of the grant amount to the GOK.[22]

In the final results of administrative review of the CVD order on CORE from Korea covering the period January 1, 2008, through December 31, 2008, the Department determined that the Promotion of Specialized Enterprises Act was *de jure* specific under section 771(5A)(D)(i) of the Act, because it is expressly limited to (1) enterprises specializing in components and materials and (2) enterprises specializing in development of technology for components and materials.[23] No information on the record of this review leads us to reconsider that determination and, thus, we preliminarily find that this program is *de jure* specific within the meaning of 771(5A)(D)(i) of the Act. We also preliminarily find that a financial contribution was provided within the meaning of section 771(5)(D)(i) of the Act because the GOK's payments constitute a direct transfer of funds.[24]

HYSCO reported that during the POR, it was involved in one R&D project under this program.[25] In the *Final Results of CORE from Korea 2008*, we treated a portion of the subsidy that does not have to be repaid as a grant and the remaining portion of the subsidy that may have to be repaid as a long-term, interest-free contingent liability loan.[26] This approach is consistent with the Department's regulation and practice.[27] We have adopted the same approach in these preliminary results.

To determine the benefit from the GOK funds HYSCO received under the Specialized Enterprises Act program, we calculated the GOK's contribution for the assistance that was apportioned to HYSCO.[28] As described immediately above, we treated a portion of this benefit as a grant. In accordance with 19 CFR 351.524(b)(2), we determined whether to allocate the non-recurring benefit from the grants over a 15-year AUL by dividing the GOK-approved grant amount by the company's total sales in the year of approval. Because the approved amount was less than 0.5 percent of the company's total sales, we expensed the grant to the year of receipt, *i.e.*, to 2011, the POR in this review.

---

[21] *See* GOK's Initial QR, Exhibit P-1 at 2.
[22] *Id.*
[23] *See Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 76 FR 3613 (January 20, 2011) ("*Final Results of CORE from Korea 2008*"), and accompanying IDM at "The Act on Special Measures for the Promotion of Specialized Enterprises for Parts and Materials."
[24] *See Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review*, 75 FR 55745; 55750 (September 14, 2010).
[25] *See* HYSCO's Initial QR at 17. The other respondents did not report receiving any benefits under this program during the POR.
[26] *See Final Results of CORE from Korea 2008*, and accompanying IDM at "The Act on Special Measures for the Promotion of Specialized Enterprises for Parts and Materials."
[27] *See* 19 CFR 351.505(d)(1); *see also Certain Hot-Rolled Carbon Steel Flat Products From India: Final Results of Countervailing Duty Administrative Review*, 73 FR 40295 (July 14, 2008), and accompanying IDM at "Export Promotion Capital Goods Scheme ("EPCGS")."
[28] *See* 19 CFR 351.504(a).

6

With respect to the portion of the subsidy that we are treating as a long-term, interest-free contingent liability loan, pursuant to 19 CFR 351.505(d)(1) for the reasons described above, we find the benefit to be equal to the interest that HYSCO would have paid during the POR had it borrowed the full amount of the contingent liability loan during the POR.  Pursuant to 19 CFR 351.505(d)(1), we used a long-term interest rate as our benchmark to calculate the benefit of a contingent liability interest-free loan because the event upon which repayment of the duties depends (*i.e.*, the completion of the R&D project) occurs at a point in time more than one year after the date in which the grant was received.  Specifically, we used the long-term benchmark interest rates as described in the "Subsidies Valuation" section of these preliminary results.

To calculate the total net subsidy amount for this program, we summed the benefits provided under this program.  Next, to calculate the net subsidy rate, we divided the portion of the benefit allocated to the POR by HYSCO's total free on board ("f.o.b.") sales for 2011.[29]  On this basis, we preliminarily determine the net subsidy rate under this program to be 0.01 percent *ad valorem* for HYSCO.

B.    Restriction of Special Taxation Act ("RSTA") Article 26

Under RSTA Article 26, a company can claim a tax credit equal to a certain percentage of its investments in its facilities.[30]  According to the GOK, the goal of this program is to boost general national economic activity.[31]  In its response to the Department's October 1, 2012, questionnaire, the GOK submitted information which indicated that these tax credits are expressly limited to a corporation's investments in facilities located outside the "Overcrowding Control Region" of the Seoul Metropolitan Area ("SMA").[32]  Specifically, the GOK provided a complete translation of Article 23(1) of the Enforcement Decree of the RSTA in the GOK's Initial QR; eligibility for the program is limited to investments made outside the Overcrowding Control Region of the SMA.[33]  Moreover, the GOK also stated that corporate investments in facilities located within the Overcrowding Control Region of the SMA are not eligible for credits under this tax program.[34]

Because information provided by the GOK indicates that the tax credit under this program is limited by law to enterprises or industries within a designated geographical region within the jurisdiction of the authority providing the subsidy, we preliminarily find that this program is regionally specific in accordance with section 771(5A)(D)(iv) of the Act.[35]  The tax credit is a financial contribution in the form of revenue foregone by the government within the meaning of section 771(5)(D)(ii) of the Act, which provides a benefit to the recipient equal to the difference between the taxes actually paid and the taxes otherwise payable in the absence of this program within the meaning of 19 CFR 351.509(a)(1).  These findings are consistent with the

---

[29] *See* 19 CFR 351.525(b)(3).
[30] *See* GOK's Initial QR at Exhibit B-1.
[31] *Id*.
[32] *Id*. at Exhibit B-6.
[33] *Id*. at Exhibit B-1.
[34] *Id*. at Exhibit B-6.
[35] *See, e.g.*, *Final Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products From Thailand*, 66 FR 50410 (October 3, 2001), and accompanying IDM at "Provision of Electricity for Less than Adequate Remuneration" (where eligibility for a program was limited to users outside the Bangkok metropolitan area, we found the subsidy to be regionally specific under section 771(5)(a)(D)(iv) of the Act).

7

determinations in *Bottom Mount Refrigerators from Korea*, the *Final Results of CORE from Korea 2009*, and the *Final Results of CORE from Korea 2010*.[36]

HYSCO and POSCO indicated that their companies used RSTA Article 26 credits during the 2011 POR.[37]

In accordance with 19 CFR 351.524(c), we generally consider tax credits to confer recurring benefits. However, pursuant to 19 CFR 351.524(c)(2)(iii), when a subsidy is tied to the capital structure or capital assets of the firm, the Department treats the subsidy as non-recurring. The benefit HYSCO received during the POR for this program did not exceed 0.5% of its total sales. Thus, we expensed all of the benefit to the POR. On this basis, we preliminarily determine the countervailable subsidy provided under this program to be 0.12 percent *ad valorem* for HYSCO. In accordance with 19 CFR 351.524(b)(2), we determine that the tax credit received by POSCO exceeded 0.5 percent of its total sales.[38] Therefore, we used the methodology described in 19 CFR 351.524(d) to allocate the benefit over time, and we divided the amount allocated to the POR by POSCO's total sales in the POR. On this basis, we preliminarily determine the countervailable subsidy provided under this program to be 0.06 percent *ad valorem* for POSCO.

    C.    <u>Asset Revaluation Article 56(2) of the Tax Reduction and Exemption Control Act ("TERCL"))</u>

Under Article 56(2) of the TERCL, the GOK permitted companies that made an initial public offering between January 1, 1987, and December 31, 1990, to revalue their assets at a rate higher than the 25 percent required of most other companies under the Asset Revaluation Act.[39] We preliminarily determine that this program is *de facto* specific under section 771(5A)(D)(iii) of the Act, because the actual recipients of the subsidy were limited in number and the basic metal industry was a dominant user of this program. We also preliminarily determine that the program constitutes a financial contribution in the form of revenue forgone pursuant to section 771(5)(D)(ii) of the Act. We further preliminarily determine that the program confers a benefit within the meaning of section 771(5)(E) of the Act on those companies that were able to revalue their assets under TERCL Article 56(2) because the revaluation resulted in participants paying

---

[36] *See Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Determination*, 76 FR 55044 (September 6, 2011)( *Bottom Mount Refrigerators from Korea*) unchanged in *Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 FR 17410 (March 26, 2012); *see also* Memorandum to Ronald K. Lorentzen from Melissa G. Skinner, Re: 2009 Review of the Countervailing duty Order on Corrosion-Resistant Carbon Steel Flat Products from Korea: Post Preliminary Analysis Memorandum for Hyundai HYSCO Ltd. (September 27, 2011) unchanged in *Corrosion-Resistant Carbon Steel Flat Products from Korea: Final Results of Administrative Review*, 77 FR 13093 (March 5, 2012) ("*Final Results of CORE from Korea 2009*"); *see also Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2010*, 78 FR 19210 (March 29, 2013) ("*Final Results of CORE from Korea 2010*").

[37] *See* HYSCO's Initial QR at 9-11 and Exhibit B-3 and POSCO's December 3, 2012 questionnaire response ("POSCO's Initial QR") at 12 and Exhibits B-2, B-3, and B-4.

[38] *Id.* at 13.

[39] *See* GOK's Initial QR at Exhibit B-9.

lower taxes than they would otherwise pay absent the program. Our findings in this regard are consistent with the Department's practice.[40]

The benefit from this program is the difference that the revaluation of depreciable assets has on a company's tax liability each year. Evidence on the record indicates that, in 1989, POSCO made an asset revaluation that increased its depreciation expense. To calculate the benefit to POSCO, we took the additional depreciation listed in the tax return filed during the POR, which resulted from the company's asset revaluation, and multiplied that amount by the tax rate applicable to that tax return. We then divided the resulting benefit by POSCO's total f.o.b. sales.[41] On this basis, we preliminarily determine the net countervailable subsidy to be 0.01 percent *ad valorem* for POSCO. Dongbu and HYSCO did not use this program during the POR.

D.      Exemption of VAT on Imports of Anthracite Coal

Under Article 106 of Restriction of Special Taxation Act ("RSTA"), imports of anthracite coal are exempt from the value added tax ("VAT").[42] We preliminarily determine that the VAT exemptions under the program constitute a financial contribution under section 771(5)(D)(ii) of the Act, as the GOK is not collecting revenue otherwise due, and that the exemptions confer a benefit under section 771(5)(E) of the Act equal to the amount of the VAT that would have otherwise been paid if not for the exemption. We also preliminarily determine that because the GOK allows for only a few items to be exempt from VAT (which includes anthracite coal), the items allowed to be imported without paying VAT are limited and, thus, the program is *de jure* specific under section 771(5A) of the Act. Our findings in this regard are consistent with the Department's practice.[43]

Dongbu and HYSCO reported that their companies did not use the program during the POR.[44] POSCO imported anthracite coal during the POR and, therefore, received a benefit in the amount of the VAT that it should have otherwise paid if not for the exemption. To determine POSCO's benefit from the VAT exemption on these imports, we calculated the amount of VAT that would have been due absent the program on the total value of anthracite coal POSCO imported during the POR. We then divided the amount of this tax benefit by POSCO's total f.o.b. sales. Based on this methodology, we preliminarily determine the POSCO received a countervailable subsidy of 0.08 percent *ad valorem*.

---

[40] *See Final Affirmative Countervailing Duty Determination:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 64 FR 73176, 73183 (December 29, 1999.
[41] *See* 19 CFR 351.525(b)(3).
[42] *See* GOK's Initial QR at Exhibit I-1.
[43] *See Notice of Final Affirmative Countervailing Duty Determination:  Certain Cold-Rolled Carbon Steel Flat Products From the Republic of Korea*, 67 FR 62102 (October 3, 2002) ("*Cold-Rolled Investigation*") and accompanying IDM at "Exemption of VAT on Imports of Anthracite Coal."
[44] *See* HSYCO's November QR at 15 and Dongbu's November 28, 2012, questionnaire response ("Dongbu's Initial QR") at 15; *see also* GOK's Initial QR at Exhibit I-2.

9

E.   Other Subsidies Related to Operations at Asan Bay:  Provision of Land and
    Exemption of Port Fees Under Harbor Act

1.   Provision of Land

As explained in the *Cold-Rolled Investigation*, the GOK's overall development plan is published every 10 years and describes the nationwide land development goals and plans for the balanced development of the country.  Under these plans, the Ministry of Construction and Transportation ("MOCAT") prepares and updates its Asan Bay Area Broad Development Plan.[45]  The Korea Land Development Corporation ("Koland") is a government investment corporation that is responsible for purchasing, developing, and selling land in the industrial sites.[46]

In the *Cold-Rolled Investigation*, we verified that the GOK, in setting the price per square meter for land at the Kodai Industrial Estate, removed the 10 percent profit component from the price charged to Dongbu.[47]  In the *Cold-Rolled Investigation*, we further explained that companies purchasing land at Asan Bay must make payments on the purchase and development of the land before the final settlement.  However, in the case of Dongbu, we found that the GOK provided an adjustment to Dongbu's final payment to account for "interest earned" by the company for the pre-payments.[48]  HYSCO and POSCO reported that their companies did not use this program.[49]

We preliminarily determine that the price discount and the adjustment of Dongbu's final payment to account for "interest earned" by the company on its pre-payments constitute countervailable subsidies.  Specifically, we preliminarily determine that the price discount and the price adjustment for "interest earned" constitutes financial contributions in the form of grants under section 771(5)(D)(i) of the Act and conferred benefits in the amount of the grants within the meaning of section 771(5)(E) of the Act.  We further preliminarily determine that the terms of Dongbu's transaction are specific under section 771(5A)(D)(iii)(I) of the Act, as they were limited to Dongbu.[50]  Our findings in this regard are consistent with the Department's practice.[51]

Consistent with the *Cold-Rolled Investigation*, we have treated the land price discount and the interest earned refund as non-recurring subsidies.[52]  In accordance with 19 CFR 351.524(b)(2), because the grant amounts were more than 0.5 percent of the company's total sales in the year of receipt, we applied the Department's standard grant methodology, as described under 19 CFR 351.524(d)(1), and allocated the subsidies over a 15-year allocation period.  *See* the "Average Useful Life" section above.  To calculate the benefit from these grants, we used as our discount rate the rates described above in the "Subsidies Valuation Information" section.  We then summed the benefits received by Dongbu during the POR.  We calculated the net subsidy rate by dividing the total benefit attributable to the POR by Dongbu's total f.o.b. sales for the POR.  On

---

[45] *See Cold-Rolled Investigation*, and accompanying IDM at "Provision of Land at Asan Bay."
[46] *Id*.
[47] *Id*.
[48] *Id*.
[49] *See* HYSCO's Initial QR at 15 and POSCO's Initial QR at 18.
[50] *See Cold-Rolled Investigation*, and accompanying IDM at "Provision of Land at Asan Bay."
[51] *Id*.
[52] *Id*.

this basis, we determine a net countervailable subsidy rate for Dongbu of 0.08 percent *ad valorem* for the POR.

      2.  Exemption of Port Fees Under the Harbor Act

Under the Harbor Act, companies are allowed to construct infrastructure facilities at Korean ports; however, these facilities must be deeded back to the government.  Because the ownership of these facilities reverts to the government, the government compensates private parties for the construction of these infrastructure facilities.  Because a company must transfer to the government its infrastructure investment, under the Harbor Act, the GOK grants the company free usage of the facility and the right to collect fees from other users of the facility for a limited period of time.  Once a company has recovered its cost of constructing the infrastructure, the company must pay the same usage fees as other users of the infrastructure.

In the *Cold-Rolled Investigation*, the Department found that Dongbu received free use of harbor facilities at Asan Bay based upon both its construction of a port facility as well as a road that the company built from its plant to its port.[53]  The Department also determined that Dongbu received an exemption of harbor fees for a period of almost 70 years under this program.[54]

We preliminarily determine that the program is specific under section 771(5A)(D)(iii)(I) of the Act because the excessive exemption period of 70 years is limited to Dongbu.  Moreover, we preliminarily determine that the GOK is foregoing revenue that it would otherwise collect by allowing Dongbu to be exempt from port charges for up to 70 years and, thus, the program constitutes a financial contribution within the meaning of section 771(5)(D)(ii) of the Act.  Further, we preliminarily determine that the exemptions confer a benefit under section 771(5)(E) of the Act in the amount of the port charges that were not collected.  Our findings in this regard are consistent with the Department's practice.[55]

In the *Cold-Rolled Investigation*, the Department treated the program as a recurring subsidy and determined that the benefit is equal to the average yearly amount of harbor fee exemptions provided to Dongbu.[56]  For purposes of these preliminary results, we have employed the same benefit calculation.  To calculate the net subsidy rate, we divided the average yearly amount of exemptions by Dongbu's total f.o.b. sales for the POR.  On this basis, we preliminarily determine that Dongbu's net subsidy rate under this program is 0.01 percent *ad valorem*.

---

[53] *Id.,* at "Dongbu's Excessive Exemptions under the Harbor Act."
[54] *Id*.
[55] *Id.,* at "Dongbu's Excessive Exemptions under the Harbor Act."
[56] *Id*.

F.  Document Acceptance ("D/A") Financing Provided Under the Korea Export-Import
    Bank's (KEXOM) Trade Rediscount Program and D/A Loans issued by the KDB and
    Other Government Policy Banks

The GOK enacted KEXIM's Trade Bill Rediscount program in July 1998.  From July 1998 to
May 2004, KEXIM rediscounted the actual D/A and export letter of credit (L/C) (*e.g.*, export
usance loans) financing of exporters that had first been discounted by commercial banks.
However, after May 18, 2004, KEXIM switched to a rediscount ceiling method with Korean
commercial.  Under the ceiling method, KEXIM calculates the rediscount ceiling for
participating commercial banks on a quarterly basis based on the total D/A or export L/C
financing provided by the banks during the previous period, the banks' projected rediscounts,
and the banks' credit rating.  Under the trade bill rediscounting program, exporters first discount
their D/As and export L/Cs with banks that are participating in the program.  The banks, in turn,
discount promissory notes with KEXIM.

Under section 771(5)(B)(iii) of the Act, a subsidy can be found whenever an "authority"  "makes
a payment to a funding mechanism to provide a financial contribution, or entrusts or directs a
private entity to make a financial contribution" to a person and a benefit is thereby conferred.  In
the *CFS Investigation*, we determined that KEXIM's trade bill rediscount program constitutes a
payment from KEXIM (an "authority") to a funding mechanism because the rediscount ceiling
KEXIM provides to banks participating under the program is contingent on banks subsequently
lending the funds to exporters.[57]  Section 771(5)(B)(iii) of the Act also states that financial
contributions from funding mechanisms can be a subsidy only if providing the contribution
would normally be vested in the government and the practice does not differ in substance from
practices normally followed by the government.  This is the "government subsidy function"
prong of an indirect financial contribution.  As determined in the *CFS Investigation*, under this
program banks are performing a government subsidy function and, therefore, their loans can
qualify as subsidies.[58]

Therefore, consistent with *CFS Investigation*, we preliminarily determine that loans from banks
under the rediscount program constitute financial contributions within the meaning of section
771(5)(D)(i) of the Act and confer a benefit upon exporters, in accordance with section
771(5)(E)(ii) of the Act, to the extent the amount exporters pay under the program is less than the
amount they would pay on comparable commercial loans they could obtain on the market.
Because receipt of the loans is contingent upon export performance, we also preliminarily
determine that KEXIM's rediscount program is specific within the meaning of section
771(5A)(B) of the Act. [59]

Consistent with the *CFS Investigation*, we further preliminarily determine that D/A Loans issued
by the KDB and other government policy banks constitute a financial contribution from an
"authority" in the form of a direct transfer of funds within the meaning of sections 771(5)(B) and

---

[57] *See Coated Free Sheet Paper from the Republic of Korea:  Notice of Final Affirmative Countervailing Duty
Determination*, 72 FR 60639 (October 25, 2007) ("*CFS Investigation*"), and accompanying IDM at "Export Loans
by Commercial Banks Under KEXIM's Trade Bill Rediscounting Program."
[58] *Id.*
[59] *Id.*

771(5)(D)(i) of the Act.  In addition, we preliminarily determine that such loans confer a benefit, in accordance with section 771(5)(E)(ii) of the Act, to the extent the amount exporters pay under the program is less than the amount they would pay on comparable commercial loans they could obtain on the market.  Because receipt of D/A loans is contingent upon export performance, we also preliminarily determined that D/A loans from the KDB and other government policy banks are specific within the meaning of section 771(5A)(B) of the Act.[60]

Consistent with the *CFS Investigation*, we preliminarily determine that subsidies on the loans under KEXIM's trade bill rediscount program are tied to sales of subject merchandise to the United States in accordance with 19 CFR 351.525(b)(4) and (5).[61]  Accordingly, we limited our benefit calculations to D/A financing issued on sales of subject merchandise to the United States.

During the POR, Dongbu and HYSCO received short-term D/A financing from commercial banks that participated in KEXIM's Trade Rediscount Program and D/A Loans issued by the KDB and other government policy banks, which we find to be "authorities" within the meaning of section 771(5)(B) of the Act.  To calculate the benefits under these programs, we compared the interest paid on D/A financing from banks that participated in the KEXIM Trade Rediscount Program and the interest paid on D/A loans issued by the KDB and other government policy banks paid during the POR with the amounts of interest that would have been paid at the weighted-average of the interest rates of the companies' comparable commercial loans.[62]  Because loans under these programs are discounted (*i.e.*, interest is paid up front at the time the loans are received), the effective rate paid by respondents on their D/A financing and D/A loans is a discounted rate.  To calculate the net subsidy rate, we divided the benefit by the company's total export sales of subject merchandise to the United States during the POR.  On this basis, we preliminarily determine the net subsidy rate for Dongbu under each program is less than 0.005 percent *ad valorem*.  With regard to HYSCO, we preliminary determine that its net subsidy rates for D/A Financing Under KEXIM Trade Rediscount Program and the D/A Loans Issued by the KDB and Other Government Policy Banks program are 0.12 percent *ad valorem* and 0.14 percent *ad valorem*, respectively.

POSCO's cross-owned affiliate, Daewoo, used D/A financing, though we preliminarily determine it received no benefit during the POR.  Specifically, the interest payment Daewoo made under the program was larger than the benchmark interest payment calculated by the Department.  POSCO did not have D/A financing or D/A loans under these programs outstanding during the POR.[63]

   G.   Reduction in Taxes for Operation in Regional and National Industrial Complexes

Under the Industrial Cluster Development and Factory Establishment Act ("Industrial Cluster Act"), a state or local government may provide tax exemptions as prescribed by the Restriction of Special Taxation Act.[64]  In accordance with this authority, Article 276 of the Local Tax Act

---

[60] *Id.*, at "D/A Loans Issued by the KDB and Other Government-Owned Banks."
[61] *Id.*
[62] *See* 19 CFR 351.505(a)(2)(iv).
[63] *See* POSCO's Initial QR at 19.
[64] *See* GOK's Initial QR at Exhibits W-1, W-2, and W-3.

13

provides that an entity that acquires real estate in a designated industrial complex for the purpose of constructing new buildings or enlarging existing facilities is exempt from the acquisition and registration tax.[65]  In addition, the entity is exempt from 50 percent of the property tax on the real estate (*i.e.*, the land, buildings, or facilities constructed or expanded) for five years from the date the tax liability becomes effective.[66]  The exemption is increased to 100 percent of the relevant land, buildings, or facilities that are located in an industrial complex outside of the Seoul metropolitan area.[67]  The GOK established the tax exemption program under Article 276 in December 1994, to provide incentives for companies to relocate from populated areas in the Seoul metropolitan region to industrial sites in less populated parts of the country.  The program is administered by the local tax officials of the county where the industrial complex is located.

During the POR, pursuant to Article 276 of the Local Tax Act, HYSCO received exemptions from the acquisition tax, registration tax, and property tax based on the location of its manufacturing facilities, Suncheon Works, in the Yulchon Industrial Complex, and its facilities in the Ulsan Works industrial complex designated under the Industrial Cluster Act.[68]  During the POR, POSCO received acquisition tax and property tax reductions in connection with their facilities located at Gwangyang and at Pohang.[69]  Dongbu received property and acquisition tax reductions in connection with their facilities located in the Asan National Industrial Complex-Godae.[70]  In addition, HYSCO, POSCO, and Dongbu received an exemption from the local education tax during the POR.  The local education tax is levied at 20 percent of the property tax.  The property tax exemption, therefore, results in an exemption of the local education tax.[71]

We preliminarily determine that the tax reductions constitute a financial contribution in the form of revenue forgone, as described under section 771(5)(D)(ii) of the Act, and a benefit under section 771(5)(E) and 19 CFR 351.509(a).  We further preliminarily determine that the property tax exemptions provided under this program are specific under section 771(5A)(D)(iv) of the Act because benefits are limited to enterprises located within designated geographical regions.  Our findings in this regard are consistent with the Department's practice.[72]

To calculate the benefit, we subtracted the amount of taxes paid by the firms from the amounts that would have been paid absent the program.  To calculate the net subsidy rate, we divided the total benefit by the total sales of the company.  In the case of HYSCO, the resulting net subsidy rate was less than 0.005 percent *ad valorem*.  Therefore, consistent with the Department's practice, we have not included any benefits under this program in net subsidy rates of HYSCO.[73]

---

[65] *Id.*

[66] *Id.* at Exhibit W-3.

[67] *Id.*

[68] *See* HYSCO's Initial QR at Exhibit W-4.

[69] *See* POSCO's Initial QR at Exhibits W-4 and W-5 and POSCO's July 26, 2013, supplemental questionnaire response ("POSCO's July SQR") at 4 and Exhibit W-6.

[70] *See* Dongbu's Initial QR at 21-22 Exhibit W-3, W-4 and W-5.

[71] *See* GOK's Initial QR at W-3 and POSCO's Initial QR at 27.

[72] *See, e.g., CFS Investigation*, and accompanying IDM at "Reduction in Taxes for Operation in Regional and National Industrial Complexes" and *Final Results of CORE from Korea 2010* and accompanying IDM at "Reduction in Taxes for Operation in Regional and National Industrial Complexes."

[73] *See, e.g., Final Results of CORE from Korea 2006*, and accompanying IDM at "GOK's Direction of Credit."

In the case of POSCO, we calculated a net subsidy rate of 0.04 percent *ad valorem*. For Dongbu, we calculated a net subsidy rate of 0.01 percent *ad valorem*.

>    H.    RSTA 22:  Corporation Tax Exemption on Dividend Income from Investment in Overseas Resource Development

Under RSTA Article 22, a domestic corporation, whose income for each business year ending before December 31, 2012, includes any dividend income from its investment in overseas resource development projects as prescribed by Presidential Decree ("Enforcement Decree"), is exempt from corporate tax for the portion of such dividend income that is exempted from the tax of the host country where the investment occurred.[74]  POSCO reported that it had investments in overseas resource development projects as prescribed by the Enforcement Decree and received tax exemptions in the host country for these investments.[75]  The tax exemptions were reflected in the tax return that POSCO filed during the POR.  Dongbu and HYSCO reported that they did not use this program.

In the last administrative review of this order, we found that this program constitutes a financial contribution in the form of revenue forgone as described under section 771(5)(D)(ii) of the Act and confers a benefit as described under section 771(5)(E) of the Act and 19 CFR 351.509(a).[76]  We also found it to be specific.  No new information or evidence of changed circumstances has been presented that would cause us preliminarily to revisit these findings.  Accordingly, we continue to find this program to be countervailable.

Under this program, the benefit is equal to the amount of added income taxes that POSCO would have paid absent the program.  We calculated a benefit to POSCO of 0.01 percent *ad valorem*.

## II.    Programs Preliminarily Determined Not To Confer a Benefit During the POR

>    A.    Overseas Resource Development Program: Loan from Korea Resources Corporation ("KORES")

In *Final Results of CORE from Korea 2006*, the Department found that the GOK enacted the Overseas Resource Development ("ORD") Business Act in order to establish the foundation for securing the long-term supply of essential energy and major material minerals, which are mostly imported because of scarce domestic resources.[77]  Pursuant to Article 11 of this Act, MKE annually announces its budget and the eligibility criteria to obtain a loan from MKE.[78]  Any

---

[74] *See* GOK's Initial QR at Exhibit B-7.

[75] *See* POSCO's Initial QR at 13 and Exhibit B-6; *see also* GOK's Initial QR at 7.

[76] *See Final Results of CORE from Korea 2010*, and accompanying IDM at "RSTA 22: Corporation Tax Exemption on Dividend Income from Investment in Overseas Resource Development."  We found that the program resulted in no measurable benefit during that period of review.

[77] *See Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review*, 73 FR 52315, 52326, (September 9, 2008) (*Preliminary Results of CORE from Korea 2006*), unchanged in *Final Results of CORE from Korea 2006*, and accompanying IDM at "Programs Determined To Be Not Used".

[78] *See* GOK's Initial QR at Exhibit S-1.

company that meets the eligibility criteria may apply for a loan to MKE.[79]  The loan evaluation committee evaluates the applications, selects the recipients and gets approval from the Minister of MKE.[80]  For projects related to the development of strategic mineral resources, the KORES lends the funds to the company for foreign resources development.[81]

During the POR, as in the prior administrative review, HYSCO had outstanding loans from KORES for investment in a copper mine in Mexico.[82]  Based upon examination of the loan documents and our prior determination concerning these loans, we preliminarily determine that the KORES loans are tied to copper, which is non-subject merchandise.[83]  Further, we find that copper is not an input primarily dedicated to the production of subject merchandise.[84]  On this basis, we find the KORES loans are tied and attributable to non-subject merchandise.[85]  Therefore, we preliminarily determine that HYSCO did not receive a benefit from this program with respect to the subject merchandise during the POR.

B.    Overseas Resource Development Program: Loan from Korea National Oil Corporation ("KNOC")

In *Final Results of CORE from Korea 2007*, the Department found that the GOK enacted the ORD Business Act in order to establish the foundation for securing the long-term supply of essential energy and major material minerals, which are mostly imported because of scarce domestic resources.[86]  Pursuant to Article 11 of this Act, the MKE annually announces its budget and the eligibility criteria to obtain a loan from MKE.[87]  Any company that meets the eligibility criteria may apply for a loan from MKE.[88]  For projects that are related to petroleum and natural gas, the Korea National Oil Corporation ("KNOC") lends the funds to the company for foreign resources development.[89]  An approved company enters into a borrowing agreement with KNOC for the development of the selected resource.[90]  Two types of loans are provided under this program:  "General loans" and "success-contingent loans".  For a success-contingent loan, the repayment obligation is subject to the results of the development project.  In the event that the project fails, the company will be exempted for all or a portion of the loan repayment obligation.  However, if the project succeeds, a portion of the project income is payable to KNOC.[91]

---

[79] *Id*.
[80] *Id*.
[81] *Id*.
[82] *See* HYSCO's Initial QR at 19 and Exhibit 8.
[83] *See Preliminary Results of CORE from Korea 2009*, 76 FR at 54214-54215, unchanged in *Final Results of CORE from Korea 2009*; *see also Final Results of CORE from Korea 2010*, and accompanying IDM at "Overseas Resource Development Program:  Loan from Korea Resources Corporation (KORES)."
[84] *Id*.
[85] *See* 19 CFR 351.525(b)(5).
[86] *See Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review*, 74 FR 46100; 46107-46108 (September 8, 2009), and unchanged in *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 74 FR 55192 (October 27, 2009) ("*Final Results of CORE from Korea 2007*").
[87] *See* GOK's Initial QR at Exhibit T-1.
[88] *Id*.
[89] *Id*.
[90] *Id*.
[91] *Id*.

During the POR, HYSCO had outstanding loans from KNOC related to petroleum exploration projects.[92]  Based upon examination of the loan documents and our determinations concerning these loans in the prior administrative review, we preliminarily determine that the KNOC loans are tied to petroleum exploration, which does not involve subject merchandise.[93]  On this basis, we find the KNOC loans are tied and attributable to non-subject merchandise.[94]  Therefore, we preliminarily determine that HYSCO did not receive a benefit from this program with respect to the subject merchandise during the POR.  We will continue to examine this program in future reviews.

C.    Pre-1992 Direct Credit

During the POR, POSCO was the only respondent company that had pre-1992 long-term loans outstanding during the POR.[95]  Assuming, *arguendo*, that the benefit under this program is equal to the sum of POSCOs total interest payments made during the POR, the resulting net subsidy rate would be less than 0.005 percent *ad valorem* when attributed to POSCO's total sales, which is not numerically significant.  Thus, consistent with the Department's practice, we are excluding this amount from the net countervailable subsidy rate.

D.    R&D Grants Under the Special Act on Balanced National Development

During the POR, HYSCO reported that it received a research and development grant under the Special Act on Balanced National Development ("National Development Act").[96]

Upon review of the information submitted by HYSCO, including information from the 2010 verification report, we preliminarily determine that the grant pertains specifically to the production of a product that is not subject merchandise.[97]  Therefore, consistent with 19 CFR 351.525(b)(5), we preliminarily determine that the National Development Act did not confer a benefit to the production or export of subject merchandise during the POR.  If a future administrative review of this proceeding is requested, we will reconsider whether grants provided under the National Development Act confer a benefit.

E.    Research and Development Grants Under the Industrial Technology Innovation Promotion Act ("ITIPA")

The GOK's Industrial Technology Innovation Promotion Act program is designed to foster future new industries and enhance the competitiveness of primary industries through

---

[92] *See* HYSCO's Initial QR at 20 and Exhibit 8.
[93] *See Preliminary Results of CORE from Korea 2009*, 76 FR at 54215 unchanged in *Final Results of CORE from Korea 2009; see also Final Results of CORE from Korea 2010*, and accompanying IDM at "Overseas Resource Development Program:  Loan from Korea National Oil Corporation (KNOC)."
[94] *See* 19 CFR 351.525(b)(5).
[95] *See* GOK's Initial QR at 3 and POSCO's Initial QR at 9.
[96] *See* HYSCO's Initial QR at 20 and HYSCO's May 21, 2013, supplemental questionnaire response ("HYSCO's May SQR") at Exhibit 12.
[97] *See Final Results of CORE from Korea 2010*, and accompanying IDM at "R&D Grants Under the Special Act on Balanced National Development."

17

fundamental technology development.[98]  The program is administered by MKE and the Korean Evaluation Institute of Industrial Technology ("KEIT").[99]

Under the Industrial Technology Innovation Promotion Act, GOK provides R&D grants to support the areas of transportation system, industrial materials, robots, biomedical equipment, clean manufacturing foundation, knowledge services and industry convergence technology.[100]

Pursuant to Article 11 of the Industrial Technology Innovation Promotion Act, KEIT prepares a basic plan for the development of technology, on behalf of MKE.[101]  This plan includes the R&D projects that are eligible, describes the application process, and designates the supporting documentation required.[102]  The plan is announced to the public.[103]  According to the GOK, any person who wishes to participate in the program prepares an R&D business plan that meets the requirements set forth in the basic plan and then submits the application to the GOK's Application Review Committee, which then evaluates the application to determine if it conforms to the terms and conditions set forth in the basic plan.[104]  If the application is approved, MKE and the company enter into an R&D agreement and then MKE provides the grant.[105]

The costs of the R&D projects under this program are shared by the company (or research institution) and the GOK.[106]  Specifically, the grant ratio for project costs are as follows:  (1) for projects with one small/medium-sized enterprise ("SME"), the GOK provides grants up to three-fourths of the project costs, (2) for projects with one conglomerate, the GOK provides grants up to one-half of the project costs, (3) for projects with more than two participants of which SMEs comprise more than two-thirds of the participant ratio, the GOK provides up to three-fourths of the project costs, and (4) for projects with more than two participants of which SMEs comprise less than two-thirds of the participant ratio, the GOK provides up to one-half of the project costs.[107]

When the project is evaluated as "successful" upon completion, the participating companies typically must repay 40 percent of the R&D grant to the GOK over five years.[108]  However, when the project is evaluated as "not successful," the company does not have to repay the GOK any of the grant amount.[109]

Prior to and during the POR, HYSCO and POSCO received grants under the Industrial Technology Innovation Promotion Act for R&D projects in which the companies participated

---

[98] See Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review, 76 FR 54209, 54213 (August 31, 2011) ("Preliminary Results of CORE from Korea 2009") unchanged in Final Results of CORE from Korea 2009, 77 FR at 13093.
[99] Id.
[100] Id.
[101] Id.
[102] Id.
[103] Id.
[104] Id.
[105] Id.
[106] Id.
[107] Id.
[108] Id.
[109] Id. and GOK's Initial QR at Exhibit Q-2.

with other firms.[110]  We treated the portions of the subsidy that do not have to be repaid as grants and the remaining portions of the subsidy that may have to be repaid as a long-term, interest-free contingent liability loans.[111]  As explained above, this approach is consistent with the Department's regulation and practice.[112]

Concerning POSCO, it reported receiving grants under the ITIPA prior to and during the POR.[113]  Dividing the sum of POSCO's benefits from these grants during the POR by POSCO's total sales results in a net subsidy rate that is less than 0.005 percent *ad valorem*, which is not numerically significant.[114]  Consistent with the Department's practice, we find that the grants received by POSCO under this program do not confer a benefit to POSCO during the POR.[115]  Consequently, we preliminarily determine that it is not necessary for the Department to make a finding as to the countervailability of the grants to POSCO received under this program.  We further note that none of the grants received prior to the POR passed the 0.5 percent test and, thus, these grants were fully expensed prior to the POR.

Concerning HYSCO, it reported receiving three ITIPA grants.  The nature of the projects for which HYSCO received the grants is business proprietary and cannot be discussed in this public memorandum.  Based upon our review of program documents submitted in the response, we preliminarily determine that two of the three grants HYSCO received are tied to non-subject merchandise.  For further information, see the HYSCO ITIPA Memorandum.[116]  Thus, we have not included these grants in our subsidy calculations.  Regarding the remaining grant, we divided the sum of HYSCO's benefits from the grant during the POR by HYSCO's total sales, which results in a net subsidy rate that is less than 0.005 percent *ad valorem*, which is not numerically significant.  Consistent with the Department's practice, we find that the grant received by HYSCO under this program does not confer a benefit to HYSCO during the POR.[117]

---

[110] *See* GOK's Initial QR at 16 and Q-1; HYSCO's Initial QR at 17-19 and Exhibit Q-1; and POSCO's Initial QR at 20 and Exhibit Q-1.

[111] *See Final Results of CORE from Korea 2008*, 76 FR at 3613 and accompanying IDM at "The Act on Special Measures for the Promotion of Specialized Enterprises for Parts and Materials."

[112] *See* 19 CFR 351.505(d)(1); *see also Certain Hot-Rolled Carbon Steel Flat Products From India: Final Results of Countervailing Duty Administrative Review*, 73 FR 40295 (July 14, 2008), and accompanying IDM at "Export Promotion Capital Goods Scheme (EPCGS)."

[113] *See* POSCO's Initial QR at Exhibit Q-1 and POSCO's July SQR at Exhibit Q-32.

[114] In the 2010 administrative review of the CVD order on CORE from Korea, the Department found one of POSCO's grant projects, Project 18, to be tied to non-subject merchandise and therefore to confer no benefit.  We excluded Project 18 from our calculations in the 2010 administrative review of CORE from Korea.  *See Final Results of CORE from Korea 2010* and accompanying IDM at Comment 1 and section II.A. "Research and Development Grants Under the Industrial Technology Innovation Promotion Act (ITIPA)."  Therefore, consistent with 19 CFR 351.525(b)(5) and our past practice, we have preliminarily determined that this grant was bestowed in connection with the production of a product that is not subject merchandise, and, therefore, we have not included it in our benefit calculations; *see also* Memorandum to the file from Andrew Medley entitled "Factual Information for Pohang Iron & Steel Co., Ltd./Pohang Coated Steel Co., Ltd. ("POSCO") from the 2010 Administrative Review," dated June 28, 2013, at Attachment 2.

[115] *See, e.g., Final Results of CORE from Korea 2006*, and accompanying IDM at "GOK's Direction of Credit" and *Preliminary Results of CORE from Korea 2009*, 76 FR at 54213.

[116] *See* Memorandum to Melissa G. Skinner, Director, Office 8 AD/CVD Operations, "HYSCO's R&D Grants Under the ITIPA Program," (September 3, 2013) (HYSCO ITIPA Memorandum).

[117] *See, e.g.,* CORE from Korea 2006 IDM at "GOK's Direction of Credit" and *Preliminary Results of CORE from Korea 2009*, 76 FR at 54213.

Consequently, we preliminarily determine that it is not necessary for the Department to make a finding as to the countervailability of the grant that HYSCO received under this program.

## III.    Programs Preliminarily Determined To Be Not Used

The Department included the following programs in its October 1, 2012, initial questionnaire. We preliminarily determine that these programs were not used by the reviewed companies during the POR.

- Reserve for Research and Manpower Development Fund Under RSTA Article 9 (TERCL Article 8)
- RSTA Article 11: Tax Credit for Investment in Equipment to Development Technology and Manpower (TERCL Article 10)
- Reserve for Export Loss Under TERCL Article 16
- Reserve for Overseas Market Development Under TERCL Article 17
- Reserve for Export Loss Under TERCL Article 22
- Exemption of Corporation Tax on Dividend Income from Overseas Resources Development Investment Under TERCL Article 24
- Reserve for Investment (Special Cases of Tax for Balanced Development Among Areas Under TERCL Articles 42-45)
- Tax Credits for Specific Investments Under TERCL Article 71
- RSTA Article 94: Equipment Investment to Promote Workers Welfare (TERCL Article 88)
- Electricity Discounts Under the Requested Loan Adjustment Program
- Electricity Discounts Under the Emergency Load Reductions Program
- Export Industry Facility Loans and Specialty Facility Loans
- Short-Term Trade Financing Under the Aggregate Credit Ceiling Loan Program Administered by the Bank of Korea
- Industrial Base Fund
- Excessive Duty Drawback
- Private Capital Inducement Act
- Scrap Reserve Fund
- Special Depreciation of Assets on Foreign Exchange Earnings
- Export Insurance Rates Provided by the Korean Export Insurance Corporation
- Loans from the National Agricultural Cooperation Federation
- Tax Incentives from Highly Advanced Technology Businesses Under the Foreign Investment and Foreign Capital Inducement Act
- Short-term Export Financing
- Research and Development Grants Under the Industrial Development Act ("IDA")
- R&D Grants Under the Act on the Promotion of the Development, Use, and Diffusion of New and Renewable Energy
- Corporate Tax Reduction for Facilities Located in the Godae Complex
- Income Tax Reduction for Facilities Located in the Godae Complex
- Cash Grants for Employees Working at Facilities in Jeollanamdo

20

Barcode:3153046-02 C-580-818 REV - Admin Review 1/1/11 - 12/31/11

- Training and Education Subsidies at Facilities in Jeollanamdo
- Support for New Investments in Facilities in Jeollanamdo
- Reduction in Rent for Facilities Located in Industrial Complexes
- Employment Subsidies for Large-Scale Investment in Ulsan
- Special Support for Large-Scale Investments in Ulsan
- Technology Development Loans for Facilities in Gwangyang Complex
- Foundation Loans for Facilities in Gwangyang Complex

## IV.   Other Program

A.   Tax Credits Received Under the Restriction of Special Taxation Act ("RSTA")

During the POR, POSCO's cross-owned affiliate, Daewoo, reported that it received tax credits under several other RSTA articles.[118]  HYSCO also reported that it received tax credits under several of the same RSTA articles.[119]  Assuming, *arguendo*, that benefits received under these other RSTA articles constitute a financial contribution and are specific under sections 771(5)(D)(ii) and 771(5A)(D) of the Act, respectively, the total net subsidy rates accruing to POSCO and HYSCO, including these tax programs, are still *de minimis*.[120]  Moreover, we note that the total net subsidy rates for POSCO and HYSCO remain *de minimis* even if we assumed that the benefits under the various RSTA tax programs are attributable to the firms' total export sales rather than total sales.  Therefore, it is not necessary to make a finding regarding the countervailability of the tax benefits.

## RECOMMENDATION

Based on our analysis, we recommend the above positions.  If this recommendation is accepted, we will publish the final results of the review in the *Federal Register*.

✓
_____          _____
Agree                          Disagree

_____
Paul Piquado
Assistant Secretary
 for Import Administration

_7  SEPTEMBER 2013_
Date

---

[118] *See* Daewoo's August 2, 2013, supplemental questionnaire response at 7-8 and Exhibit B-1, in which POSCO reported that Daewoo reported using certain RSTA income tax programs.
[119] *See* HYSCO's IQR at Exhibit B-1, in which HYSCO reported using certain RSTA income tax programs.
[120] For further discussion of the tax credits received and the calculations, *see* Memorandum To The File entitled "Preliminary Calculations - POSCO," dated concurrently with this memorandum; *see also*, Memorandum To The File entitled "Preliminary Calculations - HYSCO," dated concurrently with this memorandum..

Attachment 5

**Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2011, 79 Fed. Reg. 5,378 (Dep't Commerce Jan. 31, 2014).**

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

C-580-818
POR: 1/1/2011-12/31/2011
**Public Document**
E&C AD/CVD OIII:  AMM

January 24, 2014

**MEMORANDUM TO:**    Paul Piquado
Assistant Secretary
for Enforcement and Compliance

**FROM:**    Gary Taverman
Senior Advisor
for Antidumping and Countervailing Duty Operations

**RE:**    Issues and Decision Memorandum for the Final Results of the Countervailing Duty
Administrative Review of Corrosion-Resistant Carbon Steel Flat Products from Korea;
2011

## I.    Summary

On September 10, 2013, the Department of Commerce ("Department") published the
*Preliminary Results* of this countervailing duty ("CVD") administrative review.[1]  As explained
in a memorandum from the Assistant Secretary for Import Administration, the Department
exercised its discretion to toll deadlines for the duration of the closure of the Federal
Government from October 1 through October 16, 2013 and extended all deadlines in this
segment of the proceeding by 16 days.  The revised deadline for the final results is January 24,
2014.[2]

The companies under review are:  Pohang Iron & Steel Co. Ltd. ("POSCO"), Dongbu Steel Co.,
Ltd. ("Dongbu"), and Hyundai HYSCO Ltd. ("HYSCO").  We have analyzed the comments
submitted by interested parties in their case briefs.[3]  The "Analysis of Comments" section below
contains summaries of these comments and the Department's positions on the issues raised in the
briefs.

## II.    Period of Review

The period for which we are measuring subsidies, *i.e.*, the period of review ("POR"), is January
1, 2011, through December 31, 2011.

---

[1] *See Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Preliminary Results of
Countervailing Duty Administrative Review; 2011*, 78 FR 55241 (September 10, 2013) ("*Preliminary Results*").
[2] See Memorandum for the Record from Paul Piquado, Assistant Secretary for Enforcement and
Compliance, titled "Deadlines Affected by the Shutdown of the Federal Government," dated October 18, 2013.
[3] POSCO and HYSCO filed case briefs.  No other parties filed case or rebuttal briefs.



### III.    Scope of the Order

Products covered by this order are certain corrosion-resistant carbon steel flat products from Korea. These products include flat-rolled carbon steel products, of rectangular shape, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished or coated with plastics or other nonmetallic substances in addition to the metallic coating, in coils (whether or not in successively superimposed layers) and of a width of 0.5 inch or greater, or in straight lengths which, if of a thickness less than 4.75 millimeters, are of a width of 0.5 inch or greater and which measures at least 10 times the thickness or if of a thickness of 4.75 millimeters or more are of a width which exceeds 150 millimeters and measures at least twice the thickness. The merchandise subject to this order is currently classifiable in the Harmonized Tariff Schedule of the United States ("HTSUS") at subheadings: 7210.30.0000, 7210.31.0000, 7210.39.0000, 7210.41.0000, 7210.49.0030, 7210.49.0090, 7210.49.0091, 7210.49.0095, 7210.60.0000, 7210.61.0000, 7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.1000, 7210.90.6000, 7210.90.9000, 7212.20.0000, 7212.21.0000, 7212.29.0000, 7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7212.60.0000, 7215.90.1000, 7215.9030, 7215.90.5000, 7217.12.1000, 7217.13.1000, 7217.19.1000, 7217.19.5000, 7217.20.1500, 7217.22.5000, 7217.23.5000, 7217.29.1000, 7217.29.5000, 7217.30.15.0000, 7217.32.5000, 7217.33.5000, 7217.39.1000, 7217.39.5000, 7217.90.1000 and 7217.90.5000. Although the HTSUS subheadings are provided for convenience and customs purposes, the Department's written description of the merchandise is dispositive.

### IV.    Attribution of Subsidies

The Department has made no changes to the methodologies used in the *Preliminary Results* for attributing subsidies and no issues were raised by interested parties in case briefs regarding the attribution of subsidies. For descriptions of the methodologies used for these final results, *see* the *Preliminary Results*.

### V.    Allocation Period

The Department has made no changes to the allocation period and the allocation methodology used in the *Preliminary Results* and no issues were raised by interested parties in case briefs regarding the allocation period or the allocation methodology. For a description of allocation period and the methodology used for these final results, *see* the *Preliminary Results*.

### VI.    Subsidies Valuation Information – Benchmarks and Discount Rates

The Department has made no changes to benchmarks or discount rates used in the *Preliminary Results* and no issues were raised by interested parties in case briefs regarding benchmarks or discounts rates. For a description of the benchmarks and discount rates used for these final results, *see* the *Preliminary Results*.

**ANALYSIS OF PROGRAMS**

**I.    Programs Determined To Be Countervailable**

The Department made no changes to its preliminary determinations with regard to the following programs. For the descriptions, analyses, and calculation methodologies of these programs, *see* the *Preliminary Results*. No issues were raised by interested parties in case briefs regarding these programs. Therefore, the final company-specific program rates for each of the following programs are unchanged from *Preliminary Results* and are as follows:

A.    Promotion of Specialized Enterprises for Parts and Materials

HYSCO: 0.01 percent *ad valorem*

B.    Restriction of Special Taxation Act ("RSTA") Article 26

HYSCO: 0.12 percent *ad valorem*
POSCO: 0.06 percent *ad valorem*

C.    Asset Revaluation Article 56(2) of the Tax Reduction and Exemption Control Act ("TERCL"))

POSCO: 0.01 percent *ad valorem*

D.    Exemption of VAT on Imports of Anthracite Coal

POSCO: 0.08 percent *ad valorem*

E.    Other Subsidies Related to Operations at Asan Bay: Provision of Land and Exemption of Port Fees Under the Harbor Act

1. Provision of Land

Dongbu: 0.08 percent *ad valorem*

2. Exemption of Port Fees Under the Harbor Act

Dongbu: 0.01 percent *ad valorem*

F.     Reduction in Taxes for Operation in Regional and National Industrial Complexes

Dongbu:  0.01 percent *ad valorem*
HYSCO:  less than 0.005 percent *ad valorem*[4]
POSCO:  0.04 percent *ad valorem*

G.     RSTA 22:  Corporation Tax Exemption on Dividend Income from Investment in Overseas Resource Development

POSCO:  0.01 percent *ad valorem*

The Department made changes to its preliminary determination with regard to the following programs.[5]  HYSCO submitted comments in its case brief regarding these programs.[6]

H.     Document Acceptance ("D/A") Financing Provided Under the Korea Export-Import Bank's ("KEXIM") Trade Rediscount Program and D/A Loans issued by the KDB and Other Government Policy Banks

As explained below in the Department's position under Comment 2, in the calculations for the *Preliminary Results*, the Department inadvertently included D/A financing for sales to countries other than the United States in the benefit calculations for the two D/A financing program used by HYSCO during the POR.[7]  For these final results, we have revised the final calculations by excluding D/A financing tied to shipments to countries other than the United States.[8]  Otherwise, the Department's analysis with regard to these two programs remains unchanged from the *Preliminary Results*.

To calculate HYSCO's subsidy rate for each program, we divided the revised benefit amount for each program by the company's total export sales of subject merchandise to the United States during the POR.[9]  As a result, we determine that the final program rates for these two programs are as follows:

1. D/A Financing Under KEXIM Trade Rediscount Program

Dongbu:  less than 0.005 percent *ad valorem*
HYSCO:  0.07 percent *ad valorem*

---

[4] Where the countervailable subsidy rate for a program is less than 0.005 percent, the program is not included in the total countervailing duty rate.  See, *e.g.*, *Final Results of Administrative Review:  Certain Softwood Lumber Products from Canada*, 69 FR 75917 (December 20, 2004) and accompanying Issues and Decision Memorandum at "Other Programs Determined to Confer Subsidies."

[5] *Id.*

[6] *See* Comment 2 of this memorandum.

[7] *Id.*; *see also* Memorandum to the File from Christopher Hargett, International Trade Compliance Analyst, titled "Final Results of 2011 Countervailing Duty Administrative Review:  Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea; Final Calculations – HYSCO," dated concurrently with this memorandum ("HYSCO Calculation Memorandum").

[8] *See* HYSCO Calculation Memorandum.

[9] *Id.*

4

2.   D/A Loans Issued by the KDB and Other Government Policy Banks Program

Dongbu:  less than 0.005 percent *ad valorem*
HYSCO:  0.06 percent *ad valorem*

## II.   Programs Determined Not To Confer a Benefit During the POR

The Department made no changes to its preliminary determinations with regard to the following programs.  For the descriptions, analyses, and calculation methodologies of these programs, *see* the *Preliminary Results*.  No issues were raised in case briefs regarding these programs. Therefore, for these final results, we continue to determine that the following programs do not confer a benefit during the POR:

*Programs Tied to Non-Subject Merchandise*

A.   Overseas Resource Development Program: Loan from Korea Resources Corporation ("KORES")

B.   Overseas Resource Development Program: Loan from Korea National Oil Corporation ("KNOC")

C.   R&D Grants Under the Special Act on Balanced National Development

*Programs with Benefits of Less than 0.005 Percent Ad Valorem*

D.   Pre-1992 Direct Credit

E.   Research and Development Grants Under the Industrial Technology Innovation Promotion Act ("ITIPA")

## III.   Programs Determined To Be Not Used

The Department has made no changes to its preliminary determinations with regard to the following programs.  No issues were raised by interested parties in case briefs regarding these programs.  We continue to determine that, for these final results, the following programs were not used during the POR:

- Reserve for Research and Manpower Development Fund Under RSTA Article 9 (TERCL Article 8)
- RSTA Article 11:  Tax Credit for Investment in Equipment to Development Technology and Manpower (TERCL Article 10)
- Reserve for Export Loss Under TERCL Article 16
- Reserve for Overseas Market Development Under TERCL Article 17
- Reserve for Export Loss Under TERCL Article 22

- Exemption of Corporation Tax on Dividend Income from Overseas Resources Development Investment Under TERCL Article 24
- Reserve for Investment (Special Cases of Tax for Balanced Development Among Areas Under TERCL Articles 42-45)
- Tax Credits for Specific Investments Under TERCL Article 71
- RSTA Article 94: Equipment Investment to Promote Workers Welfare (TERCL Article 88)
- Electricity Discounts Under the Requested Loan Adjustment Program
- Electricity Discounts Under the Emergency Load Reductions Program
- Export Industry Facility Loans and Specialty Facility Loans
- Short-Term Trade Financing Under the Aggregate Credit Ceiling Loan Program Administered by the Bank of Korea
- Industrial Base Fund
- Excessive Duty Drawback
- Private Capital Inducement Act
- Scrap Reserve Fund
- Special Depreciation of Assets on Foreign Exchange Earnings
- Export Insurance Rates Provided by the Korean Export Insurance Corporation
- Loans from the National Agricultural Cooperation Federation
- Tax Incentives from Highly Advanced Technology Businesses Under the Foreign Investment and Foreign Capital Inducement Act
- Short-term Export Financing
- Research and Development Grants Under the Industrial Development Act ("IDA")
- R&D Grants Under the Act on the Promotion of the Development, Use, and Diffusion of New and Renewable Energy
- Corporate Tax Reduction for Facilities Located in the Godae Complex
- Income Tax Reduction for Facilities Located in the Godae Complex
- Cash Grants for Employees Working at Facilities in Jeollanamdo
- Training and Education Subsidies at Facilities in Jeollanamdo
- Support for New Investments in Facilities in Jeollanamdo
- Reduction in Rent for Facilities Located in Industrial Complexes
- Employment Subsidies for Large-Scale Investment in Ulsan
- Special Support for Large-Scale Investments in Ulsan
- Technology Development Loans for Facilities in Gwangyang Complex
- Foundation Loans for Facilities in Gwangyang Complex

## IV.    Other Program

The Department has made no changes to its preliminary determinations with regard to the following program. For the descriptions, analyses, and calculation methodologies of these programs, *see* the *Preliminary Results*. HYSCO and POSCO submitted comments in their case briefs regarding this program.

A.      Tax Credits Received Under the Restriction of Special Taxation Act ("RSTA")

POSCO's cross-owned affiliate, Daewoo International Corporation ("Daewoo"), reported that it received tax credits under RSTA Articles 10, 104(6), and 104(15).[10]  In the *Preliminary Results*, we determined it was not necessary to make a determination on the countervailability of these tax credits, stating:

> Assuming, *arguendo*, that benefits received under these other RSTA articles
> constitute a financial contribution and are specific under sections 771(5)(D)(ii)
> and 771(5A)(D) of the Act, respectively, the total net subsidy rates accruing to
> POSCO and HYSCO, including these tax programs, are still *de minimis*.
> Moreover, we note that the total net subsidy rates for POSCO and HYSCO remain
> *de minimis* even if we assumed that the benefits under the various RSTA tax
> programs are attributable to the firms' total export sales rather than total sales.
> Therefore, it is not necessary to make a finding regarding the countervailability of
> the tax benefits.

As explained below in the Department's position under Comment 1, for the *Preliminary Results*, the Department calculated program rates for certain RSTA tax credits received by HYSCO and POSCO and preliminarily determined that, if these rates were included in the net subsidy rates for the two companies, the net subsidy rates would be *de minimis*.  Therefore, the Department preliminarily determined it was not necessary to make a finding regarding the countervailability of these tax credits.

However, the Department inadvertently included the program rates it calculated with regard to these tax credits in its calculation of the net total *ad valorem* subsidy rates for POSCO and HYSCO.[11]  For these final results, we continue to determinate that it is not necessary to make a finding with respect to the countervailability of these tax credits.  Even if we assumed that these tax credits are countervailable and included program rates for these tax credits in the total net subsidy rates for POSCO and HYSCO, the net total subsidy rate for each company would remain *de minimis*.  Therefore, for these final results, we have removed the rates calculated for these RSTA tax credits received by HYSCO and POSCO from their net total *ad valorem* subsidy rates.[12]

---

[10] Prior to the *Preliminary Results*, neither POSCO nor HYSCO had publicly disclosed the names of these programs. Subsequent to the *Preliminary Results*, in their public case briefs, POSCO and HYSCO disclosed the names of the programs. *See* Letter from POSCO to the Department titled "Corrosion-Resistant Carbon Steel Flat Products from Korea, Case No. C-580-818: POSCO's Case Brief," dated November 1, 2013 at 3; *see also* Letter from HYSCO to the Department titled "Corrosion-Resistant Carbon Steel Flat Products from Korea, Case No. C-580-818: HYSCO's Case Brief," dated November 1, 2013 at 6.

[11] *See Preliminary Results* at "Preliminary Results of Review" section.

[12] *See* Memorandum to the File from Andrew Medley, International Trade Compliance Analyst, titled "Final Results of 2011 Countervailing Duty Administrative Review:  Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea; Final Calculations - POSCO," dated concurrently with this memorandum ("POSCO Calculation Memorandum") and HYSCO Calculation Memorandum.

7

## V.    Final Results of Review

Based on the above analyses, we determine the net total *ad valorem* subsidy rates for these final results are as follows:

| Company | Subsidy Rate |
|---|---|
| Dongbu Steel Co., Ltd. | 0.10 percent or *de minimis* |
| Hyundai HYSCO Ltd. | 0.26 percent or *de minimis* |
| Pohang Iron & Steel Co., Ltd. | 0.20 percent or *de minimis* |

## ANALYSIS OF COMMENTS

### Comment 1:    HYSCO's and POSCO's Tax Credits under the Restriction of Special Taxation Act ("RSTA")

***Case Briefs of HYSCO and POSCO:***

- The Department's inclusion of the additional RSTA tax credits was in error or unlawful. Such subsidies should be removed from the total benefit calculations because the Department has established no record evidence to substantiate such a determination.
- RSTA Article 10 was found to be not countervailable in *DRAMS from Korea*.[13]
- The Department requested information from HYSCO on RSTA Article 104(6) in the 2007 review of CORE but made no finding about the program in that review. This silence means the Department did not find the program to be countervailable.
- There have been no previous findings regarding RSTA Article 104(15), thus there is no basis for finding it countervailable in this review.

**Department's Position:** Even if the program rates calculated for the tax credits claimed by HYSCO and POSCO under RSTA Articles 10, 104(6), and 104(5) are included in calculations of the two companies' net total subsidy rates, each net total subsidy rate remains *de minimis*. Because we are not making a determination with respect to the countervailability of these tax credits, for these final results, we are not including the program rates calculated for these tax credits in the calculation of the net total *ad valorem* subsidy rates for HYSCO and POSCO.[14]

---

[13] *See Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 FR 37122 (June 23, 2003) and accompanying Issues and Decision Memorandum at 28.

[14] *See* HYSCO's and POSCO's total subsidy rates from the *Preliminary Results*, and accompanying calculation memoranda; *see also* POSCO Calculation Memorandum and HYSCO Calculation Memorandum.

**Comment 2:    Calculation of HYSCO's Benefit from Document Acceptance ("D/A")
Financing**

*Case Brief of HYSCO*:
- The listing of D/A financing reported by HYSCO includes financing for exports to all markets, not just the United States.
- In the *Preliminary Results*, the Department stated that it limited the benefit calculations to D/A financing on exports of sales of subject merchandise to the United States.
- The Department inadvertently included in the benefit calculation for HYSCO all of the D/A financing reported by HYSCO, including financing for exports to other countries other than the United States.
- The Department should limit its benefit calculations to D/A financing for sales to the United States and revise the D/A financing program rates calculated or HYSCO.
- If the Department continues to include D/A financing for sales to countries other than the United States, the Department should revise the sales denominator and recalculate the D/A financing program rates.

**Department's Position:** The Department inadvertently included in the benefit calculations D/A financing reported by HYSCO for exports to countries other than the United States. As the Department intended to limit the D/A financing calculations to D/A financing issued on sales of subject merchandise to the United States, we have calculated revised benefits for HYSCO's D/A financing accordingly.[15]

**RECOMMENDATION**

Based on our analysis, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final results of the review in the *Federal Register*.

_____✓_____        _____
Agree                Disagree


_____/e_ /X_____
Paul Piquado
Assistant Secretary
 for Enforcement and Compliance

____24 JANUARY 2014____
Date

_____
[15] *See* HYSCO Calculation Memorandum.

Attachment 6

Supercalendered Paper From Canada: Preliminary
Affirmative Countervailing Duty Determination, 80
Fed. Reg. 45,951 (Dep't Commerce Aug. 3, 2015).



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-122-854
Investigation
**Public Document**
E&C/OI: Team

July 27, 2015

MEMORANDUM TO:     Paul Piquado
                   Assistant Secretary
                     for Enforcement and Compliance

FROM:              Gary Taverman
                   Associate Deputy Assistant Secretary
                     for Antidumping and Countervailing Duty Operations

SUBJECT:           Decision Memorandum for the Preliminary Determination in the
                   Countervailing Duty Investigation of Supercalendered Paper from
                   Canada

## I.    SUMMARY

The Department of Commerce (Department) preliminarily determines that countervailable
subsidies are being provided to producers and exporters of supercalendered paper (SC paper) in
Canada, as provided in section 703 of the Tariff Act of 1930, as amended (the Act).

## II.   BACKGROUND

### A. Initiation and Case History

On February 26, 2015, the Coalition For Fair Paper Imports[1] (the petitioner) filed a petition with
the Department seeking the imposition of countervailing duties (CVDs) on imports of SC paper
from Canada.[2]  We sent supplemental questions to the petitioner on March 3, 2015.[3]  On March
9, 2015, the petitioner submitted its supplemental petition response.[4]  In accordance with section
702(b)(4)(A)(ii) of the Act,  the Department held consultations with the Government of Canada

---

[1] The Coalition For Fair Paper Imports is comprised of Madison Paper Industries and Verso Corporation.
[2] *See* letter from the petitioner, "Petition for the Imposition of Countervailing Duties on Supercalendered Paper
From Canada," (February 26, 2015) (Petition).
[3] *See* letter from the Department to the petitioner, "Petition for the Imposition of Countervailing Duties on Imports
of Supercalendered Paper From Canada: Supplemental Questions," (March 3, 2015).
[4] *See* letter from the petitioner to the Department, "Supercalendered Paper From Canada/Petitioner's Response To
The Department's Questions Regarding The Petition," (March 9, 2015).



(GOC) in the Herbert C. Hoover Building on March 12, 2015.[5]  On March 18, 2015, the Department initiated a CVD investigation on SC paper from Canada.[6]

We stated in the *Initiation Notice* that we would conduct respondent selection subsequent to the initiation.  On March 19, 2015, the Department released Customs and Border Protection (CBP) entry data under administrative protective order (APO).[7]  We received timely-filed comments from Irving Paper Limited (Irving) on March 24, 2015; from Port Hawkesbury Paper LP (Port Hawkesbury) on March 24, 2015; from Catalyst Paper Corporation (Catalyst) on March 25, 2015; the petitioner on March 25, 2015; and from Resolute Paper FP Canada Inc. (Resolute) on March 25 and March 27, 2015.[8]  On March 30, 2015, we also received and accepted comments that the GOC originally submitted on March 27, 2015.[9]  Based upon the CBP entry data, we selected Port Hawkesbury and Resolute as mandatory respondents on April 3, 2015.[10]  We received additional comments on our respondent selection from Irving on April 8, 2015, and from Catalyst on April 9, 2015.[11]

On April 6, 2015, we sent our CVD investigation questionnaire to the GOC to request information regarding the alleged subsidies.[12]  We received affiliation responses from Port Hawkesbury and Resolute on April 20, 2015.[13]  We sent supplemental questionnaires on these

---

[5] *See* Department Memorandum, "Ex-Parte Memorandum – Consultations with the Government of Canada on the Countervailing Duty Petition on Supercalendered Paper from Canada," (March 13, 2015).

[6] *See Supercalendered Paper from Canada: Initiation of Countervailing Duty Investigation*, 80 FR 15981 (March 26, 2015) (*Initiation Notice*), and Countervailing Duty Investigation Initiation Checklist:  Supercalendered Paper from Canada (March 18, 2015) (Initiation Checklist).

[7] *See* Department Memorandum, "Release of U.S. Customs and Border Protection Data," (March 19, 2015).

[8] *See* letter from Irving, "Supercalendered Paper from Canada: Comments of Irving Paper Limited on Release of CBP Data and Request for Voluntary Respondent Treatment," (March 24, 2015); letter from Port Hawkesbury, "Supercalendered Paper from Canada – Respondent Selection Comments," (March 24, 2015); letter from Catalyst, "Supercalendered Paper from Canada: Catalyst Paper's Comments on CBP Data," (March 25, 2015); letter from the petitioner, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Petitioner's Comments on Respondent Selection," (March 25, 2015); letter from Resolute, "Supercalendered Paper from Canada: Respondent Selection," (March 25, 2015); and second letter from Resolute, "Supercalendered Paper from Canada: Respondent Selection," (March 27, 2015).

[9] *See* letter from the GOC to the Department, "Supercalendered Paper from Canada: Request for Reconsideration of Rejection of March 27th Comments," at Attachment 1.

[10] *See* Department Memorandum, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Respondent Selection," (April 3, 2015) (Respondent Selection Memo).  As explained in that memorandum, when faced with a large number of producers/exporters, the Department may determine that it is not practicable to examine all companies.  In these circumstances, section 777A(e)(2)(A)(ii) of the Act and 19 CFR 351.204(c) give the Department discretion to limit its examination to a reasonable number of the producers/exporters accounting for the largest volume of the subject merchandise.

[11] *See* letter from Irving, "Supercalendered Paper from Canada: Request of Irving Paper Limited for Reconsideration of the Department's Respondent Selection Decision," (April 8, 2015); and letter from Catalyst, "Supercalendered Paper from Canada: Catalyst Paper's Request for Reconsideration of Respondent Selection and Request for Meeting," (April 9, 2015).

[12] *See* letter from Department to the GOC, "Investigation of Supercalendered Paper from Canada: Countervailing Duty Questionnaire," (April 6, 2015) (IQ).

[13] *See* letter from Port Hawkesbury, "Supercalendered Paper from Canada – Affiliated Companies Response," (April 20, 2015) (Port Hawkesbury Affiliation Response); and letter from Resolute "Supercalendered Paper from Canada Questionnaire Response," (April 20, 2015).

2

affiliation responses to Port Hawkesbury and Resolute on April 24, 2015.[14]  We received responses to these supplemental questionnaires from Port Hawkesbury and Resolute on May 1, 2015.[15]  We sent a second supplemental questionnaire on affiliation issues to Port Hawkesbury on May 8, 2015.[16]  We received a response to this questionnaire from Port Hawkesbury on May 15, 2015.[17]

We received responses to our initial questionnaire (IQ) from the GOC, Port Hawkesbury, and Resolute on May 27, 2015.[18]  We sent supplemental questionnaires to Resolute on June 2, 2015; to Port Hawkesbury on June 17, 2015; and to the GOC on June 19, 2015.[19]  Resolute replied on June 12, 2015; Port Hawkesbury replied on July 6, 2015; and the GOC replied on July 7, 2015.[20]  We sent a second supplemental questionnaire to Resolute on July 10, 2015, to which Resolute replied on July 15, 2015.[21]

On May 28, 2015, Catalyst and Irving submitted voluntary responses to our IQ.[22]  However, on April 3, 2015, we notified all interested parties that we are examining only Port Hawkesbury and Resolute as respondents in this investigation.[23]  Moreover, on May 1, 2015, we confirmed our determination that we did not have the resources to select additional mandatory respondents, nor were we able to select Catalyst or Irving as voluntary respondents because to do so would be

---

[14] *See* letter from Port Hawkesbury, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Affiliated Parties Supplemental Questionnaire," (April 24, 2015); and letter from Resolute, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Affiliated Parties Supplemental Questionnaire," (April 24, 2015).

[15] *See* letter from Resolute, "Supercalendered Paper from Canada: Supplemental Affiliated Parties Questionnaire Response," (May 1, 2015) (Resolute Supplemental Affiliation Response); and letter from Port Hawkesbury, "Supercalendered Paper from Canada – Reply to Supplemental Affiliation Questionnaire," (May 1, 2015).

[16] *See* letter from Department to Port Hawkesbury, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Affiliated Parties Second Supplemental Questionnaire," (May 8, 2015).

[17] *See* letter from Port Hawkesbury, "Supercalendered Paper From Canada – Second Supplemental Affiliation Questionnaire Response," (May 15, 2015) (Port Hawkesbury Second Affiliation Response).

[18] *See* letter from GOC, "GOC Volume I: Narrative Response and Exhibits GOC-GEN-1 to GOC-GEN-8," (May 27, 2015) (GQR); *see also* letter from Port Hawkesbury, "Supercalendered Paper from Canada – Initial Questionnaire Response," (May 27, 2015) (PQR); *see also* letter from Resolute, "Supercalendered Paper from Canada: Section III Questionnaire Response," (May 27, 2015) (RQR).

[19] *See* letter to Resolute, "Countervailing Duty Investigation of Supercalendered Paper from Canada: First Supplemental Questionnaire," (June 2, 2015); *see also* letter to Port Hawkesbury, "Countervailing Duty Investigation of Supercalendered Paper from Canada: First Supplemental Questionnaire," (June 17, 2015); *see also* letter to the GOC, "Countervailing Duty Investigation of Supercalendered Paper from Canada: First Supplemental Questionnaire," (June 19, 2015).

[20] *See* letter from Resolute, "Supercalendered Paper from Canada:  First Supplemental Questionnaire Response," (June 12, 2015) (RSQR); *see also* letter from Port Hawkesbury, "Supercalendered Paper from Canada – Supplemental Questionnaire Response," (July 6, 2015) (PSQR); *See also* letter from the GOC, "Supercalendered Paper from Canada:  First Supplemental Questionnaire Response," (July 7, 2015) (GSQR).

[21] *See* letter to Resolute, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Pre-Preliminary Supplemental Questionnaire," (July 10, 2015); *see also* letter from Resolute, "Resolute's Response to Pre-Preliminary Supplemental Questionnaire," (July 15, 2015) (RSQR2).

[22] *See* letter from Irving dated May 28, 2015, "Supercalendered Paper from Canada: Response of Irving Paper Limited to Section III of the Countervailing Duty Questionnaire; *see also* letter from Catalyst dated May 28, 2015, "Supercalendered Paper from Canada: Catalyst's Questionnaire Response and Request for Reconsideration of Voluntary Respondent Treatment."

[23] *See* Respondent Selection Memo.

unduly burdensome and would inhibit the timely completion of this investigation.[24]  Therefore, we have not analyzed any voluntary responses.[25]

*Postponement of the Preliminary Determination*:  On April 9, 2015, the petitioner requested that the Department postpone the preliminary determination.[26]  The Department granted the petitioner's request and, on April 15, 2015, postponed the preliminary determination until July 27, 2015, in accordance with section 703(c)(1)(A) of the Act and 19 CFR 351.205(b)(2).[27]

### B.  Period of Investigation

The period of investigation (POI) is January 1, 2014, through December 31, 2014.

## III.    SCOPE COMMENTS

In accordance with the preamble to the Department's regulations, we set aside a period of time in our *Initiation Notice* for parties to raise issues regarding product coverage, and encouraged all parties to submit comments within 20 calendar days of publication of that notice.[28]  We did not receive comments on the scope.

## IV.    SCOPE OF THE INVESTIGATION

The merchandise covered by this investigation is supercalendered paper (SC paper).  SC paper is uncoated paper that has undergone a calendering process in which the base sheet, made of pulp and filler (typically, but not limited to, clay, talc, or other mineral additive), is processed through a set of supercalenders, a supercalender, or a soft nip calender operation.[29]

The scope of this investigation covers all SC paper regardless of basis weight, brightness, opacity, smoothness, or grade, and whether in rolls or in sheets.  Further, the scope covers all SC

---

[24] *See* Respondent Selection Memo; *see also* Memorandum to James Maeder, Senior Director, Office I, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Whether to Select Additional Mandatory and/or Voluntary Respondents," (May 1, 2015).

[25] On June 2, 2015, Irving requested that the Department revise its respondent selection determination based upon information contained in parties' questionnaire responses.  *See* letter from Irving to the Department dated June 2, 2015, "Supercalendered Paper from Canada: Request of Irving Paper Limited for Mandatory Respondent Status Based on Questionnaire Response Information."  Consistent with its practice, however, the Department made its respondent selection determination at the outset of the investigation based upon CBP entry data.  *See* Respondent Selection Memo.  Therefore, we are not granting Irving's request.

[26] *See* letter from the petitioner, "Supercalendered Paper From Canada:  Request For Postponement Of The Preliminary Decision" (April 9, 2015).

[27] *See Supercalendered Paper From Canada: Postponement of Preliminary Determination in the Countervailing Duty Investigation*, 80 FR 22477 (April 22, 2015).

[28] *See Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27323 (May 19, 1997); *see also Initiation Notice*, 80 FR at 15982.

[29] Supercalendering and soft nip calendering processing, in conjunction with the mineral filler contained in the base paper, are performed to enhance the surface characteristics of the paper by imparting a smooth and glossy printing surface.  Supercalendering and soft nip calendering also increase the density of the base paper.

paper that meets the scope definition regardless of the type of pulp fiber or filler material used to produce the paper.

Specifically excluded from the scope are imports of paper printed with final content of printed text or graphics.

Subject merchandise primarily enters under Harmonized Tariff Schedule of the United States (HTSUS) subheading 4802.61.3035, but may also enter under subheadings 4802.61.3010, 4802.62.3000, 4802.62.6020, and 4802.69.3000.  Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the investigation is dispositive.

## V.      INJURY TEST

Because Canada is a "Subsidies Agreement Country" within the meaning of section 701(b) of the Act, the U.S. International Trade Commission (ITC) is required to determine whether imports of the subject merchandise from Canada materially injure, or threaten material injury to, a U.S. industry.  On April 14, 2015, the ITC determined that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of SC paper from Canada.[30]

## VI.      SUBSIDIES VALUATION

### A.  Allocation Period

The Department normally allocates the benefits from non-recurring subsidies over the average useful life (AUL) of renewable physical assets used in the production of subject merchandise. The Department finds the AUL in this proceeding to be 13 years, pursuant to 19 CFR 351.524(d)(2) and the U.S. Internal Revenue Service's 1977 Class Life Asset Depreciation Range System.[31]  The Department notified the respondents of the 13-year AUL in the initial questionnaire and requested data accordingly.  No party in this proceeding disputed this allocation period.

Furthermore, for non-recurring subsidies, we have applied the "0.5 percent test," as described in 19 CFR 351.524(b)(2).  Under this test, we divide the amount of subsidies approved under a given program in a particular year by the relevant sales value (*e.g.*, total sales or export sales) for the same year.  If the amount of the subsidies is less than 0.5 percent of the relevant sales value, then the benefits are allocated to the year of receipt rather than across the AUL.

---

[30] *See Supercalendered Paper from Canada; Determination*, 80 FR 21263 (Preliminary) (April 17, 2015).
[31] *See* U.S. Internal Revenue Service Publication 946 (2008), "How to Depreciate Property," at Table B-2:  Table of Class Lives and Recovery Periods.

**B.  Attribution of Subsidies**

*Cross Ownership*:  In accordance with 19 CFR 351.525(b)(6)(i), the Department normally attributes a subsidy to the products produced by the company that received the subsidy. However, 19 CFR 351.525(b)(6)(ii)-(v) provides additional rules for the attribution of subsidies received by respondents with cross-owned affiliates.  Subsidies to the following types of cross-owned affiliates are covered in these additional attribution rules:  (ii) producers of the subject merchandise; (iii) holding companies or parent companies; (iv) producers of an input that is primarily dedicated to the production of the downstream product; or (v) an affiliate producing non-subject merchandise that otherwise transfers a subsidy to a respondent.

According to 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  This section of the Department's regulations states that this standard will normally be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.  The *CVD Preamble* to the Department's regulations further clarifies the Department's cross-ownership standard.[32]  According to the *CVD Preamble*, relationships captured by the cross-ownership definition include those where:

> the interests of two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same way it can use its own assets (or subsidy benefits) . . . Cross-ownership does not require one corporation to own 100 percent of the other corporation.  Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.  In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership.[33]

Thus, the Department's regulations make clear that the agency must look at the facts presented in each case in determining whether cross-ownership exists.

The Court of International Trade upheld the Department's authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[34]

*Port Hawkesbury*

Port Hawkesbury identified the following companies and their roles, and responded to the Department's questionnaires on their behalf:[35]

---

[32] *See Countervailing Duties; Final Rule*, 63 FR 65348 (November 25, 1998) (*CVD Preamble*).

[33] *Id.*, 63 FR at 65401.

[34] *See Fabrique de Fer de Charleroi, SA v. United States*, 166 F. Supp. 2d 593, 600-604 (CIT 2001).

[35] *See generally* PQR.

- 6879900 Canada Inc.
- Port Hawkesbury Investments Ltd. (Port Hawkesbury Investments)
- Port Hawkesbury Paper GP (Port Hawkesbury GP)
- Port Hawkesbury Paper Holdings Ltd. (Port Hawkesbury Holdings)
- Port Hawkesbury Paper Inc. (Port Hawkesbury Inc.)
- Port Hawkesbury Paper LP (Port Hawkesbury)
- Pacific West Commercial Corporation (PWCC)

Port Hawkesbury reports the following roles for each of the companies:[36]

- 6879900 Canada Inc. – Holding company.
- Port Hawkesbury Investments – Holding company.
- Port Hawkesbury GP – Holding company, ownership interest in Port Hawkesbury LP.
- Port Hawkesbury Holdings – Holding company.
- Port Hawkesbury Inc. – Holding company, ownership interest in Port Hawkesbury LP.
- Port Hawkesbury – Producer of subject merchandise.
- PWCC – Involved in the purchase of NewPage Port Hawkesbury Corporation (NPPH) through the *Companies' Creditors Arrangement Act* (*CCAA*) procedure.

Port Hawkesbury's responses identify 6879900 Canada Inc., Port Hawkesbury Investments, Port Hawkesbury GP, Port Hawkesbury Holdings, and Port Hawkesbury Inc. as holding companies of Port Hawkesbury. Therefore, we preliminarily find that these companies are cross-owned with Port Hawkesbury within the meaning of 19 CFR 351.525(b)(6)(vi). Because 6879900 Canada Inc., Port Hawkesbury Investments, Port Hawkesbury GP, Port Hawkesbury Holdings, and Port Hawkesbury Inc. are holding companies, we would normally attribute the benefit from subsidies received by any one of these holding companies to that holding company's consolidated sales (net of intercompany sales), in accordance with 19 CFR 351.525(b)(6)(iii). As discussed below under the "Programs Preliminarily Determined to Be Countervailable" section, however, we preliminarily find no evidence that these holding companies received countervailable subsidies.

Regarding PWCC, Port Hawkesbury explained that on September 6, 2011, NPPH filed for protection from its creditors under the *CCAA*.[37] Following normal *CCAA* procedures, pursuant to the Supreme Court of Nova Scotia's (Court's) initial order, Ernst & Young, Inc. was appointed as the Court's Monitor (Monitor) of NPPH during the *CCAA* proceedings.[38] NPPH and the Monitor, with the approval of the Court, hired U.S. based investment bankers Sanabe & Associates LLC (Sanabe) to assist in a sale of NPPH through a bidding/auction process.[39] The Applicant, the Monitor, and Sanabe developed a list of 110 potential strategic and financial parties, including PWCC, and eventually designated 14 qualified bidders.[40] Eight of the 14

---

[36] *Id.* at 10; *see also* Port Hawkesbury Affiliation Response at 4 and 10.
[37] *See* PQR at 6.
[38] *Id.*
[39] *Id.*
[40] *Id.* at 6-7.

qualified bidders submitted offers for NPPH's assets by October 24, 2011, of which four were invited on October 28, 2011, to submit formal and final offers by December 16, 2011.[41]  Of those four final offers, two were from parties wishing to continue the operations as a going concern (one of which was PWCC) and two were from parties intending to liquidate NPPH's assets.[42]

As part of its evaluation of the opportunity, PWCC conducted due diligence and developed a restructuring plan.[43]  NPPH and Sanabe evaluated the offers, and the Monitor reviewed the evaluation.[44]  After that review, NPPH, Sanabe, and the Monitor recommended to NPPH's Board of Directors that the offer from PWCC should be pursued as the highest and best going concern proposal.[45]  On July 12, 2012, the Court approved the presentation of PWCC's offer, and on September 25, 2012, the Court issued a "Sanction Order" approving the sale.[46]  The sale was completed on September 28, 2012.[47]

Port Hawkesbury stated that PWCC has no ownership interest in Port Hawkesbury and has never had any involvement in the operations of Port Hawkesbury.[48]  Port Hawkesbury also stated that Port Hawkesbury and PWCC are affiliated only through common ownership by an ultimate owner.[49]  Because Port Hawkesbury and PWCC have the same ultimate common ownership, we preliminarily find that these companies are cross-owned within the meaning of 19 CFR 351.525(b)(6)(vi).  Further, based on PWCC's involvement in the purchase of Port Hawkesbury, we are preliminarily attributing to Port Hawkesbury's sales the benefit from any subsidies that PWCC received and transferred to Port Hawkesbury, in accordance with 19 CFR 351.525(b)(6)(v).  *See* the "Analysis of Programs - Programs Preliminarily Determined To Be Countervailable" section below for a full discussion of the subsidy programs that PWCC originally received and transferred to Port Hawkesbury.

Port Hawkesbury is the producer of the subject merchandise.  In accordance with 19 CFR 351.525(b)(6)(i), we are preliminarily attributing subsidies received by Port Hawkesbury to its own sales.

*Resolute*

Resolute responded to the Department's questionnaires on behalf of the following companies:[50]

- Resolute FP Canada Inc. (Resolute)
- Fibrek General Partnership (Fibrek)
- Forest Products Mauricie LP (Mauricie)

---

[41] *Id.* at 7.
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.* at 7-8.
[47] *Id.* at 8.  Additional information on the sale is business proprietary.  *See* PQR at 6-10.
[48] *Id.* at 4.
[49] *See* Port Hawkesbury Second Affiliation Response at 1.
[50] *See generally* RQR.

- Produits Forestiers Petit-Paris Inc. (Petit-Paris)
- Société en Commandite Scierie Opitciwan (Opitciwan)

Resolute reports the following for each of the companies:[51]

- Resolute – Produces SC Paper, inputs used in making SC Paper, and a wide range of other products.  It is also a holding company for Resolute's ownership in affiliates making other products in Canada.
- Fibrek – Wholly owned subsidiary of Resolute that operates a kraft pulp[52] mill.
- Mauricie – Resolute owns 93.2 percent of this company, which operates a sawmill.
- Opitciwan – Resolute owns 45 percent of this company, which operates a sawmill.
- Petit-Paris – Joint venture sawmill in which Resolute holds a 50 percent ownership stake.

Because Resolute is a parent company, we are preliminarily attributing the benefit from subsidies that Resolute received to Resolute's consolidated sales (net of intercompany sales), in accordance with 19 CFR 351.525(b)(6)(iii).[53]

As shown above, Resolute identified Fibrek as a wholly owned subsidiary of Resolute.  Based on Resolute's full ownership of Fibrek, we preliminarily determine that these companies are cross-owned within the meaning of 19 CFR 351.525(b)(6)(vi).  During the POI, Fibrek supplied Resolute with kraft pulp to add tensile strength to paper that Resolute produced, including SC paper.[54]  We preliminarily determine that the kraft pulp that Fibrek supplied to Resolute is primarily dedicated to production of SC paper and other downstream paper products, pursuant to 19 CFR 351.525(b)(6)(iv).

Regarding Mauricie, Opitciwan, and Petit-Paris, regardless of whether cross-ownership under 19 CFR 351.525(b)(6)(vi) exists between Resolute and Mauricie, Opitciwan, and Petit-Paris, we preliminarily find no evidence that Mauricie, Opitciwan, or Petit-Paris received assistance under any of the programs under investigation.

## C.  Denominators

In accordance with 19 CFR 351.525(b)(1)-(5), the Department considers the basis for the respondents' receipt of benefits under each program when attributing subsidies, *e.g.*, to the respondents' export or total sales.  We have identified the denominator we used to calculate the

---

[51] *Id.* at 4.  Resolute designated the specific details of the relationships between Resolute and these companies as business proprietary information.  *See* Resolute Supplemental Affiliation Response at 2-3; *see also* Department memorandum, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Resolute Paper FP Canada Inc., Calculations for the Preliminary Determination," dated concurrently with this memorandum (Resolute Preliminary Calculation Memo).

[52] Kraft pulp is a reinforcing pulp that is added, as required for paper strength, to a paper machine.  *See* RQR at 6.

[53] *See, e.g.*, *Oil Country Tubular Goods From the People's Republic of China: Final Affirmative Countervailing Duty Determination, Final Negative Critical Circumstances Determination*, 74 FR 64045 (December 7, 2009), and accompanying Issues and Decision Memorandum at Comment 39.

[54] *Id.* at 3.  *See also* RQR at Exhibit 4, page 3 (identifying the types of "specialty papers" that Resolute produces, including SC paper).

countervailable subsidy rate for each program, as discussed below and in the calculation memoranda prepared for this preliminary determination.[55]

### D.  Loan Interest Rate Benchmarks and Discount Rates

The Department is examining loans provided to Port Hawkesbury and to Resolute that were outstanding during the POI.  The loans are denominated in Canadian dollars (C$).  We are also investigating non-recurring, allocable subsidies that the respondents received.[56]  In the section below, we discuss the derivation of the benchmarks and discount rates for the POI and previous years.

Long-Term Loan Interest Rate Benchmark

Section 771(5)(E)(ii) of the Act explains that the benefit for loans is the "difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market," indicating that a benchmark must be a market-based rate.  Normally, the Department uses comparable commercial loans reported by the company for benchmarking purposes.[57]  If the firm did not receive any comparable commercial loans during the relevant periods, the Department's regulations provide that we "may use a national average interest rate for comparable commercial loans."[58]  When loans are denominated in a foreign currency, 19 CFR 351.505(a)(2)(i) directs us to use a benchmark denominated in the same foreign currency as the loan.

Port Hawkesbury submitted interest rates, along with the underlying data, that it paid on other long-term commercial loans.[59]  Resolute submitted an interest rate for "financial instruments with similar characteristics and maturities" as identified in the notes to its 2013 financial statements.[60]

Based on Port Hawkesbury's response in the PQR, we preliminarily find that the structure of Port Hawkesbury's other loans is not similar to the government-provided loans.[61]  Therefore, we preliminarily find that these loans do not meet the definition of a "comparable commercial loan" under 19 CFR 351.505(a)(2).

As noted above, the interest rate that Resolute submitted is for 2013; therefore, it is not contemporaneous with the government loans we are examining.  Moreover, the record does not show any information on the structure of the loans that are the basis of this interest rate.  Thus,

---

[55] *See* Resolute Preliminary Calculation Memo; *see also* Department memorandum, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Port Hawkesbury Paper LP Calculations for the Preliminary Determination," dated concurrently with this memorandum (Port Hawkesbury Preliminary Calculation Memo).
[56] *See* 19 CFR 351.524(b)(l).
[57] *See* 19 CFR 351.505(a)(3)(i).
[58] *See* 19 CFR 351.505(a)(3)(ii).
[59] *See* PQR at Exhibit 15-2.
[60] *See* RQR at Exhibit 3, page 89.  The financial statements do not identify the source of the interest rate.
[61] *See* 19 CFR 351.505(a)(2)(i) – (iii).  Information on these loans is business proprietary.  *See* the Port Hawkesbury Preliminary Calculation Memo for additional details on the benchmark loans.

consistent with 19 CFR 351.505(a)(2), we preliminarily find that this is not an interest rate for a "comparable commercial loan."

Where such benchmark rates for comparable commercial loans are unavailable, 19 CFR 351.505(a)(3)(ii) provides that we may use a national average interest rate as a benchmark.  In this case, the GOC submitted the Bank of Canada's prime business loan rates for 2003-2014.[62] We are preliminarily using these rates as our national average interest rates under 19 CFR 351.505(a)(3)(ii) to measure the benefit from Port Hawkesbury's and Resolute's long-term loans.

*See* the "Analysis of Programs" section below for a description of the loan programs for which we required interest rate benchmarks.

Discount Rates

Consistent with 19 CFR 351.524(d)(3)(i)(A), we have used, as our discount rate, the long-term interest rate described above for the year in which the government approved non-recurring subsidies.

Uncreditworthy Allegation

The petitioner alleged that Port Hawkesbury was uncreditworthy in 2011 and 2012, and in accordance with 19 CFR 351.505(a)(4), the Department should use an uncreditworthy benchmark to determine the benefit from long-term loans and non-recurring subsidies allocated over time.[63]  Port Hawkesbury did not receive any of the alleged subsidies in 2011; therefore, we examined whether the company was uncreditworthy only in 2012.

Under 19 CFR 351.505(a)(4)(i), the Department will consider a firm to be uncreditworthy if, at the time the long-term loan or allocated subsidy was provided, the firm could not have obtained loan-term loans from conventional commercial sources.  In the case of firms not owned by the government, under 19 CFR 351.505(a)(4)(ii), the receipt by a firm of comparable long-term commercial loans, unaccompanied by a government-provided guarantee, will normally constitute dispositive evidence that the firm is not uncreditworthy.  During 2012, Port Hawkesbury was able to obtain a comparable long-term loan from a commercial bank without a government guarantee.[64]  Therefore, we preliminarily determine Port Hawkesbury to be creditworthy in 2012.

## VII.   USE OF FACTS OTHERWISE AVAILABLE AND ADVERSE INFERENCES

With regard to the Federal Pulp and Paper Green Transformation Program (FPPGTP), the GOC provided information in its initial GQR (submitted on May 27, 2015) about the purpose and operation of the program, and indicated that the mandatory respondent Resolute had received

---

[62] *See* GQR at Government of Quebec Response, Volume I, Exhibit QC-GEN-4, page 53; *see also* GSQR at Exhibit NS-SUPP1-1E.

[63] *See* Petition, Volume II at 12.

[64] Because the details of this loan are business proprietary information, we have discussed the analysis in additional detail in the Port Hawkesbury Preliminary Calculation Memo.

benefits under this program for two projects at its mills in Thunder Bay and Fort Francis. Similarly, Resolute reported its receipt of assistance under this program for these two projects. On July 22, 2015, five days before the scheduled date for this preliminary determination, the GOC, however, submitted a "revision" to its May 27, 2015, response in which it indicated that assistance had also been provided under this program to Fibrek S.E.N.C. (Fibrek), a company owned by Resolute.  On the same date, Resolute submitted a "supplemental response" which it deemed necessary under the certification requirements provided in section 782(b) of the Act. This information detailed previously unreported assistance received by Fibrek under the FPPGTP.

The GOC and Resolute characterized these submissions as either "revised" or "supplemental" responses to the Department's April 6, 2015, initial questionnaire.  Responses to the initial questionnaire were due on May 27, 2015.  In their July 22, 2015, submissions, neither the GOC nor Resolute requested that the Department extend the May 27, 2015, deadline and accept the new factual information contained in their revised responses, pursuant to 19 CFR 351.302(c). Normally, the failure of an interested party to submit factual information in a manner consistent with 19 CFR 351.301 and 351.302 would require the Department's rejection of that information as untimely.  However, the rejection of the July 22, 2015 responses would place the Department, as the administering authority under the Act, in an untenable position.  If the Department rejects the submissions, the Department would be forced to use the information in the GOC's and Resolute's initial responses for this program in our preliminarily determination.  This information is information that the Department knows is materially incomplete.  However, 19 CFR 351.302(b) allows the Department to extend a deadline for good cause.  Therefore, in order to ensure, before the preliminary determination, that the information on the record includes evidence that the questionnaire responses of the GOC and Resolute contain a material misreporting of program usage, we find good cause to extend the GOC's and Resolute's May 27, 2015 deadline for responding to the April 6, 2015 questionnaire.  Thus, we have determined that it is appropriate to accept the submissions provided.

However, we have determined that these submissions represent more than a revision or a supplement to the GOC's and Resolute's initial questionnaire responses.  Rather, they represent a significant change to the information provided in the initial questionnaire responses in that they identify assistance to a cross-owned subsidiary of Resolute that the GOC and Resolute were expressly required to report in response to the questionnaire.  Moreover, all of Resolute's questionnaire responses indicate that it "is including in its response" Fibrek, among other cross-owned companies for which the Department requested complete responses.  Thus, as part of their initial questionnaire response, the GOC and Resolute understood their obligation to report assistance received by Resolute and any of the cross-owned companies under all programs under investigation, and the GOC and Resolute failed to satisfy this obligation.

Sections 776(a)(1) and (2) of the Act provide that the Department shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or if an interested party or any other person:  (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by the Department, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly

impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Section 776(b) of the Act further provides that the Department may use an adverse inference in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.

Because the GOC and Resolute were aware of their obligation to respond fully to the Department's questionnaires with regard to the receipt of assistance under all of the programs under investigation for the mandatory respondents and cross-owned companies for which the Department requested responses, for this preliminary determination, we find that the GOC and Resolute withheld necessary information that was requested, which significantly impeded our ability to examine Resolute's receipt of assistance under the FPPGTP. The information provided in the initial questionnaire responses was materially incomplete. Moreover, given the timing of the submission of information regarding Fibrek's receipt of assistance under the FPPGTP, three business days prior to the deadline for this preliminary determination, the Department has been impeded in its ability to analyze this information, to determine if any clarifying information is needed, to request such additional information, to allow the parties time to respond, and to review the information and incorporate it into the preliminary determination. At this stage of the proceeding, we lacked sufficient time to solicit additional necessary information before issuance of this preliminary determination. Because this information is unusable in the form that it has been presented, we preliminarily determine, in accordance with sections 776(a)(1) and (2) and 776(b) of the Act that it is appropriate to rely on facts available and apply an adverse inference with respect to Resolute's receipt of assistance under this program. The selection of a CVD rate for this purpose is discussed below in the section "The Federal Pulp and Paper Green Transformation Program."

We are, however, able to rely on information timely provided by the GOC in its initial questionnaire response for purposes of analyzing the financial contribution and specificity of this program.

## VIII.   ANALYSIS OF PROGRAMS

Based upon our analysis of the record and the responses to our questionnaires, we preliminarily determine the following.

### A.     Programs Preliminarily Determined To Be Countervailable

#### 1.   Government of Nova Scotia (GNS) Loan for Working Capital

In response to PWCC's request for financial assistance in connection with its acquisition of the Port Hawkesbury mill, the GNS established a credit facility for PWCC.[65] In August 2012, the GNS's Department of Economic and Rural Development and Tourism (ERDT), on behalf of the Minister of Nova Scotia, provided a letter of offer to PWCC for a credit facility of C\$40

---

[65] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume II, NS.II-2.

million.[66]  The Minister of Nova Scotia ultimately determined the amount of assistance, subject to approval by the Governor in Council.[67]  The GNS provided the assistance pursuant to the Nova Scotia Jobs Fund Act.[68]  The GNS offered and provided the assistance only to PWCC, which was not obligated to pay any interest on the loan during its term.[69]

In September 2012, in contemplation of the completion of the *CCAA* process, the involved parties ultimately assigned the loan to Port Hawkesbury.[70]  The loan remained outstanding during the POI.[71]  The loan is eligible for forgiveness, but only if certain conditions are fulfilled each calendar year and confirmed by the GNS.[72]  The GOC reported that as of the date of the GQR, the GNS had not forgiven any amount under the terms of the Letter of Offer, and the loan is still repayable in full as reflected in the financial accounts of the GNS.[73]

We preliminarily determine that this loan conferred a countervailable subsidy within the meaning of section 771(5) of the Act and constitutes a financial contribution in the form of a direct transfer of funds from the GNS under section 771(5)(D)(i) of the Act.  We also preliminarily determine that a benefit exists under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1) equal to the difference between the amounts paid by the company for the loan during the POI and the amounts the company would have paid on a comparable commercial loan.  Finally, we also preliminarily determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS offered and provided the assistance only to PWCC.

To calculate the benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Port Hawkesbury would have paid on a comparable commercial loan during the POI.  Because Port Hawkesbury received the loan in 2012, must fulfill certain conditions each calendar year (*i.e.*, more than one year after the receipt of the loan), and no forgiveness of any portion of the loan has been provided by the GNS, we are preliminarily treating the loan as a contingent liability interest-free loan and using a long-term interest rate benchmark.[74]

In accordance with 19 CFR 351.525(b)(6)(i), we calculated the countervailable subsidy rate by dividing this benefit amount by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section.  On this basis, we preliminarily determine that the net countervailable subsidy rate for this program is 0.48 percent *ad valorem* for Port Hawkesbury.

---

[66] *Id.* at NS.II-2 and Exhibit NS-CF-1.
[67] *Id.* at NS.II-10.
[68] *Id.* at NS.II-7 and Exhibit NS-CF-4.
[69] *Id.* at NS.II-12.  *See also* letter from the GNS, "Supercalendered Paper from Canada: Pre-Preliminary Comments Submitted by the Government of Nova Scotia," (July 13, 2015) (GNS Pre-Preliminary Comments) at 20.
[70] *See* PQR at 38 and Exhibit 3-3.
[71] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume II, NS.II-6.
[72] *Id.* at NS.II-2, Exhibit NS-CF-1, and Exhibit NS-CF-2.
[73] *Id.* at NS.II-4 - NS.II-5.
[74] *See* 19 CFR 351.505(d).

### 2.   GNS Loan to Improve Productivity and Efficiency

In response to PWCC's request for financial assistance in connection with its acquisition of the Port Hawkesbury mill, the GNS's ERDT also provided a Letter of Offer to PWCC for a loan of C$24 million.[75]  The GNS approved and provided the funds to PWCC in August 2012.[76]  The Minister of Nova Scotia ultimately determined the amount of assistance, subject to approval by the Governor in Council.[77]  The GNS provided the assistance pursuant to the Nova Scotia Jobs Fund Act.[78]  The GNS offered and provided the loan, which has an interest rate of zero, only to PWCC.[79]

PWCC assigned the loan to Port Hawkesbury after its receipt, and the loan remained outstanding during the POI.[80]  Under the terms of the Letter of Offer, the loan is eligible for forgiveness, but only if certain conditions are fulfilled each calendar year and confirmed by the GNS.[81]  The GOC reported that as of the date of the GQR, the GNS had not forgiven any amount under the terms of the Letter of Offer.[82]

We preliminarily determine that this loan conferred a countervailable subsidy within the meaning of section 771(5) of the Act and constitutes a financial contribution in the form of a direct transfer of funds from the GNS under section 771(5)(D)(i) of the Act.  We also preliminarily determine that a benefit exists under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1) equal to the difference between the amounts paid by the company for the loan during the POI and the amounts the company would have paid on a comparable commercial loan.  Finally, we preliminarily determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS only offered and provided the assistance to PWCC.

To calculate the benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Port Hawkesbury would have paid on a comparable commercial loan during the POI.  Because Port Hawkesbury received the loan in 2012, must fulfill certain conditions each calendar year (*i.e.*, more than one year after the receipt of the loan), and no forgiveness of any portion of the loan has been provided by the GNS, we are preliminarily treating the loan as a contingent liability interest-free loan and using a long-term interest rate benchmark.[83]

In accordance with 19 CFR 351.525(b)(6)(i), we calculated the countervailable subsidy rate by dividing the benefit amount by Port Hawkesbury's total sales during the POI, as described above

---

[75] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume III, NS.III-2 and Exhibit NS-LN-1.
[76] *Id.* at NS.III-2 and NS.III-5.
[77] *Id.* at NS.III-9.
[78] *Id.* at NS.III-5 and Exhibit NS-LN-4.
[79] *Id.* at NS.III-11; *see also* GNS Pre-Preliminary Comments at 23.
[80] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume III, NS.III-5; *see also* PQR at 42.
[81] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume III, NS.III-2, Exhibit NS-LN-1, and Exhibit NS-LN-2.
[82] *Id.* at NS.III-3.
[83] *See* 19 CFR 351.505(d).

in the "Subsidies Valuation Information – Attribution of Subsidies" section.  On this basis, we preliminarily determine that the net countervailable subsidy rate for this program is 0.29 percent *ad valorem* for Port Hawkesbury.

### 3.  PWCC Indemnity Loan

Port Hawkesbury explained that during the course of the sales process for NPPH, PWCC incurred transaction costs and expenses for due diligence work and restructuring planning in connection with its acquisition of NPPH.[84]  The GNS, as represented by the Minister of Natural Resources, agreed during the negotiation to reimburse PWCC for a portion of these costs and expenses, in recognition of the significant complexity, resources, and completion risk involved in pursuing, evaluating, negotiating, and implementing a possible transaction.[85]  To memorialize this arrangement, PWCC and the GNS entered into an indemnity agreement, effective November 28, 2011, and amended on September 28, 2012 (Indemnity Agreement).[86]  Under the Indemnity Agreement, if PWCC or any of its affiliates completed the acquisition of NPPH prior to October 31, 2012, PWCC (delegated to Port Hawkesbury) was obligated to repay the GNS all reimbursed amounts in three installments from 2013 – 2016.[87]  Both the GNS and Port Hawkesbury reported the outstanding balances that Port Hawkesbury owed to the GNS during the POI under the Indemnity Loan, which has an interest rate of zero.[88]

We did not initiate an investigation into this program in the *Initiation Notice*.  However, section 775 of the Act provides that if the Department "discovers a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in a countervailing duty petition … then the administering authority (1) shall include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding,..."  *See also* 19 CFR 351.311(b).  Accordingly, based upon our discovery of a practice which appears to be a countervailable subsidy from Port Hawkesbury's and the GNS's questionnaire responses, the statute authorizes us to investigate this program.

We preliminarily determine that the Indemnity Loan conferred a countervailable subsidy within the meaning of section 771(5) of the Act and constitutes a financial contribution in the form of a direct transfer of funds from the GNS under section 771(5)(D)(i) of the Act.  We also preliminarily determine that a benefit exists under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1) equal to the difference between the amounts paid by the company for the loan during the POI and the amounts the company would have paid on a comparable commercial loan.  Finally, we preliminarily determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS only provided assistance to PWCC for the due diligence work and restructuring planning in connection with the acquisition of NPPH.

---

[84] *Id.* at 94.
[85] *Id.*
[86] *Id.*
[87] *Id.* at 95.  *See also* GNS Pre-Preliminary Comments at 25.
[88] *Id.* at NS.I-17 – NS.I-18.  *See also* PQR at Exhibit 15-2a.  *See also* GNS Pre-Preliminary Comments at 26.

To calculate the benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Port Hawkesbury would have paid on a comparable commercial loan during the POI.  In accordance with 19 CFR 351.525(b)(6)(i), we calculated the countervailable subsidy rate by dividing this benefit amount by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section.  On this basis, we preliminarily determine that the net countervailable subsidy rate for this program is 0.02 percent *ad valorem* for Port Hawkesbury.

### 4.  GNS Grants for Maintaining Hot Idle Status

The GNS reports that funds were provided by the GNS to maintain the Port Hawkesbury mill in "hot idle" status through to the completion of the sale of the mill to PWCC during the *CCAA* process.  All payments by the GNS were made under the supervision of the court-appointed monitor in the context of the *CCAA* proceeding to maintain the NPPH assets in hot idle status pending the sale of the assets to potential buyers.[89]  The reason for maintaining the mill in "hot idle" status is that machinery and equipment at mills like the Port Hawkesbury mill must be in constant operation in order to maintain their efficiency, and even operability.  Any prolonged "cold" shutdown results in degradation of the machinery and equipment that can be very expensive, and sometimes impossible, to repair, thereby imperiling a successful restart.[90]

NPPH and NewPage Corporation (NewPage), NPPH's U.S. parent company, entered into a Settlement and Transition Agreement, under which NewPage committed approximately US$22 million for a "hot-idle" fund under the oversight of a court-appointed monitor to maintain the hot idle status of the mill.  However, by December 2011, these funds were nearly depleted.[91]  Therefore, the Treasury Board of the GNS approved additional funding, to be provided by the Department of Natural Resources (DNR) to maintain the hot idle status of the mill.  These approvals were granted in December 2011 and on March 26, 2012.[92]  The amount of assistance was based on the actual costs of maintaining the hot idle status as reported by the court-appointed monitor under the *CCAA* proceeding,[93] and funds were disbursed based on the monitor's approval of invoices for services rendered.  Specifically, NPPH staff would receive invoices and periodically submit them to the monitor, who was responsible for vetting them to ensure they were for activities performed during the hot idle period, and upon approval would release funds for payment of the invoice.[94]  Additionally, any excess funds remaining at the conclusion of the *CCAA* proceedings were repaid to the GNS.[95]

---

[89] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-6.
[90] *See* PSQR at 12.
[91] *See* GQR at Government of Nova Scotia Questionnaire Response at Volume VIII, NS.VIII-5.
[92] *See e.g.* GSQR at Exhibit NS-SUPP1-12, Appendix A.
[93] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-9.
[94] *See* PQR at 16-17.
[95] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-9 and Exhibit NS-HI-11.

With respect to the sales process of the mill under the *CCAA* process, 21 letters of intent were received on September 28, 2011, from parties interested in purchasing the mill assets; 14 of these were designated as qualified buyers.  On October 24, 2011, eight formal offers for the purchase of NPPH's assets were received by the monitor.  On October 28, 2011, the monitor advised four of the eight bidders that they were being invited to continue as participants in the Sales Process, and they were advised to submit formal offers by December 16, 2011.[96]  PWCC submitted its bid on December 16, 2011.  The monitor announced, in a press release issued on January 4, 2012, that PWCC was chosen as the bidder to acquire NPPH.[97]  Once the price set out in PWCC's letter of December 16, 2011, was accepted, it did not change throughout the duration of the process and the closing of its acquisition of the mill occurred based on that price.[98]

Port Hawkesbury argues that it did not receive any of the funds during the hot idle period,[99] and the GNS argues that any benefit conferred under this program was provided to NPPH and was extinguished when the mill was sold to PWCC.[100]  However, the Department's prior notice with respect to agency practice regarding privatization is instructive in evaluating the hot idle assistance.[101]  This *Notice of Final Modification* addressed the treatment of prior subsidies with respect to change-in-ownership, including the treatment of concurrent subsidies provided to encourage or facilitate privatization.[102]  For the purposes of this methodology, the Department stated that it intends to scrutinize very carefully any instances of concurrent subsidies, and will normally determine that the value of concurrent subsidies is fully reflected in the fair market value price of an arm's length change in ownership/privatization and, therefore, is fully extinguished in any such transaction, if the following criteria are met:

1. The nature and value of the concurrent subsidies were fully transparent to all potential bidders and, therefore, reflected in the final bid values of the potential bidders;
2. The concurrent subsidies were bestowed prior to the sale; and
3. There is no evidence otherwise on the record demonstrating that the concurrent subsidies were not fully reflected in the transaction price.[103]

With respect to the hot idle funds provided by the GNS, the funds were bestowed prior to the conclusion of the sale of the former NPPH to its new owners and, thus the second criterion was met.  However, we preliminarily determine that the other two criteria were not satisfied.  The solicitation for bids for the Port Hawkesbury mill and the selection of the four qualified bidders were completed by October 28, 2011, and the deadline for submitting bids was December 16,

---

[96] See GSQR at 10.

[97] *See* PSQR at 10.

[98] *See* PSQR at 11.

[99] *See* PQR at 17.

[100] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-6 - NS.VIII 7.

[101] *See Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act Section 123 Modification,* 68 FR 37125 (June 23, 2003) (*Notice of Final Modification*).

[102] The *Notice of Final Modification* explicitly addresses full privatization, but the Department later determined to apply this methodology to private-to private sales.  *See e.g., Certain Pasta From Italy: Preliminary Results and Partial Rescission of the Eighth Countervailing Duty Administrative Review* (*Pasta from Italy*), 70 FR 17971; 17972 (April 8, 2005).

[103] *See Notice of Final Modification,* 68 FR 37125, 37137.

2011.  The decisions by the GNS to provide hot idle funds were made in December 2011 and on March 26, 2012, after the solicitation for bids and after the submission of all bids.[104]  Thus, at the time the bids were submitted, the nature and the value of the hot idle funds were not "fully transparent to all potential bidders," as articulated in the first criterion above.  The potential bidders would not have been aware of the provision of hot idle funds from the GNS; therefore, the bids submitted could not have reflected the provision of the assistance by the GNS to maintain hot idle status.

Moreover, there is evidence otherwise on the record that demonstrates that the hot idle funds were not fully reflected in the transaction price.  Because the hot idle funds were not in existence before the bid price was established and approved, the value of the GNS hot idle funds could not have been reflected in the transaction price.  As Port Hawkesbury admits, the price set forth in the bid that was submitted and accepted on December 16, 2011, did not change throughout the duration of the sales process, and the closing of the acquisition of the mill ultimately occurred on the pricing terms submitted in the December 16, 2011, bid.[105]  Thus, even if that bid price initially reflected the fair market value of the Port Hawkesbury mill, and even though the hot idle funds were bestowed prior to the final sale, the value of the GNS hot idle funds could not have been reflected in the final transaction price, which was set before the hot idle funds were proposed and approved by the GNS.  Therefore, even assuming an arm's length transaction for fair market value, because the actual transaction price could not have accounted for the amount of the subsidy, we preliminarily determine that the subsidy could not have been extinguished.

We, therefore, preliminary determine that the grants provided by the GNS in order to maintain the Port Hawkesbury mill in "hot idle" status through to the completion of the sale of the mill to PWCC constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act.  We also preliminarily determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant.  Finally, we preliminarily determine that the program is *de jure* specific, in accordance with section 771(5A)(D)(i) of the Act, because the GNS authorized the assistance only to Port Hawkesbury.

Because NPPH did not receive these benefits on an on-going basis and the assistance was to be provided only during the pendency of the *CCAA* process, we are treating these subsidies as non-recurring grants.  Additionally, because Port Hawkesbury reported the total amount of payments it received, and it was not able to identify the source of funds (GNS, New Page Corporation or NPPH) for the payments it received,[106] we have used in our calculation the total amount of GNS funds disbursed under the court-appointed monitor's approval, as reported by the GNS.[107]  Using this total, we conducted the "0.5 percent test" pursuant to 19 CFR 351.524(b)(2) and we found that the benefits were greater than 0.5 percent of Port Hawkesbury's total sales in the year the grants were approved.  Thus, we allocated the total benefit over the AUL using the discount rate discussed above in the section "Loan Interest Rate Benchmarks and Discount Rates," to

---

[104] *See*, *e.g.*, GSQR at Exhibit NS-SUPP1-12, Appendix A.

[105] *See* PSQR at Exhibit 8, page 6.

[106] *See* PSQR at 14.

[107] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-17.

determine the amount attributable to the POI. We then divided the amount attributable to the POI by Port Hawkesbury's total sales during the POI. On this basis, we preliminarily determine that Port Hawkesbury received a net countervailable subsidy of 0.73 percent *ad valorem* under this program.

### 5. Forestry Infrastructure Fund

The GNS reports that the Forestry Infrastructure Fund (FIF) was created pursuant to an agreement between the GNS and NPPH dated September 16, 2011, which was put into effect by the Supreme Court of Nova Scotia on September 23, 2011, pursuant to its authority under the *CCAA* process. According to the GNS, the purpose of the FIF was to pass payments through NPPH to providers of certain services that the GNS deemed beneficial for the province.[108] Specifically, the GNS determined that because NPPH intended to shut down its mill, ancillary forestry operations which are directly beneficial to the province and the provincial economy would cease immediately. Therefore, the GNS engaged with NPPH to continue the forestry infrastructure activities of third party contractors and subcontractors.[109] These activities included silviculture (including ongoing silviculture activities that were only partially completed when NPPH sought creditor protection), road maintenance, forestry training program, and design, harvesting and transportation of timber.[110] The GNS submitted internal documents which described the FIF as follows:

> This $14 million fund was established to support NewPage's supply chain while keeping the facility ready to be sold to a new owner. This fund helped to maintain woodlands operation. (Over a six month period, approximately 300 jobs were financed by the Fund.) Originally the fund was scheduled to end in December 2011; however, it was extended until March 31, 2012, to give more time to complete the sale. This initial expansion did not require additional funding.[111]

Initial funding for the FIF was approved on September 16, 2011, in the amount of C$14 million, to be provided by the ERDT.[112] The order approving this original agreement was announced publicly on or before October 1, 2011.[113] The FIF was amended three times subsequent to its establishment.[114] Notably, on March 7, 2012, the ERDT amended the agreement to extend it until September 30, 2012, and to provide an additional amount to the FIF of C$12 million.[115]

As discussed above under the "GNS Grants for Maintaining Hot Idle Status" section, PWCC submitted its bid to purchase the mill on December 16, 2011, and once the price set out in its bid

---

[108] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, NS.X-2.
[109] *Id.* at NS.X-3.
[110] *Id.*
[111] *See* GSQR at Exhibit 98B.
[112] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, NS.X-5.
[113] *Id.* at Exhibit NS-FI-5.
[114] *Id.* at NS.X-6.
[115] *Id.* at Exhibit NS-FI-8.

was accepted, it did not change throughout the duration of the process and the closing of the acquisition of Port Hawkesbury occurred based on that price.[116]

Port Hawkesbury argues that it was not a party to the transactions under the FIF and received no benefits from it.[117]  The GNS argues that the program was "cost and cash flow" neutral to NPPH, and the services provided under the program were designed to accrue to the benefit of the GNS.[118]  However, the internal documentation submitted by the GNS demonstrates that the FIF was provided to support the ongoing operations of the mill during the bankruptcy process and to maintain the mill ready for sale as an ongoing concern,[119] which demonstrates that this program was established to support the mill through the *CCAA* and sale process, rather than only to support unrelated contractors.  Additionally, the GNS argues that even if there was a benefit to NPPH, the benefit was extinguished when NPPH was sold to PWCC in a private-to-private transaction, made at arm's length, and at fair market value.[120]  However, as discussed above, the Department looks for guidance in the *Notice of Final Modification*, which addresses the treatment of concurrent subsidies with respect to change-in-ownership.

The first step in our analysis is to determine whether the purchase of the mill from NPPH by PWCC was at arm's length for fair market value.  In analyzing whether a sales transaction was for fair market value, the Department will normally examine whether the seller acted in a manner consistent with the normal sales practice of private commercial sellers in that country.  Where an arm's-length sale occurs between private parties, we would normally expect the private seller to act in a manner consistent with the normal sales practices of private commercial sellers in that country.[121]

The sale of the company was undertaken through the *CCAA* under the general supervision of the Supreme Court of Nova Scotia.[122]  The sale of the company occurred under the normal restructuring process of the *CCAA*, which is similar to the process undertaken under Chapter 11 of the U.S. Bankruptcy Code.  The Court appointed an independent party, Ernst and Young, as the Monitor to oversee the day-to-day administration of the sale of the company.  The notice of the potential sale was advertised in the Canadian and international press including an industry journal for the pulp and paper industry.  Upon initiation of the sales process, 110 potential purchasers were contacted which resulted in the submission of 21 non-binding Letters of Intent (LOI).  Fourteen of the parties that submitted LOIs were designated qualified bidders  and eight of these qualified bidders submitted offers.  Four of these bidders were then selected to submit formal and final offers.  PWCC was then selected as the purchaser and the sale of the company by NPPH to PWCC was approved by the company's American bondholders and Canadian creditors.  Based upon the manner in which the company was sold, we preliminarily determine

---

[116]  *See* PSQR at 11.

[117]  *See* PQR at 18.

[118]  *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, NS.X-3 – NS.X-4.

[119]  *See* GSQR at Exhibit 98B.

[120]  *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, NS.X-2.

[121]  *See, e.g., Pasta From* Italy. 70 FR at 17972.

[122]  The information on the sales process of the company cited in this paragraph can be found in the PSQR at Exhibit 8.

that this private-to-private party transaction between NPPH and PWCC was at arm's-length for fair market value.

After determining that the change-in-ownership was a private-to-private transaction at fair market value, we must then determine whether any subsidies were extinguished. The *Notice of Final Modification* establishes the criteria to be used in determining whether a subsidy is fully extinguished in a fair market value price of an arm's-length change in ownership/privatization. As noted above, these criteria are:

1.  The nature and value of the concurrent subsidies were fully transparent to all potential bidders and, therefore, reflected in the final bid values of the potential bidders;
2.  The concurrent subsidies were bestowed prior to the sale; and
3.  There is no evidence otherwise on the record demonstrating that the concurrent subsidies were not fully reflected in the transaction price.[123]

With respect to the initial FIF approval amount of C$14 million provided by the GNS, those funds were bestowed prior to the conclusion of the sale of the former NPPH to its new owners and, thus, the second criterion was met. Additionally, as noted above, the order approving this original agreement was announced publicly on or before October 1, 2011,[124] which is prior to the submission of formal offers for the purchase of the mill on October 24, 2011, and prior to the submission of PWCC's final bid on December 16, 2011.[125] Therefore, the first criterion was also met, as the nature and value of the initial FIF funds were fully transparent to all potential bidders. Additionally, there is no evidence otherwise on the record demonstrating that the amounts related to the first FIF approval were not fully reflected in the transaction price. Therefore, we preliminarily determine that the subsidies related to the initial FIF approval were extinguished in the fair market price of an arm's-length sale of NPPH to PWCC.

With respect to the second FIF approval amount of C$12 million, those funds were also bestowed prior to the conclusion of the sale of the former NPPH to its new owners and, thus, the second criterion was met. However, we preliminarily determine that the other two criteria were not satisfied with respect to the second FIF approval amount. Specifically, as noted above, PWCC's final bid was submitted on December 16, 2011, whereas the second FIF amount was approved by the GNS and the ERDT after that date. Thus, at the time the bids were submitted, the nature and the value of the second FIF was not "fully transparent to all potential bidders," as articulated in the first criterion above. The potential bidders would not have been aware at the time they submitted their bids that the second FIF was forthcoming, and it is not possible that the bids submitted prior to this date could have reflected the provision of the assistance under the FIF.

Moreover, there is evidence otherwise on the record that demonstrates that the second FIF was not fully reflected in the transaction price. Because those funds were not disbursed before the bid price was established and approved, the value of the second FIF could not have been

---

[123] *See Notice of Final Modification,* 68 FR 37125, 37137.
[124] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, Exhibit NS-FI-5.
[125] *See* GSQR at 10.

reflected in the transaction price. As Port Hawkesbury admits, the price set forth in PWCC's bid that was submitted and accepted on December 16, 2011, did not change throughout the duration of the sales process and the closing of the acquisition of the mill occurred on the pricing terms submitted in the December 16, 2011, bid.[126] Thus, even if that bid price initially reflected the fair market value of the Port Hawkesbury mill, and even though the concurrent subsidy was bestowed prior to the final sale, the value of the second FIF could not have been reflected in the final transaction price, which was set before the concurrent subsidies were proposed and approved by the GNS. Therefore, because the actual transaction price could not have accounted for the amount of the subsidy, we preliminarily determine that the subsidy could not have been extinguished.

We preliminary determine that the grants provided by the GNS and the ERDT under the second FIF constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act. We also preliminarily determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant. Finally, we preliminarily determine that the program is *de jure* specific, in accordance with section 771(5A)(D)(i) of the Act, because the GNS authorized the assistance only to Port Hawkesbury.

Because NPPH did not receive these benefits on an on-going basis and the assistance was to be provided only up until September 30, 2012,[127] we are treating these subsidies as non-recurring grants. Therefore, we conducted the "0.5 percent test" pursuant to 19 CFR 351.524(b)(2) and we found that the benefits were greater than 0.5 percent of Port Hawkesbury's total sales in the year the grants were approved. Thus, we allocated the total benefit over the AUL using the discount rate discussed above in the section "Loan Interest Rate Benchmarks and Discount Rates," to determine the amount attributable to the POI. We then divided the amount attributable to the POI by Port Hawkesbury's total sales during the POI. On this basis, we preliminarily determine that Port Hawkesbury received a net countervailable subsidy of 0.55 percent *ad valorem* under this program.

### 6. GNS Grants for the Sustainable Forest Management and Outreach Program Agreement

Based on the petitioner's allegation, the Department initiated an investigation of a program titled "GNS Grants for the Promotion of Forest Management and Sustainable Harvesting" under which the GNS agreed "to provide C$3.8 million annually for 10 years in a forestry restructuring fund to support sustainable harvesting and forest land management."[128] The GNS states that the petitioner misstated the nature, content, and name of this funding agreement, but it confirms that the "Sustainable Forest Management and Outreach Program Agreement" (Outreach Agreement) does provide funding of up to C$3.8 million per year for up to ten years.[129] The GNS reported that the Outreach Agreement provides payment to Port Hawkesbury for providing certain

---

[126] *See* PSQR at Exhibit 8, page 6.
[127] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, Exhibit NS-FI-8.
[128] *See Initiation Notice* at 14.
[129] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XI.

services for the benefit of the province.[130]  Port Hawkesbury explains that the funds are used for the following activities:  road planning and maintenance, forestry planning and administration, resource inventory and data sharing, research, silviculture, operation of a silviculture program on private lands, forest planning, and forest certification.[131]  In order to receive the funds from the GNS and the DNR, Port Hawkesbury files quarterly reports outlining activities and expenses.[132]

We preliminarily determine that the grants under the Outreach Agreement that Port Hawkesbury received from the GNS constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act.  We also preliminarily determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant.  Finally, we preliminarily determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS provided the assistance only to Port Hawkesbury.[133]

In accordance with 19 CFR 351.524(c)(2), we find that the funds provided under this program constitute recurring benefits.  Therefore, we calculated the countervailable subsidy rate by dividing the amount of the grants received during the POI under the Outreach Agreement by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section.  On this basis, we preliminarily determine that Port Hawkesbury received a net countervailable subsidy of 1.62 percent *ad valorem* under this program.

### 7.  GNS Provision of Funds for Worker Training and Marketing

Port Hawkesbury reports that as part of PWCC's plan for restructuring NPHH, it sought a commitment by the GNS to provide funding going forward, in the event that PWCC was successful in purchasing NPPH.  The GNS agreed to two grants:  1) a C$1.5 million grant for workforce training at the Port Hawkesbury mill, and 2) C$200,000 annually for 5 years (C$1 million total) for the marketing of products produced at the Port Hawkesbury mill.[134]  Although there was not a specific application process, PWCC's Letter of Offer, dated August 14, 2012, and the final amended offer, dated September 22, 2012, document the agreement with respect to these funds.[135]

This grant is administered by the ERDT acting on behalf of the Minister.[136]  In order to receive funds for workforce training under this program, Port Hawkesbury provided the ERDT with schedules of estimated training initiatives and related costs.[137]  In order to receive the annual

---

[130] *Id.*
[131] *See* PQR at 22-23.
[132] *Id.*
[133] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XI, NS.XI-12.
[134] *See* PQR at 26-27.
[135] *Id.* at 26-27 and Exhibit 3-1 and 3-2.
[136] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XII, NS.XII-2.
[137] *See* PQR at 30 and Exhibit 3-4.

grant for marketing, Port Hawkesbury must provide the GNS with an annual marketing plan prior to the disbursement of funds, which it has done for 2013 and 2014.[138]

We preliminarily determine that the grants for workforce training and marketing that Port Hawkesbury received from the GNS and ERDT constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act. We also preliminarily determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant. Finally, we preliminarily determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS and ERDT provided the assistance only to Port Hawkesbury.

Under 19 CFR 351.513(c), the Departments treats worker training subsidies and promotion assistance subsidies, which would include marketing subsidies, as recurring benefits. Therefore, we calculated the countervailable subsidy rate by dividing the amount of the grants received for worker training and marketing during the POI under this program by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section. On this basis, we preliminarily determine that Port Hawkesbury received a net countervailable subsidy of 0.19 percent *ad valorem* under this program.

### 8. The Federal Pulp and Paper Green Transformation Program

The GOC reported that Resolute received grants during the POI under the FPPGTP.[139] The GOC also reported that Resolute's cross-owned affiliate, Fibrek, received assistance under this program.[140] The purpose of the program was to improve the environmental performance of Canada's pulp and paper industry. The program is authorized by the national government and administered by Natural Resources Canada. Under the program, participant companies which register and submit the required application materials receive a credit in the amount C$0.16 per liter of black liquor used/burned during the period January 1, 2009 through December 31, 2009, up to a C$1 billion cap for the total program.[141] Following the credit application process, companies receive a confirmation of the value of the credits generated, and the total credit value. Companies can then submit project proposals for funding consideration.[142] Eligible projects must be capital investments in a Canadian pulp and paper mill that are directly related to the mill's industrial process and result in demonstrable improvements in environmental performance. Additionally, the project must be located at a pulp and paper mill in Canada.[143] This program ended on March 31, 2012; project expenses incurred by participating companies after that date would not be funded by the program.[144]

---

[138] *See* PQR at 30 and Exhibit 3-5.

[139] *See* GQR at Government of Canada Questionnaire Response, Volume V, GOC-4.

[140] *See* "Revised Response of the Government of Canada to the Department's April 6 Questionnaire," July 22, 2015.

[141] *Id* at 1 and 8.

[142] *Id.* at 8.

[143] *See* GQR at Government of Canada Questionnaire Response, Volume V, GOC-12 – GOC-13 and Exhibit GOC-PPGTP-1.

[144] *Id.* at GOC-2.

We preliminarily determine that grants from the GOC under the FPPGTP constitute a financial contribution in the form of a direct transfer of funds from the government, and bestow a benefit within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act and 19 CFR 351.504(a). We also preliminarily determine that this program is specific under section 771(5A)(D)(i) of the Act because the grants provided under the program are limited to the pulp and paper industry.

As discussed above in the section, "Use of Facts Otherwise Available and Adverse Inferences," we have determined that the GOC and Resolute impeded our investigation such that the reliance of facts available with an adverse inference is warranted for this preliminary determination. Because the record lacks information that is necessary for calculating the benefit and the countervailable subsidy rate, we are relying on the use of facts available and making an adverse inference in identifying a CVD rate to apply for this program.

In accordance with our practice, the Department applies the highest calculated rate for the identical program in the investigation if a responding company used the identical program, and the rate is not *de minimis*. If there is no identical program match within the investigation, or if the rate is *de minimis*, the Department uses the highest non-*de minimis* rate calculated for the same or for a similar program (based on treatment of the benefit) in another CVD proceeding involving the same country. Absent an above-*de minimis* subsidy rate calculated for the same or for a similar program, the Department applies the highest calculated subsidy rate for any program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating companies.[145] As such, for this preliminary determination, we are applying as the countervailable subsidy rate for this program the rate we preliminarily calculated for the Sustainable Forest Management and Outreach Program Agreement, a program that provides assistance in the form of grants. Thus, we preliminarily determine the countervailable subsidy for the FPPGTP to be 1.62 percent *ad valorem*. We do, however, intend to determine whether it is necessary to solicit additional information with regard to this program and to conduct verification of the July 22, 2015, submissions.

Additionally, based on proprietary information submitted by the GOC and Resolute related to Resolute's receipt of benefits under this program, we preliminarily find that Resolute may have received additional benefits under other funding mechanisms. We intend to examine these additional potential benefits at verification and address them in the final determination.

### 9. Ontario Northern Industrial Electricity Rate Program

The Government of Ontario (GOO) and Resolute report that Resolute's Thunder Bay, Fort Frances, and Iroquois Falls mills received grants during the POI under the Ontario Northern Industrial Electricity Rate (NIER) program, established on April 1, 2013.[146] The purpose of the program is to assist Northern Ontario's largest qualifying industrial electricity consumers which

---

[145] *Id.*; *see also*, *e.g.*, *Lightweight Thermal Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 FR 57323 (October 2, 2008), and accompanying I&D Memo at "Selection of the Adverse Facts Available Rate."

[146] *See* GQR at Government of Ontario Questionnaire Response, Ontario-1 – Ontario-2; *see also* RQR at Appendix B.

commit to developing and implementing an energy management plan to manage their energy usage and improve energy efficiency and sustainability. Specifically, participants receive a rebate of two cents per kilowatt hour, capped at 2011-12 consumption levels or C$20 million, whichever is lower.[147] The program is administered by the GOO Ministry of Northern Development & Mines. Companies eligible for assistance are industrial facilities located in Northern Ontario. The program has been extended indefinitely.[148] Companies which have been accepted into the program are not required to reapply and can expect to receive rebates in variable amounts based on the amount of eligible electricity consumed, not subject to the GOO Ministry of Northern Development & Mines' discretion.[149]

We preliminarily determine that the electricity rebates that Resolute received from the GOO constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act. We also preliminarily determine that this program is specific under section 771(5A)(D)(iv) of the Act because the rebates provided under the program are limited to companies located in a certain designated geographical region, *i.e.*, Northern Ontario, within the jurisdiction of the authority providing the subsidy. We also preliminarily determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant.

In accordance with 19 CFR 351.524(c)(2), we find that the electricity rebates provided under the program constitute recurring benefits. Therefore, we calculated the countervailable subsidy rate by dividing the amount of rebates received under this program during the POI by Resolute's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section. On this basis, we preliminarily determine that Resolute received a net countervailable subsidy of 0.42 percent *ad valorem* under this program.

### 10. GNS Preferential Electricity Rate for Port Hawkesbury

The petitioners alleged that Nova Scotia Power, Inc. (NSPI) provides electricity to Port Hawkesbury for less than adequate remuneration (LTAR).

On September 6, 2011, NPPH sought protection under the *CCAA* and suspended operations at the Point Hawkesbury mill.[150] On September 28, 2012, PWCC restarted the SC paper production line.[151] Throughout the *CCAA* process, PWCC negotiated with NSPI and the Nova Scotia Utility and Review Board (NSUARB) to establish an electricity rate that would allow it to reopen the mill.[152] The result of these discussions was the development of a Load Retention Rate (LRR) that met PWCC's requirements and received approval from the NSUARB.[153]

---

[147] *Id.*
[148] *Id.* at 2.
[149] *Id.* at 25-26.
[150] *See* PQR at 6.
[151] *See* PQR at 5. *See* also PSQR Exhibit 43-1, NSPI 2014 Load Forecast at 29 and PQR at 51 (At that time, PWCC also chose not to restart the newsprint production line, reducing the annual electricity demand of the facility by 35 percent).
[152] *See* PQR at 3.
[153] *Id.*

The NSUARB, which regulates certain NSPI operations, originally approved a Load Retention Tariff (LRT) framework for NSPI on May 24, 2000 that required NSUARB to determine that an LRR is in the public interest before an LRR could be approved.[154]  This framework remained unchanged and unused until November 29, 2011, when the NSUARB approved a modification that expanded the reasons for applying the LRT to include extra-large industrial customers that are in economic distress, in particular, NPPH and Bowater Mersey Paper Company Limited (Bowater Mersey).[155]  The NSUARB also approved an amendment which required the full recovery of variable incremental costs and changed the term from five years to three (*i.e.*, 2012-2014).[156]  This LRT was further amended on April 27, 2012 by the NSUARB in response to an application from NSPI and PWCC to accommodate their plan to acquire the Port Hawkesbury mill through the *CCAA* process and to own and operate it jointly.[157]

NSUARB issued a supplemental decision and order approving a LRT applicable to the mill for PWCC and NSPI on August 20 and September 12, 2012, respectively.[158]  That order was conditioned on a favorable Advance Tax Ruling (ATR) from the Canada Revenue Agency which was not granted to NSPI and PWCC.[159]  Failing receipt of the ATR, and the resulting withdrawal of NSPI from the plan, PWCC applied to the NSUARB to amend the terms of the LRT yet again on September 22, 2012 to exclude the conditions dependent on the ATR and on NSPI joint ownership.[160]  On September 27, 2012, NSUARB approved PWCC's application for an amended LRT and issued the related order on September 28, 2012.[161]  This version of the LRT is applicable from inception through December 31, 2019.[162]

---

[154] *See* GSQR at NS.XIII.11 and GSQR Exhibit NS-EL-20 (Faced with the potential of NSPI's largest customers building gas turbine-based generation to supply their own electricity, NSUARB determined that the LRR offered the potential to continue to recoup some fixed costs rather than lose the load entirely and that this was in the public interest as long as revenue outweighed incremental cost of serving the potentially lost customer).  *See also* PQR at Exhibit 23-5.

[155] *See* GSQR at NS.XIII.11 *and* NSUARB November 29, 2011 decision at GSQR Exhibit NS-EL-21 at 5, decision at paragraphs 96-224; 284-288 (NPPH and Bowater Mersey applied for a LRR based on proposed amendments to the LRT on June 22, 2011);  at 37 (paragraph 102 - the economic distress provision states that the rate is granted in circumstances where it can be shown that the rate is required to respond to the competitive challenge of business closure for extra-large industrial customers.); and at 65 (paragraph 175 - the public interest is served when making the LRR available to the customer is necessary and sufficient for retaining the load, and the total revenue received from the LRR customer exceeds the total incremental cost of serving that customer).  *See also* PQR Exhibit 23-6.

[156] *See* GSQR Exhibit NS-EL-21 at 94-97 (p.281-288 – Amendments by NSUARB and justification of its jurisdiction).

[157] *See* PQR Exhibit 23-7, NSPI's application for an LRR *and* Exhibit 23-8, PWCC's application (Payments for the electricity were to be handled through dividend payments to NSPI.).  *See also* NSUARB's April 27, 2012 decision in the Petition at Exhibit II-32.

[158] *See* PSQR Exhibit 47-1 NSUARB August 20, 2012 Decision. *See* GSQR Exhibit NS-EL-23 for the NSUARB September 28, 2012, Order at 1.

[159] *See* GSQR at NS.XIII.16.

[160] *See* PQR at Exhibit 23-9.

[161] *See* GSQR at Exhibit NS-EL-22 for the NSUARB September 27, 2012, Supplemental Decision.  *See* GSQR at Exhibit NS-EL-23 for the NSUARB September 28, 2012, Order (LRT Order).

[162] *See* GSQR at Exhibit NS-EL-23 for the NSUARB September 28, 2012, Order at 2.

Throughout this process, NSPI was also seeking NSUARB approval of the LRR, the specific price points of the LRT for 2013 and 2014.  On May 8, 2012, NSPI submitted to the NSUARB its General Rate Application which included increases to the LRR prices for 2013 and 2014.[163] The NSUARB issued a decision with respect to the 2013/2014 General Rate Application on December 21, 2012, and issued Order M04972 setting the rates for 2013 and 2014 on February 1, 2013.[164]

*Determining Financial Contribution*

Under section 771(5)(D)(iii) of the Act, a financial contribution can be in the form of a provision of a good or service.  Under section 771(5)(B) of the Act, a financial contribution is provided by an "authority" which is defined as a government or any public entity within the territory of the country, or when an "authority" entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments.

The provision of electricity within Nova Scotia is governed by the following legislation and regulations:  (1) *Public Utilities Act*; (2) *Utility and Review Board Act*; (3) *Electricity Act*; (4) *Maritime Link Act*; (5) *Renewable Electricity Regulations*; (6) *Renewable Electricity Retail Sale Regulations*; (6) *Wholesale Market Rules Regulations*; (7) *Board Regulatory Rules*: (8) *Utility and Review Board Regulations*; (9) *Public Utilities Rules*; and (10) *Maritime Link Cost Recovery Process Regulations*.[165]  Under the *Electricity Act*, the Minister of Energy has responsibility for the general supervision and management of Nova Scotia's electricity system.  The Minister of Energy may establish and administer policies, programs, standards, guidelines, objectives, codes of practices, directives, and approval processes pursuant to the *Electricity Act*.[166]

The Government of Nova Scotia has delegated the regulatory oversight for the sale of electricity to the NSUARB which was established pursuant to the *Utility and Review Board Act of 1992*.[167] The NSUARB is an independent agency of the Government of Nova Scotia.[168]  Pursuant to the *Public Utilities Act*, the NSUARB exercises general supervision over all electric utilities operating as public utilities within the Province of Nova Scotia.  This jurisdiction includes setting rates, tolls and charges; regulations for the provision of service; approval of capital expenditures in excess of C$250,000, and any other matter the NSUARB feels is necessary to properly exercise its mandate.[169]  In addition, the annual rate of return for public utilities is

---

[163] *See* GSQR at Exhibit NS-EL-17 for the GRA. For specifics of the 2014 LRR rates *see* GSQR at Exhibit NS-EL-17 DE-03 – DE-04 at 143 (section 11.4.3.3 establishes the Variable Incremental Rate, Contribution to Fixed Costs, and Energy Charge for 2014); Appendix P at 21-29 (reiterates terms of the LRT based on NSUARB September 28, 2012, LRT Order).
[164] *See* GSQR at Exhibit NS-SUPP1-30 (Order M04972). The final version of the LRT (based on the LRT Order) and the rates for 2014 are stated in Order M04972 at Schedule D and at Attachment A thereto at GSQR 1456-1492.
[165] *See* GSQR at NS.XIII-4.
[166] *See*, *e.g.,* Section 2B of the *Electricity Act* provided as GSQR at Exhibit NS-EL-3.
[167] *See* GSQR at NS.XIII-2.
[168] *See* GSQR at NS.XIII-2.
[169] *See*, *e.g.,* GSQR at NS.XIII-2; *Public Utilities Act* provided as Exhibit NS-EL-1; Nova Scotia Utility and Review Board "Electricity" at Attachment 17 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

determined by the NSUARB.[170]  The NSUARB's rules for regulation of the electricity market in Nova Scotia are provided in the *Board Regulatory Rules*, the *Public Utilities Rules*, and the *Utility and Review Board Regulations*.[171]

Under section 5(1) of the *Utility and Review Board Act*, the Governor in Council of the Province of Nova Scotia appoints the members of the NSUARB.  The Governor in Council is required under section 6(1) of the *Utility and Review Board Act* to designate the Chair and the Vice-Chair of the NSUARB.  Under section 10(1) of the *Utility and Review Board Act*, each full-time member and each full-time employee of the NSUARB is deemed to be a person employed in the public service of the Province of Nova Scotia.

Pursuant to the *Public Utilities Act*, NSPI, an investor-owned public utility, generates, transmits and distributes electricity throughout the Province of Nova Scotia.[172]  NSPI is the successor to the Nova Scotia Power Corporation (NSPC), a crown corporation owned by the Province of Nova Scotia.[173]  The powers, rights, privileges and obligations of public utilities such as NSPI are explicitly set forth by the GNS in law and regulation.

The approval and provision of the LRR for Port Hawkesbury was made pursuant to the laws and regulations established by the GNS.  Indeed, the NSUARB on November 29, 2011, modified the reasons for applying the LRR to include extra-large industrial customers such as the Port Hawkesbury mill that are in economic distress.  The negotiation and approval of the LRR was one of the critical factors to ensure the purchase of NPPH by PWCC as a going concern, a policy goal of the GNS after NPPH applied to enter *CCAA* proceedings.[174]  Absent the approval of the GNS through its established agency, the NSUARB, the public utility NSPI could not have provided electricity to Port Hawkesbury under the terms and conditions of the LRR.   For these reasons, we preliminarily determine that under section 771(5)(B)(iii) of the Act, the GNS entrusted or directed the public utility NSPI to provide a financial contribution in the form of the LRR to Port Hawkesbury.  Therefore, we preliminarily determine that Port Hawkesbury received a financial contribution in the form of the provision of a good or service under section 771(5)(D)(iii) of the Act under this program.

*Determining Specificity*

When determining whether a program is countervailable, we must examine whether it is an export subsidy or whether it provides benefits to a specific enterprise, an industry, or group thereof, either in law (*de jure* specificity) or in fact (*de facto* specificity) pursuant to section 771(5A) of the Act.  The provision of the LRR is not an export subsidy because there are no export requirements in the legislation with respect to industrial rate setting for electricity utilities.  However, this LRR was approved and expressly limited to one company, Port Hawkesbury.

---

[170] *See* GSQR at Exhibit NS-EL-1, section 45 of the *Public Utilities Act.*
[171] *See* GSQR at NS.XIII-3.
[172] *See*, *e.g.*, Nova Scotia Utility and Review Board "Electricity" at Attachment 17 of the July 2, 2015, Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.
[173] *Id.*
[174] *See* GSQR at 14.

Therefore, we preliminarily determine that this program is specific under section 771(5A)(D)(i) of the Act.

*Determining the Appropriate Benchmark*

Under 19 CFR 351.511(a)(2), the Department determines whether a good or service is provided for LTAR by comparing, in order of preference:  (i) the government price to a market-determined price for actual transactions within the country such as prices from private parties (a "Tier 1" Benchmark); (ii) the government price to a world market price where it would be reasonable to conclude that such a world market price is available to consumers in the country in question (a "Tier 2" Benchmark); or (iii), if no world market price is available, by assessing whether the government price is consistent with market principles (a "Tier 3" Benchmark).

With respect to a Tier 1 Benchmark for the provision of electricity, NSPI is the primary electric utility company in Nova Scotia providing electricity to most provincial consumers,[175] with independent power producers generating a minimal amount of electricity by comparison and supplying that electricity over NSPI's transmission and distribution network.[176]  Furthermore, the GNS regulates the rates that NSPI charges for electricity through the NSUARB.  When the government provider constitutes a majority or a substantial portion of the market, the Department determines that prices within the country are distorted, that these prices do not satisfy the regulatory requirement for a market-determined price, and therefore cannot be used as a benchmark for determining the adequacy of remuneration.[177]  Therefore, we preliminary determine that a Tier 1 Benchmark is not available.

Pursuant to 19 CFR 351.511(a)(2)(ii), the Department will only use a Tier 2 Benchmark based on world market prices where it is reasonable to conclude that the good or service is actually available to the purchaser in the country under investigation.  The Department has specifically stated that electricity prices from countries in the world market are normally not available to purchasers in the country under investigation, due to the unique nature of electricity.[178]  NSPI

---

[175] *See* GSQR at NS.XIII.9 and Exhibit NS-EL-17 at DE-03/DE-04 Appendix H at 9 (NSPI provides 95 percent of the total electrical consumed in Nova Scotia.).  *See* also GSQR at NS.XIII.7 (There are also six regulated municipal electric utilities which either source electricity from NSPI generation, Independent Power Producers or self-generate.).

[176] *See* GSQR at Exhibit NS-EL-17 at DE-03/DE-04 Appendix L at 4.

[177] *See CVD Preamble*, 63 FR at, 65377:  "We normally do not intend to adjust such prices to account for government distortion of the market. While we recognize that government involvement in a market may have some impact on the price of the good or service in that market, such distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market. Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market, we will resort to the next alternative in the hierarchy."

[178] *See CVD Preamble*, 63 FR at 65377:  "Paragraph (a)(2)(ii) provides that, if there are no useable market-determined prices stemming from *actual* transactions, we will turn to world market prices that *would be available* to the purchaser.  We will consider whether the market conditions in the country are such that it is reasonable to conclude that the purchaser could obtain the good or service on the world market.  For example, a European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be available to consumers in Latin America."

has stated that there is no international cross-border transmission or distribution of electricity into Nova Scotia.[179]  Therefore, we preliminarily determine that we cannot rely on world market prices as a benchmark for determining whether electricity is provided for LTAR.

Because there are no market-determined prices or world market prices that satisfy the regulatory requirements, we preliminarily determine that it is appropriate to rely on the final alternative in the benchmark hierarchy set forth under 19 CFR 351.511(a)(2)(iii):  to determine whether the government price is consistent with market principles.[180]  We have done so in this case by assessing whether the prices charged under the LRR are established in accordance with market principles through an analysis of factors such as the price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination in the rate making.[181]

NSUARB sets electricity rates in Nova Scotia using standard rate of return regulation which guarantees a reasonable return on common equity electricity generation, transmission, and

---

[179] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XIII, NS.XIII-9. (There are transfers from outside the province but there is not information on the record that any of these transfers cross international boundaries.)

[180] *See CVD Preamble*, 63 FR at 65378:  "Paragraph (a)(2)(iii) provides that, in situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles.  Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.  We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.  In our experience, these types of analyses may be necessary for such goods or services as electricity, land leases, or water, and the circumstances of each case vary widely.  *See, e.g.*, *Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30954 (July 13, 1992) and *Final Affirmative Countervailing Duty Determination: Venezuelan Wire Rod*, 62 FR 55014, 55021-22 (October 22, 1997)."

[181] *See Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30954 (July 13, 1992) (*Magnesium from Canada*) ("As a general matter, the first step the Department takes in analyzing the potential preferential provision of electricity – assuming a finding of specificity – is to compare the price charged with the applicable rate on the power company's non-specific rate schedule.  If the amount of electricity purchased by a company is so great that the rate schedule is not applicable, we will examine whether the price charged is consistent with the power company's standard pricing mechanism applicable to such companies.  If the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other industries which purchase comparable amounts of electricity, we would probably not find a countervailable subsidy.").

distribution as determined by a cost-of-service methodology.[182]  NSPI submits to NSUARB complex analyses of its expected cost, revenue, and demand structure during the rate setting period for each tariff, as well as current period financial statements to support its suggested price structure.[183]  Customers are often involved in requesting tariff designs and take part in the yearly application approval process for setting prices under the existing tariffs.  As explained above, PWCC (for its subsidiary Port Hawkesbury) was heavily involved in the development of the LRT and the application for the 2014 LRR.

Each year NSPI submits a General Rate Application for the approval of the NSUARB which establishes a schedule of rates for each of the tariffs corresponding to a variety of rate payer classifications based on characteristics related to the electrical service they receive.  At the outset of this process, costs for "below-the-line" rates classes are segregated from the costs of serving "above-the-line" classes, and these costs are not included in the allocation of costs for the calculation of above-the-line rates.  Additionally, there is no cost-to-revenue requirement for below-the-line rate classes; they do not cover fixed costs nor contribute to the guaranteed return on regulated equity.[184]  Under-recovered costs are deferred and held as regulatory assets which are recovered from customers paying above-the-line rates across planned future intervals.[185]  Most electricity rates are considered "above-the-line" rates and are determined using the cost-of-service method in which costs associated with forecast demand are allocated to each tariff class.[186]  For example, large industrial users connected at the transmission level of the electrical grid, such as Port Hawkesbury, are not charged for the fixed costs associated with commercial and residential customer classes. Above-the-line rates are set to produce revenue streams within a band of 95 to 105 percent of the costs incident to the class.[187]  Above-the-line rate setting is

---

[182] *See Public Utilities Act* at section 45 available on the record at GSQR Exhibit NS-EL-1 at 14.  *See* also, explanation of the Fair Return Standard and supporting case precedent in Canada (as in the United States) in GSQR Exhibit NS-EL-17 at DE-03/DE-04 Appendix H at 5-7 (A fair return gives a regulated utility the opportunity to (1) earn a return on investment commensurate with that of comparable risk enterprise; (2) maintain its financial integrity; and, (3) attract capital on reasonable terms and conditions).  NSPI applies to NSUARB for rate approval *see* GSQR at NS.XIII.4-6 (NSPI forecasts its costs, adds a reasonable rate of return and "proposes these rates to NSAURB" either through the GRA or the Fuel Adjustment Mechanism (FAM).  The GRA application process is adversarial and often includes the Province as intervener, the electric utility, and a customer advocate; the process begins with cross-party written questioning, continues through a rate hearing, and ends with a NSUARB written decision and order. FAM addresses over or under recovery of fuels costs, is adversarial, and considers an independent audit of actual versus forecast fuel costs.) Further, regulated common equity must be maintained at nearly 40 percent of capitalization (regulated common equity plus long-term debt plus retained earnings).  *See* also, GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 117, and 126. Actual POI average common equity is 38.8 percent in NSPI's 2014 financial statement at GSQR Exhibit NS-SUPP1-36 at Attachment 1 at 6.
[183] *See* GSQR at Exhibit NS-EL-17 at DE-03/DE-04 at 110-111.
[184] *Id.* at Exhibit NS-EL-17 at DE-03/DE-04 at 139, and SR-01 Attachment 1 at 3.
[185] *Id.* at Exhibit NS-EL-17 at DE-03/DE-04 at 8.  (During the POI, under-recovered fixed costs, mainly from the LRR, were deferred under the Rate Stabilization Plan; however, not all under-recovered costs are attributable to the LRR.  Some stranded costs are the result of previous capital expenditures to meet previously forecast demand growth which did not materialize due to the 2008 economic downturn, the slow subsequent recovery, and the unexpected shift to a much reduced level of demand from the paper industry in general.).
[186] *Id.* at Exhibit NS-EL-17 at DE-03/DE-04 at 139-145, and at SR-01 Attachment 1 at 3.
[187] *Id.* at Exhibit NS-EL-17 at DE-03/DE-04 at 139-145, and at SR-01 Attachment 1 at 3-12.

NSUARB's standard pricing mechanism with respect to NSPI.  Port Hawkesbury's 2014 LRR, in contrast, is a below-the-line rate.[188]

NSPI has tariffs for 12 above-the-line rate payer classes in its 2014 schedule of rates.[189]  NSPI also has several below-the-line classes, including the LRT, which were approved by NSUARB.[190]  Port Hawkesbury is connected to NSPI at the transmission level of the electrical grid with a 185,000 kV service.[191]  Port Hawkesbury owns its own transformers, receives its service on the high voltage side of the transformer, and does not have its own generation capacity.[192]  Under its previous owner, the paper mill used the Extra Large Industrial 2 Part Real Time Pricing (ELI2P-RTP) rate, which is an above-the-line rate.[193]  However, NPPH was in the process of negotiating a below-the-line rate when it ceased operations and entered *CCAA* protection in 2011.[194]  No ELI2P-RTP rate was set for the POI because no customers intended to use it.[195]  Among the other alternative pricing schedules available to large industrial customers, the GRLF did not apply to Port Hawkesbury,[196] no rate was set for the One Part Real Time Price for 2014 and rates applicable to Bowater Mersey were not applicable to Port Hawkesbury because they were only available to Bowater Mersey.[197]  Thus, in 2014, other than the LRR, there were no electrical tariffs applicable to a customer with an extra-large connection size in the NSPI rate schedule.

The electricity rate setting process in Nova Scotia is usually conducted on a year-ahead basis; however, NSPI applied for approval of its 2013 and 2014 tariffs simultaneously in 2012 because of significant upward price pressures related to the loss of some of its largest customers and conversion from coal-based generation to the use of renewable energy sources.[198]  NSPI addressed these price pressures with a Rate Stabilization Plan that held rate increases at 3 percent for its above-the-line rate classes for 2014, rather than the 5.4 percent increase demanded by its increased cost structure, by factoring in under-recovered cost deferrals to the above-the-line rate

---

[188] *See* PQR at 64.  *See* PQR Exhibit 23-5, NSUARB May 24, 2000 Decision at 24.  *See* also, GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 142 (Below-the-line tariffs have predominantly and historically served NSPI's two largest customers:  NPPH, now Port Hawkesbury, and Bowater Mersey, which ceased operation in June 2012).

[189] *See* GSQR Exhibit NS-EL-17 at DE-03 – DE04 Appendix P, Attachment 4, at 40-76 (above-the-line tariffs 2014).  *See also* GSQR at Exhibit NS-SUPP1-30 at Schedule D.

[190] *See* Order M04972 at Schedule D.  *See* also, GSQR Exhibit NS-EL-17 at DE-03 - DE-04 at 141 (stating that Mersey Basic, Mersey Additional Energy, Generation Replacement and Load Following (GRLF), and the LRT are below-the-line rates).  *See also* GSQR Exhibit NS-EL-17 at SR-01, Attachment 1, at 110 (Revenue Analysis 2014 Exhibit 7, (showing below-the-line rates as direct revenue and including real time pricing (albeit with no revenue). This line item is for One Part Real Time Price but there was no planned usage during the POI).

[191] *See* PSQR at 33.

[192] *Id.*

[193] *See* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 128.

[194] *Id.* at Exhibit NS-EL-2 at 5 (The NSUARB November 29, 2011 Decision explains that NPPH applied for an LRT/LRR on June 22, 2011, but ceased operations September 6, 2011).

[195] *Id.* at Exhibit NS-EL-17 at DE-03/DE at 130 (Section 10.2.3 Suspension of ELI2P-RTP Rate Class).

[196] *See* PSQR Exhibit 43-1 at 39 (GRLF is for customers who have their own generation capacity of no less than 2,000 kV).

[197] *See* Order M04972 at Schedule D.  The Mersey Basic and Mersey Additional Energy rates discussed in the General Rate Agreement were not used during the POI because the General Rate Agreement was submitted prior to the June 2012 closure of Bowater Mersey.

[198] *See* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 8.

classes from the 2010 Fuel Adjustment Mechanism (FAM), Balance Adjustment.[199]  FAM, Balance Adjustments were used to lower the 2014 above-the-line rates, while above-the-line rates were held at cost-to-revenue ratios of 95 to 105 percent in line with the cost-of-service methodology.[200]  The use of FAM adjustments does not distort the standard pricing mechanism because specific under- or over-recovered fuel expenses are tracked and charged or credited to the applicable individual above-the-line rate classes.[201]  The Rate Stabilization Plan continues the deferral of system-wide unrecovered costs (*i.e.*, those from below-the-line rates, and stranded costs[202]) for recovery from above-the-line rate classes.  The deferrals of 2013-2014 costs are planned to be recovered in the 2015-2022 period.[203]  In addition, the Rate Stabilization Plan extends a program of cost shifting that began in 2012 with the Fixed Cost Recovery mechanism.[204]  The 2014 above-the-line rates include amounts for deferred cost recovery from 2012 under the Fixed Cost Recovery mechanism.[205]  Although Bowater Mersey and NPPH were both shut down for portions of 2012, the rates in effect at that time were designed with that eventuality in mind.  The 2012 rate structure was set with Bowater Mersey and NPPH load included. Above-the-line rates covered their own costs.  Stranded costs, from the lost paper mill load, were not allocated to above-the-line classes during the year that the rate was applied, but were rather deferred to 2013-2014 and spread over all above-the-line rate classes in a manner consistent with the standard pricing mechanism.[206]  Some costs that were deferred to 2014 under the Fixed Cost Recovery Mechanism were the uncovered fixed costs associated with Port Hawkesbury's LRR.  This is a departure from the standard pricing mechanism, but, although this process is continued in the Rate Stabilization Plan, it appears to be a limited arrangement that does not affect how rates are normally set.

As guided by the *CVD Preamble*, we preliminarily determine that under their normal rate setting philosophy, the NSUARB and NSPI set above-the-line rates in accordance with market principles for regulated monopolies when the cost-of-service method is employed (including the FAM).  These rates fully incorporate the costs of fuel, generation, transmission, and distribution.  Under this method of rate setting, there is a sufficient guaranteed rate of return to ensure future operations because all costs are covered, and, in order to ensure adequate investment, investors

---

[199] *Id. at* Exhibit NS-EL-17 at DE-03/DE-04 at 8, 149-150; Exhibit NS-EL-17 at DE-03/DE-04, Appendix N at 11; and Exhibit NS-EL-17 at DE-03/DE-04 at 11,.  *See also* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 27.

[200] *Id.* at Exhibit NS-EL-17 at SR-01, Attachment 1, at 130 (Exhibit 10 – Revenue and Expense Comparison for 2014)

[201] *Id.* at Exhibit NS-EL-17 at DE-03/DE-04 at 27.

[202] Stranded costs represent redundant existing investments in infrastructure which must still be paid for (either as idled or at reduced output), *e.g.*, generation facilities built to serve paper industry load which is now much smaller than forecast.

[203] *See* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 15, 26. The Fixed Cost Recovery mechanism was approved in the NSUARB's November 29, 2011, decision on the 2012 General Rate Agreement to defer lost fixed non-fuel cost contributions associated with the loss of load of NPPH and Bowater Mersey.  By this method above-the-line rates did not have to shoulder the fixed costs associated with those companies in 2012.  At the time of the application, NSPI did not know if those facilities would operate.  Accordingly, the unrecovered fixed costs were to be deferred and recouped in 2013 and 2014 based on actual figures.

[204] *Id.*

[205] *See* GSQR at Exhibit NS-EL-21 at 77.  *See also* PSQR at 42.

[206] *See* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 15.

are guaranteed a rate of return on equity that is competitive with similarly risky investments available in the market.

Before the LRR was approved for Port Hawkesbury on September 27, 2012, the applicable tariff for the paper mill was the above-the-line ELI2P-RTP rate.  During the POI, there was no rate set for the ELI2P-RTP tariff.[207]  There was a Large Industrial rate in effect during the POI, but Port Hawkesbury states that its electricity consumption is so large that the Large Industrial rate would not apply to its electricity purchases.[208]  And, as discussed above, other rates for users of Port Hawkesbury's size were inapplicable to Port Hawkesbury or not in effect during the POI.  Thus, the LRR is the only rate in the 2014 schedule of rates in Nova Scotia that is applicable to Port Hawkesbury.

In *Magnesium from Canada*, the Department stated that "if the amount of electricity purchased by a company is so great that the rate schedule is not applicable, we will examine whether the price charged is consistent with the power company's standard pricing mechanism."[209]  The above-the-line electricity rates set in Nova Scotia include all costs plus return on equity.  The LRR approved for Port Hawkesbury is based upon only the incremental costs for providing electricity as well as only a very small portion of fixed costs.  Therefore, consistent with 19 CFR 351.511(a)(2)(iii) and *Magnesium from Canada*, we preliminarily determine the LRR rate provided to Port Hawkesbury is not set according to the standard pricing mechanism, which is a price that is approved by the NSUARB, upon application of NSPI  (here the General Rate Agreement applicable to the POI), as determined via the cost-of-service methodology for the above-the-line prices.  Rather, the LRR is a below-the-line price which does not cover all fixed costs or profits.  Thus, in order to determine an appropriate Tier 3 benchmark, we have increased the LRR by including all applicable fixed costs plus the return on equity (ROE).

NSPI admitted that the LRR covers only C$2/MWh of fixed costs incident to supplying electricity to Port Hawkesbury compared to the C$26/MWh recoverable fixed cost under the 2012 ELI2P-RTP, leaving C$24/MWh in unrecovered fixed costs.[210]  The LRR itself covers all incremental costs.  We can allocate ROE to the Port Hawkesbury LRR's proportion of the yearly electric load of the system.  Adding together these three pricing factors results in a Tier 3 benchmark that is consistent with market principles because it includes all fixed costs, all variable costs, and an amount for profit.

To calculate the benefit pursuant to section 771(5)(e)(iv) of the Act, we subtracted from the amount that Port Hawkesbury would have paid for the electricity it consumed during the POI the actual amount paid by Port Hawkesbury for electricity during the POI.  The difference represents the benefit to Port Hawkesbury for the provision of electricity for LTAR.  We then divided the benefit by the total sales of Port Hawkesbury during the POI.  Based upon this methodology, we

---

[207] Information on the record reports some information regarding the 2010 and 2012 ELI2P-RTP rates.  However, the record lacks the required information to determine an appropriate ELI2P-RTP rate for the POI.  *See* PSQR at 4 and GSQR at SUPP1-50A at 30-4 and PSQR Exhibit 45-2 at 1.
[208] *See* PSQR at 32-33.
[209] *See Magnesium from Canada*, 57 FR 30946, 30954.
[210] *See* GSQR Exhibit NS-EL-17 DE-03/DE04 at 19.

preliminarily calculated a countervailable subsidy rate of 14.69 percent *ad valorem* for Port Hawkesbury.  Resolute did not use this program.

### 11. GNS Provision of Stumpage and Biomass Material for Less Than Adequate Remuneration (LTAR)

The petitioner contends that the GNS offered Port Hawkesbury a 20-year "Forest Utilization License Agreement" (FULA), providing a company-specific plan for sourcing pulpwood and biomass fuel from Crown (*i.e.*, government) lands.[211]  The petitioner claims that the FULA stipulates certain volumes of pulpwood and biomass material which Port Hawkesbury is required to purchase from private suppliers.  As such, the petitioner argues that under the FULA, Port Hawkesbury is able to obtain approximately two-thirds of its pulpwood from Crown lands and is only obligated to obtain one-third of its pulpwood from private sources.  The petitioner states this demonstrates that the FULA program for stumpage and biomass material from Crown lands constitutes a subsidy on the production of subject merchandise.

During 2014, the GNS's stumpage prices recognized 17 product/species categories, including distinct categories for hardwood and softwood products, as well as distinct categories for pulpwood, biomass, and saw fiber products.  The Province includes a regional distinction for two product categories – pulpwood and biomass.  Port Hawkesbury is located in the Eastern Region and had no authority to harvest pulpwood or biomass from the Western Region during the POI.[212]  The authority of the Minister of Natural Resources to set stumpage rates is derived from the Nova Scotia *Crown Lands Act*.[213]

The DNR provides for three instruments for the use of Crown timber:  (1) Short Term Permits under Section 28 of the *Crown Land Acts*; (2) License Agreements under Section 31 of the *Crown Land Acts*; and (3) Forest Utilization License Agreements (FULAs), which can be area-based or volume-based, provided for under Section 32 of the *Crown Land Act*.[214]

These agreements delineate various rights and obligations for DNR and the licensee.  For example, DNR agrees to provide the licensee with the right to harvest a specified amount of Crown timber, and the licensee agrees to harvest the timber.  The licensee must provide its own equipment and labor for harvesting and must provide an Operating Plan to the DNR for harvesting under the license, which DNR must approve before the harvesting can occur.  The agreements include specific requirements for the building, maintenance and restoration of roads and infrastructure.  The agreements also indicate whether any allowances will be applied for overhead or other obligations.   Finally, the agreements prescribe how the harvested wood may be used, the silviculture fees to be imposed, and the stumpage rates to be charged.[215]

---

[211] The petitioner, in addition to making its allegation on Stumpage for LTAR to cover both pulpwood stumpage and biomass stumpage, also references the government provision of biomass under the allegation of "Provision of Steam for LTAR."  We are only addressing the allegation of biomass under this stumpage program because the provision of biomass is only provided to Port Hawkesbury by the GNS under the FULA.

[212] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XXII, NS.XXII-5.

[213] *Id.*

[214] *Id.* at NS-XXII-6

[215] *Id.*

The FULA is the only agreement instrument applicable to Port Hawkesbury.[216]  The FULA with Port Hawkesbury reflects many of the general terms present in all agreements; however, some of the specifics of the Port Hawkesbury FULA differ from other agreements and are unique to the FULA for Port Hawkesbury.[217]  The primary difference is that the 2012 Port Hawkesbury agreement is a long-term (20 years), area-based agreement, whereas other agreements are shorter in length and/or based upon volume rather than area.[218]  Such distinctions result, for example, in differences in the administrative/overhead allowance amount, which can vary depending upon the type of the agreement and the attendant obligations borne by the Crown licensee.  In addition, the methodology for determining pulpwood stumpage and biomass stumpage rates in the Port Hawkesbury FULA differs from that in other agreements across the Province.[219]  The principal difference in the methodology for determining stumpage rates is that Port Hawkesbury's FULA departs from the standard FULA's reliance on particular market-related data for establishing the rates, and instead relies on completely different market-related information.[220]  Under the FULA, Port Hawkesbury has the right to harvest stumpage and biomass and has obligations relating to road building and maintenance; site preparation and clean up; and silviculture.

We preliminarily determine that the provision of stumpage from Crown land by the Government of Nova Scotia to Port Hawkesbury under the FULA constitutes a financial contribution as a provision of a good or service within the meaning of 77(5)(D)(iii) of the Act.  The Government of Nova Scotia has stated that both the terms and the methodology for determining stumpage rates in the Port Hawkesbury FULA differs from those in other agreements within the Province of Nova; therefore, we preliminarily determine the provision of stumpage under terms of the FULA is expressly limited tor PHP and, therefore, is *de jure* specific under section 771(5A)(D)(i) of the Act

The provision of stumpage provides a benefit within section 771(5)(iv) of the Act, to the extent that the GNS received less than adequate remuneration when measured against an appropriate benchmark for stumpage.  The Department's regulations at 19 CFR 351.511(a)(2) set forth the basis for identifying benchmarks to determine whether a government good or service is provided for less than adequate remuneration.  These potential benchmarks are listed in hierarchical order by preference:  (1) market prices from actual transactions within the country under investigation; (2) world market prices that would be available to purchasers in the country under investigation; or (3) an assessment of whether the government price is consistent with market principles.  This hierarchy reflects a logical preference for achieving the objectives of the statute.

---

[216] *Id.*
[217] *See* Port Hawkesbury's QR at Exhibit 25-3 for the FULA.
[218] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XXII, XXII-7.
[219] *Id.*
[220] According to the GNS, the stumpage rates in Nova Scotia are based upon the fair market value of stumpage sold by private landowners to commercial harvesters, with adjustments made for Crown overhead/administrative costs and Crown silviculture fees. The fair market value is based upon surveys of private stumpage transactions in the Maritime Region (*id.* at Exhibit NS-ST-4), updated to reflect changes in market conditions over time. Stumpage rates were updated for the fiscal years April 2013 - March 2014 and April 2014 – March 2015, respectively.  *Id.* at NS.XXII-4-5.

The most direct means of determining whether the government received adequate remuneration is a comparison with private transactions for a comparable good or service in the country, *i.e.*, using a Tier 1 benchmark. We base this on an observed market price for the good, in the country under investigation, from a private supplier (or, in some cases, from a competitive government auction) located either within the country or outside the country (the latter transaction would be in the form of an import). Our preference for Tier 1 is based on the expectation that such prices would generally reflect most closely the commercial environment of the purchaser under investigation.[221]

In accordance with the first preference in the hierarchy, to determine the existence and extent of the benefit, we analyzed the stumpage market in Nova Scotia during the POI. Each year the DNR issues a Registry of Buyers annual report indicating the total harvest in Nova Scotia from both Crown land and from private land.[222] The last published annual report was issued in June 2014 and covers calendar year 2013. According to the 2013 Registry of Buyers, stumpage harvest from Crown land accounted for 19 percent of the total harvest during 2013.[223] Thus, the harvest from private land accounted for 81 percent of the total harvest in Nova Scotia during 2013. The Registry of Buyers annual report for 2014 has not yet been published (we have requested the Government of Nova Scotia to provide a copy of the 2014 annual report upon its publication); however, the Government of Nova Scotia provided the preliminary information, which is proprietary.[224]

Because the participation of the Province in the stumpage market is small, and is well below a majority, we preliminarily determine that it does not have a distortive impact on the private stumpage market or the stumpage prices therein. Thus, for this preliminary determination, it is appropriate to rely on observed market prices for stumpage as the Tier 1 benchmark. Moreover, Port Hawkesbury itself purchased a significant amount of pulpwood and biomass stumpage from private parties during the POI; we preliminarily determine that these prices constitute observed market prices that satisfy the requirements of 19 CFR 351.511(a)(2)(i), and we are relying on them as the benchmark for determining the adequacy of remuneration.

During the POI, Port Hawkesbury purchased stumpage from private lands under both Lease Agreements and Purchase Agreements.[225] Under Lease Agreements, Port Hawkesbury pays private woodlot owners for access to land and the right to build and maintain roads and harvest wood for both pulpwood and biomass. Port Hawkesbury also incurs regeneration obligations such as replanting under its Lease Agreements.[226] These obligations are the same as the

---

[221] *See CVD Preamble*, 63 FR at 65377.
[222] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XXII, NS.XXII-3
[223] *Id.* at Exhibit NS-ST-1, Registry of Buyers at page 25.
[224] *Id.* at NS.XXII-4.
[225] *See* PQR at Exhibit 25-1 for purchases during the POI, Exhibit 25-2 for purchases of Biomass and Exhibit 25-3 for the FULA. For lease agreements that Port Hawkesbury had with private suppliers please *see* Exhibit 25-5 of the same submission.
[226] Under the terms of the Forrest Management  Agreement (FMA) the Port Hawkesbury mill will sustainably manage crown forest land for the benefit of multiple users, while receiving for itself a guaranteed annual supply of 400,000 gross metric tons per annum of logs. The FMA seeks to ensure sustainable regeneration of crown forests

obligations that Port Hawkesbury incurs under the FULA.  Under Purchase Agreements, Port Hawkesbury purchases the already-harvested wood.  Because the Lease Agreements reflect the same rights and obligations that are set forth in the FULA, we are relying on purchases under Lease Agreements as the basis for our benchmark.

The FULA for Port Hawkesbury sets separate stumpage rates for (1) softwood pulpwood; (2) hardwood pulpwood; (3) hardwood fuelwood (biomass); (4) fuelwood greater than 75 percent hardwood; (5) softwood fuelwood (biomass); and (6) fuelwood greater than 75 percent softwood.[227]  For each of the separate stumpage rate categories set by the DNR within the FULA, we compared that rate to the stumpage rate for the identical pulpwood and fuelwood harvested by Port Hawkesbury under private Lease Agreements during the POI.

To calculate the benefit received under this program, we compared the stumpage prices paid by Port Hawkesbury to the GNS under the FULA to the prices Port Hawkesbury paid under private Lease Agreements.  For pulpwood, because the private leases had the same infrastructure obligations as the FULA, and the information provided by Port Hawkesbury for its harvest under the FULA showed the wood only price and separately reported all associated additional costs (*e.g.*, silviculture, road building and maintenance).  As well, the information provided about the pulpwood harvest from private lease holders was reported on the same basis, separately showing the stumpage price and each of the additional costs.[228]  Thus, for pulpwood, we have relied on the stumpage only price under private leases as our basis for comparison to the stumpage paid under the FULA.  For the biomass harvest under the FULA, the information provided by Port Hawkesbury shows the fully inclusive price of the stumpage fee and all other costs.  Port Hawkesbury reported its purchases of fuel logs used for biomass under private leases also on this fully cost-inclusive basis.  Therefore, we compared the fully cost-inclusive price of biomass stumpage obtained under the FULA to the fully cost-inclusive price of fuel logs, used for biomass material.[229]  We summed the total benefits for pulpwood and biomass material to derive a total for benefit for stumpage provided at LTAR. We then divided the stumpage benefit by the total sales of Port Hawkesbury to calculate a net countervailable subsidy rate of 1.33 percent *ad valorem* for this program.[230]

### 12. GNS Purchase of Land for More than Adequate Remuneration (MTAR)

The Department initiated on an allegation that the GNS agreed to purchase land owned by Port Hawkesbury for almost C$400 per acre, or C$20 million total.[231]  Citing a separate June 2013 purchase of land by the GNS for a lower price, the petitioner alleged that the GNS overpaid for Port Hawkesbury's land.  Specifically, in that separate transaction, the GNS paid C$16,500,000,

---

according to Forest Stewardship Council Principles.  *See* PSQR at Exhibit 29-1 for more information on their obligations for forest regeneration of Crown Lands under the FMA.

[227] *See* PSQR at 52 and Exhibit 67-1 and 67-2 for Stumpage Fees and PQR at Exhibit 25-3.

[228] *See* PQR at Exhibit 25-1 for Crown Purchases.  For purchases from private leaseholders, *see* PSQR at Exhibit 65.2.

[229] *See* PSQR at Exhibit 65-5.

[230] *See* Port Hawkesbury Preliminary Calculation Memo.

[231] *See* Initiation Checklist at 12.

or C$300 per acre, for 55,000 acres of forestry land from an unrelated private company, Northern Pulp.[232]

In its initial questionnaire response, the GNS reported that the DNR first approached NPPH about purchasing land in September 2011.[233]  After negotiating the price with Port Hawkesbury, the DNR purchased 50,858 acres of land from Port Hawkesbury for C$20 million, or C$393/acre, on September 28, 2012.[234]  Regarding the specificity of the program, the GNS stated, "The Government of Nova Scotia stipulates specificity, as the Department of Natural Resources purchased land from PHP."[235]

We preliminarily determine that this land purchase conferred a countervailable subsidy within the meaning of section 771(5) of the Act and constitutes a financial contribution in the form of the GNS purchase of a good from Port Hawkesbury under section 771(5)(D)(iv) of the Act.  We also preliminarily determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS provided the assistance only to Port Hawkesbury.

Regarding benefit, section 771(5)(D)(iv) of the Act states that in the case where goods are purchased by a government authority, a benefit shall normally be treated as conferred if such goods are purchased for more than adequate remuneration.  This section of the Act also states the following:

> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.[236]

The Department has not developed regulations with respect to the purchase of goods.[237]  While the Department has had relatively few proceedings involving allegations of the purchase of a good for MTAR, we have in the past relied on prices within the country to determine a benchmark to measure the benefit.  The most recent proceeding in which the Department made a final determination involving the purchase of a good for MTAR, other than on an adverse facts available basis under section 776(b) of the Act, was *LEU from France*.[238]  In *LEU from France*, we used prices within the country to determine whether the government purchase of LEU was for more than adequate remuneration.

Therefore, we must first determine whether there are market prices from actual sales transactions involving private buyers and sellers within the country under investigation that we can use to

---

[232] *See* Petition at Exhibit II-38.

[233] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VII, NS.VII-2.

[234] *Id.* at NS.VII-2; *see also* GNS Pre-Preliminary Comments at 29.

[235] *See* GNS Pre-Preliminary Comments at 30.

[236] *See* section 771(5)(D)(iv) of the Act.

[237] *See* 19 CFR 351.512.

[238] *See Notice of Final Affirmative Countervailing Duty Determination: Low Enriched Uranium From France*, 66 FR 65901 (December 21, 2001) (*LEU from France*), and accompanying Issues and Decision Memorandum.

determine whether the GNS purchased Port Hawkesbury's land for MTAR.  In the PSQR and GSQR, Port Hawkesbury and the GNS submitted the Property Valuation Services Corporation's (PVSC's) records of private party transactions for forest land parcels in Nova Scotia covering the period September 29, 2011, through September 27, 2013.[239]  We are preliminarily relying on these transactions to measure the adequacy of remuneration from the GNS purchase of Port Hawkesbury's land because these represent market prices from actual sales transactions involving private buyers and sellers in Nova Scotia.

Section 771(5)(E)(iv) of the Act states that the adequacy of remuneration shall be determined in relation to the prevailing market conditions of the good being purchased.  Therefore, we are using the private transactions of forest land made in the same month as the GNS purchase of Port Hawkesbury's land because contemporaneity is a factor that has considerable impact on comparability of prices in the real property market.  Moreover, these transactions reflect the prevailing market conditions at the time the GNS purchased the land from Port Hawkesbury.  The selection of a monthly benchmark is also consistent with the benchmarks used to measure the provision of a good or service for less than adequate remuneration.  We are preliminarily using a simple average price per acre of private transactions occurring in September 2012, the same month as the GNS's purchase.  The PVSC database identifies five land transactions during September 2012.  Further considering the factors affecting comparability, we have also preliminarily excluded one of these five transactions from the benchmark.  This transaction is one-fifth of the size of the smallest of the remaining four benchmark parcels.  Moreover, its price per acre appears to be aberrational in that it is over 33 times higher than the average of the all private forest land transactions during the period from September 2011 through September 2013.[240]

We preliminarily find that the land prices of the four remaining private transactions serve as a comparable commercial benchmark.  To determine the benefit, we first calculated a simple average price per acre of the four private land transactions from the PVSC database.  Because the benchmark price per acre was less than the price per acre that the GNS paid Port Hawkesbury, we subtracted the price per acre that the GNS paid to Port Hawkesbury from the simple average benchmark price per acre to determine the per-acre benefit.  Finally, we multiplied the per-acre benefit by the acreage that Port Hawkesbury sold to the GNS to determine the total benefit.

Because the purchase of land was an exceptional event, Port Hawkesbury cannot expect to receive additional subsidies on an on-going basis, and the receipt of benefits is not automatic, we are treating the benefit from the purchase of the land as a non-recurring benefit.  Therefore, we conducted the "0.5 percent test" pursuant to 19 CFR 351.524(b)(2).  We found that the benefits were greater than 0.5 percent of Port Hawkesbury's total sales in the year in which the purchase of land was approved.  Thus, we allocated the total benefit over the AUL using the discount rate discussed above in the section "Loan Interest Rate Benchmarks and Discount Rates" to determine the amount attributable to the POI.  Using this methodology, we calculated the

---

[239] *See* PSQR at Exhibit 91-1; *see also* GSQR at Exhibit NS-SUPP1-99.  The lists of purchases in the PSQR and the GSQR are the same.
[240] *See* the Port Hawkesbury Preliminary Calculation Memo for details on this transaction and the other four benchmark land parcels.

countervailable subsidy rate by dividing the benefit amount by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section.  On this basis, we preliminarily determine that the net countervailable subsidy rate for this program is 0.43 percent *ad valorem* for Port Hawkesbury.

**B.**    **Programs Preliminarily Determined To Be Not Used or Not to Confer a Benefit During the POI**

**1.  Richmond County (Nova Scotia) Promissory Note for Property Taxes**

On September 27, 2012, NPPH, Richmond County (Nova Scotia), and PWCC entered into an agreement that set the property taxes payable on Port Hawkesbury at C$1,326,227 for the balance of the taxation year commencing September 28, 2012, and ending March 31, 2013.[241] The property taxes under the agreement were partly payable through a C$450,000 interest-free loan granted in the form of a promissory note, repayable in four annual installments from 2013 to 2016, due by September 28 of each year.[242]  The payment of taxes in this manner was contingent on the GNS passing the Richmond Port Hawkesbury Paper Ltd. Taxation Act, which gave effect to the September 2012 agreement.[243]  The GNS reported that it offered this assistance only to Port Hawkesbury.[244]  The Municipality of the County of Richmond is responsible for administering the loan.[245]

Although PWCC was the party to the agreement, Port Hawkesbury records the loan in its accounts.[246]  Port Hawkesbury's 2013 and 2014 audited financial statements include the loan in its Accounts Payable and Accrued Liabilities.[247]

To calculate the potential benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Port Hawkesbury would have paid on a comparable commercial loan during the POI.  In accordance with 19 CFR 351.525(b)(6)(i), we calculated the potential countervailable subsidy rate by dividing the benefit amount by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section.

We preliminarily find that the benefit to Port Hawkesbury under this program was less than 0.005 percent *ad valorem* during the POI.  Thus, without determining whether this program provides a financial contribution or is specific, and consistent with our practice, we are not including the assistance that Port Hawkesbury received under this program in the countervailing duty rate because there is no measurable benefit.[248]

---

[241] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume IV, NS.IV-2.
[242] *Id.* at NS.IV-2, Exhibit NS-RL-1, and Exhibit NS-RL-2.
[243] *Id.* at NS.IV-4.
[244] *Id.* at NS.IV-9.
[245] *Id.* at NS.IV-3.
[246] *See* PQR at 48.
[247] *Id.*
[248] *See, e.g., Coated Paper from the PRC* and accompanying Issues and Decision Memorandum at 23.

### 2.   Government of Québec (GOQ) Support for the Forest Industry Program

Resolute reported that Fibrek and an additional cross-owned company had loans outstanding under the "Government of Quebec Support for the Forest Industry Program" (PSIF) during the POI.[249]  In response to our questions, the GOC explained that the PSIF sought to support the consolidation of, investment in, and modernization of businesses of the forestry sector, namely forest management companies (harvest and silviculture works), pulp and paper businesses, businesses of the first transformation of wood, and businesses which produced wood transformation and forestry exploitation machinery.[250]  The Quebec Council of Ministers approved the PSIF in 2006, and the program ended in 2010.[251]  The GOQ's Investissement Québec, a government corporation owned by the GOQ, administered the program.[252]

To calculate the benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Resolute would have paid on a comparable commercial loan during the POI.  We subtracted from that amount the actual interest paid on these loans during the POI.  In accordance with 19 CFR 351.525(b)(6), we calculated the potential countervailable subsidy rate by dividing the benefit amount by the appropriate sales denominator.  For loans to Fibrek, we preliminarily attributed the benefit that Fibrek received under the program to the sales of Fibrek plus the unconsolidated sales of Resolute (net of inter-company sales), in accordance with 19 CFR 351.525(b)(6)(iv).[253]  Because Resolute designated the relationship between it and the other recipient of the loans as business proprietary information, we have described the appropriate sales denominator for measuring the benefit for this company in the Resolute Preliminary Calculation Memo.

We preliminarily find that any potential benefit to Resolute under this program was less than 0.005 percent *ad valorem* during the POI.  Thus, without determining whether this program provides a financial contribution or is specific, and consistent with our practice, we are not including the assistance that Resolute received under this program in the countervailing duty rate because there is no measurable benefit.[254]

### 3.   Richmond County (Nova Scotia) Property Tax Reduction

We initiated on an allegation that the Richmond County council agreed to reduce Port Hawkesbury's annual property taxes by half through 2016 from C$2.6 million to C$1.3 million.[255]  The GNS reported that the reduction resulted from an agreement between Richmond County, NPPH, and PWCC on September 12, 2012, to amend a 2006 tax agreement between Richmond County and Stora Enso Port Hawkesbury Limited, a former owner of the Port

---

[249] *See* RQR at 26-31.  Resolute designated the names of the other companies as business proprietary information.
[250] *See* GQR at Government of Quebec Questionnaire Response, Volume I, QC-8.
[251] *Id.* at QC-8, Exhibit QC-PSIF-3, and Exhibit QC-PSIF-4.
[252] *Id.* at QC-9.
[253] *See*, *e.g.*, *Coated Paper from the PRC* and accompanying Issues and Decision Memorandum at Comment 35.
[254] *Id.* at 23.
[255] *See* Initiation Checklist at 10.

Hawkesbury mill.[256]  The amended tax agreement reduced the annual amount of property taxes to be paid to Richmond County by Port Hawkesbury from C$2.5 million to C$1.3 million.[257]

Under section 771(5)(D)(ii) of the Act, the financial contribution from a tax program is the amount of foregone revenue that is otherwise due.  Under the amended tax agreement, the amount of property tax that Port Hawkesbury paid to Richmond County during the POI was C$1.3 million.  In its initial questionnaire response, the GNS reported that during the POI, Richmond County assessed property tax at the rate of C$2.07 per C$100 of assessed value.[258]  At this tax rate, according to the GNS, Port Hawkesbury would normally be assessed between C$550,000 – C$650,000 in property taxes during the POI.[259]  Thus, the property tax that Port Hawkesbury paid during the POI under the amended tax agreement exceeds the property tax otherwise due.  As a result, we preliminarily find that there is no revenue foregone under section 771(5)(D)(ii) of the Act during the POI; without any foregone revenue, Port Hawkesbury did not receive a benefit during the POI under this program pursuant to 19 CFR 351.509(a).  Because we preliminarily find that there is no financial contribution or benefit, it is not necessary to address whether this program is specific.

**4.   Retention of Accumulated Tax Loss to Carry Forward**

We initiated an investigation into whether PWCC obtained accrued tax losses by purchasing Port Hawkesbury.[260]  Port Hawkesbury reported that under the *Income Tax Act (Canada)* (*CITA*), Port Hawkesbury Inc. is entitled, within specified circumstances, to use the accumulated non-capital tax losses accrued prior to the purchase of NPPH through the *CCAA* process.[261]  Port Hawkesbury also explained that it does not have the ability to access the non-capital loss carry-forwards reported by Port Hawkesbury Inc. and, therefore, cannot derive any tax savings from Port Hawkesbury Inc.'s tax loss carry-forward.[262]  Further, Port Hawkesbury explains that, as a partnership under Canadian law, Port Hawkesbury is not subject to Canadian income taxes and, accordingly, also cannot derive any tax savings from Port Hawkesbury Inc.'s tax loss carry-forwards.[263]  Finally, Port Hawkesbury stated that no other responding cross-owned affiliates can, under Canadian tax law, use these tax losses to derive any reductions in their tax obligations.[264]

Income tax deductions provide a financial contribution under section 771(5)(D)(ii) of the Act in the form of foregone revenue that is otherwise due to a government.  The benefit is the extent to which the taxes paid by the firms as a result of the program are less than the tax the firms would otherwise pay in the absence of the program.  *See* 19 CFR 351.509(a)(1).  Citing the blank line for "Non-capital losses of previous tax years applied in the current tax year" in Port Hawkesbury

---

[256] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume V, NS.V-3 - NS.V-4.
[257] *Id.* at NS.V-4; *see also* PQR at 50.
[258] *Id.*
[259] *Id.* at NS.V-11.
[260] *See* Initiation Checklist at 11-12.
[261] *See* PQR at 57.
[262] *Id.* at 61.
[263] *Id.*
[264] *Id.* at 56.

Inc.'s 2013 tax year return (filed during the POI), Port Hawkesbury claims that Port Hawkesbury Inc. did not derive any tax savings from its accumulated tax losses during the POI.[265]  Based on this information and additional business proprietary information from Port Hawkesbury Inc.'s income tax return filed during the POI, we preliminarily determine that Port Hawkesbury received no benefit under this program during the POI.[266]  Because we preliminarily find that there is no benefit, we need not address whether this program provides a financial contribution or is specific.

5. **The Federal Atlantic Innovation Program**
6. **Government of New Brunswick (GNB) Funds for J.D. Irving**
7. **The Federal Transformative Technologies Pilot Scale Demonstrative Program**
8. **The British Columbia Ministry of Forests, Mines and Land Program**
9. **New Brunswick Climate Action Fund Grants**
10. **British Columbia Power Smart Program**
11. **BC Bioenergy Network Grants**
12. **New Brunswick Energy Rebate Fund**
13. **Loan from the Government of New Brunswick**
14. **The Powell River City Revitalization Tax Exemption Program**
15. **Efficiency New Brunswick Grant**
16. **Grants Under the Federal Forestry Industry Transformation Program**

C. **Program Preliminarily Determined To Be Not Countervailable**

**Provision of Steam for LTAR**

The petitioners allege that a cogeneration facility located at the Port Hawkesbury mill provides electricity and steam to the mill for LTAR, and further that the GOC provides stumpage from Crown lands at LTAR to fuel the biomass boiler.  NSPI operates the boiler, but Port Hawkesbury provides the fuel biomass.

During the POI, Port Hawkesbury purchased all of its electricity from NSPI under the LRR; therefore, it is not necessary to separately determine whether electricity from the cogeneration facility is provided for LTAR.  All electricity purchases under the LRR are addressed in the *GNS Provision of Electricity for LTAR* section above.

Similarly, with respect to the provision of biomass fuel by the GNS to Port Hawkesbury, all stumpage that Port Hawkesbury obtains from Crown lands is governed by the FULA which we have separately addressed in the *GNS Provision of Stumpage for LTAR* section above.

In 2010, before NPPH entered the *CCAA* process, NSPI entered into a set of agreements with NPPH and began improving an electricity and steam "co-generation" facility at the paper mill.[267]  Among other investments, NSPI purchased a biomass-fired boiler and added a steam turbine

---

[265] *Id.* at 60.
[266] *See* Port Hawkesbury Preliminary Calculation Memo for additional details on this analysis.
[267] *See* PQR at 51, 74.

generator to the facility to produce electricity (an arrangement that also allowed NSPI to partially meet its own legislated targets for renewable electricity generation).[268]  At that time NSPI and NPPH concluded several agreements considering the shifting of asset ownership between the parties, construction, operations and maintenance, and for the supply of steam.  When the company was reconstituted out of the *CCAA* process as Port Hawkesbury in late 2012, the company signed a new agreement with NSPI covering its purchase of process steam from NSPI.[269]  The cogeneration facility came online in 2013 and served the mill during the POI.[270]

The intention of the cogeneration facility is to provide steam to the mill and to generate electricity that can be dispatched either to the mill or to other NSPI customers via NSPI's transmission grid.[271]  When Port Hawkesbury purchased the mill in 2012 it took over the contracts with NSPI and renegotiated the steam supply agreement.[272]  NSPI and Port Hawkesbury entered into a long-term agreement through which NSPI annually provides process and heating steam to the mill.[273]  The mill uses the steam for drying paper and heating the mill.[274]

Unlike the rates for electricity which must be approved by the NSUARB, the NSUARB has ruled that it has no jurisdiction with respect to the provision and pricing of steam between NSPI and Port Hawkesbury.[275]

Accordingly, because the GNS and the regulating agency, the NSUARB, are not involved in the pricing of steam between NSPI and Port Hawkesbury, we preliminarily determine that there is no financial contribution by an authority under section 771(5)(B) of the Act, nor is there the entrustment or direction of a private entity, the NSPI, to make a financial contribution.  Because we preliminarily find that there is no financial contribution, we need not address whether this program is specific or confers a benefit.

## IX.     CALCULATION OF THE ALL OTHERS RATE

In accordance with sections 703(d) and 705(c)(5)(A) of the Act, for companies not investigated, we apply an "all others" rate, which is normally calculated by weighting the subsidy rates of the individual companies selected as respondents by those companies' exports of the subject merchandise to the United States.  The "all-others" rate does not include zero and *de minimis* rates or any rates based solely on the facts available.

Notwithstanding the language of section 705(c)(5)(A) of the Act, we have not calculated the "all others" rate by weight averaging the rates of Resolute and Port Hawkesbury because doing so risks disclosure of proprietary information.  Therefore, we calculated a simple average of

---

[268] *Id.* at 73 and GSQR at NS-SM-6 at 4.  *See also* GSQR at NS-SM-6 at 6-7.
[269] *See* PQR at 74.
[270] *Id.* at 71-72.
[271] *See* GSQR at Exhibit NS-SM-6 at 6.  *See also* GSQR at XX-4 and Exhibit NS-SM-9 at 1.
[272] *See* PQR at 74.
[273] *Id*.  *See also* PQR at Exhibit 24-4 at 6.
[274] *Id.* at 71, 75.
[275] *Id.* at Exhibit 24-3.  *See* also GSQR at 62 (provision of industrial process steam is not a function of a regulated utility in Nova Scotia to or for the public).

Resolute's and Port Hawkesbury's rates.

## X.    ITC NOTIFICATION

In accordance with section 703(f) of the Act, we will notify the ITC of our preliminary determination.  In addition, we are making available to the ITC all non-privileged and non-proprietary information relating to this investigation.  We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order, without the written consent of the Assistant Secretary for Enforcement and Compliance.

In accordance with section 705(b)(3) of the Act, if our final determination is affirmative, the ITC will make its final determination within 75 days after we make our final determination.

## XI.    DISCLOSURE AND PUBLIC COMMENT

The Department intends to disclose to interested parties the calculations performed in connection with this preliminary determination within five days of its public announcement.[276]  Case briefs or other written comments for all non-scope issues may be submitted to Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS) no later than seven days after the date on which the final verification report is issued in this proceeding, and rebuttal briefs, limited to issues raised in case briefs, may be submitted no later than five days after the deadline date for case briefs.[277]

Parties who submit case briefs or rebuttal briefs in this proceeding are encouraged to submit with each argument:  (1) a statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[278]  This summary should be limited to five pages total, including footnotes.

Interested parties who wish to request a hearing, or to participate if one is requested, must do so in writing within 30 days after the publication of this preliminary determination in the *Federal Register*.[279]  Requests should contain the party's name, address, and telephone number; the number of participants; and a list of the issues to be discussed.  If a request for a hearing is made, the Department intends to hold the hearing at the U.S. Department of Commerce, 1401 Constitution Avenue, NW, Washington, DC 20230, at a date, time and location to be determined. Parties will be notified of the date, time and location of any hearing.

Parties must file their case and rebuttal briefs, and any requests for a hearing, electronically using ACCESS.[280]  Electronically filed documents must be received successfully in their entirety by 5:00 p.m. Eastern Time,[281] on the due dates established above.

---

[276] *See* 19 CFR 351.224(b).
[277] *See* 19 CFR 351.309.
[278] *See* 19 CFR 351.309(c)(2) and (d)(2).
[279] *See* 19 CFR 351.310(c).
[280] *See* 19 CFR 351.303(b)(2)(i).
[281] *See* 19 CFR 351.303(b)(1).

## XII.   VERIFICATION

As provided in section 782(i)(1) of the Act, we intend to verify the information submitted in response to the Department's questionnaires.

## XIII.   CONCLUSION

We recommend that you approve the preliminary findings described above.

_____✓_____          _____
Agree                            Disagree

_____
Paul Piquado
Assistant Secretary
  for Enforcement and Compliance

___27 July 2015___
(Date)

49

Attachment 7

**Supercalendered Paper From Canada: Final Affirmative Countervailing Duty Determination, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015).**

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-122-854
Investigation
**Public Document**
E&C/OI: Team

October 13, 2015

MEMORANDUM TO:     Paul Piquado
                            Assistant Secretary
                               for Enforcement and Compliance

FROM:                  Gary Taverman
                            Associate Deputy Assistant Secretary
                               for Antidumping and Countervailing Duty Operations

SUBJECT:            Issues and Decision Memorandum for the Final Determination in
                               the Countervailing Duty Investigation of Supercalendered Paper
                               from Canada

## I.     SUMMARY

The Department of Commerce (Department) determines that countervailable subsidies are being provided to producers and exporters of supercalendered paper (SC paper) in Canada, as provided in section 705 of the the Act.

## II.     BACKGROUND

On August 3, 2015, the Department published its *Preliminary Determination* in the countervailing duty investigation of SC Paper from Canada.[1]  Between August 3, 2015 and August 8, 2015, we conducted verification of the Government of Canada's (GOC), Government of Nova Scotia's (GNS), Government of Ontario's (GOO), Government of Quebec's (GOQ), Port Hawkesbury's, and Resolute's questionnaire responses.  We released verification reports on August 27, 2015, and September 2, 2015, for the GOC, GNS, GOO, GOQ, Port Hawkesbury, and Resolute.[2]

The petitioner, the GOC[3], Catalyst, Irving, Port Hawkesbury, and Resolute submitted case briefs concerning case-specific issues on September 11, 2015.  On September 16, 2015, the Department rejected Irving's case brief and asked Irving to resubmit it without new factual information.  Irving timely resubmitted its case brief on September 17, 2015.

---

[1] *See Preliminary Determination* and accompanying PDM.
[2] *See* GOC Verification Report, GNS Verification Report, GOO Verification Report, GOQ Verification Report, Port Hawkesbury Verification Report, and Resolute Verification Report.
[3] Including the Government of British Columbia (GBC), the Government of New Brunswick (GNB), the GOO, the GOQ, and the GNS.



The petitioner, the GOC[4], Irving, Port Hawkesbury, and Resolute submitted rebuttal briefs on September 18, 2015.  At the request of the petitioner, the GOC[5], Catalyst, Irving, Port Hawkesbury, and Resolute, the Department held a public hearing concerning these case-specific issues on September 24, 2015.

## III.     SCOPE OF THE INVESTIGATION

The merchandise covered by this investigation is supercalendered paper (SC paper).  SC paper is uncoated paper that has undergone a calendering process in which the base sheet, made of pulp and filler (typically, but not limited to, clay, talc, or other mineral additive), is processed through a set of supercalenders, a supercalender, or a soft nip calender operation.[6]

The scope of this investigation covers all SC paper regardless of basis weight, brightness, opacity, smoothness, or grade, and whether in rolls or in sheets.  Further, the scope covers all SC paper that meets the scope definition regardless of the type of pulp fiber or filler material used to produce the paper.

Specifically excluded from the scope are imports of paper printed with final content of printed text or graphics.

Subject merchandise primarily enters under Harmonized Tariff Schedule of the United States (HTSUS) subheading 4802.61.3035, but may also enter under subheadings 4802.61.3010, 4802.62.3000, 4802.62.6020, and 4802.69.3000.  Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the investigation is dispositive.

## IV.     SUBSIDIES VALUATION

### A.  Period of Investigation

The period of investigation (POI) is January 1, 2014, through December 31, 2014.

### B.  Allocation Period

The Department normally allocates the benefits from non-recurring subsidies over the average useful life (AUL) of renewable physical assets used in the production of subject merchandise.  The Department finds the AUL in this proceeding to be 13 years, pursuant to 19 CFR 351.524(d)(2) and the U.S. Internal Revenue Service's 1977 Class Life Asset Depreciation Range System.[7]  The Department notified the respondents of the 13-year AUL in the initial

---

[4]  Including the GBC, the GNB, the GOO, the GOQ, and the GNS.
[5]  Including the GBC, the GOO, the GOQ, and the GNS.
[6]  Supercalendering and soft nip calendering processing, in conjunction with the mineral filler contained in the base paper, are performed to enhance the surface characteristics of the paper by imparting a smooth and glossy printing surface.  Supercalendering and soft nip calendering also increase the density of the base paper.
[7]  *See* U.S. Internal Revenue Service Publication 946 (2008), "How to Depreciate Property," at Table B-2:  Table of Class Lives and Recovery Periods.

questionnaire and requested data accordingly.  No party in this proceeding disputed this allocation period.

Furthermore, for non-recurring subsidies, we have applied the "0.5 percent test," as described in 19 CFR 351.524(b)(2).  Under this test, we divide the amount of subsidies approved under a given program in a particular year by the relevant sales value (*e.g.*, total sales or export sales) for the same year.  If the amount of the subsidies is less than 0.5 percent of the relevant sales value, then the benefits are allocated to the year of receipt rather than across the AUL.

### C.  Attribution of Subsidies

*Cross Ownership*:  In accordance with 19 CFR 351.525(b)(6)(i), the Department normally attributes a subsidy to the products produced by the company that received the subsidy.  However, 19 CFR 351.525(b)(6)(ii)-(v) provides additional rules for the attribution of subsidies received by respondents with cross-owned affiliates.  Subsidies to the following types of cross-owned affiliates are covered in these additional attribution rules:  (ii) producers of the subject merchandise; (iii) holding companies or parent companies; (iv) producers of an input that is primarily dedicated to the production of the downstream product; or (v) an affiliate producing non-subject merchandise that otherwise transfers a subsidy to a respondent.

According to 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  This section of the Department's regulations states that this standard will normally be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.  The *CVD Preamble* to the Department's regulations further clarifies the Department's cross-ownership standard.[8]  According to the *CVD Preamble*, relationships captured by the cross-ownership definition include those where:

> the interests of two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same way it can use its own assets (or subsidy benefits) . . . Cross-ownership does not require one corporation to own 100 percent of the other corporation.  Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.  In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership.[9]

Thus, the Department's regulations make clear that the agency must look at the facts presented in each case in determining whether cross-ownership exists.

---

[8] *See CVD Preamble*.
[9] *Id*., 63 FR at 65401.

The Court of International Trade has confirmed the Department's authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[10]

*Port Hawkesbury*

Port Hawkesbury identified the following companies and their roles, and responded to the Department's questionnaires on their behalf:[11]

- 6879900 Canada Inc.
- Port Hawkesbury Investments
- Port Hawkesbury GP
- Port Hawkesbury Holdings
- Port Hawkesbury Inc.
- Port Hawkesbury
- PWCC

Port Hawkesbury reports the following roles for each of the companies:[12]

- 6879900 Canada Inc. – Holding company.
- Port Hawkesbury Investments – Holding company.
- Port Hawkesbury GP – Holding company, ownership interest in Port Hawkesbury LP.
- Port Hawkesbury Holdings – Holding company.
- Port Hawkesbury Inc. – Holding company, ownership interest in Port Hawkesbury LP.
- Port Hawkesbury – Producer of subject merchandise.
- PWCC – Involved in the purchase of NPPH through the *CCAA* procedure.

Port Hawkesbury's responses identify 6879900 Canada Inc., Port Hawkesbury Investments, Port Hawkesbury GP, Port Hawkesbury Holdings, and Port Hawkesbury Inc. as holding companies of Port Hawkesbury.  Therefore, we find that these companies are cross-owned with Port Hawkesbury within the meaning of 19 CFR 351.525(b)(6)(vi).  Because 6879900 Canada Inc., Port Hawkesbury Investments, Port Hawkesbury GP, Port Hawkesbury Holdings, and Port Hawkesbury Inc. are holding companies, we would normally attribute the benefit from subsidies received by any one of these holding companies to that holding company's consolidated sales (net of intercompany sales), in accordance with 19 CFR 351.525(b)(6)(iii).  As discussed below under the "Programs Determined to Be Countervailable" section, however, we find no evidence that these holding companies received countervailable subsidies.

Regarding PWCC, Port Hawkesbury explained that on September 6, 2011, NPPH filed for protection from its creditors under the *CCAA*.[13]  Following normal *CCAA* procedures, pursuant

---

[10] *See Fabrique* at 600-604.
[11] *See generally* PQR.
[12] *Id.* at 10; *See, also,* Port Hawkesbury Affiliation Response at 4 and 10.
[13] *See* PQR at 6.

to the Supreme Court of Nova Scotia's (Court's) initial order, Ernst & Young, Inc. was appointed as the Court's Monitor (Monitor) of NPPH during the *CCAA* proceedings.[14]  NPPH and the Monitor, with the approval of the Court, hired U.S. based investment bankers Sanabe & Associates LLC (Sanabe) to assist in a sale of NPPH through a bidding/auction process.[15]  The Applicant, the Monitor, and Sanabe developed a list of 110 potential strategic and financial parties, including PWCC, and eventually designated 14 qualified bidders.[16]  Eight of the 14 qualified bidders submitted offers for NPPH's assets by October 24, 2011, of which four were invited on October 28, 2011, to submit formal and final offers by December 16, 2011.[17]  Of those four final offers, two were from parties wishing to continue the operations as a going concern (one of which was PWCC) and two were from parties intending to liquidate NPPH's assets.[18]

As part of its evaluation of the opportunity, PWCC conducted due diligence and developed a restructuring plan.[19]  NPPH and Sanabe evaluated the offers, and the Monitor reviewed the evaluation.[20]  After that review, NPPH, Sanabe, and the Monitor recommended to NPPH's Board of Directors that the offer from PWCC should be pursued as the highest and best going concern proposal.[21]  On July 12, 2012, the Court approved the presentation of PWCC's offer, and on September 25, 2012, the Court issued a "Sanction Order" approving the sale.[22]  The sale was completed on September 28, 2012.[23]

Port Hawkesbury stated that PWCC has no ownership interest in Port Hawkesbury and has never had any involvement in the operations of Port Hawkesbury.[24]  Port Hawkesbury also stated that Port Hawkesbury and PWCC are affiliated only through common ownership by an ultimate owner.[25]  Because Port Hawkesbury and PWCC have the same ultimate common ownership, we find that these companies are cross-owned within the meaning of 19 CFR 351.525(b)(6)(vi).  Further, based on PWCC's involvement in the purchase of Port Hawkesbury, we are attributing to Port Hawkesbury's sales the benefit from any subsidies that PWCC received and transferred to Port Hawkesbury, in accordance with 19 CFR 351.525(b)(6)(v).  *See* the "Analysis of Programs - Programs Determined To Be Countervailable" section below for a full discussion of the subsidy programs that PWCC originally received and transferred to Port Hawkesbury.  We have also adressed comments on these programs in the "Analysis of Comments" section below at comments 5 and 6.

Port Hawkesbury is the producer of the subject merchandise.  In accordance with 19 CFR 351.525(b)(6)(i), we are attributing subsidies received by Port Hawkesbury to its own sales.

---

[14] *Id.*
[15] *Id.*
[16] *Id.* at 6-7.
[17] *Id.* at 7.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.* at 7-8.
[23] *Id.* at 8.  Additional information on the sale is business proprietary.  *See* PQR at 6-10.
[24] *Id.* at 4.
[25] *See* Port Hawkesbury Second Affiliation Response at 1.

*Resolute*

Resolute responded to the Department's questionnaires on behalf of the following companies:[26]

- Resolute
- Fibrek
- Mauricie
- Petit-Paris
- Opitciwan

Resolute reports the following for each of the companies:[27]

- Resolute – Produces SC Paper, inputs used in making SC Paper, and a wide range of other products.  It is also a holding company for Resolute's ownership in affiliates making other products in Canada.
- Fibrek – Wholly owned subsidiary of Resolute that operates a kraft pulp[28] mill.
- Mauricie – Resolute owns 93.2 percent of this company, which operates a sawmill.
- Opitciwan – Resolute owns 45 percent of this company, which operates a sawmill.
- Petit-Paris – Joint venture sawmill in which Resolute holds a 50 percent ownership stake.

Because Resolute is a parent company, we are attributing the benefit from subsidies that Resolute received to Resolute's consolidated sales (net of intercompany sales), in accordance with 19 CFR 351.525(b)(6)(iii).[29]

As shown above, Resolute identified Fibrek as a wholly owned subsidiary of Resolute.  Based on Resolute's full ownership of Fibrek, we determine that these companies are cross-owned within the meaning of 19 CFR 351.525(b)(6)(vi).  During the POI, Fibrek supplied Resolute with kraft pulp to add tensile strength to paper that Resolute produced, including SC paper.[30]  We determine that the kraft pulp that Fibrek supplied to Resolute is primarily dedicated to production of SC paper and other downstream paper products, pursuant to 19 CFR 351.525(b)(6)(iv).  We have adressed comments from parties on this issues in the "Analysis of Comments" section below at comment 19.

Regarding Mauricie, Opitciwan, and Petit-Paris, regardless of whether cross-ownership under 19 CFR 351.525(b)(6)(vi) exists between Resolute and Mauricie, Opitciwan, and Petit-Paris, we

---

[26] *See generally* RQR.

[27] *Id.* at 4.  Resolute designated the specific details of the relationships between Resolute and these companies as business proprietary information.  *See* Resolute Supplemental Affiliation Response at 2-3; *see, also,* Department memorandum, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Resolute Paper FP Canada Inc., Calculations for the Preliminary Determination," dated concurrently with this memorandum (Resolute Preliminary Calculation Memo).

[28] Kraft pulp is a reinforcing pulp that is added, as required for paper strength, to a paper machine.  *See* RQR at 6.

[29] *See, e.g., OCTG* and accompanying IDM at Comment 39.

[30] *Id.* at 3.  *See, also,* RQR at Exhibit 4, page 3 (identifying the types of "specialty papers" that Resolute produces, including SC paper).

find no evidence that Mauricie, Opitciwan, or Petit-Paris received assistance under any of the programs under investigation.

### D. Denominators

In accordance with 19 CFR 351.525(b)(1)-(5), the Department considers the basis for the respondents' receipt of benefits under each program when attributing subsidies, *e.g.*, to the respondents' export or total sales.  We have identified the denominator we used to calculate the countervailable subsidy rate for each program, as discussed below and in the calculation memoranda prepared for this determination.[31]

### E. Loan Interest Rate Benchmarks and Discount Rates

The Department is examining loans provided to Port Hawkesbury and to Resolute that were outstanding during the POI.  The loans are denominated in Canadian dollars (C$).  We are also investigating non-recurring, allocable subsidies that the respondents received.[32]  In the section below, we discuss the derivation of the benchmarks and discount rates for the POI and previous years.

<u>Long-Term Loan Interest Rate Benchmark</u>

Section 771(5)(E)(ii) of the Act explains that the benefit for loans is the "difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market," indicating that a benchmark must be a market-based rate.  Normally, the Department uses comparable commercial loans reported by the company for benchmarking purposes.[33]  If the firm did not receive any comparable commercial loans during the relevant periods, the Department's regulations provide that we "may use a national average interest rate for comparable commercial loans."[34]  When loans are denominated in a foreign currency, 19 CFR 351.505(a)(2)(i) directs us to use a benchmark denominated in the same foreign currency as the loan.

Port Hawkesbury submitted interest rates, along with the underlying data, that it paid on other long-term commercial loans.[35]  Resolute submitted an interest rate for "financial instruments with similar characteristics and maturities" as identified in the notes to its 2013 financial statements.[36]

Based on Port Hawkesbury's response in the PQR, we find that the structure of Port Hawkesbury's other loans is similar to the government-provided loans.[37]  Therefore, we find that

---

[31] *See* Resolute Final Calculation Memo and Port Hawkesbury Final Calculation Memo.
[32] *See* 19 CFR 351.524(b)(l).
[33] *See* 19 CFR 351.505(a)(3)(i).
[34] *See* 19 CFR 351.505(a)(3)(ii).
[35] *See* PQR at Exhibit 15-2.
[36] *See* RQR at Exhibit 3, page 89.  The financial statements do not identify the source of the interest rate.
[37] *See* the Port Hawkesbury Final Calculation Memo and BPI Memo for more information.

these loans meet the definition of a "comparable commercial loan" under 19 CFR 351.505(a)(2) and used in them as our benchmark.[38]

As noted above, the interest rate that Resolute submitted is for 2013; therefore, it is not contemporaneous with the government loans we are examining.  Moreover, the record does not show any information on the structure of the loans that are the basis of this interest rate.  Thus, consistent with 19 CFR 351.505(a)(2), we find that this is not an interest rate for a "comparable commercial loan."

Where such benchmark rates for comparable commercial loans are unavailable, 19 CFR 351.505(a)(3)(ii) provides that we may use a national average interest rate as a benchmark.  In this case, the GOC submitted the Bank of Canada's prime business loan rates for 2003-2014.[39]  We are using these rates as our national average interest rates under 19 CFR 351.505(a)(3)(ii) to measure the benefit from Resolute's long-term loans.

*See* the "Analysis of Programs" section below for a description of the loan programs for which we required interest rate benchmarks.

Discount Rates

Consistent with 19 CFR 351.524(d)(3)(i)(A), we have used, as our discount rate, the long-term interest rate described above for the year in which the government approved non-recurring subsidies.

Uncreditworthy Allegation[40]

The petitioner alleged that Port Hawkesbury was uncreditworthy in 2011 and 2012, and in accordance with 19 CFR 351.505(a)(4), the Department should use an uncreditworthy benchmark to determine the benefit from long-term loans and non-recurring subsidies allocated over time.[41]  Port Hawkesbury did not receive any of the alleged subsidies in 2011; therefore, we examined whether the company was uncreditworthy only in 2012.

Under 19 CFR 351.505(a)(4)(i), the Department will consider a firm to be uncreditworthy if, at the time the long-term loan or allocated subsidy was provided, the firm could not have obtained loan-term loans from conventional commercial sources.  In the case of firms not owned by the government, under 19 CFR 351.505(a)(4)(ii), the receipt by a firm of comparable long-term commercial loans, unaccompanied by a government-provided guarantee, will normally constitute dispositive evidence that the firm is not uncreditworthy.  During 2012, Port Hawkesbury was

---

[38] *See* Port Hawkesbury Final Calculation Memo.

[39] *See* GQR at Government of Quebec Response, Volume I, Exhibit QC-GEN-4, page 53; *See, also,* GSQR at Exhibit NS-SUPP1-1E.

[40] The petitioner has made additional arguments in its case brief at pages 17 - 21regarding other information to find Port Hawkesbury uncreditworthy if we did not find the loan to be comparable and commercial or dispositive evidence of creditworthiness.  As we found Port Hawkesbury to be creditworthy, the comments are moot and we have not addressed them.

[41] *See* Petition, Volume II at 12.

able to obtain a comparable long-term loan from a commercial bank without a government guarantee.[42]   Therefore, we determine Port Hawkesbury to be creditworthy in 2012.[43]

## V.    USE OF FACTS OTHERWISE AVAILABLE AND ADVERSE INFERENCES

Section 776(a) of the Act provides that, subject to section 782(d) of the Act, the Department shall apply "facts otherwise available" if:  (1) necessary information is not on the record; or (2) an interested party or any other person (A) withholds information that has been requested, (B) fails to provide information within the deadlines established, or in the form and manner requested by the Department, subject to subsections (c)(1) and (e) of section 782 of the Act, (C) significantly impedes a proceeding, or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Where the Department determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that the Department will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency.  If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, the Department may disregard all or part of the original and subsequent responses, as appropriate.
On June 29, 2015, the President of the United States signed into law the Trade Preferences Extension Act of 2015 (TPEA), which made numerous amendments to the antidumping  and CVD law, including amendments to section 776(b) and 776(c) of the Act and the addition of section 776(d) of the Act.[44]  The amendments to the Act are applicable to all determinations made on or after August 6, 2015, and, therefore, apply to this investigation.[45]

Section 776(b) of the Act provides that the Department may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  In doing so, and under the TPEA, the Department is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.[46]  Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the countervailing duty investigation, a previous administrative review, or other information placed on the record.[47]

---

[42] *See* "Analysis of Comments" section at Comment 4 and BPI Memo.
[43] The petitioner filed comments on this issue and they are fully addressed below in the "Analysis of Comments" section at Comment 4.
[44] *See* TPEA, Pub. L. No. 114-27, 129 Stat. 362 (2015).  The 2015 law does not specify dates of application for those amendments.  On August 6, 2015, the Department published an interpretative rule, in which it announced applicability dates for each amendment to the Act, except for amendments contained to section 771(7) of the Act, which relate to determinations of material injury by the International Trade Commission. *See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 FR 46793 (August 6, 2015) (*Applicability Notice*).  The text of the TPEA may be found at https://www.congress.gov/bill/114th-congress/house-bill/1295/text/pl.
[45] *See Applicability Notice*, 80 FR at 46794-95.
[46] *See* section 776(b)(1)(B) of the Act; TPEA, section 502(1)(B).
[47] *See, also,* 19 CFR 351.308(c).

Section 776(c) of the Act provides that, in general, when the Department relies on secondary information rather than on information obtained in the course of a review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.[48]  Secondary information is defined as information derived from the petition that gave rise to the investigation, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[49]  Further, and under the TPEA, the Department is not required to corroborate any countervailing duty applied in a separate segment of the same proceeding.[50]

Finally, under the new section 776(d) of the Act, when applying an adverse inference, the Department may use a countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the Department considers reasonable to use.[51]  The TPEA also makes clear that, when selecting facts available with an adverse inference, the Department is not required to estimate what the countervailable subsidy rate would have been if the interested party failing to cooperate had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[52]

As discussed below, due to the failure of Resolute to accurately respond to the Department's questionnaires concerning other subsidies, the Department is relying on a subsidy rate calculated for a similar program in this proceeding.  In light of the above, the Department corroborated the rates it selected to use as AFA to the extent practicable for this final determination.  Because these rates reflect the actual behavior of the GOC with respect to similar subsidy programs, and because we lack questionnaire responses or adequate information from the GOC and the respondent companies demonstrating otherwise, the rates calculated for cooperative respondents provide a reasonable AFA rate in a manner consistent with the statute.

*Subsidies Reported Prior to the Preliminary Determination*

As described in the *Preliminary Determination*, on July 22, 2015, the GOC submitted a "revision" to its May 27, 2015, questionnaire response in which it indicated that in addition to assistance to Resolute that the GOC had previously reported under the Federal Pulp and Paper Green Transformation Program (FPPGTP), assistance had also been provided under this program to Fibrek S.E.N.C. (Fibrek), a company owned by Resolute.  On the same date, Resolute submitted a "supplemental response" which it deemed necessary under the certification requirements provided in section 782(b) of the Act.  This submission detailed previously unreported assistance received by Fibrek under the FPPGTP.  The Department determined that it was appropriate to extend the deadline to accept this information under 19 CFR 351.302(b),

---

[48] *See, also,* 19 CFR 351.308(d).
[49] *See SAA* at 870 (1994).
[50] *See* section 776(c)(2) of the Act; TPEA, section 502(2).
[51] *See* section 776(d)(1) of the Act; TPEA, section 502(3).
[52] *See* section 776(d)(3) of the Act; TPEA, section 502(3).

which allows the Department to extend a deadline for good cause.  However, the Department
also noted that these submissions

> represent a significant change to the information provided in the initial
> questionnaire responses in that they identify assistance to a cross-owned
> subsidiary of Resolute that the GOC and Resolute were expressly required to
> report in response to the questionnaire.  Moreover, all of Resolute's questionnaire
> responses indicate that it "is including in its response" Fibrek, among other cross-
> owned companies for which the Department requested complete responses.  Thus,
> as part of their initial questionnaire response, the GOC and Resolute understood
> their obligation to report assistance received by Resolute and any of the cross-
> owned companies under all programs under investigation, and the GOC and
> Resolute failed to satisfy this obligation.[53]

In the *Preliminary Determination*, we applied adverse facts available to the FPPGTP program
because the GOC and Resolute withheld necessary information, and the timing of the submission
of information regarding Fibrek's receipt of assistance impeded the Department in its ability to
analyze the information.[54]  However, the Department was able to rely on the information timely
submitted by the GOC in its initial questionnaire response for the purposes of analyzing the
financial contribution and specificity of this program.[55]

Additionally, in the *Preliminary Determination*, the Department stated that, based on the
information submitted by the GOC and Resolute on July 22, 2015, "we preliminarily find that
Resolute may have received additional benefits under other funding mechanisms.  We intend to
examine these additional potential benefits at verification and address them in the final
determination."[56]  These additional potential benefits were provided under the Ontario Forest
Sector Prosperity Fund (FSPF) and Loan Guarantee Program (LGP).[57]  At verification, the GOO
provided all requested information regarding these programs, including the program mandate,
related documentation, and disbursements of funds.[58]  Additionally, the Department verified
disbursements under these programs to Resolute during its verification of Resolute's
questionnaire responses and was able to tie the submitted information to Resolute's financial
records.[59]

The Department was able to confirm, at verification, the information submitted by the GOC and
Resolute in their July 22, 2015, submissions as well as the information requested by the
Department and provided during verification regarding the FSPF and LGP programs.  We
explain above that section 776(a)(2)(D) of the Act provides that the Department shall apply

---

[53] *See Preliminary Determination* and accompanying Decision Memorandum, at page 12.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *See* Memorandum to James Maeder, Senior Office Director, and Dana Mermelstein, Program Manager, Office I;
from Katie Marksberry and David Neubacher, International Trade Analysts; Re: Verification Report, Government of
Ontario, dated August 27, 2015 (GOO Verification Report).
[58] *Id.*
[59] *See* Resolute Verification Report.

"facts otherwise available" if an interested party or any other person provides information that cannot be verified as provided for by section 782(i) of the Act. Therefore, for this final determination, we find that it is no longer appropriate to apply AFA to the assistance received under these programs by Resolute and Fibrek. Arguments from interested parties on whether the use of AFA is appropriate in analyzing these subsidies and whether the Department properly investigated these subsidies are discussed below under Comment 12.

*Subsidies Discovered During Verification of Resolute's Questionnaire Responses*

At the verification of Resolute's questionnaire responses, the Department examined the company's 10-K annual reports, general ledger accounts, financial statements, and other selected accounts from the chart of accounts to confirm that Resolute's reported receipts of assistance were complete and accurate, and to ensure that there was no additional unreported assistance.[60] In examining these accounts, we noted entries in three accounts which showed reimbursements and/or funds received by Fibrek. Company officials provided descriptions of the funds in the accounts.[61] Additionally, at verification of the GNS, the Department conducted a completeness test and reviewed all historic entries to the Nova Scotia Jobs Fund.[62] This review led to the disclosure that after the GNS purchased the Resolute subsidiary Bowater Mersey Paper Company (Bowater), the GNS made a payment of C$14,291,000 to Resolute to satisfy an outstanding Bowater liability to Resolute. The Department further noted in its report that the GNS conceded that this information had not been reported by either it or Resolute in their questionnaire responses.[63]

As a matter of standard procedure, the Department's initial CVD questionnaire asked Resolute to report "other subsidies." Specifically, we asked: "{d}oes the GOC or entities directly owned, in whole or in part, by the GOC or any provincial or local government provide, directly or indirectly, provide any other forms of assistance to your company? If so, please describe such assistance in detail, including the amounts, date of receipt, purpose and terms, and answer all questions in the appropriate appendices."[64] In its initial questionnaire response, Resolute responded to this request by stating that it had "examined its record diligently and is not aware of any other programs... that provided, directly or indirectly, any other forms of assistance to Resolute's production and export of SC paper."[65] However, the CVD questionnaire is clear that respondents are instructed to report "any other forms of assistance to {the} company," not only assistance that the respondent considers to have been provided to subject merchandise. Therefore, given Resolute's questionnaire response, and in light of the unreported information discovered at verification, the Department determines that the use of facts available pursuant to section 776(a)(2)(A) of the Act is warranted in determining the countervailability of these

---

[60] *Id.*
[61] Record information related to these accounts is predominantly BPI. For a detailed discussion of the Department's examination of Resolute's accounting system, *see* Resolute Verification Report, at pages 8-9.
[62] *See* GNS Verification Report at page 15.
[63] Record information related to this liability and related payment is predominantly BPI. For a detailed discussion of the Department's findings at its verification of the GNS, *see* GNS Verification Report, at pages 13-14.
[64] *See* Department's Initial CVD Questionnaire, at Section III: Questionnaire for Producers/Exporters of SC Paper from Canada (Apitl 6, 2015).
[65] *See* RQR, dated May 28, 2015, at pages 32-33.

apparent subsidies that were discovered during verification. Moreover, because Resolute failed to respond to the best of its ability regarding our questions on other, non-reported subsidies provided by the GOC, including assistance discovered within Resolute's accounting system and apparent assistance discovered during verification of the GNS, we determine that an adverse inference is warranted with respect to these subsidies pursuant to section 776(b) of the Act. As a result, we are finding that, as AFA, these discovered forms of assistance provide a financial contribution and are specific within sections 771(5)(D) and 771(5A) of the Act, respectively. A benefit is conferred pursuant to section 771(5)(E). Interested parties commented on the appropriateness of applying AFA to these unreported subsidies, which we address at Comment 12.

## VI.  ANALYSIS OF PROGRAMS

Based upon our analysis of the record and the responses to our questionnaires, we determine the following.

### A.  <u>Programs Determined To Be Countervailable</u>

#### 1.  **GNS Loan for Working Capital**

In response to PWCC's request for financial assistance in connection with its acquisition of the Port Hawkesbury mill, the GNS established a credit facility for PWCC.[66] In August 2012, the GNS's Department of Economic and Rural Development and Tourism (ERDT), on behalf of the Minister of Nova Scotia, provided a letter of offer to PWCC for a credit facility of C$40 million.[67] The Minister of Nova Scotia ultimately determined the amount of assistance, subject to approval by the Governor in Council.[68] The GNS provided the assistance pursuant to the Nova Scotia Jobs Fund Act.[69] The GNS offered and provided the assistance only to PWCC, which was not obligated to pay any interest on the loan during its term.[70]

In September 2012, in contemplation of the completion of the *CCAA* process, the involved parties ultimately assigned the loan to Port Hawkesbury.[71] The loan remained outstanding during the POI.[72] The loan is eligible for forgiveness, but only if certain conditions are fulfilled each calendar year and confirmed by the GNS.[73] The GOC reported that as of the date of the GQR, the GNS had not forgiven any amount under the terms of the Letter of Offer, and the loan is still repayable in full as reflected in the financial accounts of the GNS.[74]

We determine that this loan conferred a countervailable subsidy within the meaning of section

---

[66] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume II, NS.II-2.
[67] *Id.* at NS.II-2 and Exhibit NS-CF-1.
[68] *Id.* at NS.II-10.
[69] *Id.* at NS.II-7 and Exhibit NS-CF-4.
[70] *Id.* at NS.II-12.  *See, also,* GNS Pre-Preliminary Comments at 20.
[71] *See* PQR at 38 and Exhibit 3-3.
[72] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume II, NS.II-6.
[73] *Id.* at NS.II-2, Exhibit NS-CF-1, and Exhibit NS-CF-2.
[74] *Id.* at NS.II-4 - NS.II-5.

771(5) of the Act and constitutes a financial contribution in the form of a direct transfer of funds from the GNS under section 771(5)(D)(i) of the Act.  We also determine that a benefit exists under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1) equal to the difference between the amounts paid by the company for the loan during the POI and the amounts the company would have paid on a comparable commercial loan.  Finally, we also determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS offered and provided the assistance only to PWCC.

To calculate the benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Port Hawkesbury would have paid on a comparable commercial loan during the POI.  Because Port Hawkesbury received the loan in 2012, must fulfill certain conditions each calendar year (*i.e.*, more than one year after the receipt of the loan), and no forgiveness of any portion of the loan has been provided by the GNS, we are treating the loan as a contingent liability interest-free loan and using a long-term interest rate benchmark.[75]

In accordance with 19 CFR 351.525(b)(6)(i), we calculated the countervailable subsidy rate by dividing this benefit amount by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section.  On this basis, we determine that the net countervailable subsidy rate for this program is 0.72 percent *ad valorem* for Port Hawkesbury.

## 2.  GNS Loan to Improve Productivity and Efficiency

In response to PWCC's request for financial assistance in connection with its acquisition of the Port Hawkesbury mill, the GNS's ERDT also provided a Letter of Offer to PWCC for a loan of C\$24 million.[76]  The GNS approved and provided the funds to PWCC in August 2012.[77]  The Minister of Nova Scotia ultimately determined the amount of assistance, subject to approval by the Governor in Council.[78]  The GNS provided the assistance pursuant to the Nova Scotia Jobs Fund Act.[79]  The GNS offered and provided the loan, which has an interest rate of zero, only to PWCC.[80]

PWCC assigned the loan to Port Hawkesbury after its receipt, and the loan remained outstanding during the POI.[81]  Under the terms of the Letter of Offer, the loan is eligible for forgiveness, but only if certain conditions are fulfilled each calendar year and confirmed by the GNS.[82]  The GOC reported that as of the date of the GQR, the GNS had not forgiven any amount under the

---

[75] *See* 19 CFR 351.505(d).
[76] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume III, NS.III-2 and Exhibit NS-LN-1.
[77] *Id.* at NS.III-2 and NS.III-5.
[78] *Id.* at NS.III-9.
[79] *Id.* at NS.III-5 and Exhibit NS-LN-4.
[80] *Id.* at NS.III-11; *See, also,* GNS Pre-Preliminary Comments at 23.
[81] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume III, NS.III-5; *see, also,* PQR at 42.
[82] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume III, NS.III-2, Exhibit NS-LN-1, and Exhibit NS-LN-2.

terms of the Letter of Offer.[83]

We determine that this loan conferred a countervailable subsidy within the meaning of section 771(5) of the Act and constitutes a financial contribution in the form of a direct transfer of funds from the GNS under section 771(5)(D)(i) of the Act. We also determine that a benefit exists under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1) equal to the difference between the amounts paid by the company for the loan during the POI and the amounts the company would have paid on a comparable commercial loan. Finally, we determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS only offered and provided the assistance to PWCC.

To calculate the benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Port Hawkesbury would have paid on a comparable commercial loan during the POI. Because Port Hawkesbury received the loan in 2012, must fulfill certain conditions each calendar year (*i.e.*, more than one year after the receipt of the loan), and no forgiveness of any portion of the loan has been provided by the GNS, we are treating the loan as a contingent liability interest-free loan and using a long-term interest rate benchmark.[84]

In accordance with 19 CFR 351.525(b)(6)(i), we calculated the countervailable subsidy rate by dividing the benefit amount by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section. On this basis, we determine that the net countervailable subsidy rate for this program is 0.43 percent *ad valorem* for Port Hawkesbury.

### 3. PWCC Indemnity Loan

Port Hawkesbury explained that during the course of the sales process for NPPH, PWCC incurred transaction costs and expenses for due diligence work and restructuring planning in connection with its acquisition of NPPH.[85] The GNS, as represented by the Minister of Natural Resources, agreed during the negotiation to reimburse PWCC for a portion of these costs and expenses, in recognition of the significant complexity, resources, and completion risk involved in pursuing, evaluating, negotiating, and implementing a possible transaction.[86] To memorialize this arrangement, PWCC and the GNS entered into an indemnity agreement, effective November 28, 2011, and amended on September 28, 2012 (Indemnity Agreement).[87] Under the Indemnity Agreement, if PWCC or any of its affiliates completed the acquisition of NPPH prior to October 31, 2012, PWCC (delegated to Port Hawkesbury) was obligated to repay the GNS all reimbursed amounts in three installments from 2013 – 2016.[88] Both the GNS and Port Hawkesbury reported

---

[83] *Id.* at NS.III-3.
[84] *See* 19 CFR 351.505(d).
[85] *Id.* at 94.
[86] *Id.*
[87] *Id.*
[88] *Id.* at 95. *See, also,* GNS Pre-Preliminary Comments at 25.

the outstanding balances that Port Hawkesbury owed to the GNS during the POI under the Indemnity Loan, which has an interest rate of zero.[89]

We did not initiate an investigation into this program in the *Initiation Notice*.  However, section 775 of the Act provides that if the Department "discovers a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in a countervailing duty petition … then the administering authority (1) shall include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding,..."  *See, also* 19 CFR 351.311(b).  Accordingly, based upon our discovery of a practice which appears to be a countervailable subsidy from Port Hawkesbury's and the GNS's questionnaire responses, the statute authorizes us to investigate this program.

We determine that the Indemnity Loan conferred a countervailable subsidy within the meaning of section 771(5) of the Act and constitutes a financial contribution in the form of a direct transfer of funds from the GNS under section 771(5)(D)(i) of the Act.  We also determine that a benefit exists under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1) equal to the difference between the amounts paid by the company for the loan during the POI and the amounts the company would have paid on a comparable commercial loan.  Finally, we determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS only provided assistance to PWCC for the due diligence work and restructuring planning in connection with the acquisition of NPPH.

To calculate the benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Port Hawkesbury would have paid on a comparable commercial loan during the POI.  In accordance with 19 CFR 351.525(b)(6)(i), we calculated the countervailable subsidy rate by dividing this benefit amount by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section.  On this basis, we determine that the net countervailable subsidy rate for this program is 0.03 percent *ad valorem* for Port Hawkesbury.

### 4.  Richmond County (Nova Scotia) Promissory Note for Property Taxes

On September 27, 2012, NPPH, Richmond County (Nova Scotia), and PWCC entered into an agreement that set the property taxes payable on Port Hawkesbury at C\$1,326,227 for the balance of the taxation year commencing September 28, 2012, and ending March 31, 2013.[90] The property taxes under the agreement were partly payable through a C\$450,000 interest-free loan granted in the form of a promissory note, repayable in four annual installments from 2013 to 2016, due by September 28 of each year.[91]  The payment of taxes in this manner was contingent on the GNS passing the Richmond Port Hawkesbury Paper Ltd. Taxation Act, which gave effect

---

[89] *Id.* at NS.I-17 – NS.I-18.  *See, also,* PQR at Exhibit 15-2a.  *See, also,* GNS Pre-Preliminary Comments at 26.
[90] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume IV, NS.IV-2.
[91] *Id.* at NS.IV-2, Exhibit NS-RL-1, and Exhibit NS-RL-2.

to the September 2012 agreement.[92]  The GNS reported that it offered this assistance only to Port Hawkesbury.[93]  The Municipality of the County of Richmond is responsible for administering the loan.[94]

Although PWCC was the party to the agreement, Port Hawkesbury records the loan in its accounts.[95]  Port Hawkesbury's 2013 and 2014 audited financial statements include the loan in its Accounts Payable and Accrued Liabilities.[96]

For this final determination, we find that this promissory note provides a financial contribution as a direct transfer of funds under section 771(5)(D)(i) of the Act.  Because the granting of the promissory note and the payment of property taxes in this manner required the passage of specific legislation by the GNS, the Richmond Port Hawkesbury Paper Ltd. Taxation Act, we determine that it is specific to an enterprise under section 771(5A)(D)(i) of the Act.  To calculate the benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Port Hawkesbury would have paid on a comparable commercial loan during the POI.  In accordance with 19 CFR 351.525(b)(6)(i), we calculated the countervailable subsidy rate by dividing the benefit amount by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section.

In the *Preliminary Determination*, we found that the benefit to Port Hawkesbury under this program was less than 0.005 percent *ad valorem* during the POI, and therefore there was no benefit.  For purposes of this final determination, however, we have revised the interest rate we are using as a benchmark to measure loan benefits and to allocate non-recurring benefits over time.  As a result, we determine that Port Hawkesbury received a countervailable subsidy of 0.01 percent *ad valorem* under this loan program.

### 5.  GNS Grants for Maintaining Hot Idle Status

The GNS reports that funds were provided by the GNS to maintain the Port Hawkesbury mill in "hot idle" status through to the completion of the sale of the mill to PWCC during the *CCAA* process.  All payments by the GNS were made under the supervision of the court-appointed monitor in the context of the *CCAA* proceeding to maintain the NPPH assets in hot idle status pending the sale of the assets to potential buyers.[97]  The reason for maintaining the mill in "hot idle" status is that machinery and equipment at mills like the Port Hawkesbury mill must be in constant operation in order to maintain their efficiency, and even operability.  Any prolonged "cold" shutdown results in degradation of the machinery and equipment that can be very expensive, and sometimes impossible, to repair, thereby imperiling a successful restart.[98]

---

[92] *Id.* at NS.IV-4.
[93] *Id.* at NS.IV-9.
[94] *Id.* at NS.IV-3.
[95] *See* PQR at 48.
[96] *Id.*
[97] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-6.
[98] *See* PSQR at 12.

NPPH and NewPage Corporation (NewPage), NPPH's U.S. parent company, entered into a Settlement and Transition Agreement, under which NewPage committed approximately US$22 million for a "hot-idle" fund under the oversight of a court-appointed monitor to maintain the hot idle status of the mill.  However, by December 2011, these funds were nearly depleted.[99] Therefore, the Treasury Board of the GNS approved additional funding, to be provided by the Department of Natural Resources (DNR) to maintain the hot idle status of the mill.  These approvals were granted in December 2011 and on March 26, 2012.[100]  The amount of assistance was based on the actual costs of maintaining the hot idle status as reported by the court-appointed monitor under the *CCAA* proceeding,[101] and funds were disbursed based on the monitor's approval of invoices for services rendered.  Specifically, NPPH staff would receive invoices and periodically submit them to the monitor, who was responsible for vetting them to ensure they were for activities performed during the hot idle period, and upon approval would release funds for payment of the invoice.[102]  Additionally, any excess funds remaining at the conclusion of the *CCAA* proceedings were repaid to the GNS.[103]

With respect to the sales process of the mill under the *CCAA* process, 21 letters of intent were received on September 28, 2011, from parties interested in purchasing the mill assets; 14 of these were designated as qualified buyers.  On October 24, 2011, eight formal offers for the purchase of NPPH's assets were received by the monitor.  On October 28, 2011, the monitor advised four of the eight bidders that they were being invited to continue as participants in the Sales Process, and they were advised to submit formal offers by December 16, 2011.[104]  PWCC submitted its bid on December 16, 2011.  The monitor announced, in a press release issued on January 4, 2012, that PWCC was chosen as the bidder to acquire NPPH.[105]  Once the price set out in PWCC's letter of December 16, 2011, was accepted, it did not change throughout the duration of the process and the closing of its acquisition of the mill occurred based on that price.[106]

In its quesitonnaire responses, Port Hawkesbury argues that it did not receive any of the funds during the hot idle period,[107] and the GNS argues that any benefit conferred under this program was provided to NPPH and was extinguished when the mill was sold to PWCC.[108]  However, the Department's prior notice with respect to agency practice regarding privatization is instructive in evaluating the hot idle assistance.[109]  This *Notice of Final Modification* addressed the treatment of prior subsidies with respect to change-in-ownership, including the treatment of concurrent

[99] *See* GQR at Government of Nova Scotia Questionnaire Response at Volume VIII, NS.VIII-5.
[100] *See, e.g.,* GSQR at Exhibit NS-SUPP1-12, Appendix A.
[101] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-9.
[102] *See* PQR at 16-17.
[103] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-9 and Exhibit NS-HI-11.
[104] *See* GSQR at 10.
[105] *See* PSQR at 10.
[106] *See* PSQR at 11.
[107] *See* PQR at 17.
[108] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-6 - NS.VIII 7.
[109] *See Notice of Final Modification*.

subsidies provided to encourage or facilitate privatization.[110]  For the purposes of this methodology, the Department stated that it intends to scrutinize very carefully any instances of concurrent subsidies, and will normally determine that the value of concurrent subsidies is fully reflected in the fair market value price of an arm's length change in ownership/privatization and, therefore, is fully extinguished in any such transaction, if the following criteria are met:

1.  The nature and value of the concurrent subsidies were fully transparent to all potential bidders and, therefore, reflected in the final bid values of the potential bidders;
2.  The concurrent subsidies were bestowed prior to the sale; and
3.  There is no evidence otherwise on the record demonstrating that the concurrent subsidies were not fully reflected in the transaction price.[111]

With respect to the hot idle funds provided by the GNS, the funds were bestowed prior to the conclusion of the sale of the former NPPH to its new owners and, thus the second criterion was met.  However, we determine that the other two criteria were not satisfied.  The solicitation for bids for the Port Hawkesbury mill and the selection of the four qualified bidders were completed by October 28, 2011, and the deadline for submitting bids was December 16, 2011.  The decisions by the GNS to provide hot idle funds were made in December 2011 and on March 26, 2012, after the solicitation for bids and after the submission of all bids.[112]  Thus, at the time the bids were submitted, the nature and the value of the hot idle funds provided by the GNS were not "fully transparent to all potential bidders," as articulated in the first criterion above.  The potential bidders would not have been aware of the provision of hot idle funds from the GNS; therefore, the bids submitted could not have reflected the provision of the assistance by the GNS to maintain hot idle status.

Moreover, there is evidence on the record demonstrating that the hot idle funds were not fully reflected in the transaction price.  Because the hot idle funds from the GNS were not in existence before the bid price was established and approved, the value of the GNS hot idle funds could not have been reflected in the transaction price.  As Port Hawkesbury admits, the price set forth in the bid that was submitted and accepted on December 16, 2011, did not change throughout the duration of the sales process, and the closing of the acquisition of the mill ultimately occurred on the pricing terms submitted in the December 16, 2011, bid.[113]  Thus, even if that bid price initially reflected the fair market value of the Port Hawkesbury mill, and even though the hot idle funds were bestowed prior to the final sale, the value of the GNS hot idle funds could not have been reflected in the final transaction price, which was set before the hot idle funds were proposed and approved by the GNS.  Therefore, even assuming an arm's length transaction for fair market value, because the actual transaction price could not have accounted for the amount of the subsidy, we determine that the subsidy could not have been extinguished.

---

[110] The *Notice of Final Modification* explicitly addresses full privatization, but the Department later determined to apply this methodology to private-to-private sales.  *See, e.g., Pasta from Italy* 70 FR at 17972.
[111] *See Notice of Final Modification,* 68 FR 37125, 37137.
[112] *See*, *e.g.*, GSQR at Exhibit NS-SUPP1-12, Appendix A.
[113] *See* PSQR at Exhibit 8, page 6.

We, therefore, determine that the grants provided by the GNS in order to maintain the Port Hawkesbury mill in "hot idle" status through to the completion of the sale of the mill to PWCC constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act.  We also determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant.  Finally, we determine that the program is *de jure* specific, in accordance with section 771(5A)(D)(i) of the Act, because the GNS authorized the assistance only to Port Hawkesbury.

Because NPPH did not receive these benefits on an ongoing basis and the assistance was to be provided only during the pendency of the *CCAA* process, we are treating these subsidies as non-recurring grants.[114]  Additionally, because Port Hawkesbury reported the total amount of payments it received, and it was not able to identify the source of funds (GNS, New Page Corporation or NPPH) for the payments it received,[115] we have used in our calculation the total amount of GNS funds disbursed under the court-appointed monitor's approval, as reported by the GNS.[116]  Using this total, we conducted the "0.5 percent test" pursuant to 19 CFR 351.524(b)(2) and we found that the benefits were greater than 0.5 percent of Port Hawkesbury's total sales in the year the grants were approved.  Thus, we allocated the total benefit over the AUL using the discount rate discussed above in the section "Loan Interest Rate Benchmarks and Discount Rates," to determine the amount attributable to the POI.  We then divided the amount attributable to the POI by Port Hawkesbury's total sales during the POI.  On this basis, we determine that Port Hawkesbury received a net countervailable subsidy of 0.71 percent *ad valorem* under this program.  For further discussion of the comments and arguments submitted with regard to this program in the case and rebuttal briefs, *see* Comment 5, below.

### 5.  Forestry Infrastructure Fund

The GNS reports that the Forestry Infrastructure Fund (FIF) was created pursuant to an agreement between the GNS and NPPH dated September 16, 2011, which was put into effect by the Supreme Court of Nova Scotia on September 23, 2011, pursuant to its authority under the *CCAA* process.  According to the GNS, the purpose of the FIF was to pass payments through NPPH to providers of certain services that the GNS deemed beneficial for the province.[117]  Specifically, the GNS determined that because NPPH intended to shut down its mill, ancillary forestry operations which are directly beneficial to the province and the provincial economy would cease immediately.  Therefore, the GNS engaged with NPPH to continue the forestry infrastructure activities of third party contractors and subcontractors.[118]  These activities included silviculture (including ongoing silviculture activities that were only partially completed when NPPH sought creditor protection), road maintenance, forestry training program, and design,

---

[114] A portion of this grant was returned to the GNS.  *See* Port Hawkesbury Final Calculation Memo.
[115] *See* PSQR at 14.
[116] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VIII, NS.VIII-17.
[117] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, NS.X-2.
[118] *Id.* at NS.X-3.

harvesting and transportation of timber.[119]  The GNS submitted internal documents which described the FIF as follows:

> This $14 million fund was established to support NewPage's supply chain while keeping the facility ready to be sold to a new owner.  This fund helped to maintain woodlands operation.  (Over a six month period, approximately 300 jobs were financed by the Fund.)  Originally the fund was scheduled to end in December 2011; however, it was extended until March 31, 2012, to give more time to complete the sale. This initial expansion did not require additional funding.[120]

Initial funding for the FIF was approved on September 16, 2011, in the amount of C$14 million, to be provided by the ERDT.[121]  The order approving this original agreement was announced publicly on or before October 1, 2011.[122]  The FIF was amended three times subsequent to its establishment.[123]  Notably, on March 7, 2012, the ERDT amended the agreement to extend it until September 30, 2012, and to provide an additional amount to the FIF of C$12 million.[124]

As discussed above under the "GNS Grants for Maintaining Hot Idle Status" section, PWCC submitted its bid to purchase the mill on December 16, 2011, and once the price set out in its bid was accepted, it did not change throughout the duration of the process and the closing of the acquisition of Port Hawkesbury occurred based on that price.[125]

In its questionnaire response, Port Hawkesbury argues that it was not a party to the transactions under the FIF and received no benefits from it.[126]  The GNS argues that the program was "cost and cash flow" neutral to NPPH, and the services provided under the program were designed to accrue to the benefit of the GNS.[127]  However, the internal documentation submitted by the GNS demonstrates that the FIF was provided to support the ongoing operations of the mill during the bankruptcy process and to maintain the mill ready for sale as an ongoing concern,[128] which demonstrates that this program was established to support the mill through the *CCAA* and sale process, rather than only to support unrelated contractors.  Additionally, the GNS argues that even if there was a benefit to NPPH, the benefit was extinguished when NPPH was sold to PWCC in a private-to-private transaction, made at arm's length, and at fair market value.[129]  However, as discussed above, the Department looks for guidance in the *Notice of Final Modification*, which addresses the treatment of concurrent subsidies with respect to change-in-ownership.

---

[119] *Id.*
[120] *See* GSQR at Exhibit 98B.
[121] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, NS.X-5.
[122] *Id.* at Exhibit NS-FI-5.
[123] *Id.* at NS.X-6.
[124] *Id.* at Exhibit NS-FI-8.
[125] *See* PSQR at 11.
[126] *See* PQR at 18.
[127] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, NS.X-3 – NS.X-4.
[128] *See* GSQR at Exhibit 98B.
[129] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, NS.X-2.

The first step in our analysis is to determine whether the purchase of the mill from NPPH by PWCC was at arm's length for fair market value.  In analyzing whether a sales transaction was for fair market value, the Department will normally examine whether the seller acted in a manner consistent with the normal sales practice of private commercial sellers in that country.  Where an arm's-length sale occurs between private parties, we would normally expect the private seller to act in a manner consistent with the normal sales practices of private commercial sellers in that country.[130]

The sale of the company was undertaken through the *CCAA* under the general supervision of the Supreme Court of Nova Scotia.[131]  The sale of the company occurred under the normal restructuring process of the *CCAA*, which is similar to the process undertaken under Chapter 11 of the U.S. Bankruptcy Code.  The Court appointed an independent party, Ernst and Young, as the Monitor to oversee the day-to-day administration of the sale of the company.  The notice of the potential sale was advertised in the Canadian and international press including an industry journal for the pulp and paper industry.  Upon initiation of the sales process, 110 potential purchasers were contacted which resulted in the submission of 21 non-binding Letters of Intent (LOI).  Fourteen of the parties that submitted LOIs were designated qualified bidders  and eight of these qualified bidders submitted offers.  Four of these bidders were then selected to submit formal and final offers.  PWCC was then selected as the purchaser and the sale of the company by NPPH to PWCC was approved by the company's American bondholders and Canadian creditors.  Based upon the manner in which the company was sold, we determine that this private-to-private party transaction between NPPH and PWCC was at arm's-length for fair market value.

After determining that the change-in-ownership was a private-to-private transaction at fair market value, we must then determine whether any subsidies were extinguished.  The *Notice of Final Modification* establishes the criteria to be used in determining whether a subsidy is fully extinguished in a fair market value price of an arm's-length change in ownership/privatization.  As noted above, these criteria are:

1. The nature and value of the concurrent subsidies were fully transparent to all potential bidders and, therefore, reflected in the final bid values of the potential bidders;
2. The concurrent subsidies were bestowed prior to the sale; and
3. There is no evidence otherwise on the record demonstrating that the concurrent subsidies were not fully reflected in the transaction price.[132]

With respect to the initial FIF approval amount of C$14 million provided by the GNS, those funds were bestowed prior to the conclusion of the sale of the former NPPH to its new owners and, thus, the second criterion was met.  Additionally, as noted above, the order approving this original agreement was announced publicly on or before October 1, 2011,[133] which is prior to the

---

[130] *See*, *e.g.*, *Pasta From Italy*. 70 FR at 17972.

[131] The information on the sales process of the company cited in this paragraph can be found in the PSQR at Exhibit 8.

[132] *See Notice of Final Modification,* 68 FR 37125, 37137.

[133] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, Exhibit NS-FI-5.

submission of formal offers for the purchase of the mill on October 24, 2011, and prior to the submission of PWCC's final bid on December 16, 2011.[134]  Therefore, the first criterion was also met, as the nature and value of the initial FIF funds were fully transparent to all potential bidders. Additionally, there is no evidence otherwise on the record demonstrating that the amounts related to the first FIF approval were not fully reflected in the transaction price.  Therefore, we determine that the subsidies related to the initial FIF approval were extinguished in the fair market price of an arm's-length sale of NPPH to PWCC.

With respect to the second FIF approval amount of C$12 million, those funds were also bestowed prior to the conclusion of the sale of the former NPPH to its new owners and, thus, the second criterion was met.  However, we determine that the other two criteria were not satisfied with respect to the second FIF approval amount.  Specifically, as noted above, PWCC's final bid was submitted on December 16, 2011, whereas the second FIF amount was approved by the GNS and the ERDT after that date.  Thus, at the time the bids were submitted, the nature and the value of the second FIF was not "fully transparent to all potential bidders," as articulated in the first criterion above.  The potential bidders would not have been aware at the time they submitted their bids that the second FIF was forthcoming, and it is not possible that the bids submitted prior to this date could have reflected the provision of the assistance under the FIF.

Moreover, there is evidence otherwise on the record that demonstrates that the second FIF was not fully reflected in the transaction price.  Because those funds were not disbursed before the bid price was established and approved, the value of the second FIF could not have been reflected in the transaction price.  As Port Hawkesbury admits, the price set forth in PWCC's bid that was submitted and accepted on December 16, 2011, did not change throughout the duration of the sales process and the closing of the acquisition of the mill occurred on the pricing terms submitted in the December 16, 2011, bid.[135]  Thus, even if that bid price initially reflected the fair market value of the Port Hawkesbury mill, and even though the concurrent subsidy was bestowed prior to the final sale, the value of the second FIF could not have been reflected in the final transaction price, which was set before the concurrent subsidies were proposed and approved by the GNS.  Therefore, because the actual transaction price could not have accounted for the amount of the subsidy, we determine that the subsidy could not have been extinguished.

We determine that the grants provided by the GNS and the ERDT under the second FIF constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act.  We also determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant.[136]  Finally, we determine that the program is *de jure* specific, in accordance with section 771(5A)(D)(i) of the Act, because the GNS authorized the assistance only to Port Hawkesbury.

---

[134] *See* GSQR at 10.

[135] *See* PSQR at Exhibit 8, page 6.

[136] As noted below in the "Analysis of Comments" section at comment 6, we are subtracting the total C$14 million scheduled for FIF 1 from the total funding disbursed under the FIF program when calculating a benefit for FIF 2.

Because NPPH did not receive these benefits on an on-going basis and the assistance was to be provided only up until September 30, 2012,[137] we are treating these subsidies as non-recurring grants.   As noted below, we are accounting for the full C$14 million of the initial FIF disbursement by offsetting any amount in the second FIF tranche that was not spent in the prior phase.  The remaining amount is the total amount of the grant.  Therefore, we conducted the "0.5 percent test" pursuant to 19 CFR 351.524(b)(2) and we found that the benefits were greater than 0.5 percent of Port Hawkesbury's total sales in the year the grant was approved.  Thus, we allocated the total benefit over the AUL using the discount rate discussed above in the section "Loan Interest Rate Benchmarks and Discount Rates," to determine the amount attributable to the POI.  We then divided the amount attributable to the POI by Port Hawkesbury's total sales during the POI.  On this basis, we determine that Port Hawkesbury received a net countervailable subsidy of 0.54 percent *ad valorem* under this program.  For further discussion of the comments and arguments submitted with regard to this program in the case and rebuttal briefs, *see* Comment 6, below.

### 6.  GNS Grants for the Sustainable Forest Management and Outreach Program Agreement

Based on the petitioner's allegation, the Department initiated an investigation of a program titled "GNS Grants for the Promotion of Forest Management and Sustainable Harvesting" under which the GNS agreed "to provide C$3.8 million annually for 10 years in a forestry restructuring fund to support sustainable harvesting and forest land management."[138]  The GNS states that the petitioner misstated the nature, content, and name of this funding agreement, but it confirms that the "Sustainable Forest Management and Outreach Program Agreement" (Outreach Agreement) does provide funding of up to C$3.8 million per year for up to ten years.[139]  The GNS reported that the Outreach Agreement provides payment to Port Hawkesbury for providing certain services for the benefit of the province.[140]  Port Hawkesbury explains that the funds are used for the following activities:  road planning and maintenance, forestry planning and administration, resource inventory and data sharing, research, silviculture, operation of a silviculture program on private lands, forest planning, and forest certification.[141]  In order to receive the funds from the GNS and the DNR, Port Hawkesbury files quarterly reports outlining activities and expenses.[142]

We determine that the grants under the Outreach Agreement that Port Hawkesbury received from the GNS constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act.  We also determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant.  Finally, we determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS provided the assistance only to Port Hawkesbury.[143]

---

[137] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume X, Exhibit NS-FI-8.
[138] *See Initiation Notice* at 14.
[139] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XI.
[140] *Id.*
[141] *See* PQR at 22-23.
[142] *Id.*
[143] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XI, NS.XI-12.

In accordance with 19 CFR 351.524(c)(2), we find that the funds provided under this program constitute recurring benefits.  Therefore, we calculated the countervailable subsidy rate by dividing the amount of the grants received during the POI under the Outreach Agreement by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section.  On this basis, we determine that Port Hawkesbury received a net countervailable subsidy of 1.57 percent *ad valorem* under this program.  For further discussion of the comments and arguments submitted with regard to this program in the case and rebuttal briefs, *see* Comment 7, below.

### 7.  GNS Provision of Funds for Worker Training and Marketing

Port Hawkesbury reports that as part of PWCC's plan for restructuring NPHH, it sought a commitment by the GNS to provide funding going forward, in the event that PWCC was successful in purchasing NPPH.  The GNS agreed to two grants:  1) a C$1.5 million grant for workforce training at the Port Hawkesbury mill, and 2) C$200,000 annually for five years (C$1 million total) for the marketing of products produced at the Port Hawkesbury mill.[144]  Although there was not a specific application process, PWCC's Letter of Offer, dated August 14, 2012, and the final amended offer, dated September 22, 2012, document the agreement with respect to these funds.[145]

This grant is administered by the ERDT acting on behalf of the Minister.[146]  In order to receive funds for workforce training under this program, Port Hawkesbury provided the ERDT with schedules of estimated training initiatives and related costs.[147]  In order to receive the annual grant for marketing, Port Hawkesbury must provide the GNS with an annual marketing plan prior to the disbursement of funds, which it has done for 2013 and 2014.[148]

We determine that the grants for workforce training and marketing that Port Hawkesbury received from the GNS and ERDT constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act.  We also determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant.  Finally, we determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS and ERDT provided the assistance only to Port Hawkesbury.

Under 19 CFR 351.513(c), the Departments treats worker training subsidies and promotion assistance subsidies, which would include marketing subsidies, as recurring benefits.  Therefore, we calculated the countervailable subsidy rate by dividing the amount of the grants received for worker training and marketing during the POI under this program  by Port Hawkesbury's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of

---

[144] *See* PQR at 26-27.
[145] *Id.* at 26-27 and Exhibit 3-1 and 3-2.
[146] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XII, NS.XII-2.
[147] *See* PQR at 30 and Exhibit 3-4.
[148] *See* PQR at 30 and Exhibit 3-5.

Subsidies" section.  On this basis, we determine that Port Hawkesbury received a net countervailable subsidy of 0.19 percent *ad valorem* under this program.

### 8. The Federal Pulp and Paper Green Transformation Program

The GOC reported that Resolute received grants during the POI under the FPPGTP.[149]  The GOC also reported that Resolute's cross-owned affiliate, Fibrek, received assistance under this program.[150]  The purpose of the program was to improve the environmental performance of Canada's pulp and paper industry.  The program is authorized by the national government and administered by Natural Resources Canada.  Under the program, participant companies which register and submit the required application materials receive a credit in the amount C\$0.16 per liter of black liquor used/burned during the period January 1, 2009 through December 31, 2009, up to a C\$1 billion cap for the total program.[151]  Following the credit application process, companies receive a confirmation of the value of the credits generated, and the total value of credits available for their use.  Companies can then submit project proposals for funding consideration.[152]  Eligible projects must be capital investments in a Canadian pulp and paper mill and must be directly related to the mill's industrial process and result in demonstrable improvements in environmental performance.  Additionally, the project must be located at a pulp and paper mill in Canada.[153]  This program ended on March 31, 2012; project expenses incurred by participating companies after that date would not be funded by the program.[154]

We determine that grants from the GOC under the FPPGTP constitute a financial contribution in the form of a direct transfer of funds from the government, and bestow a benefit within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act and 19 CFR 351.504(a).  We also determine that this program is specific under section 771(5A)(D)(i) of the Act because the grants provided under the program are limited to the pulp and paper industry.

The Department's regulations at 19 CFR 351.525(b)(5)(i) state that generally, "(i)f a subsidy is tied to the production or sale of a particular product, the Secretary will attribute the subsidy only to that product."  In making this determination, the Department analyzes the purpose of the subsidy based on information available at the time of bestowal.[155]  A subsidy is tied only when the intended use is known to the subsidy giver (in this case, the GOC) and so acknowledged prior to or concurrent with the bestowal of the subsidy.[156]  For example, in determining whether a loan is tied to a particular product, the Department examines the loan approval documents; to determine whether a grant is tied to a particular product, the Department examines the grant approval documents.  In the case of the grant program at issue, the grant applicant's guide clearly states that the intent of the program was to improve the environmental performance of Canada's

---

[149] *See* GQR at Government of Canada Questionnaire Response, Volume V, GOC-4.
[150] *See* "Revised Response of the Government of Canada to the Department's April 6 Questionnaire," July 22, 2015.
[151] *Id* at 1 and 8.
[152] *Id.* at 8.
[153] *See* GQR at Government of Canada Questionnaire Response, Volume V, GOC-12 – GOC-13 and Exhibit GOC-PPGTP-1.
[154] *Id.* at GOC-2.
[155] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65403 (November 25, 1998).
[156] *Id.*

pulp and paper industry, and credits were only to be granted to Canadian pulp and paper companies. Additionally, in order to be eligible for the program, "projects must be capital investments at a Canadian pulp and paper mill that are directly related to the mill's industrial process and result in demonstrable improvements in environmental performance"[157] and the project location must be at a pulp and paper mill in Canada.[158] Further, costs associated with other types of projects (specifically, costs associated with the production or export of softwood lumber products) are ineligible for the program.[159] Therefore, based on the record evidence, the purpose of this grant program was known and available prior to the bestowal of the benefit, and we determine that these grants are tied to the production of only pulp and paper products. Therefore, as required by 19 CFR 351.525(b)(5), we are attributing the benefits from these grants to the sales of the specific products that benefit from the grant (*i.e.*, pulp and paper products), rather than to Resolute's total sales.[160]

Because Resolute does not receive these benefits on an on-going basis, we are treating this subsidy as a non-recurring grant. Therefore, we conducted the "0.5 percent test" pursuant to 19 CFR 351.524(b)(2) on the amount of credit approved by the GOC based on Resolute's black liquor usage in 2009. We found that the amount of approved credit was greater than 0.5 percent of Resolute's sales of pulp and paper in the year of approval. Therefore, we allocated the total benefit over the AUL using the discount rate discussed above in the "Loan Interest Rate Benchmarks and Discount Rates," to determine the amount attributable to the POI. We then divided the POI benefits by the appropriate pulp and paper sales during the POI. On this basis, we determine that Resolute received a net countervailable subsidy of 0.22 percent *ad valorem* under this program. For further discussion of the comments and arguments submitted with regard to this program in the case and rebuttal briefs, *see* Comments 19 and 20, below.

### 9. Ontario Northern Industrial Electricity Rate Program

The GOO and Resolute report that Resolute's Thunder Bay, Fort Frances, and Iroquois Falls mills received grants during the POI under the Ontario Northern Industrial Electricity Rate (NIER) program, established on April 1, 2013.[161] The purpose of the program is to assist Northern Ontario's largest qualifying industrial electricity consumers which commit to developing and implementing an energy management plan to manage their energy usage and improve energy efficiency and sustainability. Specifically, participants receive a rebate of two cents per kilowatt hour, capped at 2011-12 consumption levels or C$20 million, whichever is lower.[162] The program is administered by the GOO Ministry of Northern Development & Mines. Companies eligible for assistance are industrial facilities located in Northern Ontario. The program has been extended indefinitely.[163] Companies which have been accepted into the program are not required to reapply and can expect to receive rebates in variable amounts based

---

[157] *See* GQR Volume I at Exhibit GOC-PPGTP-1, page 4.
[158] *Id.* at Exhibit GOC-PPGTP-1, page 9.
[159] *Id.* at Exhibit GOC-PPGTP-1, page 7.
[160] *See* RSQR2 at 1-2 and Exhibit S-8.
[161] *See* GQR at Government of Ontario Questionnaire Response, Ontario-1 – Ontario-2; *see, also,* RQR at Appendix B.
[162] *Id.*
[163] *Id.* at 2.

on the amount of eligible electricity consumed, not subject to the GOO Ministry of Northern Development & Mines' discretion.[164]

We determine that the electricity rebates that Resolute received from the GOO constitute a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act. We also determine that this program is specific under section 771(5A)(D)(iv) of the Act because the rebates provided under the program are limited to companies located in a certain designated geographical region, *i.e.*, Northern Ontario, within the jurisdiction of the authority providing the subsidy. We also determine that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant.

In accordance with 19 CFR 351.524(c)(2), we find that the electricity rebates provided under the program constitute recurring benefits. Therefore, we calculated the countervailable subsidy rate by dividing the amount of rebates received under this program during the POI by Resolute's total sales during the POI, as described above in the "Subsidies Valuation Information – Attribution of Subsidies" section. On this basis, we determine that Resolute received a net countervailable subsidy of 0.45 percent *ad valorem* under this program. For further discussion of the comments and arguments submitted with regard to this program in the case and rebuttal briefs, *see* Comment 19, below.

### 10. Ontario Forest Sector Prosperity Fund (FSPF)

As noted above, in the *Preliminary Determination*, the Department stated that it would "examine these additional potential benefits at verification and address them in the final determination," referring, in part, to the FSPF. In the verification outline issued to the GOC, the Department instructed that the GOO should "{b}e prepared to discuss the information referenced in Paragraph 2.8, "Summary of Project Funding Sources and Contributors," and Table 3, "Total from Provincial/Territorial/Municipal Governments" of the FPPGTP Application Forms you submitted in Exhibit A-1of Appendix A of your May 28, 2015 questionnaire response."[165] During verification, as requested, the GOO explained that the FSPF program was announced in 2005 and supported approved capital investment projects in value-added manufacturing, increased fiber use efficiencies, energy conservation/efficiency, and development of electricity co-generation. Eligible projects for the FSPF program were restricted to sites in northern or rural Ontario. The FSPF was a Ministry of Natural Resources capital grant program, and it stopped accepting applications in October 2008. These grants were available for up to 20 percent of eligible capital costs of approved projects (or up to 30 percent of costs for electricity generation projects). The maximum grant available was C\$25 million. Grant disbursements were made against incurred and paid eligible project costs. Under the FSPF, C\$71.5 million in grants were approved, and C\$61.7 million was disbursed.[166] Additionally, we reviewed this program during our verification of Resolute's questionnaire responses. We reviewed the full listing of disbursements of funds for each of the four projects for which Resolute received funds under the

---

[164] *Id.* at 25-26.
[165] *See* GOO Verification Report at 6.
[166] *Id.* at 4.

FSPF and tied all of the grant information to the company's financial accounts.[167]

We determine that grants from the GOC under the FSPF constitute a financial contribution in the form of a direct transfer of funds from the government, and bestow a benefit within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act and 19 CFR 351.504(a).  We also determine that this program is specific under section 771(5A)(D)(iv) of the Act because the grants provided under the program are limited to projects in northern or rural Ontario.

Because Resolute does not receive these benefits on an on-going basis, we are treating these subsidies as a non-recurring grant.  Additionally, we conducted the "0.5 percent test" pursuant to 19 CFR 351.524(b)(2).  We found that the amount of assistance was greater than 0.5 percent of Resolute's relevant sales in the year of approval.  Therefore, for the grant related to the project at Resolute's Fort Frances mill, we allocated the total benefit over the AUL using the discount rate discussed above in the "Loan Interest Rate Benchmarks and Discount Rates," to determine the amount attributable to the POI.  We then divided the POI benefits by Resolute's total sales during the POI.  On this basis, we determine that Resolute received a net countervailable subsidy of 0.10 percent *ad valorem* under this program.  For further discussion of the comments and arguments submitted with regard to this program in the case and rebuttal briefs, *see* Comment 20, below.

### 11. Subsidies Discovered During the Course of Verification

As discussed above, the Department determines, based on AFA, that subsidies from the GOC to Resolute and its cross-owned affiliates that were discovered during the course of verification are countervailable.  For purposes of this final determination, we have identified three potenital programs that Resolute benefitted from during the POI.

The first is the C$14,291,000 that GNS paid to Resolute to satusfy an outstanding liability.[168]  We further note that there was a post-closing amount of C$3,773,000 owed by Resolute to the GNS.[169]   As noted above, we are finding, as AFA, that the net amount conferred a benefit to Resolute, and we have treated the C$10,518,000 (14,291,000 - 3,773,000) as a non-recuring grant.  We conducted the "0.5 percent test" pursuant to 19 CFR 351.524(b)(2) and found the amount of assistance was less than 0.5 percent of Resolute's relevant sales in the year of approval.  Thus, this amount expenses in the year received and does not have a measurable benfit during the POI.  For the outstanding C$3,773,000 owed by Resolute to the GNS, we have treated it as a contingent liability interest-free loan and used a long-term interest rate benchmark to calculate a benefit.[170]  We divided the benfit by Resolute's total sales for the POI and note there is no measurable benefit.[171]

---

[167] *See* Resolute Verification Report, at 7.
[168] S*ee* GNS Verification Report, at 14.
[169] *See id.*
[170] *See* 19 CFR 351.505(d).
[171] *See* Resolute Final Calculation Memo.

For the subsidies discovered at Resolute's verification, we have identified the remaining two programs that we find, as AFA, to provide a financial contribution, to be specific, and to confer a benefit.[172]  Our identification relies on BPI information and is dicussed in the *Resolute Final Calculation Memo*.  With regard to our methodology for slecting an AFA rate, the Department applies the highest calculated rate for the identical program in the investigation if a responding company used the identical program, and the rate is not zero.  If there is no identical program match within the investigation, or if the rate is zero, the Department uses the highest non-*de minimis* rate calculated for the identical program in another CVD proceeding involving the same country.  If no such rate is available, the Department will use the highest non-*de minimis* rate for a similar program (based on treatment of the benefit) in another CVD proceeding involving the same country.  Absent an above-*de minimis* subsidy rate calculated for a similar program, the Department applies the highest calculated subsidy rate for any program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating companies.[173]

In the instant proceeding, we were unable to find an identical program in the investigation or in another proceeding with a *non-de minimis* rate.  Thus, we have used a program that is simlar in terms of treatment of the subsidy (*e.g.*, a grant).  As such, we are relying on the rate of 8.55 percent calculated in the *1ˢᵗ Review of Pure and Alloy Magnesium* for "Article 7 Grants from the Quebec Industrial Development Corporation," a program that provides assistance in the form of grants.[174]  Consistent with the Department's practice, this is the highest non-*de-minimis* rate for a similar program in a Candian proceeding.[175]  Therefore, we are applying a total combined rate of 17.10 (8.55 x 2) percent *ad valorem* to these two discovered programs.  Interested parties have commented on the countervailability of these discovered subsidies, which we address at Comment 17.

### 12. GNS Preferential Electricity Rate for Port Hawkesbury

The petitioner alleged that Nova Scotia Power, Inc. (NSPI) provides electricity to Port Hawkesbury for less than adequate remuneration (LTAR).

The provision of electricity within Nova Scotia is governed by the following legislation and regulations:  (1) *Public Utilities Act*; (2) *Utility and Review Board Act*; (3) *Electricity Act*; (4) *Maritime Link Act*; (5) *Renewable Electricity Regulations*; (6) *Renewable Electricity Retail Sale Regulations*; (6) *Wholesale Market Rules Regulations*; (7) *Board Regulatory Rules*: (8) *Utility and Review Board Regulations*; (9) *Public Utilities Rules*; and (10) *Maritime Link Cost Recovery Process Regulations*.[176]  The Nova Scotia Department of Energy is responsible for setting the

---

[172] *See* Resolute Verification Report at 8.
[173] *See id.*; *see, also, Thermal Paper from the PRC*  and accompanying IDM at "Selection of the Adverse Facts Available Rate."
[174] *See 1ˢᵗ Review of Pure and Alloy Magnesium*, 62 FR 13857.  The AFA rate relied upon by the Department for grant programs has changed since the *Preliminary Determination* because the Department has had additional time to review past CVD determinations involving Canada to identify a more appropriate rate under the Department's methodology.
[175] *See Pipe form Turkey* and accompanyin IDM at 5 – 7.
[176] *See* GSQR at NS.XIII-4.

policy and legislative framework for Nova Scotia's electricity system.[177]  The Minister of Energy may establish and administer policies, programs, standards, codes of practices, directives, and approval processes pursuant to the *Electricity Act*.[178]

The Nova Scotia Legislature has delegated regulatory oversight for the sale of electricity to the Nova Scotia Utility and Review Board (NSUARB) which was established pursuant to the *Utility and Review Board Act of 1992*.[179]  The NSUARB is an independent agency of the Government of Nova Scotia.[180]   The Minister of the Department of Economic and Rural Development and Tourism is responsible for the *Utility and Review Board Act*, which is the legislation that establishes the governance, structure and mandate of the NSUARB.[181]  The NSUARB reports to the Nova Scotia Legislature through the Minister of Economic and Rural Development and Tourism.[182]  Pursuant to the *Public Utilities Act*, the NSUARB exercises general supervision over all electric utilities operating as public utilities within the Province of Nova Scotia.  This jurisdiction includes setting rates, tolls and charges; regulations for the provision of service; approval of capital expenditures in excess of C$250,000; and any other matter the NSUARB feels is necessary to properly exercise its mandate.[183]  In addition, the annual rate of return for public utilities is determined by the NSUARB.[184]

The NSUARB's rules for regulation of the electricity market in Nova Scotia are provided in the *Board Regulatory Rules*, the *Public Utilities Rules*, and the *Utility and Review Board Regulations*.[185]  Under section 5(1) of the *Utility and Review Board Act*, the Governor in Council of the Province of Nova Scotia appoints the members of the NSUARB.  The Governor in Council is required under section 6(1) of the *Utility and Review Board Act* to designate the Chair and the Vice-Chair of the NSUARB.

Pursuant to the *Public Utilities Act*, NSPI, an investor-owned public utility, generates, transmits and distributes electricity throughout the Province of Nova Scotia.[186]  NSPI is the successor to the Nova Scotia Power Corporation (NSPC), a crown corporation owned by the Province of

---

[177] *See* "Nova Scotia – US Comparator: Standard-Making and Enforcement Functions" Nova Scotia Utility and Review Board, October 9, 2014 at page 1 at Attachment 16 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

[178] *See*, *e.g.,* Section 2B of the *Electricity Act* provided as GSQR at Exhibit NS-EL-3.

[179] *See* GSQR at NS.XIII-2.

[180] *See* GSQR at NS.XIII-2.

[181] *See* "Nova Scotia – US Comparator: Standard-Making and Enforcement Functions" Nova Scotia Utility and Review Board, October 9, 2014 at page 1 at Attachment 16 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

[182] *Id.*

[183] *See*, *e.g.,* GSQR at NS.XIII-2; *Public Utilities Act* provided as Exhibit NS-EL-1; Nova Scotia Utility and Review Board "Electricity" at Attachment 17 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

[184] *See* GSQR at Exhibit NS-EL-1, section 45 of the *Public Utilities Act.*

[185] *See* GSQR at NS.XIII-3.

[186] *See*, *e.g.,* Nova Scotia Utility and Review Board "Electricity" at Attachment 17 of the July 2, 2015, Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

Nova Scotia.[187]  The powers, rights, privileges and obligations of public utilities such as NSPI are explicitly set forth by the GNS in law and regulation.

On September 6, 2011, NPPH sought protection under the *CCAA* and suspended operations at the Point Hawkesbury mill.[188]  On September 28, 2012, PWCC restarted the SC paper production line.[189]  Throughout the *CCAA* process, PWCC negotiated with NSPI to establish an electricity rate that would allow it to reopen the mill.[190]  The result of these discussions was the development of a Load Retention Rate (LRR) that met PWCC's requirements and received approval from the NSUARB on September 27, 2012.[191]  During the POI, Port Hawkesbury was under the LRR.

Under section 771(5)(B) of the Act, a subsidy is described as a case in which an authority provides a financial contribution or entrust or directs a private entity to make a financial contribution.  Under section 771(5)(B) of the Act, an "authority" is defined as a government of a country or any public entity within the territory of the country.   Based on the information on the record, we determine that both the GNS and the NSUARB are "authorities" because they meet the definition of a "government" under section 771(5)(B) of the Act. For further information on this determination, please see Comment 10 of this memorandum.

*Determining Financial Contribution*

Under section 771(5)(B)(iii) of the Act, a subsidy is bestowed when an authority entrusts or directs a private entity to make a financial contribution, if providing the financial contribution would normally be vested in the government and the practice does not differ in substance from the practices normally followed by governments.  Under section 771(5)(D), the term "financial contribution" means (i) the direct transfer of funds; (ii) foregoing or not collecting revenue that is otherwise due; (iii) providing goods or services; or (iv) purchasing goods.  Therefore, under the Act, if an authority entrusts or directs a private entity to either (i) provide a direct transfer of funds such as a loan; (ii) forego revenue; (iii) provide a good or a service; or (iv) to purchase a good, then under section 771(5)(B)(iii) of the Act, a financial contribution has been made and a subsidy has been conferred if that financial contribution provides a benefit.
It is important to remember that financial contribution and benefit, as well as specificity, constitute separate and distinct types of analysis. In determining whether a financial contribution has been provided under section 771(5)(B)(iii) of the Act, we cannot comingle that determination with the analysis of whether that financial contribution has provided a benefit.
The *SAA* makes explicit reference and provides explicit directions as to when Commerce will find that a private party has made a financial contribution within the meaning of section 771(5)(B)(iii).  The SAA states:

---

[187] *Id.*
[188] *See* PQR at 6.
[189] *See* PQR at 5. *See, also,* PSQR Exhibit 43-1, NSPI 2014 Load Forecast at 29 and PQR at 51 (At that time, PWCC also chose not to restart the newsprint production line, reducing the annual electricity demand of the facility by 35 percent).
[190] *See* PQR at 3.
[191] *Id.*

In the past, the Department of Commerce (Commerce) has countervailed a variety of programs where the government has provided a benefit through private parties. *(See, e.g., Certain Softwood Lumber Products from Canada, Leather from Argentina, Lamb from New Zealand, Oil Country Tubular Goods from Korea, Carbon Steel Wire Rod from Spain, and Certain Steel Products from Korea).* The specific manner in which the government acted through the private party to provide the benefit varied widely in the above cases. Commerce has found a countervailable subsidy to exist *where the government took or imposed (through statutory, regulatory or administrative action) a formal, enforceable measure which directly led to a discernible benefit being provided to the industry under investigation.*

In cases where the government acts through a private party, such as in *Certain Softwood Lumber Products from Canada* and *Leather from Argentina* (which involved export restraints that led directly to a discernible lowering of input costs), the Administration intends that the law continue to be administered on a case-by-case basis consistent with the preceding paragraph.[192]

Thus, there may be a number of ways in which an authority can act through a private party to provide a financial contribution. The *SAA* also establishes that the circumstances by which the government acts through a private party can vary widely, and that Commerce must examine these circumstances, and the relevant evidence, on a case-by-case basis. The *SAA* also states that the "entrusts or directs" standard must be interpreted broadly.[193]

During the POI, the electricity consumed by Port Hawkesbury was provided by NSPI. Pursuant to the *Public Utilities Act*, NSPI is an investor-owned public utility that generates, transmits and distributes electricity throughout the Province of Nova Scotia.[194] As discussed in detail below, NSPI is providing this electricity at the entrustment or direction of the GNS. We find that this provision of electricity falls within the definition of a financial contribution under section 771(5)(D)(iii) of the Act because the provision of electricity is the provision of a good or service, other than general infrastructure.

While the provision of electricity is the provision of a good or service, the information on the record shows that NSPI is a private company. Because NSPI is a private company, in order for its provision of electricity to Port Hawkesbury to potentially give rise to a countervailable subsidy to Port Hawkesbury, the Department must consider two factors under section 771(5)(D)(iii) of the Act: whether an authority entrusted or directed NSPI to make a financial contribution to our respondent, Port Hawkesbury, and whether the provision of this financial contribution (provision of electricity) would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments. Again, the determination of whether a financial contribution has been provided (*i.e.*, the provision of electricity to Port Hawkesbury) is separate from the determination as to whether that financial contribution has conferred a benefit to Port Hawkesbury under section 771(5)(E) of the Act (*i.e.*,

---

[192] *See* SAA accompanying H.R. 5110, H.R. Doc. No. 316, 103d Cong., 2d Sess. 911, 926 (1994) (emphasis added).
[193] *Id.*
[194] *See* Nova Scotia Utility and Review Board "Electricity" at Attachment 17 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

whether the price of electricity for Port Hawkesbury under the LRR is for less than adequate remuneration).

To analyze whether NSPI has been entrusted or directed to provide a financial contribution to Port Hawkesbury within the meaning of section 771(5)(D)(iii) of the Act, we first reviewed the laws and regulations that govern the provision of electricity within Nova Scotia.

NSPI is the successor to the Nova Scotia Power Corporation (NSPC), a Crown (*i.e.*, government-owned) corporation owned by the Province of Nova Scotia.[195]  The provincial government of Nova Scotia, following the lead of several other Canadian provinces in establishing Crown electrical utilities, created its own Crown utility company in 1919 with the creation of the Nova Scotia Power Commission (Power Commission).[196]  The Power Commission grew throughout the 1920s to the 1960s as private and municipally-owned electrical utilities in Nova Scotia went bankrupt and sold their assets to the Power Commission.[197]  In 1972, the Power Commission and the utility company Nova Scotia Light and Power Company of Halifax were amalgamated to create the government-owned NSPC.[198]

In the wake of the OPEC oil crisis in the 1970s, the GNS decided to switch from imported oil to Cape Breton coal as Nova Scotia's primary source of electricity generation.  New coal power plants were built, mostly in Cape Breton to be close to the mines.  With this transition from imported oil to provincial coal, the debt of the Crown corporation NSPC grew as it sought to limit the impact of the rising costs of generating and supplying electricity to its customers.  By the early 1990s, NSPC's debt reached a level that the provincial government was no longer willing to bear.[199]  On January 9, 1992, the GNS announced its intention to sell a controlling interest in NSPC and thereby privatize the Crown corporation.  The *Nova Scotia Power Privatization Act* provided for the reorganization of NSPC and creation of NSPI, and for the transfer of the assets of NSPC, except the sinking fund assets in respect of the public debt of NSPC, to NSPI as a going concern.  The privatization process was completed on August 12, 1992.[200]

In that same year, 1992, when the GNS privatized the Crown-owned utility company and NSPI was created, the GNS also amended the *Public Utilities Act* and the *Utility and Review Board Act* of 1992 created the NSUARB.

NSPI is defined as a "public utility" under both the *Public Utilities Act* and the *Electricity Act*.[201]  Under the *Public Utilities Act*, the GNS has set forth by law numerous directions with respect to

---

[195] *Id.*
[196] *See* NSPI "Our History" at Attachment 18 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.
[197] *Id*.
[198] *Id*.
[199] *Id.*
[200] *See* Nova Scotia Utility and Review Board "Electricity" at Attachment 17 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.
[201] *See* section 2(e) of the *Public Utilities Act* and section 2(1)(ab) of the *Electricity Act*.

NSPI's service requirements, costs, tariff rates, and equity/ownership requirements.  Among these statutorily-enforced government directives are:

- General supervision of all public utilities (section 18).
- An ordered independent savings review of NSPI (section 34A).
- Approval of any improvement over C$250,000 (section 35).
- In an application by NSPI for approval of rates, tolls and charges or in ascertaining and determining what are proper and adequate annual rates of depreciation of NSPI's property, the NSUARB shall include in its determination of the company's rate base and revenue requirement the capital and operating costs of its generation and transmission plant or like facilities in accordance with generally accepted accounting principles (section 36(2)).
- The NSUARB may ascertain and determine the proper and adequate annual rates of depreciation (section 38(4)).
- In fixing rates, tolls and charges to be paid to NSPI for any service, the NSUARB shall include proper allowance for depreciation (section 41).
- The NSUARB will fix and determine a separate rate base for each type or kind of service furnished, rendered or supplied to the public by NSPI (section 42(1)).
- Where NSPI furnishes, renders or supplies more than one type or kind of service, the NSUARB will segregate such types or kinds of service into distinct classes or categories of service and require a rate base for each distinct class or category of service (section 43).
- The NSUARB will set NSPI's annual rate of return (section 45).
- The NSUARB has the power to compel NSPI to comply with the provisions of the *Public Utilities Act* (section 46).
- NSPI is required to furnish service and facilities reasonably safe and adequate in all respects just and reasonable (section 52).
- NSPI cannot abandon any part of its line or lines, or works without consent (section 53).
- NSPI cannot sell, assign or transfer the whole of its undertaking, or any part thereof to any person or corporation except with the approval of NSUARB (section 62).
- NSPI cannot charge, demand, collect or receive any compensation for any service performed without its schedule of rates, tolls and charges approved by NSUARB (section 64).
- NSPI cannot be granted a general rate increase to take effect sooner than twenty-four months following the effective date of the last preceding general rate increase (section 64A(2)).
- The recovery of executive remuneration of executive employees of NSPI is proscribed (section 64B).
- All tolls, rates and charges shall always, under substantially similar circumstances and conditions in respect of service of the same description, be charged equally to all persons at the same rate, and NSUARB may by regulation declare what shall constitute substantially similar circumstances and conditions (section 67(1)).
- NSPI cannot charge, demand, collect or receive a greater or less compensation for any service performed by it other than those proscribed by the scheduled rates approved by

NSUARB; and NSPI cannot demand, collect or receive any rates, tolls or charges not specified with that schedule (section 71).

- NSPI cannot issue any shares, stocks, bonds, debentures or any evidence of indebtedness payable in more than one year without approval of the NSUARB (section 74(1)).

- Where new shares are required to be offered to the shareholders, they will be offered at such price as determined by NSUARB (section 74(9)).

- NSPI will undertake cost-effective electricity efficiency and conservation activities that are reasonably available in an effort to reduce costs for its customers (section 79I(1)).

As is clear from the *Public Utilities Act*, the GNS controls and directs the methodology that NSPI has to use in rate proposals, and any rate that is charged by NSPI must be approved by the NSUARB.  More importantly, with respect to the entrustment or direction of NSPI to provide a financial contribution under section 771(5)(B)(iii) of the Act, NSPI is required by law to provide electricity to customers who request it anywhere in Nova Scotia.[202]  That is, NSPI is obligated under the laws of the Province of Nova Scotia to serve any resident or company within the Province and to provide electricity to that customer.[203]  This is a legal obligation that does not exist in some other markets.  In deregulated or totally open markets, power companies can chose to provide service only when it makes economic sense to do so.[204]

In determining whether there is entrustment or direction of a private party to provide a financial contribution, section 771(5)(B)(iii) of the Act requires that the provision of the financial contribution would normally be vested in the government and that the practice does not differ in substance from practices normally followed by the government.  The provision of a good or service is defined as a financial contribution under section 771(5)(D)(iii) of the Act.  Therefore, the provision of a good or service such as the provision of electricity is a type of financial contribution provided by a government.[205]  As explained below, because of the nature of electricity and Nova Scotia's experience, we find that the provision of electricity, which satisfies the definition of financial contribution under section 771(5)(D)(iii) of the Act, would normally be vested in the government, and that the provision does not differ substantively from the normal practices of the government.

The GNS first provided electricity within the Province through a Crown corporation in 1919, and continued to provide electricity through a government-owned utility company until 1992, when the Crown Corporation, NSPC, was privatized and NSPI was created.  Utility companies that

---

[202] *See, e.g.*, section 52 of the *Public Utilities Act*; "Regulating Electric Utilities – Discussion Paper Phase One Governance Study- Liberalization and Performance –Based from the Province of Nova Scotia at 3 at Attachment 30 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.
[203] *Id*. at 6.
[204] *Id.* at 3.
[205] *See, e.g.*, "Creating Competition & Mastering Markets: New Entrants, Monopolists and Regulators in Transforming Public Utilities Across the Atlantic;" "Imprudent Power Construction Projects:  The Malaise of Traditional Public Utility Policies;" "Public Utilities;" and "Universal Service In Competitive Retail Electric Power Markets: Whither the Duty to Serve?"  at Attachments 8, 13, 23, and 35 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

provide electricity are generally regarded as providing services which are public in nature because they comprise the foundation of economic development and furnish households with essential services.[206]  Furthermore, the public sees electricity as an essential service and a fundamental right.[207]  Quite often, public utilities such as electricity are not owned and operated by a government; however, even if the utility company is not owned by a government, it still is said to be "affected with a public interest" and subject to a degree of government regulation from which other businesses are exempt.[208]  In such situations, the utilities often operate as a monopoly in their markets under a license or franchise, and are required to render adequate services at reasonable prices to all who apply for service.[209]

The GNS directs NSPI by law to provide electricity to all companies in the Province including Port Hawkesbury.  Therefore, the provision of electricity by NSPI to Port Hawkesbury satisfies the standard of entrustment or direction under section 771(5)(B)(iii) of the Act.  As a result we determine that that Port Hawkesbury has received a financial contribution in the form of the provision of a good or service under section 771(5)(D)(iii) of the Act.

In addition to the statutory requirement through which the GNS entrusted or directed NSPI to provide a financial contribution in the form of a provision of a good or service to Port Hawkesbury, the record also demonstrates that the GNS played an essential role in the specific LRR that set the price for the electricity sold to Port Hawkesbury from NSPI.  Again, we clarify that the provision of the financial contribution, the provision of electricity, is separate from whether the individual electricity rate provided to Port Hawkesbury provides a benefit.  Thus, we are considering the extent to which the GNS entrusted or directed the creation of the LRR without regard to whether the resulting rate conferred a benefit.

As the Department stated in *DRAMs from Korea*, the Department interprets the "entrust or directs" language in 771(5)(B)(iii) to mean that, if a government affirmatively causes or gives responsibility to a private entity to carry out what might otherwise be a government subsidy function of the type listed in subparagraphs (i) to (iv) of section 771(5)(D), there would be a financial contribution.[210]  Thus, when the government executes a particular policy by operating through a private body, or when a government affirmatively causes a private body to act, such that one or more of the type of functions referred to in subparagraphs (i) to (iv) is carried out, there is entrustment or direction.  Moreover, in the case of an indirect subsidy, where the government is acting through a private party, it would make sense that the private party, and not the government itself, would fix the commercial terms.[211]  Accordingly, whether the terms are

---

[206] *See e.g.*, "Imprudent Power Construction Projects:  The Malaise of Traditional Public Utility Policies" at 512 at Attachment 30 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

[207] *See e.g.*, "The Future is Electric Remarks for Nova Scotia Electricity Week: at 3 at Attachment 33 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities

[208] *See* "What is Public Works" from the American Public Works Association at Attachment 37 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

[209] *Id.*

[210] *See DRAMs from Korea* and accompanying IDM at 47-48.

[211] *See id.*

sufficiently affected by government action so as to make the provision actionable is a factual element relevant to the measurement of "benefit," not "financial contribution."[212]

When NPPH filed for creditor protection under the *CCAA* on September 6, 2011, and suspended operation of the Point Hawkesbury paper mill on September 16, 2011, the GNS immediately started to develop a plan to help ensure that the paper mill reopened as a going concern.[213]  The Premier told the Nova Scotia Legislature that the GNS announced a seven-point plan designed to keep the paper mill in an operating condition so that a new buyer would be able to come in and bring the mill back on-line; this investment was made by the government to ensure that a new buyer had an asset that they were able to operate.[214]  The Premier also informed the Nova Scotia Legislature on April 25, 2012, that the government had done everything it could to get the mill reopened and that, since September of 2011, the GNS had invested more than $27 million to help ensure that the mill remained resale-ready for a new buyer.[215]  The Premier stated that the government was not going to sit idly by and let the mill close permanently, and that the Province would continue to work with NSPI to find a solution.[216]  While there were still a number of items to be worked out before the mill could be reopened, one of which was electricity rates, the Premier stated that he had spoken with the CEO of NSPI, and that he was confident that NSPI and PWCC were working together to build a plan that, once finalized, would go before the NSUARB for approval.[217]  The Premier further stated that he had asked PWCC and NSPI to file the necessary paperwork with the NSUARB to ensure that once an agreement was found, a timely hearing could take place in order to expedite the reopening of the mill.[218]

While the GNS was implementing its seven-point plan to keep the paper mill in operation and to maintain the mill in "hot idle" status for a new buyer, PWCC made it clear that it would not purchase and reopen the mill without a favorable rate for electricity.[219]  Therefore, in order for the GNS to successfully implement its plan to find a new buyer to reopen the paper mill, there had to be an agreement on electricity under an LRR.  The GNS stated that Port Hawkesbury would not exist if it had to pay any of the published electricity tariffs for industrial users.[220]  Thus, the LRR was the only means to get a new buyer to reopen the paper mill, the stated policy goal of the GNS.

---

[212] *See id.*

[213] *See, e.g.*, April 27, 2012 Letter to Peter W. Gurnham, Chair of the Nova Scotia Utility and Review Board from the GNS Minister of Natural Resources Subject Application by PWCC for a Load Retention Rate provided at Exhibit NS-SUPP1-33H.

[214] *See, e.g.*, The Nova Legislature House of Assembly Debates and Proceedings Third Session Tuesday, November 1, 2011 at 27/56 provided in Exhibit NS-SUPP1-102.

[215] *See e.g.*, The Nova Legislature House of Assembly Debates and Proceedings Forth Session Wednesday, April 25, 2012 at 5/48 provided in Exhibit NS-SUPP1-102

[216] *See id.*

[217] *See id.*

[218] *See id.*

[219] *See, e.g.*, March 13 2012 Letter to Nova Scotia Utility & Review Board Re Application pursuant to Nova Scotia Power Inc.'s Load Retention Tariff from McInnes Cooper, counsel for PWCC

[220] *See, e.g.*, July 7 2015 GOC Supplemental Questionnaire response 19 and 53.

To this end, the GNS worked closely with both NSPI and PWCC to address the issue of high electricity costs to the mill.  As part of the GNS's involvement in negotiations relating to the re-opening of the mill, the Province hired and bore the cost of a C$400 per hour consultant, Navigant Consulting, to help facilitate the discussions between PWCC and NSPI and to provide advice and technical support to both of these parties in designing and negotiating an LRR that could be delivered to the NSUARB for approval.[221]  After the LRR was negotiated and submitted to the NSUARB for approval, Navigant Consulting provided evidence and testimony to the NSUARB on behalf of the GNS in support of the LRR.[222]

Even before its final approval of the LRR which set this specific electricity rate for Port Hawkesbury as required under the *Public Utilities Act*, the NSUARB played a critical role in the process leading up to PWCC and NSPI filing the request for approval of the LRR.[223]

On May 24, 2000, the NSUARB passed a decision that created a Load Retention Tariff (LRT) to retain companies on the electric system that sought alternative means of generation.[224]  The purpose of this provision was to offer companies a lower rate from the standard industrial tariff to induce them to remain being served by NSPI instead of moving towards co-generation facilities resulting in loss of load for NSPI.  The NSUARB revised this decision in 2011 when the two paper companies, NPPH and Bowater, faced financial difficulties.  On June 22, 2011, NPPH and Bowater filed an application with the NSUARB to change the pre-existing LRT to make it available to a company facing "impending business closure due to economic distress" and to allow for an LRR for a company in economic distress.[225]  Without this policy change by the NSUARB to allow for an LRR for business closure due to economic distress—a policy which was created to address the financial problems of the Provincial paper mills—our respondent, Port Hawkesbury, would not have qualified for an LRR under the laws and regulations governing the electricity market in Nova Scotia.

On March 13, 2012, PWCC informed the NSUARB that as part of its planned acquisition for the NPPH paper mill, it required an electricity rate for the mill that would allow it to be a viable long-term operation.[226]  PWCC reminded the NSUARB that the paper mill had ceased manufacturing paper for economic reasons and was in hot idle status awaiting potential resumption of production.[227]  The mill required an LRR in order for the proposed acquisition by PWCC to occur and for the mill to restart.[228]  Therefore, PWCC requested pursuant to Clauses 2 and 3 of Attachment A of the Load Retention Tariff, the NSUARB to direct NSPI to conduct a

---

[221] *See* Exhibit NS-SUPP1-33K and Exhibit NS-SUPP1-32B at Schedule B.

[222] *See* Exhibit NS-SUPP1-33L and Exhibit NS-SUPP1-33M.

[223] As discussed above, we find that it was the GNS itself that entrusted or directed NSPI to provide electricity to Port Hawkesbury.  However, because we also find that the NSUARB is an authority within the meaning of section 771(5)(B) of the Act, notwithstanding its relative independence from the rest of the GNS, we have considered the extent to which that authority also entrusted or directed NSPI to provide a financial contribution.

[224] *See* PQR Exhibit 23-5.

[225] *See* PQR Exhibit 23-6 at para.1.  The LRT is a framework of rules that govern an LRR.

[226] *See* March 13 2012 Letter to Nova Scotia Utility & Review Board Re Application pursuant to Nova Scotia Power Inc.'s Load Retention Tariff from McInnes Cooper, counsel for PWCC.

[227] *Id.*

[228] *Id.*

screening to determine whether an implementation of an LRR was warranted.[229]  On March 14, 2012, the NSUARB directed NSPI to conduct that screening.[230]  When the NSUARB approved an LRR for Port Hawkesbury, it concluded that that the LRR was needed in order for the mill to reopen and afford it the prospect of long-term viability.[231]  The GNS also made a commitment to the NSUARB that if the mill load of Port Hawkesbury triggered an additional Renewable Electricity Standard (RES) obligation during the term of the proposed LRR mechanism, and if that resulted in additional incremental costs, then the GNS would guarantee that neither Port Hawkesbury nor any other ratepayers would be required to pay these costs.[232]  With the final approval of the LRR for Port Hawkesbury, the sale of the paper mill was completed and the mill reopened, completing a one-year effort to finalize the policy goal of the GNS to find a new owner of the NPPH mill and to reopen the mill.[233]

According to independent analysis of the NSUARB published in *Energy Regulation Quarterly*, the NSUARB has taken its role as an agent of government policy very seriously, while insisting that the government express its policy in legislation; however, the NSUARB has been sensitive to the broader policy context that surrounds the issues that come before it, such as the impact of electricity costs on Nova Scotia's troubled pulp and paper industry and the importance of these pulp and paper mills, such as Port Hawkesbury, to the economy of the rural communities in Nova Scotia.[234]  With respect to the LRR rate specifically provide for Port Hawkesbury, independent analysis indicates that the NSUARB has had to strike a balance between "traditional ratemaking" and the economic, social and political realities that must be accommodated within regulation.[235]

Therefore, not only did the GNS entrust or direct NSPI to provide a financial contribution to Port Hawkesbury in the form of a provision of a good or service within the meaning of section 771(5)(D)(iii) of the Act, the GNS also worked to ensure that the provision of that good or service, the provision of electricity, would be at a specially-designed LRR rate for the respondent.  The NSUARB also exercised its authority to provide LRRs to companies in economic distress.   Next we address whether this LRR rate provided to Port Hawkesbury is specific.

---

[229] *Id.*

[230] *See* March 14 2012 Letter to NSPI from NSUARB Re Application pursuant to Nova Scotia Power Inc.'s Load Retention Tariff P-202/Mater No. MO4862.

[231] *See, e.g.*, July 7 2015 GOC Supplemental Questionnaire response 52.

[232] *See* Exhibit NS-SUPP1-32A.

[233] We also note that in addition to providing Port Hawkesbury with the LRR in order to ensure that the company receives electricity for LTAR, the GNS also provided a large package of subsidies that greatly exceeded the $33 million paid by Port Hawkesbury for the NPPH paper mill.

[234] *See* "The Contributions of Utilities Regulation to the Electricity Systems Transformation: the Case of Nova Scotia"  Energy Regulation Quarterly, November 2014 – Volume 2, Fall 2014 at Attachment 32 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

[235] *Id.*

*Determining Specificity*

When determining whether a program is countervailable, we must examine whether it is an export subsidy or whether it provides benefits to a specific enterprise, an industry, or group thereof, either in law (*de jure* specificity) or in fact (*de facto* specificity) pursuant to section 771(5A) of the Act. The provision of the LRR was approved for and expressly limited to one company, Port Hawkesbury. Therefore, we determine that this program is specific under section 771(5A)(D)(i) of the Act.

*Determining the Appropriate Benchmark*

Generally, pursuant to 19 CFR 351.511(a)(2), the Department determines whether a good or service is provided for LTAR by comparing, in order of preference: (i) the government price to a market-determined price for actual transactions within the country such as prices from private parties (a "Tier 1" benchmark); (ii) the government price to a world market price where it would be reasonable to conclude that such a world market price is available to consumers in the country in question (a "Tier 2" benchmark); or (iii), if no world market price is available, by assessing whether the government price is consistent with market principles (a "Tier 3" benchmark).

   *Tier 1 Benchmarks*

With respect to a Tier 1 Benchmark for the provision of electricity, NSPI is the primary electric utility company in Nova Scotia providing electricity to most provincial consumers,[236] with independent power producers generating a minimal amount of electricity by comparison and supplying that electricity over NSPI's transmission and distribution network.[237] Furthermore, the GNS regulates the rates that NSPI charges for electricity through the NSUARB. When the government provider constitutes a majority or a substantial portion of the market, the Department determines that prices within the country are distorted, that these prices do not satisfy the regulatory requirement for a market-determined price and, therefore, cannot be used as a benchmark for determining the adequacy of remuneration.[238] We have determined that the GNS is providing electricity through NSPI to most consumers of electricity in Nova Scotia. Accordingly given that NSPI is entrusted or directed to provide electricity throughout Nova Scotia, electricity prices in Nova Scotia are not appropriate Tier 1 benchmarks.

---

[236] *See* GSQR at NS.XIII.9 and Exhibit NS-EL-17 at DE-03/DE-04 Appendix H at 9 (NSPI provides 95 percent of the total electrical consumed in Nova Scotia.). *See, also,* GSQR at NS.XIII.7 (There are also six regulated municipal electric utilities which either source electricity from NSPI generation, Independent Power Producers or self-generate.).

[237] *See* GSQR at Exhibit NS-EL-17 at DE-03/DE-04 Appendix L at 4.

[238] *See CVD Preamble,* 63 FR at, 65377: "We normally do not intend to adjust such prices to account for government distortion of the market. While we recognize that government involvement in a market may have some impact on the price of the good or service in that market, such distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market. Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market, we will resort to the next alternative in the hierarchy."

The respondents argue that the record contains benchmark information from Alberta and that the Department should use these prices as the basis for a Tier 1 benchmark.  However, 19 CFR 351.511(a)(2)(i) states that any Tier 1 price must be a price based on actual transactions, but the Alberta  price does not stem from an actual transaction.  Rather, it was constructed based on existing tariffs in Alberta as if Port Hawkesbury operated in that province.[239]  Furthermore, 19 CFR 351.511(a)(2)(iv) states that any Tier 1 benchmark must be a delivered price.  Specifically, Alberta electricity is not available, marketable, or transportable to the mill in Nova Scotia, because Nova Scotia's only inter-provincial electricity transmission connection is with New Brunswick.[240]   Further, electricity transmitted over long distances suffers from line losses which greatly inflate the electricity's price,[241] and there is no record evidence of individual provincial tariffs in place across any potential inter-provincial transmission corridor to transport electricity from Alberta to the Nova Scotia border.[242]  Finally, even if electricity from Alberta were available to Nova Scotia, the tariffs for this electricity would still be regulated by the NSUARB.  For all of these reasons, the electricity from Alberta is not appropriate as a benchmark for the purposes of 19 CFR 351.511(a)(2)(i).[243]

### Tier 2 Benchmarks

Pursuant to 19 CFR 351.511(a)(2)(ii), the Department will only use a Tier 2 benchmark based on world market prices where it is reasonable to conclude that the good or service is actually available to the purchaser in the country under investigation.  The Department has specifically stated that electricity prices from other countries are normally not available to purchasers in the country under investigation, due to the unique nature of electricity.[244]  NSPI has stated that there is no international cross-border transmission or distribution of electricity into Nova Scotia.[245]  Therefore, we determine that we cannot rely on world market prices as a benchmark for determining whether electricity is provided for LTAR.

---

[239] *See* Port Hawkesbury June 29, 2015, letter entitled "Supercalendered Paper from Canada – Benchmark Information and Pre-Preliminary Comments – Electricity" Exhibit 9a at 3.

[240] *See* GSQR Exhibit NS-EL-17 at DE-03/DE-04 Appendix L at 8.

[241] *See* PQR Exhibit 23-12 at PQR 3717 (describing how line loss increases with distance).

[242] The Open Access Transmission Tariff does cover the transmission of electricity from the Nova Scotia border to the customer, but it does not cover transmission costs (including significant line loss over the intervening distance) for the required transit from Alberta to the Nova Scotia border that such a transaction would incur. For a description of the Open Access Transmission Tariff *see* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 133.

[243] While there is inter-provincial transmission of electricity between Nova Scotia and New Brunswick, electricity from New Brunswick would not qualify as a Tier 1 benchmark because all tariffs for electricity in the Province are regulated by the NSUARB.

[244] *See CVD Preamble*, 63 FR at 65377:  "Paragraph (a)(2)(ii) provides that, if there are no useable market-determined prices stemming from *actual* transactions, we will turn to world market prices that *would be available* to the purchaser.  We will consider whether the market conditions in the country are such that it is reasonable to conclude that the purchaser could obtain the good or service on the world market.  For example, a European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be available to consumers in Latin America."

[245] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XIII, NS.XIII-9 and GNS Verification Report at 20.

*Tier 3 Benchmarks*

Because there are no Tier 1 or Tier 2 prices that satisfy the regulatory requirements, we determine that it is appropriate to rely on the final alternative in the benchmark hierarchy set forth under 19 CFR 351.511(a)(2)(iii) *i.e.*, to determine whether the government price is consistent with market principles.[246]  We have done so in this case by assessing whether the prices charged under the LRR are established in accordance with market principles through an analysis of factors including price-setting philosophy, costs (including rates of return sufficient to ensure future operations), and possible price discrimination in the rate making.[247]

The NSUARB oversees most electricity ratemaking in Nova Scotia using standard rate of return regulation, which sets a reasonable return on common equity electricity generation, transmission, and distribution as determined by a cost-of-service methodology.[248]  The NSUARB evaluates proposed rates, holds an adversarial hearing, and adjusts proposed rates and tariffs to balance the needs of ratepayers and other stakeholders.  When applying to the NSUARB for rate approval, NSPI submits complex analyses of its expected cost, revenue, and demand structure during the rate-setting process for each tariff, as well as current period financial statements to support its suggested price structure.[249]  Various parties are often involved in requesting tariff designs and take part in the application approval process for setting prices under the existing tariffs.[250]

---

[246] *See CVD Preamble*, 63 FR at 65378.

[247] *Id.* and *Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 30946, 30954 (July 13, 1992) (*Magnesium from Canada*) ("As a general matter, the first step the Department takes in analyzing the potential preferential provision of electricity – assuming a finding of specificity – is to compare the price charged with the applicable rate on the power company's non-specific rate schedule.  If the amount of electricity purchased by a company is so great that the rate schedule is not applicable, we will examine whether the price charged is consistent with the power company's standard pricing mechanism applicable to such companies.  If the rate charged is consistent with the standard pricing mechanism and the company under investigation is, in all other respects, essentially treated no differently than other industries which purchase comparable amounts of electricity, we would probably not find a countervailable subsidy.").

[248] *See* GSQR Exhibit NS-EL-1 at 14 (*Public Utilities Act* at section 45).  *See, also,*, GSQR Exhibit NS-EL-17 at DE-03/DE-04, Appendix H, at 5-7 for an explanation of the Fair Return Standard and supporting case precedent in Canada (A fair return gives a regulated utility the opportunity to 1) earn a return on investment commensurate with that of comparable risk enterprise; 2) maintain its financial integrity; and, 3) attract capital on reasonable terms and conditions).

[249] *See* GSQR at Exhibit NS-EL-17 at DE-03/DE-04 at 110-111. *See, also,* GSQR at NS.XIII.4-6 (NSPI forecasts its costs, adds a reasonable rate of return and "proposes these rates to NSUARB" either through the General Rate Application (GRA) or the Fuel Adjustment Mechanism (FAM).  The GRA application process is adversarial and often includes the Province as intervenor, the electric utility, and a customer advocate.  The process begins with cross-party written questioning, continues through a rate hearing, and ends with an NSUARB written decision and order.  FAM application procedures address over- or under-recovery of fuel costs, are adversarial, and consider an independent audit of actual versus forecast fuel costs.)  Further, regulated common equity must be maintained at nearly 40 percent of capitalization (regulated common equity plus long-term debt plus retained earnings).  *See, also,*, GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 117, and 126. Actual POI average common equity is 38.8 percent in NSPI's 2014 financial statement.  *See* GSQR Exhibit NS-SUPP1-36 at Attachment 1, p. 6.

[250] *See,* GSQR at Exhibit NS-EL-8 for the *Board Regulatory Rules – Utility and Review Board Act* at section 4(e) (describes intervenon as a person who establishes an interest in an application). *See, also,* GSQR Exhibit NS-EL-23 at 11 (the fact that there intervenors involved in the application for the Port Hawkesbury LRR).

Most electricity rates in Nova Scotia are "above-the-line" rates set using the cost-of-service methodology in which costs associated with forecast demand are allocated to each tariff class.[251] For example, residential class customers pay for the distribution system that is not required to serve large industrial customers with transmission level connections.  "Below-the-line" rates do not fully cover fixed costs nor contribute to the guaranteed return on regulated equity approved by the regulator.[252]

At the outset of the general rate setting process, a Load Forecast for the period at issue is calculated.  The Load Forecast yields electricity loads for each rate class according to expected demand.[253]  The Load Forecast is the basis for a Cost-of-Service Study (COSS) which calculates a revenue requirement equal to the sum of system-wide fixed costs, variable costs incident to the supply of "above-the-line" rates at the expected loads from the forecast, and the expected return on equity (ROE) due the electric company.[254]  Highly variable fuel costs are covered at expected prices, and fluctuations in those prices are covered by or refunded to each rate's customers in the future through rate adjustments stemming from the FAM.[255]

Next, expected revenues from "below-the-line" rate classes (which are usually negotiated separately or have been updated in the application and are not set according to the cost-of-service methodology) are subtracted from the revenue requirement.  These "below-the-line" revenues are calculated at the current price of the rate, including any current period changes proposed in the application.  Total expected system costs are then functionalized and allocated over the "above-the-line" rate classes considering the forecast load for each rate.  Total costs for each rate are calculated and compared to expected revenues based on existing tariff prices for each rate.  These outcomes yield revenue-to-cost ratios for each rate.

Next, a Revenue Analysis is conducted to determine the increase in revenue for each rate class to cover the revenue requirement (which at this point excludes the expected revenues of the "below-the-line" rates but includes ROE).  During this step, revenue-to-cost ratios for each "above-the-line" rate are set within a band of 95 to 105 percent of their respective costs.[256]  From these calculations the total shortfall from the existing rates are calculated, and rates are increased to cover the revenue requirement.[257]  This process yields the final proposed rate increases.

The electricity rate setting process in Nova Scotia usually includes a single increase; however, NSPI applied for approval of different tariff prices for both 2013 and 2014 simultaneously in 2012 because of significant upward price pressures related to the loss of some of its largest customers and conversion from coal-based generation to the use of renewable energy sources.[258]

---

[251] *See* GSQR at Exhibit NS-EL-17 at DE-03/DE-04 at 139-145, and at SR-01 Cost of Service Study Attachment 1 at 3 and SR-02 Load Forecast.
[252] *Id.* at Exhibit NS-EL-17 at DE-03/DE-04 at 139, and SR-01 Attachment 1 at 3.
[253] *See* GSQR at Exhibit NS-EL-17 SR-02 Load Forecast Attachment 1 at 4.
[254] *See* GSQR at Exhibit NS-EL-17 SR-01 Cost of Service Study Attachment 1 at 3-12.
[255] *See* GSQR at Exhibit NS-EL-17 at DE-03/DE-04 at 27.
[256] *Id.* at Exhibit NS-EL-17 at DE-03/DE-04 at 139-145, and at SR-01 Attachment 1 at 3-12.  These ratios are a normal part of cost-of-service rate-making in North America.
[257] This process rebalances the revenue-to-cost ratios across the individual rate.
[258] *See* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 8.

NSPI began addressing these price pressures in the prior general rate application for 2012 with a "Fixed Cost Recovery Mechanism,"[259] which deferred system-wide unrecovered costs (*i.e.*, those from "below-the-line" rates for recovery from "above-the-line" rate classes). For the 2012 rate year, rates were set with Bowater and NPPH contributing load and revenue. Unrecovered fixed costs from those "below-the-line" rates were not allocated to "above-the-line" rate classes during the year, but were deferred to 2013-2014, when these costs would be spread over all "above-the-line" rate classes.[260] This approach contrasted with the standard cost-of-service pricing mechanism in that it shifted costs from "below-the-line" rates to "above-the-line" rates, rather than shifting revenue pursuant to price setting in the COSS methodology or correcting for differences in expected versus actual fuel costs pursuant to a FAM.

That 2013/2014 General Rate Application (GRA), filed May 8, 2012, proposed rates for all customers by employing a Load Forecast that did not include the load for Port Hawkesbury's mill, included an LRR for Bowater as an operational mill,[261] and spread system-wide fixed costs over all "above-the-line" rate payers (minus expected revenues from "below-the-line" rate classes included in the application).[262] The 2013/2014 GRA also introduced a "Rate Stabilization Plan" to continue deferring a portion of the uncovered fixed costs incident to supplying the economically distressed pulp and paper industry with electricity at LRR prices.

The Rate Stabilization Plan created an additional step for the normal rate proposal process by holding "above-the-line" increases at three percent rather than the 5.4 percent demanded by its increased cost structure. It did so by factoring in under-recovered cost deferrals to the "above-the-line" rate classes from a 2010 FAM, Balance Adjustment,[263] which allowed NSPI to lower the "above-the-line" rates while keeping them at cost-to-revenue ratios of 95 to 105 percent in line with the cost-of-service methodology.[264] That adjustment did not distort the cost-of-service methodology because under a FAM, specific under- or over-recovered fuel expenses are tracked and charged or credited to the applicable individual "above-the-line" rate classes.[265] In this case, the shortfall in expected revenue was to be held as a regulatory asset by NSPI and spread over

[259] *Id.* at DE-03/DE-04 at 15, 26. The Fixed Cost Recovery mechanism was approved in the NSUARB's November 29, 2011, decision on the 2012 General Rate Agreement to defer lost fixed non-fuel cost contributions associated with the loss of load of NPPH and Bowater Mersey. By this method, "above-the-line" rates did not have to shoulder the fixed costs associated with those companies in 2012. At the time of the application, NSPI did not know if those facilities would operate. Accordingly, the unrecovered fixed costs were to be deferred and recouped in 2013 and 2014 based on actual figures.
[260] *See* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 15.
[261] Bowater was operational at the time application was submitted.
[262] *See* GSQR at Exhibit NS-EL-17 for the 2013/2014 GRA. For specifics of the 2014 LRR rates *see* GSQR at Exhibit NS-EL-17 DE-03 – DE-04 at 143 (section 11.4.3.3 establishes the Variable Incremental Rate, Contribution to Fixed Costs, and Energy Charge for 2014); Appendix P at 21-29 (reiterates terms of the LRR based on NSUARB September 28, 2012, LRT Order).
[263] *Id. at* Exhibit NS-EL-17 at DE-03/DE-04 at 8, 149-150; Exhibit NS-EL-17 at DE-03/DE-04, Appendix N at 11; and Exhibit NS-EL-17 at DE-03/DE-04 at 11. *See, also,* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 27.
[264] *Id.* at Exhibit NS-EL-17 at SR-01, Attachment 1, at 130 (Exhibit 10 – Revenue and Expense Comparison for 2014).
[265] *Id.* at Exhibit NS-EL-17 at DE-03/DE-04 at 27.

the 2015-2022 period;[266] however, revenue was greater than expected and alleviated the need for a deferral.

The Rate Stabilization Plan also extended the 2012 Fixed Cost Recovery Mechanism, which, as discussed above, was not consistent with the typical cost-of-service methodology.  In the 2013/2014 GRA, "above-the-line" rates covered their own costs and unrecovered system costs consisting of both the unrecovered fixed costs from "below-the-line" rates (*i.e.*, from Bowater's LRR) but also stranded costs[267] incident to the complete loss of load due to the closure of NPPH. NSPI curtailed output and idled some generation assets to generate variable cost savings and reduce total output, but the full system fixed costs still needed to be covered.  Accordingly, this continued to represent a departure from the standard cost-of-service methodology because it shifted costs from a "below-the-line" rate to the "above-the-line" rate pool.

The 2013/2014 GRA did not account for the Port Hawkesbury LRR application process that had begun in April 2012, and the Load Forecast excluded the Port Hawkesbury mill's load.  Under the 2011 amendments to the Load Retention Tariff (LRT), an LRR need only fully cover incremental, *i.e.*, variable costs, and make a contribution to fixed costs.[268]  The LRR approved for Port Hawkesbury was priced in this manner.  Accordingly, all system-wide fixed costs were covered regardless of the Port Hawkesbury LRR, even though those costs would include much of the fixed costs for Port Hawkesbury's unanticipated load.

The NSUARB approved Port Hawkesbury's LRR on September 27, 2012, issued a decision with respect to the 2013/2014 GRA on December 21, 2012, and issued an Order setting the rates for 2013 and 2014 on February 1, 2013.[269]  Because those rates were set without forecasting that revenue generated on Port Hawkesbury load would cover part of the revenue requirement, NSPI was in a position to over-recover fixed costs, even with the loss of Bowater's load.  However, it could not increase its profit margin beyond the permitted level of ROE and, instead, used the additional revenues to reverse planned deferrals and retire timely the 2012 balance of the Fixed Cost Recovery Mechanism, which set aside unrecovered fixed costs from 2012.[270].

With these cost principles and rate history in mind, we have considered whether any of the other rates established by NSPI are suitable for use as a Tier 3 benchmark.

---

[266] *Id.* at Exhibit NS-EL-17 at DE-03/DE-04 at 8.  (Some stranded costs are the result of previous capital expenditures to meet previously forecast demand growth which did not materialize due to the 2008 economic downturn, the slow subsequent recovery, and the unexpected shift to a much reduced level of demand from the paper industry in general.).

[267] Stranded costs represent redundant existing investments in infrastructure which must still be paid for (either as idled or at reduced output), *e.g.*, generation facilities built to serve paper industry load which is now much smaller than forecast.

[268] 2000 LRT modified by November 29, 2011, decision.

[269] *See* GSQR at Exhibit NS-SUPP1-30 (Order M04972).

[270] *See*, *e.g.*, GSQR NS-SUPP1- 36 at 3-4.

NSPI has tariffs for 12 "above-the-line" ratepayer classes in its 2014 schedule of rates.[271]  NSPI also has several "below-the-line" rate classes, including the Bowater LRR, which were approved by the NSUARB.[272]  Port Hawkesbury is connected to NSPI at the transmission level of the electrical grid with a 185,000 kV service.[273]  Port Hawkesbury owns its own transformers, receives its service on the high voltage side of the transformer, and does not have its own generation capacity.[274]  Under its previous owner, the paper mill used the Extra Large Industrial 2 Part Real Time Pricing (ELI2P-RTP) rate, which is an "above-the-line" rate.[275]  No ELI2P-RTP rate was set for the POI because no customers intended to use it.[276]  Among the other alternative pricing schedules available to large industrial customers, the GRLF did not apply to Port Hawkesbury,[277] no rate was set for the One Part Real Time Price for 2014 and rates applicable to Bowater Mersey were not applicable to Port Hawkesbury because they were only available to Bowater Mersey.[278]  In addition, although there was a Large Industrial rate in effect during the POI, Port Hawkesbury reported that its electricity consumption was so large that the Large Industrial rate would not apply to its electricity purchases.[279]  Thus, in 2014, other than the Port Hawkesbury LRR, there were no electrical tariffs applicable to a customer with an extra-large connection size in the NSPI rate schedule.

As guided by the *CVD Preamble*, we continue to determine that under their normal rate setting philosophy, the NSUARB and NSPI set "above-the-line" rates in accordance with market principles for regulated monopolies when the cost-of-service method is employed (including the FAM).  These rates fully incorporate the costs of fuel, generation, transmission, and distribution.  Under this method of rate setting, there is a sufficient guaranteed rate of return to ensure future operations because all costs are covered, and, in order to ensure adequate investment, investors are guaranteed a rate of return on equity that is competitive with similarly risky investments available in the market.

In *Magnesium from Canada*, the Department stated that "if the amount of electricity purchased by a company is so great that the rate schedule is not applicable, we will examine whether the price charged is consistent with the power company's standard pricing mechanism."[280]  As

---

[271] *See* GSQR Exhibit NS-EL-17 at DE-03 – DE04 Appendix P, Attachment 4, at 40-76 (above-the-line tariffs 2014).  *See, also,* GSQR at Exhibit NS-SUPP1-30 at Schedule D.
[272] *See* Order M04972 at Schedule D.  *See, also,*, GSQR Exhibit NS-EL-17 at DE-03 - DE-04 at 141 (stating that Mersey Basic, Mersey Additional Energy, Generation Replacement and Load Following (GRLF), and the LRT are "below-the-line" rates).  *See, also,* GSQR Exhibit NS-EL-17 at SR-01, Attachment 1, at 110 (Revenue Analysis 2014 Exhibit 7, (showing "below-the-line" rates as direct revenue and including real time pricing (albeit with no revenue).  This line item is for One Part Real Time Price but there was no planned usage during the POI).
[273] *See* PSQR at 33.
[274] *Id.*
[275] *See* GSQR Exhibit NS-EL-17 at DE-03/DE-04 at 128.
[276] *Id.* at Exhibit NS-EL-17 at DE-03/DE at 130 (Section 10.2.3 Suspension of ELI2P-RTP Rate Class).
[277] *See* PSQR Exhibit 43-1 at 39 (GRLF is for customers who have their own generation capacity of no less than 2,000 kV).
[278] *See* Order M04972 at Schedule D.  The Mersey Basic and Mersey Additional Energy rates discussed in the General Rate Agreement were not used during the POI because the General Rate Agreement was submitted prior to the June 2012 closure of Bowater Mersey.
[279] *See* PSQR at 32-33.
[280] *See Magnesium from Canada*, 57 FR 30946, 30954.

explained in detail above, "above-the-line" electricity rates set in Nova Scotia include all costs plus a programmed amount for ROE. "Below-the-line" rates in general do not cover all costs attributable to the load they represent and do not provide an appropriate level of ROE based on their proportion of the load. The LRT requires only that an LRR cover all incremental costs and contribute to fixed costs, as was the case for Port Hawkesbury's LRR. Accordingly, we determine that the "below-the-line" Port Hawkesbury LRR was not set by a market-determined method for a regulated monopoly and that, based on our analysis of costs, "below-the-line" rates do not include rates of return sufficient to ensure future operations by covering all costs and providing for profit. Therefore, consistent with 19 CFR 351.511(a)(2)(iii) and *Magnesium from Canada*, we determine that the Port Hawkesbury LRR was not set according to the standard pricing mechanism used by NSPI, *i.e.*, a cost-to-service methodology, and is not a market-determined price. Rather, the LRR is a "below-the-line" price that does not cover all fixed costs or profits.

Thus, in order to determine an appropriate Tier 3 benchmark, we have constructed a price that provides for complete coverage of fixed and variable costs, as well as a portion of ROE for profit using available information on the record. We started with the Port Hawkesbury LRR that covers all variable costs and makes a contribution to fixed costs. To estimate unrecovered fixed costs, we used an affirmative statement of the level of fixed costs covered by the 2012 ELI2P-RTP (C\$26/MWh), the last "above-the-line" rate used to service the mill, and subtracted from it the amount of fixed cost recovery in the Port Hawkesbury LRR (C\$2/MWh), leaving C\$24/MWh in unrecovered fixed costs under the Port Hawkesbury LRR.[281] We estimated 2014 ROE attributable to the Port Hawkesbury load by calculating the proportion of the system-wide ROE attributable to its load. To do this, we divided Port Hawkesbury's actual load by the sum of Port Hawkesbury's actual load and the 2014 Load Forecast total for the system load (calculated without Port Hawkesbury load). By adding together these three pricing factors, we constructed a Tier 3 benchmark that is consistent with market principles because it includes all fixed costs, all variable costs, and an amount for profit.

To calculate the benefit pursuant to section 771(5)(e)(iv) of the Act, we subtracted from the amount that Port Hawkesbury would have paid for the electricity it consumed during the POI according to the benchmark the actual amount paid by Port Hawkesbury during the POI under its LRR. The difference represents the benefit to Port Hawkesbury. We then divided the benefit by the total sales of Port Hawkesbury during the POI. Based upon this methodology, we calculated a countervailable subsidy rate of 14.24 percent *ad valorem* for Port Hawkesbury. Resolute did not use this program.

---

[281] *See* GSQR Exhibit NS-EL-17 DE-03/DE04 at 19.

### 13. GNS Provision of Stumpage and Biomass Material for Less Than Adequate Remuneration (LTAR)

The petitioner contends that the GNS offered Port Hawkesbury a 20-year "Forest Utilization License Agreement" (FULA), providing a company-specific plan for sourcing pulpwood and biomass fuel from Crown (*i.e.*, government) lands.[282]  The petitioner claims that the FULA stipulates certain volumes of pulpwood and biomass material which Port Hawkesbury is required to purchase from private suppliers.  As such, the petitioner argues that under the FULA, Port Hawkesbury is able to obtain approximately two-thirds of its pulpwood from Crown lands and is only obligated to obtain one-third of its pulpwood from private sources.  The petitioner states this demonstrates that the FULA program for stumpage and biomass material from Crown lands constitutes a subsidy on the production of subject merchandise.

During 2014, the GNS's stumpage prices recognized 17 product/species categories, including distinct categories for hardwood and softwood products, as well as distinct categories for pulpwood, biomass, and saw fiber products.  The Province includes a regional distinction for two product categories – pulpwood and biomass.  Port Hawkesbury is located in the Eastern Region and had no authority to harvest pulpwood or biomass from the Western Region during the POI.[283]  The authority of the Minister of Natural Resources to set stumpage rates is derived from the Nova Scotia *Crown Lands Act*.[284]

The DNR provides for three instruments for the use of Crown timber:  (1) Short Term Permits under Section 28 of the *Crown Land Acts*; (2) License Agreements under Section 31 of the *Crown Land Acts*; and (3) Forest Utilization License Agreements (FULAs), which can be area-based or volume-based, provided for under Section 32 of the *Crown Land Act*.[285]

These agreements delineate various rights and obligations for DNR and the licensee.  For example, DNR agrees to provide the licensee with the right to harvest a specified amount of Crown timber, and the licensee agrees to harvest the timber.  The licensee must provide its own equipment and labor for harvesting and must provide an Operating Plan to the DNR for harvesting under the license, which DNR must approve before the harvesting can occur.  The agreements include specific requirements for the building, maintenance and restoration of roads and infrastructure.  The agreements also indicate whether any allowances will be applied for overhead or other obligations.  Finally, the agreements prescribe how the harvested wood may be used, the silviculture fees to be imposed, and the stumpage rates to be charged.[286]

---

[282] The petitioner, in addition to making its allegation on Stumpage for LTAR to cover both pulpwood stumpage and biomass stumpage, also references the government provision of biomass under the allegation of "Provision of Steam for LTAR."  We are only addressing the allegation of biomass under this stumpage program because the provision of biomass is only provided to Port Hawkesbury by the GNS under the FULA.

[283] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XXII, NS.XXII-5.

[284] *Id.*

[285] *Id.* at NS-XXII-6

[286] *Id.*

The FULA is the only agreement instrument applicable to Port Hawkesbury.[287]  The FULA with Port Hawkesbury reflects many of the general terms present in all agreements; however, some of the specifics of the Port Hawkesbury FULA differ from other agreements and are unique to the FULA for Port Hawkesbury.[288]  The primary difference is that the 2012 Port Hawkesbury agreement is a long-term (20 years), area-based agreement, whereas other agreements are shorter in length and/or based upon volume rather than area.[289]  Such distinctions result, for example, in differences in the administrative/overhead allowance amount, which can vary depending upon the type of the agreement and the attendant obligations borne by the Crown licensee.  In addition, the methodology for determining pulpwood stumpage and biomass stumpage rates in the Port Hawkesbury FULA differs from that in other agreements across the province.[290]  The principal difference in the methodology for determining stumpage rates is that Port Hawkesbury's FULA departs from the standard FULA's reliance on particular market-related data for establishing the rates, and instead relies on completely different market-related information.[291]  Under the FULA, Port Hawkesbury has the right to harvest stumpage and biomass and has obligations relating to road building and maintenance; site preparation and clean up; and silviculture.

We determine that the provision of stumpage from Crown land by the GNS to Port Hawkesbury under the FULA constitutes a financial contribution as a provision of a good or service within the meaning of 771(5)(D)(iii) of the Act.  The GNS has stated that both the terms and the methodology for determining stumpage rates in the Port Hawkesbury FULA differs from those in other agreements within the Province of Nova Scotia; therefore, we determine the provision of stumpage under terms of the FULA is expressly limited tor Port Hawkesbury and is *de jure* specific under section 771(5A)(D)(i) of the Act

The provision of stumpage provides a benefit within section 771(5)(D)(iv) of the Act, to the extent that the GNS received less than adequate remuneration when measured against an appropriate benchmark for stumpage.  As explained above, the Department's regulations at 19 CFR 351.511(a)(2) set forth the basis for identifying benchmarks to determine whether a government good or service is provided for less than adequate remuneration.

In accordance with the first preference in the hierarchy, to determine the existence and extent of the benefit, we analyzed the stumpage market in Nova Scotia during the POI.  Each year, the DNR issues a Registry of Buyers annual report indicating the total harvest in Nova Scotia from both Crown land and from private land.[292]  According to the 2014 Registry of Buyers, stumpage

---

[287] *Id.*

[288] *See* Port Hawkesbury's QR at Exhibit 25-3 for the FULA.

[289] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XXII, XXII-7.

[290] *Id.*

[291] According to the GNS, the stumpage rates in Nova Scotia are based upon the fair market value of stumpage sold by private landowners to commercial harvesters, with adjustments made for Crown overhead/administrative costs and Crown silviculture fees. The fair market value is based upon surveys of private stumpage transactions in the Maritime Region (*id.* at Exhibit NS-ST-4), updated to reflect changes in market conditions over time. Stumpage rates were updated for the fiscal years April 2013 - March 2014 and April 2014 – March 2015, respectively.  *Id.* at NS.XXII-4-5.

[292] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XXII, NS.XXII-3

harvest from Crown land accounted for 24 percent of the total harvest during 2014;[293] the harvest from private land accounted for the remainder.

Because the participation of the Province in the stumpage market is small, and is well below a majority, we determine that it does not have a distortive impact on the private stumpage market or the stumpage prices therein. Thus, for this determination, it is appropriate to rely on observed market prices for stumpage as the Tier 1 benchmark. Moreover, Port Hawkesbury itself purchased a significant amount of pulpwood and biomass stumpage from private parties during the POI; we determine that these prices constitute observed market prices that satisfy the requirements of 19 CFR 351.511(a)(2)(i), and we are relying on them as the benchmark for determining the adequacy of remuneration.

During the POI, Port Hawkesbury purchased stumpage from private lands under both Lease Agreements and Purchase Agreements.[294] Under Lease Agreements, Port Hawkesbury pays private woodlot owners for access to land and the right to build and maintain roads and harvest wood for both pulpwood and biomass. Port Hawkesbury also incurs regeneration obligations such as replanting under its Lease Agreements.[295] These obligations are the same as the obligations that Port Hawkesbury incurs under the FULA. Under Purchase Agreements, Port Hawkesbury purchases the already-harvested wood. Because the Lease Agreements reflect the same rights and obligations that are set forth in the FULA, we are relying on purchases under Lease Agreements as the basis for our benchmark.

The FULA for Port Hawkesbury sets separate stumpage rates for (1) softwood pulpwood; (2) hardwood pulpwood; (3) hardwood fuelwood (biomass); (4) fuelwood greater than 75 percent hardwood; (5) softwood fuelwood (biomass); and (6) fuelwood greater than 75 percent softwood.[296] For each of the separate stumpage rate categories set by the DNR within the FULA, we compared that rate to the stumpage rate for the identical pulpwood and fuelwood harvested by Port Hawkesbury under private Lease Agreements during the POI.

As such, for this final determination, we continue to compare the stumpage prices under the FULA to the stumpage prices for the identical pulpwood and fuelwood harvested by Port Hawkesbury from private lands under Lease Agreements during the POI. The Lease Agreements permit Port Hawkesbury to harvest standing timber on the same terms and with the same infrastructure obligations as the FULA. The information provided by Port Hawkesbury for its harvest under the FULA showed the stumpage rate paid to the GNS and separately reported all

---

[293] See GNS July 29, 2015 supplemental response at 25.

[294] See PQR at Exhibit 25-1 for purchases during the POI, Exhibit 25-2 for purchases of Biomass and Exhibit 25-3 for the FULA. For lease agreements that Port Hawkesbury had with private suppliers please see Exhibit 25-5 of the same submission.

[295] Under the terms of the Forrest Management Agreement (FMA) the Port Hawkesbury mill will sustainably manage crown forest land for the benefit of multiple users, while receiving for itself a guaranteed annual supply of 400,000 gross metric tons per annum of logs. The FMA seeks to ensure sustainable regeneration of crown forests according to Forest Stewardship Council Principles. See PSQR at Exhibit 29-1 for more information on their obligations for forest regeneration of Crown Lands under the FMA.

[296] See PSQR at 52 and Exhibit 67-1 and 67-2 for Stumpage Fees and PQR at Exhibit 25-3.

associated additional costs (*e.g.*, silviculture, road building and maintenance).[297]  As well, the price information provided about the pulpwood harvest under private Lease Agreements was reported on the same basis, separately showing the stumpage price and each of the additional costs.[298]  For the biomass harvest under the FULA, the information provided by Port Hawkesbury shows the fully inclusive price of the stumpage fee and all other costs.[299]  Port Hawkesbury reported its purchases of fuel logs used for biomass under private Lease Agreements also on this fully cost-inclusive basis.[300]

Since the *Preliminary Determination*, however, we have learned that the stumpage rates under the FULA, for both pulpwood and biomass, are inclusive of an amount that the GNS collects as a silviculture fee. [301]  Notwithstanding any other costs that Port Hawkesbury incurs for silviculture, this is one area in which the stumpage rates under the FULA differ, in terms of what Port Hawkesbury is paying for, from those under the Lease Agreements.  In order to ensure that our benchmark reflects market-determined prices that represent actual transactions that are comparable to the Crown prices for which we are evaluating the adequacy of remuneration, we find it appropriate to add to the private Lease Agreement stumpage prices the amount that the stumpage prices under the FULA include as a silviculture fee.[302]  This is consistent with 19 CFR 351.511(a)(2)(i), under which we consider factors affecting comparability.

To calculate the benefit received under this program, we compared the stumpage prices paid by Port Hawkesbury to the GNS under the FULA to the prices Port Hawkesbury paid under private Lease Agreements.  For pulpwood, because the private leases had the same infrastructure obligations as the FULA, and the information provided by Port Hawkesbury for its harvest under the FULA showed the wood only price and separately reported all associated additional costs (*e.g.*, silviculture, road building and maintenance).  As well, the information provided about the pulpwood harvest from private lease holders was reported on the same basis, separately showing the stumpage price and each of the additional costs.[303]  Thus, for pulpwood, we have relied on the stumpage only price under private leases as our basis for comparison to the stumpage paid under the FULA.  For the biomass harvest under the FULA, the information provided by Port Hawkesbury shows the fully inclusive price of the stumpage fee and all other costs.  Port Hawkesbury reported its purchases of fuel logs used for biomass under private leases also on this fully cost-inclusive basis.  However, because we learned at verification that the rates that Port Hawkesbury pays for stumpage on Crown lands include an amount, C\$3/m$^3$, as a silviculture fee, we will add this C\$3m$^3$ to the private prices, to ensure that the benchmark reflects the same

---

[297] *See* Port Hawkesbury's SQR at 53 and Exhibits 2 -3 of its QR.
[298] *See* PQR at Exhibit 25-1 for Crown Purchases.  For purchases from private leaseholders, *see* PSQR at Exhibit 65.2.
[299] *See* Port Hawkesbury's SQR at 50-51 and Exhibits 65-2 through 65-5.
[300] *See* Exhibits 65-2 through 65-5 of Port Hawkesbury's SQR which document  the various costs that Port Hawkesbury incurred on harvesting on private leased lands.
[301] *See Preliminary Results* Issues and Decision Memorandum at 40; Port Hawkesbury Verification Report at 7-11; and GNS Verification Report at 21-22.
[302] *See* Port Hawkesbury Final Calculation Memo.
[303] *See* PQR at Exhibit 25-1 for Crown Purchases.  For purchases from private leaseholders, *see* PSQR at Exhibit 65.2.

terms as the Crown stumpage rates.[304]  Therefore, we compared the fully cost-inclusive price of biomass stumpage obtained under the FULA to the fully cost-inclusive price of fuel logs, used for biomass material.[305]  We summed the total benefits for pulpwood and biomass material to derive a total for benefit for stumpage provided at LTAR. We then divided the stumpage benefit by the total sales of Port Hawkesbury to calculate a net countervailable subsidy rate of 1.74 percent *ad valorem* for this program.[306]  For further discussion of the comments and arguments submitted with regard to this program in the case and rebuttal briefs, *see* Comment 8, below.

## B.  **Programs Determined To Be Not Used or To Not Confer a Benefit During the POI**

### 1.  **The GOQ Support for the Forest Industry Program**

Resolute reported that Fibrek and an additional cross-owned company had loans outstanding under the "Government of Quebec Support for the Forest Industry Program" (PSIF) during the POI.[307]  In response to our questions, the GOC explained that the PSIF sought to support the consolidation of, investment in, and modernization of businesses of the forestry sector, namely forest management companies (harvest and silviculture works), pulp and paper businesses, businesses of the first transformation of wood, and businesses which produced wood transformation and forestry exploitation machinery.[308]  The Quebec Council of Ministers approved the PSIF in 2006, and the program ended in 2010.[309]  The GOQ's Investissement Québec, a government corporation owned by the GOQ, administered the program.[310]

To calculate the benefit under section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), we relied on the benchmarks described above under the "Loan Interest Rate Benchmarks and Discount Rates" section to determine the amount of interest that Resolute would have paid on a comparable commercial loan during the POI.  We subtracted from that amount the actual interest paid on these loans during the POI.  In accordance with 19 CFR 351.525(b)(6), we calculated the potential countervailable subsidy rate by dividing the benefit amount by the appropriate sales denominator.  For loans to Fibrek, we attributed the benefit that Fibrek received under the program to the sales of Fibrek plus the unconsolidated sales of Resolute (net of inter-company sales), in accordance with 19 CFR 351.525(b)(6)(iv).[311]  Because Resolute designated the relationship between it and the other recipient of the loans as business proprietary information, we have described the appropriate sales denominator for measuring the benefit for this company in the Resolute Preliminary Calculation Memo and have not changed it for the final determination.

---

[304] *See* Port Hawkesbury Verification Report at 7-11; and GNS Verification Report at 21-22.
[305] *See* PSQR at Exhibit 65-5.
[306] *See* Port Hawkesbury Preliminary Calculation Memo.
[307] *See* RQR at 26-31.  Resolute designated the names of the other companies as business proprietary information.
[308] *See* GQR at Government of Quebec Questionnaire Response, Volume I, QC-8.
[309] *Id.* at QC-8, Exhibit QC-PSIF-3, and Exhibit QC-PSIF-4.
[310] *Id.* at QC-9.
[311] *See*, *e.g.*, *Coated Paper from the PRC* and accompanying IDM at Comment 35.

We find that any potential benefit to Resolute under this program was less than 0.005 percent *ad valorem* during the POI.  Thus, without determining whether this program provides a financial contribution or is specific, and consistent with our practice, we are not including the assistance that Resolute received under this program in the countervailing duty rate because there is no measurable benefit.[312]  For further discussion of the comments and arguments submitted with regard to this program in the case and rebuttal briefs, *see* Comment 18, below.

## 2.  Richmond County (Nova Scotia) Property Tax Reduction

We initiated on an allegation that the Richmond County council agreed to reduce Port Hawkesbury's annual property taxes by half through 2016 from C$2.6 million to C$1.3 million.[313]  The GNS reported that the reduction resulted from an agreement between Richmond County, NPPH, and PWCC on September 12, 2012, to amend a 2006 tax agreement between Richmond County and Stora Enso Port Hawkesbury Limited, a former owner of the Port Hawkesbury mill.[314]  The amended tax agreement reduced the annual amount of property taxes to be paid to Richmond County by Port Hawkesbury from C$2.5 million to C$1.3 million.[315]

Under section 771(5)(D)(ii) of the Act, the financial contribution from a tax program is the amount of foregone revenue that is otherwise due.  Under the amended tax agreement, the amount of property tax that Port Hawkesbury paid to Richmond County during the POI was C$1.3 million.  In its initial questionnaire response, the GNS reported that during the POI, Richmond County assessed property tax at the rate of C$2.07 per C$100 of assessed value.[316]  At this tax rate, according to the GNS, Port Hawkesbury would normally be assessed between C$550,000 – C$650,000 in property taxes during the POI.[317]  Thus, the property tax that Port Hawkesbury paid during the POI under the amended tax agreement exceeds the property tax otherwise due.  As a result, we find that there is no revenue foregone under section 771(5)(D)(ii) of the Act during the POI; without any foregone revenue, Port Hawkesbury did not receive a benefit during the POI under this program pursuant to 19 CFR 351.509(a).  Because we find that there is no financial contribution or benefit, it is not necessary to address whether this program is specific.  For further discussion of the comments and arguments submitted with regard to this program in the case and rebuttal briefs, *see* Comment 15, below.

## 3.  Retention of Accumulated Tax Loss to Carry Forward

We initiated an investigation into whether PWCC obtained accrued tax losses by purchasing Port Hawkesbury.[318]  Port Hawkesbury reported that under the *Income Tax Act (Canada)* (*CITA*), Port Hawkesbury Inc. is entitled, within specified circumstances, to use the accumulated non-capital tax losses accrued prior to the purchase of NPPH through the *CCAA* process.[319]  Port

---

[312] *Id.* at 23.
[313] *See* Initiation Checklist at 10.
[314] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume V, NS.V-3 - NS.V-4.
[315] *Id.* at NS.V-4; *see, also,* PQR at 50.
[316] *Id.*
[317] *Id.* at NS.V-11.
[318] *See* Initiation Checklist at 11-12.
[319] *See* PQR at 57.

Hawkesbury also explained that it does not have the ability to access the non-capital loss carry-forwards reported by Port Hawkesbury Inc. and, therefore, cannot derive any tax savings from Port Hawkesbury Inc.'s tax loss carry-forward.[320]  Further, Port Hawkesbury explains that, as a partnership under Canadian law, Port Hawkesbury is not subject to Canadian income taxes and, accordingly, also cannot derive any tax savings from Port Hawkesbury Inc.'s tax loss carry-forwards.[321]  Finally, Port Hawkesbury stated that no other responding cross-owned affiliates can, under Canadian tax law, use these tax losses to derive any reductions in their tax obligations.[322]

Income tax deductions provide a financial contribution under section 771(5)(D)(ii) of the Act in the form of foregone revenue that is otherwise due to a government.  The benefit is the extent to which the taxes paid by the firms as a result of the program are less than the tax the firms would otherwise pay in the absence of the program.  *See* 19 CFR 351.509(a)(1).  Citing the blank line for "Non-capital losses of previous tax years applied in the current tax year" in Port Hawkesbury Inc.'s 2013 tax year return (filed during the POI), Port Hawkesbury claims that Port Hawkesbury Inc. did not derive any tax savings from its accumulated tax losses during the POI.[323]  Based on this information and additional business proprietary information from Port Hawkesbury Inc.'s income tax return filed during the POI, we determine that Port Hawkesbury received no benefit under this program during the POI.[324]  Because we find that there is no benefit, we need not address whether this program provides a financial contribution or is specific.

### 4.  GNS Purchase of Land for More than Adequate Remuneration (MTAR)

The Department initiated on an allegation that the GNS agreed to purchase land owned by Port Hawkesbury for almost C$400 per acre, or C$20 million total.[325]  Citing a separate June 2013 purchase of land by the GNS for a lower price, the petitioner alleged that the GNS overpaid for Port Hawkesbury's land.  Specifically, in that separate transaction, the GNS paid C$16,500,000, or C$300 per acre, for 55,000 acres of forestry land from an unrelated private company, Northern Pulp.[326]

In its initial questionnaire response, the GNS reported that the DNR first approached NPPH about purchasing land in September 2011.[327]  After negotiating the price with Port Hawkesbury, the DNR purchased 50,858 acres of land from Port Hawkesbury for C$20 million, or C$393/acre, on September 28, 2012.[328]  Regarding the specificity of the program, the GNS stated, "The Government of Nova Scotia stipulates specificity, as the Department of Natural Resources purchased land from Port Hawkesbury."[329]

---

[320] *Id.* at 61.
[321] *Id.*
[322] *Id.* at 56.
[323] *Id.* at 60.
[324] *See* Port Hawkesbury Preliminary Calculation Memo for additional details on this analysis.
[325] *See* Initiation Checklist at 12.
[326] *See* Petition at Exhibit II-38.
[327] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume VII, NS.VII-2.
[328] *Id.* at NS.VII-2; *see, also,* GNS Pre-Preliminary Comments at 29.
[329] *See* GNS Pre-Preliminary Comments at 30.

We determine that this land purchase conferred a countervailable subsidy within the meaning of section 771(5) of the Act and constitutes a financial contribution in the form of the GNS purchase of a good from Port Hawkesbury under section 771(5)(D)(iv) of the Act.  We also determine that the program is specific in accordance with section 771(5A)(D)(i) of the Act because the GNS provided the assistance only to Port Hawkesbury.

Regarding benefit, section 771(5)(D)(iv) of the Act states that in the case where goods are purchased by a government authority, a benefit shall normally be treated as conferred if such goods are purchased for more than adequate remuneration.  This section of the Act also states the following:

> For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.[330]

The Department has not developed regulations with respect to the purchase of goods.[331]  While the Department has had relatively few proceedings involving allegations of the purchase of a good for MTAR, we have in the past relied on prices within the country to determine a benchmark to measure the benefit.  The most recent proceeding in which the Department made a final determination involving the purchase of a good for MTAR, other than on an adverse facts available basis under section 776(b) of the Act, was *LEU from France*.[332]  In *LEU from France*, we used prices within the country to determine whether the government purchase of LEU was for more than adequate remuneration.

Therefore, we must first determine whether there are market prices from actual sales transactions involving private buyers and sellers within the country under investigation that we can use to determine whether the GNS purchased Port Hawkesbury's land for MTAR.  In the PSQR and GSQR, Port Hawkesbury and the GNS submitted the Property Valuation Services Corporation's (PVSC's) records of private party transactions for forest land parcels in Nova Scotia covering the period September 29, 2011, through September 27, 2013.[333]  We are relying on these transactions to measure the adequacy of remuneration from the GNS purchase of Port Hawkesbury's land because these represent market prices from actual sales transactions involving private buyers and sellers in Nova Scotia.

Section 771(5)(E)(iv) of the Act states that the adequacy of remuneration shall be determined in relation to the prevailing market conditions of the good being purchased.  In a departure from the *Preliminary Determination*, we are now using private transactions of forest land occurring over the entire year of 2012.  For a discussion of this, see comment 9 below.  These transactions

---

[330] *See* section 771(5)(D)(iv) of the Act.
[331] *See* 19 CFR 351.512.
[332] *See LEU from France* and accompanying Issues and Decision Memorandum.
[333] *See* PSQR at Exhibit 91-1; *see, also,* GSQR at Exhibit NS-SUPP1-99.  The lists of purchases in the PSQR and the GSQR are the same.

reflect the prevailing market conditions at the time the GNS purchased the land from Port Hawkesbury.  The selection of a yearly benchmark is also consistent with the benchmarks used to measure the provision of a good or service for less than adequate remuneration.  The PVSC database identifies 37 land transactions during 2012.  To determine the benefit, we calculated a simple average price per acre of the private land transactions from 2012 from the PVSC database and compared that amount to the amount that the GNS paid Port Hawkesbury.  On this basis, the calculation of the subsidy from this program results in a rate that is less than 0.005 percent, and, as such, does not have an impact on Port Hawkesbury's overall subsidy rate.  Consistent with our past practice, we did not include this program in our net subsidy rate calculations for Port Hawkesbury.

### 5.  Loan Guarantee Program (LGP)

As noted above, in the *Preliminary Determination*, the Department stated that it would "examine these additional potential benefits at verification and address them in the final determination," referring, in part, to the LGP.  In the verification outline issued to the GOC, the Department instructed that the GOO should "{b}e prepared to discuss the information referenced in Paragraph 2.8, "Summary of Project Funding Sources and Contributors," and Table 3, "Total from Provincial/Territorial/Municipal Governments" of the FPPGTP Application Forms you submitted in Exhibit A-1of Appendix A of your May 28, 2015 questionnaire response."[334] During verification, as requested, the GOO explained that the LGP was announced in 2005 and supported approved capital investment projects in value-added manufacturing, increased fiber use efficiencies, energy conservation/efficiency, and development of electricity co-generation.  Specifically, the LGP provided government guarantees on commercial loans used for capital investment projects.  The program stopped accepting applications in March 2011.  The program limited the total amount of loan guarantees to C$350 million in loan principal.  The guarantees were available for up to 100 percent of loan amounts on term loans for financing eligible capital assets.  The maximum term of the guarantee was generally five years and the maximum amount was C$25 million.[335]

At verification, both the GOO and Resolute stated that Resolute did not receive any benefits under this program.[336]  At the GOO we reviewed summaries of all companies that received any benefits under this program and noted that none of the respondent companies received assistance under the LGP.   Additionally, we reviewed a letter from Abitibi Bowater (the predecessor to Resolute) in which it withdrew its request for a loan guarantee.[337]  Based on this information and our verification of program information at the GOO, we determine that none of the respondent companies used this program during the POI.  There is no need to address whether this program provides a financial contribution or is specific.

---

[334] *See* GOO Verification Report at 6.
[335] *Id.*
[336] *See* Resolute Verification Report at 7; *see, also,* GOO Verification Report at 6.
[337] *Id.*

6.  **The Federal Atlantic Innovation Program**
7.  **Government of New Brunswick (GNB) Funds for J.D. Irving**
8.  **The Federal Transformative Technologies Pilot Scale Demonstrative Program**
9.  **The British Columbia Ministry of Forests, Mines and Land Program**
10. **New Brunswick Climate Action Fund Grants**
11. **British Columbia Power Smart Program**
12. **BC Bioenergy Network Grants**
13. **New Brunswick Energy Rebate Fund**
14. **Loan from the Government of New Brunswick**
15. **The Powell River City Revitalization Tax Exemption Program**
16. **Efficiency New Brunswick Grant**
17. **Grants Under the Federal Forestry Industry Transformation Program**

C.  **Program Determined To Be Not Countervailable**

**Provision of Steam for LTAR**

The petitioners alleged that a cogeneration facility located at the Port Hawkesbury mill provides electricity and steam to the mill for LTAR, and further that the GOC provides stumpage from Crown lands at LTAR to fuel the biomass boiler.  NSPI operates the boiler, but Port Hawkesbury provides the fuel biomass.

During the POI, Port Hawkesbury purchased all of its electricity from NSPI under the LRR; therefore, it is not necessary to separately determine whether electricity from the cogeneration facility is provided for LTAR.  All electricity purchases under the LRR are addressed in the *GNS Provision of Electricity for LTAR* section above.

Similarly, with respect to the provision of biomass fuel by the GNS to Port Hawkesbury, all stumpage that Port Hawkesbury obtains from Crown lands is governed by the FULA which we have separately addressed in the *GNS Provision of Stumpage for LTAR* section above.

In 2010, before NPPH entered the *CCAA* process, NSPI entered into a set of agreements with NPPH and began improving an electricity and steam "co-generation" facility at the paper mill.[338] Among other investments, NSPI purchased a biomass-fired boiler and added a steam turbine generator to the facility to produce electricity (an arrangement that also allowed NSPI to partially meet its own legislated targets for renewable electricity generation).[339]  At that time NSPI and NPPH concluded several agreements considering the shifting of asset ownership between the parties, construction, operations and maintenance, and for the supply of steam.  When the company was reconstituted out of the *CCAA* process as Port Hawkesbury in late 2012, the company signed a new agreement with NSPI covering its purchase of process steam from NSPI.[340]  The cogeneration facility came online in 2013 and served the mill during the POI.[341]

---

[338] *See* PQR at 51, 74.
[339] *Id.* at 73 and GSQR at NS-SM-6 at 4.  *See, also,* GSQR at NS-SM-6 at 6-7.
[340] *See* PQR at 74.

58

The intention of the cogeneration facility is to provide steam to the mill and to generate electricity that can be dispatched either to the mill or to other NSPI customers via NSPI's transmission grid.[342]  When Port Hawkesbury purchased the mill in 2012 it took over the contracts with NSPI and renegotiated the steam supply agreement.[343]  NSPI and Port Hawkesbury entered into a long-term agreement through which NSPI annually provides process and heating steam to the mill.[344]  The mill uses the steam for drying paper and heating the mill.[345]

Unlike the rates for electricity which must be approved by the NSUARB, the NSUARB has ruled that it has no jurisdiction with respect to the provision and pricing of steam between NSPI and Port Hawkesbury.[346]

Accordingly, because the GNS and the regulating agency, the NSUARB, are not involved in the provision of steam between NSPI and Port Hawkesbury, we determine that there is no financial contribution by an authority under section 771(5)(B) of the Act, nor is there the entrustment or direction of a private entity, NSPI, to make a financial contribution.  Because we find that there is no financial contribution, we need not address whether this program is specific or confers a benefit.

## VII.  ANALYSIS OF COMMENTS

### Comment 1:  The Department's Selection of Mandatory and Voluntary Respondents

*The GOC's Arguments:*

- The Department should have investigated Irving and Catalyst as mandatory or voluntary respondents, in accordance with the general statutory requirements.
- The Department's obligation is to calculate countervailing duty rates as accurately as possible.[347]

*The GBC's Arguments:*

- The statute requires the Department to calculate a separate rate for each producer, unless there are a "large number" of producers.   In this investigation, there are only four.  As CIT rulings have confirmed, four producers cannot be deemed a "large number."[348]  The CIT also has rejected the Department's argument that it is too burdensome to select additional respondents because it is busy with other cases.[349]

---

[341] *Id.* at 71-72.
[342] *See* GSQR at Exhibit NS-SM-6 at 6.  *See, also,* GSQR at XX-4 and Exhibit NS-SM-9 at 1.
[343] *See* PQR at 74.
[344] *Id.  See, also,* PQR at Exhibit 24-4 at 6.
[345] *Id.* at 71, 75.
[346] *Id.* at Exhibit 24-3.  *See, also,* GSQR at 62 (provision of industrial process steam is not a function of a regulated utility in Nova Scotia to or for the public).
[347] *See Borusan* at 1336, citing *Rhone Poulenc* at 1191.
[348] *See Carpenter* at 1344; *See, also, Zhejiang* at 1263.
[349] *Id.*

At a minimum, the Department should have selected Catalyst as a voluntary respondent.

- The CIT has ruled that the "unduly burdensome" standard is higher for the Department's selection of voluntary respondents than it is for its selection of mandatory respondents.[350]

*Catalyst's Arguments:*

- According to section 777A(e)(1) and (2) of the Act, the Department shall calculate a countervailable subsidy rate for each known producer and/or exporter of subject merchandise and may only limit the number it investigates if the investigation involves a large number.
- There are only four possible Canadian exporters or producers of subject merchandise; the CIT has determined that four is not a large number.[351]  The Department has failed to demonstrate that the number of companies at issue is large.
- Alternatively, if the Department does not select Catalyst as a mandatory respondent, then it must select Catalyst as a voluntary respondent pursuant to section 782(a) of the Act.
- The CIT has recently analyzed the "unduly burdensome" standard and determined that
- the Department cannot decline to individually examine a voluntary respondent by merel referring to "the same burdens that occur" in every proceeding.[352]  The burden in this case does not exceed the burden presented in a typical CVD proceeding, and, unlike in *Husteel*, there are not multiple investigations related to SC paper.[353]
- Should the Department adhere to the statute and determine to individually investigate Catalyst, there is still time to conduct verification; the Act's requirement to conduct verification should not prevent the Department from individually investigating Catalyst at this stage.

*Irving's Arguments/Rebuttal:*

- Record evidence establishes that Irving was one of the two largest Canadian producers and exporters of SC paper during the POI.  The Department acted contrary to law when it ignored the evidence that Irving submitted showing that the CBP import volume data were unreliable and unusable.  In light of this showing, the Department should have used the actual import volume data that Irving submitted, issued quantity and value questionnaires, or requested import volume information that the four Canadian producers of SC paper had already submitted to the USITC.
- The Department's conclusion that there were far more than four Canadian producers and exporters was wrong and contradicted by the CBP data itself, as was the Department's claim that it had no evidentiary basis to claim that its customs broker erred when it classified Irving's imports of SC paper under the wrong HTSUS subheading.

---

[350] *See Ad Hoc Shrimp Trade.*

[351] *See Zhejiang* at 1263.

[352] *See Ad Hoc Shrimp,* at 1371 (quoting *Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States,* 853 F. Supp. 2d 1352, 1364-65 (CIT 2012) (*Grobest*)).

[353] *See Husteel Co., Ltd. v. United States,* Slip Op. 15-100 (CIT Sept. 2, 2015) at 13.

- Similarly erroneous was the Department's refusal to accept corrected import volume information provided in Irving's March 27, 2015, submission, the same day that the Department accepted a submission from Resolute that also addressed respondent selection.

- As of June 2, 2015, the Department had received the exact export volumes of each of the four Canadian producers, which it ignored even though it had more than adequate time to select Irving as a mandatory respondent and complete its preliminary determination by the July 27, 2015 deadline.

- The Department's refusal to select more than two mandatory respondents was arbitrary and unreasonable because it selected three mandatory respondents in other contemporaneous administrative reviews: *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China* (March 11, 2015); *Steel Wire Garment Hangers from the People's Republic of China* (December 18, 2014); and *Frozen Warmwater Shrimp from Vietnam* (October 3, 2014). The fact that these reviews might have involved different offices is irrelevant, because personnel resources are fungible, and the rationale offered for selecting three respondents in those cases was "no different in substance" from the rational provided for selecting two in this investigation.

- Regardless of record information on Irving's export volume, the Department is obligated by the Act to conduct an individual investigation of every known exporter or producer when the total number of exporters or producers is not large. CIT precedent in *Zhejiang*, *Carpenter*, and *Asahi* compels the conclusion that the Department violated the Act when it declined to treat Irving as a mandatory respondent.[354] The CIT has consistently held that four producers is not a "large" number, so the Department was obligated to select Irving as a mandatory respondent. Nothing on the record contradicts the fact that there are only four Canadian producers, despite the Department's assertion to the contrary.

- The Department's efforts to distinguish this investigation as presenting "unique and complex issues" are speculative, and the issues cited are also typical of administrative reviews. In addition, the Department is well acquainted with many relevant aspects of the paper industry in light of other investigations and reviews.[355]

- Regardless of the Department's refusal to select Irving as a mandatory respondent, the Act requires the Department to select a producer as a voluntary respondent when the total number of producers seeking voluntary respondent status is "not so large that individual examination ... would be unduly burdensome or inhibit timely completion of the investigation."[356]

---

[354] *See Zhejiang* at 1260-1264: *see, also, Carpenter* at 1337-1343; *see, also, Asahi* at 1335-1341.

[355] *See Uncoated Paper from Indonesia*; *Certain Lined Paper from India and the People's Republic of China: Continuation of Antidumping and Countervailing Duty Orders*, 77 FR 53172 (Aug. 31, 2012); *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Order*, 75 FR 70203 (Nov. 17, 2010); *Certain Crepe Paper Products from the People's Republic of China: Continuation of Antidumping Duty Order*, 75 FR 26919 (May 13, 2010); *Lightweight Thermal Paper from the People's Republic of China and Germany: Continuation of the Antidumping and Countervailing Duty Order on the People's Republic of China, Revocation of the Antidumping Duty Order on Germany*, 80 FR 5083 (Jan. 30, 2015).

[356] *See* section 782(a)(2) of the Act.

- The CIT has held that section 782(a)(2) of the Act sets a high threshold of agency burden before the requirement of individual review can be avoided.[357]  In this case, however, the Department's efforts to establish an undue burden and to demonstrate that selection of Irving would inhibit timely completion of the investigation lack merit and are not supported by substantial evidence.
- In accordance with *Husteel*, the Department should have conducted a pre-investigation into the accuracy of the CBP entry data because Irving brought to the Department's attention, in a timely manner, that the CBP entry data were incomplete.[358]  The *Husteel* court also urged the Department "to focus solely on the number of exporters or producers involved in the investigation or review" rather than its workload, and it implicitly endorsed the CIT's prior decisions by holding that three or four respondents was not so "large" a number that the Department could decline to select all of them as mandatory respondents.  The same approach is required here.
- The *Husteel* court's dismissal of arguments concerning the reasonableness of selecting two mandatory respondents is not applicable here because the parties in that case failed to raise the issue before the Department.  In contrast, Irving maintains that the selection of two respondents in this investigation was unreasonable given the circumstances of the investigation.
- Finally, pursuant to *Husteel*, the Department was obligated to ensure that its respondent selection was "representative."  Because the subsidies that Irving allegedly received are "distinctly different" from those allegedly provided by other Canadian provinces to other producers, the Department could and should have used its authority under section 777A(e)(2)(A) of the Act to select a sample of producers, in addition to using the option of selecting producers accounting for the largest volume from the exporting country.  This would have resulted in the selection of the two largest respondents (Resolute and Irving) and the selection of Irving.
- In *Ad Hoc Shrimp*, the court rejected justifications that were similar to those offered by the Department in this investigation for refusing to select a voluntary respondent.
- Amendments to section 782(a) of the Act pursuant to section 506 of the Trade Preferences Extension Act of 2015 (TPEA) are irrelevant to the Department's May 1, 2015 determination not to accept voluntary respondents.  However, those amendments did not repeal the requirement that the Department individually examine all respondents where the total number is "not so large."

*The Petitioner's Rebuttal:*

- With respect to Irving's assertion that its customs broker misclassified Irving's entries of SC paper, Irving is a large and sophisticated importer with sufficient resources to hire competent assistance in the importation process.  Any resulting problem with the import data was of Irving's own making.
- Although Irving argued that the Department should have issued quantity and value questionnaires to the potential respondents, Irving does not cite a single instance where

---

[357] *See Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342,  1363 (CIT 2012).
[358] *See Husteel* at 13, n.8.

the Department has issued quantity and value questionnaires to aid mandatory respondent selection in countervailing duty investigations.

- The CIT's ruling in *Zhejiang* involved an administrative review, not an investigation, which presents distinct challenges for the Department.
- *Husteel* supports the Department's decision not to accept voluntary respondents in this investigation because the compressed timeline presents an even bigger burden than that at issue in *Husteel*, even though there are not multiple countries involved in this investigation. The Department's reference to its workload here is not a reason to distinguish the case as suggested by Catalyst, particularly given the number of new steel investigations.
- Pursuant to section 506 of the TPEA, which amended section 782(a) of the Act, the Department may decline to review voluntary respondents for a variety of reasons that would make doing so unduly burdensome.
- Irving offers no explanation for how the Department could complete an individual investigation at this point in the proceeding given the statutory deadline.

**Department's Position:**

For the final determination, and for the reasons discussed in the Respondent Selection Memorandum and our Voluntary Respondent Selection Memorandum, we continue to find that there was a large number of potential respondents involved in this investigation, and that it was appropriate to select as the two mandatory respondents, Port Hawkesbury and Resolute, the two largest producers and/or exporters of subject merchandise during the POI. Further, we determine that, in light of the Department's available resources and the burdens presented by selecting additional respondents, the Department did not err in its decision to not select additional mandatory respondents or voluntary respondents as Catalyst and Irving have urged.

Section 777A(e)(2) of the Act permits the Department to limit its examination of all known exporters and producers of subject merchandise to a reasonable number of exporters or producers, if it is not practicable to determine individual countervailable subsidy rates because of the large number of exporters or producers involved. Under section 777A(e)(2)(A)(i) and (ii) of the Act, the Department may limit its examination to (1) a sample of exporters or producers that it determines is statistically valid based on the information available to it at the time of selection, or (2) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the Department determines can be reasonably examined. The SAA interprets these provisions to mean that the authority to select respondents, whether by using a "statistically valid" sample or by examining respondents accounting for the largest volume of subject merchandise, rests exclusively with the Department.[359]

As we stated in the Respondent Selection Memorandum, we found that "the number of producers and/or exporters shown in the Petition and CBP data constitutes a large number" and determined that it was not practicable to individually examine each of them.[360] We arrived at that conclusion by evaluating the number of producers and/or exporters in relation to our anticipated workload

---

[359] *See* SAA at 872.
[360] *See* Respondent Selection Memorandum at 5.

and deadlines, and by considering the nature of this investigation.[361]  Specifically, we determined that this particular investigation would require significant resources to analyze the requisite information for each company, any cross-owned companies, and the relevant provincial and federal governments, and that all information would need to be verified within the 75-day period between our preliminary and final determinations.[362]  As a result, whether we considered data for HTS 4802.61.3035 or the combined data for HTS 4802.61.3010, 4802.61.3090, and 4802.61.3035, the relative number of potential respondents was too large to individually examine.[363]

Parties cite various CIT decisions[364] to support their contention that the Department erred in its definition of "large," but this reliance is misplaced for several reasons.

First, parties rely on the cited cases for the proposition that "four" potential respondents is not a large number.  These assertions are beside the point because the proprietary CBP data are clear that there are more than four potential respondents.[365]  Irving contends that the CBP data reveal only names, not the actual number, of exporters and/or producers, and that *Husteel* confirmed the Department's obligation to consider evidence that "the actual number of potential respondents is likely less than the number of companies separately listed."[366]  The issue in *Husteel*, however, was whether the Department should have combined redundant company names when identifying the number of potential respondents, and the CIT ultimately determined that Commerce reasonably defined large even when those redundancies were eliminated.[367]  Irving made no suggestion as to how the Department should combine any alleged redundancies within the CBP data, and it is clear that the number of potential respondents remains larger than four even if certain similar company names were combined.[368]

Irving also contends that there is no evidence that companies other than itself, Catalyst, Port Hawkesbury, and Resolute, that were identified in the CBP data as having made entries of merchandise under HTS 4802.61.3035, were affiliated with the four "known" producers; as such, those additional exporters could not be Canadian producers of SC paper, and they were irrelevant to the Department's consideration of the actual number of potential respondents.  However, Irving offers no evidence that the companies were improperly identified as exporters in the CBP data and cites no authority for the proposition that the Department must make an *a priori* determination of affiliation with other companies before it even selects respondents.  In fact, the Department's standard practice is not to aggregate entry data based on a collapsing, cross-ownership or affiliation analysis.[369]  No party presented evidence to the Department at any point

---

[361] *Id.*
[362] *Id.*
[363] *Id.* at 6.
[364] *See Zhejiang*, *Carpenter*, and *Asahi*.
[365] *See* Respondent Selection Memorandum at Attachment.
[366] *See Husteel* at 13, n.8.
[367] *Id.*
[368] *See* Department Memorandum, "Release of U.S. Customs and Border Protection Data," (March 19, 2015) at Attachments 2, 4, and 6.
[369] *See, e.g.*, *Sugar From Mexico: Final Affirmative Countervailing Duty Determination*, 80 FR 57337 (September 23, 2015), and accompanying Issues and Decision Memorandum at Issue 9.

in the respondent selection process to suggest that the other companies identified under that HTS category were not valid respondents, and Irving's unsupported statements are not a basis for disregarding those companies' exports.

Second, all of the cited cases involved challenges to the Department's final results of administrative reviews, not investigations. Although Irving disputes the unique and complex nature of investigations and discounts our initial assessment as "speculation," we disagree. As stated in the Respondent Selection Memorandum, investigations involve products, industries, and companies which may not have been previously analyzed by the Department and require significant additional research and analysis under more rigid statutory deadlines, all of which must factor in the Department's determination of what constitutes a "large" number of companies.[370] The CIT recently agreed, stating, "the statutory deadlines for completing an investigation are shorter than the deadlines for completing a review, and Commerce is required to conduct a verification. As a general matter, 'Commerce has more work to do in less time' when conducting an investigation.'"[371] That was particularly the case in this investigation because we did not have a companion antidumping investigation with which to align the deadline for our final determination.[372] As a result, while administrative reviews offer up to 365 days for preliminary determinations and an additional 180 days for a final determination, we had only 130 days in which to issue our preliminary determination and 75 days for this final determination.

We also disagree with Irving's contention that our experience with past paper cases somehow lessened the burden in this case, because, whatever the Department's general familiarity with the paper production process, this investigation concerned  alleged subsidies provided by the government of Canada at both the provincial and federal level to Canadian producers with which the Department had no prior experience. Prior antidumping and countervailing duty proceedings involving Indonesia, India, China, and Germany are completely unrelated to the issues presented by those allegations.

Accordingly, all of these cases are distinguishable on their facts. Here, the number of potential respondents was objectively large. The CBP data demonstrate that there were more than four potential respondents, unlike the circumstances in *Zhejiang*,[373] and we did not implicitly define any number greater than two as large, unlike the CIT's findings in *Carpenter Tech.* and *Asahi*.[374] We, therefore, continue to find that it was not practicable to examine all of the potential respondents, and that we appropriately limited our investigation pursuant to section 777A(e)(2) of the Act.

We also continue to find that it was appropriate to limit our examination to the two largest respondents by volume pursuant to section 777A(e)(2)(A)(ii) of the Act. As explained in the Respondent Selection Memorandum, we determined that we had the resources to individually examine two mandatory respondents based on the complexity of the investigation and our

---

[370] *See* Respondent Selection Memorandum at 6.
[371] *See Husteel* at 15.
[372] *See* section 705(a)(1) of the Act and 19 CFR 351.210(b)(4).
[373] 637 F. Supp. 2d at 1130.
[374] *Carpenter* at 1727; *Asahi* at 1341.

resource constraints.[375]  This was in accordance with the statue, which requires only that we examine exporters accounting for the largest volume of exports of subject merchandise that "can be reasonably examined."  That determination was confirmed when we subsequently considered whether to accept additional respondents, as it had become clear that we could not reasonably do so based on our initial information about the selected companies and the relevant federal and provincial governments.[376]

We disagree with Irving's contention that selecting two mandatory respondents was unreasonable in this case given our selection of three respondents in other proceedings, and where several provincial and company-specific programs were alleged.  As an initial matter, the determination of what constitutes a "reasonable" number of respondents necessarily varies from case to case, depending on the complexity of the issues involved, the Department's experience with the case and individual respondents, the time constraints involved, and the available resources.  We are unable to comment on the particular circumstances of the cases cited by Irving because none of the referenced respondent selection determinations are on the record of this investigation; however, we note that all of them occurred prior to our respondent selection process in this case.  In addition, we dispute Irving's contention that "personnel resources are largely fungible" in this context because our resources remain finite.  Our determinations to examine three respondents in earlier proceedings—all of which were administrative reviews, not investigations—were only relevant to the resources available for this investigation to the extent that those resources were already committed elsewhere.

We also dispute Irving's assertion that limiting our examination to two respondents was unreasonable because it was "unrepresentative," and its reliance on *Husteel* is misplaced in this context.  In *Husteel*, the CIT held that the Department's respondent selection failed to account for "an entirely distinct" type of subject merchandise when evidence showed "that its production process and price differ{ed} significantly from the {subject merchandise} produced by the other respondents."[377]  In this case, on the other hand, there has been no demonstration that the subsidies alleged for Port Hawkesbury and Resolute are inherently unrepresentative of the subsidies (both federal and provincial) that were alleged for Irving.  As the CIT recognized in *Husteel*, "mandatory respondents are unlikely to match non-examined producers in all respects. Some deviation is inherent when Commerce limits the number of individually examined respondents{.}"[378]  Accordingly, although we recognize that the particular subsidies bestowed upon Resolute and Port Hawkesbury may differ to some extent from those alleged for Irving, we have no basis for concluding that they are distortive and unrepresentative, and we do not find Irving's complaint to be a sufficient reason to select additional mandatory respondents in this investigation.[379]

---

[375] *See* Respondent Selection Memorandum at 8.
[376] *See* Voluntary Respondent Selection Memorandum at 3.
[377] *Husteel* at 23, n.12.
[378] *Id*.
[379] *See, also,* Comment 2 for a discussion of the reasonableness of the all-others rate assigned to Irving based on Resolute and Port Hawkesbury's subsidy rates.

Finally, we reject Irving's argument that the Department should have relied on sampling in addition to making its selections based on volume. At no time in the respondent selection process did any party suggest that the Department should select respondents by sampling pursuant to section 777A(e)(2)(A)(i) of the Act, and Irving offers no authority for doing so in conjunction with selection under section 777A(e)(2)(A)(ii). We do not agree that *Husteel* suggested such a methodology when the CIT commented on the potential value of "selecting a larger and/or more representative sample of exporters"; instead, we interpret the Court's discussion to relate solely to the "potential pool of mandatory respondents," regardless of whether selected under 777A(e)(2)(A)(i) or (ii).[380]

With respect to Irving's arguments that the CBP data underlying our analyses were inaccurate and incomplete, we reiterate our finding from the Respondent Selection Memorandum that none of the parties provided information prior to our initial respondent selection indicating that the entry data were unreliable. In past cases, we have found CBP data to be unreliable for respondent selection purposes where they reflected inconsistent units of measure or were otherwise technically flawed.[381] There was no such showing here. As such, there was no reason for the Department to reject the CBP entry data in this investigation and to seek alternative import data for purposes of selecting respondents. We also agree with the Petitioner that no party cited Department precedent for issuing quantity and value questionnaires to aid mandatory respondent selection in investigations absent a showing that the CBP data are unreliable. Therefore, in accordance with our normal practice in investigations, we continue to find that the CBP entry data provide the most consistent and reliable basis for respondent selection.

With respect to Irving's alleged misclassification of imports, we continue to find that Irving's claims are unsupported and that we reviewed the appropriate HTS categories in selecting the mandatory respondents. As we explained in our Respondent Selection Memorandum, the information that Irving submitted on March 24, 2015, did not support its claim that entries from the POI had been misclassified and were underrepresented in our data queries.[382] To the extent that Irving argues that we should have relied on certified statements by a company official, those statements were not corroborated by CBP data or any other record information at the time we selected the mandatory respondents. In addition, although Irving contends that some of the data were "unusable" basket categories, we selected the two largest exporters of subject merchandise using HTS 4802.61.3035, which was a "clean" category limited to the subject merchandise.

We likewise disagree with Irving's assertion that we improperly rejected its submission of new factual information on March 27, 2015. In our March 19, 2015 release of CBP entry data, we specified that parties could "provide comments on the attached CBP information for the Department's consideration in respondent selection" within five days.[383] Three parties filed additional submissions on March 27, 2015 (*i.e.*, three days after such comments were due):

---

[380] *See Husteel* at 21 n.11.

[381] *See, e.g., Wooden Bedroom Furniture From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative and New Shipper Reviews and Partial Rescission of Review*, 74 FR 6372, 6373 (February 9, 2009), unchanged in *Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 41374 (August 17, 2009).

[382] *See* Respondent Selection Memorandum at 8.

[383] *See* Department Memorandum, "Release of U.S. Customs and Border Protection Data," (March 19, 2015) at 2.

Irving, Resolute, and the GOC.  We rejected the submissions by Irving and the GOC as untimely.[384]  However, we accepted the GOC's refiled comments following its explanation that they pertained to respondent selection as a whole, and were not comments on the CBP information subject to the March 24, 2015 deadline.

Irving suggests that our rejection of its March 27, 2015 submission was unreasonable because we did not likewise reject Resolute's submission, which discussed the CBP data.[385]  However, Resolute's comments were limited to rebuttal arguments in response to Irving and Catalyst's March 24, 2015 comments and did not contain new factual information.[386]  In contrast, Irving's submission addressed and contained new factual information directly relating to the original CBP data—information that it failed to provide within the established deadline for rebutting that data. It was therefore appropriate to reject that information as untimely.[387]

Finally, we disagree that we improperly ignored export volumes as summarized in Irving's June 2, 2015 submission.[388]  As explained above, the Department determined that we could reasonably examine two mandatory respondents given the circumstances of this investigation. We selected those respondents on the basis of the information available at the time, *i.e.*, CBP data.  To the extent that later submissions suggested different export volumes and relative producer rankings,[389] we were not in a position to examine those data for purposes of considering whether to select additional mandatory respondents at that point in the proceeding.[390]  The fact that the Department issued supplemental questionnaires to the mandatory respondents following Irving's submission does not mean that we could have done the same for Irving; to the contrary, the extra effort and analysis required for those supplemental questionnaires confirm our findings that, given our resource constraints and the complexities that became evident in the case, we could not practically add mandatory respondents to our investigation.

Turning to comments regarding the acceptance of voluntary respondents, we continue to find that we were unable to examine either Irving or Catalyst as a voluntary respondent.  We note that on June 29, 2015, the President of the United States signed into law the TPEA, which made numerous amendments to the AD and CVD law, including amendments to section 782(a) of the

---

[384] *See* letter to Irving, "Countervailing Duty Investigation of Supercalendered Paper from Canada:  *Untimely Filed Comments*," dated April 1, 2015; letter to the GOC, "Countervailing Duty Investigation of Supercalendered Paper from Canada:  *Untimely Filed Comments*," dated March 27, 2015.

[385] We note that Resolute filed its comments on March 26, 2015 under the Department's one-day lag rule, not March 27.

[386] *See* letter from Resolute, "Supercalendered Paper from Canada:  Respondent Selection," dated March 26, 2015.

[387] *See* 19 CFR 351.302(c)(4).

[388] *See* letter from Irving, "Supercalendered Paper from Canada:  Request of Irving Paper Limited for Mandatory Respondent Status Based on Questionnaire Response Information," dated June 2, 2015.

[389] We note that the export data for Catalyst and Irving referenced in Irving's submission were not subject to individual examination and were not verified pursuant to section 782(i) of the Act.

[390] *See* Voluntary Respondent Selection Memorandum at 3.

Act.[391]  Under the current language of that provision, when the Department limits the number of producers and/or exporters examined in an investigation, section 782(a) of the Act directs the Department to calculate individual countervailable subsidy rates for companies not initially selected for examination who voluntarily provide information if:  1) the information is submitted by the due date specified for producers and/or exporters initially selected for examination, and 2) the number of producers and/or exporters subject to the investigation is not so large that any additional individual examination of such companies would be unduly burdensome to the Department and inhibit the timely completion of the investigation.  We disagree with arguments that the amendments do not apply to this investigation, because they apply to "determinations made on or after August 6, 2015" and, therefore apply to the disposition of this issue in the final determination of this investigation.[392]

Notwithstanding the effective date of the amendment, the amendment "*compliments* {sic} the Department's voluntary respondent analysis and does not require parties…to submit additional information or argument."[393]  Specifically, under section 782(a) of the Act as amended by the TPEA, in determining whether it would be unduly burdensome to examine a voluntary respondent under the revised section 782(a) of the Act, the Department may consider:  (A) the complexity of the issues or information presented in the proceeding, including questionnaires and any responses thereto; (B) any prior experience of the administering authority in the same or similar proceedings; (C) the total number of investigations and reviews being conducted by the administering authority as of the date of the determination; and (D) other factors relating to the timely completion of each such investigation and review as the administering authority considers appropriate.

In this investigation, the Department faced unique complications and difficulties including:  the "more compressed schedule"; the fact that this particular product, industry, and each individual company had not been previously investigated; the number of cross-owned affiliates identified for the mandatory respondents; and the number of governments responding to our questionnaires.[394]  Not only would investigating additional respondents individually likely require multiple rounds of supplemental questionnaires and extensive analysis,[395] but the short history of this case has already presented us with extremely complex issues (*e.g.*, the provision of electricity for LTAR) and unexpected complications (*e.g.*, substantive filings concerning program use made shortly before the *Preliminary Determination*).  All of these factors continue to lead us to conclude that accepting Catalyst and Irving as voluntary respondents would be

---

[391] *See* Pub. L. No. 114-27, 129 Stat. 362 (June 29, 2015).  The 2015 law does not specify dates of application for those amendments.  On August 6, 2015, the Department published an interpretative rule, in which it announced the applicability dates for each amendment to the Act, except for amendments contained in section 771(7) of the Act, which relate to determinations of material injury by the ITC. *See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 FR 46793 (August 6, 2015).

[392] *Id.*, at 46794-95.  The 2015 amendments may be found at https://www.congress.gov/bill/114th-congress/house-bill/1295/text/pl.

[393] *Id.* (emphasis added).

[394] *See* Voluntary Respondent Selection Memorandum at 4-5.

[395] *Id.* at 5.

unduly burdensome and would inhibit the timely completion of the investigation.[396]  This comprehensive evaluation of our ability to complete the investigation in accordance with the statutory deadlines was consistent with the statutory standard.[397]

Parties cite *Ad Hoc Shrimp* and *Grobest* for the proposition that the "unduly burdensome" standard is higher than the standard for limiting our examination under section 777A(e)(2), and that the Department cannot decline to investigate voluntary respondents based on "the same burdens that occur" in every proceeding.[398]  We find, however, that the analysis described above satisfies the standard as interpreted by the CIT in those cases.[399]  Here, the statutory deadlines alone are distinct—and much more stringent—than those encountered in most other proceedings before the Department.  That factor, in combination with the highly complex issues that became apparent with the submission of the mandatory respondents' information (*e.g.*, electricity), necessarily limited our ability to devote additional resources to an individual examination of Catalyst and Irving such that we would not have been able to complete this investigation in a timely manner had we granted their requests.

We disagree with Catalyst's contention that this case presents less of a burden than that at issue in *Husteel*, where the Department's investigation of a product spanned multiple countries— although this investigation concerns only one country, our resource constraints, the unique issues of the case, and the shorter timeframe present their own burden that is, at a minimum, comparable to that identified in *Husteel*.  We further disagree with Irving's assertion that the lack of a companion antidumping case facilitated more resources for this investigation that would have been otherwise available, because the proceeding still required us to provide adequate time for parties to respond to our questionnaires, issue and receive supplemental questionnaires, analyze those responses, and conduct verification—all within a more compressed timeframe than usual.

Finally, we disagree with Catalyst and Irving that it would have been feasible to individually investigate and verify their responses in the time remaining in the proceeding.  The statute afforded us only 75 days after our *Preliminary Determination* to complete verification, conduct an administrative hearing, and issue this final determination.[400]  In that time, we conducted verification of both mandatory respondents, their cross-owned affiliates, the federal Canadian government, and three provincial governments.  We also allowed 46 days for case briefs, five additional days for rebuttal briefs, and conducted an administrative hearing on September 24, 2015.  It was not possible, in that short time, to take on the additional burden of analyzing both

[396] *Id.*
[397] *See Husteel* at 28 (holding that "the concept of 'undue burden' contained in {section 782(a)} is predicated on Commerce's ability to complete the investigation on time, which would seem to invite consideration of Commerce's resources.").
[398] *See Ad Hoc Shrimp* at 1371, citing *Grobest*, 853 F. Supp. 2d at 1364-65.
[399] The CIT's discussion addressed the older standard under section 782(a), which stated that the Department shall accept voluntary respondents if "the number of exporters or producers who have submitted such information is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation."  Our finding that we conform to the CIT's rulings in those cases remains the same even under the new statutory standard.
[400] *See* section 705(a)(1) of the Act.

companies' responses, issuing any necessary supplemental questionnaires, conducting verification, and fully analyzing the resulting information such that we could complete this investigation in a timely manner.

Accordingly, we didn't accept voluntary respondents in this investigation pursuant to the discretion granted by section 782(a) of the statute.

**Comment 2:  The Calculation of the All Other's Rate**

*Catalyst's Arguments:*

- Should the Department continue to assign the all-others rate to Catalyst, it must calculate a rate that is supported by substantial evidence demonstrating that the rate reflects the economic reality of Catalyst.
- The Department must calculate subsidy rates as accurately as possible.  To that end, the all-others rate calculated pursuant to the statute must reasonably reflect CVD rates for the companies that were not individually examined, and must be supported by "substantial evidence demonstrating that the rate reflects economic reality for {those} uninvestigated respondents."[401]
- Using a simple average that includes company-specific and province-specific countervailable subsidies from which Catalyst could not possibly have benefited yields an all-others rate that does not reasonably reflect Catalyst's economic reality.  Of the twelve programs that the Department determined to be countervailable, eleven were specific to provinces in which Catalyst has no presence, and ten were available exclusively to one of the two selected respondents, Port Hawkesbury.  In *Xiamen*, the CIT found that "where the data used clearly indicates an unexplained anomaly, Commerce must articulate a reasonable basis for its use of the anomalous result."[402]  This investigation presents such an anomaly because the company- and province-specific rates underlying the all-others rate are so unique that they cannot reflect Catalyst's actual subsidy rates.
- In *CWP from the PRC*, the Department excluded from its calculations countervailable subsidies that the respondent could not have received.[403]  In *MacLean-Fogg III*, the CIT criticized the Department for deciding "to apply every single subsidy program available throughout {the investigated country} to the {non-selected} respondents, regardless of their actual location."[404]  In this case, only six programs are potentially applicable to Catalyst, and those programs result in a *de minimis* overall subsidy rate.
- If the Department continues to apply an all-others rate to Catalyst based on the rates of the two mandatory respondents, then it must, pursuant to section 705(c)(5)(A) of the Act, calculate a weighted-average all others rate based on public information on the record.

[401] *See Navneet Publications (India) Ltd., v. United States*, 999 F. Supp. 2d 1354, 1358 (CIT 2014) (*Navneet*).
[402] *See Xiamen Int'l Trade and Industrial Co., Ltd. v. United States*, 953 F. Supp. 2d 1307, 1327 (CIT 2013) (*Xiamen*).
[403] *See CWP from the PRC* and accompanying IDM at Comment 15.
[404] *See MacLean-Fogg Co. v. United States*, 853 F. Supp. 2d 1336, 1343 (CIT 2012) (*MacLean-Fogg III*).

*Irving's Arguments/Rebuttal:*

- The Department has an obligation under section 705(c)(5) of the Act to adjust the subsidy rates used in the calculation of the all-others rate where necessary to prevent distortion and unfairness.  The all-others rate of 11.19 percent from the preliminary determination, however, bears no reasonable relationship to the benefits that Irving may have received.  Instead, the all-others rate reflects the benefits that Port Hawkesbury and Resolute received under subsidy programs that, as a matter of both law and fact, were unavailable to Irving.  The benefits that Port Hawkesbury and Resolute received were under programs administered by provinces in which neither Irving nor any of its cross-owned companies were located.   No evidence supports the assumption that Irving could have received benefits under these programs or under similar programs administered by Irving's home province of New Brunswick.  As such, the Department's all-others rate violates the World Trade Organization Subsidies and Countervailing Measures Agreement and is unreasonable due to Irving's formal renunciation of benefits under any subsidy programs administered by provinces other than the Province of New Brunswick.  The all-others rate violates the Department's overriding obligation to calculate subsidy rates, including an all-others rate, as accurately as possible.[405]
- The Department has discretion to adjust the all-others rate.  The Department exercises this discretion when, for example, calculating the all-others rate using a simple average instead of a weight average, or when relying on ranged data, to avoid the disclosure of proprietary information.  Given the Department's practice of adjusting AFA rates to account for unused programs, the Department must exercise its discretion to reasonably reflect the subsidy rates of cooperating respondents.
- The Department should calculate the all-others rate as the weighted average of the two individually calculated margins using the publicly ranged sales data that Port Hawkesbury and Resolute provided in their questionnaire responses.  This would generate an all-others rate of 9.77%, in contrast to the preliminary 11.19% rate.
- If the Department agrees with Resolute that it did not receive any countervailable subsidies, then the Department would recalculate the all-others rate under the "General rule" in section 705(c)(5)(A)(i) to include only the final CVD rate that it calculates for Port Hawkesbury.  If the Department does not reduce Port Hawkesbury's individual CVD rate below the Preliminary all-others rate of 11.19%, Irving will receive an all-others rate in the final determination that is even higher than the preliminary all-others rate.  This result would be even more unreasonable than the current all-others rate.

*The GOC's Arguments:*

- The Department's obligation is to calculate CVD duty rates as accurately as possible; thus, the all-others rate must be reasonably reflective of potential CVD rates for non-investigated exporters or producers.

---

[405] *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1336 (citing *Rhone Poulenc*, 899 F .2d at 1191); *see, also, MacLean-Fogg III*, 853 F. Supp. 2d at 1340-41.

72

- The CIT has recognized that the all-others rate must be based on reliable evidence on the record, relevant to the all-others respondents, and reflective of economic reality for the uninvestigated respondents.[406]  The Department's preliminary all-others rate failed to meet this standard.
- The Department has exercised its discretion in the past to adjust the all-others rate where necessary to prevent distortion.[407]

*The GBC's Arguments:*

- In the *Preliminary Determination*, the Department unlawfully failed to exclude from the calculation of the all-others rate the subsidy rates calculated for provincial programs in provinces where Irving and Catalyst do not operate.  Thus, it would be distortive and grossly unfair to assign Catalyst an all-others rate based primarily on Nova Scotia's alleged subsidies provided to Port Hawkesbury.
- Section 705(c)(5) of the Act requires that the all-others rate must reasonably and accurately
  reflect subsidy rates for those companies that were not individually examined.
- The Department has repeatedly excluded subsidy rates for programs administered by provinces or other sub-national jurisdictions in which a given company did not operate when calculating AFA rates for that company.  For example, in *CWP from the PRC*, when calculating the AFA rate for a specific respondent, the Department excluded rates pertaining to subsidies conferred by provinces in which that respondent did not operate.[408]

*The Petitioner's Rebuttal:*

- Irving or Catalyst did not cite any statutory support for their suggestion to receive a zero CVD rate and they provided no compelling reason for the Department to depart from its established practice of calculating an all-others rate based on an average of the CVD rates found for investigated respondents.
- Some of the subsidies alleged to have benefitted Irving and Catalyst are national and are not provincial.
- Irving and Catalyst are free to request an administrative review of their entries and recover any countervailing duty deposits (with interest) if it is established that they are not benefitting from illegal subsidies.

---

[406] *MacLean-Fogg III*, 853 F. Supp. 2d at 1340-1341; *see, also, Navneet*, 999 F. Supp. 2d. at 1358.
[407] *See Refrigerators from Korea*.
[408] *See CWP from the PRC* and accompanying IDM at Comment 15.  *See, also, Non-Oriented Electrical Steel from Taiwan*, 79 FR 61602 (October 14, 2014) (*NOES from Taiwan*); *Certain Tow-Behind Lawn Groomers and Certain Parts Thereof from the People's Republic of China*, 74 FR 29180 (June 19, 2009) (*Lawn Groomers from the PRC*); *Aluminum Extrusions from the People's Republic of China*, 76 FR 18521 (April 24, 2011) (*Aluminum Extrusions from the PRC*).

- The Department's use of a simple average to protect confidential information is consistent with past practice.[409]

**Department's Position:**

As stated in "Calculation of the All Others Rate Memo," *supra*, sections 703(d) and 705(c)(5)(A) of the Act state that, for companies not investigated, the Department will determine an all-others rate by weight-averaging the individual countervailable subsidy rate of each of the companies investigated.  The statute further explains that the all-others rate may not include zero and *de minimis* rates or any rates based solely on the facts available.[410]

For the final determination, and consistent with the Department's practice, we have calculated the all-others rate based on the weighted average of the mandatory respondents' calculated subsidy rates.[411]  In certain situations, the Department will calculate the all-others rate as a simple average in order to avoid disclosing the business proprietary sales data normally used to weight the rates when calculating an average.  As Irving and Catalyst argue, however, Resolute and Port Hawkesbury provided publicly-ranged data in this investigation, and the Department is able to use this data to calculate the all-others rate as a weighted-average for this final determination.  As discussed in the Department's proprietary memorandum,[412] we compared the all-others rate calculated as a simple average and the all-others rate calculated as a weighted average using publicly-ranged sales data to the all-others rate calculated using a weighted average based on the mandatory respondent's actual proprietary sales data.  Based on this comparison, we determine that in this circumstance, calculating the all-others rate as a weighted average using the publicly ranged data yields a result closer to the weighted average rate calculated using the business proprietary sales data than calculating the all-others rate as a simple average.  Therefore, the rate of 18.85 percent based on the publicly ranged data is a more accurate rate to use for this proceeding.

Additionally, we disagree with the argument put forth by Catalyst, Irving and the GBC that the Department must exclude from its calculation of the all-others rate the subsidy rates calculated for provincial programs in provinces where Irving and Catalyst do not operate.  They claim that *MacLean-Fogg III* supports the supposition that the Department may not apply the rates from every subsidy program investigated to the non-selected respondents, regardless of location.  However, in *MacLean-Fogg IV* the CIT agreed that the Department may calculate an all-others rate based on subsidies in locations where non-selected companies may not be located.[413]  Whereas plaintiffs in *MacLean-Fogg IV* alleged that the Department must take into consideration

---

[409] *See, e.g., Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Results of the Countervailing Duty Administrative Review,* 77 FR 21744, (April 11, 2012).
[410] *See* Section 705(c)(5)(A)(i) of the Act.
[411] *See, e.g., Countervailing Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part,* 80 FR 34888 (June 18, 2015).
[412] *See* Department Memorandum, "Calculation of the All Others Rate for the Final Determination in the Countervailing Duty Investigation of Supercalendered Paper from Canada," dated concurrently with this Issues and Decision Memorandum.
[413] *See Maclean-Fogg Co. v. United States*, 885 F. Supp. 2d 1337, 1342 (CIT 2012) (*MacLean-Fogg IV*).

the "limited geographic footprint" of the non-selected companies, the Court found that the Department's methodology was a reasonable one where there was "uncertainty" surrounding the location of the non-selected respondents.[414]  Similarly, in this investigation, the Department cannot conclude without additional investigation that the non-selected companies, or any of their cross-owned companies, have no operations in a particular location.  As we explained in our Voluntary Respondent Selection Memorandum, and again at Comment 1, we were unable to investigate additional mandatory or voluntary respondents in this investigation.  Accordingly, we are not in a position to speculate as to the completeness and accuracy of the addresses listed in the Petition or the responses submitted by Catalyst and Irving.[415]

Parties also misplace their reliance on cases in which we adjusted company-specific AFA subsidy rates.[416]  In those cases, the Department addressed record evidence (or the lack thereof) that indicated a mandatory respondent did not operate within certain provinces of those countries and therefore could not have received a countervailable subsidy from certain programs.  However, the exclusion of certain provincial programs was in the context of assigning a company-specific AFA rate, not an all-others rate, as is the issue here.  Furthermore, there was record evidence making it clear that the respondent did not operate in certain provinces, and the Department's determination to exclude the programs at issue reflected the Federal Circuit's holding that the Department could not rely on rates that were "discredited by the agency's own investigation."[417]  As explained above, we cannot come to the same conclusion with respect to the non-selected respondents in this case without additional investigation of those companies.  Accordingly, we have calculated the all-others rate by weight-averaging the rates calculated for investigated respondents in accordance with the statute and find it to be a reasonable estimate of the countervailing duty rate applicable to the non-selected respondents.[418]

We also disagree with parties' reliance on *Navneet*, which can easily be distinguished.  In that case, the Department calculated the all-others rate in an antidumping review based on a simple average of the zero rates of the two mandatory respondents and the AFA rates assigned to two uncooperative respondents.  In doing so, the Department operated under the "Exception" to the general rule specified by section 735(c)(5)(B) of the Act to use "any reasonable method" to establish an all-others rate when the only rates established for individually investigated

---

[414] *Id.*

[415] *Id.*

[416] *See CWP from the PRC*, 73 FR 31966  and accompanying IDM at Comment 15; *Aluminum Extrusions from the PRC*, 76 FR 18521 and accompanying IDM at 11-12 (declining to remove any sub-national programs from the subsidy rate absent evidence that the three non-cooperating companies had no facilities and/or cross-owned affiliates in those particular provinces); *NOES from Taiwan*, 79 FR 61602 and accompanying IDM at Comment 5 (removing certain provincial programs in the context of assigning a company-specific AFA rate); *Lawn Groomers from the PRC*, 74 FR 29180 and accompanying IDM at 5 (noting that the Department will only accept evidence from the government that can demonstrate through complete, verifiable, positive evidence that a company is not located in a specific province whose subsidies are being investigated when that company is a non-cooperating mandatory respondent).

[417] *Id.*, citing *F.lli De Cecco De Filippo Fara S. Martino S.p.A. v. United States*, 216 F.2d 1027, 1032 (Fed. Cir. 2000).

[418] *See See MacLean Fogg IV* at 1342.

75

companies are zero, *de minimis*, or based entirely on AFA.[419]  The CIT found that the all-others rate was untethered to the non-selected respondent's pricing behavior and economic reality.  The CIT faulted the Department's reasoning in light of evidence supporting a lower all-others rate and where the chosen all-others rate represented a historic high in five proceedings under the order and appeared aberrational when examined in context.[420]  Contrastingly, in this investigation, we are operating under the "General rule" of section 705(c)(5)(A)(ii) of the Act, which prescribes a particular methodology to determine the all-others rate.  Moreover, we have no evidentiary basis to conclude that the all-others rate is unreasonable, there is no prior historical context against which to evaluate the all-others rates, and the mandatory respondents do not have zero or *de minimis* rates.  As discussed above, for this final determination, the Department has calculated the all-others rate using a weighted average of the mandatory respondent's calculated rates as required by the statute.

Although Catalyst cites *Xiamen* to suggest that the resulting all-others rate is an anomaly, nothing about the rates calculated for Resolute and Port Hawkesbury is inherently distortional.[421]  Specifically, in that case, the CIT noted its concern that one of the calculated rates underlying the all-others rate was higher than the total AFA rate assigned to the PRC-wide entity.[422]  Here, to the extent we have relied on partial AFA in calculating Resolute's rate, the total subsidy rate is still lower than the rate calculated for Port Hawkesbury.  More importantly, the resulting rate is a reasonable, statutorily mandated estimate of the rate applicable to the non-selected respondents given the Department's inability to investigate all potential respondents.  The all-others rate therefore reasonably reflects potential countervailable subsidy rates to all other companies.

Finally, we do not agree with parties that calculating the all-others rate based on "other information" in order to avoid the disclosure of proprietary information is analogous to parties' requests to adjust the all-others rate in this investigation by excluding certain programs.[423]  To the extent that we are departing from the language of section 705(c)(5)(A) of the Act in those circumstances, we do so in order to fulfill our statutory mandate under section 777(b) of the Act not to disclose proprietary information to unauthorized persons.  We have no analogous basis for making the requested adjustments to the all-others rate.  To the extent that parties' claim that we are obligated to do so in the interest of accuracy, we disagree that the all-others rate calculated in this final determination is distorted or otherwise unrepresentative of the non-selected respondents' actual subsidy rates for the reasons explained above.[424]

---

[419] The "Exception" language of section 705(c)(5)(A)(ii) of the Act, which is applicable in this CVD investigation, mirrors that of section 735(c)(5)(B) of the Act.
[420] *See Navneet* at 1364.
[421] *See Xiamen* at 1327.
[422] *Id*. at 1326-27.
[423] *See*, *e.g.*, *Refrigerators from Korea*, 77 FR at 17412 (explaining that we did not calculate the all-others rate using a weight average of the mandatory respondents' rates "because doing so risk{ed} disclosure of proprietary information." And instead "calculated an average rate using other information on the record.").
[424] The GOC relied on *Refrigerators from Korea* for the proposition that we have previously adjusted the all-others rate "to prevent distortion."  However, there is no discussion of possible "distortions" in that decision.  Instead, our only reason for relying on "other information" in that investigation was to avoid the disclosure of proprietary information.  *See* 77 FR at 17412.

Irving's assertion that it has "renounced" all subsidy benefits for programs under investigation not administered by the Province of New Brunswick has no bearing on our findings. As an initial matter, Irving cites no provision in U.S. law to support the contention that the Department must somehow account for this renunciation in its calculation of an all-others rate.[425] To the extent that the Department has addressed the renunciation of subsidies in other cases, it has only done so in the context of sunset reviews when considering the likelihood of the continuation or recurrence of countervailable subsidies,[426] and in suspension agreements.[427] Neither circumstance is relevant to this investigation. In addition, we cannot confirm Irving's claims without additional investigation and verification.[428] We are unable to conduct such additional investigation beyond the two companies selected as mandatory respondents for the reasons explained in Comment 1, and, in any event, the statute does not require the Department to do so when calculating an all-others rate.

Finally, we note that Irving's renunciation of benefits is limited to those not administered by the Province of New Brunswick. Because we were unable to individually investigate Irving as noted above, we have not investigated potential subsidies granted by the Province of New Brunswick. Accordingly, even if we were to adjust the all-others rate by excluding "renounced" subsidies from the all-others rate, we would have no factual basis for concluding that the resulting rate was any more accurate or representative of Irving's actual rate of subsidization without conducting an individual examination of Irving's alleged subsidies. Moreover, the statute does not require us to engage in such a company-specific inquiry in the context of respondents not selected for individual examination.

**Comment 3: Whether the Department Should Allow Irving to Post Bonds Until the Final Results of an Expedited Review**

*Irving's Arguments:*

- The Department possesses discretion under the Act to allow Irving to post a bond, rather than a cash deposit, as security for all imports during the provisional measures period.
- Fundamental fairness requires that the Department exercise this discretion in light of the manner in which the Department has calculated the all-others rate.
- The Department should extend the bonding option throughout the entire period that it takes to complete an expedited review that Irving may request under 19 CFR 351.214(k). This regulation requires the Department to conduct an expedited review of an exporter that was not investigated during an investigation. Article 19.3 of the WTO SCM Agreement also mandates an expedited review.

---

[425] *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (declining to impose extra analytical requirements on the Department where the statute had no such requirement).

[426] *See* SAA at 888 ("[A]s long as a subsidy program continues to exist, Commerce will not consider company- or industry-specific renunciations of countervailable subsidies, by themselves, as an indication that continuation or recurrence of countervailable subsidies is likely.").

[427] *See, e.g.*, *Roses and Other Cut Flowers From Colombia; Miniature Carnations From Colombia Final Results of Countervailing Duty Administrative Reviews of Suspended Investigations*, 61 FR 9429 (March 8, 1996).

[428] *Id.* and accompanying IDM at Comment 2.

- Although 19 CFR 351.214(k)(3)(ii) provides that the Department "will not permit the posting of a bond or security under paragraph (e) of this section," paragraph (e) refers to the posting of a bond "at the option of the importer."

**Department's Position:**

The Department modified 19 CFR 351.205 specifically to discontinue the option to post a bond during the provisional measures period (*i.e.*, the period between an affirmative preliminary antidumping or countervailing duty determination and the issuance of an antidumping or countervailing duty order) and, thereby, enhance enforcement by insuring that importers bear responsibility for any future duties they may owe.[429]  Although the *Modification*, by using the term "normally," "provides the Department flexibility to address those rare and unusual circumstances that the Department may find warrant the acceptance of bonds,"[430] the *Modification* also states that the Department views any departure from cash deposits as an exceptional determination to be made on a case-by-case basis.[431]  We consider that Irving's arguments about the all-others rate and respondent selection, as discussed in Comments 1 and 2 above, do not warrant an exceptional determination to depart from requiring cash deposits.  The CIT has recognized that paying cash deposits "is an ordinary consequence of the statutory scheme," and that cash deposits are needed to strengthen enforcement and "ensure that foreign exporters will not default in the satisfaction of their import obligations."[432]  Therefore, there is no basis to permit the option of posting a bond in lieu of cash deposits for Irving for the provisional measures period.

There is similarly no basis for permitting Irving to post bonds after the provisional measures period (*i.e.*, after a countervailing duty order is in place).  The Department's regulations unambiguously state that an antidumping or countervailing duty order will "instruct{} the Customs Service to require a cash deposit of estimated antidumping or countervailing duties at the rates included in the Secretary's final determination."[433]

Moreover, contrary to Irving's contention, the Department's regulations do not permit the posting of a bond to satisfy the security requirement during the pendency of an expedited review.  With regard to the treatment of a respondent's entries during the pendency of an expedited review, 19 CFR 351.214(k)(3)(ii) is definitive in stating that the Department "will not permit the posting of a bond or security under paragraph (e) of this section."  Irving's claim that the paragraph (e) reference to bonding "at the option of the importer," permits the Department to allow bonding during an expedited review is misguided.  First, paragraph (e) by its express language applies only to new shipper reviews, and 19 CFR 351.214(a) distinguishes between

---

[429] *See Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and Countervailing Duty Investigations*, 76 FR 61042, 61043 (October 3, 2011). (*Modification*).

[430] *Id.* at 61045.

[431] *Id.*

[432] *See Shandong Huarong General Group Corp. v. United States*, 122 F. Supp. 2d 143, 148 (CIT 2000) (denying plaintiff's motion for a preliminary injunction to enjoin the collection of cash deposits, noting that plaintiff failed to prove it would suffer irreparable harm by being forced to pay).

[433] 19 CFR 351.211(b)(2).

new shipper reviews and expedited reviews.  Furthermore, the importer is always the party responsible for satisfying the security requirements for entering merchandise covered by an antidumping or countervailing duty action.[434]  In any situation in which the Department has permitted bonding in lieu of the requirement for a cash deposit, bonding is the exception to the requirement to post a deposit, in cash, of the estimated duties, and it is one way in which the importer, if it so chooses, can satisfy the security requirement.[435]  Accordingly, the "option of the importer" language in 19 CFR 351.214(e) does not translate into a requirement for the Department to permit bonding when the plain language of 19 CFR 351.214(k)(3)(ii) prohibits it.

## Comment 4:  Whether Port Hawkesbury is Creditworthy

*The Petitioner's Arguments:*

- The Department needs to reconcile its preliminary finding that the BOA revolving line of credit was a comparable commercial loan for purposes of dispositive evidence of creditworthiness, but not for benchmark purposes.
- The BOA financing is not suitable as dispositive evidence of creditworthiness due to special conditions present in the loan agreement and the general conditions surrounding the restructuring of Port Hawkesbury.
- The Department has found that revolving lines of credit are not comparable to other types of loans.[436] The GNS loans, in this instance, are not structured nor used as revolving lines of credit.
- The Department's practice is to treat revolving lines of credit as short-term loans, even when the credit line is in place over a number of years.[437]  A review of Port Hawkesbury's use of the BOA financing is consistent with the Department's practice to treat lines of credit as short-term borrowing instruments.
- The Department may not view the loan as dispositive evidence where a company has taken out a single commercial bank loan for a relatively small amount, where a loan has unusual aspects, or where it considers a commercial loan to be covered by an implicit government guarantee.[438]
- The facts in this case are analogous to *DRAMS from Korea*, as the Citibank loan in that case was found to have an implicit government guarantee and unusual aspects in the lending agreement.[439] In addition, the Department also looked to other characteristics

---

[434] *See* section 709(b) of the Act.

[435] *See, e.g., High Pressure Steel Cylinders From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determinations*, 76 FR 64301 (October 18, 2011) ("In accordance with sections 703(d)(1)(B) and (2) of the Act, we are directing U.S. Customs and Border Protection to suspend liquidation of all entries of steel cylinders from the PRC that are entered, or withdrawn from warehouse, for consumption on or after the date of the publication of this notice in the Federal Register, and to require a cash deposit **or** bond for such entries of merchandise in the amounts indicated above.") (emphasis added).

[436] *See CFS from Korea* at Comment 21.

[437] *See CFS from Korea* at Comment 20, *Butt-Weld Pipe Fittings from Taiwan* at Comment 8, and *Steel Flat Products and Plate from Canada* at Comment 5.

[438] *See Preamble* at 65367 and *DRAMS from Korea* at "Creditworthiness" section.

[439] *Id.*

such as collateral, size and other special circumstances.[440] Collateral was not analyzed in *DRAMS from Korea*, but record evidence in this case demonstrates special circumstances in regard to collateral. With regard to size, Citibank's involvement in the restructuring was relatively small and the fact pattern *in DRAMS from Korea* parallels the instant proceeding.[441]

- The Department must examine the additional special features in the BOA financing that provide further support a finding the loan is not comparable.

*Port Hawkesbury's Rebuttal:*

- The company had two competing commercial lenders offering financing and neither contained a government guarantee.
- The Department's analysis focuses on three basic characteristics:  structure, maturity, and currency.[442]
- The GNS and BOA loans have the same structure and currency.  The maturities are different, but all are long term.
- The Department has not found revolving lines of credit are not comparable to other loans, but found in specific instances these types of loans were not comparable to the government loans in the specific case or had maturity restrictions of one year.[443]
- *CFS from Korea* actually supports a creditworthy finding in the instant case as the Department found private long-term lending to be dispositive evidence, even though it was part of a workout plan and included a general payment guarantee as part of the syndicated loan.[444]
- The GNS was not involved in the negotiation of any commercial loans and there is no implicit or explicit guarantee with the BOA financing.

**Department's Position:**

Under 19 CFR 351.505(a)(4)(ii), the receipt of comparable commercial long-term loans, unaccompanied by a government guarantee, will normally constitute dispositive evidence that the firm is not uncreditworthy.  When examining whether a loan is a comparable commercial loan, the Department will place primary focus on the structure (*e.g.*, fixed vs. variable interest rate), maturity (*e.g.*, short vs. long term), and currency.[445]  The petitioner argues the BOA and GNS loans are not comparable and notes the GNS loans are not structured, nor have they been used as revolving lines of credit.  Moreover, the petitioner asserts that Department practice is to treat revolving lines of credit as short-term loans , even when the credit is in place for a number of years.

---

[440] *See DRAMS from Korea* at "Creditworthiness Section" and *Preamble* at 65363 and 67.

[441] *See DRAMS from Korea* at "Creditworthiness" section and the petitioner's case brief at 13-14.

[442] *See* 19 CFR 351.505(a)(4)(i) and *Preamble* at 65363.

[443] *See CFS from Korea* at Comment 20 and *Butt-Weld Pipe Fittings from Taiwan* at Comment 8.

[444] *See CFS from Korea* at 21 and Comment 8.

[445] *See* 19 CFR 351.505(a)(2).

We find the petitioner's reliance on *CFS from Korea, Butt-Weld Pipe Fittings from Taiwan,* and *Steel Flat Products and Plate from Canada* to be misplaced. Those proceedings involved comparing loans provided under a revolving line of credit to other types of loans, terms available under a revolving line of credit, and how a revolving line of credit was examined in an antidumping proceeding.[446]  In the instant proceeding, however, we are determining if the commercial loan provided is comparable to the GNS loan based on the above three factors. Based on our evaluation of the factors, we find the BOA and GNS loans are comparable commercial loans with regard to structure, maturity, and currency.[447]

In addition to 19 CFR 351.505(a)(4)(ii), the petitioner relies on the *Preamble* in arguing that the Department must also examine the size of the loan, special circumstances, and any explicit or implicit guarantees in finding the loan to be dispositive evidence of creditworthiness.  Moreover, the petitioner argues that the current circumstances mirror *DRAMS from Korea.*  We disagree with the petitioner and continue to find that the BOA financing is suitable for comparison purposes and dispositive evidence of creditworthiness.

In *DRAMS from Korea*, all loans were part of the restructuring effort of the Creditors Council. In that respect, the Citibank loan being examined was negotiated in conjunction with loans from government and private banks found to be entrusted or directed by the Government of Korea.[448] Thus, the Department established specific links to the relative size of the Citibank loan and its distinct motivations from an average lender in terms of all lending under the restructuring effort. Thus, we found that it did not constitute dispositive evidence of creditworthiness.[449]  In the instant case, Port Hawkesbury was in a restructuring process, but there has been no alleged link or relationship found between the BOA financing and the GNS that is similar to Citibank in *DRAMS from Korea*.  Indeed, Port Hawkesbury received two commercial financing offers and selected the BOA financing.[450]

The petitioner also tries to equate the relative size of the lending in *DRAMS from Korea* with that of Port Hawkesbury.  However, in that case, we found Citibank's financing to be small in relation to all lending from creditors, while the petitioner is discussing the BOA financing in relation to GNS loans and the other subsidies examined in the proceeding.[451]  Thus, reliance on any alleged similarities to *DRAMs from Korea* is misplaced.

Finally, the petitioner references special features of the BOA financing to support its assertion, noting that secured and/or guaranteed loans are a sign of a highly leveraged or otherwise uncreditworthy company and that the financial community would not have been willing to make a loan to Port Hawkesbury without these items.[452]  The petitioner does not explain how these special features rise to "unusual aspects" as referenced in the *Preamble*, rather than being the normal practices of a financial business conducting its due diligence and providing lending based

---

[446] *See CFS from Korea* at Comment 20 and *Butt-Weld Pipe Fittings from Taiwan* at Comment 8.
[447] *See* BPI Memo for a full discussion.
[448] *See DRAMS from Korea* at "Creditworthiness" section.
[449] *Id.*
[450] *See* PQR at 89.
[451] *See DRAMS from Korea* at "Creditworthiness" section and the petitioner's Case Brief at 10.
[452] *See* the petitioner's Case Brief at 16.

on its perceived risks.[453]  As such, the petitioner's references to the BOA financing are not aspects we would  normally consider unusual based on the circumstances of this proceeding, and we find the BOA financing to be dispositive evidence of creditworthiness.[454]

As noted in the "Uncreditworthy Allegation" section, we agree with the petitioner that the BOA financing loan is a comparable commercial loan and are using it as a benchmark and discount rate for loans and non-recurring grants provided or approved in 2012.

**Comment 5:  Whether the GNS' Hot Idle Funding is Extinguished**

*The GOC's Arguments:*

- The Department did not properly follow its rule that "When a subsidy recipient is sold to an unrelated party in an arm's-length transaction, subsidies received before the sale are presumed to be extinguished at the time of the sale."
- Under the concurrent subsidies analysis, the Department wrongly found only one of the three criteria was met.  Evidence on the record demonstrates that prospective bidders knew the mill was being sold in hot idle status, and the mill was required to remain in this status.[455]
- The fair market value of the mill did not change as a result of the additional hot idle funds. The Department is confusing the value of the company being purchased with the cost to the government of providing funds.[456]
- The three criteria for finding that concurrent subsidies have been extinguished have been met.

*The GNS' Arguments:*

- The Department's *Preliminary Determination* was legally flawed because it failed to follow its established presumption that an arm's-length sale for fair market value extinguishes all pre-sale subsidies.
- The Department's *Preliminary Determination* was also factually flawed because, from the beginning of the *CCAA* proceeding, bids were obtained for the mill to be sold as a "going concern."  A "going concern" bid requires the mill to be kept in a hot idle state; thus, any bids received after the mill was placed in hot idle status fully reflect the value of a hot idled mill, regardless of the hot idle funding source.

- The Department's extinguishment criteria are satisfied and any benefit associated with the provision of hot idle funds was extinguished upon the completion of the *CCAA* process.

---

[453] *See Preamble* at 65367 (""In general, we believe that if commercial banks are willing to provide loans to the firm, we should not substitute our judgment and find the firm to be uncreditworthy.").
[454] *See* BPI Memo for a full discussion.
[455] *See* PQR at Exhibit G-12, page 7, Exhibit G-13, page 1, and Exhibit G-15.
[456] *See Allegheny Ludlum* and *US – UK Lead and Steel.*

- In *Pasta from Italy,* the Department affirmed its extinguishment presumption, namely, that cases where there is a change in ownership, subsidies are extinguished through an arm's-length sale for fair market value.[457]   The Department failed to conduct this analysis in the *Preliminary Determination.*

- The change in ownership from NPPH to PWCC occurred at arm's length and for fair market value.  The parties are not related; both parties sought to secure a deal within their best interests; the creditors and bondholders wanted to receive the largest return possible; and PWCC wanted to obtain the mill at the lowest price possible.  The sale was at fair market value, as evidenced by Ernst & Young, which was appointed as Monitor and independently determined that the PWCC offer through the competitive bidding process provided the greatest potential recovery to the estate.

- The Department's privatization methodology establishes a rebuttable presumption that subsidies provided prior to a change in ownership are extinguished.[458]   There is no factual basis to overturn this presumption.

- Even though this sale did not have any government involvement, the Department can still examine the details and circumstances of the transaction to determine whether the subsidies were extinguished.[459]   The circumstances of the sale establish the arm's-length nature and fair market value of this transaction.  The creditors and bondholders voted that the sale returned the maximum value; the Monitor concluded the price paid was the best value; the sale was advertised throughout North America and received numerous letters of intent.

- The Department erred in applying the three part test for extinguishment because "hot idle" was a necessary condition of a "going concern" sale from the beginning of the *CCAA* process.  The bid price was for a sale of the mill to be delivered in hot idle status and, therefore, the nature and value of the hot idle funds were known to the bidder and reflected in the sales price.

- The CIT has held that "…a firm receives a subsidy if it gets something it did not pay for…"[460]   PWCC's offer to purchase the mill was an offer to purchase it as a going concern.  Any hot idle funds used to preserve the going concern were reflected in the purchase price.

- There is no evidence on the record to conclude that the December 16, 2011, offers did not include an element for hot idle.  All bidders knew prior to December 16, 2011, that continued hot idle funding would be necessary for a successful completion of the sale of the mill as a going concern.

- All hot idle funds were paid to NPPH; thus, Port Hawkesbury did not receive a financial contribution.

---

[457] *See Pasta from Italy*, 70 FR at 17972 (citing SAA at 928).
[458] *See Notice of Final Modification*, 68 FR at 37130.
[459] *See Id.* at 37131.
[460] *See Allegheny Ludlum Corp. v. United States*, 358 F. Supp. 2d 1334, 1339 (CIT 2005).

*Port Hawkesbury's Arguments:*

- The Department erroneously: (i) conflates the value of a subsidy with the amount of the financial contribution; (ii) applies a "cost-to-government" standard in determining the amount of the benefit, instead of a "benefit-to-recipient" standard; (iii) confuses the date of PWCC's final bid with the determination of fair market value; and (iv) determines exactly who benefitted from the hot idle.
- NPPH had an obligation to maintain the mill in hot idle status.  PWCC purchased the mill on this condition.
- Section 771(5)(E) of the Act states that "a benefit shall normally be treated as conferred where there is a benefit to the recipient."  Thus, the Department should consider whether a benefit was conferred on Port Hawkesbury, not on how much it cost the GNS to assist NPPH.
- The CIT has upheld that an arm's-length transaction for fair market value eliminates any pass through of subsidies.[461]
- The "benefit to recipient" standard is consistent with U.S. obligations under the WTO SCM Agreement.  The WTO Appellate Body has stated that "the question whether a 'financial contribution' confers a 'benefit' depends, therefore, on whether the recipient has received a 'financial contribution' on terms more favorable than those available to the recipient in the market."[462]  Regardless of the cost to NPPH and the GNS to maintain the hot idle status, the value of the hot idle was reflected in the price paid and, therefore, Port Hawkesbury received no benefit.
- Fair market value was determined when PWCC submitted its bid on December 16, 2011, not when all parties approved the final transaction and closed the deal.
- The CAFC has stated: "the dictionary further defines 'fair market value' as '{t}he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction' the point at which supply and demand intersect."[463]  The parties continued to negotiate after December 16, 2011, and had a right to reject the plan if any felt they could get a higher price.  Thus, it is the closing of the deal on September 28, 2012 that determines the fair market value of the mill.
- Maintaining the mill in hot idle status provided the highest possible return for NPPH.  Thus, NPPH's creditors, not Port Hawkesbury, were the beneficiaries of the hot idle.

*The Petitioner's Rebuttal:*

- There is a "baseline presumption" established in the *Notice of Final Modification* that non-recurring subsidies can benefit the recipient over a period of time normally corresponding to the average useful life of the recipient's assets.[464]  Port Hawkesbury has failed to rebut this presumption and prove that the sale of the mill was at arm's length and at fair market value.

---

[461] *See Id.*

[462] *See United States – Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom, WT/DS138/AB/R (June 7, 2000) at page 25, para. 68.*

[463] *See Allegheny Ludlum* (citing *Black's Law Dictionary* 103 (7th ed. 1999)).

[464] *See Notice of Final Modification,* 68 FR at 37127.

- Even if the Department were to conclude that the sale of the mill occurred at arm's length and for fair market value, which it should not, it does not automatically follow that the subsidies were extinguished. The Department may and should conclude that market distortions existed and, thus, the subsidies passed through to the new owner.
- The Department's change-in-ownership methodology provides that in situations where a government's actions may distort the market, the "market" price should be disregarded because the "transaction price was meaningfully different from what it would otherwise have been absent the distortive government action."[465]
- In *Pasta from Italy* the Department reiterated this practice, noting: "even if we find the sales price was at 'market value' parties can demonstrate that the broader market conditions were severely distorted by the government and that the transaction price was meaningfully different from what it would otherwise have been absent the distortive government action."[466]
- Port Hawkesbury's contention that it purchased the mill on the condition that it had been maintained in hot idle status does not negate the potential for a countervailable subsidy that benefitted the new owner.
- Port Hawkesbury's reliance on the CIT's decision in *Allegheny Ludlum* to support its contention that the Department erred in using a "cost-to-government" rather than a "benefit-to-the recipient" analysis is mistaken. That case supports a finding that the sale of the mill to PWCC was not at fair market value and that the hot idle subsidies did pass through to PWCC.
- The issue before the Department is not whether the amount of any subsidies provided to the mill's prior owner passed through to PWCC, but rather whether subsidies provided concurrent with and in facilitation of the mill's sale, benefitted PWCC. The Department's established methodology for examining concurrent subsidies was correctly applied in the *Preliminary Determination*.
- Port Hawkesbury argues that fair market value was established on the date all parties approved the transaction. The Department should continue to reject this argument and use the date that PWCC submitted its bid. The date the sale closed is irrelevant as the Department must consider whether the nature and value of the concurrent subsidies were fully transparent to all potential bidders.
- PWCC did not "buy" the mill; instead, the GNS paid PWCC to take the mill over. The purchase was, therefore, not at fair market value and, moreover, the GNS's actions distorted the price for Port Hawkesbury.
- Although Port Hawkesbury asserts that it was NPPH's creditors who were the beneficiaries of the hot idle payments and that maintaining the mill in hot idle status resulted in the highest possible return for NPPH, the record does not reflect that the creditors were better off with a going concern bid, nor does it demonstrate that maintaining the mill in hot idle status maximized return to the creditors rather than the desire of the GNS to maintain employment in the province.

---

[465] *Id.*
[466] *See Pasta from Italy*, 70 FR at 17973.

**Department's Position:**

The GNS argues that NPPH's sale of the Port Hawkesbury mill to PWCC was an arm's-length transaction between two unrelated parties, and as such, all subsidies provided to maintain the mill in hot idle status were extinguished by the sale.  The GNS further claims that the Department must look to the SAA when examining extinguishment.  The SAA defines an arm's-length transaction as one negotiated amongst unrelated parties, each of which is acting in its own interest, or between related parties where the terms of the transaction are those that would exist if the transaction had been negotiated by unrelated parties.[467]  However, the SAA also states that, "the sale of a firm at arm's length does not automatically, and in all cases, extinguish any prior subsidies conferred."[468]  The *Notice of Final Modification* states that, "the Department is not required to find extinguishment of previously bestowed subsidies on the sole basis that a change in ownership occurred, or that it occurred in an arm's-length transaction," and "a finding of both an arm's-length transaction and a transaction price reflective of fair market value {is} the basis for overriding the baseline presumption" of receiving a subsidy.[469]  Therefore, we dismiss the GNS's argument that an arm's-length transaction between two unrelated parties automatically results in extinguishment.  As we explain above in the "Analysis of Programs – 5. GNS Grants for Maintaining Hot Idle Status," even assuming an arm's-length transaction for fair market value, the assistance authorized under hot idle funding could not have been extinguished by the sale to PWCC because the sale price had been established prior to the provision of the assistance, and, therefore, the bidders could not have incorporated the value of this assistance in their bids.

The GNS claims that in *Pasta from Italy,* the Department affirmed its extinguishment presumption—namely that, in cases where there is a change in ownership, subsidies are extinguished through an arm's-length sale for fair market value[470]—and that the Department's *Preliminary Determination* failed to follow that established presumption.  The subsidies at issue in *Pasta from Italy,* however, occurred prior to the sale of the firm under discussion.[471]  In contrast, the subsidies alleged here occurred concurrently with the sale to PWCC.  Moreover, both the GNS and Port Hawkesbury misread the rebuttable presumption outlined in the *Notice of Final Modification.*  The "baseline presumption" is that non-recurring subsidies can continue to benefit a company after a change in ownership.[472]  The presumption *may* be rebutted by, among other things, a sale at arm's length and for fair market value.[473]  However, a sale at arm's length and for fair market value does not *automatically* extinguish subsidies provided prior to the sale (or the establishment of the price), and does not extinguish concurrent subsidies, except when the Department's established criteria have been satisfied.[474]  Those criteria are:

---

[467] *See Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 316, 103d Cong., 2d Session, at 928 *(1994).*

[468] *Id.* at 928.

[469] *See Notice of Final Modification,* 68 FR 37128.

[470] *See Pasta from Italy,* 70 FR at 17972.

[471] *Id.* at 17972-73.

[472] 68 FR 37127.

[473] *Id.*

[474] *Id.* at 37128.

1.      The nature and value of the concurrent subsidies were fully transparent to all potential bidders and, therefore, reflected in the final bid values of the potential bidders;

2.      The concurrent subsidies were bestowed prior to the sale; and

3.      There is no evidence otherwise on the record demonstrating that the concurrent subsidies were not fully reflected in the transaction price.[475]

After the funds that NPPH committed to maintain the plant in hot idle status were depleted in December 2011, the GNS authorized an amount of hot idle funds to keep the paper mill functioning until the completion of the mill's sale to its new owners.  When the sale of the mill had not been completed and additional funding was necessary to continue the hot idle activities, the GNS's DNR provided additional hot idle funds in March 2012.[476]  Although PWCC offered its final bid and ultimately purchased the mill knowing that the mill had been kept in hot idle status, its final bid price could not reflect the value of the hot idle funds approved in December 2011 and March 2012, after its bid was submitted and the price established.  The price established in PWCC's December 2011 bid did not change through the course of the CCAA process.  The fact that Ernst & Young was appointed as Monitor and mediator of the bidding process, and that the creditors and bondholders voted for the sale's completion, is not relevant to the Department's evaluation of the concurrent subsidies criteria because the final bid could not have incorporated, and did not incorporate, the actual value of the final bestowal of hot idle funds.  Accordingly, because the bid price for the mill was finalized in December 2011, criteria one and three were not satisfied with regard to the hot idle funding, and that assistance was not extinguished.

The GNS claims that the Department erred in applying the three-part test for extinguishment because "hot idle" was a necessary condition of a "going concern" sale from the beginning of the CCAA process.  Yet the amount of funding from the GNS authorized in December 2011 and March 2012 was not known to PWCC and, therefore, was not included in PWCC's final bid amount.  To the extent that "a firm receives a subsidy if it gets something it did not pay for,"[477] as the CIT observed, PWCC's bid did not take into account the December 2011 or March 2012 hot idle funds and, therefore, did not pay for them.[478]  The question of whether the bid price was for a sale of the mill to be delivered in hot idle status, as the GNS contends, is inapposite.  The issue is actually whether the bid and sale prices reflected and incorporated the hot idle funds approved in December 2011 and March 2012.  We acknowledge that PWCC's bid was offered for the mill as a going concern with the understanding that the mill was being maintained in hot idle status.  However, PWCC made that bid with the expectation that NPPH would maintain it as such and could not have anticipated that the GNS would assume responsibility for that

---

[475] 68 FR at 37137.

[476] *See* GQR at Government of Nova Scotia Questionnaire Response at Volume VIII, NS.VIII-5.  *See, also, e.g.* GSQR at Exhibits NS-SUPP1-5A and NS-SUPP1-12, Appendix A.

[477] *See Allegheny Ludlum*, 358 F. Supp. 2d at 1339.

[478] *See* 68 FR 37137 ("All other things being equal, in a normally functioning and transparent market, we would expect that potential investors would be willing to increase the value of their offer prices to reflect the additional value that such concurrent subsidies are expected to contribute to the overall value of the company or its assets. Such additional value is therefore properly considered to be 'paid for' in the purchase prices, barring clear evidence to the contrary.").

maintenance.[479]  Thus, once NPPH could not fulfill its obligations, PWCC received a benefit in the form of additional, unanticipated financing from the GNS for the mill's continued hot idle status.  Our measurement of that benefit is not a cost-to-government analysis, as parties have claimed, but a recognition that the full value of maintaining the mill in hot idle status was not accounted for in the original bid.[480]

Furthermore, PWCC/Port Hawkesbury has explicitly stated that the purchase of the mill was a transaction between two private parties.  Therefore, it was purchasing the mill in hot idle status from a private party.  PWCC was not purchasing a mill in hot idle status from the GNS.   In an arm's-length transaction between two private parties, there should not be an expectation of government subsidization of that transaction if that transaction was at fair market value.

We disagree with the GNS's claim that Port Hawkesbury did not receive a financial contribution because all hot idle funds were paid to NPPH.  The subsidies occurred concurrently with the sale to PWCC and we have appropriately considered whether those subsidies survived the change in ownership.[481]  As explained above, because the final bid price that PWCC/Port Hawkesbury submitted did not account for hot idle funds approved after the submission of the bid, the subsidy was not extinguished.  Similarly, we reject Port Hawkesbury's argument that the benefits of continued hot idle funding accrued to NPPH creditors because the funds maximized the creditors' return.  This argument is simply a variation on Port Hawkesbury's contention that the subsidy was extinguished by a fair market transaction.[482]  As explained above, however, it is not enough for a sale to occur at fair market value, and Port Hawkesbury has not adequately rebutted our "baseline presumption" that the hot idle funding benefitted PWCC once the sale was complete.

## Comment 6:  Whether the GNS' FIF Funding is Extinguished

*The GOC's Arguments:*

- Similar to the payments provided to maintain the Port Hawkesbury plant in hot idle status, the FIF payments are not countervailable.
- Using the concurrent subsidy analysis, the FIF payments were known to the bidders.  The purpose of those payments was to keep the mill operational, and the additional payments were reflected in the final bid price.

*The GNS' Arguments:*

- The Department preliminarily analyzed the FIF as a grant that was not extinguished by reason of the arm's-length sale of the mill, rather than as a purchase of services.  Because no money inured to NPPH or to Port Hawkesbury, rather, the funds went to third party

---

[479] *See* GQR, Government of Nova Scotia Questionnaire Response, Volume VIII, at Exhibit NS-HI-4.
[480] *Id*.
[481] *Id*. at 37127.
[482] *Id*. (explaining that a "primary consideration" of whether a transaction was for fair market value was whether the seller "failed to maximize its return on what it sold.").

contractors and subcontractors, the Department must conduct an upstream subsidy analysis prior to finding any such payments countervailable. Port Hawkesbury did not receive these funds directly.

- By defining a financial contribution to include government purchases of goods but not government purchases of services, section 771(5)(D) of the Act precludes the Department from finding countervailable the province's purchase of services under the FIF.

- The CAFC upheld this view in *Eurodif S.A. v. United States*.[483]  In *Softwood Lumber IV*, the Department also declined to initiate an investigation of an allegation of excessive payments made under a service contract by a state-owned company, concluding that the government purchase of services does not constitute a financial contribution and cannot be countervailable.[484]

- The Department has always examined the "purpose of the subsidy…at the time of bestowal."[485]  Therefore, the Department's preliminary determination that a side effect of the FIF benefitted the purchaser of the mill does not indicate that the program is countervailable when the stated purpose of the program was the purchase of services and not a direct or indirect subsidy to NPPH or to the ultimate purchaser.

- Upon the sale of the mill at arm's length for fair market value, the payments under the FIF are presumptively extinguished; there are no facts to rebut this presumption and, therefore, no factual basis to find these payments countervailable.

- The Department committed a ministerial error by including extinguished FIF 1 funds in its calculation. Because the Department reasoned that all bidders knew that the province would provide C$14 million in funding, the Department must adjust its *ad valorem* calculation to be in line with its own methodology.  Accordingly, if the Department persists in its erroneous findings regarding the countervailability of FIF 2 funds, the *ad valorem* calculation must only rely upon the correct amount rather than the amount used in the *Preliminary Determination*.

*Port Hawkesbury's Arguments:*

- The Department's finding in the *Preliminary Determination* that payments under the FIF provided a countervailable subsidy to Port Hawkesbury is flawed because: (i) payments under the FIF went to third parties, and neither Port Hawkesbury nor the mill had any ownership rights in the output of such third parties; (ii) even if there were a benefit provided to Port Hawkesbury, it could only derive from its purchases from third parties of wood harvested pursuant to the FIF, and therefore, would be an upstream subsidy at most;  and (iii) even if the mill benefitted directly during the *CCAA* process from the FIF, that benefit did not pass through to Port Hawkesbury.

- Unless the GNS is relieving a company of an obligation that it normally would incur, there is no subsidy to the company.  In *Softwood Lumber*, the Department rejected an

---

[483] *See Eurodif S.A. v. United States*, 411 F.3d 1355, 1364-5 (Fed. Cir. 2005).
[484] *See Notice of Final Results of Countervailing Duty Administrative Review and Rescission of Certain Company-Specific Reviews: Softwood Lumber Products from Canada*, 69 FR 75917 (December 20, 2004) (*Softwood Lumber IV*).
[485] *See CVD Preamble*, 63 FR at 65403.

argument that the program in question provided a countervailable subsidy because it relieved the producers of obligations that they would otherwise incur.[486]

- Because there was no direct benefit to the mill, the only way the Department could have found a benefit to Port Hawkesbury from the FIF would be if it conducted an upstream subsidy analysis. The WTO panel reviewing the decision in *Softwood Lumber IV* held that the Department's "failure to conduct a pass-through analysis in respect of upstream transactions…was inconsistent with Article 10 of the Subsidies and Countervailing Measures Agreement…"[487]  Because the Department did not conduct this analysis it cannot find that any benefit to the third parties passed through to Port Hawkesbury.
- The bid price in December 2011 could have changed prior to the September 2012 deal and any of those parties could have altered the agreement if they felt the price did not reflect a fair market value.

*The Petitioner's Rebuttal:*

- Both Port Hawkesbury and the GNS argue that the FIF was implemented to further forestry policy goals and to pay for the infrastructure activities of third party contractors. However, the actual reason for the FIF program, as the Department found it its *Preliminary Determination*, was to "support the ongoing operations of the mill during the bankruptcy process and to maintain the mill ready for sale as a going concern."[488]
- Because the FIF payments are not bestowed on the production of an input, the upstream subsidy provision does not apply here.
- The term "obligation" should be interpreted broadly and not simply in the sense of a legal obligation.[489]
- The benefits from the FIF payments were not extinguished with the purchase of the mill, whether based on distortion or on the Department's concurrent subsidy analysis.

**Department's Position:**

In the *Preliminary Determination*, the Department found the extinguishment of subsidies that were provided under the first authorization of Forestry Infrastructure Funds (FIF 1) and were associated with the funding of ancillary forestry operations considered directly beneficial to the province and the provincial economy while the Port Hawkesbury paper mill was non-operational.  The finding of extinguishment rested upon the knowledge of the bidders, prior to the submission of the bids, that the GNS had provided a specified amount of funding for purposes of continuing certain activities deemed beneficial to the provincial economy, such as silviculture (including ongoing silviculture activities that were only partially completed when NPPH sought creditor protection), road maintenance, forestry training program, and design,

---

[486] *See Notice of Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Softwood Lumber Products from Canada*, 67 FR 15545 (April 2, 2002) and accompanying Issues and Decision Memorandum, at section III.3 (*Softwood Lumber*).
[487] *See United States – Final Countervailing Duty Determination with respect to Certain Softwood Lumber from Canada*, WT/DS257/R (August 29, 2003) at para. 8.1(c).
[488] *See Preliminary Determination*, at 21.
[489] *See CVD Preamble* at 65379 and *Pasta from Italy*.

harvesting and transportation of timber.[490]  However, the Department found that the second tranche of FIF funding (FIF 2), which was authorized by the GNS after the date of the PWCC bid, was not extinguished by PWCC's purchase of the mill, because the provision and the amount of the subsidy were not transparent to PWCC at the time of its bid.

Port Hawkesbury argues that because the payments under the FIF were made to third parties, no benefit was provided to it.  However, the internal documentation submitted by the GNS demonstrates that FIF payments were provided to support the ongoing forestry operations of the mill during the bankruptcy process in order to avoid an interruption in the forestry work that would have a negative impact on the condition and the productive value of the forestry assets.[491]  Under the Forestry Infrastructure Agreement (FIA), the province would pay the costs of, among other things, silviculture (on Crown lands and on private lands); harvesting, cutting and transportation, road maintenance on Crown lands, and "all work of the core NPPH staff in relation to the above."  Although payments were made by Port Hawkesbury to third parties, the GNS reimbursed the company for the above activities that would otherwise be the company's responsibility.  Thus, the amount reimbursed to Port Hawkesbury is the benefit, not the payment to the third parties, which is Port Hawkesbury's obligation.  Port Hawkesbury's reliance on *Softwood Lumber* is misplaced, as discussed further below, because Port Hawkesbury was responsible for these activities pursuant to an agreement.[492]

Port Hawkesbury and the GNS also argue that even if there was a benefit provided to it under the FIF, the benefit could only be derived from its purchases from third parties of wood harvested pursuant to the FIF, and as a result, the FIF could provide only an upstream subsidy.  However, because the FIF payments are not bestowed on an unaffiliated entity's production of an input, but instead to Port Hawkesbury, the upstream subsidy provision does not apply here.[493]  As such, Port Hawkesbury reliance on *Softwood Lumber IV* is inapposite because our examination of the benefit is not to the third parties, but to Port Hawkesbury itself.  Therefore, a pass-through analysis in respect of an upstream subsidy transaction is not applicable.

The GNS argues that the Department committed a ministerial error by including extinguished FIF 1 funds in its calculation because the GNS did not disburse the full C$14 million that it intended to provide under FIF 1.  Therefore, because the Department reasoned that all bidders knew that the province would provide C$14 million in funding, the Department must adjust its *ad valorem* calculation to extinguish the full C$14 million that was included in FIF 1.  Although the Department intentionally included the full amount of FIF 2 in its calculation for the *Preliminary Determination*, we agree with the GNS that the calculation should be adjusted for the final determination.  Although we continue to find that the amount authorized for FIF 2 could not have been transparent to PWCC at the time of its bid, we also agree that the bid price fully accounted for the C$14 million originally authorized under FIF 1.  Therefore, we find it appropriate to subtract the full C$14 million from the total funding disbursed under the FIF program when calculating a benefit under that program.

---

[490] *Id.*

[491] *See* GSQR at Exhibit 98B; *GNS Verification Report* at 9.

[492] *See* PQR at 17.

[493] *See* 19 CFR 351.523(a)(ii)(A).

We disagree with Port Hawkesbury's contention that FIF payments constitute the government purchase of services and do not meet the definition of financial contribution in section 771(5)(D) of the Act. The information regarding the purpose of the FIF program (to maintain as ongoing the forestry operations which were otherwise interrupted by the closure of the NPPH mill), and the manner in which the payments were provided (as reimbursements for expenses incurred in the conduct of the proscribed forestry activities by "the core NPPH staff") indicate that the payments were provided to alleviate the financial burden of continuing forestry activities for which NPPH itself would otherwise have been responsible.[494] As such, the assistance provided by FIF 2 funds constitutes a grant, and not the purchase of services by the government.

Moreover, for the same reasons that we find the assistance provided for maintaining hot idle was not extinguished by PWCC's purchase of NPPH, we find that the subsidies provided by FIF 2 are not extinguished by PWCC's purchase. The final bid price submitted by PWCC was submitted in December 2011, and FIF 2 funding of C$12 million was authorized by the GNS in March 2012.[495]

In the *Preliminary Determination*, the Department examined the FIF 2 funding as a concurrent subsidy in the context of the change in ownership analysis contemplated by the *Notice of Final Modification*. As with our hot idle analysis, we relied on three criteria to determine whether the concurrent subsidies were fully reflected in the arm's-length, fair market value price of PWCC's purchase of NPPH:

1.  The nature and value of the concurrent subsidies were fully transparent to all potential bidders and, therefore, reflected in the final bid values of the potential bidders;
2.  The concurrent subsidies were bestowed prior to the sale; and
3.  There is no evidence otherwise on the record demonstrating that the concurrent subsidies were not fully reflected in the transaction price.[496]

The *Notice of Final Modification*'s "baseline presumption" holds that non-recurring subsidies can benefit the recipient over a period normally corresponding to the average useful life of the recipient's assets.[497] Port Hawkesbury has failed to rebut this presumption by demonstrating that PWCC's final bid price included an element for benefits from the FIF 2 funds, with the exception of those excluded, as discussed above.

As we explained with respect to the provision of hot idle funds, funds provided concurrently with the sale from NPPH to PWCC were not necessarily extinguished even assuming an arm's-length fair market value transaction. Here, PWCC's final bid was submitted on December 16, 2011, prior to the March 2012 approval of the FIF 2 funds, and it did not change to account for the value of those additional funds. Although parties make a similar argument to those concerning the GNS's provision of hot idle funds—namely, that PWCC's bid for a going concern and the

---

[494] *See* PQR at 17.
[495] *See GNS Verification Report* at 10.
[496] *See Notice of Final Modification,* 68 FR 37125, 37137.
[497] *Id.* at 37127.

FIF funds were part of maintaining it as such—we do not find them persuasive in this context for the same reason previously articulated.  That is, although PWCC made its bid with knowledge that such forest maintenance had been funded under FIF 1, it received a benefit in the form of additional, unanticipated FIF 2 funds.

**Comment 7:  Whether Assistance Under the Outreach Agreement is Countervailable**

*The GNS' Arguments:*

- Section 771(5)(D) of the Act prevents a finding of financial contribution for government purchases of services.
- If the Department finds the Outreach Agreement payments to constitute a grant, the Department must offset these payments against Port Hawkesbury's associated costs.

*Port Hawkesbury's Arguments:*

- Any funds provided by the GNS to Port Hawkesbury pursuant to the Outreach Agreement were for services received, not a grant, and therefore, not a financial contribution.
- Whereas section 771(5)(D) of the Act states that the government provision of goods and services or the government purchase of goods constitutes a financial contribution, it does not include the purchase of services by the government.  This notable absence demonstrates Congress' intent that purchases of services by the government are not financial contributions.  This is affirmed in the CVD Preamble which states "{w}e believe that if governmental purchases of services were intended to be treated similarly to the governmental purchase of goods, the statute and the WTO SCM Agreement would specifically mention services as they do with the provision of goods and services."[498]
- The Department recognized such a distinction in practice as well by determining not to initiate in the *Softwood Lumber IV* investigation on certain allegations that involved the government purchase of services.[499]
- Even if the Department determines that payments made pursuant to the Outreach Agreement do not reflect the purchase of services, such payments are not countervailable because they reflect the reimbursement of expenses incurred solely at the request of the GNS for actions taken that are not required by statute or regulation

*The Petitioner's Rebuttal:*

- Funds provided pursuant to the Outreach Agreement are grants within the meaning of section 771(5)(D)(i) of the Act and not simply purchases of services as respondents argue.
- The Outreach Agreement was included in the negotiations for the sale of the mill in order to support Port Hawkesbury's production of subject merchandise.  According to the Department's regulations, a subsidy will be attributed only to that product if it is tied to the

---

[498] *See CVD Preamble*, 63 FR at 65379.
[499] *See Softwood Lumber IV*, 69 FR 75917, and accompanying Issues and Decision Memorandum at Cmt. 50.

production or sale of that product.[500]  This is the case here, where the GNS provided funds to Port Hawkesbury so that it may renew and maintain forestry land.

- The Outreach Agreement had the ancillary effect of increasing employment in the province, similar to the FIF, and was an important policy goal of the GNS.  The objective of the Monitor was to sell to a buyer who would restart the mill and put people to work.

**Department's Position:**

In the *Preliminary Determination*, the Department found that the funds provided to Port Hawkesbury by the GNS for Sustainable Forest Management and Outreach were a recurring benefit in accordance with 19 CFR 351.524(c)(2).  We determined that the grants under the Outreach Agreement that Port Hawkesbury received from the GNS constituted a financial contribution in the form of a direct transfer of funds from the government bestowing a benefit in the amount of the grants, within the meaning of sections 771(5)(D)(i) and 771(5)(E) of the Act.[501]  We also determined that a benefit exists under 19 CFR 351.504(a), equal to the amount of the grant.  Finally, we determined that the program is specific, in accordance with section 771(5A)(D)(i) of the Act, because the GNS provided the assistance only to Port Hawkesbury.[502]

Port Hawkesbury and the GOC argue that these payments were not benefits but a purchase of services by the GNS through Port Hawkesbury.  In its case brief, Port Hawkesbury cites the *Preamble* and the Department's decision not to initiate on several service-related programs in *Softwood Lumber IV* as examples that a government purchase of services could be considered an income support and, therefore, is not a financial contribution.[503]  The GOC reiterates Port Hawkesbury's contention that the statute does not include the purchase of services in the definition of "financial contribution" and recognizes the distinction between the purchase of goods and the purchase of services, in practice, as well.[504]

The activities for which Port Hawkesbury receives reimbursement under the Outreach Agreement (road planning and maintenance; forestry planning and administration; resource inventory and data sharing, research, silviculture, including on private lands, forest planning and forest certification)[505] are activities that involve the renewal and maintenance of forestry land, *i.e.*, the management of Port Hawkesbury's input and supply chain.  These are activities that Port Hawkesbury would undertake even in the absence of the Outreach Agreement.  As such, Port Hawkesbury's and the GNS's characterization of the Outreach Agreement as the government purchase of services misconstrues the nature of the assistance being provided.  Because the Outreach Agreement provides reimbursements to Port Hawkesbury for costs it incurs in the course of managing its input and ensuring the efficient operation of its supply chain, *i.e.*, activities it was obligated to undertake as part of its operation, we continue to find that it

---

[500] 19 CFR 351.525(b)(5).
[501] *See Preliminary Results* at 23.
[502] *See* GQR at Government of Nova Scotia Questionnaire Response, Volume XI, NS.XI-12.
[503] *See* PHP Case Brief at 17.
[504] *See* GOC Case Brief at "Joint Issues-14".
[505] *See* PQR at 22-23.

provides a financial contribution in the form of a direct transfer of funds under section 771(5)(D)(i) of the Act.

With regard to the GNS's argument that the Department should offset the Outreach Agreement payments with Port Hawkesbury's associated costs, section 771(6) of the Act identifies the limited circumstances under which the Department will reduce the benefit amount.  Qualifying offsetting amounts are:

> (A) any application fee, deposit, or similar payment in order to qualify for or receive, the benefit of the countervailable subsidy,
> (B) any loss in the value of the countervailable subsidy resulting from its deferred receipt, if the deferral is mandated by Government order, and
> (C) export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received.

There is no record evidence that Port Hawkesbury's associated costs meet the narrow definition provided in the statute.  Accordingly, there is no basis for the Department to recognize them as an offset to the benefits provided under the Outreach Agreement.

## Comment 8:  Whether Port Hawkesbury's Private Stumpage Purchases Provide an Appropriate Benchmark for Port Hawkesbury's Crown Stumpage Purchases

*Port Hawkesbury's Argument:*

- The Department incorrectly applied a cost-to-government standard instead of a benefit-to-recipient standard when it compared Port Hawkesbury's purchase of Crown pulpwood to Port Hawkesbury's private purchase of wood.  Section 771(5)(E) of the Act requires finding subsidies based on whether a company received a benefit, but the Department improperly used the cost-to-government analysis from *Softwood Lumber from Canada* to focus on the GNS's receipt of the Crown stumpage fees.[506]  There, the Department conducted an aggregate investigation based on information provided by the relevant governments that could be applied to all producers.  The Department compared the aggregate stumpage fees paid to harvest Crown sawlogs to an aggregate private benchmark.  In this investigation, this issue is narrower:  whether Port Hawkesbury received a benefit from its purchase of pulpwood.  Therefore, *Softwood Lumber from Canada* is inapplicable.
- The benefit-to-recipient analysis should consider whether Port Hawkesbury paid less to purchase Crown wood under the FULA than to purchase private wood.  Because the Department limited its analysis only to the stumpage fees, the Department failed to consider the full cost Port Hawkesbury incurred under the FULA, private lease agreements, or roadside purchases.
- For its private purchases of pulpwood, Port Hawkesbury considered the delivery cost when determining whether to make a roadside purchase, harvest on leased land, or

---

[506] *See Softwood Lumber from Canada*, 67 FR at 15545.

harvest on Crown land.  Therefore, whether Port Hawkesbury received a benefit depends on whether the Crown pulpwood costs less on a per cubic meter basis at the point of delivery to the mill than does the pulpwood purchased from private sources.

- The Department has the fully inclusive cost of Crown pulpwood.  It should compare the fully inclusive costs of Crown pulpwood with Port Hawkesbury's fully inclusive delivered costs for private purchases in the same region.
- Moreover, the unit prices under the private lease agreements are not comparable to the stumpages fees under the FULA and, therefore, are not an appropriate benchmark.  The FULA and the private lease agreements are under different rights and obligations.  For example, the FULA is for a 20-year term, renewable in 10-year increments.  Private leases are for one- to five-year periods with no built-in renewal clauses.  Land access and maintenance, record keeping, and administrative obligations are different for the FULA and private leases.  Port Hawkesbury incurs more administrative costs on FULA lands than it does on private leases because of the stumpage fees to the Crown.
- Comparing the fully allocated delivered cost of Crown pulpwood to the fully allocated delivered cost of private pulpwood from the same counties in Nova Scotia would accurately demonstrate that, even including roadside purchases, the benefit is minimal.
- Even if the Department limits the comparison of Crown wood to the wood purchased pursuant to the private leases, the benefit is tiny.

*The Petitioner's Argument:*

- The Department should revise its benchmark to measure the benefit from stumpage from Crown lands to include prices paid to all private suppliers, including those with whom Port Hawkesbury had Lease Agreements and Purchase Agreements. Inclusion of only prices from sales made pursuant to Lease Agreements understates the benefit.
- Despite Port Hawkesbury's contention at verification that "roadside purchases are a third option for Port Hawkesbury that it uses only when it cannot obtain enough wood products from Crown and leased lands," these roadside purchases are actual purchases of wood products that it uses for its operation with the meaning of 19 CFR 351.511(a)(2)(i) and these purchases represent a significant portion of the market from which it obtains its inputs.
- In a recent case before the CIT, in upholding the Department's averaging of multiple data sources for use in assessing the adequacy of remuneration, the Court found that when there is more than one data source, "Commerce must average such prices to the extent practicable, making due allowance for factors affecting comparability.  These factors ensure that the composite benchmark reflects prevailing market conditions in the home country."[507]
- Port Hawkesbury obtains a more beneficial price for roadside purchases than it does for its lease options.
- The Department should also adjust the benchmark upwards to include silviculture costs which are included in the prices for Crown stumpage but are not included in private stumpage prices.

---

[507] *RZBC Group Shareholding Co.*, Slip Op. 15-83 (CIT 2015) at 25 (citing 19 C.F.R. 351.511(a)(2)(ii)).

*The Petitioner's Rebuttal*

- The Department did not use the cost-to-government approach.  If the Department did so, it would have calculated no benefit from this program because the government incurs no cost to allow someone to cut down government-owned trees on government-owned land.
- For pulpwood stumpage, the Department's comparison of the price Port Hawkesbury paid the GNS for standing timber to the price Port Hawkesbury paid to private parties for standing timber is the correct comparison and is consistent with section 771(5)(E) of the Act, which defines the benefit to the recipient as, among others, where goods or services are provided for LTAR.
- Harvesting stumpage, *i.e.*, standing timber, substantially transforms stumpage into logs and log offcuts used as biomass and it adds significant value to the transformed products.
- In *CFS from Indonesia*,[508] the Department found it inappropriate to use the delivered price of logs for purposes of calculating the benefit from a stumpage program.
- Port Hawkesbury cannot rely on *Softwood Lumber from Canada* to propose the use of log prices as a benchmark for stumpage.  In *Softwood Lumber from Canada*, the Department recognized log prices as a reasonable starting point for a benchmark to stumpage, but only where there were no comparable private stumpage prices available, and the Department recognized that such prices need adjustments to reflect the value of the underlying stumpage.
- Likewise, the fuelwood stumpage (*i.e.*, biomass) benchmark should not be based on the delivered fuelwood log prices.  The fuelwood stumpage price Port Hawkesbury paid to the GNS should be compared to the average of the fuelwood stumpage price Port Hawkesbury paid under its Lease and Purchase Agreements.  Port Hawkesbury reported the all-inclusive prices for biomass purchases from private providers and the underlying details of those all-inclusive prices.

*The GOC's Rebuttal:*

- The Department has consistently recognized that stumpage and logs are distinct goods, and that only private stumpage prices can serve as a Tier 1 benchmark for Crown stumpage prices.
- The Department should continue its practice from the *Preliminary Determination* of rejecting the petitioner's attempts to mix Tier 1 and Tier 3 benchmark data.
- The petitioner's reliance upon *RZBC* is misplaced because it directs the Department to average prices to the extent practicable when they are within the same tier.
- The petitioner's assertion that the Department needs only to deduct harvesting costs to derive a residual value for stumpage is incorrect; in fact, to capture the residual value based on roadside/delivered log prices requires the deduction of all costs from the point of delivery "back to the stump."
- The petitioner is incorrect in claiming that the Department must adjust the benchmark upward by C\$3/m$^3$ to account for private silviculture costs.  Because the GNS has a tariff

---

[508] *Coated Free Sheet Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 72 FR 60642 (October 25, 2007) (*CFS from Indonesia*).

establishing monetary credits for silviculture activities, the net per-cubic-meter cost for private silviculture for any given company can differ from the proscribed amount. The delivered/roadside private biomass prices used as a benchmark are already inclusive of any private silviculture costs incurred by the biomass stumpage buyer. To add an additional C$3/m$^3$ would result in double-counting.

**Department's Position:**

In the *Preliminary Determination*, the Department found that the provision of stumpage from Crown land by the GNS to Port Hawkesbury under the FULA constituted a financial contribution as a provision of a good or service within the meaning of section 771(5)(D)(iii) of the Act. Furthermore, the GNS stated that both the terms and the methodology for determining stumpage rates in the Port Hawkesbury FULA differed from those in other agreements within the Province of Nova Scotia; therefore, we determined the provision of stumpage under terms of the FULA is *de jure* specific under section 771(5A)(D)(i) of the Act because it was expressly limited to Port Hawkesbury.

As the petitioner noted correctly in its rebuttal brief, the program that the Department found countervailable in the *Preliminary Determination* was the provision of stumpage, *i.e.*, the right to harvest standing timber; it was not the provision of logs already harvested and delivered to Port Hawkesbury's mill. Thus, the Department is comparing the prices that Port Hawkesbury pays for the right to cut standing timber on Crown lands to the prices Port Hawkesbury paid to private parties for the right to harvest standing timber on private lands. Despite the GOC's and Port Hawkesbury's contentions, this is consistent with our practice from past cases involving stumpage.[509]  In instances where there are no prices for the right to harvest standing timber on private lands, we have used the available data to develop a benchmark that reflects such prices under Tier 2 benchmark methodology rather than under Tier 1 methodology, as we are able to do in this case. As such, in *CFS from Indonesia, Uncoated Paper from Indonesia* and *Softwood Lumber from Canada*, when the only prices that were available were prices of delivered logs, we adjusted such prices to remove all the costs incurred between the point of delivery and the point of harvest, *i.e.*, we took the prices back to the stump.

We disagree with Port Hawkesbury that this approach impermissibly reflects an analysis of the benefit on a "cost-to-government" basis, rather than on the statutorily required "benefit-to-recipient" basis. The GNS is providing stumpage; it is not providing logs already harvested and delivered to the mill. The benefit inures to Port Hawkesbury when the prices it pays for the harvest of standing timber on Crown lands are less than the prices it pays for the harvest of

---

[509] *See CFS from Indonesia* and accompanying IDM at Comment 14 and *Uncoated Paper from Indonesia*  and accompanying PDM at 22.  In both cases the Department derived benchmark stumpage prices from standing timber. Also, as the petitioner noted in its rebuttal brief, in *CCP from Indonesia* and *Uncoated Paper from Indonesia*, when calculating the benefit from the log export ban program, the Department used the delivered prices of logs. *See Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia:  Final Affirmative Countervailing Duty Determination,* 75 Fed. Reg. 59209 (Sept. 27, 2010) and accompanying IDM at 11 (*CCP from Indonesia*) and *Uncoated Paper from Indonesia* and accompanying PDM at 22.  This showed that we used distinct benchmarks for stumpage and logs.  *See CCP from Indonesia* at Comment 12 and *Uncoated Paper from Indonesia* at section IX.A.2 (page 25).

standing timber on private lands. Because the Crown stumpage prices under the FULA represent the price of the right to harvest standing timber, under a Tier 1 benchmark analysis, we are seeking a market determined price for the same product. The prices Port Hawkesbury pays to harvest standing timber on Leased Lands represent purchases that are identical to Port Hawkesbury's purchases on Crown lands. Therefore, these private stumpage prices under Lease Agreements satisfy the requirements for a benchmark. However, as discussed above in the section "Provision of Stumpage for Less than Adequate Remuneration," the stumpage prices under the FULA include an amount that the GNS collects as a silviculture fee that is not represented in the private stumpage prices that Port Hawkesbury pays. As such, we have included this amount for silviculture fees in our benchmark prices, for both pulpwood and biomass.

The GOC argues that the inclusion of the C\$3/m$^3$ silviculture fee in the benchmark would result in double-counting because the GNS has already established monetary credits for silviculture activities, and the delivered/roadside private biomass prices are already inclusive of any private silviculture costs incurred by the biomass stumpage buyer. This argument is unavailing. First, we are not using the delivered/roadside purchases in our benchmark, because we have actual stumpage prices from Lease Agreements that represent purchases more comparable to Crown stumpage prices, which are the prices Port Hawkesbury pays for the right to harvest standing timber. For the *Preliminary Determination*, and for the final determination, the Department used only Port Hawkesbury's leased purchases as a benchmark. Second, the Department learned at verification that the Crown stumpage prices paid by Port Hawkesbury include a silviculture fee collected by the GNS. Thus, when comparing the terms of the purchases on Crown lands to those on Leased Lands, we recognize that the Leased Lands prices do not include this silviculture fee. Therefore, as discussed above in the section "Programs Found Countervailable," it is appropriate, and consistent with 19 CFR 351.511(a)(2)(i), to include an amount for silviculture in the benchmark developed using Port Hawkesbury's private stumpage purchases on Leased Lands.

We disagree with the petitioner that the Department should include in the benchmark Port Hawkesbury's purchases of already harvested wood under Purchase Agreements. In the *Preliminary Determination,* the Department stated that it used the prices paid for stumpage harvested on leased lands for comparison to Crown stumpage purchases because "the Lease Agreements reflect the same rights and obligations that are set forth in the FULA."[510] The same cannot be said for Purchase Agreements, under which Port Hawkesbury purchases already-harvested wood; these purchases do not reflect the same rights and obligations.[511] Furthermore, there is no information on the record with which the Department can derive a stumpage fee from the prices paid for wood products obtained under the Purchase Agreements, *e.g.*, information on the costs incurred in the harvest of the standing timber and its transportation, that would have to be subtracted to take the price back to the stump such that it would be appropriate for measuring the adequacy of remuneration of the Crown stumpage prices that Port Hawkesbury pays.

---

[510] *See* Preliminary Determination Decision Memorandum at 40; *see, also,* GQR at Government of Nova Scotia Questionnaire Response, Volume XXII, NS.
[511] *See* Preliminary Determination  at 40 and see Port Hawkesbury's SQR at 58 for the distinctions between Port Hawkesbury's lease obligations as compared to their purchase obligations.

Furthermore, even if complete information were on the record, the stumpage prices set forth in the Lease Agreements are more comparable to the FULA, and would still be the more appropriate benchmark.

## Comment 9:  Land for MTAR

*The GNS' Arguments:*

- The Department must measure the adequacy of remuneration in relation to prevailing market conditions, which normally include price, quality, availability, marketability, transportation or other conditions of the sale.  For comparison purposes, the Department will seek information on market-determined prices for the good or service in question, stemming from actual transactions.
- With regard to land, comparability includes factors such as location, the size of the land parcels, the type of land parcels and contemporaneity.
- The Department recognized these comparability factors when it solicited information from the GNS for land transactions similar in size and location, for the period one year plus or minus the date that the GNS purchased the Port Hawkesbury land.
- In narrowing the sales identified for purposes of establishing a benchmark to the four sales that occurred in September 2012, the Department did not satisfy its standard for examining prevailing market conditions.
- In selecting only sales from September, the Department has not satisfied contemporaneity, especially because the negotiations for the sale of land to the GNS spanned a year, and the GNS approved the funds more than a month before the transaction closed.
- The Department also did not satisfy comparability on the basis of location; these four transactions occurred in only two of the nine counties in which the GNS purchased land from Port Hawkesbury and represented only 19 percent of the land purchased by the GNS from Port Hawkesbury.
- Using a benchmark that meets the Department's own standards for comparability shows that there was no benefit from the purchase by the GNS of land from Port Hawkesbury.

*Port Hawkesbury Arguments:*

- The Department found a benefit for the GNS purchase of land only by using an aberrational benchmark that did not reflect prevailing market conditions.  The Department solicited information about private land sales in Nova Scotia consistent with its practice of creating a robust benchmark using as many data points as possible.[512]
- By limiting the sales it used in its benchmark to the four sales that occurred in September 2012, the Department created an unrepresentative benchmark.  This benchmark included too few transactions, in too few counties.  The resulting monthly benchmark is based on

---

[512] *See, e.g.*, *Utility Scale Wind Towers from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 77 FR 75978 (Dec. 26, 2012) and accompanying IDM at Comment 15 (*Wind Towers from the PRC*).

the incorrect assumption that one month is sufficiently contemporaneous, and it excludes large quantities of relevant contemporaneous data.

- The use of a full year of data for benchmark purposes is common Department practice, and prior Department decisions indicate a preference by the Department to capture as much of the POI as possible when developing benchmarks.[513]
- If the Department continues to find that a benchmark based on one month of data is appropriate, it should use data from private land sales in March 2012, the month in which the GNS and PWCC reached agreement on the land price. On this basis, March is more indicative of the relevant prevailing market conditions.

*The Petitioner's Rebuttal Arguments:*

- The Department should continue to calculate a benefit for the purchase of land for MTAR using the benchmark used in the *Preliminary Determination*, because the single most important factor in valuing land is the time period in which the land was purchased.
- The Department's longstanding practice is to use monthly prices for benchmarking purposes, and the Department has repeatedly rejected arguments to use annual benchmarks.[514]
- Record evidence does not establish that the final price was agreed to in March 2012; indeed, the record indicates that the price was still a point of debate between the parties in March. Moreover, the breakdown in negotiations between the parties in September 2012 demonstrates that all elements of the deal remained fluid. Thus, the Department should reject the GNS' and Port Hawkesbury's arguments to use sales price data from March.
- The Department's benchmark is a reasonable estimation of private forestry land prices in Nova Scotia.

**Department's Position**

The Department has reexamined the benchmark for purposes of measuring whether the GNS purchased land for more than adequate remuneration. The GNS, Port Hawkesbury, and the petitioner have all identified cases in which the Department has variously expressed its preference for benchmarks based on annual or monthly data. Those cases involved the development of loan interest rate benchmarks, benchmarks for the sale of commodity products by the government for LTAR, and benchmarks for the provision of land for LTAR. The Department's preference in any particular situation is influenced by the particular good or service for which the Department is seeking a benchmark, as well as by the quality and quantity of benchmark information. The Department selects the appropri benchmark based on the facts on the record in the particular investigation, and these facts will influence the decision as to whether to calculate a monthly or annual benchmark.

---

[513] *See Notice of Final Affirmative Countervailing Duty Determination: Low Enriched Uranium From Franc*, 66 FR 65901 (Dec. 21, 2001) and *Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 77 FR 13093 (Mar. 5, 2012).
[514] *CFS from Korea* and accompanying IDM at 51-52.

The Department has considerable discretion under the statute and regulations in developing benchmarks for various purposes, and it approaches this task on a case-by-case basis. For example, the petitioner cites *CFS from Korea*, in which the Department stated, "{b}ecause the price is determined on a monthly basis by market-driven forces for each company, the Department believes the most accurate calculation is on a monthly, not annual, basis." That approach was appropriate in that case, which involved the government provision of chemical pulp that was sold under annual contracts at prices that varied by month. The government provision of chemical pulp occurred throughout the POI and in that case, the Department had information from which to choose the appropriate benchmark approach. In a case cited by Port Hawkesbury, *Wind Towers from the PRC*, the Department stated, ". . .to derive the most robust HRS benchmark possible, we have sought to include as many data points as possible." Again, the selection of a benchmark in each of these cases was based on the individual facts of each investigation.

For the *Preliminary Determination*, we developed a benchmark based on only the sales that occurred in the same month as the purchase of land by the GNS from Port Hawkesbury. The GNS argues that the benchmark should reflect prevailing market conditions for land, which include location, size of land parcel, contemporaneity, and land type, while the petitioner suggests that contemporaneity is important based upon finding a benchmark based on the date of sale. Based upon the comments from the interested parties, we have revised our benchmark. For this final determination, we calculated a benchmark using a simple average that includes all available land transactions during 2012, the calendar year in which the GNS made the land purchase.[515]

We moved from a monthly average to an annual average land benchmark because the final negotiated price between Port Hawkesbury and GNS was not based solely on the prevailing market conditions in the month that the land was purchased, as can be shown by the fact that the offered price on the land changed throughout the year.[516] In addition, the date of the final sales contract for the land purchase between the GNS and Port Hawkesbury was not driven by the land purchase but by the date on which PWCC purchased the NPPH paper mill.[517] Therefore, based upon the facts on the record, the prevailing market conditions for forest land is better reflected in a benchmark calculated using all private forest land transactions in Nova Scotia during the year, instead of determining the benchmark only using the transitions that occurred in the month the sales contract was finally signed.

## Comment 10 Whether the NSUARB is an Authority

*The GOC's Arguments:*

- The NSUARB is an independent, quasi-judicial body established pursuant to the *Utility Review Board Act*. Its members have tenure, set procedures, and are not subject to

---

[515] *See* Port Hawkesbury Final Calculation Memo.
[516] *See e.g.*, GSQR at 79.
[517] *See* PQR at 86.

government control over decision making, and the record establishes that the NSUARB is legally, financially, and in-practice independent of the GNS.

*The GNS' Arguments:*

- In the *Preliminary Determination* the Department found that under the *Electricity Act,* the GNS Minister of Energy has responsibility for the general supervision and management of Nova Scotia's electricity system.  This is an overstatement of the Minister of Energy's role.
- The *Electricity Act* deregulated the energy market in Nova Scotia and allows wholesale customers to purchase electricity from any competitive supplier, and suppliers must meet regulated minimums of renewable generation.[518]  The *Public Utility Act* governs the oversight of the electricity market by the NSUARB and sets forth the legal requirements pertaining to public utilities like NSPI.  This act does not address the role of the Minister of Energy on these points.
- Members of the NSUARB are not part of the GNS.  In the *Preliminary Determination* the Department found that "{u}nder section 10(1) of the *Utility and Review Board Act*, each full-time member and each full-time employee of the NSUARB is deemed to be a person employed in the public service of Nova Scotia."[519]  This overly broad statement was contradicted through verification.  The *Utility and Review Board Act* states that "{f}or all purposes of the *Public Service Superannuation Act*, each full-time member and each full-time employee of the Board is and is deemed to be a person employed in the public service of the Province and full-time service in employment of the Board is and is deemed to be public service."[520]  The *Public Service Superannuation Act* establishes the Nova Scotia Pension Plan.[521]  Therefore, section 10(1) of the Utility and Review Board Act merely permits NSUARB members and staff to participate in the pension plan.  That, by itself, does not mean that the NSUARB is controlled by the Province.  The NSUARB chair explained at verification that the "NSUARB takes no policy direction from the government," that none of the cost associated with rate hearings are borne by the GNS, and that "Board Members are deemed civil servants only for the purposes of providing them with a pension."[522]
- The Department failed to properly apply its five part test to determine that the NSUARB is an "authority" as the term is used in the statute.  Under that test, the Department considers "1) the government's ownership; 2) the government's presence on the entity's board of directors; 3) the government's control over the entity's activities; 4) the entity's pursuit of governmental policies or interests; and 5) whether the entity is created by

---

[518] *See* GNSQR Exhibit NS-EL-3.
[519] *See PDM* at 30.
[520] *See* GSQR Exhibit NS-EL-2 at section 10(1) {italics added}.
[521] *See* GSQR Exhibit NS-SUPP1-41A at section 46.
[522] *See* GNS Verification Report at 18.

statute."[523]  The Department has stated that it analyzes these facts together, taking into account the facts and circumstances of the case.[524]

- The record demonstrates that the NSUARB satisfies only one of these criteria.  The NSUARB is not owned by the government like the entity at issue in *Kitchen Racks China*.[525]  Further, there is no GNS presence on the NSUARB; rather, its members are appointed for life (except on bad behavior), on merit, through a complex committee review process following NSUARB objective criteria.  This process mirrors that for appointments and retention for the Supreme Court Nova Scotia.  In addition, GNS policymaking cannot control NSUARB activities; indeed, the NSUARB acts independently from GNS policies or interests, and the NSUARB has passed decisions that differ from GNS policy despite the GNS's appearance before NSUARB hearings.  The NSUARB's mandate covers many other things.  Its orders can be appealed to the Nova Scotia Court of Appeals, and it must act under applicable legal principles or risk reversal.

- Whether the entity is created by statute is the only factor satisfied here.  In the past the Department has recognized that even if certain factors are satisfied, a negative determination may still be warranted.  Here, the GNS cannot act through the NSUARB anymore than the Department can act through the CIT.

- NSPI and Port Hawkesbury agreed as private parties to set the electricity rate.  It was the NSUARB's role as arbiter in a contested hearing that established the proposed electricity rate.  Under the LRT framework, the NSUARB must examine "whether, on a balance of probabilities, the other customers of NSPI would be better off by having {the extra-large industrial ratepayer} remain on the system (on the load retention rate) than those customers would be if {the extra-large industrial ratepayer} stopped taking service."[526]  Even before receiving Port Hawkesbury's application, the NSUARB announced that it would not and could not approve a rate where other customers were worse off.

- NSUARB's role in this process is similar to that of the Supreme Court of Nova Scotia's when it examined the plan of arrangement entered into between the creditors, NPPH and PWCC.

*Port Hawkesbury's Arguments:*

- The Department ignored the evidence that the NSUARB was and is an independent, quasi-judicial regulatory body, does not perform a "government subsidy function" under U.S. countervailing duty law, and is not an "authority" within the meaning of the law.  Therefore, it could not provide a financial contribution within the meaning of the Act.

---

[523] *See Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 FR 4936 (Jan. 28, 2009) and accompanying Issues and Decision Memorandum at Comment V.A.1 (*Pressure Pipe China*).

[524] *See CFS fromKorea* and accompanying IDM at Comment 11.

[525] *See Certain Kitchen Shelving and Racks from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 74 FR 37012 (July 27, 2009) and accompanying Issues and Decision Memorandum at Comment 4 (*Kitchen Racks China*).

[526] *See* GQR Exhibit NS-EL-21 at para. 283.

- Under Canadian law, the principle of institutional independence consists of three core components: security of tenure, financial security, and administrative control.[527]  For administrative tribunals, such as the NSUARB, the degree of independence is determined by enabling statue and the degree of independence that the legislature intended.[528]  The Nova Scotia Court of Appeal has specifically confirmed that "The {NSUARB} is an independent quasi-judicial body which has both regulatory and adjudicative functions."[529]  The United States has a similar principle.[530]

- Further, this contention was supported by the Department's own factual information that it placed on record of the investigation.[531]  NSUARB members have security of tenure, serving to the age of 70 on good behavior, this fact ensures NSUARB independence and the selection process is designed to prevent political influence (and is stronger than the short duration public utility commissionerships in certain jurisdictions in the United States).  The NSUARB has financial security because it is funded by the public utilities.  The NSUARB has administrative control because it has exclusive jurisdiction,[532] it has the powers, privileges, and immunities of a Nova Scotia Supreme Court Judge,[533] its findings upon questions of facts within its jurisdiction are binding and conclusive,[534] and appeals of its decision are restricted to questions of law and jurisdiction.[535]

- This structure exists to ensure that in Nova Scotia an independent economic regulator makes electricity pricing decision in the best interests of NSPI's ratepayers based on fundamental economic principles and statute in the *Public Utilities Act*, including section 109(1) that prohibits public utilities from providing undue or unreasonable preference or advantage to individual firms and section 67(1) requiring the equality of tolls, rates and charges for like service to like customers.

---

[527] *See* Pre-Preliminary Electricity Comments Appendix 3 (Ocean Port Hotel Ltd. v. British Columbia (General Manager, Liquor Control and Licensing Branch), 2001 SCC 52 at para. 12).

[528] *Id*. at para. 20.

[529] *See* Pre-Preliminary Electricity Comments Appendix 4 (Antigonish (County) v. Antigonish (Town), 2006 NSCA 29 at para. 18); *see, also,* GNS Verification Report at p. 88. ("the NSUARB's role as regulator is as an independent statutory tribunal which has the power to regulate directly, unlike other public utility boards in Canada that merely have the power to recommend decisions to the government.")

[530] *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935) (finding that the length and certainty of tenure was vital to Congress' intention of creating a commission independent of the government).

[531] *See, e.g.*, Memorandum to the File, entitled, "Placement of Documents on the Record Relating to Public Utilities," (July 2, 2015) at Attachment 18: ".Nova Scotia – US Comparator: Standard-Making and Enforcement Functions from Nova Scotia Utility and Review Board," dated October 9, 2014 at 1 (the NSUARB is "...an independent, quasi-judicial body which has both regulatory and adjudicative jurisdiction flowing from the Utility and Review Board Act.") and at Attachment 8: "Creating Competition & Mastering Markets, New Entrants, Monopolists and Regulators in Transforming Public Utilities Across the Atlantic" at 1 (describing two different variations of public utility regulation, one of which is "public regulation," the model in Nova Scotia. Concerning this model, that document describes "...administrative agencies that enjoy a considerable degree of independence from the industry and government in regulating a particular market" and states that "{t}he role of such a regulator is restricted to that of referee in charge of general oversight and legal enforcement, reflecting a more judicial relationship between the state and the private sector.")

[532] UARB Act section 22(1).

[533] UARB Act section 16.

[534] UARB Act section 26.

[535] UARB Act section 30(1).

- The GNS acts only as an intervenor before the NSUARB, and the NSUARB has sided against the GNS on rate setting issues (*e.g.*, the NSUARB decided against two GNS positions on Fuel Adjustment Mechanism issues[536]).

*The Petitoner's Case Brief:*

- The Department reasonably found that the GNS, via the NSUARB, entrusted or directed NSPI to provide electricity for LTAR.  The Department could also reasonably find that, as an authority, the NSUARB provides a financial contribution to PHP by making the subsidized rate available to Port Hawkesbury.

*The GOC's Rebuttal:*

- The NSAURB is independent of the GNS in both law and fact.  The GNS does not exercise control over the NSAURB's activities and has no legal ability to instruct NSUARB with respect to its decisions.
- Neither NSPI nor the NSUARB are government authorities under the countervailing duty laws. Because there is no action by any "authority," there can be no finding that a financial contribution has been provided.
- NSPI's sale of electricity is dissimilar to the provision of stumpage in *Softwood Lumber Canada 2002*[537] and *Free Sheet Paper Indonesia*.[538]  In those cases the Department explained that its definition of "providing" a good or service by "making it available" relies upon a factual record where a government acted to grant a right of access to harvest timber on government owned forest land through the issuance of licenses. The Department found that the pre-requisite to a government "making the good available" was government-ownership of the land. Here, as opposed to other Canadian provinces, there is no government ownership of the good, electricity, because NSPI owns the electrical system. Also, the NSUARB's action approving NSPI's proposed customer electricity rates does not grant a license for access to government owned property; rather, NSPI, a private entity, retains control and access to the electricity.  Therefore the Department's precedent defining "providing" as "making available" is inapplicable in this case.

---

[536] *See* GQR Exhibit NS-EL-15 *and* discussion in Pre-Preliminary Electricity Comments at 8-9.  *See, also,* GSQR Exhibit NS-SUPP1-38A at paras. 30, 81-84.

[537] *See Notice of Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Softwood Lumber Products From Canada*, 67 Fed. Reg. 15,545 (Apr. 2, 2002) and accompanying Issues and Decision Memorandum at I (Provincial Stumpage Programs Determined to Confer Subsidies) (*Softwood Lumber Canada 2002*)).

[538] *See Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 FR 60642 (Oct. 25, 2007) and accompanying Issues and Decision Memorandum at Comment 9 (*Free Sheet Paper Indonesia*).

*The GNS' Rebuttal:*

- Neither NSPI nor the NSUARB are government authorities under the countervailing duty laws. Because there is no action by any "authority," there can be no finding that a financial contribution has been provided.
- There is no government ownership of the NSUARB and its electricity rate making is funded by the electric utilities to cover the cost of regulation.
- The GNS is not represented on the NSUARB and GNS policy-making cannot and does not control NSUARB activities. The NSUARB acts independent from, and on occasion, contrary to GNS policies or interests.

*Port Hawkesbury's Rebuttal:*

- Petitioner is mistaken that an entrustment or direction determination is not required under *Softwood Lumber IV*. First, in *Softwood Lumber IV*, the Crown owned the trees; here, the GNS does not own the electricity. Second, there are no licensing fees for electricity in Nova Scotia. NSUARB action is much more akin to the Federal Trade Commission's approval of a merger between two private companies in the United States.

*The Petitioner's Rebuttal:*

- Respondents' contention that the NSUARB is not an authority is inaccurate. The agency possesses all the attributes of a public body as defined by the WTO Appellate Body. Specifically, the WTO has stated that a public body is "an entity that possesses, exercises or is vested with government authority,"[539] and that a government "enjoys effective power to regulate, control, or supervise individuals, or otherwise restrain their conduct through the exercise of lawful authority."[540]
- The NSUARB is an authority under the Act. It was established by the *Utility and Review Board Act*[541] and has both regulatory and adjudicative functions,[542] and operates under the GNS Department of Economic and Rural Development and Tourism.[543] The NSUARB has the power "to require and compel" a utility "to comply with the provisions of this Act and any municipal ordinance or regulation,"[544] and is the regulator responsible for the "setting of prices."[545] The NSUARB has been described as "playing a catalytic

---

[539] *See* Report of the Appellate Body, *United States- Countervailing Measures on Certain Hot-Rolled Carbon Steel Flat Products from India,* WT/DS436/AB/R  (December 8, 2014), at para. 4.29.

[540] *See* Reports of the Panels, *Canada- Certain Measures Affecting the Renewable Energy Generation Sector; Canada- Measures Relating to the Feed-In Tariff Program,* WT/DS412/R and WT/DS426/R (December 19, 2012) at para. 7.233

[541] *See PHP Electricity Pre-Preliminary Comments* at 5.

[542] *Id. Comments* at 11.

[543] *See Petitioner's Pre-Preliminary Comments* Exhibit 13, entitled*,* "Nova Scotia- US Comparator: Standard-Making and Enforcement Functions," *NSUARB* (October 9, 2014) at 1.

[544] *See* PQR Exhibit 24-1 at 13.

[545] *See PHP Electricity Pre-Preliminary Comments* at 7-8, quoting *Petroleum Products Pricing Act (Re),* 2011NUSARB164 (Appendix 5).

role in prompting necessary policy development" and is a "super-regulator" with responsibility to regulate many things.[546]  The NSUARB also has broad statutory powers to regulate NSPI.[547]

- Port Hawkesbury's reliance on *Humphrey's Executor v. United States* and the U.S. Supreme Court's consideration of the independence of the Federal Trade Commission are inapposite.  Utility regulatory commissions may occupy a "special" place, but they are nevertheless part of the landscape of governmental agencies.  The fact that different government agencies have different mandates and advocate before each other does not mean that they are not part of the government.[548]

- The NSUARB had a critical role and approved the LRR pricing "effective upon satisfying the conditions of the {NSUARB} decision."[549]  The NSUARB actively executed its statutory role in establishing all aspects of the LRR. The NSUARB found NSPI's neutral stance not acceptable and directed NSPI to actively participate in the rate setting proceedings decided November 29, 2011, concerning economic distress provisions for the LRT, an LRR for NPPH and Bowater, and the 2012 GRA.[550] Although later mooted by changes to the LRR, the NSUARB required a remedy concerning the environmental mental conditions at the mill in its September 12, 2012, Order.[551]

**Department's Position:**

In our *Preliminary Determination*, we found that the GNS, through the NSUARB, entrusted or directed NSPI to provide a electricity to Port Hawkesbury at a reduced rate.  In this final determination, we have modified our analysis to find that the GNS *directly* entrusted or directed NSPI to provide electricity pursuant to the *Public Utilities Act*.  The provision of electricity falls within the definition of a financial contribution under section 771(5)(D)(iii) of the Act because the provision of electricity is the provision of a good or service, other than general infrastructure. To analyze whether NSPI has been entrusted or directed to provide a financial contribution to Port Hawkesbury within the meaning of section 771(5)(D)(iii) of the Act, we first review the laws and regulations that govern the provision of electricity within Nova Scotia.
As is clear from the *Public Utilities Act*, the GNS, acting both through its laws and the NSUARB, controls and directs the methodology that NSPI must use in rate proposals, and any rate that is charged by NSPI must be approved by the NSUARB.  More importantly, with respect to the entrustment or direction of NSPI to provide a financial contribution under section

---

[546] *See Petitioner's Pre-Preliminary Comments* Exhibit 5 at 2-3.

[547] *See NSQR*  Exhibit SUPP1-38A, 2007 *NSUARB* 174 (December 10, 2007) at 27 (paras. 69 and 70)). 38A), provided as Exhibit 4 to*, discussing key provisions of the Public Utilities Act.

[548]  *See Petitioner's Pre-Preliminary Comments* Exhibit 15 entitled, "Agency transformation and state utility commissions," *Utilities Policy* (Aug. 13, 2006) at 8 (They are imbued with "broad authority" and sometimes have been referred to as "the fourth branch of government" given their nominal independence in the exercise of their regulatory functions.)

[549] *See* PQR PHP, Exhibit 20-7, NSUARB Order (Sept. 12, 2012), attached to Sixteenth Report of the Monitor (Sept.25, 2012) at Appendix B, at 2 (para. 1)*; see, also, id.* at Appendix A to Appendix B at 1 ("The term of the arrangements contemplated by this Mechanism {*i.e.*, the Port Hawkesbury LRR,} shall be from approval by the{NSUARB} to December 31, 2019").

[550] *See* PQR Exhibit 23-6 at 78 (para. 218).

[551] See PQR Exhibit 20-7 (para. 8).

771(5)(B)(iii) of the Act, NSPI is required by law to provide electricity to customers who request it anywhere in Nova Scotia.[552]  That is, NSPI is obligated under the laws of the Province of Nova Scotia to serve any resident or company within the Province and to provide electricity to that customer.[553]  Therefore, the provision of electricity by NSPI to Port Hawkesbury satisfies the standard of entrustment or direction under section 771(5)(B)(iii) of the Act.  As a result we have determined that Port Hawkesbury received a financial contribution in the form of the provision of a good or service under section 771(5)(D)(iii) of the Act.  At no point in this investigation have respondents argued that the GNS, which enacted the laws governing the provision of electricity by NSPI, is not an "authority" under section 771(5)(B) of the Act.  We now turn to respondents' arguments regarding whether NSUARB is an "authority."

Under section 771(5)(B) of the Act, an "authority" means a government of a country or any public entity within the territory of the country.  When Congress enacted the countervailing duty law it did not provide a definition of "government" within section 771(5)(B) of the Act.  Thus, the discretion to define "government" lies with the Department.[554]  Black's Law Dictionary has a number of definitions for the term "government," including:

- The regulation, restraint, supervision, or control which is exercised upon the individual members of an organized jural society by those invested with the supreme political authority, for the good and welfare of the body politic; or the act of exercising supreme political power or control.
- The system of polity in a state; that form of fundamental rules and principles by which a nation or state is governed, or by which individual members of a body politic are to regulate their social actions.
- The sovereign or supreme power in a state or nation.
- The machinery by which the sovereign power in a state expresses its will and exercises its functions; or the framework of political institutions, departments, and offices, by means of which the executive, judicial, legislative, and administrative business of the state is carried on.[555]

"Government" can therefore be the "act" of exercising supreme control over citizens and resources, a "system" of governance in the form of rules and principles, the moniker for the source of authority in a nation, as well as the apparatus itself through which that authority is expressed.[556]

---

[552] *See, e.g.*, section 52 of the *Public Utilities Act*; "Regulating Electric Utilities – Discussion Paper Phase One Governance Study- Liberalization and Performance –Based from the Province of Nova Scotia at 3 at Attachment 30 of the July 2, 2015 Memorandum to the File regarding Placement of Documents on the Record Relating to Public Utilities.

[553] *Id*. at 6.

[554] *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

[555] Black's Law Dictionary, 2nd Edition (1910).

[556] Other definitions of "government" support this analysis.  For example, the New Shorter Oxford English Dictionary defines government to include "the action of governing; continuous exercise of authority over subjects; authoritative direction or regulation; control; chiefly spec. the action of governing the affairs of a State; political rule and administration."  New Shorter Oxford English Dictionary, at 1123 (1993).  This definition also comports with the statement of the WTO Appellate Body that "the essence of government is that it enjoys the effective power to regulate, control, or supervise individuals, or otherwise restrain their conduct, through the exercise of lawful authority."  *United States – Definitive Anti-Dumping and Countervailing Duties on Certain Products from China*,

The NSUARB fulfills various definitions of the term "government." It is a body established by law to perform a specific regulatory function of the state in the public interest. Regulation of a market or a monopoly is a government function and, indeed, governments create antitrust laws in order to place legal sanctions on private parties that attempt to manipulate the market or create a monopoly. As such, the NSUARB is an apparatus through which the authority of the GNS is expressed. Accordingly, the NSUARB falls under the definition of "government" pursuant to section 771(5)(B) of the Act.

Respondents themselves concede that the NSUARB is a "quasi-judicial regulatory" body and cite to a decision from the Nova Scotia Court of Appeals in which the Court confirmed that "{t}he {NSUARB} is an independent quasi-judicial body which has both regulatory and adjudicative functions.[557]" Regulatory and adjudicative functions are both activities and functions of a government. Respondents even acknowledge that the NSUARB's role in reviewing and approving electricity tariffs, including the LRR approved for Port Hawkesbury, is similar to the role of the Supreme Court of Nova Scotia in overseeing the *CCAA*. They further state that NSUARB has the power, privileges and immunities of a Nova Scotia Supreme Court Judge and that its findings upon questions of fact within its jurisdiction are binding and conclusive. Thus, respondents appear to concede that the NSUARB is a governmental body. Respondents' basic premise is that the NSUARB is not an authority because it is an independent body. There is no reason that governmental bodies cannot be independent, however; the legislative, executive, and particularly the judicial branches that exist in both the United States and Canada operate largely independent of each other but are still undoubtedly part of the government.[558]

The NSUARB was created by the legislative branch of the Nova Scotia government in 1992 with the *Utility and Review Board Act*, and its governmental regulatory authority over public utilities operating in Nova Scotia is also set forth by the legislative branch of the Nova Scotia government in the *Public Utilities Act*. We recognize that the NSUARB, as a "quasi-judicial body" and "administrative agency," may make decisions that are at odds with the policies of elected government officials in both the legislative and executive branches of the Nova Scotia government; however, that independence is a common approach used by policymakers when delegating regulatory authority to government agencies. Thus, while we recognize the NSUARB's relative independence from both the legislative and executive branches of the Nova Scotia government as outlined by the respondents, the independence conferred on it by law does not mean that the NSUARB is not a government body.

---

WT/DS379/AB/R, at para. 290.

[557] *See* Pre-Preliminary Electricity Comments Appendix 4 (Antigonish (County) v. Antigonish (Town), 2006 NSCA 29 at para. 18); *see, also,* GNS Verification Report at p. 88. ("the NSUARB's role as regulator is as an independent statutory tribunal which has the power to regulate directly, unlike other public utility boards in Canada that merely have the power to recommend decisions to the government.").

[558] *See, e.g., Humphrey's Executor v. United States*, 295 U.S. 602, 629 (1935) (discussing the independence of the FTC as a quasi-legislative and quasi-judicial government body and stating, "The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question.").

Respondents argue that the *Public Service Superannuation Act* establishes the Nova Scotia Pension Plan.[559]  Therefore, section 10(1) of the Utility and Review Board Act merely permits NSUARB members and staff to participate in the pension plan.  That, by itself, does not mean that the NSUARB is controlled by the Province.  We have already explained why, under the definition of "government," the NSUARB is a government body.  ThThat determination does not rest upon the mere fact that members and employees of the NSUARB are deemed to eligible for a government pension or that individuals that receive a government pension are  "controlled by the Province."

Respondents also argue that the Department cannot find an entity to be an authority without conducting the "five-factor test" referenced in *Pressure Pipe China* and *CFS from Paper Korea*. Respondents' argument with respect to this point represents a misunderstanding of the statute, the "five-factor test," and case precedent.  The "five-factor test" had its beginnings in *Dutch Flowers* where the Department was analyzing whether a natural gas company with partial government ownership was a public entity.[560]  The Department used the factors that became the "five-factor test" to determine that the provision of nature gas by that company was the provision of natural gas by the government.  The Department used the "five-factor test" in subsequent cases, including *Pressure Pipe China*, to determine whether a state-owned enterprise was a public entity.

In this final determination, however, we have determined that the NSUARB is an "authority" because it is part of the government, not a public entity.  The "five-factor test" is not used to determine whether an entity is a government body; therefore it is irrelevant in our determination that the NSUARB is an "authority" under the Act.
Finally, for purposes of this investigation, we have analyzed the provision of electricity to Port Hawkesbury as entrustment or direction.  Therefore, for purpose of this final determination we have not applied the "five-factor test" or any other "public body test" to NSPI and have treated NSPI as a private entity.

## Comment 11:  Whether the Government Entrusted or Directed NSPI to Provide a Financial Contribution

*The GOC's Arguments:*

- Based on the statute for financial contribution and the Department's two part test for entrustment and direction, the Department cannot find entrustment or direction.[561]

---

[559] *See* GSQR Exhibit NS-SUPP1-41A at section 46.

[560] *See Final Affirmative Countervailing Duty Determination: Certain Fresh Cut Flowers From the Netherlands*, 52 FR 3301, 3302-03 (February 3, 1987) (*Dutch Flowers*).

[561] *See* sections 771(5)(D) and 771(5)(B)(iii) of the Act, *DRAMS from Korea* and accompanying Issues and Decision Memorandum at comment  46-47, *See CFS from  Korea*; *Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 75 FR 16428 (Apr. 1, 2010) and the accompanying issues and decision memorandum at comment 3. (*PRCBs Vietnam*); *DRAMS Korea*; and, *Certain Steel Nails from the Sultanate of Oman: Final Negative Countervailing Duty Determination*, 80 FR 28958 (May 20, 2015) and the accompanying issues and decision memorandum at comment 8 (*Nails Oman*).

- The WTO Appellate Body has made clear that entrustment or direction cannot be a by-product of government regulation.[562]  The NSUARB's involvement in the transactions between PWCC and NSPI was not even a by-product because it was limited exclusively to approving the rate structure negotiated between PWCC and NSPI.

- The Department's practice in *Pipes and Tubes from Turkey* confirms that regulatory approval of a transaction by private parties is not government entrustment or direction because there must be substantial circumstantial evidence and more than mere government presence.[563]

- Similar to regulators of electricity in the United States, the NSUARB regulates "public utilities" in the province, pursuant to the *Public Utilities Act*.  Therefore, countervailing the provision of electricity by NSPI on the basis that the NSUARB, a regulatory body, approved the rate structure would have dire consequences for all regulatory bodies in the United States and would go far beyond the scope of any previous finding by the Department.

- PWCC and NSPI are private entities that agreed to the LRR and petitioned the NSUARB for approval.

- NSUARB's involvement in the deal was limited to approving the removal of a condition requested by the NSPI that PWCC seek an Advanced Tax Ruling from Revenue Canada and its approval on September 27, 2012 of a new price arrangement between NSPI and PWCC.[564]

- There is no record evidence that the GNS or the NSUARB interfered with NSPI's negotiations with PWCC or that the GNS or NSUARB induced or coerced the NSPI to negotiate a rate with PWCC that did not reflect market realities.

*The GNS' Arguments:*

- In the *Preliminary Determination*, the Department ignored three fundamental principles of the electricity market in Nova Scotia:  1) NSPI is a wholly owned publicly traded corporation that sets rates through long established procedures and settlement agreements with stakeholders; 2) the independent quasi-judicial NSUARB approves NSPI's proposed rates through a contested argument process; and, 3) the GNS's role before the NSUARB is limited to that of any interested party.

- The Department erred when it stated that the NSUARB negotiated with PWCC and NSPI to set the LRR. [565]

- NSPI submitted a letter that was reviewed by the Department verifiers, who were able to ask follow up questions regarding the contents of the NSPI letter when meeting with the

---

[562] Appellate Body Report, *US – DRAMS,* WT/DS353AB/R.
[563] *See Pipes and Tubes from Turkey*
[564] *See* GNS Verification Report at 16, 18, and NS Verification Exh. 28 at 20.
[565] Port Hawkesbury has similar arguments about inconsistencies in the *Preliminary Determination* with respect to NSUARB involvement in negotiation the terms of the Port Hawkesbury LRR and confusion between the Port Hawkesbury LRR and the LRT; its arguments are included in this section in the interest of brevity.  All of Port Hawkesbury's specific points are identified directly.

NSUARB on this matter, contrary to the explanation provided by the verifiers in footnote 10 of the Verification Report.  The Department did not request a meeting with NSPI.[566]

- Verification discussions cleared up any error:  the verification report shows that the Department understands that "there are two separate LRRs"—one for Bowater Mersey in the 2013/2014 GRA, and one for Port Hawkesbury handled under a separate rate setting process before the NSUARB.[567]  Accordingly, no increases in prices for the Port Hawkesbury LRR are reflected in the 2013/2014 GRA.

- The LRT, the overarching legal framework under which a LRR may be approved, was established in 2000 and was designed to retain certain large customers who in the absence of the rate and the availability of other sources of energy supply would stop purchasing electricity from NSPI to the detriment of other rate payers.[568]  In 2011, an application approved by the NSUARB expanded the LRT to make it available to companies in economic distress (submitted by NPPH and Bowater on June 22 and approved by an NSAURB decision on November 29).[569]  The LRT was not affected by PWCC's April 27, 2012 application for an LRR under the November 29, 2011, LRT framework.[570]

- The *Preliminary Determination* incorrectly stated that the NSUARB approved the NSPI/PWCC application for an LRR on April 27, 2012; on this date, the application was filed.

- The *Preliminary Determination* incorrectly stated that the NSUARB made the order conditional on a favorable Advance Tax Ruling (ATR) from Revenue Canada, implying that it was the NSUARB that imposed the condition; in fact, it was NSPI that included the condition in its April 27, 2012 LRR application.

- PWCC's application for an LRR does not impact the existing Bowater load retention rate.  The *Preliminary Determination* incorrectly stated that NSPI's 2013/2014 GRA included increases to the LRR prices for 2013 and 2014.  The verification report correctly stated that the 2013/2014 GRA could not refer to the Port Hawkesbury LRR at issue because NPPH had ceased operations at the time.[571]  The 2013/2014 GRA explicitly excluded NPPH and, accordingly, it could not include price increases for the Port Hawkesbury LRR.[572]

- The Department properly concluded that NSPI is not a government or public entity – it is a private entity and, therefore, NSPI is not an "authority" and its provision of electricity to Port Hawkesbury is not countervailable.[573]  There is no record evidence that any

---

[566] The contents of NSPI's letter are business proprietary information.

[567] *See* Government of Nova Scotia Verification Report at 15-16.

[568] *See* GNSQR Exhibit NS-EL-20 for the NSUARB May 24, 2000 decision.

[569] *See* GNSQR Exhibit NS-EL-21 for the NSUARB November 29, 2011 decision.

[570] *See* GNSQR Exhibit NS-EL-17 at DE-03/DE-04 at 35.

[571] *See* Government of Nova Scotia Verification Report at 15-16.

[572] *See* GNSQR Exhibit NS-EL-17 at DE-03/DE-04 at 35 ("The main cause of the decline {in net energy demand} is our assumption, for the purpose of our load forecast, that the paper mill in Port Hawkesbury will not operate in {2013 and 2014}.").

[573] *See Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products From Thailand,* 66 FR 50410 (Oct. 3, 2001) (*Flat Products from Thailand*), *Welded Line Pipe from the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination,* 80 FR 14907 (Mar. 20 2015) (*Line Pipe Korea*), *Final Affirmative Countervailing Duty Determination: Steel Wire Rod from Trinidad and Tobago,* 62 FR 55003 (Oct. 22, 1997) (*Steel Wire Rod from*

"authority" entrusted or directed NSPI to provide electricity to Port Hawkesbury. NSPI entered into agreement with Port Hawkesbury as a self-interested, private entity. Under the LRR, Port Hawkesbury makes payments to NSPI to cover the incremental costs to supply the electricity and a contribution to the overall fixed costs of supplying electricity to all other ratepayers in Nova Scotia.

- In the *Preliminary Determination*, the Department found entrustment or direction by the GNS without first applying its two-part test. Reviewing this standard, first established in *DRAMS from Korea*, the CIT explained that "Commerce must consider counterevidence that the transactions making up that alleged program {were} formulated by an independent commercial actor (not a government) and motivated by commercial considerations."[574] The Department has applied this "totality of evidence" approach in recent proceedings as evidenced in *Retail Carrier Bags from Vietnam*[575] and *Nails Oman.*[576]

- There is nothing on the record in this investigation that would satisfy the Department's two-part test. With regard to step one, there is no evidence that the GNS compelled the NSPI to provide PWCC with electricity or the specific rate at which it was provided. Although the *Preliminary Determination* cited to evidence of the GNS policy goal of the completion of the *CCAA* with the mill being sold as a going concern, this does not satisfy step one. The Department conflates the GNS' hot idle funding with an entirely different program, approval of a preferential electricity rate, that is unrelated to the *CCAA* proceeding.

- The Department cites to the Monitor's report as evidence of influence, where the Monitor identified a bidder in PWCC that would purchase the mill as a going concern, but needed more time to complete the transaction. The GNS provided funds to maintain the *status quo* pending resolution of the *CCAA*. There is no evidence that hot idle funds were contingent on a successful agreement being reached between NSPI and PWCC, therefore there is nothing on the record to establish that any GNS policy influenced NSPI or the NSUARB.

- Step two would require the Department to establish a pattern of practice by the GNS with respect to NSPI's decision-making. However, record evidence establishes that the GNS, rarely, if at all, interacted with the PWCC and NSPI in their negotiations. No pattern of practice existed.

- In *DRAMS from Korea* the Department found evidence of "(1) the Korean government's propensity to subsidize companies like Hynix; (2) the Korean government's proclivity for influencing or coercing the actions of financial institutions to achieve its policy goals; (3) the Korean government's opportunity or capacity to specifically influence or coerce the financial institutions involved in Hynix's restructuring; and (4) direct commands by the

---

Trinidad and Tobago), *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination,* 77 FR. 64473 (Oct. 22, 2012) (*Pipe from Oman*)

[574] *See Hynix Semiconductor Inv. v. United States,* 391 F. Supp. 2d 1337, 1343 (CIT 2005) (*Hynix*).

[575] *See Polyethylene Retail Carrier Bags from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination*, 75 FR 16428 (April 1, 2010) and accompanying IDM at Comment 8. (*Retail Carrier Bags from Korea*).

[576] *See Nails Oman,* 80 FR 28958 and accompanying IDM at Comment 3.

Korean government to some of these institutions."[577]  The record in this investigation is to the contrary; it shows that the GNS had no ability to influence or coerce NSPI.

- Applying the Court's determination in *Hynix* to examine counterevidence, it is also clear that the GNS did not entrust or direct NSPI to provide electricity to Port Hawkesbury.
- The fact that public utilities like NSPI are required to act within the law in Nova Scotia is not unusual.  All private companies in the United States are similarly required to act lawfully.  Regulation alone cannot form the basis for entrustment or direction.  All record evidence establishes that NSPI acted as an independent and reasonable commercial actor.  Having Port Hawkesbury purchase electricity from it and contribute to the overall fixed costs of a system that would have otherwise gone uncollected proves that NSPI was independently motivated by commercial concerns.

*Port Hawkesbury's Arguments:*

- The fact that the NSUARB was not involved in the negotiation to establish the terms of the LRR is the evidence cited by the Department to support it assertion that the NSUARB was involved in setting the terms of the Port Hawkesbury LRR prior to the application submitted by NSPI and PWCC (on April 27, 2012), is incorrect and therefore the Department's position (that the NSUARB was involved in the negotiation to set the terms of the Port Hawkesbury LRR) cannot be sustained in the final determination.  The record demonstrates that the following negotiations occurred:

  o In Q1 2012, representatives of PWCC and NSPI met to negotiate the electricity price.[578]
  o On April 27, 2012, PWCC and NSPI applied for approval of the LRR for their partnership.
  o NSPI requested PWCC seek an ATR, and made it a condition of the deal.[579]
  o When the ATR was denied, NSPI withdrew.[580]
  o NSPI and PWCC engaged in several days of negotiations resulting in a new price arrangement that was approved by the NSUARB September 27, 2012.[581]
  o Neither the GNS nor the NSUARB interfered with these negotiations to compel a desired outcome.[582]  The verification report's description is accurate:  there is an adversarial hearing process and the GNS participates in the NSUARB process as one of many intervenors.

- LRTs are a common, well-established, market-based form of electricity tariff that have been widely used throughout North America by electricity suppliers, both public and private, for many decades.[583]  Nova Scotia has had an LRT since 2000; in its November 29, 2011, decision amending the LRT, the NSUARB specifically found that an LRT

---

[577] *See Hynix*, 391 F. Supp. 2d at 1349.
[578] *See* PHPSQR at Exhibit 42-1.
[579] *See* PHPQR at Exhibit 23-7 at para. 6.
[580] *See* PHPQR at Exhibit 23-9.
[581] *See* PHPQR at Exhibit 23-11.
[582] *See* PHP Pre-Preliminary Comments, "Benchmark Information and Pre-Preliminary Comments – Electricity," (June 29, 2015) at 17.
[583] *See id.* at 17 and Appendix 1.

based on economic distress is grounded on long established and well-accepted ratemaking principles applied in various jurisdictions, including Nova Scotia.  Such rates are in the public interest and provide for rates that are reasonable and appropriate for all customers.[584]  In making the 2000 decision, the NSUARB cited examples in Texas and Indiana that supported giving LRT-type rates to large volume customers that could cogenerate.[585]  A witness in the hearing identified 11 utilities in North America that offered LRT-type rates related to customer's economic hardship.[586]  Port Hawkesbury was provided an LRR under the already approved LRT as a result of an arm's-length negotiation between PWCC and NSPI.

- The 2013/2014 GRA and the Port Hawkesbury LRR application were handled in separate NSUARB proceedings.  The application for the Port Hawkesbury LRR was submitted 11 days before the 2013/2014 GRA.  The latter stated that the Port Hawkesbury LRR application was based on the mill taking incremental energy so that no customer was at risk to pay any of the mill's load. The November 29, 2011, NSUARB decision stated that the new owner of the mill should apply for an LRR, which would have been appropriate for NPPH.[587]

- Port Hawkesbury's LRR requires the acceptance of the full risk of hourly incremental fuel costs unlike the November 29, 2011, decision for Bowater based on NSPI's year-by year estimate of incremental avoided costs.

- There is no evidence to support the *Preliminary Determination* that the negotiation and approval of the LRR was one of the critical factors to ensure the purchase of NPPH by PWCC as a going concern, a policy goal of the GNS after NPPH entered CCAA protection.  There is no evidence suggesting that the GNS directed NSPI to provide electricity to Port Hawkesbury at specific rates.  The LRR was negotiated between two private corporations pursuant to the terms of a previously approved tariff without input or involvement from the NSUARB.

*The Petitioner's Arguments:*

- Port Hawkebury received a countervailable subsidy through the provision of electricity at LTAR.  Providing subsidized electricity was essential to the sale and re-opening of the Port Hawkesbury mill, as it was well known that "low cost electricity was a pre-condition for the sale"[588]  Record information shows that re-opening of the mill was contingent upon the providing of electricity at lower rates.

- The *Preliminary Determination* was correct in finding that the GNS entrusted or directed NSPI to provide electricity to Port Hawkesbury under the terms of and conditions of the LRR.

---

[584] PHQR Exhibit 23-6, paras. 171-172.

[585] *Id.* at 14 and *see* PHQR Exhibit 23-5 at para. 15 (citing *Re Northern Indiana Public Service Company*, (1988), 89 PUR 4th 385), respectively).

[586] PHQR Exhibit 23-6 at para. 117.

[587] *See* PHQR Exhibit 23-6 at para. 224.

[588] *See* Petitioner's PHP Deficiency Comments at Exhibit 10 ("Nova Scotia court approves sales of paper mill for $33 million, UARB approves discount power rate," *CBC News* (Sept. 27, 2012)).

- The NSUARB's decisions are "purposeful, targeted compulsion by the government to the private entity at issue"[589] and in turn, NSPI is entrusted to implement these decisions. The government in Canada has previously been found to exercise control over commercial utility companies.[590]
- The Department could also reasonably find that the NSUARB provides a financial contribution to Port Hawkesbury with respect to electricity for LTAR, because the NSUARB is an authority or agency within the GNS. In *Softwood Lumber Products from Canada*, the Department defined "provide" as "make available" and, thus, found that the right to harvest timber constitutes a provision of a good and, in-turn, the provision of a financial contribution.[591] Similarly, Port Hawkebury has the right to access electricity at rates established by the NSUARB. *Softwood Lumber Products from Canada* was upheld by a WTO Panel, which found that "the right to harvest standing timber is not severable from the right over the standing timber and providing the right to harvest timber is therefore different from providing standing timber."[592] The Panel was upheld by the WTO Appellate Body, which defined "provides" as "to put at the disposal of".[593]
- In this instance, there is a "reasonably proximate relationship" between the action of the NSUARB and Port Hawkesbury's electricity use, because the NSUARB "put at the disposal of" Port Hawkesbury electricity at reduced rates, thus providing a financial contribution to the company.

*The GOC's Rebuttal:*

- The three statements provided by the petitioner to support its assertion are not supported by record evidence, are factually incorrect, and misstate the elements to find entrustment or direction. [594]
- In *US-DRAMS* the WTO Appellate Body stated that "{a} finding of entrustment or direction…requires that the government give responsibility to a private body – or exercise its authority over a private body – in order to effectuate a financial contribution."
- The petitioner's argument, that even if entrustment or direction did not occur, the NSUARB itself made a direct financial contribution to Port Hawkesbury, is baseless.

---

[589] *See* PHP Electricity Pre-Preliminary Comments at 17.

[590] *See Canada-Certain Measures Affecting the Renewable Energy Generation Sector I Canada -Measures Relating to the Feed-In Tariff Program,* Report of the Panels, WT/DS/412 and WT/DS426/R (December 19, 2012).

[591] *See Certain Softwood Lumber Products from Canada*) and accompanying IDM at I (Provincial Stumpage Programs Determined To Confer Subsidies).

[592] *See United States-Final Countervailing Duty Determination With Respect To Certain Softwood Lumber From Canada,* Report of the Panel, WT/DS257/R (Aug. 29, 2003) at para. 7.11.

[593] *See United States-Final Countervailing Duty Determination With Respect To Certain Softwood Lumber From Canada,* Report of the Appellate Body, WT/DS257/AB/R (January 19, 2004) ("the concept of 'making available' or 'putting at the disposal of'... requires there to be a reasonably proximate relationship between the action of the government providing the good or service on the one hand, and the use or enjoyment of the good or service by the recipient on the other. Indeed, a government must have some control over the *availability* of a specific thing being 'made available.'") at paragraph 71.

[594] *See* The Petitioner's Case Brief, at 36.

- The Act states that a countervailable subsidy exists where an authority provides a financial contribution to a person, and a benefit is conferred. The Act defines "authority" as a "government of a country or any public entity within the territory of a country." The NSUARB is not an authority within the meaning of the Act. When deciding whether an entity is an "authority," the Department must consider whether the entity acts as an agent of the government in implementing policy or whether it operates independent of government control.

- The petitioner's focus on the word "provide" is a red herring. Simple approval by the NSUARB of a rate negotiated between private parties does not qualify as a provision of a financial contribution by the NSUARB to PWCC.

- The petitioner's reliance on two WTO cases: *Softwood Lumber from Canada*[595] and *Canada – Certain Measures Affecting the Renewable Energy Generation Sector* is misplaced.[596] These cases are inapposite.

- In *Softwood Lumber* the WTO Appellate Body determined that for purposes of applying Article 1.1(a)(1)(iii) of the SCM Agreement, it does not matter if "provides" is interpreted as "supplies," "makes available," or "puts at the disposal of." For determining the existence of a subsidy what matters is whether all the elements of the definition are fulfilled as a result of the transaction.[597] The facts of this investigation can be distinguished. In that case, timber was harvested from government-owned land. Here there is no government ownership of the generation, transmission, or generation of electricity in Nova Scotia. The issue in *Softwood Lumber* was whether an access right provided by a government was equivalent to the provision of a good provided by the government. The issue in this investigation, however, is whether or not the GNS provided a good for less than adequate remuneration.

- In order to find a countervailable subsidy, the Department must find: (1) that the NSUARB is an "authority;" and (2) that simple approval by the NSUARB of a privately negotiated rate constitutes the provision of a good, and is, thereby, a financial contribution.

- Also distinguishable is the *Canada Feed-in Tariff* decision. In that case, the panel examined Ontario's electricity system. The company at issue, Hydro One, was wholly owned by the Government of Ontario. As a result of regular meetings with the Minister of Energy to set the company's strategic outlook and approval of Hydro One's performance "expectations" by the Ministers of Energy and Finance, the panel concluded that the Government of Ontario exercised meaningful control over Hydro One's activities. The panel also found that the Government of Ontario continued to play a critical role in all aspects of the system's functioning, including regulation. NSPI is not owned or controlled by the GNS. The NSUARB is not subject to meaningful control by the policy-making offices of the GNS.

---

[595] *See United States – Final Countervailing Duty Determination with Respect to Certain Softwood Lumber From Canada* WT/DS257/AB/R (January 19, 2004) (*Softwood Lumber*).

[596] *See Canada – Certain Measures Affecting the Renewable Energy Generation Sector WT/DS412/R and Canada – Measures Relating to the Feed-In Tariff Program* WT/DS426/R (December 19, 2012).

[597] *See Softwood Lumber*, at para. 73.

*The GNS' Rebuttal:*

- NSPI's sale of electricity is dissimilar to the provision of stumpage in *Softwood Lumber Canada 2002*[598] and *Coated Free Sheet Paper Indonesia*.[599]  In those cases, the Department explained that its definition of "providing" a good or service by "making it available" relies upon a factual record where a government acted to grant a right of access to harvest timber on government-owned forest land through the issuance of licenses.  The Department found that the pre-requisite to a government "making the good available" was government ownership of the land.  Here, unlike in other Canadian provinces, there is no government ownership of the good, electricity, because NSPI owns the electrical system. Also, NSUARB's action approving all NSPI-proposed electricity rates does not grant a license for access to government-owned property.  Rather, NSPI, a private entity, retains control and access to the electricity.  Therefore, the Department's precedent defining "providing" as "making available" is inapplicable in this case.
- Sections 771(5)(D) and (E) the Act specify that the Department must make separate findings of financial contribution and benefit. The electricity rate is examined under the benefit prong of the analysis of goods provided for LTAR.  The Act does not permit the NSUARB approval of the rate to automatically transform the approving entity into the provider of the good; rather, in *Softwood Lumber Canada 2002* and *Coated Free Sheet Paper Indonesia*, the Department relied upon the government ownership of the good to find action by an authority.
- *Canada Feed-in Tariff* does not support the Department's finding of entrustment or direction because of differences between the electrical systems of Nova Scotia and Ontario.  Unlike in Ontario, the GNS does not own the electrical system, and there is no meaningful control by the GNS over NSPI.
- The verification of the GNS established that the *Preliminary Determination* was incorrect in stating: 1) that PWCC and NSPI negotiated with the NSUAB throughout the *CCAA* process; and 2) that NSUARB full-time members and employees are deemed to be employees in the public service of the province of Nova Scotia under section 10(1) of the *Utility and Review Board Act*.  The NSUARB did not engage in any off-the-record or pre-application discussions with NSPI and Port Hawkesbury.  The NSUARB is not part of the GNS, and NSUARB members are deemed civil servants only for the purpose of providing them with pensions.
- The Department explained its two-part test to determine whether a private entity has been entrusted or directed to make a financial contribution in *DRAMS from Korea*.

---

[598] *See Notice of Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Softwood Lumber Products From Canada*, 67 Fed. Reg. 15,545 (Apr. 2, 2002) and accompanying Issues and Decision Memorandum at I (Provincial Stumpage Programs Determined to Confer Subsidies) (*Softwood Lumber Canada 2002*)).

[599] *See Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 FR 60642 (Oct. 25, 2007) and accompanying Issues and Decision Memorandum at Comment 9 (*Free Sheet Paper Indonesia*).

- In *DRAMS from Korea*, the Government of Korea (GOK) owned the banks, regulated them, and directly interfered in bank operations.[600]  In order to determine entrustment or direction, the Department looked beyond mere statements and considered specific acts. The Department also determined whether the GOK was in a position to coerce or induce private entities to provide a financial contribution.

- Unlike in *DRAMS from Korea*, the GNS does not own NSPI or Port Hawkesbury; NSPI is completely separate from its independent regulator, the NSUARB; and the GNS did not guarantee Port Hawkesbury's loan from Bank of America.

- In *CFS from Korea*, the Department found that while the GOK provided direct financial assistance by its participation in Shinho Paper's workout plan and syndicated loan, this assistance was insufficient to demonstrate entrustment or direction of Shinho Paper's other creditors to provide credit either through coercion or threats.[601]

- In *PRCBs Vietnam*, discussed in *Nails Oman*, the Department determined that a private landlord in a government-run industrial zone was not a public authority and assessed whether entrustment or direction could be discerned from the relationship between the GOV and the private landlord and found that encouragement to pass along savings is a tenuous link.

- In *US-DRAMS*, the WTO Appellate Body stated that in most cases, one would expect entrustment or direction of a private body to involve some form of threat or inducement which could serve as evidence of entrustment or direction.  Furthermore, the giving of responsibility to or the exercise of authority over a private body implies a more active role than mere encouragement.[602]

- In *US-Export Restraints*, the panel stated that "the ordinary meanings of the words 'entrusts' and 'directs' require an explicit and affirmative action of delegation or command."[603]

- In *Korea-Commercial Vessels*, the WTO panel "agree{d} that the delegation or command inferred by the terms 'entrustment' and ' direction' must take the form of an affirmative Act.[604]

- This case is consistent with *CFS from Korea*, *PRCBs Vietnam*, and *Nails Oman*, not *DRAMS from Korea*.  There is no evidence of inducement or coercion by the GNS or the NSUARB.  The NSUARB approves prices, and it evaluates them based on non-discrimination and the public interest using well-established economic principles.

- In *Cantour v. Detroit Edison*, the U.S. Supreme Court found that in analogous situations in the context of antitrust actions, the mere approval of rates by a utility regulator was insufficient to establish state action by the private utility provider.[605]  *Cantour* also stated that the exercise of sufficient freedom of choice bred independence.[606]  Here, NSPI

---

[600] *Preliminary Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors From the Republic of Korea*, 68 Fed. Reg. 16,766, 16,773 (Apr. 7, 2003).

[601] *See Free Sheet Paper Korea* at 22-23.

[602] *See* United States – Countervailing Duty Investigation on Dynamic Random Access Memory Semiconductors DRAMS from Korea, WT/DS296/AB/R (2 June 2005) at paras. 108, 114.

[603] United States – Measures Treating Export Restraints as Subsidies, WT/DS194/R (29 June 2001) at para. 8.44.

[604] Korea – Measures Affecting Trade in Commercial Vessels, WT/DS301/R (7 March 2005) at para. 7.370.

[605] *See Cantour v. Detroit Edison* , 428 U.S. at 582-583.

[606] *Id.* at 593.

negotiated the rate with PWCC, and then brought the rate to the NSUARB, which approved it after conducting adversarial hearings.

- If the mere approval of an electricity rate by an independent regulatory body constitutes entrustment and direction, the Department has wrongly and dangerously expanded the definition of entrustment and direction to include a wide range of activities that it presumably did not intend, such as the review and approval of mergers by the U.S. Government.

- LRRs are market-based prices; when properly designed they can lead customers to make business decisions that are financially attractive and economically efficient, providing advantages to the affected customer and other customers on the system.  To be effective, an LRR must be necessary to retain the load, the rate must be sufficient to retain the load, the rate must exceed the marginal cost of providing service, and must benefit all ratepayers.  Port Hawkesbury's LRR does all of these.

- In the *Preliminary Determination* the Department assumed that an independent quasi-judicial body which reviews and approves arm's-length transactions between private parties, such as the NSUARB or U.S. courts (in the context of settlement agreements),[607] performs a "government subsidy function" for purposes of U.S. countervailing duty law – a far-reaching precedent likely to be used against U.S. exporters.  This assumption would also implicate the U.S. International Trade Commission, the Securities and Exchange Commission, FERC, the Federal Reserve Board, and the Federal Trade Commission, as well as the U.S. Departments of Justice, Transportation, Treasury, and Commerce, all of which review mergers directly or as part of a CFIUS review.  Based on the evidence before it, this assumption cannot be sustained in the final determination.

- The Department's groundless determination that the NSUARB participated in the negotiation of a private contract between two private parties, either directly or through its review and approval of the proposed pricing mechanism also implicates private and publicly-owned U.S. electricity suppliers that negotiate individual rates with large customers.[608]

- Many U.S. states (*e.g.*, Pennsylvania, Minnesota, and Maine, the location of the petitioner's SC paper mills) have explicitly endorsed non-cost-of-service rates.

- The LRR that Port Hawkesbury negotiated with NSPI is fully consistent with NSPI's historical approach to electricity pricing for extra-large industrial customers.  It is a form of market-based "below-the-line" rate that ensures the full recovery of incremental costs and a contribution to fixed costs and cannot be considered countervailable.

---

[607] *See, e.g.*, *Moeller Commercial De Mexico, S. de R.L. de C.V. v. United States*, 44 F. Supp. 3d 1398 (CIT 2015); *see, also, Hynix*, 30 CIT at 308-309, 425 F. Supp. 2d at 1305-1306 (commending the Department's limited view of entrustment and direction, thus avoiding declaring court awards of punitive damages to be potentially countervailable).

[608] *See, e.g.*, *Philadelphia Suburban Transportation Company v. Pennsylvania Public Utility Commission*, 3 Pa Commw. 184, 281 A.2d 179, 186 (Pa. Cmwlth. 1971).

*Port Hawkesbury's Rebuttal:*

- The petitioner conflates the Bowater LRR and the Port Hawkesbury LRR.
- The petitioner does not provide evidence of entrustment or direction; it only states that the record establishes that the sale of the mill was contingent upon an agreement for an electricity price lower than that paid by NPPH. Contrary to this opinion, the price was set by negotiation between two private parties, NSPI and PWCC, NSPI received significant commercial benefits, including the recovery of all incremental costs without subsidization from the other rate-payers, and the NSUARB approved the rate. NSPI is a private, for-profit company owned by a publicly traded company with fiduciary obligations to its shareholders to maximize profits. The NSUARB approval of electricity rates is not entrustment or direction because the NSUARB is a fully independent quasi-judicial body like a court of law; the U.S. Supreme Court found that mere approval of rates by a utility regulatory body is insufficient to turn the actions of an investor-owned electricity company into state action.[609]
- The petitioner's reliance on *Feed-in Tariffs* fails because Hydro One is wholly owned and controlled by the Government of Ontario and NSPI is privately held.
- The petitioner's argument that an entrustment or direction determination is not required by reliance on *Softwood Lumber IV* is unreasonable. First, in *Softwood Lumber IV*, the Crown owned the trees; here the GNS does not own the electricity. Second, there are no licensing fees for electricity in Nova Scotia. NSUARB action is much more like the Federal Trade Commission's approval of a merger between two private companies in the United States.

*The Petitioner's Rebuttal:*

- Port Hawkesbury's arguments that the GNS did not interfere with the process of setting electricity prices is contradicted by record evidence. Keeping the Port Hawkesbury mill open was a key objective of the GNS and having a lower electricity rate was an essential factor in re-opening the mill.
- Evidence on the record indicates that the GNS worked closely to address the issue of the mill's high electricity costs and that the agency was committed to re-opening the mill for the benefit of the Nova Scotian economy.[610] The government was heavily involved in the negotiations between PWCC and NSPI, via a consultant hired to facilitate negotiations.[611] Further, the GNS was involved in ensuring that the LRR was approved. Thus, despite comments by Port Hawkesbury, record evidence shows that the GNS was essential to this process.
- The Department's finding of entrustment or direction is reasonable, consistent with the Act, and fully supported by the record, and even meets the threshold standard advocated by Port Hawkesbury in its comments prior to the *Preliminary Determination* that

---

[609] *See Cantor v. Detroit Edison*, 428 U.S. 579, 96 S.Ct. 3110 (1976).

[610] *See Petitioner's Supplemental Pre-Preliminary Comments at Exhibit 5.* (Government of Nova Scotia Opening Statement, PWCC/NSPI Load Retention Tariff Application (NSUARB P-203) at 1 (NS-SUPP1-33K)).

[611] *See Petitioner's Supplemental Pre-Preliminary Comments at Exhibit 12.* (Nova Scotia, Department of Natural Resources letter to the NSUARB (April 27, 2012) at 1 (NS-SUPP1-33H)).

entrustment or direction is "purposeful, targeted compulsion by the government to a private entity."[612]

- In *Feed-in Tariffs*, the government exercised meaningful control over the utility, notwithstanding that the utility is a commercial enterprise with an independent Board of Directors.[613]  Similarly, NSPI must comply with the directives of the NSUARB.

- *DRAMS from Korea, US-DRAMS Korea, CFS from Korea, PRCBs Vietnam,* and *Nails Oman* are all consistent with the Department's finding on entrustment and direction in the *Preliminary Determination.*

- In relying on litigation concerning *DRAMS from Korea*, Port Hawkesbury misconstrues the underlying facts because:  1) in *DRAMS from Korea* the government-owned bank took into account economic and social policy considerations in determining to participate in the respondent's restructuring,[614] while here, the GNS and the NSUARB took into account social and policy considerations; 2) government ownership was not the dispositive issue in *DRAMS from Korea* because there the Department included public and private banks for restructuring finance, while here, the record indicates much more than government influence because NSPI could only sell electricity to Port Hawkesbury pursuant to, and under the conditions of, the LRR.  The facts here are stronger than in the decisions upon which Port Hawkesbury relies.

- Port Hawkesbury's reliance on *U.S. – Export Restraints* and *Korea-Commercial Vessels* is unavailing.  There, the U.S. position was that "under the ordinary meaning of 'direct,' there would have to be the requisite causal connection between the government measure and the behavior of private actors in order for a financial contribution to exist."[615]  Here, that causal nexus exists.

- *Korea - Commercial Vessels* stated that "the ordinary meanings of the verbs 'entrust' and 'direct' comprise" the elements of something that is "necessarily delegated" to someone to do something.[616] Here, there was every expectation that NSPI would supply electricity to Port Hawkesbury under the LRR.

- In *US – DRAMS*, the panel indicated that the finding that the GOK "maintained a policy of supporting Hynix's financial restructuring and thereby avoiding the firm's collapse" supported an affirmative determination.  Here, because the GNS maintained an announced policy to save the mill and, and together with the NSUARB, was willing to take extraordinary measures to save the mill does not diminish the rationale for an affirmative determination. This is similar to *Hynix*, where the government's "willingness" to participate in past restructuring efforts for other firms supported a determination that such efforts were taken with respect to Hynix.

---

[612] *See PHP Electricity Pre-Preliminary Comments* at 17.

[613] *See Canada Feed-in Tariffs* at paras. 7.235, 7.236, and 7.239.

[614] *See Hynix Semiconductor Inc. v. United States,* 425 F.Supp.2d 1287, 1304 (Ct. Int'l Trade 2006) (finding that the Department "did in fact adduce evidence supporting its conclusion that the {GOK} was able to influence or coerce multiple members of Hynix's creditors council, both with and without government ownership."

[615] *See* Report of the Panel, *United States -Measures Treating Export Restraints as Subsidies,* WT/DS194/R (June 29, 2001), at para. 8.39

[616] Report of the Panel, *Korea – Measures Affecting Trade in Commercial Vessels,* WT/DS273/R (March 7, 2005), at para. 7.367, quoting *US. -Export Restraints* at para. 8.29.

- In contrast to the facts of this investigation, "there was no record evidence" in *Nails Oman* indicating that the government had a policy of entrusting or directing private companies to provide a financial contribution;[617] the Department found no government actions to effectuate a "bail-out" policy in *CFS from Korea*;[618] and the Department found "no evidence" that the government interfered with land rent prices in *PRCBs Vietnam*.[619]

- *Cantour* is not applicable.  There, the court drew a "distinction between economic action taken by the State itself and private action taken pursuant to a state statute permitting or requiring individuals to engage in conduct prohibited by the Sherman Act."[620]  The Court stated that the "approval of respondent's decision to maintain such a program does not, therefore, implement any statewide policy relating to light bulbs."[621] The Court stated "there can be no doubt that the option to have, or not to have, such a program is primarily respondent's, not the Commission's. Indeed, respondent initiated the program years before the regulatory agency was even created."[622] The Court concluded that "even though there may be cases in which the State's participation in a decision is so dominant that it would be unfair to hold a private party responsible for his conduct in implementing it, this record discloses no such unfairness."[623]

- The CIT has stated that it is the Department's obligation is to "show through the totality of its evidence that entrustment or direction has taken place."[624] Therefore the Department need not heed Port Hawkesbury's argument that the Department should "be careful" to limit entrustment and direction findings to require that the private party action is "fulfilling a government subsidy function."

**Department's Position:**

The majority of the comments raised by the interested parties with respect to the issue of entrustment or direction have been addressed in the narrative section of this memorandum.[625] Thus, we incorporate that position here and do not repeat our position on those comments here.

The respondents have argued that the Department failed to apply the "two-part test" used in *DRAMs from Korea* to find entrustment or direction.  However, we did not use this "two-part test" in the instant investigation because that test is not applicable to the facts of this case.  The SAA is clear that the analysis of an indirect subsidy through entrustment or direction is administered on a case-by-case basis because the specific manner in which a government may act through a private party is widely varied.[626]

---

[617] *See Nails Oman* 80 FR at 28959.
[618] *See CFS from Korea* and the accompanying Issues and Decision Memorandum at 23.
[619] *See PRCBs Vietnam* and the accompanying Issues and Decision Memorandum at 24.
[620] *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 589 (1976).
[621] *Id.* at 584.
[622] *Id.* at 594.
[623] *Id.* at 595.
[624] *See Hynix Semiconductor Inc. v. United States* 425 F.Supp.2d at 1304.
[625] *See* "GNS Preferential Electricity Rate for Port Hawkesbury" section above.
[626] *See* Statement of Administrative Action (SAA) accompanying H.R. 5110, H.R. Doc. No. 316, 103d Cong., 2d Sess. 911, 926 (1994).

The "two-part test" used in *DRAMs from Korea* was appropriate to the specific manner in which the government acted to provide a financial contribution through a private party. In the instant investigation, the GNS entrusted or directed a private party, NSPI, to provide a financial contribution, the provision of electricity, directly through its laws. In *DRAMs from Korea*, the government used a manner other than direct legislation to entrust or direct private parties to provide a financial contribution to the respondent, Hynix. Therefore, the Department had to rely on circumstantial information to determine that there was entrustment or direction of a private party to provide a financial contribution. This is not the case here. If, similar to this instant investigation, the GOK had simply passed a law directing private financial institutions to provide a financial contribution to Hynix, the Department would not have used this two-part test because it would have been able to find entrustment or direction based solely on GOK law. Accordingly, it was not necessary to apply that test in this investigation.

The respondents also argue that there can be no entrustment or direction because the LRR rate was negotiated between two private parties. This argument has already been explicitly dismissed as irrelevant in *DRAMs from Korea*:

> The Department interprets the "entrust or directs" language in 771(5)(B)(iii) to mean that, if a government affirmatively causes or gives responsibility to a private entity to carry out what might otherwise be a government subsidy function of the type listed in subparagraphs (i) to (iv) of section 771(5)(D), there would be a financial contribution. Thus, when the government executes a particular policy by operating through a private body, or when a government affirmatively causes a private body to act, such that one or more of the type of functions referred to in subparagraphs (i) to (iv) is carried out, there is entrustment or direction. Moreover, in the cases of an indirect subsidy, where the government is acting through a private party, it would make sense that the private party, and not the government itself, would fix the commercial terms. Whether the terms are sufficiently affected by government action so as to make the provision actionable is a factual element relevant to the measurement of "benefit," not "financial contribution."[627]

The respondents' reliance on *Pipes and Tubes Turkey* to support their argument that government entrustment or direction is more than mere government presence, and their statement that entrustment or direction cannot be a by-product of government regulations, while correct, are misplaced with respect to the facts on the record of this investigation. Indeed, these statements provide further support for the Department's finding of entrustment or direction.

*Pipes and Tubes Turkey* involved the sale of land between two private companies located in a Turkish industrial zone. The petitioner in that case argued that the Government of Turkey's (GOT) approval of firms to locate in that zone constituted entrustment or direction on the sale of land between the two private parties. Based on the information on the record in that

---

[627] *See* June 16 2003 *Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Dynamic Random Access Memory Semiconductors from the Republic of Korea* (*DRAMs from Korea*) at 47-48.

investigation, we determined that there was no evidence that the GOT directed one private party to sell land to another private party.  Similarly, in *PRCBs Vietnam* and *Nails Oman*, there was no evidence on the record that the government was entrusting or directing a private party to provide a financial contribution.   In our investigation, the GNS, by law, directs the provision of a financial contribution by one private party to another.

We also agree that the entrustment or direction of a private party to provide a financial contribution cannot merely be a by-product of government regulation.  Again, however, that is not the case in this investigation because the financial contribution, the provision of electricity, is not a by-product of regulation—it is the explicit subject of legislation.  The provision of that financial contribution is the reason why the GNS enacted the *Public Utility Act* and why the GNS regulates not only the provision of the financial contribution but the provision of the benefit (to the extent that one exists) as well.

The respondents argue that finding a regulatory body such as the NSUARB to be an authority would have "dire consequences" for all regulatory bodies in the United States. They further argue that finding an independent quasi-judicial regulatory body an authority would implicate the U.S. International Trade Commission, FERC, the Securities and Exchange Commission, the Federal Reserve Board, the Federal Trade Commission, and numerous others, not to mention less-independent bodies like the Departments of Justice, Transportation, Treasury and Commerce.  We find this argument unavailing.  The mere fact that an entity is a government body does not make its activities subject to the countervailing duty law under our approach. Regardless of whether an entity is an authority under section 771(5)(B), a government action can only be found to be a countervailable subsidy if there is also a financial contribution as defined under section 771(5)(D) that provides a benefit as defined under 771(5)(E) which is specific as defined under section 771(5A) of the Act.

The respondents also argue that there are states such as Minnesota and Maine that have endorsed non-cost-of service rates; however, this fact is more germane to the existence of a benefit, and not to the issue of entrustment or direction.  While we recognize that the respondents have acknowledged the potential use of a cross-border benchmark, for the reasons set forth elsewhere in this determination, we have used a tier 3 benchmark under 19 CFR 351.511(a)(2)(iii).

The respondents also argue that LRTs like that applicable to Port Hawkesbury are common throughout North America.  Again, this is not relevant to this portion of our analysis because the prevalence of such tariffs speaks to the potential for a benefit, not the question of whether entrustment or direction of a financial contribution occurred.   The information on the record of this investigation demonstrates that electricity provided pursuant to the LRR is a financial contribution that provides a benefit and is specific.  That provision of electricity is, therefore, a countervailable subsidy under section 771 of the Act.

The respondents cite to *Cantor v. Detroit Edison*, which was a Supreme Court decision involving the federal antitrust laws, not the application of the countervailing duty law.  Notwithstanding that distinction, *Cantor* recognized that state government regulation by a Public Service Commission of a private utility company engaged in a monopoly is an act of government, and the Supreme Court made no distinction between the Government of Michigan and the Michigan

Public Service Commission that the State of Michigan created by statute to regulate public utilities.[628]  Thus, *Cantour v. Detroit Edison* supports our determination that NSUARB is a government authority.

Finally, with regard to the GNS' contention that the Department's verifiers did not request a meeting with NSPI, the Department included the following information requests in the verification outline issued to the GOC:

> c.  *Discuss and document how cost and revenue components of both "above-the-line" and "below-the-line" tariffs were determined for NSPI for the POI based on, where appropriate, the 2013-2014 GRA's Revenue Analysis, or other documents on the official record.  Provide a detailed explanation of this process for the Large Industrial Tariff, the Extra Large Industrial Two Part Real Time Pricing, and the Load Retention Tariff.   Additionally, provide a description of the load forecast for these tariffs.*

> d.  *Explain outcomes of the Rate Stabilization Plan for NSPI during the POI with respect to the uncovered fixed costs inherent in providing the LRR to Port Hawkesbury.  Discuss any differences between actual revenues during the POI and those that were forecast during the general rate application process.  Discuss aspects of the NSPI's 2014 Financial Statement with respect to the balance of deferral accounts linked to the Rate Stabilization Plan and the Cost Recovery Mechanism from the 2012 rate year.*

The Department did not explicitly request to meet with NSPI.  However, these agenda items were prepared in an effort to ensure that the Department would have the opportunity at verification to engage in a meaningful discussion with the appropriate individuals on the topics that the Department identified as germane to this investigation.  As stated in the verification report:

> {The GNS official} was able to explain the overall rate setting process but did not have access to information other than that which was on the record.  He was able to discuss how rate setting is conducted, but he was not able to answer our questions about why certain rates were set at certain prices within the cost of service methodology or to provide additional information about the outcomes of deferrals which are discussed in the NSPI POI financial statement, e.g., the windup of the s.21 tax deferral and the planned, but not used, deferral under the Rate Stabilization Plan. {Citation omitted.}  Counsel for the GNS explained that they had requested that NSPI participate in verification, or provide assistance to the GNS in preparing to respond to the verification agenda items c and d.  In response to the GNS request, NSPI provided a letter . . . . .[629]

---

[628] *See Cantor*, 428 U.S. at 594-96.
[629] *See* GNS Verification Report, at 19-20.

Thus, the Department did not have the opportunity to review the relevant record information or to discuss it at length at verification with NSPI.  NSPI did provide a letter that the Department accepted as a verification exhibit, and the letter was marked as business proprietary information in its entirety.  Separately, the Department did meet directly with the NSUARB to discuss various aspects of the electricity allegation at issue, as presented in the verification report.[630]  However, and contrary to the GOC' contention, because the letter provided by NSPI was marked as business proprietary information in its entirety, the Department's verifiers were expressly prohibited from discussing its contents or asking any follow-up questions with the NSUARB.

## Comment 12:  Whether to Use a Tier 1 Benchmark

*The GOC's Arguments:*

- The facts of the case do not support the Department's conclusion that a government provider of electricity constitutes a majority or a substantial portion of the market, that prices within the country are distorted, and that these prices do not satisfy the regulatory requirement for a market determined price under Tier 1.
- The Department ignored the Tier 1 benchmark data that was available on the record for Alberta and provided an inadequate basis to reject a Tier 1 benchmark.  NSPI is a private company that is not entrusted or directed to supply electricity in Nova Scotia by the government, the GNS is not a supplier of any electricity in Nova Scotia and does not constitute a majority or a substantial portion of the electricity market, and regulation by the NSUARB is not sufficient involvement in a private transaction to find prices distorted by government involvement.
- Governmental regulatory approval of private electricity rates, a factor cited by the Department when rejecting the use of a Tier 1 benchmark, does not rise to the level of government involvement necessary to reject Tier 1 benchmarks.  Even if the GNS did account for a substantial portion of the market, the Department must still determine whether actual transaction prices are significantly distorted as a result of the government's involvement in the market, and it has not done so.

*The GNS' Arguments:*

- The Department's benefit analysis is flawed because the Department impermissibly ignored its regulatory hierarchy and failed to use a Tier 1 benchmark for calculating the benefit.
- The Alberta benchmark reflects private party transactions in the country under investigation and, therefore, meets the requirements of 19 CFR 351.511(a)(2)(i).  The *CVD Preamble*[631] explains that the Department must conclude that actual transaction prices are "significantly distorted as a result of the government's involvement in the market," before it will resort to the next alternative in the hierarchy.  The Department wholly ignored this framework, and dispensed with the Alberta benchmark data by

---

[630] *See* Id. at 20
[631] *See CVD Preamble* at 65,377 (Nov. 25, 1998).

focusing exclusively on the electrical system in Nova Scotia even though the country of investigation is Canada.

- There is no basis to depart from the regulations in the examination of electricity markets. In *Steel Wire Rod from Trinidad and Tobago*, the Department explained that a Tier 3 benchmark would be appropriate where "it is only the government that provides electricity within a country or where electricity cannot be sold across service jurisdictions within a country and there are divergent consumption and generation patterns within the service jurisdictions."[632] However in *Softwood Lumber from Canada AR3 Prelim*, the Department abandoned this analysis in favor of Tier 1 in-country benchmarks that do not include any intra-country jurisdictional analysis.[633]

*Port Hawkesbury's Arguments:*

- The Department ignored the use of a Tier 1 benchmark and didn't establish that prices for electricity are distorted due to government involvement in doing so. Prices for electricity in Nova Scotia are based on sound economic and ratemaking practices as approved by an independent regulator.
- Alberta has a competitive wholesale and retail electricity market and its prices are not distorted by government involvement in the market. The Alberta electricity price information provided represented actual, market-determined prices in the country. In *Softwood Lumber from Canada AR1* and *AR2*, for stumpage, the Department determined that 'country' was not interchangeable with 'province' and that the analysis for whether to use a Tier 1 benchmark must be conducted at the country level, not at the province level. A comparison between the Alberta benchmark and the price paid by Port Hawkesbury yields no benefit.[634]

*The Petitioner's Arguments:*

- The Act provides that availability is one of the elements which establish prevailing market conditions. The Alberta electricity price is based on a price set by a utility review board and is equivalent to the "permitted tariffs" disqualified by the Department in *Pipe from Oman*. Moreover, electricity from Alberta is not available in the Nova Scotia market; only prices in Nova Scotia were available to Port Hawkesbury.

---

[632] *See CVD Preamble* at, 65,377 (citing *Final Affirmative Countervailing Duty Determination: Steel Wire Rod From Trinidad and Tobago*, 62 FR 55,003, 55,006-07 (Oct. 22, 1997) (*Steel Wire Rod from Trinidad and Tobago*).
[633] *See, e.g.*, *Notice of Preliminary Results and Extension of Final Result of Countervailing Duty Administrative Review: Certain Softwood Lumber Products From Canada*, 71 FR 33,932, 33,946 (Jun. 12, 2006) (*Softwood Lumber from Canada AR3 Prelim*) (Private Stumpage Prices in New Brunswick and Nova Scotia May Serve as a First-Tier Benchmarks in the Subject Provinces...we have used Maritimes' private prices to measure the adequacy of remuneration of the stumpage programs administered by the GOA...").
[634] *See* Notice of Final Results of Countervailing Duty Administrative Review and Rescission of Certain Company-Specific Reviews: Certain Softwood Lumber Products From Canada, 69 FR 75917 (Dec. 20, 2004) and accompanying Issues and Decision Memorandum at 34 (*Softwood Lumber AR1*); *and* Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada, 70 FR 73448 (Dec. 12, 2005) and accompanying Issues and Decision Memorandum at 20-24 (*Softwood Lumber from Canada AR2*).

**Department's Position**:

The Department's regulations at 19 CFR 351.511(a)(2)(i) provides that the preferred means of determining the adequacy of remuneration is a comparison with a market-determined price resulting from actual transactions for a comparable good or service in the country under investigation. Such a price can include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions.

When the government provider constitutes a majority or a substantial portion of the market, the Department determines that prices within the country are distorted and we will move to the next alternative in the hierarchy.[635] As explained in "Program Found to be Countervailable" electricity prices in Nova Scotia are distorted by government involvement in the market because NSPI has been entrusted or directed to supply electricity therein and accounts for 95 percent of the province's generation, as well as most of the transmission and distribution. The respondents have argued that we should use electricity prices in Albert as a Tier 1 benchmark. However, we have already addressed this argument in the narrative section of this memorandum  Accordingly, there is no available  Tier 1 benchmark.

In *Steel Wire Rod from Trinidad and Tobago* the Department stated that "particular problems can arise when the government is the sole supplier of a good for LTRAR…{i}n this situation there may be no alternative prices available in the country."  To remedy this situation we suggested alternatives that are now considered a Tier 3 Benchmark analysis.[636]  *Steel Wire Rod from Trinidad and Tobago* stated that such an approach is specifically warranted when "electricity cannot be sold across service jurisdictions within a country and there are divergent consumption and generation patterns within the service jurisdictions."[637]  As explained in "Program Found to be Countervailable"  the Canadian electricity market is segmented because there are divergent consumption and generation patterns within the service jurisdictions.

The GNS contends that we abandoned the *Steel Wire Rod from Trinidad and Tobago* analysis when determining to use private stumpage prices in the Maritime Provinces to measure the adequacy of remuneration for Government of Alberta administered stumpage programs.[638]  Port Hawkesbury further contends that based on our decisions in *Softwood Lumber from Canada AR1* and *Softwood Lumber from Canada AR2*, we cannot exchange "country" for "province" in making a Tier 1 benchmark determination with respect to determining that prices are distorted by government involvement.  We do not agree.  First, the GNS's reliance on *Softwood Lumber from Canada AR3 Prelim* is mistaken.  As an initial matter, there was no final determination corresponding to *Softwood Lumber from Canada AR3 Prelim* because that review was rescinded

---

[635] *See CVD Preamble*, 63 FR at 65377.
[636] *See Steel Wire Rod from Trinidad and Tobago.*
[637] *Id.*
[638] *See Softwood Lumber from Canada AR3 Prelim* (Private Stumpage Prices in New Brunswick and Nova Scotia May Serve as a First-Tier Benchmarks in the Subject Provinces…we have used Maritimes' private prices to measure the adequacy of remuneration of the stumpage programs administered by the GOA...").

and the order revoked before completion of the review.[639]  Thus, *Softwood Lumber from Canada AR3 Prelim* does not reflect a final position of the Department.  In addition, the benchmark price under Tier 1 must be a delivered price to the respondent pursuant to 19 CFR 351.511(a)(2)(iv).  Accordingly, we find that the discussion about market segmentation in *Steel Wire Rod from Trinidad and Tobago* is instructive for this investigation.

In addition, we have not determined that all electricity prices in Canada are distorted by government interference and that we cannot use any Canadian electricity prices.  Rather, because the market for electricity in Canada is segmented, our finding that prices are distorted in Nova Scotia because of government involvement is limited to that market.  Our decision not to use the Alberta price, on the other hand, is based on our consideration that our regulations require that a Tier 1 price reflect delivery charges and respondents have provided no information on the costs that would be incurred to transmit and deliver electricity from Albert to Nova Scotia.  Moreover, the retail prices of electricity that is sold in Nova Scotia is regulated by the GNS.  The cited *Softwood Lumber* decisions are therefore inapposite, because our decision to disregard the Alberta price is not based on a finding that a Tier 1 benchmark can only reflect prices in the province under investigation.

For these reasons we continue to find that there is no Tier 1 benchmark available to determine the adequacy of remuneration.

## Comment 13:  Whether the Port Hawkesbury LRR is based on Market Principles

*The GOC's Arguments:*

- The Department erred in its application of a Tier 3 benchmark based on "market principles" to the NSPI electricity rate provided to Port Hawkesbury.[640]  Instead of accepting that an electricity rate which was based on an actual market transaction between two private parties was in accordance with "market principles," the Department constructed a complex benchmark to make this evaluation.  In so doing, the Department failed to recognize that 1) LRRs are based on market principles in that they are a reasonable market-based approach to retain load from large power consumers; 2) Port Hawkesbury's load is substantially greater than any other company in Nova Scotia and the rate applied to Port Hawkesbury is consistent with the normal rate-setting practices for large load consumers; and 3) recovery of all fixed costs is neither a requirement for such negotiated rates nor for rates that are "consistent with market principles."

---

[639] *See Notice of Rescission of Antidumping Duty Reviews and Revocation of Antidumping Duty Order: Certain Softwood Lumber Products From Canada*, 71 FR 61714 (October 19, 2006).

[640] Under 19 CFR 351.511(a)(2) the Department determines whether a good or service is provided for LTAR by "assessing whether the government price is consistent with market principles."

*The GNS' Arguments:*

- LRTs are a common, well-established, market-based form of electricity tariff that have been widely used throughout North America by electricity suppliers, both public and private, for many decades.[641]  Nova Scotia has had an LRT since 2000, and in its November 29, 2011, decision amending the LRT, the NSUARB specifically found that extending the availability of a LRT to companies in economic distress is grounded in normal ratemaking principles applied in various jurisdictions, including Nova Scotia. Such rates are in the public interest and provide for rates that are reasonable and appropriate for all customers.[642]  In implementing the LRT in 2000, the NSUARB cited examples in Texas and Indiana that supported giving LRT-type rates to large volume customers that could cogenerate.[643]  Port Hawkesbury was provided an LRR under the already-approved LRT as a result of an arm's-length negotiation between PWCC and NSPI.

- PWCC's application for an LRR did not impact the existing Bowater LRR.  The Department's verification report correctly stated that the 2013/2014 GRA could not refer to the Port Hawkesbury LRR at issue because NPPH had ceased operations at the time.[644] Indeed, the 2013/2014 GRA explicitly excluded Port Hawkesbury and, accordingly, it could not include price increases for the Port Hawkesbury LRR.[645]

- The *Preliminary Determination* incorrectly stated that the November 29, 2011 approval of an LRR for Bowater amended the general LRT framework to require the full recovery of variable incremental costs.  In its November 29, 2011 decision, the NSUARB did not amend the general LRT framework to require full recovery of incremental costs; it stated that it would only approve the Bowater LRR if it was consistent with the general framework providing for full recovery of incremental costs.[646]

- The 2013/2014 GRA and the Port Hawkesbury LRR were handled in separate NSUARB proceedings.  The application for the Port Hawkesbury LRR was submitted 11 days before the 2013/2014 GRA.  The 2013/2014 GRA stated that the Port Hawkesbury LRR application is based on the mill taking incremental energy so that no customer is at risk of paying any of the costs of the mill's load.[647]  The November 29, 2011, NSUARB decision stated that the new owner of the mill should apply for an LRR and that it would have been appropriate for NPPH to have done so.[648]

- The LRR requires the acceptance of the full risk of hourly incremental fuel costs unlike the November 29, 2011, decision for Bowater that was based on NSPI's year-by-year estimate of incremental avoided costs.

---

[641] *See* PEC at 17 and Appendix 1.

[642] *See* PQR at Exhibit 23-6, paras. 171-172.

[643] *Id*. at 14; and *see* PHQR Exhibit 23-5 at para. 15 (citing Re: Northern Indiana Public Service Company, (1988), 89 PUR 4th 385), respectively.

[644] *See* Government of Nova Scotia Verification Report at 15-16.

[645] *See* GQR at Government of Nova Scotia Questionnaire Response Exhibit NS-EL-17 at DE-03/DE-04 at 35 ("The main cause of the decline {in net energy demand} is our assumption, for the purpose of our load forecast, that the paper mill in Port Hawkesbury will not operate in {2013 and 2014}").

[646] *See* GQR at Government of Nova Scotia Questionnaire Response Exhibit 23-6 at 95-96.

[647] *See* GQR at Government of Nova Scotia Questionnaire Response  Exhibit NS-El-17 at DE-03/DE-04 at 143.

[648] *See* PQR Exhibit 23-6 at para. 224.

- There is no evidence to support the Department's contention that the negotiation and approval of the LRR was one of the critical factors that ensured the purchase of NPPH by PWCC as a going concern, a policy goal of the GNS after NPPH entered CCAA protection.  There is no record evidence suggesting that the GNS directed NSPI to provide electricity to Port Hawkesbury at specific rates.  The LRR was negotiated between two private corporations pursuant to the terms of a previously approved tariff without input or involvement from the NSUARB.

- The Department incorrectly determined that the Port Hawkesbury LRR is not set according to NSPI's standard pricing mechanism, which is not a requirement of a Tier 3 benchmark analysis.  Under 19 CFR 351.511(a)(2)(iii), the Department is required to analyze whether the price charged is "consistent with market principles," not whether it is consistent with the "standard pricing mechanism."

- The Department appears to follow the "consistent with market principles" framework when drawing the conclusion that such an electricity rate "fully incorporates the costs of fuel, generation, transmission, and distribution" with a sufficient rate of return incorporated.  The Department's standard defines Port Hawkesbury's electricity rate perfectly for the following reasons: 1) the LRR includes all fuel and transmission incremental costs associated with Port Hawkesbury's electricity usage; 2) there are no associated distribution costs because Port Hawkesbury is connected to the grid at the transmission level; and, 3) because Port Hawkesbury's load was excluded from the load forecast and associated forecasts of cost, the 2013/2014 GRA covered all system fixed costs and the portion of Port Hawkesbury's fixed costs contributed by the LRR is the sufficient rate of return for NSPI.

- The Department found in *Steel Wire Rod from Trinidad and Tobago* that when a utility returns a profit on the customer category under investigation, the rate is established "in accordance with market principles."[649]

- The Department has found in *Melamine from Trinidad and Tobago* that where the industrial customer is treated less favorably than other customers, the electricity rate being charged is not a countervailable subsidy.[650]  Port Hawkesbury is comparatively disadvantaged because Port Hawkesbury 1) must pay on a week-ahead forecast basis, 2) incurs the full pass-through fuel cost and therefore doesn't get the benefit of having its electricity rate remain constant when fuel costs vary (unlike Bowater's LRR and ratepayers on the FAM), 3) is subject to supply interruption first before any other system user, and 4) is subject to penalty if NSPI generates or imports additional electricity on the system that Port Hawkesbury does not use.

- The Department concluded that "below-the-line" rates fail to take into account the cost-of-service methodology, rather than applying the required "market principles" analysis with regard to Port Hawkesbury's LRR. As well, the Department analyzed "market principles" incorrectly, by assuming that the 2013/2014 GRA included the lost loads of

---

[649] *See Final Negative Countervailing Duty Determination: Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago*, 67 Fed. Reg. 55,810 (Aug. 30, 2002) (*Steel Wire Rod from Trinidad and Tobago*) and accompanying Issues and Decision Memorandum at Comment 7.

[650] *See Melamine From Trinidad and Tobago: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Determination*, 80 FR. 21,708 (Apr. 20, 2015) (*Melamine from Trinidad and Tobago*) and the accompanying Issues and Decision Memorandum at IX.B.2.

NPPH and Bowater. Thus, the Department incorrectly presumed that NSPI incurred stranded costs with regard to NPPH's lost load. Port Hawkesbury's load was not included in the Load Forecast used for rate setting during this period; therefore, Port Hawkesbury did not contribute to system-wide fixed costs during the POI. System-wide fixed costs were covered by all other rate payers either during the rate year or through deferrals. Because the Port Hawkesbury load was not included in the Load Forecast, no associated fixed costs were under-recovered and there was no cross-subsidization by other ratepayer classes. Therefore, when Port Hawkesbury came back online at a rate that covered all incremental costs, this represented a net gain for NSPI through Port Hawkesbury's contribution to system-wide fixed costs.

- Under the Tier 3 methodology, the Department should not disqualify NSPI's "below-the-line" rates because the use of forecast costs applies equally to "above-the-line" and "below-the-line" ratepayer classes. Both types of rates are cost-based in different ways. The Department observed at verification that NSPI determines total costs across all customer categories and includes the total ROE. From that system-wide figure, revenue from "below-the-line" rates is subtracted first. The remaining amount is apportioned over the "above-the-line" classes based upon the established revenue-to-cost ratios. Therefore, the Department is incorrect to conclude that "below-the-line" rates are not based upon forecasted costs including the ROE. "Below-the-line" rates are determined pursuant to a rate-making methodology that accounts for forecasted costs.

- The Department's reliance on *Magnesium from Canada* to depart from its regulations is inapplicable in this case. In *Magnesium from Canada*, the Department compared the industrial rate determined through regular rate-making procedures with the rate charged under user-specific Rate and Profit Sharing agreements. In this investigation, however, the LRR is not comparable to the Rate and Profit Sharing agreements in *Magnesium from Canada*. This is because the agreements in *Magnesium from Canada* were a deviation from the normal rate schedule. Here, the Port Hawkesbury mill ceased operations, the overall rate schedule was updated without the Port Hawkesbury mill online, and therefore, Port Hawkesbury's LRR did not deviate from the customer category to which it was otherwise subject. This is why analyzing the rate under a standard pricing mechanism is not applicable.

- Contrary to the facts in *Magnesium from Canada*, the ELI2PT-RTP rate (NPPH's former rate) had not complied with a standard pricing mechanism. In 2008 for instance, the NSUARB recognized the need to exceed the revenue-to-cost ratio bands with the General Demand class increasing to 107.2% and the ELI2PT-RTP class reducing to 91%.

- LRRs are determined by the standard pricing mechanism. Specifically, the LRR must satisfy the criteria established in the published LRT which require the user to demonstrate economic hardship or the viability of using alternative sources of energy to qualify. This is no different than qualifying for a given rate based on the amount of electricity used. The LRR must be structured in a way to retain the customer on the system and not to have any cross-subsidization from other ratepayers. This is no different than a cost-of-service methodology of rate-setting where the costs associated with a specific user or user category are assigned directly to that user or user category. This is not a one-off, customer-specific discounted electricity tariff. Rather, the load retention rate was set through NSPI's standard pricing mechanism, which the NSUARB approved through an adversarial process.

*Port Hawkesbury's Arguments:*

- When there are no Tier 1 or 2 benchmarks, the regulations provide that the Department will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles. Port Hawkesbury has outsize demand compared to all other NSPI customers; its LRR, a "below-the-line" rate, is in a class by itself. There are other "below-the-line" rates for 7 percent of the load forecast in effect in the province during the POI. "Below-the-line" rates are market-oriented because the NSUARB uses its discretion under provincial law to approve methods other than cost-based rates and has done so for decades. The Department provided no legal or evidentiary support in concluding that only cost-of-service based rates were consistent with market principles. In its November 29, 2011, decision the NSUARB stated that it has discretion under the law to vary from fully cost-based rates if it is in the public interest and if it does not subject other customer classes to undue discrimination. Such rates can be fair and equitable; therefore, they are consistent with market principles and are part of the standard pricing mechanism particularly for extra-large industrial customers.
- LRTs are market-based prices; when properly designed, they can lead customers to make business decisions that are financially attractive and economically efficient, providing advantages to the affected customer and other customers on the system. To be effective an LRR must be necessary to retain the load, it must be sufficient to retain the load, it must exceed the marginal cost of providing service, and it must benefit all rate payers. Port Hawkesbury's LRR does all of these.
- Certain U.S. states,[651] have explicitly endorsed non cost-of-service rates.
- The LRR that PHP negotiated with NSPI is fully consistent with NSPI's historical approach to electricity pricing for extra-large industrial customers. It is a form of a market-based "below-the-line" rate that ensures the full recovery of incremental costs and a contribution to fixed costs, and it cannot be considered countervailable.

**Department's Position:**

We have already explained in detail the methodology required under 19 CFR 351.511 to determine whether the LRR provided to Port Hawkesbury provided a benefit under section 771(5)(E)(iv) of the Act.[652] The Department does not dispute that LRTs may be a common form of tariffs. The sole issue before the Department is whether the LRR provided to Port Hawkesbury provides a countervailable benefit under the countervailing duty law. In order to assess whether the LRR is consistent with market principles in accordance with 19 CFR 351.511(a)(2)(iii), we have resorted to the method described in *Magnesium from Canada* and compared the Port Hawkesbury LRR to a price set by the standard pricing mechanism.

---

[651] For a list of states with LRRs *see* PHQR Exhibit 23-4 and for discount rates *see* Pre-Preliminary Electricity Comments at Appendix 10.

[652] *See* "GNS Preferential Electricity Rate for Port Hawkesbury" under "Analysis of Programs" above.

Under a Tier 3 Benchmark analysis, the Department will assess whether the prices charged by NSPI are set in accordance with market principles through an analysis of such factors as NSPI's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.  We have not put these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.[653]  For purposes of this investigation, under our Tier 3 Benchmark analysis, we assessed whether the prices charged under the LRR provided to Port Hawkesbury are set in accordance with market principles through an analysis of NSPI's standard pricing mechanism.  If the rate charged under the LRR is consistent with the standard pricing mechanism and Port Hawkesbury is, in all other respects, essentially treated no differently than other companies and industries, then there is no benefit.[654]

Based on our analysis of the information on the record, we have determined that the LRR provided electricity to Port Hawkesbury for less than adequate remuneration during the POI.

The GNS argued that this situation is not comparable to that in *Magnesium from Canada* because the price under investigation in that case deviated from the rate schedule while the LRR at issue here did not deviate from NSPI's rate schedule.  We disagree.  We have applied the standard set forth in *Magnesium from Canada* in investigations where the respondent's rate did not deviate from the tariff rate.[655]

The GOC also argues that we should have accepted the LRR as an actual market transaction between two private parties.  However, as we explain above, NSPI has been entrusted or directed to supply electricity to Port Hawkesbury and the rates of electricity in Nova Scotia are by law set and approved by the NSUARB.

Finally, the argument that the Port Hawkesbury LRR is not cross-subsidized because it covers all incremental costs overlooks the fact that it does not cover all fixed costs, an integral part of price-setting principles consistent with market principles.

*Constructing a Tier 3 Benchmark*

*The GOC's Arguments:*

- The Department's Tier 3 benchmark methodology is flawed, because it relied upon facts irrelevant to Port Hawkesbury and double counted ROE.
- The Bowater fixed cost calculation is irrelevant to Port Hawkesbury because the Bowater LRR was based on the 2012 Standard Energy Charge adjusted for the Base Cost of Fuel Component and the Fuel Adjustment Mechanism.[656]  Therefore, the rate charged (and reported in the 2012 GRA) was linked directly to Bowater's electricity usage under the

[653] *See CVD Preamble*, at 65378.
[654] *See* discussion of *Magnesium from Canada* at footnote 100.
[655] *See e.g. Welded Line Pipe from the Republic of Korea:  Final Negative Countervailing Duty Determination*, 80 FR 61365 (Oct. 13, 2015).
[656] *See* GSQR Exhibit NS-SUPP1-38A at 6; *see, also,* Exhibit NS-SUPP1-38E at Appendix E for the calculation.

ELI2PT-RTP rate, and not to a standard allocation of fixed cost contribution under the
ELI2PT-RTP.

- There is no information in the 2012 GRA regarding the fixed cost contribution that NPPH
made prior to closing or a comparison between it and the new LRR.  In any event, as
discussed, the ELI2PT-RTP rate otherwise fails the Department's *Preliminary
Determination* standard for a rate determined under normal rate-setting procedures
because the rate was beyond the revenue-to-cost band at 91%.  Therefore, not only is this
"benchmark" inapplicable to Port Hawkesbury, it does not satisfy the Department's stated
standard.

- The Department double counted return on equity by erroneously assuming that the
Bowater rate did not include any ROE.  However, ROE is always included across all rate-
payer categories.  Specifically, the Department verified that NSPI's revenue requirement
"includes NSPI's return on equity for the entire system."  From that established revenue
requirement, "the "below-the-line" revenues are first deducted from the revenue
requirement, and the remaining amount…is then allocated over all the "above-the-line"
rate classes…"  Thus, "below-the-line" revenues reduce the overall revenue requirement
for the system.  Accordingly, under the established rate-setting framework using the
2013/2014 GRA as a proxy for calculating benefit, the Bowater rate included an amount
for ROE.  Therefore, the Department should not have increased the LRR to include ROE.

*Port Hawkesbury's Arguments:*[657]

- The amount included in the Tier 3 Benchmark for uncovered fixed costs in the
Department's benchmark does not consider the difference between incremental fuel costs
already incorporated in the LRR and average system fuel costs incorporated in the 2012
ELI2P-RTP, the source of the amount of the uncovered fixed costs used by the
Department in its benchmark.  Other customers receive a reduction in fuel costs because
Port Hawkesbury is paying actual incremental fuel costs off the top of the generation
stack, *i.e.*, the most expensive generation.  In order to be meaningful, the inclusion of an
amount for fixed costs in the benchmark would need to be reduced by the additional fuel
costs resulting from the disparity between the incremental fuel costs under the LRR and
average system fuel costs used in the 2012 ELI2P-RTP and the non-fixed charges
(including the "Variable Cost Adder," the "Environmental Adder," Line Loss
Adjustment, and other minor adjustments) that PHP incurred under the LRR compared to
those incurred under the ELI2P-RTP.  Additionally, there would have to be a deduction
to reflect the price of risk for the fact that the LRR is for service provided as priority
interruptible.

- NSPI "above-the-line" rates cover ROE as part of the calculation of the revenue
requirement.  The uncovered fixed cost component the Department used in the
construction of its benchmark was derived from an "above-the-line" rate, therefore, it
already included a component of ROE.

---

[657] Certain comments were summarized with the GNS brief *supra*.

*The Petitioner's Rebuttal:*

- Port Hawkesbury is incorrect when it argues that the LRR itself (with none of the Department's adjustments for uncovered fixed costs or ROE) represents the applicable Tier 3 benchmark because neither the GNS nor the NSUARB induced or coerced NSPI to negotiate a rate with PWCC to obtain a price which did not reflect market reality. PWCC was able to secure from the NSUARB an electricity price that was low enough for it to purchase and reopen the mill after it stated that an LRR was the only way it was able to do so.

- Port Hawkesbury's contention that the benchmark is irrational because it represents more than a 50 percent increase over what it paid is incorrect. Moreover, the benchmark favored by Port Hawkesbury uses an element from 2012 for uncovered fixed costs that was not increased by the 5.4 percent rate that was applied to all above-the line rates for 2014.

- The Department would have been justified in using the Large Industrial Rate as a benchmark.

- The Department's approach to calculating the benchmark was transparent and reasonable. Port Hawkesbury admits that its criticisms are unsupported by sufficient record evidence to fully analyze. There is no basis to find that incremental fuel costs are higher than average fuel costs.

- It is unclear to what extent, if any, the Department has double counted ROE. The Department was unable to explore this at verification because the Department did not meet with NSPI to discuss the comments in their letter or to have NSPI explain how fixed costs and ROE are actually calculated. Thus, the Department should not rely on the selective and incomplete submission of new factual information.

**Department's Position:**

As described in the previous comment, we resorted to the type of analysis used in *Magnesium from Canada* to select a benchmark to determine the adequacy of remuneration of Port Hawkesbury's LRR. For conducting this analysis, we would normally select as the benchmark a contemporaneous rate set by the standard pricing mechanism. However, despite the petitioner's contention, there were no "above-the-line" rates in effect during the POI for a customer with a load size similar to Port Hawkesbury's. We identified several rates from the standard pricing mechanism as possible benchmark selections, but we have rejected these actual "above-the-line" rates because they are not comparable. For example, before the LRR was established, the electricity tariff that applied to NPPH was the ELI2P-RTP; however, this rate was not in effect during the POI. Additionally, the Large Industrial Rate in the 2013/2014 GRA would not apply to Port Hawkesbury because of its large electricity consumption. No other existing "above-the-line" rates were applicable.

With no available "above-the-line" rates, we constructed a rate similar to an "above-the-line" rate determined using a cost-of service methodology based upon NSPI's standard pricing methodology. One approach to this task would have been to conduct a hypothetical COSS for 2014 and determine the price for the ELI2P-RTP because this is an established tariff, and a rate set by this tariff applied previously to the mill and to other extra-large industrial customers. We

were not able to conduct a hypothetical COSS for the POI because there is insufficient information to do so available on the record.  Specifically, this would have required substantial accounting and operational information from NSPI sufficient to functionalize all costs and allocate them across the "above-the-line" rates.   As an alternative, however, we were able to estimate the two missing elements that are not incorporated into the LRR:  the uncovered fixed costs, and an amount for profit that would bring the rate in line with the standard pricing mechanism.

First, to the existing price of the LRR we added a measure of uncovered fixed costs from an "above-the-line" rate.[658]

The 2012 COSS is not on the record so we cannot identify the asset costs that were assigned to rates in that period.  However, the 2012 ELI2P-RTP rate was designed based on the load of Bowater and Port Hawkesbury, and it is an "above-the-line" rate set by the standard pricing mechanism.  We approximated the fixed costs that would be assigned to the Port Hawkesbury load by identifying the fixed cost rate per MWh that was assigned to the pooled loads of the two largest customers in 2012 (including the mill in question).   This amount represents a cost-of-service defined amount of total fixed costs during the POI, and is the preferred comparison (*i.e.*, a contemporaneous price set by the standard pricing methodology) to the amount of fixed costs incurred by Port Hawkesbury during the POI under a rate set by the standard pricing mechanism.  The C$26/MWh total fixed costs attributed to the 2012 ELI2P-RTP in the 2013/2014 GRA is likely based on the 2012 COSS,[659] because the constituents of this factor were necessarily calculated to set the 2012 ELI2P-RTP.  Because the 2012 COSS is not on the record, however, we are relying on the affirmative statement in direct evidence before the NSUARB in the 2013/2014 GRA as an indicator of fixed cost coverage in the 2012 ELI2P-RTP and the fixed costs for the 2014 Port Hawkesbury load.  This is discussed in further detail below.

Next we estimated the portion of ROE attributable to a hypothetical 2014 COSS-determined rate by dividing Port Hawkesbury's 2014 load by the Port Hawkesbury load plus total-system-forecast load used in the 2013/2014 COSS which did not include Port Hawkesbury load.  By this method we approximated the weighting of the ROE by the more complex cost-of service method, which assigns the cost of specific asset classes to rate-class loads and distributes revenue over the cost of rate-class load.

We disagree with the parties' contention that we have double counted ROE in the benchmark.  First, the statement we are quoting specifically calls it an amount of "fixed cost contribution."  It does not say that it is an element of the 2012 ELI-2P-RTP tariff, *i.e.*, energy charge, *etc.*  We also disagree that the 2012 rate sheet, if it were on the record, would prove that the uncovered fixed cost amount contains ROE.  A full description of the 2012 ELI-2P-RTP tariff is available on the

---

[658] *See* GSQR Exhibit NS-EL-17 DE-03/DE04 at 19. ("Even if the Port Hawkesbury mill restarts, it is unlikely to contribute to fixed costs at historical levels.  The system's second biggest customer {Bowater} is operating on a load retention tariff which produces the same result; a markedly lower contribution to fixed costs: $4 per MWh instead of $26 per MWh under the Extra Large Industrial Two Part Real Time Pricing rate.").

[659] When compared to how rates were calculated in the 2013/2014 GRA COSS.  *See* GSQR Exhibit NS-EL-17 SR-01 Attachment 1 at 5-6.

record and does not specifically identify any fixed cost component.[660]  No other information on the record establishes the amount in question.  The 2012 COSS is the apparent source of the information at step 6 where fixed costs for each "above-the-line" tariff are determined by functionalization and allocation.[661]  Only in the next step of the COSS, when revenue analysis is conducted, is ROE included.   Prices for individual rates are derived from this final outcome which determines the amount of revenue that must be covered for the rate class.  Real time prices involve complex pricing methodologies and there is no way to identify fixed costs from the information in the 2012 ELI-2P-RTP tariff or on the record.  Therefore our selection of an affirmative statement that captures an exact rate of uncovered fixed costs that was presented in the direct evidence of the 2013/2014 GRA is appropriate and does not include any ROE.

We disagree with Port Hawkesbury's arguments that the benchmark should be adjusted for top of the fuel stack generation under the LRR, and that we should compare average system fuel costs to the incremental fuel costs for the top of the generation stack under the LRR.  First, the LRR negotiations were concluded after the 2013/2014 GRA rates were approved, so the rest of the generation stack was accounted for.  Second, average system fuel costs for "above-the-line" rate classes are corrected to account for actual fuel costs by the FAM, through which all rate classes eventually pay their own allocated actual fuel costs.  Finally, no alternative calculation methodology has been proposed, and we do not have the information on the record to make that comparison.

Port Hawkesbury also argues that we should factor into the benchmark the risk of interruptability, but again, Port Hawkesbury has not proposed a methodology, and the record lacks sufficient information to do so.  Moreover, there were no interruptible rates available to use as a benchmark.

## Comment 14:  Whether Steam for LTAR Provides a Countervailable Subsidy

*The Petitioner's Arguments:*

- The NSUARB exercises jurisdiction over and approved the steam provision/co-generation agreement.  The Department should find that the co-generation agreement was part of the LRR approved by the NSUARB for Port Hawkesbury and was merely another aspect of the agreement for subsidized electricity.
- The GNS's statement that the NSUARB determined that a biomass facility and any agreements necessary for its operation are not subject to NSUARB approval is inaccurate and

---

[660] *See* GSQR Exhibit NS-EL-17 SR-01 Attachment 1 .(Explanation of 2013/2014 COSS: Under the GRA application all "above-the-line" rates have been increased to cover the revenue requirement including the ROE.  First, load was forecast for each class of rate payer. Second, expected revenue is determined with the existing tariffs.  Third, costs are functionalized and then allocated to each rate class and the revenue requirement is determined including ROE.  Next, total required revenues are compared to the expected revenue generated from the existing rate structure and increases to cover the revenue requirement are allocated to the "above-the-line" tariffs (below-the-line tariff increases are determined separately without the full cost covering requirement).   The ROE used to determine the profits for NSPI is based on a percentage of capitalization so it not directly traceable to the allocation of costs to rate classes in step three.)

[661] *See*, *e.g.*, GSQR Exhibit NS-EL-17 SR-01 Attachment 1 at 5-6.

seems to be the only record evidence cited in the *Preliminary Determination* to find that the NSUARB had no jurisdiction with respect to the provision and pricing of steam between NSPI and Port Hawkesbury.

- The Biomass Boiler agreement was an integral part of the LRR.

- Although the GNS presents the biomass project as an agreement between two private parties without any government involvement, the steam/electricity co-generation agreement was developed simultaneously with the electricity subsidy and thus, the GNS was "intimately" involved in the negotiations between NPSI and PWCC regarding the co-generation agreement.[662]  Mr. Williams, of Navigant consulting, has stated that he "facilitated discussions regarding the Mill's access to steam from the biomass boiler in the NSPI cogeneration facility."[663]

- The GNS's own exhibits make clear that the biomass plant and its operation were part of the LRR provisions negotiated and approved by the NSUARB.[664]  As provided for in documentation filed by NSPI with the NSUARB, the NSUARB approved NSPI's C$208.6 million capital work order application for the Port Hawkesbury bio-mass co-generating facility.[665]  Furthermore, NSPI asked that the NSUARB make any approval of the LRR "conditional upon the Government's formal implementation of the assurance provided in the July 20th letter from Deputy Minister Collican,"[666] regarding the bio-mass co-generation plant.  Even after the advance tax ruling was denied by the Revenue Canada, the NSUARB's "conditions relating to the operation and costs of the Biomass Plant" remained relevant.[667]

- The degree to which the mill would trigger additional Renewable Energy Standards (RES) costs over the LRR period was part of the NSUARB proceeding.  PWCC assumed no responsibility for the costs of meeting RES requirements.  In fact when PWCC disputed an estimate in additional annual costs, the Deputy Minister of Energy stepped in to prove the GNS's commitment to covering any additional RES costs and to deem the biomass plant a "must run" facility.[668]

- Port Hawkesbury receives a benefit in the form of steam taken off the turbine generating electricity.  It remains unclear if Port Hawkesbury pays anything for the process steam recovered from the electricity generating process.  Port Hawkesbury is, at a minimum, receiving a benefit equal to the cost of the steam generation.

- The benefit from steam is specific.  The biomass project was needed only if the mill continued to operate.  The boiler equipment purchase and biomass supply agreements appear to have benefitted only Port Hawkesbury, and NSPI's participation in the purchase and operation of the boiler subsidizes Port Hawkesbury's steam use in the mill.

---

[662]*See*  GSQR Exhibit NS-SUPP1-33M.
[663] *Id*. at 13.
[664] *See id.* at Exhibit NS-SUPP1-55A (2012 NSUARB 126 (August 20, 2012) at 5I (para. IS6) *GQR* Exhibit NS-SUPPl-33K at 2. *See, also, GSQR* Exhibit NS-SUPPl-35Z at 1; *GSQR* Exhibit NS-SUPPl-35V at 14; *GSQR* Exhibit NS-SUPP-55A at 14 (para. 9).
[665] *See* Id. at ExhibitNS-SUPPl-36 at 11.
[666] *See* Id.at ExhibitNS-SUPPl-35K at 3-4. *See, also,* Exhibit NS-SUPPl-35S at 1, 2.
[667] *See* Id. at ExhibitNS-SUPPl-35P at I.
[668] *See* Id. at Exhibit NS-SUPPI-55A at 58 (para. 178) and 59 (para. 179).

*The GNS' Rebuttal:*

- The Department should continue to find in the final determination that there is no factual basis to satisfy the requirements of the countervailing duty statute with regard to steam.
- The petitioner claims that the NSUARB had jurisdiction to review and approve the Shared Services and Steam Supply Agreement between Port Hawkesbury and NSPI because it was part of the LRR proceeding; this argument is flawed.  The petitioner fails to establish any GNS involvement in the pricing of steam pursuant to the negotiated Shared Services and Steam Supply Agreement.  Furthermore, the Department verified that the NSUARB did not exercise jurisdiction over the sale and purchase of steam from the biomass facility.
- The NSUARB is not an authority under the statute.  Therefore, there is no action by a statutorily defined "authority" and, as a result, there can be no finding of a countervailable subsidy.
- The petitioner relies on the submission of evidence by a consultant during the LRR proceeding to demonstrate GNS involvement; however, the consultant's involvement is unremarkable.  The Department has verified that all parties involved in the NSUARBs proceedings hired experts to provide evidence.   This consultant testified that he did not advocate for any specific party, nor could he, as he was limited contractually to his role as an expert.  Additionally, the consultant's evidence demonstrates that the Shared Services and Steam Supply Agreement was an external, unrelated, side agreement entered into by Port Hawkesbury and NSPI.
- The petitioner also points to discussions of the Shared Services and Steam Supply Agreement and the biomass facility during the LRR proceeding to support its claim that the NSUARB exercised jurisdiction over the biomass facility.  However, the Department verified that the NSUARB did not have jurisdiction over the supply of steam for industrial use.  In fact, the NSUARB found that it did not need to approve the agreement.
- Discussions about RES costs were not relevant to the Shared Services and Steam Supply Agreement as it relates to the purchase of steam.  The LRT sets the framework for establishing qualification for the LRR and the criteria that the LRR must satisfy for approval.  References to the biomass facility and the RES during the load retention proceeding address the benefits that exist to the electricity system as a whole across customer categories if the mill became operational and whether the biomass facility would incur costs that would need to be passed on to ratepayers.  Such discussions would be expected in the NSUARB's rigorous adversarial proceedings.
- In addition to having no jurisdiction over the biomass facility and steam agreement, the NSUARB is also not an "authority" that provided the good as required by the statute.  There is no government ownership of the NSUARB, no GNS presence on the NSUARB, GNS policy-making cannot control the NSUARB's activities, the NSUARB is an independent actor and, although the NSUARB is a creation of statute, the facts and circumstances establish that the NSUARB is completely independent from the GNS.  Furthermore, the NSUARB does not own the biomass facility that produces the steam.

*Port Hawkesbury Rebuttal:*

- The Department's finding that there was no entrustment or direction involved in NSPI's sale of steam to Port Hawkesbury is supported by record evidence and was further substantiated at verification.

- The Department verified that the NSUARB does not regulate the provision of steam for industrial purposes, and the NSUARB itself has stated that it was not required to approve all agreements provided to them as part of the LRR approval process. As a result, it did not approve the steam-related agreements.

- The petitioner's arguments regarding the expert also fall short of proving entrustment and direction. The consultant was not an advocate for any party in the negotiations, he was an independent contractor contracted for his expertise. Describing his limited role, he stated that he "did not advocate for any specific party or position, but occasionally offered suggestions and proposals to help resolve differences and keep the discussions moving forward."[669] The petitioner overstates the role played by the consultant.

- Department precedent supports the conclusion that technical advice from an industry expert is insufficient to demonstrate entrustment and direction. In the *DRAMS from Kore*a litigation, the Department found that the role of Citibank/SSB as financial advisors to Hynix in developing the debt restructuring was insufficient to make that action a commercial transaction and the Department's finding of entrustment and direction was upheld.[670] On remand the Department found that such actions were "not those of an orchestrator or chief executive but rather those of a consultant who is assigned to implement a specific task with little or no influence on defining, or ensuring the execution of that task."[671]

- Similarly, the consultant was hired to implement a specific task and had no influence on defining or ensuring that PWCC and NSPI would enter into an agreement or on the specific terms of that agreement. His role was insufficient to indicate that the GNS has entrusted or directed NSPI to provide steam to Port Hawkesbury.

- The petitioner's argument that the NSUARB is involved in approving the steam supply arrangement because the NSUARB had previously approved the capital work order for the biomass generation plant as an additional 60 MW source of NSPI electricity is unavailing. This approval by NSPI occurred before PWCC purchased the mill and is not related to the negotiations between PWCC and NSPI for steam supply from the biomass plant.

- The petitioner also incorrectly implies that NSPI's operation of the biomass plant to provide renewable electricity to its ratepayers is tied to NSPI's provision of steam to Port Hawkesbury. This is unsupported by record evidence. Rather, the RES is province-wide and similar to most mandates, if not all, in the United States. The GNS sought to ensure that the biomass plant would operate whether or not the mill re-opened. A renewable energy statutory requirement does not create a financial contribution by a government to NSPI or to Port Hawkesbury.

- The petitioner also contends incorrectly that PWCC assuming no responsibility for any additional costs of meeting RES requirements is an indication of entrustment or direction.

---

[669] *See* GNSSQR Exhibit NS-SUPP1-33M at p.6.
[670] *See Hynix Semiconductor Inc. v. United States*, 425 F. Supp. 2d 1287 (CIT 2006).
[671] *See* "*Final Results of Redetermination Pursuant to Remand, Hynix Semiconductor, Inc.v. United States,* Court No. 03-00651, Slip. Op. 05-106 (CIT August 26, 2005)," (November 23, 2005) at p.7.

There were no additional RES costs expected from the operation of the mill, thus, there was nothing to assume. As mentioned in the NSUARB decision, both NSPI and PWCC argued in the LRR proceeding that NSPI will have excess renewable energy through at least 2019, whether or not the mill operates. The GNS policy was that there was enough renewable supply coming online that Port Hawkesbury's load would not trigger any incremental RES cost over the term of the proposed mechanism. There were no changes to GNS policy as a result of the LRR application and it had no impact on the specific pricing terms and conditions for the steam supply negotiated privately between NSPI and Port Hawkesbury.

- The record demonstrates that Port Hawkesbury pays for all steam it receives. Port Hawkesbury pays a combined rate for the steam it purchases from NSPI, which includes the prices of the fuel used to produce the steam. Under Schedule 9 of the Shared Services and Steam Supply Agreement, Port Hawkesbury is fully responsible for all the fuel required to provide its entire steam usage and it otherwise pays a monthly charge in advance for NSPI's provision of steam to the mill. This information was verified by the Department.

- It is inaccurate for the petitioner to allege that the biomass project was necessary only if the mill continued to operate when the steam plant was approved by the NSUARB in 2010 and construction began long before PWCC decided to purchase the mill.

- The petitioner's contention that the Bowater LRR somehow led customers to cover higher costs associated with Port Hawkesbury's LRR is inaccurate. Port Hawkesbury's LRR was approved in a separate decision nearly a year later. Under its LRR, Port Hawkesbury pays the incremental fuel costs on the top of the generation stack and its costs fluctuate hourly.

- The petitioner also falsely contends that the boiler equipment purchase and biomass supply agreements benefit only Port Hawkesbury and that NSPI's participation in the purchase and operations of the boiler subsidize Port Hawkesbury's steam use in the mill. According to the petitioner, this would mean that NSPI, a private company, answerable to its publicly-traded parent, under no obligation to do so and contrary to its own interests, freely negotiated away the value of steam to Port Hawkesbury in exchange for less than adequate remuneration. This proposition is contradicted by NSPI's April 27, 2012 application to the NSUARB for approval of the electricity pricing mechanism it had negotiated with Port Hawkesbury. NSPI stated: "{t}he ability to run the biomass as a cogeneration facility results in improved economics over time for NS Power's customers when compared to having no mill in operation, as was fully canvassed during the work order for the biomass plant."[672] NSPI and its customers are clearly better off as a result of the steam supply agreements.

- Even if the Department found entrustment or direction there would still be no benefit. The petitioner's suggestion that the Department use imports of natural gas to compare to Port Hawkesbury's steam prices is unreasonable. Under 19 CFR 351.11(a)(2)(i), the Department is required to measure the adequacy of remuneration by "comparing the government price to a market-determined price for the good or service." The regulation does not permit the comparison of different products such as gas and steam. Even if the Department decided to compare the two, the appropriate benchmark would be the rates Port Hawkesbury pays for natural gas. That price is substantially below what Port Hawkesbury pays for steam, because it is only one of several components of the steam price.

---

[672] *See* PHQR Exhibit 23-7 at p. 5.

**Department's Position:**

The petitioner has argued that the involvement of the NSUARB in approving the NSPI purchase of the biomass facility is evidence that the NSUARB has exercised its governmental authority in a manner that demonstrates financial contribution. We disagree. The NSUARB had jurisdiction only to the extent that NSPI's purchase of the biomass facility represented a capital investment that required its approval. The record demonstrates that because NSPI's return on equity is determined against the value of capital of its regulated business, the NSUARB examines NSPI capital expenditures to ensure the accurate valuation of the capital of its regulated business. After granting approval for NSPI's purchase of the biomass facility and the concomitant capital expenditure, the NSUARB concluded that the generation of steam by NSPI was an area of NSPI activity that was not subject to regulation, and therefore it was beyond the NSUARB's jurisdiction. On this basis, we found in the *Preliminary Determination* that there was no financial contribution. Contrary to the petitioner's argument, the involvement of a contracted expert consultant does not demonstrate government involvement in the provision of steam sufficient to establish a financial contribution within the meaning of the section 771(5)(D)(iii) of the Act.[673]

There is no evidence to demonstrate that once the NSUARB made the determination that it had no jurisdiction over the provision or pricing of steam, there was any requirement that the NSUARB further consider the impact of the NSPI's unregulated business on NSPI's regulated business. Moreover, there is no evidence that the NSUARB did consider the impact. For example, there are no later rate-making proceedings that show that NSUARB gave any consideration to the impact on NSPI's regulated electricity generation and transmission business of the biomass facility's generation of steam and residual electricity. On this basis, we continue to find that the purchase by NSPI of the biomass facility provided no countervailable subsidy to Port Hawkesbury.

## Comment 15:  Whether the Property Tax Reduction in Richmond County Provides a Countervailable Subsidy

*The Petitioner's Arguments:*

- The GNS provided a countervailable subsidy in the form of reduced property taxes.
- Normally, property assessments are governed by the *Assessment Act*. Port Hawkesbury's former owner negotiated a special 10-year agreement in 2006 that was to remain in force unless the mill shut down. That 10-year agreement and resulting rate were subsequently authorized by legislation passed in 2006.
- In 2012, negotiations for the purchase of Port Hawkesbury included a discussion of reducing the property tax and a disclaimer was filed on the agreement under the CCAA. The disclaimer was eventually overruled by the court due to a finding it would cause an

---

[673] We note that these findings are consistent with our finding regarding the entrustment or direction of the provision of electricity under the LRR. The lack of regulatory jurisdiction with respect to the provision of steam is dispositive evidence that such entrustment or direction could not have occurred, in light of petitioner's argument that entrustment or direction rests solely upon the NSUARB's regulatory jurisdiction over NSPI.

undue hardship to the county, but the municipality still concluded a new agreement that lowered the property tax to C$1.3 million in 2012.

- The Department erroneously found no benefit for this program because Port Hawkesbury's tax assessment would have been lower had it paid under the normal assessment procedures. The proper analysis is the rate it otherwise would have paid, *e.g.*, C$2.5 million under the 10-year agreement. Accordingly, the revenue foregone should have been measured as the difference between the C$2.5 million under the 10-year agreement and the C$1.4 million paid.

- The petitioner cites to a verification exhibit to comment on the Property Valuation Services Corporation (PVSC) assessment examined at verification.[674] Estimates of the proper assessed value done by the PVSC, a government agency, is not reflective of the true value of the property.

- The program meets all the elements to find it a countervailable subsidy with a benefit of C$1.2 million.

*The GNS' Rebuttal:*

- The 10-year agreement was properly disclaimed in the CCAA process and a new tax assessment agreement was established. The court held that the 10-year agreement could be disclaimed despite its promulgation through legislation. Moreover, the hardship finding by the court concerned a new provision of the CCAA, and a negotiated settlement agreement was preferable over litigating thatuntested provision.

- The petitioner's argument suggests that Port Hawkesbury should lose in litigation rather than settle to avoid any potential countervailable subsidies. Settlement is a normal outcome in government proceedings.

- The petitioner does not dispute that PVSC is an independent government agency and that Port Hawkesbury's assessed value is well below the amount paid in taxes.

- Record evidence does not support a finding thattax authorities were "forced" to forego revenue or that the PVSC tax assessment for 2015 or 2014 is "suspect."

*Port Hawkesbury's Rebuttal:*

- The proper analysis to determine a benefit for a tax program is the amount the company would have paid absent the program.[675] In this instance, the Department was correct in comparing it to the assessed tax rate, as it would have been the applicable tax under the law.

- The petitioner's assertion that the verification exhibit is incomplete is not reflected in the cited exhibit and the petitioner asserts that Department officials have discretion in terms of what documents to take at verification.[676]

---

[674] *See* The Petitioner's Case Brief at 42 (Contains BPI).

[675] *See* Lined Paper Products from India at Comment 9.

[676] *See* PH Rebuttal Breif at 20 (contains BPI) and *Floral Trade Council* at 399, *Ferrosilicon from the Russia* at Comment 2, *Pipe and Tube from India* at Comment 8.

- The PVSC is a government agency that assesses land for property taxes pursuant to the law, but is not an entity that is an authority. Nonetheless, its assessment is in line with an independent assessment of Port Hawkesbury's land.
- The CIT has observed that for tax programs, "only another government-set rate...would be paid absent the countervailing exemption."[677] The only government-set rate would be the assessed rate, as the 10-year rate was outside the normal tax assessment procedure.

**Department's Position:**

In September 2012, the GNS and Port Hawkesbury amended their 10-year agreement on tax assessment.[678] The Legislature of Nova Scotia also promulgated legislation to enact the amended terms of the agreement.[679] Thus, during the POI, the terms by which Port Hawkesbury owed property taxes were based on the amended tax agreement and the legislation promulgated by the Nova Scotia legislature. The petitioner argues that Port Hawkesbury is still legally bound to pay the tax specified in the original agreement, which should be the basis on which we measure whether there is a financial contribution or benefit. Moreover, the petitioner frames the process of the negotiated amended tax agreement to demonstrate that "the county ultimately agreed to lower the taxes, thus providing a subsidy to PHP."[680]

Although the petitioner argues that the amended tax agreement resulted in a subsidy by virtue of the conditions surrounding the negotiations, it has not provided any statutory or regulatory support for the Department to consider in evaluating Port Hawkesbury's tax valuations under the former tax provisions. In contrast, the amended legislation sets out the current tax assessment of Port Hawkesbury during the POI and contains a provision that a permanent closure of the mill or expiration of the agreement will revert the mill to the normal tax assessment process.[681] Therefore, we continue to examine whether a financial contribution or benefit was provided under the auspices of the amended law.

The petitioner also questions PVSC's evaluation of Port Hawkesbury's land assessment, citing an exhibit contained in the verification report.[682] As noted by Port Hawkesbury, however, the Department has discretion regarding its verification methods and which documents it will take as exhibits.[683] Moreover, the narrative of the report which cites to the particular exhibit states:

> PVSC's valuation of the mill site was approximately 3.57 percent lower in the 2013 year-end valuation than the 2014 valuation. Based on these two valuations, however, Port Hawkesbury's estimate of its property tax liability to Richmond County of between C$550,000 and C$650,000 in the absence of the agreement

---

[677] *See Royal Thai* at 1365. *See, also,, LWTP from China* at comment 8 and 19 CFR 351.511.
[678] *See* GQR atGNSQR, Volume V at Exhibit NS-RT-6 and PQR at Exhibit 20-3.
[679] *See* GQR at GNSQR, Volume V at Exhibit NS-RT-7.
[680] *See* the petitioner's Case Brief at 40.
[681] *See* GQR at GNSQR, Volume V at Exhibit NS-RT-7.
[682] *See* the petitioner's Case Brief at 42.
[683] *See* PH Rebuttal Brief at 20 (contains BPI) and *Floral Trade Council* at 399, *Ferrosilicon from the Russia* at Comment 2, *Pipe and Tube from India* at Comment 8.

was accurate. *See* VE-15 at 20-21. Thus, we found no discrepancies between the information in the PQR and the source documentation.[684]

Notwithstanding the petitioner's issue with the verification exhibit, the report concludes that the Port Hawkesbury's tax liability based on the valuations was accurate.[685] The petitioner argues the Department should discount PVSC's assessment based on inconsistencies with prior evaluations and an independent assessment on the record. However, there is nothing on the record that supports the argument that one particular PVSC or independent assessment is more informative or reflective of market prices. As noted by the petitioner, PVSC is an independent agency of the GNS and is charged with assessing properties for tax valuations. In that regard, property taxes owed to the GNS are based on the PVSC's valuations. Thus, the petitioner's speculation on prior and independent assessments in relation to recent PVSC valuations does not explain how the Department should conclude that a countervailable subsidy was provided under section 771(5)(D)(ii) of the Act or 19 CFR 351.509(a) *without* relying on the PVSC assessments, because the verified PVSC assessments would still be the basis for the tax amount owed by Port Hawkesbury absent the amended agreement. Likewise, the petitioner has not explained what would be used to evaluate whether there is a financial contribution or benefit in place of PVSC's assessments. Accordingly, we have not changed our calculation of the benefit under this program, and we continue to find that Port Hawkesbury received no benefit.

**Comment 16:  Exclusion of the PWCC Indemnity Loan Program from Port Hawkesbury's Cash Deposit Rate**

*Port Hawkesbury's Arguments:*

- The PWCC Indemnity Loan was paid off in full before the *Preliminary Determination*, as the Department verified. Therefore, the cash deposit rate should not include any subsidy rate that the Department calculates for this loan.[686]
- The WTO SCM Agreement at Article 19.4 requires that no countervailing duty be levied in excess of the amount of subsidy found to exist, calculated in terms of subsidization per unit of the
  subsidized and exported product.

**Department's Position**

Under 19 CFR 351.526, the Department may take into account a program-wide change in establishing the estimated CVD cash deposit rate. In an investigation, if the Department

---

[684] *See Port Hawkesbury Verification Report* at 14.
[685] *Id.*
[686] See *CWP from Turkey*, 51 FR 1268 (excluding from the duty deposit rate short-term export financing loans that had principal outstanding during the review period, but were verified as paid off in full prior to the preliminary determination) ("{I}t is the Department's policy to adjust the duty deposit rate to correspond as nearly as possible to the eventual duty liability in cases where changes have occurred after the period for which we are measuring subsidization and prior to our preliminary determination.").

determines that a program-wide change has occurred subsequent to the POI and prior to the preliminary determination, and the Department is able to measure the change in the amount of countervailable subsidies provided under the program in question, the Department may remove from the cash deposit rate the countervailable subsidy rate for the program.  A program-wide change is defined in 19 CFR 351.526(b) as (1) a change that is not limited to an individual firm or firms; and (2) is effectuated by an official act, such as the enactment of a statute, regulation, or decree, or contained in the schedule of an existing statute, regulation, or decree.  We do not consider that the Port Hawkesbury's repayment of this loan meets the definition of a program-wide change because there was no government act that "effectuated" a change to this program.  Thus, we do not agree that it is appropriate to adjust the cash deposit rate to exclude the countervailable subsidy rate calculated for the PWCC Indemnity Loan, and we have not done so.

## Comment 17: Whether to Apply AFA to Resolute

*The Petitioner's Arguments:*

- The Department should continue to apply AFA for the FPPGTP which was reported three days prior to the *Preliminary Determination*.  The Department should also apply AFA for FSPF and LGP and for certain programs from which Fibrek benefited (information about which is BPI), which the Department discussed in the Resolute Verification Report.  Finally, the Department should continue to apply the highest rate calculated for a program that provides assistance in the form of grants.

*Resolute's Arguments:*

- Without the application of the AFA used in the *Preliminary Determination* for PPGTP, and with the finding that the IQ loans conferred no benefit, Resolute's overall countervailable subsidy rate is *de minimis*.

*The GOC's Arguments:*

- The Department no longer has a basis to AFA or adverse inferences the FPPGTP program.
- Both the Act and the WTO SCM Agreement establish that a minimum threshold must be met before the Department initiates a CVD investigation when determining which programs to include in that investigation.  The alleged subsidies were not identified in the petition and, rather than initiating an investigation with respect to these alleged subsidies, the Department engaged in a "fishing expedition."
- Most of the subsidies at issue have been investigated by the Department in previous investigations and, therefore, the fact they were not included in the petition indicates that the petitioner recognized that these programs did not provide benefits to the production of the subject merchandise.
- The Department's practice is not to expand the scope of a CVD investigation to include additional programs without first making a formal determination that these basic initiation requirements have been met, as in a new subsidy allegation determination.

*The GOQ's Arguments:*

- Upon discovering new programs, the Act and the Department's regulations require the Department to either: (1) include the program if time permits; (2) defer analysis of the measure to a future review, if there is one; or (3) allow petitioner to withdraw and re-file its petition to include the new information.
- The petitioner's advocacy for the application of AFA for these programs requires that, if something is discovered—irrespective of whether it is relevant or material—adverse inferences must be applied, because it could have been discovered or reported earlier and was not.
- The GOQ, GOC, and Resolute responded to the Department's questionnaires and data requests completely and to the best of their ability. The petitioner's assertion that, because the Department did not collect information at verification, it must be that information was withheld, is in error. Thus, the Department is precluded from applying AFA.

*The Petitioner's Rebuttal:*

- The intent of section 776(b) of the Act is to prevent a non-cooperating respondent from receiving the same result as it would have received had it fully cooperated, and provides that the Department may use an adverse inference if a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information."[687]
- In *Steel Authority of India v. United States,* the court upheld the Department's application of AFA to the respondent SAIL based on its partial reporting of information in response to the Department's questionnaires.
- The Department should apply AFA to the FPPGTP program because the information was untimely, and to other programs discovered during the course of the investigation, by applying the highest rate calculated for a program that provides assistance in the form of grants.
- Section 775 of the Act and t 19 CFR 351.311(b) provide the Department the authority to investigate subsidies discovered in the course of an investigation. Therefore, the Department should reject the respondents' arguments that, because the FSPF and LGP programs were not alleged, there is no legal basis for applying CVDs.
- The Department's practice demonstrates that when subsidies are discovered in an investigation, the subsidies are analyzed and countervailing duties are applied when the record demonstrates financial contribution, specificity, and benefit.

*Resolute's Rebuttal:*

- The Department accepted the July 22, 2015, submissions from the GOC and Resolute, and verified all of the submitted information. There is, therefore, no basis for the application AFA, because none of the circumstances under which AFA may be applied occurred here.
- Resolute has complied with every request for information and went well beyond any reasonable standard for a respondent to act to the best of its ability.

---

[687] *See* SAA at 870.

- Under 19 CFR 351.311, if potentially countervailable subsidies are uncovered or discovered in the course of an investigation, they are subject to complete investigation, or if there is insufficient time to investigate them, they must be subject to an inquiry in a new review or through a new petition.

- The petitioner has the option, under the law, to withdraw its petition and submit a new one with additional allegations under 19 CFR 351.311(c)(1). The petitioner does not have the option to have the Department apply AFA under the law.

- The petitioner's brief refers to a GNS transaction, which included paying off a liability of the Resolute property that the GNS was acquiring, and which netted the GNS a substantial profit. The transfer of money was the repayment of a loan owed by Bowater to Resolute at the time the GNS acquired Bowater. There was, thus, never a grant from Nova Scotia to Resolute.

- The Department did not discover the FSPF at verification; rather, it was referenced in a document supplied by Resolute to the Department. Further, although it could have nothing to do with the investigation, Resolute cooperated fully in providing all of the information requested by the Department, and the Department verified the information.

- Descriptions in Fibrek's accounts indicated that it may have received reimbursement for portions of projects long before Resolute acquired Fibrek, thereby extinguishing any benefit to Resolute (had there been any). The record shows the reimbursements could have no value anywhere but Fibrek and could not involve a countervailable subsidy to the production of subject merchandise which was not manufactured, produced, or exported from there.

- The Department did not take the amounts of the funds in the accounts it examined or take any verification exhibits. The reason the Department did not do this is either that: 1) the Department did not find evidence that these were subsidies; 2) the amounts were so small as to be trivial; 3) the petitioner did not make any subsidy allegations pertaining to these reimbursements and there was no evidence they were related to subject merchandise; or 4) to the extent that these activities might be subsidies, the Department concluded that examination of them should be deferred to a subsequent administrative review.

- This case is distinguished from *Solar Cells* because there the Department said it discovered at verification potential countervailable subsidies and the record did not show that the apparent assistance did not benefit subject merchandise. Here, the record is clear that Fibrek does not produce supercalendered paper and its products are not primarily dedicated to the production of supercalendered paper, so there is no evidence that anything discovered here could be related to subject merchandise.

*The GOC's Rebuttal:*

- The Department was put on notice, by the GOC, that the Department's "other subsidy programs" question was overly broad and inconsistent with the Act, the Department's regulations, and the WTO SCM Agreement. Further, the GOC interpreted the scope of this question narrowly and it was the Department's responsibility under the Act to indicate to the GOC that its interpretation was not correct. Therefore, the Department has no basis to apply AFA for programs that did not meet the test set forth in the GOC's interpretation of the "other programs" question.

**Department's Position**

There are two issues  related to the Department's consideration of the application of partial AFA to Resolute for the final determination.  First, as discussed above in the section, "Use of Facts Otherwise Available and Adverse Inferences," we no longer determine that it is appropriate to apply AFA to the grants received by Resolute under the FPPGTP program, and further, we do not find it appropriate to apply AFA to the grants received under the FSPF or LGP programs. Second, also discussed above, we determine, as AFA, that certain grants discovered during the verification of Resolute are countervailable.

The first issue relates to the grants that were reported by the GOC and Resolute in their "revised questionnaire responses" submitted shortly prior to the *Preliminary Determination*.[688]  In these submissions, the GOC and Resolute stated that during preparation for verification, they discovered that Resolute's cross-owned company, Fibrek, received benefits under the FPPGTP program.  In the *Preliminary Determination,* the Department determined that it was appropriate to accept the information submitted in these two submissions.  However, due to the timing of the submissions, the Department applied AFA to the FPPGTP program for the *Preliminary Determination*.  Additionally, the Department determined that it would examine certain other "additional potential benefits," which were received under the FSPF and LGP, at verification and address them in the final determination, as discussed above in the "Use of Facts Otherwise Available and Adverse Inferences" section of this memorandum.

The petitioner argues that the Department should continue to apply AFA to the FPPGTP program, as well as the FSPF and LGP programs, because the respondents did not act to the best of their ability, and there is no question that Resolute and the GOC understood their reporting obligations.  Resolute argues that because the Department accepted the information submitted by the GOC and Resolute, and was able to fully and accurately verify the information related to the FPPGTP, FSPF and LGP programs, there is no basis for applying AFA to these programs in the final determination.  The Department agrees with Resolute with respect to the FPPGTP, FSPF, and LGP programs.  As discussed above, sections 776(a)(1) and (2) of the Act provide that the Department shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or if an interested party or any other person:  (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by the Department, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act. Although for the *Preliminary Determination* the Department applied AFA to the FPPGTP program, the information and facts available on the record of this investigation are materially different at this stage in the proceeding.  The Department accepted Resolute's and the GOC's information filed on July 22, 2015, under 19 CFR 351.302(b), which allows the Department to extend a deadline for good cause.  Additionally, the Department was able to confirm at verification the entirety of the information necessary to fully examine and analyze the FPPGTP,

---

[688] *See* Revised Response of the Government of Canada, dated July 22, 2015, at page 2; *see, also,* Resolute's Supplemental Response to Questionnaire, dated July 22, 2015, at page 2.

FSPF, and LGP programs.  Therefore, the conditions that necessitated the reliance on adverse inferences for these programs in the *Preliminary Determination* are no longer present.

The second issue relates to the unreported grants that were discovered at the verification of Resolute's questionnaire responses.  At the verification, the Commerce team noted entries for several unreported grants in the company's various accounts during the verification of non-use of subsidy programs.[689]   Despite the Department's questions concerning "Other Forms of Assistance" in the initial questionnaire, the GOC and Resolute did not report the existence of these grants in their initial or supplemental questionnaires.  Resolute made no attempt to provide the information requested by the deadline for the submission of information, and gave no indication that it needed more time to provide the information requested, despite having done so in responding to questions on other topics, as noted elsewhere in this memorandum.

As explained above in the section "Use of Facts Otherwise Available and Adverse Inferences," we find that Resolute failed to provide information regarding this assistance discovered at verification, and thus, section 776(a)(2)(B) of the Act applies.  We further find that by not divulging the receipt of this unreported assistance prior to the commencement of verification, Resolute failed to cooperate by not acting to the best of its ability and precluded this unreported assistance from being verifiable. Thus, pursuant to section 776(b) of the Act, we are determining, as AFA, that the unreported assistance in question is countervailable.

We disagree with Resolute as to why we did not take information regarding the amounts of the funds in these accounts.  By its own actions, Resolute precluded the Department from fully investigating and verifying this information when it not only withheld the information until after the deadline for the submission of new factual information had passed, but never provided this information at all, leaving the Department to discover it during the verification process.  The purpose of verification is "to verify the accuracy of information previously submitted to the record by the respondent," not to collect new information that had been previously requested but not reported.[690]   Second, the limited information obtained at verification was collected merely to record that Resolute received benefits from unreported government assistance programs.  The Department did not "verify" this information. In the course of its long-standing verification procedures, the Department examined only certain accounts in order to determine non-use of programs and conduct its standard completeness methodology.[691]   Additionally, the record evidence does not demonstrate that the information collected at the verification constitutes the entirety of the accounting information regarding unreported government grants.  For example, the Department did not reconcile the amounts of these unreported government grants to Resolute's financial statements.[692]   The fact that Resolute presented this information to Department officials during verification and not within the time limits for the submission of new factual information, or with its July Supplemental Response to Questionnaire, precluded the

---

[689] *See* Resolute Verification Report at pages 8-9.
[690] *See*, *e.g.*, *Final Determination of Sales at Less Than Fair Value: Silica Bricks and Shapes From the People's Republic of China*, 78 FR 70918 (November 27, 2013), and accompanying Issues and Decision Memorandum at Comment 7; *see*, *also*, *Marsan Gida Sanayi Ve Ticaret A.S. v. United States*, 931 F. Supp. 2d 1258, 1280 (CIT 2013) (agreeing that "[t]he purpose of verification is not to collect new information").
[691] *See* Resolute Verification Report at 8-9.
[692] *Id.*

Department from verifying this information.  Relying on this information now would not be consistent with the statute's mandate that the Department "shall verify all information relied upon in making . . . a final determination in an investigation."[693]  Instead, we must rely on the adverse inference that Resolute chose not to timely report this information and subject it to verification because doing so would have resulted in a less favorable result than allowing the Department to discover this information at verification.[694]

The GOC described that it took the following steps in determining what types of assistance to report: 1) identify cross-owned companies, 2) identify any forms of assistance not listed in the petition, 3) identify those programs that provided assistance to the production or export of SC paper, and 4) evaluate whether the other assistance was provided under a program generally available within Canada, and exclude such assistance from its reporting.[695]  However, the Department, not responding parties, makes the determination of whether assistance is reportable and ultimately countervailable.  The GOC also argues that it "put the Department on notice" that our question regarding other subsidy programs was overly broad and inconsistent with the Department's statute and regulations.  We note that the GOC's reply to our question stated:

> In the absence of any allegations or evidence respecting other programs, consistent with Article 11.2 of the Agreement on Subsidies and Countervailing Measures, sections 701(b) and 775 of the Tariff Act of 1930, as amended and 19 C.F.R. 351.311, the GOC believes that no reply to this question is warranted or required.[696]

However, the GOC stated that it had attempted to "comply in good faith" and, in coordination with respondent and cross-owned companies, respond to the Department's question.[697]  Additionally, in its initial questionnaire response, Resolute stated that it had "examined its records diligently and is not aware of any other programs by the GOC or its entities, or any provincial or local government, that provided, directly or indirectly, any other forms of assistance to Resolute's production and export of SC Paper."[698]  Despite both Resolute's and the GOC's assertion that they had intended to comply fully with the Department's requests, both parties later amended their submission to include additional subsidies received by Resolute's affiliate Fibrek under the FPPGTP program that were not originally reported.  It is reasonable that the GOC and Resolute may have discovered these additional benefits as a result of preparing for verification;[699] however, these late-submitted "revised questionnaires" also clearly indicate that the GOC and Resolute were aware of their obligation to report assistance provided to cross-owned affiliates, including Fibrek, whether or not the assistance was provided prior to Fibrek's acquisition by Resolute.  Therefore, an effort to comply in good faith with the Department's request to report other types of assistance would necessarily have included reporting other grants received by Fibrek.

---

[693] *See* section 782(i) of the Act.
[694] *See* SAA at 870.
[695] See GOC's Initial Questionnaire Response, at Volume VIII, page 49
[696] *See* GOC Rebuttal Brief at Joint Issues 5.
[697] See GOC's Initial Questionnaire Response, at Volume VIII, page 49.
[698] *See* Resolute's Initial Questionnaire Response, dated May 28, 2015, at 32-33.
[699] *See* Revised Response of the Government of Canada, dated July 22, 2015, at page 2; *see, also,* Resolute's Supplemental Response to Questionnaire, dated July 22, 2015, at page 2.

Therefore, with respect to Resolute and the GOC's arguments, and consistent with *Shrimp from the PRC*,[700] we find the failure of the GOC and Resolute to respond fully to our questions on "Other Forms of Assistance" demonstrates an unwillingness to respond to the Department's initial and supplemental questionnaires regarding this unreported assistance. Further, section 775 of the Act and 19 CFR 351.311(b) direct the Department to examine apparent subsidy practices discovered during the course of the proceeding and not alleged in the petition (if the Secretary "concludes that sufficient time remains"). The grants that we "discovered" at verification were clearly booked into Resolute's accounts.[701] Thus, the evidence examined at verification of Resolute's questionnaire responses indicated practices that appeared to provide countervailable subsidies, and the Department properly examined these programs under section 775 of the Act and 19 CFR 351.311(b).

We acknowledge that the Department's practice regarding assistance discovered during verification has varied in past cases. However, we find that the facts of this particular case merit the application of AFA. For example, in *Washers from Korea*, the respondent demonstrated that the grant in question was not tied to subject merchandise, and was not relevant to the investigation at hand; thus, the Department concluded that the grant in question was not tied to subject merchandise and was not countervailable.[702] In the instant investigation, we have no information on the record to demonstrate that the apparent assistance discovered at verification did not benefit the subject merchandise that would justify Resolute's failure to report. Although Resolute argues that these subsidies were received by Fibrek, and therefore, could not involve a subsidy to the production of subject merchandise, the Department has determined that Fibrek and Resolute are cross-owned, and therefore subsidies received by Fibrek may benefit subject merchandise. However, we are unable to make that determination based on the information on the record.

19 CFR 351.311(d) provides that the Department will notify the parties to the proceeding of any subsidy discovered during an ongoing proceeding, and whether it will be included in the ongoing proceeding. The parties were notified of the discovery of this assistance discovered at verification and their inclusion in this proceeding when the Department released Resolute's Verification Report. Such notice is evident in the fact that interested parties commented on the issues surrounding this assistance prior to the final determination.

Finally, for the assistance discovered at Resolute's verification, and consistent with our practice,[703] we have applied our CVD AFA methodology to identify the CVD rate(s) to apply for the unreported assistance discovered at Resolute's verification, as discussed above in the section "Application of Facts Otherwise Available and Adverse Inferences."

---

[700] *Shrimp from the PRC* and accompanying Issues and Decision Memorandum at 15

[701] Record information related to these accounts is predominantly BPI. For a detailed discussion of the Department's examination of Resolute's accounting system, *see* Resolute Verification Report, at pages 8-9.

[702] *See Washers from Korea* and accompanying Issues and Decision Memorandum at Comment 18.

[703] *See Shrimp from the PRC* and accompanying Issues and Decision Memorandum at 15.

**Comment 18:  Whether the Support for the Forest Industry Program (Investissement Québec Loans) Provides Countervailable Subsidies to Resolute's SC Paper Production**

*The GOQ's Arguments:*

- Two of Resolute's cross-owned or affiliated companies received loans under this program that were outstanding during the POI.  Neither of these companies were producers of SC paper; and they only supplied minimal volumes of kraft pulp or wood chips to the Resolute mills in Québec that did produce SC paper.
- The Department has found no benefit for loans from IQ in prior CVD proceedings.[704]
- The Department's verification confirms its finding in the preliminary determination that PSIF loans from IQ conferred no benefit on Resolute or on the production of SC paper during the POI.

*Resolute's Arguments:*

- The Department preliminarily found the interest rates on the IQ loans to be higher than commercial rates, in one instance, and the benefit of the loan to be too small to measure, in another. The loans, therefore, have not contributed in any way to the manufacture, production or export of the subject merchandise and are not countervailable. The Department must come to the same conclusion in its final determination as in the *Preliminary Determination* that Resolute received zero benefit from the IQ loans.
- The Department has previously found IQ loans to be non-countervailable.[705] Resolute also incorporates the GOQ case brief by reference in finding the IQ loans provided to Resolute's cross-owned or affiliated companies to be non-countervailable.
- In the alternative to a non-countervailable finding, the Department should find the IQ loans did not confer a benefit.

*The Petitioner's Rebuttal:*

- The precedents cited by the GOQ and Resolute only support finding the IQ loans did not confer a benefit.

**Department's Position**

In the *Preliminary Determination*, we found PSIF loans from IQ either did not confer a benefit or a measurable benefit.[706]  We have not changed our preliminary finding.  However, the cases cited by the GOQ and Resolute do not confirm a finding that IQ loans are not countervailable, but rather that they have never been found to confer a measurable benefit.  Therefore, as in our

---

[704] *See Lumber from Canada Investigation, Lumber from Canada 1st AR, Lumber from Canada 2nd AR, and Lumber from Canada 3rd AR.*

[705] *See Lumber from Canada 2nd AR at 21.*

[706] *See Preliminary Results* and accompanying IDM at page 44.

past examinations of IQ loans, we are not determining whether this program provides a financial contribution or is specific, consistent with our practice.[707]

## Comment 19:  Whether Certain Programs Provides Countervailable Subsidies to Resolute's SC Paper Production

*Resolute's Arguments:*

- None of Resolute's SC paper facilities, all of which manufactured thermo-mechanical pulp, produce black liquor.  Fibrek was eligible for and received FPPGTP credits for the black liquor production at its kraft pulp mill, but only a small amount of kraft pulp (for tensile strength) was provided for SC paper production.
- All four FPPGTP projects were for capital improvements to Fibrek's kraft pulp machinery.  Thus, the funds were tied to projects at mills that produced only non-subject merchandise.[708]
- The only exception to the Department's tying rule arises when the subsidy is to an input product, in which case it is attributed to both the input and downstream products.[709]  However, Resolute and Fibrek are separate corporations, so this exception is not applicable.  Moreover, Fibrek's kraft pulp is not primarily dedicated to Resolute's production of SC paper.
- The Department should treat the four projects under the FPPGTP program as separate grants.  As such, each individual approval amount is less than 0.50 percent of the company's sales in the year of approval and would be expensed.  If the Department collapses the four projects and amortizes the benefit over the AUL, it would need to attribute this value either to the small amount of kraft pulp that went into the manufacture of SC paper during the POI, or to the operations of the entire Resolute corporation.
- The record is unambiguous that certain alleged subsidies were tied to non-subject merchandise due to the approval and bestowal of the funds.
- The NIER program is available only in the Province of Ontario, and any subsidies can be attributed only to production within the Province of Ontario.  The Department may not find a program to be regionally specific and also attribute its benefits to production outside of that region.  Therefore, the credits received at Resolute's mills in northern Ontario may not be attributed to Resolute as a whole or to Resolute's production of SC paper in Québec.
- NIER credits granted to Resolute's mills in northern Ontario were tied to the actual electricity consumed in those mills during each billing cycle and were, therefore, tied at the time of bestowal to those particular mills.
- If the Department attributes NIER credits to anything other than the three mills in northern Ontario, it must attribute the benefits to Resolute's total net sales, not limited to those in Canada.
- The FSPF is a program specific to the Province of Ontario, and no inputs into SC paper came from any of Resolute's operations in Ontario.  Therefore, the Department may not attribute any benefits from the FSPF to the manufacture, production or export of subject merchandise.

---

[707] *See, e.g.*, *Coated Paper from the PRC* and accompanying Issues and Decision Memorandum at page 23.

[708] *See* 19 CFR 351.525(b)(5), *Certain Steel Products from Belgium*, *PET Film from India* at Comment 2, *Core from Korea* at 12, *Washers form Korea* at 14, *Steel Wheels from the PRC* at 30, and the *Preamble* at 65403.

[709] *See* 19 CFR 351.525(b)(5)(ii).

- The Government of Ontario approved specific projects under the FSPF and entered into contracts that restricted the use of funding to the specific projects at the Fort Frances and Thunder Bay mills.  Therefore, at the time of bestowal, the sole purpose of the funding was for projects related exclusively to the production in those mills.
- The three project grants are non-recurring: therefore, all of the FSPF grants to the Thunder Bay mill would be expensed in the year of receipt.  The remaining project grant at Fort Frances should be allocated over of Resolute's total sales from all of its operations, not only those in Canada.

*The GOC's Arguments:*

- Subsidies to an input may only be countervailed in another company's production of subject merchandise when there is an upstream subsidy or a cross-owned supplier provides an input that is primarily dedicated to the downstream product.
- FPPGTP payments were made to two Resolute mills in Ontario that do not produce the subject merchandise; nor do they produce an input used by Resolute in the production of subject merchandise.
- FPPGTP benefits were applied for and approved for specific projects at these two mills.
- To the extent they were not extinguished in Resolute's arms-length acquisition of Fibrek, FPPGTP payments to Fibrek are not countervailable because Fibrek does not produce SC paper, and only a very small quantity of the kraft pulp produced by Fibrek was provided to Resolute for use in the latter's production of SC paper.
- Contributions under the FPPGTP to Fibrek were tied to capital improvements to equipment that was used to make kraft pulp.  Thus, the benefits are tied to the Saint-Félicien mill.
- Subsidies to inputs can be countervailed only where: 1) there is an upstream subsidy analysis; or 2) there is cross-ownership between the input supplier and the producer of subject merchandise and the input product is "primarily dedicated."
- The upstream subsidy provisions were not invoked here, and Fibrek's production of kraft pulp is not primarily dedicated to Resolute's production of SC paper.
- The three Resolute mills that received NIER rebates were eligible based on their location in northern Ontario. Additionally, the three mills produce only non-subject merchandise and none provides inputs to Resolute's production of SC paper.  Thus, Resolute's production of SC paper in Quebec could not have benefitted from the lower electricity costs.
- Payments under the FSPF program were for specific capital projects at two Resolute mills; they could only benefit the production of goods manufactured at those mills; and eligibility for the program was restricted to Ontario, where there was no SC paper production.

*The GOO's Arguments:*

- None of the benefits of the FSPF or the LGP can be attributed to SC paper production because:  1) the programs were restricted to Ontario, where no SC paper was produced during the POI; and 2) the programs were tied to particular projects that were unrelated to SC paper production.
- Therefore, benefits from the NIER program are not attributable to subject merchandise.

158

*The GOQ's Arguments:*

- Two of Resolute's cross-owned companies received loans under the IQ program that were outstanding during the POI.  Neither of these companies were producers of SC paper and they only supplied minimal volumes of kraft pulp or wood chips to the Resolute mills in Québec that did produce SC paper.
- The Department's verification confirms its finding in the *Preliminary Determination* that IQ conferred no benefit on Resolute or on the production of SC paper during the POI.

*The Petitioner's Rebuttal:*

- The Department should continue to countervail the NIER program and, in calculating the rate, should divide the amount of rebates received under the program during the POI by Resolute's total sales amount, as revised at verification.

*Resolute's Rebuttal:*

- There is a reason that 19 CFR 351.525(b)(6)(iv) refers to the (specific) downstream product, not some unknown universe of downstream products.  Countervailable subsidies must be tied to subject merchandise.
- In order to benefit Resolute, any countervailable subsidies found at Fibrek would have to pass through the thimble of input to the subject merchandise.  The kraft pulp produced by Fibrek is not an input that is "primarily dedicated" to the production of the downstream product.

*The Petitioner's Rebuttal:*

- As a threshold matter, the Court of International Trade holds that "{t}here is nothing in the statute or case law to suggest that those specific items actually imported into the United States must have benefitted from the subsidies."[710]  The respondents misstate the law and the Department's practice regarding the attribution of subsidies in an investigation.  However, a review of the Department's practice and the correct legal provision demonstrate that each of the subsidies under consideration is properly attributable to Resolute.
- The respondents have taken the argument from *Softwood Lumber from Canada* that the Department should calculate mill-specific rates, and expanded it to cover Resolute's three mills in Quebec.  The Department should reject this argument as it did in *Softwood Lumber from Canada,*[711] where the Department declined to narrow its investigation to exclude other facilities making non-subject merchandise.  For the final determination, the Department should follow its established practice and decline to limit its investigation.
- The Department's practice is not to trace subsidies through the production process.[712]  The Department's regulations state that "{i}f a subsidy is tied to production of an input product,

---

[710] *See Fabrique v. United States.*
[711] *See Softwood Lumber from Canada* and accompanying IDM at Comment 8.
[712] *See Coated Paper from the PRC* and accompanying IDM at Comment 18.

then the Secretary will attribute the subsidy to both the input and downstream products produced by a corporation."

- The respondents argue that the Department may only attribute subsidies to inputs used in the production of subject merchandise.  However, the Department's attribution regulation, which is applicable to Resolute's factual circumstances in this investigation, does not require an input to be used in the production of subject merchandise.[713]
- The Department should reject Resolute's argument that the NIER program was tied exclusively to production in Ontario and is beyond the scope of this investigation, because in determining whether a subsidy is tied, the Department only looks at "the stated purpose of the subsidy… at the time of bestowal."[714]
- The respondents' theory is that a subsidy that is found to be specific because it is limited to a geographical region is not attributable to firms outside of that region.  However, the Department found no evidence that the NIER subsidies were tied to a particular market or product within the meaning of 19 CFR 351.525(b)(4) or (5).

**Department's Position**

We disagree with Resolute and the GOC that it is not appropriate for the Department to countervail subsidies received by Resolute's mills or cross-owned companies that do not produce SC paper or that are located outside Québec.  As an initial matter, we disagree with Resolute that we cannot attribute Fibrek's subsidies to Resolute pursuant to 19 CFR 351.525(b)(6)(iv) because kraft pulp manufactured by Fibrek is not primarily dedicated to the production of SC paper.  It is our practice to include in our calculations subsidies provided to cross-owned companies on inputs that *could be* used in the production of a downstream product.[715]  In this case, Resolute has reported the following with regard to Fibrek:  1) that it produced and supplied kraft pulp to Resolute; and 2) that kraft pulp is used in the production of paper products, including SC paper.[716]  Further, Resolute has argued that that the inputs produced by Fibrek were not primarily dedicated to subject merchandise, because only a small amount of kraft pulp was used in the production of SC paper.

In *Coated Paper from the PRC*, the Department faced a similar issue of whether to trace subsidized inputs to merchandise sold to the United States and merchandise sold to other markets.  The Department stated that it had "implemented tying regulations to attribute subsidies rather than tracing subsidies through the company.  By analogy, we will not trace subsidized inputs through a company's production process."[717]  Additionally, as the Department noted in *Coated Paper from the PRC*, the Department also did not trace subsidized inputs in *IPA from Israel*, in which the Department attributed input subsidies to all downstream products that the input could have been used to produce, regardless of whether the input was actually used to

---

[713] *Id.*

[714] *Citing MTZ Polyfilms.*

[715] *See e.g. Light-Walled Rectangular Pipe and Tube From People's Republic of China:  Final Affirmative Countervailing Duty Investigation Determination*, 73 FR 16428 (June 24, 2008) and accompanying IDM at Comment 8.

[716] *See Preliminary Determination* and accompanying IDM at page 9; *see, also,* Resolute's Initial Questionnaire Response at 6.

[717] *See Coated Paper from the PRC* and accompanying IDM at Comment 18.

produce subject merchandise.[718]  Furthermore, as the Department also noted in *Coated Paper from the PRC*, the CIT in *Fabrique* upheld the Department's position that it is not appropriate to trace the benefit of a particular subsidy to specific items actually imported into the United States.[719]

Accordingly, the question is whether the input *could have* been used to produce the subject merchandise exported to the United States, not whether the inputs were *actually* used for that purpose during the POI.  Therefore, because Resolute has reported that some of Fibrek's kraft pulp is, in fact, used in the production of subject merchandise (*i.e.* SC paper), and, thus, necessarily could be used to produce the downstream product (*i.e.* paper), the Department concludes that inputs produced by Fibrek are primarily dedicated, within the meaning of 19 CFR 351.525(b)(6)(iv).

Resolute and the GOC have also argued that the subsidies bestowed on the various mills are tied to projects that are specific to the location of the mill, that certain benefits were tied to non-subject merchandise, and that benefits received in Ontario cannot be attributed to merchandise produced in a different province.  The issue of tying regional subsidies to the production in a particular region, essentially to a particular factory or mill of a respondent, has previously been raised before the Department,  Our subsidy attribution regulations explicitly rejected the concept that benefits from regional subsidies are tied to the production in that particular region and to the particular factory located in that region.[720]   In addition, the statute and the regulations do not provide for, or require, the attribution of a domestic subsidy to a specific entity within a firm.[721]  Therefore, we continue to find that it is appropriate to measure and attribute the benefits provided to Resolute's cross-owned companies because we do not trace subsidized inputs through a company's production process, and, as discussed above, neither Resolute nor the GOC has demonstrated that the subsidized inputs are not primarily dedicated to the production of a downstream product.

The CVD *Preamble* references the intent of the Department to attribute subsidies to the sales for which costs are reduced (or revenues increased).[722]  Based on this statement, the Department provides examples of how this would apply to different types of subsidies (*e.g.*, export, *etc.*) and also describes the rationale behind its attribution under 19 CFR 351.525(b)(6)(iv).[723]  This rationale states that, for situations where there is an input producer whose production is dedicated almost exclusively to the production of higher value-added product, the Department's believes that "the purpose of a subsidy provided to the input producer is to benefit the production

---

[718] See *Coated Paper from the PRC* at Comment 18, page 100, citing *Industrial Phosphoric Acid from Israel: Final Results of Countervailing Duty Administrative Review*, 63 FR 13626 (March 20, 1998) ("*IPA from Israel*").
[719] *See Coated Paper from the PRC* at Comment 18, page 101, citing *Fabrique*, 166 F. Supp. 2d at 603. The CIT in *Fabrique* also cited the Federal Circuit's decision that "{i}t would be burdensome and unproductive for the Department of Commerce to attempt to trace the use and effect of a subsidy demonstrated to have been provided to producers of the subject merchandise." *See Saarstahl A.G. v. United States*, 78 F.3d 1539, 1543 (Fed. Cir. 1996).
[720] *See Preamble* at 65404.
[721] *See*, *Coated Paper from the PRC* and accompanying IDM at Comment 18.  *See*, also, *Final Results and Partial Rescission of Countervailing Duty Expedited Reviews:  Softwood Lumber from Canada*, 67 FR 67638 (November 5, 2002) and accompanying IDM  at Comment 8.
[722] *See CVD Preamble* at 65400.
[723] *Id.* at 65401.

of both input and downstream products…" and "(b)(6)(iv) requires the Department to attribute the subsidies received by the input producer to the combined sales of the input and downstream products (excluding the sales between the corporations)."[724]  Thus, based on the above discussion regarding the Department's established practice that it does not trace subsidized inputs through a company's production process, the Department appropriately followed its practice with regard of the attribution of subsidies to subject merchandise.

We disagree with Resolute that the Department should treat the four projects under the FPPGTP program as separate grants for the purpose of establishing whether they are attributable to the POI under the "0.5 percent test," conducted pursuant to 19 CFR 351.524(b)(2).  As described by Resolute and the GOC in their questionnaire responses, the FPPGTP program was comprised of two steps:  1) apply for and receive confirmation of eligibility for credits under the program; and 2) submit project proposals for approval to use the previously awarded credits.[725]  Therefore, based on the elements and requirements of the program, we find that the approval date and the total amount of credits are established once per participant, immediately following the application for credits.  Section 351.524(b)(2) of the Department's regulations instructs us to determine whether "the total amount approved under the subsidy program is less than 0.5 percent of relevant sales… of the firm in question during the year in which the subsidy was approved."  Because the total amount approved under the subsidy was established prior to the submission of individual project proposals, the Department finds it appropriate to use the total amount approved, in accordance with our practice and the regulations, to determine whether the non-recurring benefits provided under the FPPGTP should be allocated to the POI.

Finally, Resolute argues that the Department should use its total corporate sales, including sales outside Canada, to calculate the *ad valorem* subsidy rate for this program.  In the *Preliminary Determination*, the Department outlined its regulatory provisions for attributing subsidies to Resolute and its cross-owned companies.  As contemplated in our regulations at 19 CFR 351.525(b)(6)(i), the intent is to attribute the subsidy to the products produced by the corporation that received the subsidy.  Moreover, in the case of a multinational firm, the subsidy will be attributed to products produced by the firm within the country of the government that granted the subsidy, unless it is demonstrated that the subsidy was tied to more than domestic production.[726]  Resolute has not provided any support for finding that any of the countervailed subsidies were tied to more than domestic production, so we will not consider Resolute's corporate sales outside of Canada for attribution purposes.

**Comment 20:  Whether Subsidies are Extinguished by Changes in Ownership**

*Resolute's Arguments:*

---

[724] *Id.*

[725] *See e.g.* GOC Original Questionnaire Response at Volume V, page 7.

[726] *See* 19 CFR 351.525(b)(7).  *See, also, Large Residential Washers from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 77 FR 75975 (December 26, 2012) and IDM at Comment 13, and *Final Affirmative Countervailing Duty Determination:  Carbon and Certain Alloy Steel from Canada*, 67 FR 55813 (August 30, 2002) and IDM at Comment 9.

- Fibrek received contributions under the FPPGTP program for four projects, all prior to March 31, 2012, the date that the FPPGTP program was terminated by the federal government.  Resolute acquired a controlling interest in Fibrek on May 2, 2012, and completed its acquisition on July 31, 2012, after all approved costs obliging reimbursement under the FPPGTP had been incurred and after the program was terminated.
- The Department verifi rateed that Resolute booked the full value of the payments under the PPGTP program, including payments to be made after the acquisition.  Therefore, the full value of the project disbursements was an explicit part of the purchase of the company by Resolute at fair market value.
- The value of FPPGTP to Fibrek was fully paid for by Resolute in an arm's-length transaction for fair market value and must be presumed to be extinguished in its entirety and, therefore, not countervailable.[727]

*The GOC's Arguments:*

- The full amount of the project reimbursements to Fibrek from the GOC following the acquisition of Fibrek by Resolute was transparent and, therefore, was taken into account in reaching a fair market value for Fibrek.  An arm's-length sale extinguishes prior subsidies.
- The Department's preliminary analysis does not address the fact that: (i) Resolute acquired Fibrek in a hostile takeover through share acquisitions that presumptively reflected the fair market value of the shares; and (ii) all four of the PPGTP grants to Resolute were approved and had been recorded in Fibrek's books, and three-quarters of the contributions had actually been paid out to Fibrek, long before the acquisition.
- The existence and value of grants to Fibrek were established when Resolute made its arm's-length acquisition, so the price paid for the shares reflected the full value of Fibrek, including the grants.[728]

*The Petitioner's Rebuttal:*

- In situations involving a change in ownership, the Department's baseline presumption is that nonrecurring subsidies benefit the recipient over a period of time normally corresponding to the average useful life of the recipient's assets.  "{A}n interested party may rebut this baseline presumption by demonstrating that during the allocation period, a privatization occurred in which the government sold its ownership of all or substantially all of a company or its assets, and that the sale was an arm's length transaction for fair market value."[729]
- The evidence provided by respondents is insufficient for the Department to conduct its technical arm's-length and fair market value analysis given the complexity of the analysis.[730]
- The Department should reject the respondents' argument that subsidies to Fibrek were extinguished.

---

[727] *Citing Pasta from Italy*, 17972.

[728] *Id.*

[729] *See Notice of Final Modification,* 68 FR 37125, 37217.

[730] *See Stainless Steel Plate in Coils from Belgium: Preliminary Results of Countervailing Duty Administrative Review*, 74 FR 26844, (June 4, 2009). (*Steel Plate in Coils from Belgium*) and PQR at Exhibit 8.

**Department's Position:**

The Department disagrees with Resolute and the GOC that the Department should find that subsidies received by Fibrek were extinguished by Resolute's purchase of Fibrek.  As discussed above in Comment 19, the Department's prior notice with respect to agency practice regarding privatization is instructive in evaluating whether benefits are extinguished by a change in ownership.[731]  The *Notice of Final Modification* addressed the treatment of prior subsidies with respect to change in ownership, including the treatment of concurrent subsidies provided to encourage or facilitate privatization.[732]  For the purposes of this methodology, the Department stated that it intended to scrutinize very carefully any instances of subsidies provided prior to, or concurrent with, a change in ownership, and would normally determine that the value of concurrent subsidies is fully reflected in the fair market value price of an arm's-length change in ownership/privatization and, therefore, is fully extinguished in any such transaction, if the following criteria were met:

1. The nature and value of the concurrent subsidies were fully transparent to all potential bidders and, therefore, reflected in the final bid values of the potential bidders;
2. The concurrent subsidies were bestowed prior to the sale; and
3. There is no evidence otherwise on the record demonstrating that the concurrent subsidies were not fully reflected in the transaction price.[733]

The Department has applied this methodology to the sale of the former NPPH to its new owners, and determined that certain subsidies were extinguished by the change in ownership.  However, Resolute has not provided the evidence necessary for the Department to apply the same analysis to Resolute's purchase of Fibrek.  Specifically, the Department examined, in detail, the process through which Port Hawkesbury was put into bankruptcy, maintained during bankruptcy, and sold through the *CCAA* process, including the bidding process, the number of bids, the dates on which bids were placed and accepted, formal offers, and the acceptance of a bidder and the establishment of a purchase price.  This information was examined within the context of the methodology set out in the *Notice of Final Modification* to establish whether the subsidies were extinguished by the sale.[734]

With respect to Resolute's purchase of Fibrek, the Department does not have any of the evidence or documentation that it would require to establish that the purchase of Fibrek was an arm's-length transaction for a fair market price, or any detailed information related to the timing, bidding or bid acceptance process and, thus, cannot determine whether any of the subsidies received before or during the purchase of Fibrek by Resolute were extinguished.  The Department's original questionnaire stated:

---

[731] *See Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act Section 123 Modification,* 68 FR 37125 (June 23, 2003) (*Notice of Final Modification*).

[732] The *Notice of Final Modification* explicitly addresses full privatization, but the Department later determined to apply this methodology to private-to-private sales.  *See e.g., Certain Pasta From Italy: Preliminary Results and Partial Rescission of the Eighth Countervailing Duty Administrative Review* (*Pasta from Italy*), 70 FR 17971; 17972 (April 8, 2005).

[733] *See Notice of Final Modification,* 68 FR 37125, 37137.

[734] *See Preliminary Determination* at pages 17-20.

> Finally, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, we require a complete questionnaire response for such company.  It is essential to include a discussion of all such "change in ownership" transactions within your responses to the questions below regarding your company's history.[735]

While Resolute and the GOC responded on behalf of Fibrek, they did not supply any evidence or detailed information regarding the purchase of Fibrek by Resolute. Instead, throughout the investigation, Resolute and the GOC have submitted unsubstantiated assertions that the purchase of Fibrek was a "hostile takeover in 2012."[736]  As a result, the Department has no evidentiary basis for determining whether the purchase, or hostile takeover, of Fibrek properly extinguishes the subsidies received by Fibrek (through a finding of both an arm's-length transaction and a transaction price reflective of fair market value).  Therefore, the Department maintains its baseline presumption that the subsidy benefits are not extinguished.[737]

Additionally, the GOC and Resolute argue that the Department should consider the fact that the benefits received by Fibrek prior to its purchase by Resolute were approved and booked in its accounting system prior to Resolute's acquisition of Fibrek.  Resolute contends that the Department also should consider how Resolute booked the full value of the remaining FPPGTP payments as anticipated revenue at the time it acquired Fibrek.  As discussed above, the Department's analysis in determining whether subsidies are extinguished, by a change in ownership takes into account three criteria.  Here an examination of Fibrek's and Resolute's accounting records may be relevant to evaluating those criteria.  However, an initial determination that a sale is made at an arm's-length price and for fair market value must be made before the three additional criteria are examined. Therefore, because the Department does not have the evidence on the record to determine whether Resolute's purchase of Fibrek was made at an arm's-length price and for fair market value, the fact that Fibrek booked the subsidies prior to the sale or that Resolute did likewise at the time of the acquisition is not a determining factor in our extinguishment analysis. Additionally, the Department's practice with regard to non-recurring subsidies is to allocate benefits received prior to the POI over the AUL to determine what amount is attributed to the POI.  Therefore, as the Department has determined that these subsidies are not extinguished, the fact that these benefits were booked into Fibrek's accounting prior to its purchase by Resolute does not preclude the Department from calculating an attributable benefit amount.

---

[735] *See* The Department's Initial CVD Questionnaire, dated April 6, 2015, at page 44.
[736] *See e.g.* Resolute's Initial Questionnaire Response at page 4; GOC Case Brief at Joint Issues page 7.
[737] *See Notice of Final Modification*, 68 FR at 37130.

## VIII.   CONCLUSION

We recommend that you approve the findings described above.


_____✓_____          _____
Agree                              Disagree


_____
Paul Piquado
Assistant Secretary
 for Enforcement and Compliance


_13  OCTOBER  2015_____
(Date)

**APPENDIX**

I.       **ACRONYM AND ABBREVIATION TABLE**

| Acronym/Abbreviation | Complete Title |
|---|---|
| Act | Tariff Act of 1930, as amended |
| AFA | Adverse Facts Available |
| ATR | Advanced Tax Ruling |
| AUL | Average Useful Life |
| C$ | Canadian Dollars |
| CCAA | Companies Creditors Arrangement Act |
| CFR | Code of Federal Regulations |
| CIT | Court of International Trade |
| CITA | Income Tax Act (Canada) |
| CVD | Countervailing Duty |
| Department | Department of Commerce |
| DNR | The Government of Nova Scotia's Department of Natural Resources |
| ELI2P-RTP | Extra Large Industrial 2 Part Real Time Pricing |
| ERDT | The Government of Nova Scotia's Department of Economic and Rural Development and Tourism |
| FAM | Fuel Adjustment Mechanism |
| Fibrek | Fibrek General Partnership |
| FIF | Forestry Infrastructure Fund |
| FPPGTP | Federal Pulp and Paper Green Transformation Program |
| FULA | Forest Utilization License Agreement |
| GBC | Government of British Columbia |
| GNB | Government of New Brunswick |
| GNS | Government of Nova Scotia |
| GOC | Government of Canada |
| GOO | Government of Ontario |
| GOQ | Government of Québec |
| GRA | General Rate Application |
| GRLF | General Replacement and Load Following |
| HTSUS | Harmonized Tariff Schedule of the United States |
| IDM | Issues and Decision Memorandum |
| ISIC | International Standard Industrial Classification |

| Acronym/Abbreviation | Complete Title |
|---|---|
| kV | Kilo-volt |
| LEU | Low Enriched Uranium |
| LLC | Limited Liability Company |
| LOI | Letter of Intent |
| LRR | Load Retention Rate |
| LTAR | Less Than Adequate Remuneration |
| Mauricie | Forest Products Mauricie LP |
| MWh | Megawatt-hour |
| MTAR | More Than Adequate Remuneration |
| NIER | Ontario's Northern Industrial Electricity Rate |
| NPPH | NewPage Port Hawkesbury |
| NSPC | Nova Scotia Power Corporation |
| NSPI | Nova Scotia Power, Inc. |
| NSUARB | Nova Scotia Utility and Review Board |
| Opitciwan | Société en Commandite Scierie Opitciwan |
| PDM | Preliminary Decision Memorandum |
| Petit-Paris | Produits Forestiers Petit-Paris Inc. |
| Petitioner | The Coalition for Fair Paper Imports, which is composed of Madison Paper Industries and Verso Corporation |
| POI | Period of Investigation |
| Port Hawkesbury | Port Hawkesbury Paper LP |
| Port Hawkesbury Inc. | Port Hawkesbury Paper Inc. |
| Port Hawkesbury Investments | Port Hawkesbury Investments Ltd. |
| Port Hawkesbury GP | Port Hawkesbury Paper GP |
| Port Hawkesbury Holdings | Port Hawkesbury Paper Holdings Ltd. |
| PVSC | Property Valuation Services Corporation |
| PSIF | Programme de Soutién a l'Industrie Forestière (Government of Québec's Program of Support for the Forest Industry) |
| PSQR | Port Hawkesbury Questionnaire Response |
| PWCC | Pacific West Commercial Corporation |
| Q&V Questionnaires | Quantity and Value Questionnaires |
| Resolute | Resolute FP Canada Inc. |
| ROE | Return on Equity |
| SC paper | Supercalendered paper |

| Acronym/Abbreviation | Complete Title |
|---|---|
| U.S.C. | U.S. Code |
| USD | U.S. Dollars |
| USITC | United States International Trade Commission |
| WTO SCM Agreement | World Trade Organization Agreement on Subsidies and Countervailing Measures |

## II.   LITIGATION TABLE

| Short Citation | Complete Court Case Title |
|---|---|
| *Ad Hoc Shrimp* | *Ad Hoc Shrimp Trade Action Committee v. United States,* 925 F. Supp. 2d 1367 (CIT 2013) |
| *Allegheny Ludlum* | *Allegheny Ludlum Corp. v. United States*,  358 F. Supp. 2d 1334 (CIT 2005) |
| *Allegheny Ludlum II* | *Allegheny Ludlum Corp. v. United States*, 367 F. 3d 1339, 1349 (Fed. Cir. 2004) |
| *Asahi* | *Asahi Seiko Co., Ltd. v. United States*, 751 F. Supp. 2d 1335 (CIT 2010) |
| *Borusan* | *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015) |
| *Carpenter* | *Carpenter Technology Corp. v. United States*, 662 F. Supp. 2d 1337 (CIT 2009) |
| *Eurodif* | *Eurodif S.A. v. United States*, 411 F.3d 1355 (Fed. Cir. 2005) |
| *Fabrique* | *Fabrique de Fer de Charleroi, SA v. United States*, 166 F. Supp. 2d 593 (CIT 2001) |
| *GPX I* | *GPX Int'l Tire Corp. v. United States*, 893 F. Supp. 2d 1296 (CIT 2013) |
| *GPX II* | *GPX Int'l Tire Corp. v. United States*, 942 F. Supp. 2d 1343 (CIT 2013), *aff'd*, 780 F. 3d 1136 (Fed. Cir. 2015) |
| *Grobest* | *Grobest & I-Mei Indus. (Viet.) Co. v. United States,* 853 F. Supp. 2d 1342 (CIT 2012) |
| *Husteel* | *Husteel Co., Ltd. v. United States,* 2015 CIT LEXIS 100; Slip Op. 2015-100 (CIT 2015) |
| *MacLean-Fogg* | *MacLean-Fogg Co. v. United States,* 853 F. Supp. 2d 1336 (CIT 2012) |
| *Navneet* | *Navneet Publ'ns (India) Ltd. v. United States,* 999 F. Supp. 2d 1354 (CIT 2014) |

| Short Citation | Complete Court Case Title |
|---|---|
| *Rhone Poulenc* | *Rhone Poulenc, Inc. v. United States*, 899 F .2d 1185 (Fed. Cir. 1990) |
| *Xiamen* | *Xiamen Int'l Trade and Industrial Co. v. United States,* 953 F. Supp. 2d 1307 (CIT 2013) |
| *Zhejiang* | *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v. United States,* 637 F. Supp. 2d 1260 (CIT 2009) |

### III.   ADMINISTRATIVE DETERMINATIONS AND NOTICES TABLE

Note: if "certain" is in the title of the case, it has been excluded from the title listing.

| Short Citation | Administrative Case Determinations |
|---|---|
| *1st Review of Pure and Alloy Magnesium* | *See Pure and Alloy Magnesium From Canada: Final Results of the First (1992) Countervailing Duty Administrative Reviews,* 62 FR 13857 (March 24, 1997) |
| *CFS from Korea* | *Coated Free Sheet Paper from the Republic of Korea; Notice of Final Affirmative Countervailing Duty Determination,* 72 FR 60639 (Oct. 25, 2007) |
| *Coated Paper from the PRC* | *Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 72 FR 60645 (October 25, 2007) |
| *Corrosion Resistant Steel from Korea* | *Corrosion-Resistant Carbon Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review,* 77 FR 13093 (March 5, 2012) |
| *CWP from the PRC* | *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances,* 73 FR 31966 (June 5, 2008) |
| *CWP from Turkey* | *Certain Welded Carbon Steel Pipe and Tube Products from Turkey,* 51 FR 1268 (January 10, 1986) |
| *DRAMS from Korea* | *Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea,* 68 FR 37122 (June 23, 2003) |
| *LEU from France* | *Notice of Final Affirmative Countervailing Duty Determination: Low Enriched Uranium From France,* 66 FR 65901 (December 21, 2001) |
| *Magnesium from Canada* | *Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium from Canada,* 57 FR 30946, 30954 (July 13, 1992) |
| *Notice of Final Modification* | *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act Section 123 Modification,* 68 FR 37125 (June 23, 2003) |

| Short Citation | Administrative Case Determinations |
|---|---|
| *OCTG from the PRC* | *Oil Country Tubular Goods From the People's Republic of China: Final Affirmative Countervailing Duty Determination, Final Negative Critical Circumstances Determination*, 74 FR 64045 (December 7, 2009) |
| *Pasta from Italy* | *Pasta From Italy: Preliminary Results and Partial Rescission of the Eighth Countervailing Duty Administrative Review*, 70 FR 17971 (April 8, 2005) |
| *Refrigerators from Korea* | *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea: Final Affirmative Countervailing Duty Determination,* 77 FR 17410 (March 26, 2012) |
| *Softwood Lumber from Canada* | *Notice of Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination:  Softwood Lumber Products from Canada*, 67 FR 15545 (April 2, 2002) |
| *Softwood Lumber IV* | *Notice of Final Results of Countervailing Duty Administrative Review and Rescission of Certain Company-Specific Reviews: Softwood Lumber Products from Canada*, 69 FR 75917 (December 20, 2004) |
| *Thermal Paper from the PRC* | *Lightweight Thermal Paper From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 73 FR 57323 (October 2, 2008) |
| *Pipe from Turkey* | *Welded Line Pipe From the Republic of Turkey: Final Affirmative Countervailing Duty Determination*, 80 FR 61371 (October 13, 2015) |
| *Uncoated Paper from Indonesia* | *Certain Uncoated Paper from Indonesia:  Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 80 FR 51771 (Aug. 26, 2015) |
| *Wind Towers from PRC* | *Utility and Scale Wind Towers From the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 77 Fed. Reg. 75,978 (Dec. 26, 2012) |
| *Wire Rod from Venezuela* | *Final Affirmative Countervailing Duty Determination: Venezuelan Wire Rod*, 62 FR 55014, 55021-22 (October 22, 1997) |

## IV.   CASE-RELATED DOCUMENTS

| Short Citation | Complete Document Title |
|---|---|
| BPI Memo | Department Memorandum, "Business Proprietary Information Memorandum for the Final Determination," (October 13,2015). |

| Short Citation | Complete Document Title |
|---|---|
| GNS Pre-Preliminary Comments | Letter from the GNS, "Supercalendered Paper from Canada: Pre-Preliminary Comments Submitted by the Government of Nova Scotia," (July 13, 2015) |
| GNS Verification Report | Department Memorandum, "Verification Report:  Government of Nova Scotia," (September 2, 2015) |
| GOC Verification Report | Department Memorandum, "Verification Report:  Government of Canada," (August 27, 2015) |
| GOO Verification Report | Department Memorandum, "Verification Report:  Government of Ontario," (August 27, 2015) |
| GOQ Verification Report | Department Memorandum, "Verification Report:  Government of Québec," (August 27, 2015) |
| GQR | Letter from the GNS, "Response of the Government of Nova Scotia to the Department's April 6, 2015 Questionnaire," (May 28, 2015) |
| GQR | Letter from the GOQ, "Response of the Government of Québec to the Department's April 6, 2015 Questionnaire," (May 27, 2015) |
| Initiation Checklist | CVD Investigation Initiation Checklist: Supercalendered Paper from Canada (March 18, 2015) |
| *Initiation Notice* | *Supercalendered Paper From Canada:  Initiation of Countervailing Duty Investigation*, 80 FR 15981 (March 26, 2015) |
| Port Hawkesbury Affiliation Response | Letter from Port Hawkesbury, "Supercalendered Paper from Canada – Affiliated Companies Response," (April 20, 2015) |
| Port Hawkesbury Final Calculation Memo | Department memorandum, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Port Hawkesbury Paper LP Calculations for the Final Determination," (October 13, 2015) |
| Port Hawkesbury Preliminary Calculation Memo | Department memorandum, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Port Hawkesbury Paper LP Calculations for the Preliminary Determination," (July 27, 2015) |
| Port Hawkesbury Verification Report | Department memorandum, "Verification of the questionnaire responses submitted by Port Hawkesbury LP (Port Hawkesbury) and cross-owned affiliates 6879900 Canada Inc. (687), Port Hawkesbury Investments Ltd., Port Hawkesbury Paper GP, Port Hawkesbury Paper Holdings Ltd., Port Hawkesbury Paper Inc. (Port HawkesburyI), and Pacific West Commercial Corporation (PWCC)," (September 2, 2015) |
| PQR | Letter from Port Hawkesbury, "Supercalendered Paper from Canada – Initial Questionnaire Response," (May 27, 2015) |
| Port Hawkesbury Second Affiliation Response | Letter from Port Hawkesbury, "Supercalendered Paper from Canada – Reply to Supplemental Affiliation Questionnaire," (May 1, 2015) |
| PSQR | Letter from Port Hawkesbury, "Supercalendered Paper from Canada – Supplemental Questionnaire Response," (July 6, 2015) |

| Short Citation | Complete Document Title |
|---|---|
| *Preliminary Determination* | *Supercalendered Paper From Canada: Preliminary Affirmative Countervailing Duty Determination,* 80 FR 45951 (August 3, 2015), and accompanying Preliminary Decision Memorandum. |
| Resolute Final Calculation Memo | Department Memorandum, "Final Determination Calculations for Resolute FP Canada Inc. (Resolute)," (Ocotber 13, 2015) |
| Resolute Preliminary Calculation Memo | Department Memorandum, "Preliminary Determination Calculations for Resolute FP Canada Inc. (Resolute)," (July 27, 2015) |
| Resolute Supplemental Affiliation Response | Letter from Resolute, "Supercalendered Paper from Canada: Supplemental Affiliated Parties Questionnaire Response," (May 1, 2015) |
| Resolute Verification Report | Department Memorandum, "Verification of the Questionnaire Responses of Resolute FP Canada Inc.," (August 27, 2015) |
| RQR | Letter from Resolute, "Supercalendered Paper from Canada: Section III Questionnaire Response," (May 28, 2015) |
| Respondent Selection Memo | Department Memorandum, "Countervailing Duty Investigation of Supercalendered Paper from Canada: Respondent Selection," (April 13, 2015) |
| RSQR | Letter from Resolute, "Supercalendered Paper from Canada: First Supplemental Questionnaire," (June 12, 2015) |
| RSQR2 | Letter from Resolute, "Supercalendered Paper from Canada: Resolute's Supplemental Repsonse to Questionnaire," (July 22, 2015) |
| Revised Response of the Government of Canada | Letter from the GOC, "Supercalendered Paper from Canada: Revised Response of the Government of Canada to the Department's April 6 Questionnaire," (July 22, 2015) |

## V.   MISCELLANEOUS TABLE (REGULATORY, STATUTORY, ARTICLES, ETC.)

| Short Cite | Complete Title |
|---|---|
| *Board Regulatory Rules* | *Board Regulatory Rules made under Section 12 of the Utility and Review Board Act; S.N.S. 1992, c. 11; N.S. Reg. 235/2005 (December 23, 2005) as amended up to N.S. Reg. 9/2013 (January 16, 2013)* |
| *CCAA* | *Companies Creditors Arrangement Act (R.S.C., 1985, C. C-36)* |
| *CITA* | *Income Tax Act (R.S.C., 1985, c. 1(5th Supp.))* |
| *CVD Preamble* | *Countervailing Duties; Final Rule,* 63 FR 65348 (November 25, 1998) |
| *Crown Land Act* | *Crown Lands Act; Chapter 114 of the Revised Statutes, 1989 amended 2012, c. 6* (March 14, 2013) |
| *Electricity Act* | *Electricity Act: Chapter 25 of the Acts of 2004; as amended by 2010, c. 14; 2011, c. 15; 2013, c. 34* (March 18, 2014) |

| Short Cite | Complete Title |
|---|---|
| *How to Depreciate Property* | U.S. Internal Revenue Service Publication 946 (2008), "How to Depreciate Property," at Table B-2 |
| *Hot-Rolled Lead* | *United States – Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom,* WT/DS138/AB/R (June 7, 2000) |
| *Maritime Link Act* | *Maritime Link Act; Chapter 9 of the Acts of 2012; as amended by 2013, c. 40* (December 12, 2013) |
| *Notice of Final Modification* | *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act Section 123 Modification,* 68 FR 37125, 37137 (June 23, 2003) |
| *Nova Scotia Jobs Fund Act* | *Nova Scotia Jobs Fund Act; Chapter 40 of the Acts of 2011; as amended by 2014, c. 9, s. 34* (May 1, 2014) |
| *Richmond Port Hawkesbury Paper Ltd. Taxation Act* | *Richmond Port Hawkesbury Paper GP Ltd. Taxation Act; Chapter 51 of the Acts of 2006 as amended by 2012, c. 49* (December 6, 2012) |
| *Public Utilities Act* | *Public Utilities Act; Chapter 380 of the Revised Statutes, 1989 as amended by 1992, c. 8, s. 35; 1992, c. 11, s. 43; 1992, c. 37, s. 3; 1997, c. 4, s. 43; 2001, c. 35, s. 30; 2005, c. 25, s. 1; 2006, c. 45; 2008, C. 31; 2010, cc. 24,71; 2012, c. 41; 2014, c. 5, s. 15* (May 1, 2014) |
| *Public Utilities Rules* | *Public Utilities Rules, made under Section 12 of the Utility and Review Board Act, S.N.S. 1992, c. 11, N.S. Reg. 290/92* (December 14, 1992) |
| *Renewable Electricity Regulations* | *Renewable Electricity Regulations made under Section 5 of the Electricity Act; S.N.S. 2004, c. 25; O.I.C. 2010-381 (October 12, 2010), N.S. Reg. 155/2010 as amended up to O1.C. 2014-26 (January 28, 2014), N.S. Reg. 14/2014* |
| *Renewable Electricity Retail Sale Regulations* | *Renewable Electricity Retail Sale Regulations made under Section 5 of the Electricity Act; S.N.S. 2004, c. 25, O.I.C. 2014-356 (August 25, 2014), N.S. Reg. 130/2014* |
| *SAA* | *Statement of Administrative Action accompanying the Uruguay Round Agreements Act,* H.R. Doc. No. 316, 103d Cong., 2d Session (1994) |
| *SCM* | *WTO Agreement on Subsidies and Countervailing Measures* |
| *Utility and Review Board Act* | *Utility and Review Board Act; Chapter 11 of the Acts of 1992, amended 1995, c. 7; 1998,c. 18, s. 582; 2007, c. 23; 2008, c. 68* (September 16, 2009) |
| *Utility and Review Board Regulations* | *Utility and Review Board Regulations made under Section 34 of the Utility and Review Board Act; S.N.S. 1992, c. 11; O.I.C. 92-1209 (December 10, 1992), N.S. Reg. 270/92* |
| *US – Civil Aircraft* | *United States – Measures Affecting Trade In Large Civil Aircraft (Second Complaint),* WT/DS353/AB/R (Mar. 12, 2012) at 44, |

| Short Cite | Complete Title |
|---|---|
| *US – Softwood Lumber* | *United States – Final Countervailing Duty Determination with respect to Certain Softwood Lumber from Canada*, WT/DS257/R (August 29, 2003) |
| *US – UK Lead and Steel* | *United States – Imposition of Countervailing Duties on Certain Hot-Rolled Lead and Bismuth Carbon Steel Products Originating in the United Kingdom*, WT/DS138/AB/R (May 10, 2000) at page 25, para. 68. |
| *Wholesale Market Rules Regulations* | *Wholesale Market Rules Regulations made under Section 5 of the Electricity Act; S.N.S. 2004, c. 25; O.I.C. 2007-43 (January 22, 2007, effective February 1, 2007), N.S. Reg. 36/2007* |

Attachment 8

Certain Quartz Surface Products From the Republic of
Turkey: Preliminary Affirmative Countervailing Duty
Determination, Preliminary Affirmative Critical
Circumstances Determination, and Alignment of Final
Determination With Final Antidumping Duty
Determination, 84 Fed. Reg. 54,841 (Dep't Commerce
Oct. 11, 2019).

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

C-489-838
Investigation
POI: 01/01/2018-12/31/2018
**Public Document**
E&C/OIII:  SB/PZ

October 7, 2019

**MEMORANDUM TO:**  Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

**FROM:**  James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**SUBJECT:**  Decision Memorandum for the Preliminary Affirmative
Determination in the Countervailing Duty Investigation of Certain
Quartz Surface Products from the Republic of Turkey

---

# I.    SUMMARY

The Department of Commerce (Commerce) preliminarily determines that countervailable
subsidies are being provided to producers and exporters of certain quartz surface products
(quartz surface products) from Turkey, as provided in section 703(b)(1) of the Tariff Act of
1930, as amended (the Act).

# II.    BACKGROUND

## A.    Initiation and Case History

On May 8, 2019, we received antidumping duty (AD) and countervailing duty (CVD) petitions
concerning imports of quartz surface products from the Republic of Turkey (Turkey) and India,
filed in proper form on behalf of Cambria Company LLC (the petitioner).[1]  Pursuant to section
702(b)(4)(A)(ii) of the Act, we invited representatives of the Government of Turkey (GOT) for
consultations with respect to the CVD Petition on quartz surface products from Turkey.[2]  On
May 24, 2019, we held consultations with the GOT.[3]

On May 22, 2019, we released the U.S. Customs and Border Protection (CBP) data for entries of

---

[1] *See* Petitioner's Letter, " Petitions for the Imposition of Antidumping and Countervailing Duties:  Certain Quartz
Surface Products from India and the Republic of Turkey," dated May 8, 2019 (Petition).
[2] *See* Commerce's Letter, "Countervailing Duty Petition on Certain Quartz Surface Products from Turkey:
Invitation for Consultations to Discuss the Countervailing Duty Petition," dated May 9, 2019.
[3] *See* Memorandum, "Consultations with Government of Turkey Officials regarding the Countervailing Duty
Petition on Certain Quartz Surface Products from the Republic of Turkey," dated May 24, 2019.



subject merchandise under the appropriate subheading of the Harmonized Tariff Schedule of the United States (HTSUS), as listed in the scope, and invited interested parties to submit comments on the CBP data as well as respondent selection.[4]   We received no comments on the CBP data. On May 28, 2019, we initiated the CVD investigation on quartz surface products from Turkey.[5]

We stated in the *Initiation Notice* that, if appropriate, we intended to base the selection of mandatory respondents on CBP entry data for U.S. imports of quartz surface products from Turkey during the period of investigation (POI) under the HTSUS subheadings listed in the scope of the investigation.[6]   Section 777A(e)(1) of the Act directs Commerce to calculate individual countervailable subsidy rates for each known producer/exporter of the subject merchandise.   However, when faced with a large number of producers/exporters, and, if Commerce determines it is therefore not practicable to examine all companies, section 777A(e)(2)(A)(ii) of the Act and 19 CFR 351.204(c) give Commerce discretion to limit its examination to a reasonable number of the producers/exporters accounting for the largest volume of the subject merchandise that can reasonably be examined.

On June 21, 2019, pursuant to section 777A(e)(2) of the Act and 19 CFR 351.204(c)(2), we selected Belenco Diş Ticaret A.Ş. (Belenco) as the mandatory respondent.[7]   On June 21, 2019, we also issued the initial CVD questionnaire to the GOT with instructions to forward the questionnaire to Belenco.[8]   On July 5, 2019, we received the respondent's company affiliation response,[9] and between August 9 and August 12, 2019, we received initial questionnaire responses from the GOT[10] and Belenco.[11]

On June 20, 2019, the petitioner requested that we postpone the preliminary determination in this investigation.[12]   On June 28, 2019, the U.S. International Trade Commission (ITC) published in the *Federal Register* a notice of its affirmative determinations in the preliminary phase of the AD and CVD investigations concerning imports of quartz surface products from India and Turkey.[13]

---

[4] *See* Memorandum, "Countervailing Duty Petition of Certain Quartz Surface Products from the Republic of Turkey: Release of Customs Data from U.S. Customs and Border Protection," dated May 22, 2019..

[5] *See Certain Quartz Surface Products from India and the Republic of Turkey:  Initiation of Countervailing Duty Investigations*, 84 FR 25524 (June 3, 2019) (*Initiation Notice*) and accompanying Initiation Checklist.

[6] *See Initiation Notice*, 83 FR at 25527.

[7] *See* Memorandum, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Respondent Selection," dated June 21, 2019.

[8] *See* Letter, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey: Initial Questionnaire," dated June 21, 2019.

[9] *See* Belenco's Letter, "Quartz Surface Products from Turkey – Affiliation Response of Belenco dis Tikaret A.Ş.," dated July 5, 2019 (Belenco's Affiliation Response).

[10] *See* GOT's Letter, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Questionnaire Response of the Government of Turkey," dated August 9, 2019 (GOT's IQR).

[11] *See* Belenco's Letter, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Initial Questionnaire," dated August 12, 2019 (Belenco's IQR).

[12] *See* Petitioner's Letter, "Certain Quartz Surface Products from the Republic of Turkey:  Request to Postpone Preliminary Determination," dated June 20, 2019 (Request for Postponement).

[13] *See Quartz Surface Products from India and Turkey*, 84 FR 31100 (June 28, 2019) (*ITC Preliminary Determination*); *see also* ITC publication 4919 (July 2019), Quartz Surface Products from India and Turkey, Invs. 701-TA-624-625 and 731-TA-1450-1451 (Preliminary) at page 1 (ITC Publication).

On July 1, 2019, the ITC notified Commerce of its affirmative preliminary determinations.[14]

Between September 3 and September 24, 2019, we issued supplemental questionnaires to Belenco[15] and the GOT,[16] and between September 5 and October 2, 2019, received timely responses from Belenco[17] and the GOT.[18]

On September 9, 2016, the petitioner submitted a benchmark factual information filing.[19] Belenco filed a rebuttal to the Petitioner's Benchmark Submission.[20]

On October 1, 2019, the petitioner requested that we align the final CVD determination in this investigation with the final determination in the companion AD investigation of quartz surface products from Turkey.[21]

## B.      Postponement of Preliminary Determination

On July 3, 2019, we postponed the deadline for this preliminary determination until no later than 130 days after the initiation of the investigation, based on a request from the petitioner.[22]  As such, we postponed the preliminary determination until October 7, 2019,[23] in accordance with sections 703(c)(1) and (2) of the Act and 19 CFR 351.205(f)(1).

---

[14] See the ITC's Letter, dated July 1, 2019 (Notification of ITC Preliminary Determinations).

[15] See Commerce's Letters, "Countervailing Duty Investigation on Certain Quartz Surface Products from the Republic of Turkey:  First Supplemental Questionnaire," dated September 3, 2019; "Countervailing Duty Investigation on Certain Quartz Surface Products from the Republic of Turkey:  Second Supplemental Questionnaire," dated September 13, 2019; and "Countervailing Duty Investigation on Certain Quartz Surface Products from the Republic of Turkey:  Third Supplemental Questionnaire," dated September 24, 2019.

[16] See Commerce's Letter, "Countervailing Duty Investigation on Certain Quartz Surface Products from the Republic of Turkey:  First Supplemental Questionnaire," dated September 13, 2019.

[17] See Belenco's Letters, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Response to 1st Supplemental Questionnaire," dated September 5, 2019 (Belenco's SQR1); "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Response to 2nd Supplemental Questionnaire," dated September 23, 2019 (Belenco's SQR2); "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Response to 3rd Supplemental Questionnaire," dated September 27, 2019 (Belenco's SQR3); and "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Response to Q.1a of 3rd Supplemental Questionnaire," dated October 2, 2019 (Belenco's SQR4).

[18] See GOT's Letter, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  First Supplemental Questionnaire Response of the Government of Turkey," dated September 23, 2019 (GOT's SQR).

[19] See Petitioner's Letter, "Certain Quartz Surface Products from Turkey:  Benchmark Factual Information," dated September 9, 2019.

[20] See Belenco's Letter, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Rebuttal to Petitioner's Factual Information Submission," dated September 19, 2019.

[21] See Petitioner's Letter, "Certain Quartz Surface Products from Turkey:  Request to Align Determinations," dated October 1, 2019 (Request for Alignment).

[22] See Certain Quartz Surface Products from India and the Republic of Turkey:  Postponement of Preliminary Determinations in the Countervailing Duty Investigations, 84 FR 31839 (July 3, 2019) (Preliminary Determination Postponement); see also Request for Postponement.

[23] See Preliminary Determination Postponement.

## C.   Period of Investigation

The POI is January 1, 2018, through December 31, 2018.

## III.   SCOPE COMMENTS

In accordance with the *Preamble* to Commerce's regulations,[24] we set aside a period of time, as stated in the *Initiation Notice*, for parties to raise issues regarding product coverage.[25]  We received several comments concerning the scope of the AD and CVD investigations of quartz surface products from India and Turkey.  We are currently evaluating the scope comments filed by the interested parties.  We intend to issue our preliminary decision regarding the scope of the AD and CVD investigations in the preliminary determinations of the companion AD investigations, the deadline for which is December 4, 2019.[26]  We will incorporate the scope decisions from the AD investigations into the scope of the final CVD determination for this investigation after considering any relevant comments submitted in case and rebuttal briefs.

## IV.   SCOPE OF THE INVESTIGATION

The merchandise covered by the investigation is certain quartz surface products.  Quartz surface products consist of slabs and other surfaces created from a mixture of materials that includes predominately silica (*e.g.*, quartz, quartz powder, cristobalite, glass powder) as well as a resin binder (*e.g.*, an unsaturated polyester).  The incorporation of other materials, including, but not limited to, pigments, cement, or other additives does not remove the merchandise from the scope of the investigation.  However, the scope of the investigation only includes products where the silica content is greater than any other single material, by actual weight.  Quartz surface products are typically sold as rectangular slabs with a total surface area of approximately 45 to 60 square feet and a nominal thickness of one, two, or three centimeters.  However, the scope of these investigation includes surface products of all other sizes, thicknesses, and shapes.  In addition to slabs, the scope of this investigation includes, but is not limited to, other surfaces such as countertops, backsplashes, vanity tops, bar tops, work tops, tabletops, flooring, wall facing, shower surrounds, fire place surrounds, mantels, and tiles.  Certain quartz surface products are covered by the investigation whether polished or unpolished, cut or uncut, fabricated or not fabricated, cured or uncured, edged or not edged, finished or unfinished, thermoformed or not thermoformed, packaged or unpackaged, and regardless of the type of surface finish.

In addition, quartz surface products are covered by the investigation whether or not they are imported attached to, or in conjunction with, non-subject merchandise such as sinks, sink bowls, vanities, cabinets, and furniture.  If quartz surface products are imported attached to, or in conjunction with, such non-subject merchandise, only the quartz surface product is covered by the scope.

---

[24] *See Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27323 (May 19, 1997) (*Preamble*).
[25] *See Initiation Notice*, 84 FR at 25524-25525.
[26] *See Certain Quartz Surface Products from India and the Republic of Turkey:  Postponement of the Preliminary Determinations in the Less-Than-Fair-Value Investigations*, 84 FR 52062 (October 1, 2019) (*AD Postponement Notice*).

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise fabricated in a third country, including by cutting, polishing, curing, edging, thermoforming, attaching to, or packaging with another product, or any other finishing, packaging, or fabrication that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the quartz surface products.

The scope of the investigation does not cover quarried stone surface products, such as granite, marble, soapstone, or quartzite.  Specifically excluded from the scope of the investigation are crushed glass surface products.  Crushed glass surface products must meet each of the following criteria to qualify for this exclusion:  (1) the crushed glass content is greater than any other single material, by actual weight; (2) there are pieces of crushed glass visible across the surface of the product; (3) at least some of the individual pieces of crushed glass that are visible across the surface are larger than 1 centimeter wide as measured at their widest cross-section ("Glass Pieces"); and (4) the distance between any single Glass Piece and the closest separate Glass Piece does not exceed three inches.

The products subject to the scope are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under the following subheading: 6810.99.0010.  Subject merchandise may also enter under subheadings 6810.11.0010, 6810.11.0070, 6810.19.1200, 6810.19.1400, 6810.19.5000, 6810.91.0000, 6810.99.0080, 6815.99.4070, 2506.10.0010, 2506.10.0050, 2506.20.0010, 2506.20.0080, and 7016.90.1050.  The HTSUS subheadings set forth above are provided for convenience and U.S. Customs purposes only.  The written description of the scope is dispositive.

## V.  PRELIMINARY AFFIRMATIVE DETERMINATION OF CRITICAL CIRCUMSTANCES

The petitioner submitted information alleging that, pursuant to section 703(e)(1) of the Act, and 19 CFR 351.206, critical circumstances exist with respect to imports of quartz surface products from Turkey.[27]  In accordance with 19 CFR 351.206(c)(2)(i), because the petitioner submitted a critical circumstances allegation 20 days before the scheduled date of this preliminary determination, Commerce must issue a preliminary critical circumstances determination no later than the date of the preliminary determination.  Based on information provided by the petitioner,[28] and data placed on the record of this investigation by mandatory respondent Belenco,[29] Commerce preliminarily determines that critical circumstances exist with respect to imports of quartz surface products from Turkey.

Section 703(e)(1) of the Act provides that Commerce will determine that critical circumstances exist in CVD investigations if there is a reasonable basis to believe or suspect:  (A) that "the alleged countervailable subsidy" is inconsistent with the Agreement on Subsidies and Countervailing Measures (SCM Agreement) of the World Trade Organization; and (B) that there

---

[27] See Petitioner's Letter, "Certain Quartz Surface Products from Turkey: Allegation of the Existence of Critical Circumstances," dated September 17, 2019.

[28] Id.

[29] See Belenco's Letter, "Quartz Surface Products from Turkey:  Monthly U.S. Shipment Data for September 2018 to August 2019," dated September 26, 2019.

have been massive imports of the subject merchandise over a relatively short period.

As discussed in the "Analysis of Programs" section below, we preliminarily determine that Belenco received countervailable benefits under certain programs that are contingent upon export performance.  Therefore, we preliminarily determine that there is a reasonable basis to believe or suspect that there are programs in this investigation that are inconsistent with the SCM Agreement.  Use of an export subsidy program is sufficient to meet the inconsistent-with-the-SCM-Agreement criterion under section 703(e)(1)(A) of the Act.[30]

In determining whether there are "massive imports" over a "relatively short period," pursuant to section 703(e)(1)(B) and 19 CFR 351.206(i), Commerce normally compares the import volumes of the subject merchandise for at least three months immediately preceding the filing of the petition (*i.e.*, the "base period") to a comparable period of at least three months following the same date (*i.e.*, the "comparison period").  Commerce's regulations provide that, generally, imports must increase by at least 15 percent during the "comparison period" to be considered "massive."[31]

Therefore, to determine whether or not there has been a massive surge of imports with respect to the mandatory respondents, we have used a comparison period starting with the month the petition was filed (*i.e.*, May 2019) and ending with the most recent month for which we have shipping data on the record (*i.e.*, August 2019).  We then selected a base period with the same number of months, ending in the month prior to the filing of the petition (*i.e.*, January 2019 through April 2019).  Based on the analysis described above, Commerce preliminarily determines that Belenco had massive imports over a relatively short period.[32]

Consistent with our practice,[33] for "all other" exporters and producers of quartz surface products from Turkey, Commerce compared Global Trade Atlas (GTA) data for the base and comparison periods for which GTA data are currently available (*i.e.*, February 2019 through April 2019 and May 2019 through July 2019, respectively), excluding shipments reported by Belenco.  Based on this analysis, we preliminarily determine that all other exporters and producers of quartz surface products had massive imports over a relatively short period.[34]

Thus, because we are issuing an affirmative preliminary determination that includes countervailable subsidies that are inconsistent with the SCM and because GTA data indicate that "massive shipments" occurred with respect to Belenco's and to all-other companies' imports of

---

[30] *See Notice of Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination: Certain Softwood Lumber Products from Canada*, 66 FR 43186, 43189-90 (August 17, 2001) unchanged in  *Notice of Amended Final Affirmative Countervailing Duty Determination and Notice of Countervailing Duty Order: Certain Softwood Lumber Products from Canada*, 67 FR 36070 (May 22, 2002)..
[31] *See* 19 CFR 351.206(h)(2).
[32] *See* Memorandum, "Preliminary Critical Circumstances Shipment Data Analysis," dated concurrently with this memorandum (Critical Circumstances Memorandum).
[33] *See, e.g.*, *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination Final Affirmative Critical Circumstances Determination*, 79 FR 54963 (September 15, 2014) and accompanying Issues and Decision Memorandum (IDM) at 4.
[34] *See* Critical Circumstances Memorandum.

quartz surface products from Turkey, we preliminarily determine that critical circumstances exist for these companies.  Commerce will issue its final determination concerning critical circumstances when it issues its final CVD determination.  All interested parties will have the opportunity to address this preliminary determination in case briefs submitted prior to the completion of the final CVD determination.

## VI.    INJURY TEST

Because Turkey is a "Subsidies Agreement Country" within the meaning of section 701(b) of the Act, the ITC is required to determine whether imports of the subject merchandise from Turkey materially injure, or threaten material injury to, a U.S. industry.  On June 24, 2019, the ITC preliminarily determined that there is a reasonable indication that an industry in the United States is threatened with material injury by reason of imports of quartz surface products from Turkey that are alleged to be sold at less than fair value and subsidized by the GOT.[35]

## VII.    ALIGNMENT

In accordance with section 705(a)(1) of the Act and 19 CFR 351.210(b)(4)(i), and based on the petitioner's request,[36] we are aligning the final CVD determination in this investigation with the final determination in the companion AD investigation of quartz surface products from Turkey.  Consequently, the final CVD determination will be signed on the same date as the final AD determination, which is currently scheduled to be due no later than February 18, 2020,[37] unless postponed.

## VIII.    SUBSIDIES VALUATION

### A.    Allocation Period

Commerce normally allocates the benefits from non-recurring subsidies over the average useful life (AUL) of renewable physical assets used in the production of subject merchandise.[38]  In Commerce's initial questionnaire to the GOT, we notified the respondents to this investigation that the AUL period is 15 years, on the basis of U.S. Internal Revenue Service Publication 946 (2018), "Appendix B – Table of Class Lives and Recovery Periods."[39]  No parties submitted comments challenging the proposed AUL period, and we therefore preliminarily determine that a 15-year period is appropriate to allocate benefits from non-recurring subsidies.

Furthermore, for non-recurring subsidies, we applied the "0.5 percent test," as described in 19 CFR 351.524(b)(2).  Under this test, we divide the amount of subsidies approved under a given program in a particular year by the relevant sales value (*e.g.*, total sales or export sales) for the year in which the assistance was approved.  If the amount of the subsidies is less than 0.5 percent

---

[35] *See ITC Preliminary Determination*, 84 FR at 31100; *see also* ITC Publication.

[36] *See* Request for Alignment.

[37] *See AD Postponement Notice*.

[38] *See* 19 CFR 351.524(b).

[39] *See* IRS Publication 946 (dated February 15, 2019) at Appendix B.  The 15-year period corresponds to asset class "32.3 – Manufacture of Other Stone and Clay Products;" *see also* Petition Volume V at Exhibit V-2 and page 2.

of the relevant sales value, then the benefits are allocated to the year of receipt rather than over the AUL.  If the amount of the subsidies is greater than 0.5 of the relevant sales value, we used the standard grant allocation methodology described under 19 CFR 351.524(d)(1) to determine the amount of the exemption attributable to the POI.

## B.    Attribution of Subsidies

In accordance with 19 CFR 351.525(b)(6)(i), Commerce normally attributes a subsidy to the products produced by the company that received the subsidy.  However, 19 CFR 351.525(b)(6)(ii)-(v) provides additional rules for the attribution of subsidies received by respondents with cross-owned affiliates.  Subsidies to the following types of cross-owned affiliates are covered in these additional attribution rules:  (ii) producers of the subject merchandise; (iii) holding companies or parent companies; (iv) producers of an input that is primarily dedicated to the production of the downstream product; or (v) an affiliate producing non-subject merchandise that otherwise transfers a subsidy to a respondent.  Further, 19 CFR 351.525(c) provides that benefits from subsidies provided to a trading company which exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm producing the subject merchandise that is sold through the trading company, regardless of affiliation.

According to 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets.  This section of Commerce's regulations states that this standard will normally be met where there is a majority voting interest between two corporations or through common ownership of two (or more) corporations.  The preamble to Commerce's regulations further clarifies Commerce's cross-ownership standard.  According to the *CVD Preamble*, relationships captured by the cross-ownership definition include those where:

> {T}he interests of two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same way it can use its own assets (or subsidy benefits) . . . Cross-ownership does not require one corporation to own 100 percent of the other corporation.  Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations.  In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership.[40]

Thus, Commerce's regulations make clear that the agency must look at the facts presented in each case in determining whether cross-ownership exists.  The U.S. Court of International Trade (CIT) upheld Commerce's authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[41]

---

[40] *See Countervailing Duties*, 63 FR 65348, 65401 (November 25, 1998) (*CVD Preamble*).
[41] *See Fabrique de Fer de Charleroi, SA v. United States*, 166 F. Supp. 2d 593, 600-604 (CIT 2001).

Belenco responded to Commerce's questionnaire on behalf of itself and its Turkish parent company, Peker Yüzey Tasarıları Sanayi ve Tic. A.Ş. (Peker Yüzey).[42]  Belenco is a wholly-owned subsidiary of Peker Yüzey.  Because Belenco is directly owned by Peker Yüzey, they meet the definition of cross-ownership at 19 CFR 351.525(b)(6)(vi).[43]  Further, in accordance with 19 CFR 351.525(b)(6)(iii), we attributed any benefits that Belenco and Peker Yüzey received in the POI to the consolidated total sales of Belenco and Peker Yüzey.

## C.    Denominators

In accordance with 19 CFR 351.525(b)(1)-(5), Commerce considers the basis for the respondents' receipt of benefits under each program when attributing subsidies, *e.g.*, to the respondents' export or total sales, or portions thereof.  As discussed in the "Programs Preliminarily Determined to be Countervailable" section and in Belenco's preliminary calculations memorandum, where a program is found to be countervailable as a domestic subsidy, we used the recipient's total product sales as the denominator (or the total combined sales of the cross-owned affiliates, as described above).  Similarly, where the program has been found to be countervailable as an export subsidy, we used the recipient's total export sales as the denominator (or the total export sales of the cross-owned affiliates, as described above).

All sales used in the net subsidy rate calculations are net of inter-company sales.  For a further discussion of the denominators used, see the Preliminary Analysis Memorandum.[44]

## IX.    BENCHMARKS AND INTEREST RATES

Section 771(5)(E)(ii) of the Act provides that the benefit for a loan is the "difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market," indicating that a benchmark must be a market-based rate.  In addition, 19 CFR 351.505(a)(3)(i) stipulates that when selecting a comparable commercial loan that the recipient "could actually obtain on the market," Commerce will normally rely on actual loans obtained by the firm.  However, when there are no comparable commercial loans during the period, Commerce "may use a national average interest rate for comparable commercial loans," pursuant to 19 CFR 351.505(a)(3)(ii).

Additionally, 19 CFR 351.505(a)(2)(ii) states that Commerce will not consider a loan provided by a government-owned special-purpose bank for purposes of calculating benchmark rates.  In the absence of reported long-term loan interest rates by the respondents we use the above-discussed interest rates as discount rates for purposes of allocating non-recurring benefits over time pursuant to 19 CFR 351.524(d)(3)(i)(B).

The respondents did not have lira-denominated comparable commercial long-term loans in the

---

[42] *See* Belenco's Affiliation Response at 5-6; *see also* Belenco's SQR1 at 1-4.
[43] *See* Belenco's Affiliation Response at 5-6; *see also* Belenco's SQR1 at 1-4.
[44] *See* Memorandum, "Certain Quartz Surface Products from the Republic of Turkey:  Analysis and Calculations for the Preliminary Countervailing Duty Determination," dated concurrently with this memorandum (Preliminary Analysis Memorandum).

AUL;[45] therefore, we used national average long-term interest rates, pursuant to 19 CFR 351.505(a)(3)(ii), from *International Financial Statistics* (*IMF Statistics*), a publication of the International Monetary Fund.[46]

Peker Yüzey received exemptions from import duties and valued added taxes (VAT) under the Regional Investment Incentive Scheme, which we determined to be non-recurring benefits in accordance with 19 CFR 351.524(c).[47]  Thus, unless an exception applies, Commerce identifies an appropriate long-term interest rate for purposes of allocating the non-recurring benefits over time pursuant to 19 CFR 351.524(d)(1) and (d)(3).

Section 351.524(d)(3) of Commerce's regulations directs us regarding the selection of a discount rate or long-term lending rate for the purposes of allocating non-recurring benefits over time.  The regulations provide several options in order of preference.  The first among these is the cost of long-term fixed-rate loans of the firm in question, excluding any loans which have been determined to be countervailable, for each year in which nonrecurring subsidies have been received.  The second option directs us to use the average cost of long-term, fixed-rate loans in the country in question.  Because the respondents did not report any long-term fixed-rate commercial loans, we used the yearly average long-term lending rate in Turkey from *IMF Statistics*.[48]

## X.    ANALYSIS OF PROGRAMS

Based upon our analysis and the responses to our questionnaires, we preliminarily determine the following:

### A.  Program Preliminarily Determined to be Countervailable

1.  Foreign Fair Support

Under the Foreign Fair Support program, the Ministry of Trade reimburses companies for certain expenditures related to participation in trade fairs abroad.[49]  The purpose of this program is to support Turkish companies' participation in international trade fairs abroad and to contribute to the increase of exports by supporting exhibition participation of the companies held abroad and the promotional activities of the exhibition organizers.[50]  The Foreign Fair Support program is regulated by the Communiqué on Supporting Participation in Fairs Abroad no. 2009/5.[51]  This communiqué was prepared on the basis of the Money Credit and Coordination Board's Decree number 2009/11 of 23/12/2009, which was issued based on the "Decree of State Aid for Export," which entered into force with the Council of Ministers' Decision no. 94/6401 of 27/12/1994.[52]

---

[45] *See* Belenco's IQR at Exhibit CVD-22.
[46] *See* Preliminary Analysis Memorandum.
[47] *See* Belenco's SQR2 at Exhibit CVDS-7.
[48] *See* Preliminary Analysis Memorandum.
[49] *See* GOT's SQR at 36.
[50] *See* Belenco's SQR at Exhibit CVD-39.
[51] *See* GOT's SQR at Exhibit 4.
[52] *Id.*

The Communiqué on Supporting Participation in Fairs Abroad no. 2009/5 was replaced in 2017 by the "Decree on Supporting Participation to Fairs in Abroad" numbered 2017/4.[53]  Peker Yüzey benefitted from this program.[54]

According to the Communiqué on Supporting Participation in Fairs Abroad no. 2009/5 and 2017/4, the support under the program is provided to Turkish Corporations that are members of the exporters' associations and entities that will participate in trade fairs abroad.[55]  The program provides reimbursement of up to 50 percent of eligible transportation services, exhibition booth fee/rent, and travel tickets of company representatives.[56]

We preliminarily determine that this is a financial contribution in the form of direct transfer of funds under section 771(5)(D)(i) of the Act, because Peker Yüzey received reimbursement from the Ministry of Trade for expenses covered by this program.  We preliminarily determine that Peker Yüzey benefitted from Foreign Fair Support under section 771(5)(E) of the Act in the amount of the reimbursement for expenses incurred related to its participation in international trade fairs.[57]  We preliminarily determine that the program is export specific within the meaning of section 771(5A)(A) and (B) of the Act, because it is provided to Turkish Corporations that are members of the exporters' associations and entities that will participate in trade fairs abroad.[58]

After first performing the "0.5 percent test" of 19 CFR 351.524, for each year in the AUL in which the respondent received a benefit, we allocated this amount to the POI, in accordance with 19 CFR 351.524(d).  To calculate the net countervailable subsidy rate attributable to the respondent, we divided the total POI benefit to Peker Yüzey by the respondents' consolidated total sales during the POI.  On this basis, we preliminarily find that the respondent received a net countervailable subsidy rate of 0.01 percent *ad valorem* for this program.[59]

2. Regional Investment Incentive Scheme (RIIS)

The GOT reported that the RIIS is one of four separate incentive schemes (*i.e.*, RIIS, Large Scale Investment Incentive Scheme, Strategic Investment Incentive Scheme, and General Investment Incentive Scheme) that fall under the umbrella of the Investment Incentive Program (IEP), which is designed and implemented by the Ministry of Industry and Technology and is based on the provisions of the Council of Ministers' Decree No. 2012/3305, in force since June 2012.[60]  Investment Incentive Certificates (IIC) are issued to companies that apply and meet the criteria pursuant to Decree No. 2012/3305.[61]  IIC holders are eligible to receive different benefits under the various incentive schemes.  According to the GOT, the purpose of the IEP is to reduce

---

[53] *See* GOT's IQR at 37.
[54] *See* Belenco IQR at 59.
[55] *See* GOT's SQR at Exhibit 4; *see also* Belenco's SQR at Exhibit CVD-39.
[56] *See* GOT's SQR at 36 and Exhibit 4 at Article 5.
[57] *See* GOT's IQR at 125-128.
[58] We intend to issue a supplemental questionnaire requesting further information regarding this program to cure issues with the respondent's and GOT's responses to this program.
[59] *See* Preliminary Analysis Memorandum.
[60] *See* GOT's IQR at 52 and Exhibit 7.
[61] *See* Belenco's IQR at 25.

regional development disparities by encouraging regional, large scale, and strategic investments.[62]

The programs available to IIC holders under the RIIS include, *inter alia*, Customs Duty Exemption, VAT Exemption, Interest Support, Social Security Premium Support (Employer's Share), Social Security Premium Support (Employee's Share), and Tax Reduction.[63]  In order to be eligible for an IIC under the RIIS companies must meet the regional and sectoral criteria outlined in Article 4 of Decree No. 2012/3305.  Under the RIIS, the 81 provinces of Turkey were grouped according to their socio-economic development levels into six regions.  The types and amounts of incentives available vary by region.[64]  Peker Yüzey is located in Manisa province, which is located in Region 3.[65]  Annexes 2-A and 2-B of Decree No. 2012/3305 outline the sectors eligible for incentives in each province and the minimum investment required, by region, for each eligible sector.  In Region 3, the minimum investment required for a company in Peker Yüzey's sector was 2 million TRY.[66]  Peker Yüzey was issued three IICs under the RIIS during the AUL period.  Each certificate lists that Peker Yüzey is eligible to use, *inter alia*, Social Security Premium Support (Employer's Share), VAT and Customs Duty Exemptions, and Tax Reduction programs.[67]

   a.   <u>Regional Investment Incentive Scheme – Social Security Support</u>

Under the Social Security Premium Support element of this program, the Ministry of Industry and Technology will cover the employer's share of the social security premium paid for any additional employment created by a project with an IIC.[68]  A company becomes eligible for this support after the GOT issues a competition visa for the project covered by the IIC.[69]  Since Peker Yüzey is located in region three,[70] the duration of implementation for Social Security Premium Support is five years pursuant to Decree No. 2009/15199.[71]  However, two of the three IICs are specified for a period of six years rather than five years, pursuant to Article 18 of Decree No. 2012/3305, because Peker Yüzey's investment was realized in an Organized Industrial Zone (OIZ).[72]

In order to obtain this support, Peker Yüzey reported that it submitted monthly e-declaration forms to the Social Security Institution and demonstrated the records for the social security premium vouchers.[73]  Peker Yüzey reported benefits for social security premium support Act Number 25510 and social security premium support Act Number 16322 on monthly vouchers to

---

[62] *See* GOT's IQR at 52.
[63] *Id.* at 53-54.
[64] *Id.*
[65] *Id.* at Exhibit 7.
[66] *Id.*
[67] *Id.* at 56 and Exhibit 8.
[68] *Id.* at 53.
[69] *Id.* at 53.
[70] *See* Belenco's IQR at 27.  *See also* GOT's IQR at Exhibit 7 at Annex-1.
[71] *See* GOT's IQR at Exhibit 7.  *See also* Belenco's SQR3 at 3.
[72] *See* Belenco's IQR at 43-44 and Exhibit CVD-17, Exhibit CVD-18, and Exhibit CVD-19; *see also* GOT's IQR at Exhibit 7 and Belenco's SQR3 at 2-3.
[73] *See* Belenco's IQR at 46.

the Social Security Institution.[74]  The Social Security Premium Support Act Number 25510 is regulated by the "Social Insurance and General Healthcare Law" No. 5510 published in 2006.[75] Social Security Premium Support Act Number 16322 benefits are subject to regulations specified by "Act No:  16322 - 26322 Incentives Implemented According to Decree Regarding State Aid on Investments."[76]

We preliminarily determine that this is a financial contribution in the form of revenue forgone under section 771(5)(D)(ii) of the Act, because the amount corresponding to the employer's share of the social security premium on legal minimum wage paid by the IIC holder is covered by the Ministry of Industry and Technology.[77]  We find that Peker Yüzey benefitted in the amount corresponding to the employer's share of the social security premium covered by the Ministry of Industry and Technology pursuant to section 771(5)(E) of the Act.  We also find that this program is specific under sections 771(5A)(D)(i) and (iv) of the Act, because, as discussed above, the program is limited to firms making a minimum investment and to firms located in certain geographic regions.[78]

For purposes of calculating the countervailable subsidy rate, we took the sum of the benefits from the monthly vouchers submitted to the Social Security Institution during the POI and divided this sum by the respondents' consolidated total sales reported during the POI.  We preliminarily determine that the countervailable subsidy rate is 0.08 percent *ad valorem* for this program.[79]

> b.   Regional Investment Incentive Scheme – Tax Reduction

Under the Tax Reduction portion of the RIIS, a company's corporate tax rate is reduced by the discount rate indicated in Article 15 of the Council of Ministers' Decree No. 2012/3305.  The IIC holder is eligible to receive this benefit until the total amount of tax reduction equals the contribution rate cap specified in Article 15 of the Council of Minters' Decree No. 2012/3305.[80] Peker Yüzey benefitted from the tax reduction associated with IIC number 98476 during the POI, which stipulates a corporate tax deduction rate of 80 percent and a contribution rate cap of 40 percent of the total investment specified by that IIC.[81]

We find that the benefits under this program constitute a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act in the amount of savings. The reduction provides a benefit in the amount of the tax savings to the company pursuant to

---

[74] *Id.* at Exhibit CVD-38.
[75] *Id.* at 45 and Exhibit CVD-33.
[76] *Id.* at 42.
[77] *See* GOT's IQR at 53 and Exhibit 7.
[78] *See* GOT's IQR at Exhibit 7.
[79] *See* Preliminary Analysis Memorandum.
[80] *See* GOT's IQR at Exhibit 7.
[81] *See* Belenco's IQR at 34 and Exhibit CVD-17.

section 771(5)(E) of the Act.  We also find that this program is specific under sections 771(5A)(D)(i) and (iv) of the Act, because, as discussed above, the program is limited to firms making a minimum investment and to firms located in certain geographic regions.[82]

To calculate the benefit, we calculated the amount of tax that Peker Yüzey would have paid on its tax return filed during the POI in the absence of this program and compared that amount with the amount of taxes that Peker Yüzey did pay on the tax return filed during the POI.  The difference between the two equals the benefit to Peker Yüzey under this program during the POI. To calculate a subsidy rate, we divided the POI benefit by the respondents' consolidated POI sales.  On this basis, we preliminarily determine that the respondent received a net countervailable subsidy rate of 2.27 percent *ad valorem* for this program.[83]

c.   Regional Investment Incentive Scheme – VAT and Customs Duty Exemptions

Under this program, investment machinery and equipment imported and/or locally provided within the scope of an IIC are exempted from customs duties and VAT.  Article 4 of the Council of Ministers' Decree No. 2012/3305 provides that IIC holders are exempt from customs duties and VAT on equipment covered by the IIC.[84]  Articles 9 and 10 of Decree No. 2012/3305 detail the requirements of these exemptions.[85]

We find that the benefits under this program constitute a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act in the amount of customs duty and tax savings.  The reduction provides a benefit in the amount of the customs duty and tax savings to the company pursuant to section 771(5)(E) of the Act.  We also find that this program is specific under sections 771(5A)(D)(i) and (iv) of the Act, because, as discussed above, the program is limited to firms making a minimum investment and to firms located in certain geographic regions.[86]

Commerce previously determined in *Welded Line Pipe from Turkey 2015*, that under the IEP, exempted import duties and VAT remain payable to the GOT, with interest, if the exempted company fails its final onsite inspection by the GOT to close out the relevant investment incentive certificate and issue a "completion visa."[87]  Thus, pending a successful close-out of the investment incentive certificate, the company continues to be liable for the exempted duties and VAT.[88]  It is Commerce's practice to treat any balance on an unpaid liability, that may be waived in the future, as a contingent-liability interest-free loan pursuant to 19 CFR 351.505(d)(1). Accordingly, since the unpaid customs duties and VAT under the program are a liability contingent on subsequent events, we regard the unpaid amounts as an interest-free contingent-liability loan.  Accordingly, we find that the amount of interest the respondent would have paid during the POI, had it borrowed the full amount of the duty and VAT exemption at the time of

---

[82] *See* GOT's IQR at Exhibit 7.
[83] *See* Preliminary Analysis Memorandum.
[84] *See* GOT's IQR at Exhibit 7.
[85] *Id.*
[86] *Id.*
[87] *See Welded Line Pipe from the Republic of Turkey:  Final Results of Countervailing Duty Administrative Review; 2015*, 83 FR 34113 (July 19, 2018) (*Welded Line Pipe from Turkey 2015*), and accompanying IDM at 7-11.
[88] *Id.*

importation (or purchase for domestic goods), to constitute the first benefit under the customs duty and VAT exemption program.

Furthermore, we find that a second benefit arises based on the amount of customs duties and VAT forgone by the GOT on the imports and/or domestic purchases covered by an IIC certificate at the time the GOT certifies that the investment requirements have been met and issues a completion visa. Pursuant to 19 CFR 351.505(d)(2), under such circumstances, we treat the total customs duty and VAT exemptions under a given IIC certificate as grants received in the year in which the GOT waived the contingent liability on those exemptions. Additionally, in accordance with 19 CFR 351.524(c)(2)(iii), because the import duty and VAT exemptions under this program are approved for the purchase of capital equipment, and thus tied to the company's capital assets, we are treating the exemptions as a non-recurring benefit as of the date of the receipt of the completion visa from the GOT.

Peker Yüzey reported purchases under this program during the AUL period and during the POI, and accordingly was eligible to be exempted from customs duties and/or VAT on those purchases. The respondent reported purchases pursuant to an IIC not yet completed and pursuant to an IIC completed during the POI. Therefore, the import duty and VAT exemptions received by Peker Yüzey constitute deferrals on the payment of the import duties and VAT during the POI, *i.e.*, contingent liabilities within the meaning of 19 CFR 351.505(d) for all or part of the POI. Therefore, we are calculating a subsidy rate based on the interest otherwise payable on the amounts outstanding during the POI before completion.[89]

Record evidence demonstrates that the time period between exempted purchases under the program and the final waiver of liabilities, in the form of a "completion visa" issued by the GOT, may span a certain number of years.[90] As such, pursuant to 19 CFR 351.505(d)(1), the benchmark for measuring this benefit is a long-term interest rate, because the event upon which repayment of the duties is contingent (*i.e.*, the date of expiration of the time period to satisfy the contingency) occurs at a point in time that is more than one year after the date of purchase or importation of the capital goods. Accordingly, for the benchmark interest rate, we used the long-term interest rate as discussed in the "Benchmarks Interest Rates" section, above. We calculated a daily interest rate based on the long-term benchmark interest rate for the year in which the capital good was imported (or purchased if it was a domestic purchase). We then multiplied the daily rate by the number of days the loan was outstanding during the POI, and by the amount of unpaid customs duties and VAT under Peker Yüzey's investment incentive certificates. We summed these amounts to determine the total benefit from the interest free liability. For certificates completed during the AUL and the POI, we calculated an additional benefit in the amount of the total import duty and VAT waived for the duration of each certificate pursuant to completion. After first performing the "0.5 percent test" of 19 CFR 351.524, we allocated this amount to the POI in accordance with 19 CFR 351.524(d).

To calculate the net countervailable subsidy rate attributable to the respondent, we divided the total POI benefit to Peker Yüzey, determined as discussed above, by the consolidated total sales

---

[89] *See Welded Line Pipe from Turkey 2015* IDM at Comment 1.
[90] See Belenco's SQR2 at Exhibit CVDS-7.

during the POI.  On this basis, we preliminarily find that the respondent received a net countervailable subsidy rate of 1.40 percent *ad valorem* for this program.[91]

3.   Regional Development Subsidies – Exemption of Property Tax

Turkey's Ministry of Finance provides a property tax exemption on buildings.[92]  Peker Yüzey received an exemption from property tax for buildings in OIZs, Free Trade Zones (FTZs), Industry Regions, Technology Development Regions, and industry areas.[93]  Article 4(m) of Property Tax Law No. 1319 establishes that buildings in OIZs, FTZs, Industry Regions, Technology Development Regions, and industry areas are exempted from the property tax permanently as of July 2017.[94]  Commerce found a previous iteration of this program to be countervailable in *Welded Line Pipe from Turkey*.[95]

We preliminarily find that Peker Yüzey benefitted from property tax exemption under section 771(5)(E) in the amount of the property taxes that it did not pay.  We preliminarily find that this program is specific under section 771(5A)(D)(iv) because it is limited to companies located in OIZs, FTZs, Industry Regions, Technology Development Regions, and industry areas.[96]  We preliminarily find that this program constitutes a financial contribution in the form of revenue forgone within the meaning of 771(5)(D)(ii).

To calculate the benefit from the tax relief that Peker Yüzey received under the property tax exemption program, we calculated the total amount of property tax Peker Yüzey would have paid during the POI in the absence of this program.[97]  We divided the amount of the benefit by the respondents' consolidated total sales during the POI.  On this basis, we preliminarily find that the respondent received a net countervailable subsidy rate of 0.01 percent *ad valorem* for this program.[98]

4.   Support for Foreign Market Research

Under the foreign market research program, transportation and accommodation expenses of employees of companies during market research trips abroad are supported partially by the Ministry of Trade.[99]  Seventy percent of the transportation and accommodation expenses of employees of companies are supported up to a maximum amount of 5,000 U.S. dollars per every foreign market research trip.[100]  A maximum of two company employees for up to ten foreign

---

[91] *See* Preliminary Analysis Memorandum.
[92] *See* Belenco's IQR at 51.
[93] *See* Belenco's IQR at 51-52.
[94] *See* GOT's IQR at 74-75 and Exhibit 10.
[95] *See Welded Line Pipe From the Republic of Turkey: Final Affirmative Countervailing Duty Determination*; 80 FR 61371 (October 13, 2015) (*Welded Line Pipe from Turkey*) and accompanying IDM at 24.
[96] *See* Belenco's IQR at 51-52.
[97] *See* Belenco's SQR2 at 13.
[98] *See* Preliminary Analysis Memorandum.
[99] *See* GOT's IQR at 125 and Exhibit 14.
[100] *See* GOT's IQR at 125-126.

market research trips per company are supported each year.[101]  The GOT reported that the
purpose of the program is to support Turkish companies' market research trips abroad.[102]  The
foreign market research program is regulated by the Communique on Market Research and
Market Access Support No. 2011/1 published in March 2011.[103]  Belenco reported vouchers
demonstrating the total amount Belenco and Peker Yüzey received under the Foreign Market
Research Program.[104]

We preliminarily determine that this is a financial contribution in the form of direct transfer of
funds for both Belenco and Peker Yüzey under section 771(5)(D)(i) of the Act because both
Belenco and Peker Yüzey received a benefit under the program that is remitted to the respective
company's account during the POI.[105]  We preliminarily find that both Belenco and Peker Yüzey
benefitted from support from foreign market research under section 771(5)(E) of the Act in the
amount of the transportation and accommodation expenses for company employees during
market research trips abroad that is supported partially by the Ministry of Trade.[106]

Consistent with *Olives from Spain* regarding a similar program,[107] we preliminarily determine
that the program is export specific within the meaning of section 771(5A)(A) and (B) of the Act
because the respondents were reimbursed for expenses incurred for foreign market research,
activities by which companies seek to expand their export sales.[108]

After first performing the "0.5 percent test" of 19 CFR 351.524, for each year in the AUL in
which the respondents received a benefit, we allocated this amount to the POI in accordance with
19 CFR 351.524(d).  To calculate the net countervailable subsidy rate attributable to the
respondents, we divided the total POI benefit to Peker Yüzey by the respondents' consolidated
total sales during the POI.  On this basis, we preliminarily find that the respondent received a net
countervailable subsidy rate of 0.01 percent ad valorem for this program.[109]

   5.  Tax Incentives for Research and Development Activities

The GOT reported research and development (R&D) incentives are available to support R&D
activities (*e.g.*, support for development of technological knowledge and innovation in product
and production processes).[110]  These incentives are based on Law No. 5746, the Law on
Supporting Research, Development and Design Activities, which has been in force since April
2008.[111]  The support elements provided under Law No. 5746 are "R&D and Design

---

[101] *Id.*
[102] *See* GOT's IQR at 125.
[103] *See* Belenco's IQR at 60; *see also* GOT's IQR at 126 and Exhibit 14.
[104] *See* Belenco's SQR2 at 15 and Exhibit CVDS-16.
[105] *See* GOT's IQR at 127-128; *see also* Belenco's IQR at 62.
[106] *See* GOT's IQR at 125-128.
[107] *See Ripe Olives from Spain:  Final Affirmative Countervailing Duty Determination*; 83 FR 28186 (June 18, 2018) (*Olives from Spain*) and accompanying IDM at 14-15.
[108] We intend to issue a supplemental questionnaire requesting further information regarding this program to cure issues with the respondent's and GOT's responses to this program.
[109] *See* Preliminary Analysis Memorandum.
[110] *See* GOT's IQR at 16.
[111] *See* GOT's IQR at 16 and Exhibit 6.

Allowance", "Income Tax Withholding Support", "Insurance Premium Support", and "Stamp Tax Exemption." Peker Yüzey was eligible for the incentives under this program because it was approved as an R&D center on April 17, 2018.[112] A company must apply to be designated as an approved R&D center and be granted an R&D center certificate pursuant to Article 15 of notice number 26953 published July 2008 in the Official Journal.[113] Peker Yüzey received benefits under the R&D and Design Allowance and Insurance Premium Support elements of this program during the POI.[114]

The R&D and Design Allowance program concerns a deduction from taxable income. Peker Yüzey was first eligible to claim this benefit on its 2018 corporate tax return, which was filed in 2019 (*i.e.*, outside of the POI).[115] Peker Yüzey was not eligible for and did not claim this benefit on its 2017 corporate tax return filed during the POI.[116] Consistent with 19 CFR 351.509(b)(1), Commerce preliminarily finds that the R&D and Design Allowance element of this program was not used in the POI.

Under the Insurance Premium Support element of this program, half of the employer's share of insurance premiums for certain R&D personnel is supported by the Ministry of Treasury and Finance.[117] Pursuant to Article 3(3) of Law No. 5746, incentives under the Insurance Premium Support element are available to technology centers, R&D centers, design centers, R&D projects, design projects, pre-competition cooperation projects and techno-initiative capital.[118] Peker Yüzey was eligible for this program during the POI because it was approved by the Ministry of Industry and Technology as an R&D center on April 17, 2018.[119] In order to receive support Peker Yüzey must submit an e-declaration to the Social Security Institution on a monthly basis.[120]

We preliminarily determine that this support constitutes a financial contribution in the form of revenue forgone under section 771(5)(D)(ii) of the Act because of the tax reduction received for R&D center personnel. The reduction provides a benefit in the amount of the tax savings to the company pursuant to section 771(5)(E) of the Act. We preliminarily find that the program is specific according to section 771(5A)(D)(i) of the Act because the number of enterprises access to the program is limited.

To calculate the benefit, we summed the total of the monthly vouchers to the Social Security Institution that the respondents submitted during the POI.[121] We then calculated the net subsidy rate by dividing the POI benefit by the respondents' consolidated sales during the POI. On this

---

[112] *See* Belenco's IQR at 15 and Exhibit CVD-14.
[113] *See* Belenco's IQR at 15 and Exhibit CVD-13.
[114] *See* Belenco's SQR2 at 7.
[115] See Belenco's SQR2 at 5.
[116] *See* Belenco's IQR at Exhibit CVD-6.2.
[117] *See* GOT's IQR at 16.
[118] *See* GOT's IQR at Exhibit 6.
[119] *See* Belenco's SQR2 at 7.
[120] See Belenco's IQR at 76.
[121] *See* Belenco's IQR at Exhibit CVD-38.

basis, we preliminarily find that the respondent received a net countervailable subsidy rate of 0.03 percent *ad valorem* for this program.[122]

## B. Programs Preliminarily Determined To Not Confer a Measurable Benefit During the POI

Belenco and Peker Yüzey reported receiving benefits under various programs, some of which were specifically alleged and some were self-reported.  Based on the record evidence, we preliminarily determine that the benefits from certain programs:  (1) were fully expensed prior and thus not allocable to the POI; or (2) if allocable to the POI, are less than 0.005 percent *ad valorem* in the POI when attributed to the respondent's applicable sales as discussed above in the "Attribution of Subsidies" section above.[123]  Consistent with Commerce's practice, we have not included these programs in our preliminary subsidy rate calculations.

1. Environment Support
2. Insurance Premium Support for Employer's Share Law No. 6545
3. Local Fair Support
4. Patent Support
5. Regional Investment Incentive Scheme – Interest Support
6. Social Security Premium Support Act No. 4857
7. Support for Collective Memberships to E-Business/Commerce Website Program
8. Trademark Registry Support

## C. Programs Preliminarily Found to be Not Countervailable

1. Insurance Premium Support for Employer's Share Law No. 6111

This program was not alleged by the petitioner, but Belenco and Peker Yüzey reported they received benefits under this program in its questionnaire response.[124]  The GOT also provided a response with respect to this program.[125]

According to the GOT, this program was established in March 2011 by Unemployment Insurance Law 4447, which was appended by Law 6111.[126]  The Social Security Institution administers this program.[127]  The purpose of the program is to increase the employment of young people, women and vocational proficiency certificate holders by reducing the amount of insurance premium shares covered by employers.[128]

Based on the information on the record, we preliminarily find that this program is not specific within the meaning of sections 771(5A)(A)-(D) of the Act.  We preliminarily find that the

---

[122] *See* Preliminary Analysis Memorandum.
[123] *Id.*
[124] *See* Belenco's SQR2 at 15-16.
[125] *See* GOT's IQR at 87.
[126] *See* Belenco's SQR2 at 16.
[127] *Id.* at 17.
[128] *Id.* at 16-17.

program is not *de jure* specific to an enterprise or industry, or group(s) thereof, within the meaning of section 771(5A)(D)(i) of the Act.  We further preliminarily find that the program is not *de facto* specific because it is not used by a limited number of enterprises or industries, and that no enterprise or industry, or group(s) thereof, is a preponderant user or a disproportionate beneficiary of the premium support program within the meaning of section 771(5A)(D)(iii) of the Act.[129]  Finally, we also preliminarily find that this program is not limited to enterprises located in designated geographic regions and, thus, not specific under section 771(5A)(D)(iv) of the Act.  As a result, we preliminarily find that this program is not countervailable during the POI.

    2.  <u>Insurance Premium Support for Employer's Share Law No. 7103</u>

This program was not alleged by the petitioner, but Belenco and Peker Yüzey received benefits under this program in its questionnaire response.[130]  The GOT also provided a response with respect to this program.[131]

According to the GOT, this program was established in March 2018 under Law No. 7103 as a provision added to Law 4447; under Turkish law, the program took effect on January 1, 2018.[132]  The Social Security Institution of the GOT administers this program.[133]  The purpose of this program is to support all companies that hire new employees who were previously unemployed by reducing the cost of the insurance premiums paid by employers.[134]

We preliminarily find, based on the record information, that the program is not specific within the meaning of sections 771(5A)(A)-(C) of the Act.  We preliminarily find that the program is not *de jure* specific to an enterprise or industry, or group(s) thereof, within the meaning of section 771(5A)(D)(i) of the Act.  We further preliminarily find that the program is not *de facto* specific because it not is used by a limited number of enterprises or industries, and that no enterprise or industry, or group(s) thereof, is a preponderant user or a disproportionate beneficiary of the premium support program within the meaning of section 771(5A)(D)(iii) of the Act.[135]  Finally, we also preliminarily find that this program is not limited to enterprises located in designated geographic regions and, thus, not specific under section 771(5A)(D)(iv) of the Act.  As a result, we preliminarily find that this program is not countervailable during the POI.

    3.  <u>Social Security Premium Support Act No. 5510</u>

Belenco self-reported that, according to "Social Security and General Health Insurance Law" No. 5510, employers may deduct five percent of their share of social security payments, provided that they file all of their Social Security documents and pay all of their Social Security premiums

---

[129] *See* GOT's IQR at 96-99.
[130] *See* Belenco's IQR at 86-89.
[131] *See* GOT's IQR at 101-113.
[132] *Id.* at 102.
[133] *Id.*
[134] *Id.* at 101.
[135] *Id.* at 108-112.

on a timely basis and they have no debt or other outstanding obligations to the Social Security Administration.[136]

In *Pasta from Turkey 2014 AR* and *Pipe and Tube from Turkey 2011 AR*, Commerce found that this program is not countervailable because the eligibility criteria under the program do not give rise to a specific subsidy under section 771(5A) of the Act.[137]  We preliminarily find, based on the record information, that the program is not specific within the meaning of sections 771(5A)(A)-(C) of the Act.  We also preliminarily find that the program is not *de jure* specific to an enterprise or industry, or group(s) thereof, within the meaning of section 771(5A)(D)(i) of the Act.  We further preliminarily find that the program is not *de facto* specific because it is not used by a limited number of enterprises or industries, and that no enterprise or industry, or group(s) thereof, is a preponderant user or a disproportionate beneficiary of the premium support program within the meaning of section 771(5A)(D)(iii) of the Act.[138]  Finally, we also preliminarily find that this program is not limited to enterprises located in designated geographic regions and, thus, not specific under section 771(5A)(D)(iv) of the Act.  As a result, we preliminarily find that this program is not countervailable during the POI.

## D.  Programs Preliminarily Determined To Be Not Used

We preliminarily determine that respondents did not apply for or receive benefits during the POI under the following programs:

- Credit Program for Participating to Overseas Trade Fairs
- Deductions from Taxable Income for Export Revenue
- Export Buyer's Credits[139]
- Export-Oriented Business Investment Loan
- Foreign Trade Companies Short-Term Export Credits Program
- General Investment Incentive Scheme
- Investment Credit for Export
- Post Shipment Rediscount Credit Program
- Pre-Export Credit Program
- R&D Grants

---

[136] *See* Belenco's IQR at 78-79.

[137] *See Pasta from Turkey:  Preliminary Results of Countervailing Duty Administrative Review; 2014*, 81 FR 52825 (August 10, 2016), and accompanying Preliminary Decision Memorandum at 8, unchanged in *Pasta from Turkey: Final Results of Countervailing Duty Administrative Review; 2014*, 81 FR 90775 (December 15, 2016) (*Pasta from Turkey 2014 AR*); *see also Circular Welded Carbon Steel Pipes and Tubes from Turkey:  Notice of Court Decision Not in Harmony With Final Results of Countervailing Duty Administrative Review and Notice of Amended Final Results of Countervailing Duty Administrative Review; 2011*, 80 FR 43709 (July 23, 2015), amending *Circular Welded Carbon Steel Pipes and Tubes from Turkey:  Final Results of Countervailing Duty Administrative Review; Calendar Year 2011*, 78 FR 64916 (October 30, 2013) (*Pipe and Tube from Turkey 2011 AR*), and accompanying IDM at 19-20.

[138] *See* GOT's SQR at 10-14.

[139] Although we preliminarily determine that the respondents did not use this program, we intend to issue a supplemental questionnaire to the GOT requesting further information regarding this program, and will evaluate the countervailability of this program for our final determination, if it is found to provide measurable benefits.

- Rediscount Credit Program (Pre-Shipment Export Credit Program)
- Regional Development Subsidies - Exemption of Income Tax on Wages and Salaries
- Regional Development Subsidies - Provision of Land for LTAR
- Regional Investment Incentive Scheme - Income Tax Withholding
- Regional Investment Incentive Scheme - VAT Refund
- Specific Export Credit Program

## XI.    DISCLOSURE AND PUBLIC COMMENT

Commerce intends to disclose to interested parties the calculations performed in connection with this preliminary determination within five days of its public announcement.[140]  Case briefs may be submitted to Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS) no later than seven days after the date on which the last verification report is issued in this proceeding and rebuttal briefs, limited to issues raised in the case briefs, may be submitted no later than five days after the deadline for case briefs.[141]

Parties who submit case briefs or rebuttal briefs in this proceeding are encouraged to submit with each argument:  (1) a statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[142]  This summary should be limited to five pages total, including footnotes. Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, filed electronically using ACCESS.  An electronically filed document must be received successfully in its entirety by Commerce's electronic records system, ACCESS, by 5:00 p.m. Eastern Time, within 30 days after the date of publication of this notice.[143]  Hearing requests should contain the party's name, address, and telephone number, the number of participants, and a list of the issues parties intend to present at the hearing.  If a request for a hearing is made, Commerce intends to hold the hearing at the U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230, at a time and location to be determined. Prior to the date of the hearing, Commerce will contact all parties that submitted case or rebuttal briefs to determine if they wish to participate in the hearing.  Commerce will then distribute a hearing schedule to the parties prior to the hearing and only those parties listed on the schedule may present issues raised in their briefs.

Parties must file their case and rebuttal briefs, and any requests for a hearing, electronically using ACCESS.[144]  Electronically filed documents must be received successfully in their entirety by 5:00 p.m. Eastern Time,[145] on the due dates established above.

---

[140] *See* 19 CFR 351.224(b).
[141] *See* 19 CFR 351.309(c)(1)(i) and (d)(1).
[142] *See* 19 CFR 351.309(c)(2) and (d)(2).
[143] *See* 19 CFR 351.310(c).
[144] *See* 19 CFR 351.303(b)(2)(i).
[145] *See* 19 CFR 351.303(b)(1).

## XII.   CONCLUSION

We recommend that you approve the preliminary findings described above.

☒                                    ☐
_____                            _____
Agree                                Disagree

                                     10/7/2019

X  _~~~signature~~~_____
_____

Signed by: JEFFREY KESSLER
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

Attachment 9

Certain Quartz Surface Products From the Republic of
Turkey: Final Affirmative Countervailing Duty
Determination and Final Affirmative Determination of
Critical Circumstances, In Part, 85 Fed. Reg. 25,400
(Dep't Commerce May 1, 2020).

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

C-489-838
Investigation
POI: 01/01/2018 – 12/31/2018
**Public Document**
E&C/OIII: SB/PZ

April 27, 2020

**MEMORANDUM TO:**     Jeffrey I. Kessler
Assistant Secretary
 for Enforcement and Compliance

**FROM:**     James Maeder
Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

**SUBJECT:**     Issues and Decision Memorandum for the Final Determination in
the Countervailing Duty Investigation of Certain Quartz Surface
Products from Turkey

---

## I.     SUMMARY

The Department of Commerce (Commerce) determines that countervailable subsidies are being
provided to producers and exporters of certain quartz surface products (quartz surface products)
from the Republic of Turkey (Turkey), as provided in section 705 of the Tariff Act of 1930, as
amended (the Act). The petitioner is Cambria Company LLC. The mandatory respondent
subject to this investigation is Belenco Diş Ticaret A.Ş. (Belenco).[1] The period of investigation
(POI) is January 1, 2018 through December 31, 2018.

Below is the complete list of issues in this investigation for which we received comments from
interested parties:

Comment 1:     Whether Commerce Should Apply Adverse Facts Available (AFA) to the Local
Fair Support Program
Comment 2:     Whether Commerce Should Countervail the Value-Added Tax (VAT) Exemption
Granted Under the Regional Investment Incentive Scheme (RIIS)

---

[1] In the *Preliminary Determination*, we determined that Belenco was cross-owned with its parent company Peker
Yüzey Tasarıları Sanayi ve Tic. A.Ş. (Peker Yüzey). No party commented on this cross-ownership determination
for this final determination. *See Certain Quartz Surface Products from the Republic of Turkey: Preliminary
Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and
Alignment of Final Determination with Final Antidumping Duty Determination*, 84 FR 54841 (October 11, 2019)
(*Preliminary Determination*) and accompanying Preliminary Decision Memorandum (PDM).



## II.    BACKGROUND

On October 11, 2019, Commerce published the *Preliminary Determination* in this investigation.[2] Between December 9 and 12, 2019, we conducted verification of the questionnaire responses submitted by Belenco.[3]  Between December 16 and 18, 2019, we conducted verification of the questionnaire responses submitted by the Government of Turkey (GOT).[4]  Interested parties submitted case briefs on January 30, 2020,[5] and rebuttal briefs on February 4, 2020.[6]

## III.    SCOPE COMMENTS

During the course of this investigation, Commerce received scope comments from interested parties.  We issued a Preliminary Scope Memorandum to address these comments and set aside a period of time for parties to address scope issues in case and rebuttal briefs.[7]  We did not receive scope case briefs from interested parties.  Thus, for this final determination, we have made no changes to the scope of this investigation, as published in the *Preliminary Determination*.

## IV.    SCOPE OF THE INVESTIGATION

The products covered by this investigation are quartz surface products.  For a complete description of the scope of this investigation, *see* the accompanying *Federal Register* notice at Appendix I.

## V.    FINAL DETERMINATION OF CRITICAL CIRCUMSTANCES

Commerce preliminarily determined that critical circumstances exist with respect to all companies.[8]  No parties submitted comments regarding our preliminary critical circumstances determination.  Consistent with Commerce's practice, for the final determination, we have updated the base and comparison periods to account for the quantity and value data that Belenco reported following the *Preliminary Determination*.[9]  It is Commerce's practice to base the

---

[2] *See Preliminary Determination*.

[3] *See* Memorandum, "Verification of the Questionnaire Responses of Belenco Diş Ticaret A Ş.," dated January 23, 2020 (Belenco Verification Report).

[4] *See* Memorandum, "Verification of the Questionnaire Responses of the Republic of Turkey," dated January 23, 2020 (GOT Verification Report).

[5] *See* Petitioner's Letter, "Certain Quartz Surface Products from Turkey:  Submission of Administrative Case Brief," dated January 30, 2020 (Petitioner's Case Brief); *see also* Belenco's Letter, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Belenco's Case Brief," dated January 30, 2020 (Belenco's Case Brief).

[6] *See* Petitioner's Letter, "Certain Quartz Surface Products from Turkey:  Submission of Administrative Rebuttal Brief," dated February 4, 2020 (Petitioner's Rebuttal Brief); *see also* Belenco's Letter, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey:  Belenco's Rebuttal Brief," dated February 4, 2020 (Belenco's Rebuttal Brief).

[7] *See* Memorandum, "Certain Quartz Surface Products from India and Turkey:  Preliminary Scope Decision Memorandum," dated December 4, 2019 (Preliminary Scope Memorandum).

[8] *See* PDM at 5-7.

[9] *See, e.g.*, *Certain Steel Wheels 12 to 16.5 Inches in Diameter from the People's Republic of China:  Final*

critical circumstances analysis on all available data, and to limit the comparison period by the month that Commerce began suspension of liquidation resulting from an affirmative preliminary determination.[10]  Accordingly, we are continuing to define base and comparison periods within the bounds of our normal practice by extending the comparison period up through the month of the *Preliminary Determination*.  For this final determination, we are comparing shipments over a period beginning in May 2019 through September 2019, with the period December 2018, through April 2019.[11]  We have not included the month of the *Preliminary Determination* (*i.e.*, October 2019) because the *Preliminary Determination* was published in the first half of the month (*i.e.*, on October 11, 2019).  As such, including data from that month would be distortive in the critical circumstances analyses because it would reflect the impact of the preliminary cash deposits collected on shipments during the greater part of that month.[12]

As we explained in the *Preliminary Determination*, as part of the critical circumstances analysis under section 703(e)(1)(B) and 19 CFR 351.206(i) Commerce must determine whether there are "massive imports" over a "relatively short period."[13]  Commerce's regulations provide that, generally, imports must increase by at least 15 percent during the "comparison period" to be considered "massive."[14]  As a result of the updates discussed above, we determine that critical circumstances do not exist for Belenco because imports during the comparison period increased less than 15 percent when compared to the base period and, therefore, are not massive.[15]  Moreover, we continue to determine that critical circumstances continue to exist with respect to all-other companies.[16]

# VI.    SUBSIDIES VALUATION INFORMATION

## A.    Allocation Period

We made no changes to, and interested parties raised no issues in their case briefs regarding, the allocation methodology used in the *Preliminary Determination*.  For a description of the allocation period and the methodology used for this final determination, *see* the *Preliminary Determination*.[17]

## B.    Attribution of Subsidies

We made no changes to, and interested parties raised no issues in their case briefs regarding, the

---

*Affirmative Countervailing Duty Determination, and Final Affirmative Determination of Critical Circumstances*, 84 FR 32723 (July 9, 2019) and accompanying Issues and Decision Memorandum (IDM) at 6-7.
[10] *Id.*
[11] *See* Memorandum, "Monthly Shipment Quantity and Value Analysis for Critical Circumstances," dated concurrently with this memorandum (Critical Circumstances Memorandum).
[12] *See, e.g.*, *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 FR 31966 (June 5, 2008) and accompanying IDM at Comment 11.
[13] *See* PDM at 6.
[14] *Id.*
[15] *See* Critical Circumstances Memorandum.
[16] *Id*.
[17] *See* PDM at 7-8.

methodology underlying our attribution of subsidies in the *Preliminary Determination*. For a description of the methodology used for this final determination, *see* the *Preliminary Determination*.[18]

## C.  Denominators

We made no changes to, and interested parties raised no issues in their case briefs regarding the denominators used in the *Preliminary Determination*. For a description of the methodology used for this final determination, *see* the *Preliminary Determination*.[19]

## D.  Benchmarks and Interest Rates

We made no changes to, and interested parties raised no issues in their case briefs regarding the benchmarks we used in the *Preliminary Determination*. For a description of the methodology used for this final determination, *see* the *Preliminary Determination*.[20]

## VII.  ANALYSIS OF PROGRAMS

## A.  Programs Determined to Be Countervailable

### 1.  Foreign Fair Support

At the verification of the GOT's responses, we confirmed that a portion of the funds received in 2013 by Peker Yüzey that were assigned to the Foreign Fair Support program during the *Preliminary Determination* were actually disbursed under the Trademark Registry Support Program.[21] Accordingly, for the final determination, we reduced the amount of approval for Foreign Fair Support for 2013 and assigned the corresponding amount to the Trademark Registry Support program.[22] While we revised the amount of approval in the calculation for 2013, we made no changes to our methodology for calculating a subsidy rate for Peker Yüzey under this program.[23]

Belenco/Peker Yüzey:  0.01 percent *ad valorem*.

---

[18] *Id.* at 8-9.
[19] *Id.* at 9.
[20] *Id.* at 9-10.
[21] *See* GOT Verification Report at 2-3.
[22] *See* Memorandum, "Analysis and Calculations for the Final Countervailing Duty Determination," dated concurrently with this memorandum (Final Calculation Memorandum).
[23] *See* PDM at 10-11.

      2.        <u>RIIS - Social Security Support</u>

No parties submitted comments regarding this program.  Commerce has not modified its calculation of the subsidy rate for this program from the *Preliminary Determination*.[24]

Belenco/Peker Yüzey:  0.08 percent *ad valorem*.

      3.        <u>RIIS – Tax Reduction</u>

No parties submitted comments regarding this program.  Commerce has not modified its calculation of the subsidy rate for this program from the *Preliminary Determination*.[25]

Belenco/Peker Yüzey:  2.27 percent *ad valorem*.

      4.        <u>Regional Development Subsidies – Exemption of Property Tax</u>

No parties submitted comments regarding this program.  Commerce has not modified its calculation of the subsidy rate for this program from the *Preliminary Determination*.[26]

Belenco/Peker Yüzey:  0.01 percent *ad valorem*.

      5.        <u>Support for Foreign Market Research</u>

No parties submitted comments regarding this program.  Commerce has not modified its calculation of the subsidy rate for this program from the *Preliminary Determination*.[27]

Belenco/Peker Yüzey:  0.01 percent *ad valorem*.

      6.        <u>Tax Incentives for Research and Development Activities</u>

No parties submitted comments regarding this program.  Commerce has not modified its calculation of the subsidy rate for this program from the *Preliminary Determination*.[28]

Belenco/Peker Yüzey:  0.03 percent *ad valorem*.

      7.        <u>Local Fair Support</u>

In the *Preliminary Determination*, Commerce found that the local fair support program did not confer a measurable benefit during the POI and, therefore, it was not necessary to make a

---

[24] *Id.* at 12-13.
[25] *Id.* at 13-14.
[26] *Id.* at 16.
[27] *Id.* at 16-17.
[28] *Id.* at 17-19.

determination on financial contribution or specificity.[29]  Interested parties submitted comments in their case and rebuttal briefs regarding this program, which are discussed in Comment 1.

Under the local fair support program, companies that participate in industry-specific international domestic exhibitions receive support from the Ministry of Economy.[30]  The local fair support program is regulated by the Decree on Supporting Sectoral International Domestic Fairs (No. 2014/4) published in August 2014.[31]  Decree No. 2014/4 indicates that the decree is based on The Government Decree on Subsidies for Export.[32]  Support is provided for fairs that the Ministry of Economy's General Directorate of Export approves per the export strategies and economic preferences of the Directorate and meet the requirements laid out in Decree No. 2014/4.[33]  Fifty percent of the expenses relating to participation in the Ministry approved fairs are supported up to a maximum amount of 30,000 Turkish lira per exhibition.[34]  Belenco reported, and the GOT confirmed, that Peker Yüzey received an amount in the average useful life period (AUL).  As discussed below in Comment 1, at verification, Commerce discovered an additional amount relating to this program that Peker Yüzey received in the POI.

We determine that these payments are financial contributions in the form of direct transfer of funds to Peker Yüzey under section 771(5)(D)(i) of the Act, because Peker Yüzey received a benefit under the program that is remitted to the company's account during the AUL and POI.[35]  We find that Peker Yüzey benefitted from support from local fair support under section 771(5)(E) of the Act in the amount of the expenses for participation in the fairs that were supported by the Ministry of Economy.[36]

We determine that this program is export specific within the meaning of sections 771(5A)(A) and (B) of the Act because Peker Yüzey was reimbursed for expenses incurred for participation in international domestic fairs, an activity by which companies seek to expand their export sales.[37]

---

[29] *Id.* at 19.
[30] *See* Belenco's Letter, "Countervailing Duty Investigation of Certain Quartz Surface Products from the Republic of Turkey: Initial Questionnaire," dated August 12, 2019 (Belenco's IQR) at 54-57 and Exhibit CVD-27.
[31] *Id.* at Exhibit CVD-27.
[32] *Id.*
[33] *Id.*
[34] *Id.* at 55 and Exhibit CVD-27.
[35] *See* Belenco Verification Report at 12-13 and Verification Exhibit (VE)-15 at 7.
[36] *Id.*
[37] We note that in *Olives from Spain,* we made a similar finding on a similar program.  *See Ripe Olives from Spain: Final Affirmative Countervailing Duty Determination*, 83 FR 28186 (June 18,2018) and accompanying IDM at 14-15.

After first performing the "0.5 percent test" provided for in 19 CFR 351.524, for each year in the AUL and POI in which Peker Yüzey received a benefit, we allocated this amount to the POI, in accordance with 19 CFR 351.524(d).  To calculate the net countervailable subsidy rate attributable to the respondents, we divided the total POI benefit to Peker Yüzey by the respondents' consolidated export sales during the POI.  We have calculated a rate of 0.02 percent *ad valorem* for this final determination.[38]

Belenco/Peker Yüzey:  0.02 percent *ad valorem*.

## B.      Programs Determined Not to Confer A Measurable Benefit

Unless otherwise noted below, we made no changes to the *Preliminary Determination* with respect to the measurability of the following programs.

1.      Environment Support
2.      Insurance Premium Support for Employer's Share Law No. 6545
3.      Patent Support
4.      RIIS – Interest Support
5.      RIIS – VAT and Customs Duty Exemption[39]
6.      Social Security Premium Support Act No. 4857
7.      Support for Collective Memberships to E-Business/Commerce Website Program
8.      Trademark Registry Support[40]

## C.      Programs Found to be Not Countervailable

We did not receive comments and made no changes to the *Preliminary Determination* with respect to the non-countervailability of the programs listed below.

1.      Insurance Premium Support for Employer's Share Law No. 6111
2.      Insurance Premium Support for Employer's Share Law No 7103
3.      Social Security Premium Support Act No. 5510

## D.      Programs Determined Not to Be Used

Commerce has made no changes in the analysis of the following programs from the *Preliminary Determination*.  Commerce received no comments from interested parties on these programs.

1.      Credit Program for Participating to Overseas Trade Fairs
2.      Deductions from Taxable Income for Export Revenue

---

[38] *See* Final Calculation Memorandum.

[39] Interested parties submitted comments in their case and rebuttal briefs regarding this program, which are discussed in Comment 2.  As a result, we have determined that this program did not confer a measurable benefit during the POI.

[40] As described above, at the GOT verification, we confirmed that the GOT disbursed an amount to Peker Yüzey under this program in 2013.  Accordingly, we performed our standard calculation methodology on this amount and continue to determine that the respondents did not receive a measurable benefit under this program during POI.  *See* Final Calculation Memorandum.

3.      Export Buyer's Credits
4.      Export-Oriented Business Investment Loan
5.      Foreign Trade Companies Short-Term Export Credits Program
6.      General Investment Incentive Scheme
7.      Investment Credit for Export
8.      Post Shipment Rediscount Credit Program
9.      Pre-Export Credit Program
10.     R&D Grants
11.     Rediscount Credit Program (Pre-Shipment Export Credit Program)
12.     Regional Development Subsidies – Exemption of Income Tax on Wages and Salaries
13.     Regional Development Subsidies – Provision of Land for LTAR
14.     RIIS – Income Tax Withholding
15.     RIIS – VAT Refund
16.     Specific Export Credit Program

## VIII.   ANALYSIS OF COMMENTS

## Comment 1:   Whether Commerce Should Apply AFA to the Local Fair Support Program

*Petitioner's Case Brief*[41]
- In accordance with its practice when it discovers additional financial contributions through the verification process,[42] Commerce should apply AFA for this program.
- Since there is no other respondent and it does not appear that Commerce has previously countervailed this program, Commerce should use AFA and apply the highest non-*de minimis* rate for a grant program involving Turkey.

*Belenco's Rebuttal Brief*[43]
- Application of AFA is unwarranted.  The reporting error found at verification was insignificant and not systemic.
  - The amount of the support discovered at verification would be *de minimis*.
  - There is no need for AFA, since the data needed to correct the error are on the record and verified.
- If Commerce were to apply AFA, it should not use the grant program suggested by the petitioner because:  (1) the rate of that program is disproportionate to the nature of the error at issue; and (2) the proposed grant program is not similar to the program at issue.
  - The grant program suggested by the petitioner was a grant relating to agricultural exports.
  - Instead, if Commerce decides to apply AFA, Commerce should use a proxy grant

---

[41] *See* Petitioner's Case Brief at 1-4.
[42] *See* Petitioner's Case Brief at 1-4, citing to *Certain Oil Country Tubular Goods from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Negative Critical Circumstances Determination*, 74 FR 64045 (December 7, 2009) (*OCTG from China*) and accompanying IDM at 6; and *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination*, 82 FR 23188 (May 22, 2017) (*Rebar from Turkey*) and accompanying IDM at Comment 5.
[43] *See* Belenco's Rebuttal Brief at 1-5.

program for reimbursement of attorney fees.

**Commerce's Position:**  As an initial matter, we agree with the petitioner that an additional benefit was discovered at verification.  Belenco acknowledged that a reporting error was made and that Belenco did not report the entire amount of the benefit Peker Yüzey received under the program accurately prior to verification.

However, after evaluating the record of this proceeding, we disagree with the petitioner that AFA is warranted.  Sections 776(a)(1) and (2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person:  (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Section 776(b) of the Act further provides that Commerce may use an adverse inference in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.

The prerequisites for applying facts available under section 776 of the Act are not present in this case.  In its questionnaire responses, Belenco reported that Peker Yüzey received benefits under the Local Fair Support program, including the amount of the benefit.[44]  At Belenco's verification, Commerce discovered an error, one instance of an unreported receipt of funds in a relatively small amount for Peker Yüzey, in Belenco's reporting relating to the Local Fair Support program.  Moreover, the amount of the funds that Peker Yüzey received, but initially did not report, is on the record.[45]  The record contains the necessary information to assess all the benefits conferred under this program.[46]  Accordingly, Commerce performed its standard grant calculation for this program.

In *Welded Line Pipe from Korea*, Commerce similarly determined that AFA was not warranted despite the discovery of previously unreported grants at verification because the amount of assistance was on the record and there was no lack of necessary information with which to assess the grants.[47]  In this investigation, likewise, the amount of assistance is on the record and, as detailed below, we have all the necessary information with which to assess the grants.  As a result, we have performed our standard grant calculation using the actual amount of benefit that is on the record.

The petitioner argues that it is Commerce's practice to apply AFA when it discovers additional

---

[44] *See* Belenco IQR at 54-57.
[45] *See* Belenco Verification Report at 12-13 and VE-15 at 7.
[46] *See Welded Line Pipe from the Republic of Korea:  Final Negative Countervailing Duty Determination*, 80 FR 61365 (October 13, 2015) (*Welded Line Pipe from Korea*) and accompanying IDM at Comment 2.
[47] *See Welded Line Pipe from Korea* IDM at Comment 2.

9

financial contributions through the verification process, citing to *OCTG from China*[48] and *Rebar from Turkey*.[49]  We disagree.  Application of AFA is a fact intensive inquiry that is specific to the facts of each proceeding.  The record in this investigation differs from the records in those investigations because, in this investigation, the record contains the amount of support received under the program and the necessary information required to assess the grants.  That was not the case in either *OCTG from China* or *Rebar from Turkey*.  In *OCTG from China*, Commerce determined that it "did not have a full understanding of the loans provided to these companies and was unable to request further information, if necessary, to fully evaluate the loans in question."[50]  In contrast, the instant record contains all payments that the respondent received under this program and all necessary information required to assess the countervailability of the program.  In *Rebar from Turkey*, the subsidy discovered at verification was for a previously unreported program,[51] while in this investigation, the support discovered at verification relates to a program which Belenco reported before verification and under which the company had attempted to provide timely responses.  Based on Belenco's responses before verification, Commerce was able to assess information about the countervailability of the program, including financial contribution and specificity, and had the opportunity to collect further information, if necessary.  More importantly, the record contains all necessary information for making our determination, and Commerce was able to verify the entirety of the accounting information regarding this program.  Thus, after evaluating the record of this proceeding and the totality of circumstances surrounding this program and Belenco's reporting, application of AFA is not warranted.

**Comment 2:  Whether Commerce Should Countervail the VAT Exemption Granted Under the RIIS**

*Belenco's Case Brief*[52]
- Substantial record evidence demonstrates that the VAT exemption under the RIIS does not constitute a financial contribution or confer a benefit on Belenco.  The VAT exemption is an offset of the company's VAT payable and receivable balance.
- Verification revealed that the VAT paid for domestically purchased or imported machinery (*i.e.*, normal purchases not under the RIIS program) can be offset in the same month or in the coming months depending on the company's VAT balance, while companies that receive a VAT exemption through the RIIS can claim an exemption when the machinery and equipment is domestically purchased or imported.
- In either scenario, the company does not pay the VAT – it is either exempted (under the RIIS) or used as an offset (purchases not made under the RIIS) and, thus, there is no financial contribution because there is no revenue forgone.
- Program participants are not better off than any other company which purchases machinery and equipment without participating under the RIIS and, therefore, the program is not specific in conferring its benefit.

---

[48] *See OCTG from China* IDM at 6.
[49] See *Rebar from Turkey* IDM at Comment 5.
[50] *See OCTG from China* IDM at 6.
[51] *See Rebar from Turkey* IDM at Comment 5.
[52] *See* Belenco's Case Brief at 2-6.

- If Commerce continues to find the RIIS VAT exemption to be countervailable, Commerce should revise its calculation by not double-counting the benefit as both an interest-free contingent loan and a grant to the extent that the liability is waived.

*Petitioner's Rebuttal Brief*[53]

- Commerce should continue to countervail the program and Belenco's VAT savings as it did in the *Preliminary Determination*, because the exemptions confer a benefit in the form of revenue foregone or not collected. Belenco's argument ignores that the exemptions it receives under the program reduce the company's VAT liabilities, regardless of how the company may satisfy those liabilities. Thus, the program results in a financial contribution in the form of revenue forgone or not collected because the company's overall VAT liability is decreased.
- Commerce should continue to find that benefits exist both in the amount of revenue forgone or not collected and interest-free loans during the period the period of contingent liability.
  - There is no merit to Belenco's argument that Commerce should not consider the RIIS program to confer a secondary benefit in the form of an interest-free loan during the time between the purchase and when final VAT and/or customs liability is resolved.
  - Belenco's argument ignores that the VAT or customs liability remains a contingent liability until the time at which government finally determines that the conditions precedent have been satisfied and the liability is definitively resolved. Consequently, any unpaid tax is akin to an interest-free loan during the period between the equipment purchase and final resolution of tax liability.

**Commerce's Position**: In the *Preliminary Determination*, Commerce found the RIIS – VAT and Customs Duty Exemption program to be countervailable.[54] In light of information obtained at verification and the parties' arguments, Commerce has determined that the VAT portion of the RIIS – VAT and Customs Duty Exemption program does not provide a benefit under 19 CFR 350.510(a). Because the respondents did not utilize the customs duty exemption portion of program during the AUL, we find that the program did not confer a measurable benefit on the respondents during the POI.

Under 19 CFR 351.510(a), for the exemption of indirect taxes, a benefit "exists to the extent that the taxes paid by a firm as a result of the program are less than the taxes the firm would have paid in the absence of the program." As we have explained in *Shrimp from Thailand*, a VAT exemption does not provide a benefit under a normal VAT system:

> Under a normal VAT system, a producer pays input VAT on its purchases from suppliers and collects output VAT on its sales to customers. The producer merely conveys the tax forward and the ultimate tax burden is borne by the final (non-producing) consumer. This is achieved through a reconciliation mechanism in which the input VAT paid is offset against the output VAT collected. Any excess output VAT is remitted by the producer to the government. Any excess input

---

[53] *See* Petitioner's Rebuttal Brief at 2-5.
[54] *See* PDM at 14-16.

VAT is refunded back to the producer by the government or credited to the producer to offset against future input VAT, as the case may be.  Under this mechanism, the producer ultimately keeps no surplus output VAT and pays no excess input VAT.  Thus, the net VAT incidence to the producer is ultimately zero, with the actual VAT burden conveyed forward to the final, non-producing consumer.

…19 CFR 351.510(a)(1) governs the identification and measurement of any benefit that might arise from an indirect tax such as a VAT, under a program other than an export program.  Section 351.510(a)(1) states that a benefit exists under a remission or exemption of taxes "to the extent that the taxes or import charges paid by a firm as a result of the program are less than the taxes the firm would have paid in the absence of the program."  As indicated in the plain text of the regulation…section 351.510(a) makes no distinction between a remission of the tax and an exemption of the tax and therefore does not require the Department to apply different means by which to identify and measure benefits that arise from a VAT refund compared to a VAT exemption.  Instead, section 351.510(a) directs the Department to determine a benefit by assessing whether the producer pays less under the refund or exemption program than it would normally pay without the program.

In the normal reconciliation mechanism for VAT, in which input VAT is offset against output VAT, there is no benefit within the meaning of section 351.510(a), because the net VAT incidence to the producer is ultimately zero both under the program and in the absence of the program.  This holds true whether the program involves a refund as part of the reconciliation mechanism or an exemption that obviates the need for a reconciliation in the first place.  In other words, section 351.510(a) recognizes no distinction between the producer getting a refund instead of an exemption and the producer getting an exemption instead of a refund. [55]

We verified at Belenco that, absent the VAT exemption, Belenco ultimately pays no VAT.[56] According to the verification report, VAT paid by Belenco for domestically purchased or imported machinery (*i.e.*, normal purchases not under the RIIS program) is offset in the same month or in the coming months.[57]  The record evidence supports a finding that this is a normal VAT system, which under our practice does not confer a benefit.  Thus, in accordance with 19 CFR 351.510(a), we determine that the VAT exemption portion of this program confers no benefit.

Notwithstanding the determinations relating to the VAT portion of the RIIS – VAT and Customs Duty Exemption program above, we have not changed our determination that the customs duty exemption non-VAT portion of this program remains countervailable.  However, since the

---

[55] *See Certain Frozen Warmwater Shrimp from Thailand:  Final Negative Countervailing Duty Determination*, 78 FR 50379 (August 19, 2013) (*Shrimp from Thailand*) and accompanying IDM at Comment 9.
[56] *See* Belenco Verification Report at 10 and VE-12.
[57] *Id.*

respondents did not receive a customs duty exemption during the AUL, we determine that the program did not confer a measurable benefit on the respondents during the POI.

As Commerce noted in the *Preliminary Determination*, the RIIS – VAT and Customs Duty Exemption program appears to be similar to another program that we previously found to be countervailable in previous proceedings involving Turkey – the Investment Encouragement Program (IEP):  Customs Duty and VAT Exemption program.[58]  Our findings in this instant investigation have no bearing on our previous determinations regarding the IEP – Customs Duty and VAT Exemption program.  In the next Turkey proceeding, we will gather facts about the operations of the relevant VAT system and make appropriate determinations based on the facts of the proceeding.

## IX.   RECOMMENDATION

We recommend approving all of the above positions.  If these positions are accepted, we will publish the final determination in the *Federal Register* and will notify the U.S. International Trade Commission of our determination.

☒                              ☐

_____        _____
Agree                          Disagree

4/27/2020

X  _____

Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
    for Enforcement and Compliance

---

[58] *See* PDM at 14-16.

Attachment 10

**Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2017, 85 Fed. Reg. 64,122 (Dep't Commerce Oct. 9, 2020).**

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

C-580-884
Administrative Review
POR:  1/1/2017  – 12/31/2017
**Public Document**
E&C/V:  EH

September 28, 2020

**MEMORANDUM TO:**       Jeffrey I. Kessler
                                        Assistant Secretary
                                         for Enforcement and Compliance

**FROM:**                           James Maeder
                                        Deputy Assistant Secretary
                                         for Antidumping and Countervailing Duty Operations

**SUBJECT:**                     Issues and Decision Memorandum for the Final Results of the
                                        Administrative Review of the Countervailing Duty Order on
                                        Certain Hot-Rolled Steel Flat Products from the Republic of
                                        Korea; 2017

---

## I.       SUMMARY

There is one respondent in the administrative review of the countervailing duty (CVD) order on
certain hot-rolled steel flat products (hot-rolled steel) from the Republic of Korea (Korea)
covering the period of review (POR) January 1, 2017 through December 31, 2017:  Hyundai
Steel Co., Ltd. (Hyundai Steel).  For these final results, we analyzed the case and rebuttal briefs
submitted by interested parties in this administrative review.  As a result of our analysis, we have
made changes to the *Preliminary Results.*[1]  We recommend that you approve the positions
described in the "Discussion of Comments" section of this memorandum.

Below is a complete list of the issues for which we received comments from interested parties in
this review:

Comment 1:    Whether the Electricity for Less Than Adequate Remuneration (LTAR) Upstream
                        Subsidy Allegation Confers a Benefit
Comment 2:    Whether the Subsidy Rate for Industrial Technology Innovation Promotion Act
                        Grants Was Improperly Calculated
Comment 3:    Whether the Tax Programs Under the Restriction of Special Location Taxation
                        Act (RSLTA) and Restriction of Special Taxation Act (RSTA) Meet the
                        Specificity Requirement

---

[1] *See Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing
Duty Administrative Review, 2017*, 84 FR 67927 (December 12, 2019) (*Preliminary Results*), and accompanying
Preliminary Decision Memorandum (PDM); *see also* Memorandum, "Post-Preliminary Analysis Memorandum –
Upstream Subsidy on Electricity," dated March 11, 2020 (Upstream Subsidy Analysis Memorandum).



Comment 4:    Whether the Trading of Demand Response Resources (DRR) Program is Countervailable

Comment 5:    Whether the Modal Shift Program Confers a Countervailable Benefit

Comment 6:    Whether Commerce Correctly Measured the Benefit for Port Usage Rights at Incheon Harbor

Comment 7:    Whether the Suncheon Harbor Usage Fee Exemptions Under the Harbor Act Are Countervailable

Comment 8:    Whether Hyundai Green Power is Hyundai Steel's Cross-Owned Input Supplier and Received Countervailable Benefits

## II.    BACKGROUND

On December 12, 2019, the Department of Commerce (Commerce) published the *Preliminary Results* of this administrative review.[2]  In the *Preliminary Results*, Commerce indicated it would issue its preliminary determination on the upstream subsidy on electricity program after the *Preliminary Results*.  On December 31, 2019, we issued supplemental questionnaires related to the electricity upstream subsidy program to the Government of Korea (GOK) and Hyundai Steel and received timely responses.[3]

On December 23, 2019, Commerce issued a briefing schedule related to all issues except those pertaining to the alleged upstream subsidy program.[4]  On January 22, 2020, Nucor Corporation and United States Steel Corporation (collectively, the petitioners) and the GOK submitted case briefs.[5]  On January 31, 2020, the petitioners, the GOK, and Hyundai Steel each timely filed rebuttal briefs.[6]

On March 11, 2020, Commerce determined that Korean hot-rolled steel producers did not benefit from upstream subsidies in the form of subsidized electricity during the POR.[7]  Commerce issued a separate briefing schedule with respect to the upstream subsidy on electricity program

---

[2] *See Preliminary Results.*

[3] *See* GOK's Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, 01/01/2017-12/31/2017 Administrative Review, Case No. C-580-884:  The GOK's Response to the Upstream Subsidy Supplemental Questionnaire," dated January 9, 2020 (GOK January 9, 2020 Upstream SQR); *see also* Hyundai Steel's Letter, "Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884:  Hyundai Steel Upstream Subsidy Supplemental Questionnaire Response," dated January 10, 2020.

[4] *See* Memorandum, "Briefing Schedule," dated December 23, 2019.

[5] *See* Petitioners' Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Case Brief," dated January 22, 2020 (Petitioners Case Brief); *see also* GOK's Letter, "Countervailing Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Case Brief," dated January 22, 2020 (GOK Case Brief).

[6] *See* Petitioners' Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Rebuttal Brief," dated January 31, 2020 (Petitioners Rebuttal Brief); *see also* GOK's Letter, "Countervailing Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Rebuttal Brief," dated January 31, 2020 (GOK Rebuttal Brief); and Hyundai Steel's Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884:  Hyundai Steel Rebuttal Brief," dated January 31, 2020 (Hyundai Steel Rebuttal Brief).

[7] *See* Upstream Subsidy Analysis Memorandum.

on March 13, 2020.[8]  On March 20, 2020, the petitioners timely filed a case brief.[9]  On March 25, 2020, Hyundai Steel and the GOK timely filed rebuttal briefs.[10]

On March 19, 2020, Commerce extended the deadline for the final results to 180 days after the publication of the *Preliminary Results*, making the new deadline June 9, 2020.[11]  On April 24, 2020, Commerce tolled all deadlines in administrative reviews by 50 days.[12]  On July 21, 2020, Commerce tolled all deadlines in administrative reviews by an additional 60 days.[13]  The deadline for the final results of this review is now September 28, 2020.

## III.    CHANGES SINCE THE *PRELIMINARY RESULTS*

The "Discussion of Comments" section contains summaries of the comments and Commerce's positions on the issues raised in the briefs.  As a result of this analysis, we have made changes to the subsidy calculations for Hyundai Steel's Port Usage Rights at Incheon Harbor program, to include in the benefit computation certain income which Hyundai Steel was entitled to receive during the POR.  For further discussion, *see* "Use of Facts Otherwise Available" section and Comment 6, below.

## IV.    SCOPE OF THE ORDER

For a full description of the scope of this order, *see* Attachment.

## V.    PERIOD OF REVIEW

The POR is January 1, 2017 through December 31, 2017.

## VI.    SUBSIDIES VALUATION INFORMATION

## A.    Allocation Period

Commerce made no changes to the allocation period or the allocation methodology used in the *Preliminary Results*.[14]  No issues were raised by interested parties in case briefs that would lead

---

[8] *See* Memorandum, "Briefing Schedule for Upstream Subsidy on Electricity Program," dated March 13, 2020.
[9] *See* Petitioners' Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Case Brief of United States Steel Corporation and Nucor Corporation," dated March 20, 2020 (Petitioners Upstream Subsidy Brief).
[10] *See* GOK's Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Rebuttal on the Petitioners Case Brief of the Upstream Subsidy," dated March 25, 2020 (GOK's Upstream Subsidy Rebuttal Brief); *see also* Hyundai Steel's Letter, "Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884: Hyundai Steel's Upstream Subsidy Rebuttal Brief," dated March 25, 2020 (Hyundai Steel's Upstream Subsidy Rebuttal Brief).
[11] *See* Memorandum, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Extension of Deadline for Final Results of Countervailing Duty Administrative Review, 2017," dated March 19, 2020.
[12] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews in Response to Operational Adjustments Due to COVID-19," dated April 24, 2020.
[13] *See* Memorandum, "Tolling of Deadlines for Antidumping and Countervailing Duty Administrative Reviews," dated July 21, 2020.
[14] *See Preliminary Results* PDM at 7.

us to reconsider our preliminary finding regarding the allocation period or the allocation methodology for the respondent companies.

## B.   Attribution of Subsidies

Commerce has made no changes to the methodologies used in the *Preliminary Results* for attributing subsidies.[15]  No issues were raised by interested parties in case briefs that would lead us to reconsider our preliminary finding regarding the attribution of subsidies.

## C.   Benchmark Interest Rates

Commerce made no changes to benchmarks or discount rates used in the *Preliminary Results*.[16] No issues were raised by interested parties in case briefs that would lead us to reconsider our preliminary finding regarding benchmark interest rates.

## D.   Denominators

We have made no changes to the denominators used in the *Preliminary Results*.  No issues were raised by interested parties in case briefs that would lead us to reconsider our preliminary finding regarding the appropriate denominators.  For a description of the denominators used for these final results, *see* the *Preliminary Results* and accompanying PDM.

## VII.   USE OF FACTS OTHERWISE AVAILABLE

Sections 776(a)(1) and (2) of the Act of 1930, as amended (the Act) provide that Commerce shall, subject to section 782(d) of the Act, apply facts otherwise available (FA) if necessary information is not on the record or an interested party or any other person:  (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

Section 776(b) of the Act further provides that Commerce may use an adverse inference in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the investigation, a previous administrative review, or other information placed on the record.  When selecting an adverse facts available (AFA) rate from among the possible sources of information, Commerce's practice is to ensure that the rate is sufficiently adverse "as to effectuate the statutory purposes of the AFA rule to induce respondents to provide Commerce with complete and accurate information in a timely

---

[15] *Id.* at 7-8.
[16] *Id.* at 8-10.

manner."[17]  Commerce's practice also ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[18]  At the same time, section 776(b)(1)(B) of the Act states that Commerce is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information.

*Application of Facts Available*

Commerce relied on "facts otherwise available" for information relating to non-recurring subsidies received by Hyundai HYSCO, a cross-owned affiliate of Hyundai Steel, for the 2002 through 2005 reporting period.[19]  For further discussion of this decision, *see* the *Preliminary Results*.[20]  Because no party commented on this finding, Commerce continues to use FA for these final results for subsidies received by Hyundai HYSCO during this portion of the AUL period.

*Application of AFA:  GOK*

On August 13, 2019, we issued a new subsidy allegations questionnaire to the GOK regarding a new subsidy we are investigating in this review.[21]  In this questionnaire, we requested the GOK provide the standard questions appendix, grant and allocation appendix, and income tax programs appendix for the provision of port usage rights at the Port of Incheon program.  This information included key program procedures and guidelines pertaining to assistance provided under this program used by Hyundai Steel during the POR.  In particular, we requested official documentation and program operation information to determine the countervailability of these programs.  The GOK did not submit a response to this questionnaire.[22]

Because the GOK failed to provide any information regarding this program, we determine that necessary information is not available on the record and that the GOK withheld information that was requested of it.  Further, the GOK significantly impeded the review.  Thus, Commerce must rely on "facts available" in making our determination, in accordance with sections 776(a)(1) and 776(a)(2)(A) and (a)(2)(C) of the Act.  We determine that the GOK failed to cooperate by not acting to the best of its ability to comply with our request for information.  Consequently, an

---

[17] *See, e.g., Drill Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 76 FR 1971 (January 11, 2011); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Static Random Access Memory Semiconductors from Taiwan*, 63 FR 8909, 8932 (February 23, 1998).

[18] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. I at 870 (1994), reprinted at 1994 U.S.C.C.A.N. 4040, 4199.

[19] *See Preliminary Results* PDM at 11.

[20] *Id.*

[21] *See* Letter to the GOK, "Countervailing Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  New Subsidy Allegations Questionnaire," dated August 13, 2019; *see also* Memorandum, "New Subsidy Allegations," dated August 12, 2019.

[22] *See* Letter to the GOK, "Certain Hot-Rolled Steel Flat Products from the People's Republic of Korea: Countervailing Duty Administrative Review – Denial of Request to Extend Deadline," dated August 28, 2019; *see also* Letter to the GOK, "Certain Hot-Rolled Steel Flat Products from the People's Republic of Korea: Countervailing Duty Administrative Review – Conference Call," dated September 13, 2019.

adverse inference is warranted in the application of facts available, pursuant to section 776(b) of the Act.  In applying AFA, we find that the provision of port usage rights at the Port of Incheon program constitutes a financial contribution within the meaning of section 771(5)(D)(ii) of the Act, and that this program is specific within the meaning of section 771(5A)(D)(iii)(I) of the Act. Commerce also relied on FA to determine certain benefits related to Hyundai Steel's usage of the Port of North Incheon, pursuant to section 771(5)(E ) of the Act.  For further discussion, *see* Comment 6.

## VIII.  ANALYSIS OF PROGRAMS

### A.  Programs Determined to be Countervailable

#### 1.  RSLTA – Local Tax Exemptions on Land Outside Metropolitan Areas – Article 78

Commerce made no changes to the *Preliminary Results* regarding this program.  We continue to find this program to be countervailable for the final results.  *See* Comment 3.

Hyundai Steel:      0.02 percent *ad valorem*

#### 2.  Tax Deduction Under RSTA Article 26:  GOK Facilities Investment Support

Commerce made no changes to the *Preliminary Results* regarding this program.  We continue to find this program to be countervailable for the final results.  *See* Comment 3.

Hyundai Steel:      0.28 percent *ad valorem*

#### 3.  RSTA Article 25(2):  Tax Deductions for Investments in Energy Economizing Facilities

Commerce made no changes to the *Preliminary Results* regarding this program.  We continue to find this program to be countervailable for the final results.  *See* Comment 3.

Hyundai Steel:      0.02 percent *ad valorem*

#### 4.  RSTA Article 25(3):  Tax Credit for Investment in Environmental and Safety Facilities

Commerce made no changes to the *Preliminary Results* regarding this program.  We continue to find this program to be countervailable for the final results.  *See* Comment 3.

Hyundai Steel:      0.05 percent *ad valorem*

**5.  Electricity Discounts under Trading of DRR Program**

> Commerce made no changes to the *Preliminary Results* regarding this program.  We continue to find this program to be countervailable for the final results.  *See* Comment 4.

> Hyundai Steel:      0.06 percent *ad valorem*

**6.  Modal Shift Program**

> Commerce made no changes to the *Preliminary Results* regarding this program.  We continue to find this program to be countervailable for the final results.  *See* Comment 5.

> Hyundai Steel:      0.01 percent *ad valorem*

**7.  Provision of Port Usage Rights at the Port of Incheon**

Hyundai Steel reported that the GOK established this program under the North Inchon Harbor Enforcement Agreement, where, pursuant to Article 5 of the Agreement, "after construction was completed, the wharf constructed by Hyundai Steel reverted to the GOK, and Hyundai Steel was authorized to operate the wharf for a specific period, under the revised agreement."[23]  Under this program, once Hyundai Steel had built the wharf and received a specific amount of reimbursements from the GOK, it continued to receive free use of harbor facilities and the right to collect fees from third-party users.[24]  The reimbursements received by Hyundai Steel are not limited by the amount of the costs that Hyundai Steel incurred to construct the wharf; instead, once ownership reverted to the GOK, Hyundai Steel was authorized to operate the wharf for a specific period, regardless of the amount of fees collected and amount of the company's personal usage of the harbor facilities.[25]

As discussed above, the GOK was non-responsive regarding this program, and, thus, Commerce is relying on AFA with respect to the financial contribution and specificity determinations.  We determine that this program is countervailable because it provides a financial contribution in the form of revenue foregone under section 771(5)(D)(ii) of the Act, and because it is specific under section 771(5A)(D)(iii)(I) of the Act

To calculate the benefit that Hyundai Steel received under this program during the POR, we determined, as facts available, that in accordance with this financial contribution, the berthing income reported by Hyundai Steel was a benefit related to "other" income in

---

[23] *See* Hyundai Steel's Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884:  Response to Section III of Initial Questionnaire," dated April 1, 2019, at 59-60 and Exhibit M-8 and M-11.
[24] *See* Hyundai Steel's Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884:  New Subsidy Allegation Supplemental Questionnaire Response," dated October 31, 2019 (NSA SQR) at 3.  According to this submission, no third party has used the harbor to date.
[25] *See* Letter from Nucor, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  New Subsidy Allegations," dated April 29, 2019 at 25-26.

connection with Hyundai Steel's own usage of the port.[26]  We divided this amount by Hyundai Steel's total sales.  On this basis, we determine that Hyundai Steel received a countervailable subsidy rate of 0.06 percent *ad valorem* under this program.[27]

## B.  Programs Determined to be Not Used or Not to Confer a Measurable Benefit During the POR

1.    Korean Export-Import (KEXIM) Bank Import Financing
2.    KEXIM Short-Term Export Credits
3.    KEXIM Export Factoring
4.    KEXIM Export Loan Guarantees
5.    KEXIM Loan Guarantees for Domestic Facility Loans
6.    KEXIM Trade Bill Rediscounting Program
7.    KEXIM Overseas Investment Credit Program
8.    Korea Development Bank and Industrial Base Fund Short-Term Discounted Loans for Export Receivables
9.    Loans under the Industrial Base Fund
10.   Korea Trade Insurance Corporation (K-SURE) Export Credit Guarantees
11.   K-SURE Short-Term Export Credit Insurance
12.   Long-Terms Loans from Korean Resources Corporation (KORES) and the Korea National Oil Corporation (KNOC)
13.   Clean Coal Subsidies
14.   GOK Subsidies for Green Technology Research and Development (R&D) and its Commercialization
15.   Support for Small and Medium Enterprises "Green Partnerships"
16.   Tax Deduction under RSTA Article 10(1)(1)
17.   Various R&D Grants Provided Under the Industrial Technology Innovation Promotion Act
18.   RSTA Article 10(1)(2)
19.   RSTA Article 11
20.   RSTA 104(14)
21.   RSLTA Articles 19, 31, 46, 84, LTA 109, 112, and 137
22.   Tax Reductions and Exemptions in Free Economic Zones
23.   Grants and Financial Support in Free Economic Zones
24.   Sharing of Working Opportunities/Employment Creating Incentives
25.   GOK Infrastructure Investment at Inchon North Harbor
26.   Machinery & Equipment (KANIST R&D) Project
27.   Grant for Purchase of Electrical Vehicle
28.   Power Business Law Subsidies
29.   Provision of Liquefied Natural Gas (LNG) for LTAR
30.   Energy Savings Programs
   a.   Electricity Savings for Designated Period Program

---

[26] *See* Comment 6 for a discussion on the facts available benefit determination.
[27] *See* Memorandum, "Administrative Review of the Countervailing Duty Order of Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results Calculations for Hyundai Steel Co., Ltd.," dated concurrently with this memorandum (Hyundai Steel Final Results Calculation Memorandum).

b. Electricity Savings through the Bidding Process Program
c. Electricity Savings upon an Emergent Reduction Program
d. Electricity Savings through General Management Program
e. Management of the Electricity Load Factor Program
31. The GOK's Purchases of Electricity for More Than Adequate Remuneration
32. Incentives for Compounding and Prescription Cost Reduction
33. Incentives for Usage of Yeongil Harbor in Pohang City
34. Value Added Tax Exemptions on Imported Goods
35. Incentives for Usage of Gwangyang Port
36. Incentives for Natural Gas Facilities
37. Subsidies for Construction and Operation of Workplace Nursery
38. Subsidies for Hyundai Steel Red Angels Women's Football Club
39. Suncheon Harbor Port Usage Fee Exemptions; *See* Comment 7.
40. Seoul Guarantee Insurance
41. Subsidies for Pohang Art Festival
42. Other Transactions with Government Entities
43. Fast-Track Restructuring Program
44. Reduction for Sewerage Usage Fee

## IX.  DISCUSSION OF COMMENTS

### Comment 1:  Whether the Electricity for LTAR Upstream Subsidy Allegation Confers a Benefit

The petitioners alleged that an upstream subsidy exists related to the sale of electricity in Korea. Specifically, the petitioners claim that in 2017 the Korean electricity generators (GENCOs) sold electricity to the Korean Electric Company (KEPCO) via the Korean Power Exchange (KPX), and the prices for this electricity were at LTAR.  After collecting and analyzing information related to the Korean electricity market, we preliminarily found that a benefit was not conferred from KPX's pricing of the electricity generated by the GENCOs and that an upstream subsidy was not provided to hot-rolled steel producers, including Hyundai Steel.[28]

*Petitioners' Case Brief*
- Commerce correctly found in its post-preliminary analysis that there is no viable tier (i) benchmark on the record upon which to measure adequate remuneration, as the market is distorted and it is illogical to use these same prices to analyze market principles under a tier (iii) analysis.[29]

---

[28] *See* Upstream Subsidy Analysis Memorandum.
[29] *See* Petitioners Upstream Subsidy Brief at 9-11 (citing *Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination Final Affirmative Critical Circumstances Determination*, 79 FR 54963 (September 15, 2014), and accompanying Issues and Decision Memorandum (IDM) at 15; *Certain Steel Wheels from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 77 FR 17017 (March 23, 2012), and accompanying IDM at 24; *Supercalendered Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 80 FR 63535 (October 20, 2015) (*SC Paper*), and accompanying IDM at 41; *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation:  Final Affirmative*

- Commerce has interpreted the term "adequate remuneration" to mean "fair market value." Thus, the fact that a government sets a price at a level which is both profitable and allows for cost recovery, in and of itself, does not mean the price reflects fair market value. In addition to cost recovery and profitability, a price-setting methodology is only consistent with market principles insofar as it permits the maximization of profit and market share. There is ample evidence on the record that the KPX price-setting methodology does not allow the prices of KEPCO's GENCOs to reflect fair market value. For example, based on the merit order system, an electricity generator could reduce its price without gaining any competitive advantage, and the GENCOs could raise their prices and not lose any sales volume or market share.[30]
- The fact that the GENCOs received a higher rate of return than KEPCO, their affiliated electricity distributor, is irrelevant. Instead, a proper analysis would be to compare the rate of return among the GENCOs, Independent Power Producers (IPPs), and other independent generators.[31]
- The above comparison should also take into account public statements from Korea Hydro & Nuclear Power Co., Ltd. In its 2018 Offering Circular, the company indicated the downward adjustment of the adjusted coefficient in 2017 contributed to a decrease in its revenue compared to 2016. Further, the decrease in the average unit price of electricity sold in early 2018 was mainly due to a decrease in the adjusted coefficient applicable to nuclear energy.[32]
- The regulations that require KEPCO to correct for the losses incurred by the GENCOs indicate that the Korean wholesale electricity market does not operate consistent with market principles.[33]
- As shown in *SC Paper*, Commerce's practice is to use a tier (iii) benchmark to measure adequate remuneration. As Commerce did not collect sufficient cost information on the record to construct a benchmark, the IPPs prices from KPX would serve as viable tier (iii) benchmarks.[34]
- The Electricity for LTAR Upstream Subsidy program has also met the statutory requirements in terms of financial contribution and specificity. On this basis, Commerce has evidence on the record to find that this alleged program provides a countervailable upstream subsidy to producers of subject merchandise.[35]

---

*Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 FR 49935 (July 29, 2016) (*Cold-Rolled Steel from Russia*), and accompanying IDM at 55; and *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1327 (CIT 2015) (citing *Wire Decking from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 FR 32902 (June 10, 2010), and accompanying IDM, affirmed by *Maverick Tube Corporation v. United States*, 857 F3d 1353 (Fed. Cir. 2017))).
[30] *Id.* at 11-15 (citing *Policy Bulletin – Policies Regarding the Conduct of Changed Circumstances Reviews of the Countervailing Duty Order on Softwood Lumber from Canada*, 68 FR 37457 (June 24, 2003) (Lumber Policy Bulletin); *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 FR 37125, 37132 (June 23, 2003) (*Privatization Practice FR*); *Light-Walled Rectangular Pipe and Tube from People's Republic of China: Final Affirmative Countervailing Duty Investigation Determination*, 73 FR 35642 (June 24, 2008) (*LWRP from China*), and accompanying IDM at Comment 7; and *Nucor Corp. v United States*, 927 F.3d 1243 (Fed. Cir. 2019) (*Nucor*)).
[31] *See* Petitioners Upstream Subsidy Brief at 16-17.
[32] *Id.* at 18, n.38.
[33] *Id.* at 18-19.
[34] *Id.* at 19-23 (citing *SC Paper*).
[35] *Id.* at 23-28.

*GOK Rebuttal Brief*
- Public utility markets, such as electricity, are monogopolistic or oligopolistic regulated markets and do not exhibit open and competitive characteristics.  Therefore, as upheld in several U.S. courts, the electricity market does not need to have electricity generators maximize profits for pricing to reflect a fair return on investment.[36]
- Commerce does not have a practice that requires the use of a tier (iii) benchmark.[37]
- The record evidence demonstrates that KPX prices are based on market principles and the calculation of a benchmark price is not necessary under the tier (iii) analysis.  Moreover, Commerce has stated that IPP prices are not comparable and, thus, cannot be used as tier (iii) benchmarks.[38]
- Even if a benefit is found for the alleged subsidy, the petitioners' allegation with respect to financial contribution and specificity does not meet the statutory requirements.  Moreover, the alleged subsidy would not confer a competitive benefit, as defined in section 771A of the Act, and therefore, it would not provide an upstream subsidy to producers of subject merchandise.[39]

*Hyundai Steel Rebuttal Brief*
- Commerce found that there were no comparable electricity prices in its tier (i) analysis, not that there was a distortion in the market.[40]  Commerce's prior proceedings make plain a tier (iii) market principles analysis is applicable in this situation.[41]

---

[36] *See* GOK's Upstream Subsidy Rebuttal Brief at 2-4 (citing U.S. Code § 824d; *Alabama Electric Cooperative, Inc. v. FERC*, 684 F.2d 20, 27 (District of Columbia Circuit 1982); *Bluefield Co. v. Pub. Serv. Comm., 262 U.S. 679, 690* (1923); *Hope, FPC v. Hope Nat.  Gas Co.*, 320 U.S. 591, 604 (1994); *Potomac Edison Co. v. Pub. Serv. Comm.*, 279 Md.  573, 369 A.2d.  1035 (1977); and *Nucor*, 927 F.3d at 1254-55).

[37] *Id.* at 6-8 (citing *Arcelormittal USA v. United States*, Slip-Op. 18-121 (CIT 2018) at 14; *Silicon Metal from Australia:  Final Affirmative Countervailing Duty Determination*, 83 FR 9834 (March 8, 2018) (*Silicon Metal from Australia*), and accompanying IDM at 10-11; and *Melamine from Trinidad and Tobago:  Final Affirmative Countervailing Duty Determination*, 80 FR 68849 (November 6, 2015), and accompanying IDM at 10).

[38] *Id.* at 8-10.

[39] *Id.* at 9-13.

[40] *See* Hyundai Steel's Upstream Subsidy Rebuttal Brief at 4-6.

[41] *Id.* at 6-8 (citing *Countervailing Duties*, 63 FR 65348, 65378 (November 25, 1998) (*CVD Preamble*); *Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 FR 16341 (April 4, 2017), and accompanying IDM at 28-33; *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Affirmative Determination*, 81 FR 53439 (August 12, 2016) (*HRS Final Determination*), and accompanying IDM at 44-49; *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 5310 (June 2, 2016), and accompanying IDM at 18-24; *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Preliminary Affirmative Determination*, 80 FR 68842 (November 6, 2015), and accompanying PDM at 19; *Welded Line Pipe from the Republic of Korea:  Final Negative Countervailing Duty Determination*, 80 FR 61365 (October 13, 2015) (*Welded Line Pipe*), and accompanying IDM at 13-18; *Nucor Corp v. United States*, 286 F. Supp. 3d 1364, 1375 (CIT 2018); *Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1309-10 (CIT 2017) (*Maverick Tube Corp.*); *POSCO v. United States*, 337 F. Supp 3d 1265, 1282 (CIT 2018); *POSCO v. United States*, 353 F. Supp. 3d 1357, 1372-73 (CIT 2018); and *POSCO v. United States*, 296 F. Supp 3d 1320, 1360-61 (CIT 2018)).

- Commerce's tier (iii) analysis is in accordance with law.  Commerce should reject the assertion that adequate remuneration must include the maximization of profit and market share.[42]
- The tier (iii) analysis is a mechanism to measure adequate remuneration in regulated utility markets, like electricity, where prices are not solely dictated by supply and demand.[43]
- *SC Paper* does not stand for the proposition that Commerce must always use a tier (iii) benchmark.  It only demonstrates that Commerce has the discretion to use a benchmark when analyzing prices under tier (iii).[44]
- The IPP prices through KPX are not viable tier (iii) benchmarks, as the prices are not comparable to the GENCOs' prices through KPX. Moreover, if Commerce were to compare the prices paid to the IPPs and GENCOs, based on fuel type, record evidence demonstrates the per-unit prices are similar and consistent with market principles.[45]
- Commerce considered, and rejected, the same arguments by the petitioners in the recent final results of *CORE Korea 2017 Final*.[46]

**Commerce's Position:**  We continue to find that a benefit was not conferred by the alleged Electricity for LTAR Upstream Subsidy program for the final results.  In determining whether a benefit was conferred, Commerce evaluated the program pursuant to 19 CFR 351.511 and examined KPX pricing within tier (i), tier (ii), and tier (iii) as provided in 19 CFR 351.511(a).[47]

First, the petitioners argue it is illogical to find KPX prices[48] for electricity to be distorted under tier (i) and consistent with market principles under tier (iii).  Under a tier (i) analysis, Commerce seeks to measure the adequacy of remuneration by comparing a government price to a market-determined price for the good or service resulting from actual transactions.[49]  In this instance, Commerce preliminarily found that the KPX set prices for nearly all the electricity in Korea, including the prices paid to the IPPs, and, therefore, that the prices paid to the IPPs were not appropriate benchmarks.[50]  Hence, there were no comparable prices on the record to use as a tier (i) benchmark.

The case cites by the petitioners misconstrue Commerce's use of a tier (iii) benchmark to measure adequate remuneration and do not relate to our rationale for not using a tier (i) benchmark.[51]  In each of these examples, the petitioners contend Commerce rationalized that use

---

[42] *Id.* at 8-9 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984); *Timken Co. v. United States*, 354 F. 3d 1334, 1342 (Fed. Cir. 2004) (quoting *Torrington V. United States*, 82 F. 3d 1039, 1044 (Fed. Cir. 1996); and *Nucor,* 927 F.3d at 1254-55)).

[43] *Id.* at 9-11 (citing *Nucor*, 927 F.3d at 1251, n.6; and *Maverick Tube Corp.*, 273 F. Supp. 3d at 1309).

[44] *Id.* at 11 (citing *Certain Uncoated Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 81 FR 3104 (January 20, 2016) (*Uncoated Paper from Indonesia*), and accompanying IDM at 15).

[45] *Id.* at 12.

[46] *Id.* at 13 (citing *Certain Corrosion-Related Steel Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2017,* 85 FR 15112 (March 17, 2020) (*CORE Korea 2017 Final*), and accompanying IDM at Comment 1 at 12-18).

[47] *See* Upstream Subsidy Analysis Memorandum at 5-9.

[48] *Id.* at 8 (nearly all of the electricity generated within Korea is sold through KPX to one distributor, KEPCO).

[49] *See* 19 CFR 351.511(a)(2)(i).

[50] *See* Upstream Subsidy Analysis Memorandum at 6.

[51] *See* Petitioners Upstream Subsidy Brief at 10, and n.15 and 16.

of a market-determined price in a distorted market would essentially be comparing a government price to itself and that would not lead to an adequate measurement of remuneration.  To be clear, the price being distorted in these cited examples is the "market" price, not the government price.  In this instance, however, Commerce did not find the KPX prices paid to IPPs to be distorted market prices.[52]  Our analysis concluded the GENCOs and the IPPs participated in the same KPX pricing system and its structure did not allow comparability between the prices paid to the two groups.[53]  The *CVD Preamble* already contemplated a possibility where there may not be prices available at tier (i) and tier (ii).  In those circumstances, we can evaluate the government price in the context of market principles under tier (iii).[54]  Under tier (iii), our focus is on whether the government price was established in accordance with market principles rather than how the government price compares with a domestic or world market-determined price.  Therefore, there is no disconnect in our analysis of the KPX prices under tier (i) versus tier (iii).

The petitioners next argue KPX's price-setting mechanism is not consistent with market principles (*i.e.*, tier (iii)) as the mechanism sets prices that do not reflect fair market value, which should include the maximization of profit and market share.[55]  We note that section 771(5)(E)(iv) of the Act states "the adequacy of remuneration shall be determined in relation to the prevailing market conditions for a good or service being provided … Prevailing market conditions include price, quality, availability, marketability, transportation and other conditions of purchase of sale."  Moreover, 19 CFR 351.511(a)(2) sets out how adequate remuneration is defined and lays out the three-tiered analysis to measure the extent a benefit exists.

Commerce reviewed and verified:  (1) KPX's methodology used to forecast demand; (2) KPX's methodology to set the system marginal price; (3) the electricity generator's reporting requirements to establish variable and fixed costs; and (4) the underlying methodology to determine the electricity generator's rates of return and the adjusted coefficient.[56]  KEPCO's tariff rates applicable to its customers are approved by the Ministry of Trade, Industry and Energy.

As noted in the Upstream Analysis Memorandum, the KPX bidding process looks at demand on an hourly basis and establishes the price paid for the hour on a merit order system.[57]  Under this process, an electricity generator increasing capacity could increase its market share, an electricity generator lowering its marginal price below that of a competitor with a high capacity could gain market share, and a GENCO who has a high marginal price and establishes the system marginal

---

[52] *See* Upstream Subsidy Analysis Memorandum at 6.
[53] *Id.*
[54] *See CVD Preamble*, 63 FR at 65378 ("In situations where the government is clearly the only source available to consumers in the country, we normally will assess whether the government price was established accordance with market principles.  Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles … In our experience, these types of analyses may be necessary for goods or services as electricity …").
[55] *See* Petitioners Upstream Subsidy Brief at 10, and n.15 and 16.
[56] *See* Upstream Subsidy Analysis Memorandum at 7-8; *see also* Commerce's Letter, "Submission of Verification Documents to Proceeding," dated January 31, 2020; and GOK's Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, 01/01/2017-12/31/2017 Administration Review, Case No. C-580-884:  Submission of Verification Documents," dated February 7, 2020 (GOK Verification Report) at 3-6.
[57] *See* Upstream Subsidy Analysis Memorandum at 3.

13

price could be priced out of the market by another electricity generator that lowers its marginal price and takes its place and fulfills the balance of the hourly demand, pushing the GENCO outside the purchase order hour.[58]

The petitioners posit several reasons why prices set by the KPX bidding process in the Korean electricity market may not represent fair market value or market principles, but all of the petitioners' reasons are speculative in nature.[59]  For example, the petitioners claim that the system is not market-based because, they allege, there is no reason for generators to sell electricity well below the competitor with the next lowest price, as reducing one's electricity price would not result in increased market share or sales; indeed, according to the petitioners, every single GENCO could raise its prices and not lose any sales volume or market share.[60] However, the petitioners have not addressed the prevailing market of the Korean electricity market as it pertains to the:  (1) structure of the KPX system; (2) varying reporting data that is part of the variable costs; (3) the electricity generators submission of financial data (including costs); (4) weight average cost of capital calculation; (5) adjusted coefficient; and (6) other standardized formulas used in KPX's price setting.[61]

The petitioners further their argument with regard to the maximization of profit and market share not equating to cost recovery and profit with references to the Lumber Policy Bulletin, *Privatization Practice FR*, *LWRP from China*, and *Nucor*.[62]  As an initial matter, we note the Lumber Policy Bulletin has not been adopted by Commerce and the current CVD order on *Certain Softwood Lumber Products from Canada* applied our benchmark regulations (*i.e.*, 19 CR 351.511(a)(2)(i)).[63]  In *LWRP from China*, the respondents requested a tier (iii) analysis for a hot-rolled steel (HRS) producer.[64]  However, Commerce only determined the HRS producer's profitability was not relevant in the context of the tier (i) analysis and subsequently used a tier (ii) benchmark.[65]  Thus, the issue of market principles under tier (iii) was never addressed in *LWRP from China*, as Commerce was able to find a tier (ii) world market price for HRS, an input

---

[58] *Id.* at 4, n.25 (providing examples of per unit prices from GENCOs based on fuel types); *see also* GOK January 9, 2020 Upstream SQR at Exhibit USQ-16, page 14 (demonstrating fuel types from low price to high price in determining the SMP), and Exhibit USQ-10, pages 43-49 (KEPCO reported 20-F providing average cost per kilowatt hour for different fuel types:  Nuclear (from KHNP):  10.29 Won; Pumped Storage and Hydroelectric (from KHNP):  11.00 Won; Bituminous Coal (from Midland, KSEP, KWP, KSP and KEWP):  48.46, 50.37, 53.63, 49.31, 65.51, 53.43, 50.4, 58.7, 80.97 and 93.77 Won; Anthracite Coal (from Midland, KSEP and KEWP):  72.38, 101.38 and 99.77 Won; Oil (from Midland, KWP, KSP and KEWP):  144.77, 110.61, 152.5 and 176.75 Won; and LNG (from Midland):  188.79 Won).

[59] *See* Petitioners Upstream Subsidy Brief at 13-16.

[60] *Id.* at 14-15.

[61] *See* GOK Verification Report at 4-6; *see also* Upstream Analysis Memorandum at 7-8.

[62] *See* Petitioners Upstream Subsidy Brief at 13-14.

[63] *See Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM at 104 ("The {Lumber Policy Bulletin} was a preliminary document, through which comments were solicited from the public pertaining to proposed policies for Canadian provinces to move to market-based systems of timber sales.  Those proposed policies, however, were never adopted by {Commerce}… Rather, consistent with {Commerce's}practice we have thoroughly evaluated the record evidence to reach a finding on the market conditions existing within a provincial stumpage system pursuant to the framework set forth in 19 CFR 351.511(a)(2)(i).").

[64] *See LWRP from China* IDM at 33.

[65] *Id.* at 36-37.

that is globally traded and does not have the limitations of the Korean electricity market that may necessitate a tier (iii) analysis.[66]

In *Nucor*, the dissenting opinion did not state that cost recovery is not synonymous with fair market value, but that cost recovery, in this instance, should be defined and explained in light of the statutory requirement under section 771(5)(E)(iv) of the Act.[67]  In this instance, Commerce has evaluated the Korean electricity market as it pertains to the generation of electricity and how the GENCOs receive remuneration for the generation of electricity within Korea.  The laws, regulations, economic rationale, and submitted cost and other required data have been examined and analyzed pursuant to the statute and regulations in determining that KPX's prices, through the price-setting mechanism and cost, are consistent with market principles.[68]  Finally, in *Privatization Practice FR*, Commerce stated that it does consider profit maximization as a criterion in evaluating a privatization for fair market value.  However, we also stated that, in the case of privatization, none of the factors listed, including profit maximization, are dispositive and all relevant facts and circumstances of a privatization will be considered.[69]  Although we are not examining a privatization, we have considered all relevant facts and considerations in our analysis, and the petitioners have provided no support for the proposition that maximization of profit and market share is the main factor that should inform our tier (iii) analysis or determine if a good is provided for LTAR.[70]

The petitioners also argue the GENCOs' receipt of a higher rate of return than their affiliated electricity distributor, KEPCO, is irrelevant and a proper analysis would be to compare the rate of return among the GENCOs, IPPs, and other independent generators.[71]  Commerce's regulations do not call for a tier (iii) analysis to be a strict comparison of rates of returns or to require that an entity absolutely maximize its returns; rather the regulations state that such rate of return ought to be "sufficient to ensure future operations."[72]  The GOK has provided information

---

[66] *See CVD Preamble*, 63 FR at 65377-78.

[67] *See Nucor*, 927 F.3d at 1258 ("The majority does not explain what 'familiar standards of cost recovery' means or how they are consistent with the statutory requirement that price setting be in accordance with prevailing market conditions.  The majority constructs …").

[68] *Id.* 927 F.3d at 1254-55 ("In our analysis rejecting the government's broad position, we have decided that nonpreferentiality of the sort the government stresses is insufficient to meet the statutory standard of adequate remuneration, which, along with its implementing regulation, requires ensuring that the government authority's price is not too low considering what the authority is selling.  That ruling is significant but limited in constraining Commerce.  We readily recognize that such a standard, while excluding the government's broad preferentiality position potential, leaves a large range of potential implementation choices.  One need only look outside the present statutory context to the familiar rate-regulation context to see the great variety of methodologies used over time to ensure that rates of a monopoly provider are not too low, some directly focused on value (such as "fair value"), some on various measures of "cost" (which may reflect value).  Commerce has considerable prima facie leeway to make a reasonable choice within the permissible range, and properly justify its choice, based on the language and policies of the countervailing duty statute as well as practicality and other relevant considerations.") (internal citations omitted).

[69] *See Privatization Practice FR*, 68 FR at 37131 ("We will generally not consider any one factor in itself to be dispositive, but will consider all the relevant facts and circumstances of a privatization to determine whether the sales price was a fair market value.").

[70] *See* Upstream Subsidy Analysis Memorandum.

[71] *See* Petitioners Upstream Subsidy Brief at 16-17.

[72] *See CVD Preamble*, 63 FR at 65378 ("Paragraph (a)(2)(iii) provides that, in situations where the government is

on the record concerning its rate of return methodology or weighted average cost of capital (WACC) formula for the KPX pricing that provides a fair market return on capital.[73]  The petitioners do not provide any rationale for why a comparison of the rates of return across all electricity generators would inform a tier (iii) benchmark analysis.  Under a tier (iii) market principles analysis, Commerce examined KPX prices and the relevant price setting mechanism.  As part of the review, we have analyzed and verified that the WACC formula operates within the KPX pricing and provides a fair market return on capital.  We also confirmed how the KPX pricing in place recognizes and accounts for the higher risk to return on investment associated with the GENCOs than that of their affiliated distributor, KEPCO, and accounts for this in the calculation of the adjusted coefficient.  We have also confirmed that the costs and other financial data submitted by the electricity generators to KPX and the differences in fuel types are also accounted for in KPX's adjusted coefficient.[74]  The fact that the GENCOS have a higher rate of return in relation to KEPCO is only one of many factors considered in our tier (iii) analysis.

The petitioners have also mischaracterized language cited from Korea Hydro & Nuclear Power Co., Ltd.'s 2018 Offering Circular.[75]  The same document also notes that the adjusted coefficient was revised upward in 2016 which contributed to an increase in revenue in 2016 as compared to 2015.[76]  We find that it is practical to assume that revenue will rise and fall with changes to the adjusted coefficient.  However, the petitioners present no other argument or support – based on the record information, the prevailing market conditions of the Korean electricity market, or the basis of how the adjusted coefficient is calculated – for their claim.  They focus solely on the fact that the adjusted coefficient does not allow the GENCOs to maximize profit.  They even go as far to say that "there is no evidence that the IPPs' prices and rates of return are artificially capped in the same way as the GENCOs."  While factually correct, certain IPPs are subject to an adjusted coefficient, which does not include a consideration of KEPCO's rate of return; in their profit maximization argument, the petitioners choose only to cast a line between the GENCOs' adjusted coefficient methodology and IPPs' prices and rates of return, without considering and addressing the rationale and nuance that exists in the Korean electricity market.[77]

---

clearly the only source available to consumers in the country, we normally will assess whether the government price was established in accordance with market principles.  Where the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser, we will assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.  We are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.  In our experience, these types of analyses may be necessary for such goods or services as electricity, land leases, or water, and the circumstances of each case vary widely.").

[73] See GOK's Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, 01/01/2017-12/31/2017 Administrative Review, Case No. C-580-884:  The Republic of Korea's Response to the Countervailing Duty Initial Questionnaire," dated March 25, 2019 (GOK's March 25, 2019 IQR) at Exhibit E-4; see also GOK Verification Report at 4-6.

[74] See Upstream Subsidy Analysis Memorandum at 8.

[75] See Petitioners Upstream Subsidy Brief at 16, footnote 31.

[76] See Petitioners' Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Petitioners' Allegation of Upstream Subsidies to Korean Steel Producers," dated April 29, 2019 at Exhibit 1.

[77] See GOK's Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, 01/01/2017-12/31/2017 Administrative Review, Case No. C-580-884:  The GOK's Response to the Upstream Subsidy Questionnaire," dated October 15, 2019 at 12 ("In principle, the adjusted coefficient factor is applied to all nuclear and coal-fired generation units in operation regardless of whether they are operated by KEPCO's wholly owned generation

The petitioners also misconstrue our statement in the Upstream Analysis Memorandum that KEPCO "will, if necessary reimburse the GENCOs for costs, even if the company is in a loss position."[78]  The petitioners' reliance on KEPCO's 20-F is misplaced, as the conditions articulated in KEPCO's 20-F[79] and our statement in the Upstream Analysis Memorandum are not similar.  First, the language from the 20-F pertains to situations where the GENCOs receive excessive profits.  As noted above, one of the functions of the adjusted coefficient for the GENCOs is to ensure a fair rate of return between the GENCOs and KEPCO. The statement in KEPCO's 20-F confirms this concept in that, if the GENCOs do receive excessive profits and KEPCO incurs a loss situation, the GENCOs must correct this imbalance.  This situation may be effectuated in many ways, one of which could be a modification to the adjusted coefficient.  The regulation described in the Upstream Analysis Memorandum has nothing to do with KEPCO's being in a loss situation while the GENCOs have received excessive profits.  Rather, the regulation merely states that the GENCOs' costs must be covered by KEPCO, even if KEPCO is in a loss position.[80]  Hence, KEPCO may not purchase electricity generated by the GENCOs at a price that does not fully cover the GENCOs' costs.  Again, the statement is not dispositive of market principles or used in determining adequate remuneration, but it is one of many factors that establish how the KPX price setting mechanism operates and other factors that may impact the Korean electricity market.  In this instance, the regulation, implemented in 2015, lays out how, and the extent to which, the GENCOs shall be compensated if KEPCO is in a loss position.[81]  We note that there is no record evidence that this situation existed in 2017, nor have the petitioners argued that it did.  Finally, the petitioners' arguments pertaining to the original investigation of the electricity for LTAR allegation is inapposite.  The original investigation covered calendar year 2014 and this regulation was implemented in 2015, one year later.  Moreover, KEPCO's pricing mechanism was based on cost, and a component of KEPCO's cost was the price paid for the electricity through KPX.[82]  So, it is not clear how this regulation invalidates our prior analysis, as it was demonstrated through record evidence in the

---

facilities or private independent power producers, and is set for the generators to receive just amount to recover all costs for generating electricity and a fair amount of investment calculated with the weighted average cost of capital formula (Exhibit USQ-24)") and 39-40 ("Adjusted coefficient is using the WACC formula and their cost (both variable and fixed) to generate electricity.  There is one more step taken for KEPCO's wholly owned generation facilities … additionally adjusted to keep the ratio between KEPCO's fair amount of investment return and KEPCO's wholly owned generation facilities' fair amount of investment return"); *see also* GOK Verification Report at 5 and 6 ("KPX officials provided the following formula to calculate the adjusted coefficient … KPX officials explained the KEPCO, GENCOs, and IPPs provide financial statements, budget and other financial information to the Market & System Development Department.  {Commerce} calculates the weighted average cost of capital (WACC) that is the return on investment (ROI) and included in the adjusted coefficients" and "We also observed the costs provided by the GENCOs and KEPCO used in the adjusted coefficient.").

[78] *See* Upstream Subsidy Analysis Memorandum at 8-9.

[79] *See* Petitioners Upstream Subsidy Brief at 18 (quoting the 20-F, "{T}he adjusted coefficient must be determined so that the price of electricity sold by our generation subsidiaries to us shall have the effect of ensuring a fair rate of return to us as a standalone entity, which means any imbalance caused by excessive profits taken by our generation subsidiaries to our loss must be corrected.").

[80] *See* Upstream Subsidy Analysis Memorandum at 8-9.

[81] *See* GOK Verification Report at 6 ("KEPCO will have to compensate the GENCOs for their costs, even if the company is in a loss position.") (citing GOK's August 12, 2019 Translation of Upstream Subsidy Questionnaire Response (QRT) at Exhibit 6 (Article 8.4.2.4.2)).

[82] *See HRS Final Determination* IDM at 23.

investigation that KEPCO fully covered its costs.[83]  KEPCO's costs and underlying methodology were also examined in this administrative review and no discrepancies were found.[84]

Finally, the petitioners argue Commerce should establish a tier (iii) benchmark in determining the extent of adequate remuneration in the Korean electricity market, and they cite *SC Paper* as support for this exercise.[85]  With regard to electricity, Commerce has normally conducted a tier (iii) analysis based on market principles.[86]  When Commerce has applied a tier (iii) benchmark, it has done so after first concluding that the government price is not consistent with market principles.[87]  With regard to *SC Paper*, Commerce determined the Nova Scotia electricity market applied market principles in setting tariffs under a tier (iii) analysis.[88]  However, the respondent's rate in the proceeding was established outside this general price setting structure and was determined not to be a market-determined price.[89]  Thus, an alternate was developed using a tier (iii) benchmark to determine the benefit.[90]  In this instance, the GOK has provided the requested information and it was verified.[91]  Our determination has fully examined the extent

---

[83] *Id.*

[84] *See* GOK Verification Report at 8.

[85] *See* Petitioners Upstream Subsidy Brief at 19-23.

[86] *See, e.g., Glycine from Thailand:  Final Negative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 84 FR 38007 (August 5, 2019) (*Glycine from Thailand*), and accompanying IDM at "1.  The Provision of Electricity at LTAR," and Comments 3 and 4; *Silicon Metal from Australia* at "1.  The Provision of Electricity for Less Than Adequate Remuneration"; *SC Paper* IDM at "12.  GNS Preferential Electricity Rate for Port Hawkesbury"; *Final Negative Countervailing Duty Determination:  Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago*, 67 FR 55810 (August 30, 2002), and accompanying IDM at "C. Provision of Electricity"; *Final Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 50410 (October 3, 2001), and accompanying IDM at "B. Provision of Electricity for Less Than Adequate Remuneration"; *Final Affirmative Countervailing Duty Determination:  Steel Wire Rod from Venezuela*, 62 FR 55014, 55021-22 (October 22, 1997); and *Final Affirmative Countervailing Duty Determination:  Steel Wire Rod from Trinidad and Tobago*, 62 FR 55003, 55006-07 (October 22, 1997) (*Steel Wire Rod from Trinidad and Tobago*).

[87] *See, e.g., Glycine from Thailand* IDM at "1.  The Provision of Electricity at LTAR," and Comments 3 and 4; *Cold-Rolled Steel from Russia* IDM at "1.  Provision of Natural Gas for LTAR"; *Uncoated Paper from Indonesia* IDM at "1.  Provision of Standing Timber for Less Than Adequate Remuneration"; *SC Paper* IDM at "12.  GNS Preferential Electricity Rate for Port Hawkesbury"; *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia:  Final Affirmative Countervailing Duty Determination*, 75 FR 59209 (September 27, 2010), and accompanying IDM at "1.  GOI Provision of Standing Timber for Less Than Adequate Remuneration"; *Laminated Woven Sacks from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances,* 73 FR 35639 (June 24, 2008), and accompanying IDM at "1.  Provision of Land for Less Than Adequate Remuneration"; *Final Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products from Thailand,* 66 FR 50410 (October 3, 2001*), and accompanying* IDM at "B. Provision of Electricity for Less Than Adequate Remuneration"; and *Steel Wire Rod from Trinidad and Tobago,* 62 FR at 55006-07.

[88] *See SC Paper* IDM at 47 ("As guided by the *CVD Preamble*, we continue to determine that under their normal rate setting philosophy, the NSUARB and NSPI set "above-the-line" rates in accordance with market principles for regulated monopolies when the cost-of-service method is employed (including the FAM).  These rates fully incorporate the costs of fuel, generation, transmission, and distribution.  Under this method of rate setting, there is a sufficient guaranteed rate of return to ensure future operations because all costs are covered, and, in order to ensure adequate investment, investors are guaranteed a rate of return on equity that is competitive with similarly risky investments available in the market").

[89] *Id.* at 48.

[90] *Id.*

[91] The GOK provided identical information on the record of the 2017 administrative review of certain corrosion-

that KPX's price setting mechanism is consistent with market principles and, thus, no further action is necessary to determine a benefit.

As Commerce has determined there is no benefit, the comments regarding financial contribution, specificity, and the application of the upstream subsidy methodology are moot.

**Comment 2:   Whether the Subsidy Rate for ITIPA Grants Was Improperly Calculated**

*Petitioners Case Brief*
- ITIPA is a single subsidy program.  Commerce deviated from its established calculation methodology for ITIPA grants by treating each individual grant as a separate program, and, thus, it preliminarily determined that the grants did not confer a benefit to Hyundai Steel.[92]
- Commerce's established practice, used in the previous review, is to divide the total value of the grants by the respondent's total sales.  Commerce should use this methodology here and find that the program conferred a measurable benefit that should be included in Hyundai Steel's subsidy rate.[93]

*Hyundai Steel Rebuttal Brief*
- The grants reported are not part of a single subsidy program as the petitioners argue, and they should not be treated as such.  In addition to 19 grants under ITIPA, Hyundai Steel received one grant under the Defense Acquisition Program Act (DAPA) and one grant under the Information and Communications Technology Industry Promotion Act (ICTIPA).[94]
- Further, companies apply for these grants with different government agencies and each grant is for a specific R&D project.[95]
- Even if Commerce chooses to sum up the grants, it should not include the grants not received under ITIPA, *i.e.*, grants received under DAPA and ICTIPA.[96]  Under this methodology, the calculation still would result in a benefit of less than 0.005 percent.[97]

---

resistant steel products from the Republic of Korea, and such information was verified in that proceeding.  *See* GOK Verification Report.
[92] *See* Petitioners Case Brief at 8-13.
[93] *Id.* at 8-13.
[94] *See* Hyundai Steel Rebuttal Brief at 10-11.
[95] *Id.* at 11; *see also* Hyundai Steel's Letter, "Certain Hot-Rolled Steel Flat Products from the Republic of Korea, Case No. C-580-884:  Response to Section III of Initial Questionnaire," dated April 2, 2019 (Hyundai Steel IQR) at 58-60 and Exhibit K-3.
[96] *Id.* at 12-13.
[97] *Id.*

*GOK Rebuttal Brief*
- Commerce's treatment of each ITIPA grant as a separate program is correct and consistent with its practice in other cases.[98]
- Each ITIPA program grant is different and independent in various aspects including its period, companies engaged, and the topic.  Therefore, Commerce should continue to treat each ITIPA R&D grant as a separate program.[99]

**Commerce's Position:**  Based on parties' arguments and upon reviewing prior cases, we have revised our calculation methodology for the ITIPA program.[100]  The *CVD Preamble* provides guidance in the context of the 0.5 test used for determining whether to allocate or expense non-recurring benefits over time.  The *CVD Preamble* states that "we will apply the 0.5 percent test to all benefits associated with a particular program, not each individual benefit, if there are more than one."[101]  Further, the *CVD Preamble* notes that Commerce will calculate an *ad valorem* subsidy rate by dividing the amount of the subsidy benefit by the sales value of the product or products to which the subsidy is attributed.[102]  In addition, when encountering similar situations in the past, Commerce rounded only the total program rates and not individual project rates or individual cross-owned company rates.[103]  Therefore, we summed the benefits from grants received during the POR and divided this total benefit by Hyundai Steel's total sales, rounded to four decimal places, resulting in an *ad valorem* rate of zero percent.[104]  We note that in *Corrosion-Resistant Flat Rolled Products from Korea*, Commerce determined that two of the three grants received by HYSCO were tied to non-subject merchandise, and we excluded those grants from the subsidy calculation.[105]  However, in the instant review, Hyundai Steel reported that the grants received were not tied to any particular product.[106]  Therefore, we did not exclude any of the ITIPA grants from our calculation.

With regard to the grants reported by Hyundai Steel under DAPA and ICTIPA,[107] for this administrative review, Hyundai Steel reported DAPA and ICTIPA as separate programs from ITIPA.  Nothing on the record of this administrative review contradicts Hyundai Steel's reporting that these are separate programs.  Therefore, we have not included these grants under the ITIPA program, but rather as separate R&D grants.  Using the same methodology described above, we calculated a separate rate each for DAPA and ICTIPA, which also resulted in *ad valorem* rates of zero percent.[108]

---

[98] *See* GOK Rebuttal Brief at 2.

[99] *Id.* at 2-3.

[100] *See e.g.*, *CORE Korea 2017 Final* IDM at Comment 2.

[101] *See CVD Preamble*, 63 FR at 65394.

[102] *Id.*, 63 FR at 65399.

[103] *See Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from India:  Final Affirmative Determination*, 81 FR 49932 (July 29, 2016), and accompanying IDM at Comment 5.

[104] *See* Memorandum, "Final Results Calculation for Hyundai Steel Company," dated concurrently with this Memorandum (Hyundai Steel Final Results Calculation Memorandum).

[105] *See Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 FR 55241 (September 10, 2013), and accompanying PDM at 19.

[106] *See* Hyundai Steel IQR at 58-60 and at Exhibit K-2, K-3, K-4 and K-5.

[107] *Id.* at 34.

[108] *See* Hyundai Steel Final Results Calculation Memorandum.

**Comment 3:   Whether the Tax Programs Under the RSLTA and RSTA Meet the Specificity Requirement**

*GOK Case Brief*

- Commerce's preliminary finding that the tax credit under RSLTA Article 78 is specific is erroneous.  The GOK has explained that the program is not regionally-specific as its purpose is to encourage investments into Korea regardless of its region.[109]

- The GOK did not limit benefits to enterprises located within designated geographical regions, but rather benefits are open to all enterprises in Korea except for those in a very small portion of territory, *i.e.*, the Seoul Metropolitan Area.  Enterprises in the Seoul Metropolitan Area are ineligible because that region is overcrowded.  Thus, this program is not countervailable.[110]

- With respect to tax credits under RSTA 25(2) and 25(3) preliminarily found to be *de facto* specific, Commerce's interpretation of "actual recipients are limited in number" in section 771(5A)(D)(iii)(I) of the Act is not in accordance with rulings by the United States Court of International Trade (CIT) or statements in the Statement of Administrative Action on the Agreement on Subsidies and Countervailing Measures (SAA).[111]

- For instance, the CIT has stated that discounts provided under the Voluntary Curtailment Adjustment program[112] were distributed to a large number of customers, across a wide range of industries, and this finding was based on information provided by the GOK that 190 customers received benefits.[113]  Commerce's interpretation of the phrase "actual recipients are limited in number" in section 771(5A)(D)(iii)(I) of the Act is not in accordance with the interpretation of the CIT.[114]

- In another instance, with respect to a tax program which allowed a deduction of 200 percent of training expenses from taxable income,[115] the CIT expressly took the opinion that the tax laws do not provide subsidies which are specific to the taxpayer if their terms are generally available.  The CIT rejected the broader rationale that, as a rule, generally-available benefits are not subsidies, and it recognized that the laws of taxation do not provide subsidies to the taxpayer unless the laws are selective in their terms or in their administration.[116]

---

[109] *See* GOK Case Brief at 6.  It appears the GOK unintentionally referred to RSLTA Article 26 in its arguments (the GOK states that it "has continuously explained that RSLTA Article 26 is not regionally specific in terms of its application.").  Given the title of the header of this argument ("RSLTA – Local Tax Exemptions on Land Outside Metropolitan Areas – Article 78:  Not regionally specific"), and the context of the argument, Commerce is treating this argument as it relates to RSLTA Article 78 only.

[110] *Id.*

[111] *Id.* at 6-7.

[112] *Id.* at 8, *see also Final Affirmative Countervailing Duty Determination:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 64 FR 73176 (December 29, 1999) (*Steel Plate from Korea*) (with regard to the Voluntary Curtailment Adjustment program).

[113] *See* GOK Case Brief at 8-11 (citing *Bethlehem Steel v. United States*, 140 F. Supp. 2d 1354 (CIT 2001)).

[114] *Id.*

[115] *Id.* at 8; *see also Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders; Certain Steel Products from South Africa*, 47 FR 39379, 39380 (September 7, 1982) (*Steel from South Africa*) (with regard to the Employee Training Program).

[116] *See* GOK Case Brief at 8 (citing *Bethlehem Steel v. United States*, 590 F. Supp. 1237 (CIT 1984)).

- The CIT has also implied that things such as public highways and bridges, as well as tax credits for expenditures on capital investment, if available to all industries and sectors, should not be determined to be *de facto* specific.[117]
- The SAA also implies that *de facto* specificity should not be found if the actual users of the program are too large in number to reasonably be considered a specific group. Thus, according to the SAA, Commerce needs to consider whether the number of enterprises or group of enterprises is small enough to be considered specific.[118]
- Based on the CIT's opinions above and the SAA, Commerce should not determine that the various RSTA tax credit programs are *de facto* specific by relying solely on the actual number of recipients, nor should it compare the number of recipients who used a program to the total number of tax returns filed.[119]

*Petitioners Rebuttal Brief*
- Commerce should follow established practice and continue to countervail tax programs under RSLTA and RSTA.[120]
- The GOK reported that there were no changes to any of the RSLTA or RSTA tax programs during the POR and did not provide any new information on the record to distinguish the facts of this proceeding from those in previous proceedings where Commerce has found these tax programs to be specific and countervailed them accordingly.[121]
- Commerce has already rejected similar arguments in other proceedings.[122]

**Commerce's Position:** We disagree with the GOK's contention that the RSLTA Article 78 program is not regionally-specific. Similar to *Coated Free Sheet Paper from Korea*[123] and *CTL*

---

[117] *Id.* at 9-11 (citing *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (CIT 1983)).

[118] *Id.* at 10.

[119] *Id.* at 10-11.

[120] *See* Petitioners Rebuttal Brief at 5-6.

[121] *Id.* at 6.

[122] *Id.* at 6 (citing *e.g.*, *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Affirmative Determination*, 80 FR 68842 (November 6, 2015), and accompanying PDM at 17-18, unchanged in *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015-2016*, 84 FR 11749 (March 28, 2019) (*CORE Korea 2015-2016 Final*); *Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, and Rescission of Review, in Part; 2017*, 84 FR 48107 (September 12, 2019) (*CORE Korea 2017 Prelim*), and accompanying PDM at 16-18, unchanged in *CORE Korea 2017 Final* IDM at Comment 3; *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, 2016*, 83 FR 51446 (October 11, 2018), and accompanying PDM at 16-18, 21, 23-24, unchanged in *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review, 2016*, 84 FR 24087 (May 24, 2019); *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2017*, 84 FR 60377 (November 8, 2019) (*CRS 2017 Prelim*), and accompanying PDM at 15-17, unchanged in *Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2017*, 85 FR 38261 (June 26, 2020) (*CRS 2017 Final*)).

[123] *See, e.g.*, *Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination,* 72 FR 60639 (October 25, 2007) (*Coated Free Sheet Paper from Korea*), and accompanying IDM at 12.

*Plate from Korea*,[124] we continue to find that this program is regionally-specific under section 771(5A)(D)(iv) of the Act. The GOK contends that the program does not limit benefits to enterprises located within designated geographical regions, but rather that benefits are open to all enterprises in Korea except for a very small portion of territory, *i.e.*, the Seoul Metropolitan Area. However, the geographical size of the landmass outside of the Seoul Metropolitan Area is not relevant to our decision, so long as the GOK designates that enterprises in a geographical region (*i.e.*, the Seoul Metropolitan Area) are excluded from these benefits. The percentage or respective size of land mass bears no relationship to regional specificity, or to the percentage of economic activities excluded under this program. Thus, we continue to find that the GOK established a designated geographical region to which this program is available, and that subsidies under RSLTA Article 78 are specific within the meaning of section 771(5A)(D)(iv) of the Act.[125]

Regarding the GOK's arguments concerning the *de facto* specificity determination made with respect to RSTA tax programs, namely, under RSTA Articles 25(2) and 25(3), section 771(5A)(D)(iii)(I) of the Act states that a subsidy is specific as a matter of fact if the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number. Further, section 771(5A) of the Act states that "any reference to an enterprise or industry is a reference to a foreign enterprise or industry and includes a group of such enterprises or industries." The SAA states that "{t}he Administration intends to apply the specificity test in light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy."[126] Therefore, in light of the SAA, the specificity provision in section 771(5A)(D)(iii)(I) of the Act is intended to capture those subsidies that are not broadly available and widely used throughout an economy. In order to determine whether these RSTA tax credits are broadly available and widely used throughout an economy as contemplated by the SAA, we examined the nominal number of recipients of these RSTA tax incentives, other than those determined to be either regionally-specific or *de jure* specific, and compared the actual number of the users of these RSTA tax incentives to the actual number of corporate tax returns.[127] On this basis, we find that these programs benefitted only a limited number of users, and, therefore, they are *de facto* specific.

The Voluntary Curtailment Adjustment Program in *Steel Plate from Korea* and the Employee Training Program in *Steel from South Africa*[128] are not applicable to this case. The SAA makes clear that when Commerce applies the *de facto* test, "the weight accorded to particular factors

---

[124] *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Final Results of Countervailing Duty Administrative Review; and Rescission of Countervailing Duty Administrative Review, in Part*, 83 FR 32840 (July 26, 2018) (*CTL Plate from Korea*), and accompanying IDM at 8.

[125] *See, e.g., LDWP from Korea Final* IDM at 37-38; *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Portland Hydraulic Cement and Cement Clinker from Mexico*, 48 FR 43063, 43065 (September 21, 1983); *see also* GOK's March 25, 2019 IQR at 23, 133-144; and *Preliminary Results* PDM at 11-12.

[126] *See* SAA at 929 (The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act …").

[127] *See* GOK's March 25, 2019 IQR at 133-144; *see also* PDM at 11-12.

[128] *See Steel from South Africa*, 47 FR 39383 at "II. Programs Determined Not To Be Bounties or Grants to Manufacturers, Producers, or Exporters of Certain Steel Products; D. Employee Training Programs."

23

will vary from case to case."[129]  The courts have long recognized that Commerce's *de facto* specificity analysis is fact-intensive and case-specific.[130]  Congress could have established a rigid formula or bright-line test to determine specificity, but it chose not to, given the fact-intensive nature of the inquiry, and the broad variety of circumstances under which subsidy programs operate.  The analysis pertaining to the Voluntary Curtailment Adjustment Program in *Steel Plate from Korea* and the Employee Training Program in *Steel from South Africa* are based on the facts on those records involving different programs.  Commerce cannot rely on the analysis of those determinations to determine whether a program in this case is *de facto* specific.  Rather, according to the facts on this record, we determine that this program is *de facto* specific because the recipients are limited in number.[131]

## Comment 4:  Whether the Trading of the DRR Program is Countervailable

*GOK Case Brief*
- Commerce should revisit its conclusion in the *Preliminary Results* that the Trading of DRR program is countervailable.[132]
- The payments under the DRR program come neither from the GOK nor any public entities; rather, KPX runs the program with money collected from electricity consumers.[133]
- The program is purely market-driven from its financial perspective, and the GOK or public entities do not make a financial contribution.[134]
- Any and all electricity users in Korea can participate in the DRR program as long as the relevant conditions are met, and the KPX has no discretion in determining which company will take the benefit.[135]
- Therefore, Commerce should find that payments under the DRR program do not constitute a financial contribution, nor is the program specific.  Thus, the program is not countervailable.[136]

*Petitioners Rebuttal Brief*
- Commerce should follow established practice and continue to countervail the DRR program.[137]
- The GOK reported that there were no changes to the DDR program during the POR and provides no new information on the record to distinguish the facts of this proceeding from previous proceedings where Commerce countervailed the program.[138]

---

[129] *See* SAA at 931.
[130] *See, e.g.*, *Geneva Steel v. United States,* 914 F. Supp. 563, 598 (CIT 1996) (*Geneva Steel*) (citing *PPG Industries, Inc. v. United States*, 928 F.2d 1568, 1577 (Fed. Cir. 1991) (*PPG I*), discussing *Cabot Corp. v. United States*, 620 F. Supp. 722, 732 (CIT 1985) ("A finding of *de facto* specificity requires a case by case analysis to determine whether there has been a bestowal upon a specific class.") (internal quotations omitted))).
[131] *See* GOK's March 25, 2019 IQR at 99-134; *see also Preliminary Results* PDM at 13-14.
[132] *See* GOK Case Brief at 2.
[133] *Id.* at 2-3.
[134] *Id.* at 3.
[135] *Id.* at 3-4.
[136] *Id.* at 2-4.
[137] *See* Petitioners Rebuttal Brief at 2-4.
[138] *Id.*

- Commerce has already rejected similar arguments that the GOK raised in other proceedings, and Commerce noted in those proceedings that Commerce had recently verified the program and continues to find it countervailable.[139]

**Commerce's Position:**  We disagree with the GOK and continue to find that this program is countervailable for the final results.  In its initial questionnaire response, the GOK provided the legal basis for the program as Article 31(5) of the Electricity Business Law and Chapter 12 of KPX's Rules on Operation of Electric Utility Market.[140]  Further, the GOK stated that the payments made by KPX are received from KEPCO.[141]  Commerce has previously found KEPCO and KPX to each be an "authority" within the meaning of section 771(5)(B) of the Act, and we continue to do so in this review.[142]  In *LDWP from Korea Final*, which covers the same 2017 period as the instant review, Commerce stated:

> While the GOK claims that there is no separate budget allocated by the GOK to operate this program and that the source of payments to the aggregators comes from the KPX, in the *Preliminary Determination*, we found that KEPCO pays KPX to administer this program through funds KEPCO collects from electricity consumers.  The GOK further reiterated during verification that funding for this program comes through KEPCO…
>
> Accordingly, because there is no information on the record regarding the source of the funds used by KPX to make payments to the aggregators other than information demonstrating that the funds are passed to KPX from KEPCO, and record evidence supports a continued finding that KEPCO and KPX are authorities, we continue to find that a financial contribution in the form of a direct transfer of funds from KPX is provided to companies participating in this program under section 771(5)(D)(i) of the Act, and that a benefit exists in the amount of the grant provided to Hyundai Steel and SeAH Steel in accordance with 19 CFR 351.504(a).[143]

In the instant review, the DRR program operated in the same manner, and there is no new information or different information with respect to this program on the record of this review.[144]  Therefore, we continue to find that KEPCO and KPX are authorities within the meaning of section 771(5)(B) of the Act, a financial contribution in the form of a direct transfer of funds from KPX is provided under section 771(5)(D)(i) of the Act, and a benefit exists in the amount of the grant provided in accordance with 19 CFR 351.504(a).  Further, we continue to find that the program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, as the actual recipients were limited in number.[145]

---

[139] *Id.* at 4.

[140] *See* GOK's March 25, 2019 IQR at Exhibits ENERGY-1, ENERGY-2, ENERGY-3, and ENERGY-4.

[141] *Id.* at 32; *see also Preliminary Results* PDM at 15.

[142] *See, e.g., Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review and Rescission of Countervailing Duty Administrative Review, in Part*, 82 FR 39410 (August 18, 2017), and accompanying IDM at 20; and *LDWP from Korea Final* IDM at 35.

[143] *See LDWP from Korea Final* IDM at 35-36.

[144] *See* GOK's March 25, 2019 IQR at Exhibits ENERGY-1, ENERGY-2, ENERGY-3, and ENERGY-4.

[145] *Id.* at 234-235; *see also CTL Plate from Korea* IDM at 7.

**Comment 5:   Whether the Modal Shift Program Confers a Countervailable Benefit**

*GOK Case Brief*
- The modal shift program was established pursuant to the GOK's environmental policy, and not for the GOK's economic interests.  The GOK conducted research and benchmarked programs in other countries before adopting this program.[146]
- Companies would not use this program if they only considered their economic interest. However, they choose to support the good of society and enhance environmental conditions at the expense of their economic interests.[147]
- The GOK compensates 30 percent of a company's research expenses to comply with the policy.[148]  This program does not provide any economic benefits.[149]
- It is not appropriate to conclude that the program provides a benefit to recipients given that they suffer from economic losses rather than receiving economic benefits.[150]
- According to the dictionary, the term "benefit" means "something that produces good or helpful results or effects or that promotes well-being.  Commerce should interpret the term "benefit" in section 771(5)(E) of the Act as implicitly embracing the meaning of "better off" in comparison to where no subsidies exist.[151]
- Hyundai Steel enjoyed partial compensation for the loss incurred in adhering to the national environmental policy and there was no benefit making Hyundai Steel "better off" than it would otherwise have been.  Therefore, Commerce should determine the program does not confer a countervailable benefit.[152]

*Petitioners Rebuttal Brief*
- Commerce should follow established practice and continue to countervail the Modal Shift program.[153]
- The GOK reported that there were no changes to the Modal Shift program during the POR and did not provide new information on the record to distinguish the facts of this proceeding from previous proceedings where Commerce countervailed this program.[154]

**Commerce's Position:**  As an initial matter, we note that the GOK has not disagreed that this program is intended to assist companies in recouping losses, which are incurred as a result of adhering to the GOK's transportation environmental policies.  Through its Sustainable Transport and Logistics Development Act, the GOK provides support to entities to promote a shift towards a greater use of environment-friendly means of transportation.[155]  Rather, the GOK argues that this program is not countervailable because it does not cover all the losses incurred and does not provide an additional benefit to companies that switch from truck to marine transport.  When determining whether an alleged program is countervailable, the Act directs Commerce to

---

[146] *See* GOK Case Brief at 5.
[147] *Id.* at 5.
[148] *Id.*
[149] *Id.*
[150] *Id.*
[151] *Id.*
[152] *Id.*
[153] *See* Petitioners Rebuttal Brief at 4-5.
[154] *Id.*
[155] *See* GOK's March 25, 2019 IQR at Exhibit MODAL-1 and MODAL-2.

determine whether there is a subsidy, *i.e.*, a financial contribution is conferred by an authority, which confers a benefit to the recipient, and that the subsidy is specific to an enterprise or industry.[156]  Further, the Act does not contemplate that the benefit determination should take into account any secondary effects, such as losses incurred.[157]

As described in the *Preliminary Results*, Commerce determined first whether the Modal Shift program met the criteria for a countervailable subsidy by analyzing whether it provided a financial contribution, was specific, and conferred a benefit to Hyundai Steel.[158]  The evidence on the record supports all three criteria, as discussed in the *Preliminary Results*.[159]  Therefore, because the GOK did not identify any evidence on the record which refutes our finding in the *Preliminary Results*, we continue to determine that this program is countervailable.

**Comment 6:   Whether Commerce Correctly Measured the Benefit for Port Usage Rights at Incheon Harbor**

In the *Preliminary Results*, Hyundai Steel reported receiving benefits from the provision of port usage rights at the Port of Incheon program.[160]  Commerce determined that the net subsidy rate for this program was not measurable.

*Petitioners Case Brief*
- Hyundai Steel reported the benefit the company received from its operation of the wharf at Incheon Harbor; this included berthing fees from shipping companies that used the wharf to ship merchandise to Hyundai Steel.[161]  However, Commerce should include in its benefit calculation income from certain fees Hyundai Steel did not receive, but had the right to receive and made the business decision not to.[162]
- Hyundai Steel ignores the fact that the only reason it was in the position not to collect certain income is because it acquired the right from the GOK to operate and use the port.  If Hyundai Steel was not the sole operator of the port, Hyundai Steel, or any other party using the port on behalf of Hyundai Steel, would be required to pay such fees.[163]
- With respect to income from third parties, Hyundai Steel receives a benefit by maintaining the right to collect certain fees, and this benefit does not disappear simply because Hyundai Steel decides not to collect such fees.  By using the port solely for its own shipments and not those of third parties, Hyundai Steel is choosing not to collect fee payments from third parties.  Regardless of whether Hyundai Steel actually collected

---

[156] *See* generally section 771(5) of the Act.
[157] *See CVD Preamble*, 63 FR at 65361 ("Section 771(5B)(D) of the Act treats the imposition of new environmental requirements and the subsidization of compliance with those requirements as two separate actions.  A subsidy that reduces a firm's cost of compliance remains a subsidy (subject, of course, to the statute's remaining tests for countervailability), even though the overall effect of the two government actions, taken together, may leave the firm with higher costs."); *see also* section 771(5)(C) of the Act (stating that Commerce is "not required to consider the effect of the subsidy in determining whether a subsidy exists").
[158] *See Preliminary Results* PDM at 16.
[159] *Id.*; *see also* GOK Verification Report at 8-9.
[160] *See Preliminary Results* PDM at 17.
[161] *See* Petitioners Case Brief at 3 (the specific name of the income in question is business proprietary information).
[162] *Id.* at 3-4.
[163] *Id.* at 4-5.

these fees, this income constitutes revenue forgone by the GOK and, thus, Commerce should account for it in the final subsidy rate calculations.[164]

- In the final results, Commerce should measure the amount of forgone income by multiplying the specific fee rate reported by Hyundai Steel by the volume of cargo shipped through Hyundai Steel's wharf at Incheon Harbor, as reported by the petitioners.[165]

*Hyundai Steel Rebuttal Brief*

- In the *Preliminary Results*, Commerce limited its benefit calculation under this program to berthing fee income.  Because Commerce found no measurable benefit from the provision of port usage rights at the Port of Incheon, Commerce did not examine the countervailability of the program.[166]
- The petitioners present an argument to include specific income that Hyundai Steel could have received in the benefit calculation for this program; however, the petitioners provide no basis for Commerce to apply facts available here.[167]  Commerce issued no deficiency questionnaire following Hyundai Steel's new subsidy allegation (NSA) SQR submission, nor did the petitioners file comments or raise any issues regarding that response.[168]
- The program alleged by the petitioners and initiated upon by Commerce stated that a benefit exists in the "amount of revenue forgone, to the extent that the value of Hyundai Steel's exemptions from port usage fees and direct reimbursements exceed the costs incurred by Hyundai Steel in constructing the port."[169]  Thus, this program links the receipt of a benefit from fee exemptions or reimbursements to whether they "exceed the costs incurred by Hyundai Steel in constructing the port."[170]
- Nowhere in the petitioners' brief do the petitioners demonstrate, or even argue, that these alleged "benefits" from this income that Hyundai Steel could have received resulted in the receipt of a benefit that exceeds the costs that Hyundai Steel incurred in constructing the Incheon Port.  Thus, the petitioners fail to allege the existence of any benefit under their own allegation that served as the basis for Commerce's initiation of this program.[171]
- Hyundai Steel reported that, although it had the right to collect specific income from third parties, it did not receive this specific income because no third parties used the port.[172]
- The petitioners misinterpreted Hyundai Steel's response and conflated its arrangement with its harbor operator.[173]
- Hyundai Steel's right to collect such fees is granted as a repayment of a debt and is not a grant or benefit provided to Hyundai Steel.  The CIT's decision in *Government of Sri Lanka v. United States* is instructive on the point that reimbursements of this kind are not benefits and, thus, are not countervailable.[174]

---

[164] *Id.*
[165] *Id.* at 6-8.
[166] *See* Hyundai Steel Rebuttal Brief at 3.
[167] *Id.*
[168] *Id.* at 10 (citing NSA SQR).
[169] *Id.* at 4.
[170] *Id.*
[171] *Id.*
[172] *Id.* at 5-6.
[173] *Id.*
[174] *Id.* at 7-10 (citing *Government of Sri Lanka v. United States*, 308 F. Supp. 3d at 1381).

**Commerce's Position:**  After examining the information on the record, for the final results, we find that Hyundai Steel received additional benefits under this program that are, as facts available, measurable.  Our analysis of the additional benefits is set forth below.

Hyundai Steel self-reported this program in its initial response to the CVD questionnaire.[175] Thereafter, the petitioners submitted an NSA related to this program; based on the allegation by the petitioners, Commerce initiated an investigation of this program.[176]

The GOK granted Hyundai Steel the right to operate and use the port of North Incheon for its own operations, as well to collect fees from shipping operators and third-party users.[177]  As part of its agreement with the GOK, Hyundai Steel reported that it was scheduled to recover its investment costs by obtaining income from two sources:  berthing income from shipping operators and "other" income from itself and third-party users through using and operating the North Incheon Harbor.[178]  Hyundai Steel reported the actual berthing fees it received from 2007 through 2017 from shipping operators.[179]

In the *Preliminary Results*, we first determined whether Hyundai Steel received a measurable benefit under this program.[180]  To calculate the program's benefit, we divided the POR berthing income by Hyundai Steel's total free on board (or FOB) sales value and determined a subsidy rate of less than 0.005 percent, *i.e.*, not measurable.[181]

Throughout this review, Hyundai Steel has maintained that, because third parties have not used North Incheon Harbor, Hyundai Steel has not collected any of the "other" income it was entitled to under its agreement with the GOK.[182]  The petitioners now argue that Commerce should factor this "other" income into Hyundai Steel's benefit calculation.[183]

We agree with the petitioners that Hyundai Steel received a benefit related to the "other" income that it was entitled to receive in connection with its own usage of the port.  As discussed in the Final Analysis Memorandum, we find that Hyundai Steel did receive a financial contribution because certain fees represent revenue forgone within the meaning of section 771(5)(D)(ii) of the

---

[175] *See* Hyundai Steel IQR at 58-60.

[176] *See* Memorandum, "New Subsidy Allegations," dated August 12, 2019 (NSA Memo) at 4.

[177] *See* NSA SQR at 1.

[178] *See* NSA SQR at 2 (referring to the "Revised Incheon Agreement," a revision to the North Incheon Harbor Agreement between Hyundai Steel and the GOK, which were provided in Exhibit NSA-2, and Exhibit NSA-1, respectively, in the NSA QR (*see* Hyundai Steel's Letter, "Certain Hot-Rolled Steel Products from the Republic of Korea, Case No. C-580-884:  Hyundai Steel New Subsidy Allegations Questionnaire Response," dated August 23, 2019 (NSA QR))).  The "other" income we note is proprietary information.

[179] *See* NSA QR at Exhibit NSA-3.

[180] *See Preliminary Results* PDM at 17.

[181] *See* Memorandum, "Countervailing Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Preliminary Results Calculations for Hyundai Steel Co., Ltd.," dated December 5, 2019 (Preliminary Calculations Memo) at 4 and at Attachment II.

[182] *See* NSA SQR at 4.

[183] *See* Petitioners Case Brief at 4.  Commerce discusses the petitioners' argument, and Hyundai Steel's rebuttal arguments, which are proprietary in nature, in the Final Analysis Memorandum.  *See* Hyundai Steel Final Results Calculation Memorandum.

Act.[184]  Further, we find that, because necessary information is not available on the record with respect to these fees, it is appropriate to calculate the benefit based on facts available, pursuant to section 776(a)(1) of the Act.  As facts available, therefore, we have determined that the benefit of this program should be measured using the fee reported by Hyundai Steel.[185]  We have applied this rate to the volume of cargo Hyundai Steel reported during the POR.[186]  When added to the reported berthing income, we determine that Hyundai Steel has received a measurable benefit from this program.

Hyundai Steel argues that this program should not be countervailed and that, even when using the benefit that the petitioners allege Hyundai Steel received, the benefit does not exceed the costs that Hyundai Steel incurred in constructing the port of North Incheon.[187]  Therefore, according to Hyundai Steel, Commerce should find that any benefit that Hyundai Steel received from this program during the POR is not measurable.

As we have explained above, we are determining that as adverse facts available, the program provides a financial contribution.  Further, consistent with prior proceedings, Commerce has treated this program as a recurring grant program and has determined that the benefit is equal to the amount of fees reported foregone during the POR.[188]

We disagree with Hyundai Steel that Commerce should compute the benefit using only income to Hyundai Steel which exceeded the cost of constructing the port of North Incheon.  For the reasons we have provided in past cases, Commerce has consistently not included an offset for the cost of constructing the port in its benefit analysis.[189]

We disagree with Hyundai Steel that, in general, these reimbursements are not benefits and, thus, are not countervailable.  The essence of this program is that the GOK helped Hyundai Steel build a port for its own use for a very long time.  The way the GOK provided the benefit for this program is through reimbursements as well as foregoing revenue that the GOK was entitled to

---

[184] *Id.*  As discussed above, we have relied on AFA to determine that this program provides a financial contribution and is specific.

[185] *See* NSA QR at Exhibit NSA-9.  Because Hyundai Steel has claimed business proprietary treatment for the nature of these fees, we are unable to discuss them here.  For further discussion, *see* Hyundai Steel Final Results Calculation Memorandum.

[186] *See* NSA SQR at Exhibit NSA2-1; *see also* Hyundai Steel Final Results Calculation Memorandum.

[187] Hyundai Steel reported its reimbursement schedule, which sets out the yearly projections for Hyundai Steel to recover its project costs through the collection of berthing and "other" income.  The petitioners calculated an "other" income estimated amount that is less than the amount of "other" income Hyundai Steel was projected to recover during the POR. Therefore, the record indicates that, even using the petitioners' calculated amount, the benefits did not yet exceed the cost incurred by Hyundai Steel in constructing the port.  *See* NSA QR at Exhibit NSA-2 at Appendices 7 and 8.

[188] *See e.g.*, *Notice of Final Results of Countervailing Duty Administrative Review:  Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea*, 72 FR 38565 (July 13, 2007) and accompanying IDM at 6-7 and Comment 1; *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Preliminary Results of Countervailing Duty Administrative Review; 2011*, 78 FR 55241 (September 10, 2013) and accompanying PDM at 11, unchanged *in Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2011*, 79 FR 5378 (January 31, 2014); and *Notice of Final Affirmative Countervailing Duty Determination:  Certain Cold-Rolled Carbon Steel Flat Products from the Republic of Korea*, 67 FR 62102 (October 3, 2002) and accompanying IDM at 20 and Comment 11.

[189] *Id.*

collect.  For that reason, no offsets to Hyundai Steel's benefit calculation for this program are warranted.  The facts in *Government of Sri Lanka v. United States* are in contrast to the facts in this review and are distinguishable.  In *Government of Sri Lanka v. United States*, the CIT characterized payments under the GPS program as interest-free repayment of a debt rather than "a direct transfer of funds," and it held that the payments constituted reimbursement of an interest-free debt that did not benefit the tire producer.[190]  In the *Tires Sri Lanka Final*,[191] we determined that the government's payments to the respondent were direct transfers of funds and countervailable in their full amount (treating the respondent's earlier payment of the "guaranteed price" to its producer as irrelevant).[192]  However, the CIT found that we had erroneously assessed the reimbursements in isolation from the GPS program because the tire producer was being required to provide the government an interest free loan by paying an above-market price for which it was later reimbursed.  The CIT concluded that Commerce ignored record evidence that the respondent received payment corresponding exactly to the above-market portion of its payment to the small-scale farmer, paid on behalf of the government.[193]

Further, we find that the Harbor Act program in this review is not comparable to the GPS program that the CIT analyzed in *Government of Sri Lanka v. United States*.  The two programs are distinguishable in the way that they work (*i.e.*, producer overpayment for an input in the *Tires Sri Lanka Final*, versus exemption of the usage fee, thereby granting Hyundai Steel free usage of the facility in the instant review) and, importantly, the type of benefit at issue (*i.e.*, a direct transfer of funds in the *Tires Sri Lanka Final* versus revenue forgone with regard to certain income in this program).  In *Government of Sri Lanka v. United States*, the CIT characterized the transaction at issue as resulting in a detriment, rather than a benefit, to the respondent in that case.[194]  In this review, however, there is no evidence on the record demonstrating that Hyundai Steel's building of a port, the GOK's subsequent assumption of ownership of the port, and Hyundai Steel's exemption from payment of port usage fees, resulted in a detriment to Hyundai Steel.  Therefore, Hyundai Steel's reliance on *Government of Sri Lanka v. United States* is inapposite and does not support its request that Commerce provide offsets to its benefit calculations.

Finally, we disagree with the petitioners that it is appropriate to include in the benefit calculation theoretical revenue that Hyundai Steel could have collected from other third parties.  The petitioners argue that the

> benefit Hyundai Steel receives by maintaining the right to collect {certain} income does not disappear simply because the respondent makes the business decision not to collect {other} income.  Instead, by using the port solely for its own shipments and not those of third parties, Hyundai Steel is choosing not to collect fee payments from third parties.  Regardless of whether Hyundai Steel actually collected these fees, this {other} income

---

[190] *See Government of Sri Lanka v. United States*, 308 F. Supp. 3d at 1381.
[191] *See Certain New Pneumatic Off-the-Road Tires from Sri Lanka:  Final Affirmative Countervailing Duty Determination, and Final Determination of Critical Circumstances*, 82 FR 2949, 2950 (January 10, 2017) (*Tires Sri Lanka Final*) and accompanying IDM.
[192] *See Tires Sri Lanka Final* IDM at Comment 4.
[193] *See Government of Sri Lanka v. United States*, 308 F. Supp. 3d at 1380-83.
[194] *Id.* at 1382.

constitutes revenue {forgone} by the GOK and, thus, should be accounted for in {Commerce's} benefit calculations.[195]

As noted above, Hyundai Steel self-reported the receipt of benefits through the collection of berthing income under the program during the POR in its initial questionnaire response.[196] Further, in response to questionnaires issued in connection with the NSA, Hyundai Steel again reported that berthing income was the only benefit it received under this program.  While Hyundai Steel acknowledged that it would have been entitled to receive "other" income as well, had other parties used the port, it stated that it did not actually receive such "other" income, and, thus, it had nothing to report.[197]  Commerce normally calculates benefits at the time of receipt. Because Hyundai Steel did not receive this additional income from third parties, there is no basis for Commerce to factor it into our subsidy calculation.  Additionally, Hyundai Steel states that it was entitled to receive this additional income from third-parties only, and that no third party used the port during the POR; therefore, the record indicates that there was no theoretical revenue for Hyundai Steel to collect.[198]

## Comment 7:   Whether the Suncheon Harbor Usage Fee Exemptions Under the Harbor Act Are Countervailable

*Petitioners Case Brief*
- In the *Preliminary Results*, Commerce determined that the Suncheon Harbor usage fee exemptions program was not used by Hyundai Steel.[199]
- Commerce should continue to countervail the Suncheon Harbor usage fee exemptions that Hyundai Steel reported that it received during the POR.[200]
- Commerce has previously rejected arguments by parties that this program is not countervailable, and it should continue to do so here.[201]

*Hyundai Steel Rebuttal Case Brief*
- Commerce clearly listed the Suncheon Harbor Usage Fees Exemptions program in the *Preliminary Results* section "Programs Preliminary Determined to be Not Used or Not to Confer a Measurable Benefit."  Commerce's calculations show that the benefits Hyundai Steel received from usage fee exemptions at Suncheon Harbor did not confer a measurable benefit.[202]
- The petitioners' brief contains no information or argument that would change Commerce's approach for the final results, and, thus, Commerce should continue to find the usage fee exemptions at Suncheon Harbor not measurable.[203]

---

[195] *See* Petitioners Case Brief at 4.
[196] *See* Hyundai Steel IQR at 58-60 and at Exhibit K-2, K-3, K-4 and K-5.
[197] *See* NSA QR at 1-2; *see also* NSA SQR at 3 and at Exhibit NSA-3.
[198] *See* NSA QR at 2.
[199] *See* Petitioners Case Brief at 14 (citing *Preliminary Results* PDM at 17-18; Preliminary Calculations Memo at 5-6).
[200] *Id.* at 14-15.
[201] *Id*.
[202] *See* Hyundai Steel Rebuttal Brief at 13 (citing *Preliminary Results* PDM at 17-18; and Preliminary Calculations Memo at 5-6).
[203] *Id.* at 14.

**Commerce's Position:**  We continue to find that the usage fee exemptions at Suncheon Harbor did not confer a measurable benefit to Hyundai Steel during the POR.  In the *Preliminary Results*, we listed this program under the section "Programs Preliminarily Determined to be Not Used or Not to Confer a Measurable Benefit," indicating that the programs included in the list either were not used or did not confer measurable benefits during the POR.[204]  In the calculations accompanying the *Preliminary Results*, we measured whether a measurable benefit existed under this program[205] and found that Hyundai Steel did not receive a measurable benefit under this program, *i.e.*, the calculated rate was less than 0.005 percent *ad valorem*.  Therefore, contrary to the petitioners' assertion, Commerce has found that Hyundai Steel did use this program, but it did not receive a measurable benefit during the POR.

### Comment 8:   Whether Hyundai Green Power is Hyundai Steel's Cross-Owned Input Supplier and Received Countervailable Benefits

*Petitioners Case Brief*
- Commerce should find that Hyundai Green Power is Hyundai Steel's cross-owned input supplier.  Hyundai Steel and Hyundai Green Power cannot operate independently of each other, as evidenced in public statements by Hyundai Steel.[206]
- Commerce relied on its findings regarding Hyundai Green Power and Hyundai Steel from past proceedings, but it should instead view the record of each administrative review as separate and distinct.[207]
- The record of this review establishes that Hyundai Green Power supplies approximately 55 percent of Hyundai Steel's power demand in Dangjin, thereby confirming that Hyundai Green Power is an input supplier to Hyundai Steel.[208]
- In similar contexts, Commerce has focused on the economic reality of transactions in which inputs are supplied indirectly from an input producer to a downstream producer.  Commerce should do the same here and treat Hyundai Green Power as an electricity *supplier*, irrespective of whether Hyundai Steel actually "purchased" electricity directly from Hyundai Green Power.[209]
- Commerce should find that Hyundai Green Power is Hyundai Steel's cross-owned input supplier and that the loans and equity infusions received by Hyundai Green Power constitute a countervailable benefit to Hyundai Steel.[210]
- The record demonstrates that Hyundai Green Power was not creditworthy at the time that some loans were provided.  Under normal circumstance Hyundai Green Power would not have received the terms provided for some of these loans.[211]
- The record clearly establishes that Hyundai Green Power received a benefit from the GOK-backed equity infusions.  Commerce has acknowledged that Korean government-

---

[204] *See Preliminary Results* PDM at 17-18.
[205] *See* Preliminary Calculations Memo at Attachment II (at "Various Other Grants").
[206] *See* Petitioners Case Brief at 18.
[207] *Id.* at 18-19.
[208] *Id.* at 20.
[209] *Id.*
[210] *Id.* at 15.
[211] *Id.* at 16-17.

33

owned entities are involved in equity infusions to Hyundai Green Power.  Based on the limited information reasonably available, the petitioners demonstrated that these equity infusions were likely made in a manner inconsistent with that of a normal private investor, and, thus, Commerce should reconsider its determination in the final results.[212]

*Hyundai Steel Rebuttal Brief*

- Hyundai Steel and Hyundai Green Power are not cross-owned, and, thus, the issue of any subsidies received by Hyundai Green Power are moot.

- The *Preliminary Results* are in accord with the final results of *CORE Korea 2015-2016 Final*,[213] in which Commerce concluded that there was no cross-ownership between Hyundai Steel and Hyundai Green Power.  The record in this proceeding demonstrates that Hyundai Green Power is not an input supplier to Hyundai Steel.[214]

- The record demonstrates that Hyundai Steel and Korea Midland Power are the largest minority shareholders in Hyundai Green Power, with each owning 29 percent of shares in Hyundai Green Power during the POR.[215]  Commerce has previously stated that the fact that both Hyundai Steel and Korea Midland Power own 29 percent of shares of Hyundai Green Power "undercuts the petitioner's claim that Hyundai Steel is able to exert control over Hyundai Green Power."  Hyundai Steel's ownership stake in Hyundai Green Power remains the same in this review, and, thus, Commerce's analysis holds.[216]

- Nothing in the public statements on the record demonstrate that Hyundai Steel has control over Hyundai Green Power.  Commerce has analyzed these statements both in this segment of the proceeding and in past segments and has not found them persuasive evidence that Hyundai Steel has control over Hyundai Green Power.[217]

- Hyundai Green Power is not an input supplier to Hyundai Steel because Hyundai Steel purchases its electricity from KEPCO. Even if Hyundai Green Power supplied 55 percent of the electricity used at the Dangjin facility, as the petitioners contend, Hyundai Steel still had to purchase this electricity at rates set by KEPCO for all consumers and it, therefore, did not receive any benefit by virtue of the electricity's being produced by Hyundai Green Power.[218]

- Electricity is the type of input that cannot be primarily dedicated to the production of subject merchandise, as required by 19 CFR 351.525(b)(6)(iv), and, thus, should not be considered an input product.[219]

- Hyundai Green Power is not a cross-owned input supplier to Hyundai Steel and no new information was presented by the petitioners on the record of this proceeding to cause Commerce to reach a different conclusion than in previous segments.  Moreover, Commerce did not state that it was relying on previous findings as suggested by the petitioners, but rather that its determination was consistent with previous findings.[220]

---

[212] *Id.* at 17.
[213] *See CORE Korea 2015-2016 Final.*
[214] *See* Hyundai Steel Rebuttal Brief at 18.
[215] *Id.* at 19.
[216] *Id.*
[217] *Id.* at 20.
[218] *Id.*
[219] *Id.* at 21.
[220] *Id.* at 21-22.

- In the NSA Memo and in the *Preliminary Results*, Commerce already determined that there is insufficient evidence on the record that the GOK provided countervailable subsidies to Hyundai Green Power through the provision of loans or equity infusions.[221]
- Commerce's regulations provide that "{i}n the case of firms not owned by the government, the receipt by the firm of comparable long-term commercial loans, unaccompanied by a government-provided guarantee, will normally constitute dispositive evidence that the firm is not uncreditworthy." Hyundai Green Power is not owned by the government and Hyundai Green Power has long-term commercial loans and had them in 2015, thereby demonstrating that it is not currently uncreditworthy and also was not uncreditworthy in 2015.[222]
- Hyundai Green Power has been profitable in every year since the start of its operations in 2010, and it has also made dividend payments to its shareholders over the 2011 – 2017 period.[223]
- While the petitioners indicate that Korean government-owned entities are involved in equity infusions to Hyundai Green Power, the mere involvement of government-owned entities does not establish the provision of a benefit.[224]
- The unit purchase price of Hyundai Green Power's shares is the same for all investors, whether private or government; therefore, the equity infusion is not inconsistent with usual investment practices.[225]

**Commerce's Position:** Consistent with prior segments of this proceeding and other proceedings, we continue to find that Hyundai Steel and Hyundai Green Power are not cross-owned. Under 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation in essentially the same way it can use its own assets. The regulation further states that the cross-ownership standard "normally" will be met "where there is majority ownership interest between two corporations or through common ownership of two (or more) corporations." The *CVD Preamble* further states that, in "certain circumstances, a large minority voting interest (for example, 40 percent) or a 'golden share' may also result in cross-ownership."[226] However, the *CVD Preamble* makes clear that the standard for finding cross-ownership is higher than the standard for finding affiliation and that a cross-ownership finding hinges on the ability of one party to have unilateral control over the other party's assets, including subsidy benefits:

> The underlying rationale for attributing subsidies between two separate corporations is that the interests of those two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same ways it can use its own assets (or subsidy benefits). The affiliation standard does not sufficiently limit the relationships we would examine to those where corporations have reached such a commonality of interests. Therefore, reliance upon the affiliated party definition would result in {Commerce} expending

---

[221] *Id.* at 14-15 (citing *Preliminary Results* PDM at 7-8); *see also* NSA Memo at 2-4.
[222] *See* Hyundai Steel Rebuttal Brief at 16.
[223] *Id.*
[224] *Id.* at 17.
[225] *Id.*
[226] *See CVD Preamble*, 63 FR at 65401.

unnecessary resources collecting information from corporations about subsidies which are not benefitting the production of the subject merchandise, or diluting subsidies more properly attributed to input producers by allocating such subsidies over the production of remotely related and affected downstream producers.  In response to the second comment, we note that varying degrees of control can exist in any relationship.

Therefore, we believe the more precise definition of cross-ownership that we have adopted in these Final Regulations is more appropriate.  Contrary to the assertions of the commenters, in limiting our attribution rules to situations where there is cross-ownership, we are not reading "affiliated" out of the CVD law – we simply do not find the affiliation standard to be a helpful basis for attributing subsidies.  Nowhere in the statute or the SAA is there any indication that the affiliated party definition was intended to be used for subsidy attribution purposes. . .  we do not intend to investigate subsidies to affiliated parties unless cross-ownership exists or other information, such as a transfer of subsidies, indicates that such subsidies may in fact benefit the subject merchandise produced by the corporation under investigation.[227]

We did not find cross-ownership between Hyundai Steel and Hyundai Green Power in the *Preliminary Results*,[228] which is consistent with our analysis detailed in our NSA Memo[229] and with our analysis conducted in other recent proceedings.[230]  Furthermore, the petitioners have not provided any new information on the record or demonstrated that Commerce has not considered all the record information that would require a change to our preliminary finding.

Further, while the petitioners point out information on this record that suggests that the GOK loans and equity infusions that created Hyundai Green Power may have conferred a benefit, that information does not affect our determination with respect to whether cross-ownership exists.  As noted above, the standard for finding cross-ownership is higher than the standard for finding affiliation, and only when the companies are found to be cross-owned will Commerce then consider the subsidies received by the cross-owned company and how they must be attributed.  Absent cross-ownership, we find the petitioners' arguments regarding subsidies received by these alleged cross-owned companies and any consequent attribution to be moot and, thus, they do not need to be addressed.  We will continue to evaluate new information in a subsequent administrative review regarding Hyundai Steel and Hyundai Green Power.

---

[227] *Id*.
[228] *See Preliminary Results* PDM at 7-8.
[229] *See* NSA Memo.
[230] *See CORE Korea 2017 Prelim* PDM at 9, unchanged in *CORE Korea 2017 Final*.

## X.    RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions. If accepted, we will publish the final results in the *Federal Register*.

⊠                              ☐

_____               _____
Agree                         Disagree


9/28/2020

X  _____

Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

**Attachment**

**Scope of the Order**

The products covered by this order are certain hot-rolled, flat-rolled steel products, with or without patterns in relief, and whether or not annealed, painted, varnished, or coated with plastics or other non-metallic substances.  The products covered do not include those that are clad, plated, or coated with metal.  The products covered include coils that have a width or other lateral measurement ("width") of 12.7 mm or greater, regardless of thickness, and regardless of form of coil (*e.g.*, in successively superimposed layers, spirally oscillating, *etc.*).  The products covered also include products not in coils (*e.g.*, in straight lengths) of a thickness of less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness. The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).  For purposes of the width and thickness requirements referenced above:

(1) where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the resulting measurement makes the product covered by the existing antidumping[231] or countervailing duty[232] orders on Certain Cut-To-Length Carbon-Quality Steel Plate Products from the Republic of Korea (A-580-836; C-580-837), and

(2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which:  (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by weight; and (3) none of the elements listed below exceeds the quantity, by weight, respectively indicated:

- 2.50 percent of manganese, or
- 3.30 percent of silicon, or
- 1.50 percent of copper, or
- 1.50 percent of aluminum, or
- 1.25 percent of chromium, or
- 0.30 percent of cobalt, or
- 0.40 percent of lead, or

---

[231] *See Notice of Amendment of Final Determinations of Sales at Less than Fair Value and Antidumping Duty Orders:  Certain Cut-to-Length Carbon-Quality Steel Plate Products from France, India, Indonesia, Italy, Japan and the Republic of Korea*, 65 FR 6585 (February 10, 2000).
[232] *See Notice of Amended Final Determinations:  Certain Cut-to-Length Carbon-Quality Steel Plate from India and the Republic of Korea; and Notice of Countervailing Duty Orders:  Certain Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, and the Republic of Korea*, 65 FR 6587 (February 10, 2000).

- 2.00 percent of nickel, or
- 0.30 percent of tungsten, or
- 0.80 percent of molybdenum, or
- 0.10 percent of niobium, or
- 0.30 percent of vanadium, or
- 0.30 percent of zirconium.

Unless specifically excluded, products are included in this scope regardless of levels of boron and titanium.

For example, specifically included in this scope are vacuum degassed, fully stabilized (commonly referred to as interstitial-free (IF)) steels, high strength low alloy (HSLA) steels, the substrate for motor lamination steels, Advanced High Strength Steels (AHSS), and Ultra High Strength Steels (UHSS).  IF steels are recognized as low carbon steels with micro-alloying levels of elements such as titanium and/or niobium added to stabilize carbon and nitrogen elements.  HSLA steels are recognized as steels with micro-alloying levels of elements such as chromium, copper, niobium, titanium, vanadium, and molybdenum.  The substrate for motor lamination steels contains micro-alloying levels of elements such as silicon and aluminum.  AHSS and UHSS are considered high tensile strength and high elongation steels, although AHSS and UHSS are covered whether or not they are high tensile strength or high elongation steels.

Subject merchandise includes hot-rolled steel that has been further processed in a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the hot-rolled steel.

All products that meet the written physical description, and in which the chemistry quantities do not exceed any one of the noted element levels listed above, are within the scope of this order unless specifically excluded.  The following products are outside of and/or specifically excluded from the scope of this order:

- Universal mill plates (*i.e.*, hot-rolled, flat-rolled products not in coils that have been rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, of a thickness not less than 4.0 mm, and without patterns in relief);
- Products that have been cold-rolled (cold-reduced) after hot-rolling;[233]
- Ball bearing steels;[234]

---

[233] For purposes of this scope exclusion, rolling operations such as a skin pass, levelling, temper rolling or other minor rolling operations after the hot-rolling process for purposes of surface finish, flatness, shape control, or gauge control do not constitute cold-rolling sufficient to meet this exclusion.

[234] Ball bearing steels are defined as steels which contain, in addition to iron, each of the following elements by weight in the amount specified:  (i) not less than 0.95 nor more than 1.13 percent of carbon; (ii) not less than 0.22 nor more than 0.48 percent of manganese; (iii) none, or not more than 0.03 percent of sulfur; (iv) none, or not more than 0.03 percent of phosphorus; (v) not less than 0.18 nor more than 0.37 percent of silicon; (vi) not less than 1.25

- Tool steels;[235] and
- Silico-manganese steels;[236]

The products subject to this order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers:  7208.10.1500, 7208.10.3000, 7208.10.6000, 7208.25.3000, 7208.25.6000, 7208.26.0030, 7208.26.0060, 7208.27.0030, 7208.27.0060, 7208.36.0030, 7208.36.0060, 7208.37.0030, 7208.37.0060, 7208.38.0015, 7208.38.0030, 7208.38.0090, 7208.39.0015, 7208.39.0030, 7208.39.0090, 7208.40.6030, 7208.40.6060, 7208.53.0000, 7208.54.0000, 7208.90.0000, 7210.70.3000, 7211.14.0030, 7211.14.0090, 7211.19.1500, 7211.19.2000, 7211.19.3000, 7211.19.4500, 7211.19.6000, 7211.19.7530, 7211.19.7560, 7211.19.7590, 7225.11.0000, 7225.19.0000, 7225.30.3050, 7225.30.7000, 7225.40.7000, 7225.99.0090, 7226.11.1000, 7226.11.9030, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.5000, 7226.91.7000, and 7226.91.8000.  The products subject to the order may also enter under the following HTSUS numbers:  7210.90.9000, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7214.99.0060, 7214.99.0075, 7214.99.0090, 7215.90.5000, 7226.99.0180, and 7228.60.6000.

The HTSUS subheadings above are provided for convenience and U.S. Customs purposes only. The written description of the scope of the order is dispositive.

nor more than 1.65 percent of chromium; (vii) none, or not more than 0.28 percent of nickel; (viii) none, or not more than 0.38 percent of copper; and (ix) none, or not more than 0.09 percent of molybdenum.
[235] Tool steels are defined as steels which contain the following combinations of elements in the quantity by weight respectively indicated:  (i) more than 1.2 percent carbon and more than 10.5 percent chromium; or (ii) not less than 0.3 percent carbon and 1.25 percent or more but less than 10.5 percent chromium; or (iii) not less than 0.85 percent carbon and 1 percent to 1.8 percent, inclusive, manganese; or (iv) 0.9 percent to 1.2 percent, inclusive, chromium and 0.9 percent to 1.4 percent, inclusive, molybdenum; or (v) not less than 0.5 percent carbon and not less than 3.5 percent molybdenum; or (vi) not less than 0.5 percent carbon and not less than 5.5 percent tungsten.
[236] Silico-manganese steel is defined as steels containing by weight:  (i) not more than 0.7 percent of carbon; (ii) 0.5 percent or more but not more than 1.9 percent of manganese, and (iii) 0.6 percent or more but not more than 2.3 percent of silicon.